# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> The City of New York, *a municipal entity*, Bill de Blasio, *as Mayor of the City of New York*, Louise Carroll, *Commissioner of New York City Department of Housing Preservation & Development,* and Jonnel Doris, *Commissioner of New York City Department of Small Business Services,* <br><br> *Defendants*. | Civ. No. 20-cv-5301 (RA) <br><br> **Oral Argument Requested** |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTIVE AND DECLARATORY RELIEF

**PATTERSON BELKNAP WEBB & TYLER LLP**
Stephen P. Younger
Alejandro H. Cruz
Hyatt M. Howard
Esther Y. Kim
Timothy H. Smith

1133 Avenue of Americas
New York, NY 10036
Telephone: 212-336-2685
Facsimile:  212-336-2222

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ...................................................................................3

    A.    Plaintiffs Built a Living from Their Properties..................................................3

    B.    New York State Becomes the Epicenter of the Pandemic .................................5

    C.    COVID-19's Impact on the New York City Real Estate Market ..........................5

    D.    New York State's Response to COVID-19 .................................................6

    E.    The City Council Passes the Laws Based on Speculation and Conjecture, Ignoring Less Restrictive Alternatives....................................................8

    F.    The Challenged Laws ................................................................10

    G.    The Harassment Laws Chill Plaintiffs' Commercial Speech ................................12

    H.    The Guaranty Law Destroys a Critical Remedy................................................14

    I.    Plaintiffs Face Potential Ruin of Their Businesses.................................................14

ARGUMENT .....................................................................................15

I.    Plaintiffs Are Likely to Succeed on Their Claims .................................................15

    A.    The Harassment Laws Violate the First Amendment ...........................................15

    B.    Plaintiffs Are Likely to Succeed on Their Contracts Clause Claim .....................23

    C.    Plaintiffs Are Likely to Succeed on Their Preemption Claims...........................28

II.    Plaintiffs Will Likely Suffer Irreparable Harm Without an Injunction ...........................32

    A.    Defendants' Constitutional Violations Establish *Per Se* Irreparable Harms ........32

    B.    Plaintiffs Have Independently Demonstrated Irreparable Harm ..........................33

III.    A Preliminary Injunction Is in the Public Interest .................................................34

CONCLUSION.......................................................................................34

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Int'l v. Healey,*
No. CV 20-10767-RGS, 2012 WL 2198366 (D. Mass. May 6, 2020) ....................................20

*Allen v. State of Minn.,*
867 F. Supp. 853 (D. Minn. 1994)........................................................................................33

*Ass'n of Equip. Mfrs. v. Burgum,*
No. 1:17-CV-151, 2017 WL 8791104 (D.N.D. Dec. 14, 2017),
*aff'd,* 932 F.3d 727 (8th Cir. 2019)......................................................................................33

*Ba Mar, Inc. v. Cty. of Rockland,*
164 A.D.2d 605 (2d Dep't 1991)...........................................................................................32

*Bad Frog Brewery, Inc. v. New York State Liquor Auth.,*
134 F.3d 87 (2d Cir. 1998)........................................................................................18, 20, 21

*Basank v. Decker,*
No. 20 CIV. 2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ...............................33

*Buffalo Teachers Fed'n v. Tobe,*
464 F.3d 362 (2d Cir. 2006)...........................................................................................23, 26

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980).......................................................................................................16, 20

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
868 F.3d 104 (2d Cir. 2017)......................................................................................17, 21, 22

*Chwick v. Mulvey,*
81 A.D.3d 161 (2d Dep't 2010)....................................................................................28, 29, 31

*Citizens Union of City of New York v. Attorney Gen. of New York,*
269 F. Supp. 3d 124, 140–41 (S.D.N.Y. 2017)......................................................................20

*DeAngelis v. El Paso Mun. Police Officers Ass'n,*
51 F.3d 591 (5th Cir. 1995) ..................................................................................................16

*DJL Rest. Corp. v. City of New York,*
96 N.Y.2d 91 (N.Y. 2001) ....................................................................................................28

*Dombrowski v. Pfister,*
380 U.S. 479 (1965)..............................................................................................................18

ii

# TABLE OF AUTHORITIES
## (continued)

**PAGE**

*Donohue v. Mangano*,
886 F. Supp. 2d 126 (E.D.N.Y. 2012) ...................................................................33

*Elmsford Apartment Assocs., LLC v. Cuomo*,
No. 20-CV-4062 (CM), 2020 WL 3498456 (S.D.N.Y. June 29, 2020) ....................24, 25, 27

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
459 U.S. 400 (1983).............................................................................................24

*Eng v. Smith*,
849 F.2d 80 (2d Cir. 1988)...................................................................................15

*Equip. Mfrs. Inst. v. Janklow*,
300 F.3d 842 (8th Cir. 2002) ...............................................................................26

*Eric M. Berman*, P.C. v. City of New York,
895 F. Supp. 2d 453 (E.D.N.Y. 2012),
*vacated in part*, 796 F.3d 171 (2d Cir. 2015) ....................................................25

*Evergreen Ass'n v. City of New York*,
740 F.3d 233 (2d Cir. 2014)..................................................................................33

*Five Star Dev. Resort Communities, LLC v. iStar RC Paradise Valley LLC*,
No. 09 CIV. 2085 (LTS), 2010 WL 1005169 (S.D.N.Y. Mar. 18, 2010)..................33, 34

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
85 F. Supp. 3d 577, 607 (D.P.R. Feb. 10, 2015), *aff'd*, 805 F.3d 322
(1st Cir. 2015), *aff'd,* 136 S. Ct. 1938 (2016)......................................................26

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ..............................................................................34

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007)...................................................................................32

*Hayes v. N.Y. Attorney Grievance Comm. of the Eight Judicial Dist.*,
672 F.3d 158 (2d Cir. 2012)..................................................................................20

*Home Bldg. & Loan Ass'n v. Blaisdell*,
290 U.S. 398 (1934)........................................................................................23, 27

*HRPT Prop. Tr. v. Lingle*,
715 F. Supp. 2d 1115 (D. Haw. 2010) ..................................................................25

*Jamal v. Kane*,
105 F. Supp. 3d 448, 457–58 (M.D. Pa. 2015) .....................................................16

iii

# TABLE OF AUTHORITIES
### (continued)

**PAGE**

*Kraebel v. New York City Dep't of Hous. Pres. & Dev.*,
  NO. 90-cv-4391, 1991 WL 84598 (S.D.N.Y. May 13, 1991), *aff'd in part,
  rev'd on other grounds*, 959 F. 395 (2d Cir. 1992)................................................................27

*Lansdown Entm't Corp. v. New York City Dep't of Consumer Affairs*,
  141 A.D.2d 468 (1st Dep't 1988), *aff'd*, 74 N.Y.2d 761 (1989) ...............................................31

*Majewski v. Broadalbin-Perth Cent. Sch. Dist.*,
  91 N.Y.2d 577 (1998) .....................................................................................................18

*Mejia v. Time Warner Cable Inc.*,
  No. 15-CV-6445 (JPO), 2017 WL 3278926 (S.D.N.Y. Aug. 1, 2017) ...............................16

*Minard Run Oil Co. v. U.S. Forest Serv.*,
  670 F.3d 236 (3d Cir. 2011)...........................................................................................34

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
  883 F.3d 32 (2d Cir. 2018)..............................................................................................15

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013)......................................................................................33, 34

*Nat'l Adver. Co. v. Town of Babylon*,
  900 F.2d 551 (2d Cir. 1990).............................................................................................20

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
  992 F.2d 430 (2d Cir. 1993)............................................................................................34

*One Wythe LLC v. Elevations Urban Landscape Design Inc.*,
  67 Misc. 3d 1207(A), 2020 WL 1917760 (N.Y. Civ. Ct. April 17, 2020) .............................18

*Ross v. City of Berkeley*,
  655 F. Supp. 820 (N.D. Cal. 1987)..............................................................................27, 28

*S. Cal. Gas Co. v. City of Santa Ana*,
  336 F.3d 885 (9th Cir. 2003) .....................................................................................24, 25

*Safelite Grp., Inc. v. Jepsen*,
  764 F.3d 258 (2d Cir. 2014)......................................................................................22, 23

*San Francisco Apartment Ass'n v. City & Cty. of San Francisco*,
  881 F.3d 1169 (9th Cir. 2018) ........................................................................................16

*Sanitation & Recycling Indus., Inc. v. City of New York*,
  107 F.3d 985 (2d Cir. 1997)......................................................................................23, 26

# TABLE OF AUTHORITIES
## (continued)

PAGE

*Seals v. McBee,*
    898 F.3d 587 (5th Cir. 2018) ........................................................................16, 19

*Sunrise Check Cashing & Payroll Servs., Inc. v. Town of Hempstead,*
    91 A.D.3d 126 (2d Dep't 2011), *aff'd sub nom.* 20 N.Y.3d 481 (2013).
    Significantly, in Executive Order 202.3 ...............................................30

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)..................................................................................17

*Sveen v. Melin,*
    138 S. Ct. 1815 (2018)........................................................................23, 27

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.,*
    307 F.3d 243 (3d Cir. 2002)......................................................................16

*U.S. Trust Co. of New York v. New Jersey,*
    431 U.S. 1 (1977)......................................................................................24

*U.S. v. Davila,*
    461 F.3d 298 (2d Cir. 2006).....................................................................18

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803 (2000)..................................................................................16

*Vives v. City of New York,*
    405 F.3d 115 (2d Cir. 2005).....................................................................19

*Vugo, Inc. v. City of New York,*
    931 F.3d 42 (2d Cir. 2019)..................................................17, 19, 20, 21

*W. Indian Co. v. Gov't of V. I.,*
    643 F. Supp. 869 (D.V.I. 1986),
    *aff'd,* 812 F.2d 134 (3d Cir. 1987).........................................................33

*Walsh v. City of River Rouge,*
    189 N.W.2d 318 (Mich. 1971)............................................................31, 32

*Wandering Dago, Inc. v. Destito,*
    879 F.3d 20 (2d Cir. 2018).......................................................................15

*Waste Mgmt. Holdings, Inc. v. Gilmore,*
    64 F. Supp. 2d 537 (E.D. Va. 1999) ........................................................26

*Wenner Media LLC v. N. & Shell N. Am. Ltd.,*
    No. 05 CIV. 1286 (CSH), 2005 WL 323727 (S.D.N.Y. Feb. 8, 2005) .................32

**TABLE OF AUTHORITIES**
(continued)

**PAGE**

*Winter v. Wolnitzek,*
    834 F.3d 681 (6th Cir. 2016) ....................................................................17

*Woodhull Freedom Found. v. United States,*
    948 F.3d 363 (D.C. Cir. 2020) .................................................................17

**Statutes**

28 U.S.C. § 2201 .............................................................................................1

42 U.S.C. § 1983 .............................................................................................1

N.Y. Exec. Law § 29-a............................................................................ *passim*

N.Y. Real Prop. Acts. Law § 770 .................................................................11

N.Y.C. Admin. Code § 22-902 ....................................................10, 17, 18, 19

N.Y.C. Admin. Code § 22-903 ......................................................................11

N.Y.C. Admin. Code § 27-2004 ...............................................................11, 18

N.Y.C. Admin. Code §§ 27-2005 ..................................................................11

N.Y.C. Admin. Code § 27-2115 .....................................................................11

Plaintiffs respectfully submit this memorandum of law in support of their motion for preliminary injunctive and declaratory relief, pursuant to Federal Rule of Civil Procedure 65, 28 U.S.C. § 2201 and 42 U.S.C. § 1983, which seeks to enjoin Defendants from enforcing, and to declare unconstitutional and preempted, New York City Local Law 53 of 2020 (the "Commercial Harassment Law"), Local Law 56 of 2020 (the "Residential Harassment Law") (together, the "Harassment Laws"), and Local Law 55 of 2020 (the "Guaranty Law") (collectively, the "Laws").

## PRELIMINARY STATEMENT

This case is about three New York City Laws, rushed to passage in the midst of the COVID-19 pandemic (the "Pandemic"), that run roughshod over the constitutional rights of New York City (the "City") property owners. Together, these widely sweeping Laws—the Commercial Harassment Law, the Residential Harassment Law, and the Guaranty Law—squelch Plaintiffs' ability to engage in lawful speech and extinguish Plaintiffs' contractual rights to enforce critical lease guaranties.

Plaintiffs Marcia Melendez and Ling Yang are entrepreneurs who built up modest real estate holdings through the sweat of their labors. They rent their properties to businesses and individuals, and depend on those rent collections to pay their taxes, mortgage obligations, and other expenses. The City's new Laws threaten Plaintiffs' livelihoods by shifting onto them the economic burden of tenants' unpaid rents. While the new Laws may have sincere intentions— *i.e.,* assisting certain New Yorkers impacted by the Pandemic—their extraordinary breadth and one-sided impact render them unconstitutional.

This Court should grant Plaintiffs' motion because these new Laws violate Plaintiffs' constitutional rights in two main ways.

1

*First,* the Harassment Laws infringe Plaintiffs' rights to free commercial speech by muzzling ordinary business communications with tenants, including lawful requests to collect unpaid rent. These speech restrictions fail First Amendment scrutiny because they: a) were passed based on pure speculation and conjecture and b) are far more extensive than necessary. Indeed, the Harassment Laws' extraordinary over-reach is shown by the fact that major retail and restaurant chains—such as Old Navy LLC, Gap Inc. and Sweetcatch Poke—have already sought their protection.

*Second,* the City's Guaranty Law re-writes Plaintiffs' contracts with their tenants, by forever stripping them of bargained-for remedies to enforce personal guaranties, thereby destroying the value of those leases for the period covered by this new Law. Extinguishing this crucial contractual remedy violates the Contracts Clause of the Constitution by improperly shifting these mounting economic burdens solely onto the backs of property owners for the benefit of tenants' special interests. Significantly, like the Harassment Laws, the Guaranty Law lacks any substantial injury requirement—an obvious less restrictive alternative—such that the Law is open to being invoked by well-capitalized commercial tenants.

*Additionally,* and equally important, all three Laws are preempted – under State law preemption doctrines – by acts of the New York State Legislature (the "Legislature"), which has both legislated in this field itself and granted New York's Governor, Andrew M. Cuomo, sweeping powers to address the COVID-19 crisis that conflict with the City's Laws. In contrast to these new local Laws, New York State has acted in a measured and even-handed way to address the serious landlord-tenant issues that have arisen from the Pandemic.

While it is well-settled that Plaintiffs are entitled to a presumption of irreparable harm on their First Amendment and Contracts Clause claims, Plaintiffs also demonstrate irreparable

harm—separate and apart from these constitutional violations—because the enforcement of these Laws against Plaintiffs creates a substantial risk that their businesses will be ruined beyond monetary repair. An injunction, moreover, is in the public interest because enforcement of an unconstitutional law is always contrary to the public interest, and these Laws pose a substantial threat to the City's property tax revenues. Accordingly, this Court should enjoin enforcement of each of the unconstitutional Laws.

## STATEMENT OF FACTS

A.   <u>Plaintiffs Built a Living from Their Properties</u>

Plaintiff Marcia Melendez ("Ms. Melendez") owns two properties in Brooklyn through Plaintiffs Jarican Realty Inc. and 1025 Pacific LLC (the "Melendez Companies" and together with Ms. Melendez, the "Melendez Plaintiffs"). (Melendez Decl. ¶¶ 3-6) Originally from Jamaica, Ms. Melendez immigrated to the U.S. at the age of 17. (*Id.* ¶ 7) In or around 1983, she started a flower shop, which she later extended into a landscaping business with her husband. (*Id.* ¶ 9) Ms. Melendez and her husband thereafter funded the purchase of the two properties they own in Brooklyn. (*Id.* ¶¶ 10, 12) In 2000, they bought their first property located at 547 Nostrand Ave., Brooklyn, New York, scraping together the funds for the down payment, and taking out loans to fund extensive renovations.[1] (*Id.* ¶¶ 10–11) In 2016, Ms. Melendez and her husband invested in the purchase of the second Brooklyn property located at 283 East 55th St. (*Id.* ¶ 12)

In 2017, Ms. Melendez and her husband retired. (*Id.*) Ms. Melendez and her husband rely on the rent payments from their two properties to fund their retirement, in addition to some income from Ms. Melendez's part-time work as a real estate broker and social security benefits.

---

[1] In 2004, Jarican Realty Inc. became the record owner of 547 Nostrand Ave., Brooklyn, New York.

(*Id.* ¶¶ 13–14) They also rely on this rent revenue to pay various tax and mortgage obligations on the properties, as well as to fund maintenance on the properties. (*Id.* ¶¶ 15–18)

Plaintiff Ling Yang ("Ms. Yang") and her son own two properties in Queens, New York through Haight Trade LLC and Top East Realty LLC ("Yang Companies" and together with Ms. Yang, the "Yang Plaintiffs"). (Yang Decl. ¶¶ 3-6) Ms. Yang is originally from the People's Republic of China, where she was a successful businessperson. (*Id.* ¶¶ 7-8) But in 1994, she decided to immigrate to the United States after experiencing the Cultural Revolution and the Chinese government's actions which caused the ruin of individual businesses. (*Id.* ¶¶ 8-9)

Ms. Yang arrived in the United States with very little money, and unable to speak, read or write English. (*Id.* ¶ 10) For years, she worked hard to support herself and her family. (*Id.* ¶ 11) She was employed as a housekeeper, as a nanny, in restaurants, at a clothing factory, and in food delibery. (*Id.*) In 2002, she started and invested in small businesses using the savings she accumulated through her jobs and the assets from her former life in China. (*Id.* ¶¶ 12-14)

In 2012, Ms. Yang invested in the purchase of the property located at 4118 Haight St., Flushing, New York. (*Id.* ¶ 15) Several years later, she invested in the purchase of a second property located at 4059 College Point Blvd., Flushing, New York. (*Id.* ¶ 16) Ms. Yang funded these purchases with money from the sale of her assets in China, and her life savings. (*Id.* ¶ 17)

The Yang Companies are not yet profitable: all of the rent payments need to be dedicated to pay various tax and mortgage obligations, plus expenses related to maintaining the two buildings. (*Id.* ¶¶ 19-23) Ms. Yang does plan to support herself and her family after her retirement from the rent payments once more of the mortgage loans are satisfied. (*Id.* ¶ 23)

The Yang Companies require all their commercial tenants to provide personal guaranties in order to secure their commercial leases. (*Id.* ¶ 31) For example, the lease agreement with their

commercial tenant, Home Décor Expo, is personally guaranteed by its principal. (*Id.* ¶ 30) Absent a personal guaranty, the risk of having a small business (with few assets) as a tenant would be so great as to be prohibitive, and the Yang Companies would not be able to enter into leases with small businesses. (*Id.*)

B.     New York State Becomes the Epicenter of the Pandemic

In December 2019, the highly infectious novel coronavirus called COVID-19 was first detected in China. (Younger Decl. ¶ 2) By March 2020, New York State had become the epicenter of the United States outbreak. (*Id.* ¶ 4) As of July 21, 2020, New York continues to have the highest number of confirmed cases and related deaths of any State. (*Id.* ¶ 5)

C.     COVID-19's Impact on the New York City Real Estate Market

COVID-19's impact goes well beyond public health; it has also severely disrupted everyday business and economies across the world, within the United States and around New York State—especially real estate markets. (*Id.* ¶¶ 7-17) Surveys indicate that landlords are unable to collect rent from numerous commercial tenants. In New York, some commercial landlords report failing to receive rent from as much as 80% of their commercial tenants. (*Id.*, Ex. 3 at 1) Many commercial tenants who fail to pay rent have the financial ability to pay the rent, such as Old Navy LLC, Gap Inc., Victoria's Secret Stores LLC, Bath & Body Works LLC, and Sweetcatch Poke. (*Id.* ¶¶ 14-16, 73) These types of well-financed tenants have already invoked the Commercial Harassment Law as a reason to avoid making rent payments. (*Id.* ¶¶ 14-15, 73)

Many property owners across New York are or will soon be in financial distress. The precipitous decline in their rental income has threatened the ability of many landlords—including Plaintiffs—to pay their own bills, such as taxes, mortgages, maintenance expenses and employee

5

salaries. (Melendez Decl. ¶ 30; Yang Decl. ¶ 37) Nevertheless, many property owners, including Plaintiffs, are assisting distressed tenants by offering rent concessions. (Younger Decl. ¶ 10). For example, in Brooklyn, approximately 20% of commercial tenants have received a rent concession each month since March 2020. (*Id.*)

Real estate taxes account for more than half of the City's tax revenue. (*Id.*, Ex. 13 at 8) If New York City property owners—like Plaintiffs—are unable to generate enough revenue to pay those taxes, the City will be starved of an enormous revenue stream that helps pay for an array of critical public services. (*Id.* ¶¶ 20-21)

The Melendez Companies owe City property tax obligations for their two properties in Brooklyn. (Melendez Decl. ¶ 16) For the period January 1–June 30, 2020, these obligations total over $20,500. (*Id.*) But during March–June 2020, they incurred losses of thousands of dollars due to their inability to collect full rent payments from their tenants. (*Id.* ¶ 30) As a result, the Melendez Companies have been unable to pay their full property tax obligations. (*Id.*)

The Yang Companies have tax and mortgage obligations for their two properties, which total approximately $32,000 per month. (Yang Decl. ¶ 20) Both of the Yang Companies have incurred losses of approximately $100,000 as a direct consequence of their commercial tenants' failure to pay their full rent owed during March–July 2020. (*Id.* ¶ 36) If rent payments drop further, they may face difficulty paying their January 2021 property taxes. (*Id.* ¶ 37)

D.    New York State's Response to COVID-19

1.    *New York State Legislature's Amendment of Section 29-a*

New York State has taken extensive, but tailored, measures to address the Pandemic. In March 2020, the Legislature expanded Governor Cuomo's emergency powers under Section 29-a of the New York Executive Law, amending this statute to allow the Governor: a) to "*issue any directive during a state disaster emergency declared*" in an "*epidemic[] [or] disease outbreak*

. . . ." and b) to "provide for procedures reasonably necessary to enforce such directives." N.Y.

Exec. Law § 29-a (emphasis added) This amendment currently expires on April 30, 2021. (*Id.*)

        2.     *Governor Cuomo's Response to COVID-19*

On March 7, 2020, using these newly conferred powers, Governor Cuomo declared a

state of disaster emergency for the entire State of New York due to COVID-19. (*Id.*, Ex. 17)

Governor Cuomo also directed in Executive Order 202.3 that no city issue any orders that

conflict with or supersede any of his executive orders and suspended any local orders,

administrative codes, laws or regulations that are "different" from or "in conflict with" any of the

Governor's directives. (*Id.*, Ex. 18) Then, to mitigate the economic impact of COVID-19 on both

landlords and tenants alike, and the real estate industry more broadly, Governor Cuomo issued

Executive Orders Nos. 202.8, 202.28, and 202.48. (*Id.* ¶¶ 36-37, 39-41, 43) These gubernatorial

orders provide for, among other things: a) a moratorium on tenant evictions, b) a requirement

that landlords provide certain rent relief to tenants if they face financial hardships due to

COVID-19, and c) a temporary prohibition against demands for payment of fees or charges for

late payments of rent. (*Id.* ¶¶ 37, 39, 41-43) Recently, because of the protections afforded to

tenants under New York State's Tenant Safe Harbor Act (the "TSHA"), Governor Cuomo issued

an executive order rescinding his eviction moratorium as to residential tenants, but that order

continues to apply to commercial tenants, further evincing a carefully circumscribed approach.

(*Id.*, Ex. 25 at 2) Notably, much of the relief extended under these directives is restricted to those

New Yorkers who have suffered substantial injuries.  Importantly, the Governor's orders are

evenhanded in that they impact both tenants and landlords.[2]

---

[2] New York State also launched the New York Forward Loan Fund, a loan program aimed at providing working capital loans to small businesses, including small landlords. (Younger Decl. ¶¶ 49-50)

### 3.    Recent Legislation in Response to COVID-19

The Legislature also recently passed two statutes to provide relief to both landlords and residential tenants: the Emergency Rent Relief Act of 2020 ("ERRA") and the TSHA. (*Id.* ¶¶ 45-46) The ERRA makes rental assistance vouchers available to landlords on behalf of those tenants who have experienced an increase in their rent burdens between April 1 through July 31, 2020 because of a loss in income due to COVID-19. (*Id.*, Ex. 26) The TSHA prevents a court from issuing a warrant of eviction for any residential tenant or occupant that has experienced "financial hardship" for nonpayment of rent that accrues from March 7, 2020 until the Governor's executive orders on non-essential gatherings expire. (*Id.*, Ex. 27)  The TSHA explicitly recognizes the power of courts to grant landlords money judgments so that they can recover back rents.  (*Id.*)

### E.    The City Council Passes the Laws Based on Speculation and Conjecture, Ignoring Less Restrictive Alternatives

On May 13, 2020, the New York City Council ("Council") passed its own local laws, which, *inter alia*, purported to focus on the impact of the Pandemic on the real estate industry, including the Harassment Laws and the Guaranty Law challenged here. (*Id.* ¶¶ 51-52) These Laws are phrased in terms that cover broad swaths of the City, including those who can afford to weather the crisis. They thus seek to shift the economic burden wrought by COVID-19 on the real estate industry entirely onto the backs of landlords. As the Council Speaker explained, "[i]t's essential that New Yorkers get the rent cancellation they need. . . ." (*Id.*, Ex. 32 at 1)

All three Laws were introduced a mere three weeks before their passage, with minimal time for consideration and review. (*Id.* ¶ 52) The Council's hearings on these Laws provided only a patchwork record of vague and anecdotal evidence, which failed to justify the Laws. (*Id.* ¶¶ 55–58) One hearing witness claimed, with no corroborating evidence, that her organization

had merely been "hearing" anecdotes of supposed harassment by landlords who believed their tenants have lost income. (*Id.*, Ex. 33 at 63) Another witness reported receiving "one call" about residential harassment by the tenant's roommate—not by the tenant's landlord—which was allegedly related to COVID-19. (*Id.*, Ex. 33 at 128) And, since the outbreak of COVID-19, the New York City Department of Housing Development and Preservation ("HPD") reported that the majority of harassment claims it received concerned heat or hot water, without a single mention of a harassment claim involving "threatening" speech. (*Id.*, Ex. 33 at 97)

The hearings, moreover, revealed that pre-existing laws already addressed some of the purported problems that the Laws sought to remedy. (*Id.* ¶ 59) Notably, a City official testified that "several of the protections contemplated in [the Residential Harassment Law] already exist" in "the City Human Rights Law and the Housing Maintenance Code." (*Id.*, Ex. 33 at 98–99)

The hearings also made clear that the Council ignored the impact that the Laws would have (and that the Pandemic itself already had) on the City's property owners. (*Id.* ¶ 59) A tenant organization testified that property owners—who were acknowledged to be mostly "small landlords who own one or two buildings"—will have to contend with "tenants who can pay but who are [nonetheless] going to withhold rent out of solidarity." (*Id.*, Ex. 33 at 40, 44) And a City Council Member warned that the Guaranty Law "may end up helping Louis Vuitton as much as it helps Louise'[s] pizza." (*Id.*, Ex. 31 at 37)

Some Council members openly challenged the bills' proposed approaches and offered alternatives which went ignored. (*Id.* ¶ 60) One Council member noted that the Guaranty Law was unconstitutional because "the city cannot retroactively adjust, amend a contract that was entered into by two parties at arm's length . . . [e]mergency or not." (*Id.*, Ex. 34 at 89) Another questioned if it made "more sense to have the state come up with a fund to pay for [] rent, just

like Delaware." (*Id.*, Ex. 33 at 51) But this alternative went nowhere (although New York State has since adopted a similar policy as a statewide measure). Rather than consider less burdensome and constitutional alternatives, the Council charged headlong to approve the Laws.

The committee reports for the Laws are similarly devoid of any meaningful consideration of ways to tailor the Laws' prohibitions to focus on a problem worthy of legislative relief. (*Id.* ¶¶ 62–64) The analyses behind these new Laws merely summarize the terms of the Laws. (*Id.* ¶ 64) Nowhere do these reports contain any analytical support for the legislation such as with empirical data tailored to the purported problems. Furthermore, those reports confirm that the Council failed to consider less burdensome alternatives to the proposed measures. (*Id.* ¶ 64)

On May 26, 2020, Mayor de Blasio signed the three bills into law in a ceremony that ignored the over-reach of the Laws' scope. (*Id.* ¶ 65)

F.      The Challenged Laws

1.      *The Commercial Harassment Law*

N.Y.C. Administrative Code Section 22-902 already prohibits commercial tenant harassment. It provides, in relevant part, that such harassment includes:

> any act or omission by or on behalf of a landlord that (i) would reasonably
> cause a commercial tenant to vacate covered property, or to surrender or
> waive any rights under a lease or other rental agreement or under
> applicable law in relation to such covered property, and (ii) includes . . .
> threatening a commercial tenant based on [a protected characteristic.]

N.Y.C. Admin. Code § 22-902(a). The term "threatening" is nowhere defined in the Law. Section 22-902's anti-harassment prohibitions may be enforced through a private cause of action created for tenants. *Id*. § 22-903.

The Commercial Harassment Law broadly extends Section 22-902's harassment protections to a wide range of tenants who have either: 1) "status as a person or business impacted by COVID-19," a status defined in expansive terms; or 2) "recei[ved] a rent concession

or forbearance for any rent owed during the COVID-19 period."[3] (Younger Decl., Ex. 28)

Violations of this new Law are punishable by a civil penalty of between $10,000 and $50,000.

N.Y.C. Admin. Code § 22-903(a). Plaintiffs may also recover attorneys' fees and punitive

damages. *Id.* § 22-903(a)(3).

>    2.    *The Residential Harassment Law*

Section 27-2004(a)(48) similarly protects a sweeping range of residential tenants from

harassment, defined as:

> any act or omission by or on behalf of an owner that (i) causes or is intended
> to cause any person lawfully entitled to occupancy of a dwelling unit to vacate
> such dwelling unit or to surrender or waive any rights in relation to such
> occupancy, and (ii) includes . . . threatening any person lawfully entitled to
> occupancy of such dwelling unit based on [a protected characteristic].

N.Y.C. Admin. Code § 27-2004(a)(48). This provision may be enforced by the City through

HPD, *see* N.Y. Real Prop. Acts. Law § 770, or more typically, through a private cause of action,

N.Y.C. Admin. Code §§ 27-2005(d), 27-2115(h)(1).

The Residential Harassment Law broadly extends this protection to tenants who have: 1)

"actual or perceived status as an essential employee," 2) "status as a person impacted by

COVID-19," or 3) "recei[ved] a rent concession or forbearance for any rent owed during the

COVID-19 period." (Younger Decl., Ex. 30) Violations of this new prohibition are punishable

by a civil penalty of $2,000 to $10,000. N.Y.C. Admin. Code § 27-2115(m)(2). In addition,

plaintiffs may recover attorneys' fees and punitive damages. *See id.* §§ 27-2005(d), 27-

2115(h)(1), 27-2115(o).

---

[3] The COVID-19 period for both Harassment Laws is defined as starting on March 7, 2020 and ending no
sooner than September 30, 2020 and potentially as long as Governor Cuomo's commercial eviction
moratorium lasts.

The two Harassment Laws would potentially cover at least tens of thousands of businesses and over a million individuals in the City, if not more, without regard to whether they were seriously injured by the Pandemic. (Younger Decl. ¶¶ 67–83)

       3.     *The Guaranty Law*

The Guaranty Law prevents landlords from holding natural person guarantors liable for a tenant's obligations if the tenant: 1) under the Governor's Executive Order 202.3, had to stop serving patrons food or beverage on premises or otherwise had to cease operations; 2) was a non-essential retail business owner subject to in-person limitations under Executive Order 202.6; or 3) was among a class of businesses (like cosmetologists and barber shops) that had to close to the public under Executive Order 202.7. N.Y.C. Admin. Code § 22-1005; (*see also* Younger Decl. ¶¶ 32–34, 85). If a tenant meets any of these conditions and has defaulted or otherwise become liable under its lease between March 7 and September 30, 2020, the landlord is forever prohibited from enforcing the personal guaranty. N.Y.C. Admin. Code § 22-1005. This Law also prohibits attempts to enforce such personal guaranties as "harassment." *Id.*

As with the Harassment Laws, the Guaranty Law contains no substantial injury requirement for businesses to invoke its protections and it thus sweeps numerous businesses under its protections, regardless of whether they merit such relief. (Younger Decl. ¶ 86) The stated objective of this Law is "so that city business owners don't face the loss of their businesses and also personal bankruptcy." (*Id.*, Ex. 34 at 11–12)

    G.    <u>The Harassment Laws Chill Plaintiffs' Commercial Speech</u>

Prior to the passage of the Harassment Laws, the Melendez Plaintiffs communicated from time-to-time with delinquent tenants concerning their unpaid rent. (Melendez Decl. ¶¶ 21, 25) One residential tenant in their property at 283 East 55th St. in Brooklyn failed to make timely

rent payments starting in November 2019. (*Id.* ¶ 20) As a result, before the COVID-19 outbreak, the Melendez Plaintiffs sent this delinquent tenant notices of late rent and sought to recover the unpaid rent in Housing Court in accordance with their normal practices. (*Id.* ¶ 21) They further sought to evict this delinquent tenant before Governor Cuomo's March 20, 2020 eviction moratorium took effect. (*Id.* ¶ 22) As a result of that moratorium, however, this tenant still remains in the premises. (*Id.*) Although this residential tenant has since paid a portion of the rent owed, the tenant has still failed to pay rent for April 2020 to the present. (*Id.* ¶ 21).

Similarly, a commercial tenant in the Melendez Plaintiffs' property at 527 Nostrand Ave. in Brooklyn, whose rent makes up over half the rent roll for that property, has not made any rent payments since February 2020, before the emergency's onset. (*Id.* ¶¶ 23-24) On April 27, 2020, the Melendez Plaintiffs sent the tenant a dispossess notice through their attorney. (*Id.* ¶ 25)

But for the enactment of the Harassment Laws, the Melendez Plaintiffs would have sent additional demand notices to their delinquent tenants. (*Id.* ¶ 29) In May 2020, however, Ms. Melendez learned of the new Harassment Laws, and feared that any attempt to enforce their contractual rights by issuing further notices could be considered harassment under these Laws. (*Id.* ¶ 26) This fear was particularly acute because their residential tenant had previously accused Ms. Melendez of "harassment" simply for seeking payments through demand notices even before the passage of the new Harassment Laws. (*Id.* ¶¶ 21, 29)

The Yang Plaintiffs likewise sent notices of late rent and sought to recover unpaid rent in Housing Court prior to the outbreak of COVID-19. (Yang Decl. ¶ 34) Since they learned of the Residential Harassment Law, however, they have stopped even mentioning to their residential tenants the consequences of the tenants' continued failures to pay rent out of fear that such statements could be considered "harassment" under the Law. (*Id.* ¶ 35)

13

H.      The Guaranty Law Destroys a Critical Remedy

It is common practice for New York City property owners to require personal guaranties, usually from a tenant's principal, before entering into lease agreements with small and mid-sized commercial tenants. (Golino Decl. ¶¶ 27, 30) Personal guaranties are essential for commercial lease agreements because they provide a critical remedy, to recover unpaid rent. (*Id.* ¶¶ 30-31, 100) Indeed, the Yang Plaintiffs would not have entered into commercial leases with their tenants if they were not personally guaranteed. (Yang Decl. ¶ 31)

Personal guaranties, moreover, benefit both owners and tenants by encouraging property owners to lease property to commercial tenants who may not be as creditworthy, such as small business start-ups, and discouraging tenant holdovers following a lease default. (Golino Decl. ¶ 30) By suspending the operation of such personal guaranties, the Guaranty Law destroys this core remedy and prevents landlords from ever recovering rent for March to September 2020; this creates a perverse incentive for tenants to abandon their leases without repercussions, which will likely have a detrimental effect on this City by accelerating the blight of vacant storefronts. (Golino Decl. ¶ 100; *see also* Younger Decl. ¶¶ 69–70) But for the enactment of the Guaranty Law, the Yang Plaintiffs would have sought to enforce their rights under the personal guaranty.

I.      Plaintiffs Face Potential Ruin of Their Businesses

Due to Plaintiffs' inability to collect the full rent due on their properties, they have or will likely face difficulties in meeting the various obligations and expenses owed on their properties. As discussed above, they are already struggling to meet their property tax and mortgage obligations, and they are likely to face further financial difficulties should they be unable to collect additional unpaid rent. (Melendez Decl. ¶ 30; Yang Decl. ¶¶ 36–38) If these economic difficulties continue, Plaintiffs face the prospect of financial ruin. (*Id.*)

14

**ARGUMENT**

To obtain a preliminary injunction, Plaintiffs must show: "(1) irreparable harm; (2) either [i] a likelihood of success on the merits or [ii] both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Plaintiffs readily meet that burden here given that: a) the Harassment Laws impose extensive restrictions on their protected commercial speech; b) the Guaranty Law guts Plaintiffs' contracts and deprives them of material remedies; and c) the Laws were not within the Council's power to pass in the first place because they were preempted by the State.

**I.      Plaintiffs Are Likely to Succeed on Their Claims**

To establish likely success on the merits, Plaintiffs need only show that "the probability of [their] prevailing is better than fifty percent." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988).

**A.      The Harassment Laws Violate the First Amendment[4]**

As applied to Plaintiffs, the Harassment Laws are content-based restrictions on commercial speech. To the extent they prohibit demands for rent and representations regarding the consequences of unpaid rent, the Laws prohibit communications that "relate[] solely to the economic interests of the parties," which is protected commercial speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980); *see also San Francisco Apartment Ass'n v. City & Cty. of San Francisco*, 881 F.3d 1169, 1176 (9th Cir. 2018) (holding that a landlord and a tenant's discussion about "a buyout agreement is commercial speech").

---

[4] The New York State Constitution's Free Speech Clause and Due Process Clause "are at least as protective as their federal counterparts." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018). Accordingly, Plaintiffs are likely to prevail on their New York State Constitution claims for much the same reasons as their First and Fourteenth Amendment constitutional claims.

These speech restrictions are content-based for at least three reasons. *First*, they prohibit speech (specifically, harassing, "threatening" speech) that is "based on" the audience's membership in a protected class. *See Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 267 (3d Cir. 2002); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (5th Cir. 1995). *Second*, "a court would be required to examine the content of the message at issue" to determine whether the content is proscribed by the Laws, which is "sufficient under [Supreme Court precedent] to render the provision[s] content based." *Mejia v. Time Warner Cable Inc.*, No. 15-CV-6445 (JPO), 2017 WL 3278926, at *14 (S.D.N.Y. Aug. 1, 2017); *see also Seals v. McBee*, 898 F.3d 587, 595 (5th Cir. 2018), as revised (Aug. 9, 2018) ("[B]y criminalizing 'threats,' the statute regulates content."). *Third*, these Laws proscribe expression based on its impact on the tenant,[5] and "Supreme Court [precedent] is unequivocal: a legislative proscription conditioned upon the impact an expression has on its listeners 'is the essence of content-based regulation.'" *Jamal v. Kane*, 105 F. Supp. 3d 448, 457–58 (M.D. Pa. 2015) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000)).

Content-based restrictions on commercial speech are unconstitutional where: "(1) the speech restriction concerns lawful activity," and the government fails to make any one of the following showings: "(2) the [government's] asserted interest is substantial; (3) the prohibition 'directly advances' that interest; and (4) the prohibition is no more extensive than necessary to serve that interest;" that is, the law is narrowly tailored. *Vugo, Inc. v. City of New York*, 931 F.3d 42, 51 (2d Cir. 2019). Defendants bear the burden of proving that the restriction directly advances a substantial interest, and that it does so by means no more extensive than necessary.

---

[5] As detailed in the Golino Declaration, existing case law defines prohibited "harassment" based on its impact on the tenant, not on the landlord's intent. (Golino Decl. ¶ 87)

*See id.* at 52. The Harassment Laws prohibit lawful commercial speech, and are not narrowly tailored to a substantial interest given their expansive reach.

### 1.    *The Harassment Laws Restrict Plaintiffs' Lawful Speech*

A restriction on commercial speech "concerns lawful activity" so long as the speech it restricts does not "*necessarily* constitute an illegal act." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 114 (2d Cir. 2017). Here, the Harassment Laws restrict Plaintiffs' lawful commercial speech.

As an initial matter, the Harassment Laws proscribe Plaintiffs' intended speech.[6] The Commercial Harassment Law prohibits conduct that: 1) involves "threatening" a tenant based on its status of having been impacted by COVID-19 or based on its receipt of a rent concession or forbearance; and 2) is of such a nature that it would "reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property." N.Y.C. Admin. Code § 22-902(a). Similarly, the Residential Harassment Law prohibits conduct that: 1) involves "threatening" a tenant based on his or her status as a COVID-19 impacted individual or as a recipient of a rent concession or forbearance; and 2) "causes or is intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy." *Id.* § 27-2004(a)(48).

---

[6] Because Plaintiffs are bringing a pre-enforcement claim, they need not establish that their speech is certainly proscribed to show an Article III injury-in-fact. Instead, they need only show that: 1) their alleged future course of constitutionally protected conduct is "arguably proscribed," and 2) there is a "credible threat of [enforcement]." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–65 (2014) (quotations omitted); *see also Woodhull Freedom Found. v. United States*, 948 F.3d 363, 372 (D.C. Cir. 2020) (using this standard in an "as applied" Free Speech challenge); *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (same). Both requirements are readily met here.

Notably, the prohibited conduct of "threatening" is nowhere defined in the Harassment

Laws. Case law under existing "harassment" prohibitions has interpreted this term as viewed

through the lens of the tenant—not the property owner. *See* (Golino Decl. ¶ 87)[7] As a result, no

matter how benign a landlord's intentions may be, they can still be accused of prohibited

"harassment" based on their legitimate efforts to collect rent. This plainly infringes Plaintiffs'

free speech rights.

Further, given that the Harassment Laws lack any definition of this key term,

"threatening" must be interpreted in accordance with its "plain meaning." *Majewski v.

Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 583 (1998).[8] The plain meaning of

"threatening" includes making a "declaration of hostile determination or of loss, pain,

punishment, or damage to be inflicted in retribution for or conditionally upon some course." *U.S.

v. Davila*, 461 F.3d 298, 302 (2d Cir. 2006). Plaintiffs' intended speech—*e.g.,* communicating

intent to pursue eviction proceedings if a tenant fails to pay overdue rent—would fall within that

plain meaning of threatening.

Because Plaintiffs have no intent to use fighting words or to threaten tenants with

violence, (Melendez Decl. ¶ 21; Yang Decl. ¶ 34), their speech is protected by the First

---

[7] Because the term "threatening" is undefined in either Harassment Law, these Laws create tremendous uncertainty for landlords who attempt to recover back rent. And that confusion is compounded with respect to the Commercial Harassment Law because, under Section 22-902, "the effect on the small business tenant" is the sole focus. *See One Wythe LLC v. Elevations Urban Landscape Design Inc.*, 67 Misc. 3d 1207(A), 2020 WL 1917760, at *8 (N.Y. Civ. Ct. April 17, 2020). The Harassment Laws, moreover, apply a definition of "impacted by COVID-19" that is so sweeping as to make it nearly impossible for property owners, such as Plaintiffs, to know whether a tenant is "impacted" or not. *See supra* Section F.2. For these reasons, the Harassment Laws are also void for vagueness under the Fourteenth Amendment. (*See* Compl. ¶¶ 165–167)

[8] Any ambiguity in the meaning of "threatening" militates in favor of this Court resolving Plaintiffs' constitutional claims, rather than waiting for a state court to construe "threatening." It is well-settled that a federal court should exercise jurisdiction where, as here, a state or municipal law is "justifiably attacked . . . as applied for . . . discouraging protected activities." *Dombrowski v. Pfister*, 380 U.S. 479, 489–90 (1965); *see also Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 94 (2d Cir. 1998).

Amendment. *See Seals*, 898 F.3d at 594, 597; *Vives v. City of New York*, 405 F.3d 115, 123–24 (2d Cir. 2005) (Cardamone, *J.*, concurring). Absent these Laws, Plaintiffs intend to communicate their desire to collect the rents owed and to describe the remedies available to them if tenants continue not paying. (Melendez Decl. ¶ 29; Yang Decl. ¶¶ 34-35) Demands for back rent through routine late payment and dispossess notices, and descriptions of the contractual consequences of failing to pay rent constitute lawful "threats," which Defendants' legislation nonetheless proscribes. Plaintiffs issued such notices in the past, but are now inhibited from doing so against anyone "impacted by COVID-19." (Melendez Decl. ¶¶ 21, 25; Yang Decl. ¶ 34)[9]

> ### 2.    *The Harassment Laws Fail to Directly Advance a Substantial Government Interest*

Because these Laws' speech restrictions concern lawful commercial activity, Defendants must prove that the restrictions directly advance a substantial interest.[10] *Vugo*, 931 F.3d at 52 (citation omitted). To meet their burden, Defendants need to show: "(1) 'the harms [they] recite[] are real,' and (2) '[] [the] restriction[s] will in fact alleviate them to a material degree.'" *Id.* (citation omitted). Defendants' burden on these elements is "not slight," and, critically, "mere speculation or conjecture" will not suffice. *Hayes v. N.Y. Attorney Grievance Comm. of the Eight Judicial Dist.*, 672 F.3d 158, 166 (2d Cir. 2012) (quotations omitted). A commercial speech

---

[9] Section 22-902(b) of the N.Y.C. Administrative Code provides that a "landlord's lawful termination of a tenancy, lawful refusal to renew or extend a lease or other rental agreement, or lawful reentry and repossession of the covered property shall not constitute commercial tenant harassment for purposes of this chapter." But that savings provision fails to address whether restatement of lease provisions requiring the payment of rent, communications concerning unpaid rent and the consequences of not paying rent are considered "threatening" under the Commercial Harassment Law. If such communications constitute "threatening" acts, it would gut the savings clause because before landlords can even commence non-payment proceedings in court, they must first make rent demands. (Golino Decl. ¶¶ 39-40, 54-56) Moreover, judges in these types of cases are likely to gloss over this savings provision when faced with claims of tenant harassment. (*Id.* ¶ 89)

[10] Plaintiffs do not contend that Defendants are incapable of identifying a substantial government interest, given the impact of the Pandemic. Rather, Defendants cannot carry their burden on the remaining prongs – *i.e,* whether these Laws directly advance such an interest and are narrowly tailored to do so.

regulation cannot be sustained where it "provides only ineffective or remote support for the government's purpose." *Cent. Hudson*, 447 U.S. at 564; *see also Bad Frog Brewery, Inc. v. N.Y.S. Liquor Auth.*, 134 F.3d 87, 100 (2d Cir. 1998) (it is not enough that the law makes "*any* contribution to achieving" the asserted interest) (emphasis in original).

*First*, the City's Harassment Laws were improperly premised on "mere speculation and conjecture."[11] *Hayes*, 672 F.3d at 166. Defendants cannot show that the specific harms the Laws are intended to address—*i.e.*, harassment by landlords of tenants affected by COVID-19—are real. The cursory committee reports for the Laws contain no factual basis to support such a substantial interest. (Younger Decl. ¶¶ 62–64) Similarly, the hearings on the bills lacked any meaningful evidence of the problems the bills are ostensibly designed to address. (*Id*. ¶¶ 56–58)

There is no dispute that COVID-19 has devastated the City. But the Pandemic does not excuse Defendants' obligation to provide fact-based support for their speech restrictions, as recent federal decisions confirm. *See e.g. ACA Int'l v. Healey*, No. CV 20-10767-RGS, 2012 WL 2198366, at *6 (D. Mass. May 6, 2020) (invalidating commercial speech restriction for lack of empirical evidence of identified problem).

*Second*, Defendants cannot show that the Harassment Laws will advance any identified government interest to a material degree. The Laws actually undermine the purported goal of protecting small businesses which include small property owners such as Plaintiffs. These new Laws gut their ability to collect rent—the principal means by which they earn revenue needed to fund their operations and pay obligations such as mortgages, property taxes, and maintenance

---

[11] Defendants cannot rely on *post hoc* rationalizations to restrict commercial speech. *See Nat'l Adver. Co. v. Town of Babylon*, 900 F.2d 551, 556 (2d Cir. 1990). And evidence on which Defendants did not rely at the time of the bills' enactment cannot justify a restriction retroactively. *See Citizens Union of City of New York v. Attorney Gen. of New York*, 269 F. Supp. 3d 124, 140–41 (S.D.N.Y. 2017).

expenses. (*See, e.g.*, Melendez Decl. ¶¶ 15-18, 30; Yang Decl. ¶¶ 19-23, 36) And large, well-capitalized tenants, such as national retailers, will be motivated to use the Commercial Harassment Law to avoid their rent obligations. For example, Old Navy LLC and Gap Inc. recently brought a lawsuit against their landlord, seeking to terminate their commercial lease agreements. (Younger Decl., Ex. 5) These large retailers allege that their landlord's notices of default, without more, constituted a "clear violation" of the Commercial Harassment Law. (*Id.*, Ex. 5 ¶ 24) A restaurant chain has also invoked the Commercial Harassment Law to avoid paying rent and to justify a request that its landlord rescind a default notice. (*Id.*, Ex. 42)

### 3. The Harassment Laws Are Not Narrowly Tailored

The Laws' speech restrictions also fail the "narrow tailoring" prong. Defendants must "establish that the regulation does not burden substantially more speech than is necessary to further the government's legitimate interests." *Vugo*, 931 F.3d at 58 (quotations omitted).

It is well-settled that a law is not narrowly tailored "if there existed numerous and obvious less-burdensome alternatives to the restriction on commercial speech." *Centro*, 868 F.3d at 117. As the Second Circuit has held, the government must give "[]adequate consideration" to "alternatives that would prove less intrusive to the First Amendment's protections for commercial speech." *Bad Frog Brewery*, 134 F.3d at 101 (quotations omitted). Likewise, a speech restriction is more extensive than necessary where "[p]re-existing law provides a thoroughly effective way of protecting [the asserted interest]." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 265 (2d Cir. 2014). If an ordinance "simply adds a speech-based component to an already existing prohibition," it is not narrowly tailored. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d at 118.

Here, there were several less burdensome alternatives to the restrictions that the City imposed on commercial speech. For example, although the Council was informed that numerous tenants who could pay rent were, nonetheless, "going to withhold rent out of solidarity," the City failed to limit the Laws' protections to those who have suffered financial hardship. (Younger Decl., Ex. 33 at 44) As did the State, the City easily could have enacted a law that was triggered by a tenant's inability to pay or conditioned eligibility on a showing of financial hardship. *See supra* at 8. Its decision instead to "'impose a prophylactic ban[,] merely to spare itself the trouble of distinguishing the harmless from the harmful," confirms that these Laws are not narrowly tailored. *Centro*, 128 F. Supp. 3d 597, 618 (E.D.N.Y. 2015) (quotations omitted), *aff'd* 868 F.3d at 115. As discussed above, the lack of an injury requirement has helped allow substantial commercial tenants—like Old Navy LLC, Gap Inc. and Sweetcatch Poke—to avoid paying rent, despite their financial ability to do so; this is a result that the City should have foreseen. (*See* Younger Decl. ¶¶ 14–16) The exceedingly broad reach of the Harassment Laws is further shown by conservative calculations—which do not account for all of the Laws' triggers—which reveal that a staggeringly high number of New Yorkers and City-based businesses could potentially invoke the protection of these new Laws. (*Id.*¶¶ 67–83)

The City also failed to adequately consider approaches that would not restrict protected speech, such as using government funds to "to pay for [] rent." (*Id.*, Ex. 33 at 51) Such an approach was actually floated before the Council but was never substantively discussed (although the State later adopted such a policy in the ERRA, confirming its viability). (*Id.*) Nor were any other less burdensome alternatives meaningfully deliberated.

Tenants, moreover, were already covered by numerous COVID-19 related protections even before these new Harassment Laws were passed. Tenants benefited from several of

Governor Cuomo's executive orders. *See supra* at 9. And residential tenants were also already covered by federal, state, and local law housing protections. A City official acknowledged as much before the Council, testifying that "*several of the protections* contemplated in [the Residential Harassment Law] *already exist*" under City law. (Younger Decl., Ex. 33 at 98–99) Given these pre-existing protections, the Harassment Laws' speech restrictions are clearly more extensive than is necessary to address any stated interest. *Safelite Grp.*, 764 F.3d at 265.

      B.      <u>Plaintiffs Are Likely to Succeed on Their Contracts Clause Claim</u>

Plaintiffs are also likely to succeed in showing that the Guaranty Law violates the Contracts Clause. Under that constitutional provision, municipalities are prohibited from enacting legislation that "extinguishes" or "renders [contractual obligations] invalid . . . ." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 431 (1934); *see also Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).

A law violates the Contracts Clause where: a) "the contractual impairment [is] substantial"; b) "the law [does not] serve a legitimate public purpose"; and c) "the means chosen to accomplish [the alleged legitimate] purpose [are not] reasonable and necessary." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006); *see also Sveen*, 138 S. Ct. at 1821.

      *1.    Plaintiffs' Contractual Relationships Are Substantially Impaired*

"[T]he primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). But "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983). An impairment is considered substantial if it, *inter alia*: a) "deprives a private party of an important right"; b) "thwarts performance of an essential term"; or c) "alters a financial term." *S. Cal. Gas*

23

*Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003). An "[i]mpairment of a remedy [is] held to be unconstitutional if it effectively reduced the value of substantive contract rights." *U.S. Trust Co. of New York v. New Jersey,* 431 U.S. 1, 19 n. 17 (1977).

The Guaranty Law not only disrupts, but actually destroys the reasonable expectations of the parties to commercial lease agreements. A personal guaranty is a critical inducement for commercial landlords to lease their properties in New York City. (Golino Decl. ¶ 97; *see also* Yang Decl. ¶ 31 ("We would not have entered into any lease agreements with small businesses if not for the personal guaranties given by the principals of the businesses.")) Such guaranties serve several critical purposes. *First*, such guaranties serve as much needed security to back up commercial leases. (Golino Decl. ¶¶ 28, 30) *Second*, these guaranties permit small businesses, which often are not very creditworthy, to enter into leases with landlords without needing to show that they have sufficient assets to pay their rent. (*Id.*) *Third*, they act as an efficient remedy in the event that a small corporate tenant, often with minimal assets, defaults under a lease because Housing Court proceedings in New York are "slow [and] cumbersome." *Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *4 (S.D.N.Y. June 29, 2020); *see also* (Golino Decl. ¶¶ 33-52)

The Guaranty Law forever guts those reasonable expectations for the period covered by this Law. It permanently strips leasing arrangements of this critical remedy that landlords reasonably believed would be available should a tenant default. And the Law retroactively alters the economic benefits and burdens that existed at the time when property owners entered their leases, further upending landlords' reasonable expectations. *See Cal. Gas Co.*, 336 F.3d at 890; *HRPT Prop. Tr. v. Lingle*, 715 F. Supp. 2d 1115, 1137 (D. Haw. 2010) (substantial impairment where law prohibited enforcement of lease rental terms); *cf Elmsford Apartment Associates,*

*LLC*, 2020 WL 3498456, at *14 (no substantial impairment where Governor Cuomo's orders "d[id] not prevent Plaintiffs from safeguarding or reinstating their rights" after defined time period). Here, the Guaranty Law thwarts the performance of guaranties in perpetuity, making it impossible to enforce them as to any liabilities incurred between March 7 and September 30, 2020. (*See e.g.* Younger Decl., Ex. 29)

Absent these personal guaranties, property owners like the Yang Companies would not have agreed to their lease agreements. (Yang Decl. ¶ 31; Golino Decl. ¶ 96) For many landlords, including Plaintiffs, the party leasing the commercial space is (especially as to restaurants, bars, and small retailers that are the focus of this Law) typically an entity with no substantial assets; as a result, a personal guaranty is the landlord's sole means of collecting unpaid rent. (Golino Decl. ¶¶ 96, 100) Accordingly, extinguishing these guaranties results a substantial contract impairment as a matter of law. *See Eric M. Berman*, *P.C. v. City of New York*, 895 F. Supp. 2d 453, 499 (E.D.N.Y. 2012), *vacated in part*, 796 F.3d 171 (2d Cir. 2015).

The Guaranty Law's impact on the value of Plaintiffs' contracts is also amplified by the Commercial Harassment Law's proscription of communications to tenants regarding the contractual consequences of not paying rent. And because the Guaranty Law codifies "harassment" as including attempts to enforce personal guaranties, the Law poses yet another roadblock for landlords in collecting back rent. Due to these prohibitions, Plaintiffs have no other contractual remedy to invoke—thereby materially changing the binding force of Plaintiffs' contracts. *See Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 607 (D.P.R. Feb. 10, 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 64 F. Supp. 2d 537, 546 (E.D. Va. 1999).

#### 2.    *The Guaranty Law Fails to Serve a Legitimate Public Purpose*

While Plaintiffs do not dispute that the Pandemic presents an economic emergency for small business owners, the Guaranty Law is not aimed at addressing that emergency in any legitimate way. The stated objective of the Guaranty law is "so that city business owners don't face the loss of their businesses and also personal bankruptcy." (Younger Decl., Ex. 34 at 11–12) But COVID-19 affects small business owners who are tenants and landlords alike. Plaintiffs own properties in the City for their small rental businesses and are finding it difficult, if not impossible, to meet their full tax and mortgage obligations due to their tenants withholding rent. (Yang Decl. ¶¶ 36–38) If Plaintiffs' rental incomes fall further, their companies are at risk of lacking sufficient assets to continue as a going concern, and the properties might be foreclosed, which could take them off the City's tax rolls. (*Id.* ¶¶ 37–38) Moreover, the Guaranty Law is phrased in such categorical terms and lacks any substantial injury requirement so that it sweeps in large swaths of businesses that would not merit assistance. (Younger Decl. ¶ 86)

By passing the Guaranty Law, Defendants have improperly transferred the economic burdens experienced by tenants onto their landlords—regardless of their respective financial situations. Such burden shifting is not a legitimate public purpose. *See Buffalo Teachers Fed'n*, 464 F.3d at 368; *Sanitation & Recycling Indus.*, 107 F.3d at 993 (noting that law should be "aimed at remedying an important general social or economic problem rather than providing a benefit to special interests") (quotations omitted); *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002) (finding that the law violates the Contract Clause because "the only real beneficiaries…are the narrow class of dealers of agricultural machinery").

#### 3.    *The Guaranty Law Is Unreasonable and Unnecessary*

Even assuming Defendants had a legitimate purpose, Defendants' chosen means to accomplish it must be reasonable and necessary to serve that purpose. *Sveen*, 138 S. Ct. at 1817.

Reasonable and necessary laws are those that are "temporary and conditional" and that provide the contracting parties with value commensurate with their reasonable expectations under the contract. *See Blaisdell*, 290 U.S. at 441. For leases, that standard is met when "reasonable compensation [was made] to the landlord" to accommodate modifications that were inconsistent with the parties' expectations. *Id.*; *see also Elmsford Apartment Assocs.,* 2020 WL 3498456, at *14 ("[R]egulations that reimburse landlords for lost rental income do not impose a substantial impairment on those parties' contract rights.") (quotations omitted); *Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, NO. 90-cv-4391, 1991 WL 84598, at *5 (S.D.N.Y. May 13, 1991), *aff'd in part, rev'd on other grounds*, 959 F. 395 (2d Cir. 1992). A failure to consider less restrictive measures can show that the law is unreasonable and unnecessary. *See Ross v. City of Berkeley*, 655 F. Supp. 820, 835 (N.D. Cal. 1987) (holding that a prohibition of owner occupancy violated the Contracts Clause because the government failed to consider less restrictive measures that other municipalities had used).

Here, the City forever snuffed out Plaintiffs' personal guaranties in their entirety for this six-month period (and perhaps longer); and it did so with no means to compensate property owners, no alternative remedy, and no accommodation of the parties' contractual expectations. Extinguishing Plaintiffs' personal guaranties in this fashion is unreasonable because the Guaranty Law is not tailored at all to meet the societal ill it ostensibly seeks to ameliorate: *i.e.*, the economic impact of the Pandemic on the City's small businesses. Some tenants have been disproportionately affected financially by COVID-19, while others or the well-capitalized principals behind them have not seen their financial situations change dramatically. Also, landlords are not all similarly situated. Many landlords, like Plaintiffs, are small business owners—whom the Guaranty Law was ostensibly created to protect—and rely on rent

collections to meet the numerous obligations and expenses for their properties. They are at risk of failing to meet these obligations if rent payments decrease further. (Yang Decl. ¶¶ 19, 36-38) Moreover, the Guaranty Law creates a perverse incentive for commercial tenants to abandon their leaseholds prior to the Law's expiration date, which will likely accelerate the blight of vacant storefronts—to the detriment of all concerned in the City. (Golino Decl. ¶ 100).

Accordingly, the Guaranty Law "overreaches its stated objectives" by causing unnecessary harm to small landlords whose small businesses and livelihoods depend on rent payments while benefiting some well-funded commercial tenants. *See Ross*, 655 F. Supp. at 835.

C.    Plaintiffs Are Likely to Succeed on Their Preemption Claims

In New York, local laws may be preempted when a locality 1) adopts a law that is in direct conflict with a State statute ("conflict preemption"); or 2) tries to legislate in a field over which the Legislature has assumed full regulatory responsibility ("field preemption"). *DJL Rest. Corp. v. City of New York*, 96 N.Y.2d 91, 95-96 (N.Y. 2001). All three Laws are preempted under the doctrines of both conflict preemption and field preemption.

1.    *The Harassment and Guaranty Laws Are Conflict Preempted*

"Under the doctrine of conflict preemption, a local law is preempted by a state law when a right or benefit that is expressly given . . . by . . . State law. . . has then been curtailed or taken away by the local law." *Chwick v. Mulvey*, 81 A.D.3d 161, 167-68 (2d Dep't 2010) (quotations omitted). "The crux of conflict preemption is whether there is a head-on collision between the . . . ordinance as it is applied and a state statute." *Id.* at 168 (quotations omitted). The three Laws directly conflict with the TSHA, ERRA, and the Governor's Executive Orders.

*First,* these three Laws curtail residential rent collection that is expressly permitted under the TSHA and facilitated by rent subsidies of the ERRA. While the TSHA extends Governor Cuomo's eviction moratorium for individuals suffering from financial hardship during a defined

28

"COVID-19 covered period" (ending when the Governor's Executive Orders closing businesses and restricting non-essential gatherings expire), the Act expressly permits property owners to sue for, and courts to issue money judgments awarding, back rent. 2020 Sess. Law News of N.Y. Ch. 127, (*see also* Younger Decl., Ex. 27). These are the very same rent collection efforts that the City's Harassment Laws seek to hinder or even "cancel," creating an express conflict. Further, in passing the ERRA, the Legislature allocated $100 million for rent vouchers to be provided to property owners on behalf of their eligible residential tenants, and has permitted landlords to collect rent from these individuals while alleviating some of the economic strain on their tenants. 2020 Sess. Law News of N.Y. Ch. 125; *see also* (Younger Decl., Ex. 26). Accordingly, the ERRA recognizes that landlords can collect rent from eligible tenants in the form of rent subsidies and creates a State policy that funds such rent relief to property owners.

There are further conflicts. Both the TSHA and the ERRA narrowly define the tenants who qualify for this legislative assistance, whereas the Harassment Laws lack any substantial injury requirement and thus extend benefits to well-off tenants whom the Legislature deemed ineligible for assistance.  Moreover, the City's Harassment Laws contain much different end dates for their relief, potentially extending this emergency assistance well beyond the Statewide emergency that the Governor declared and is empowered to end. N.Y. Exec. Law §§ 28, 29-a.

*Second*, because the Legislature has granted broad emergency powers to the Governor concerning the Pandemic under Section 29-a, any local laws that conflict with the Governor's Executive Orders are likewise conflict preempted. *Sunrise Check Cashing & Payroll Servs., Inc. v. Town of Hempstead*, 91 A.D.3d 126, 139–40 (2d Dep't 2011), *aff'd sub nom.* 20 N.Y.3d 481 (2013). Significantly, in Executive Order 202.3, the Governor expressly prohibited the City from issuing "any local emergency order . . . inconsistent with . . . any . . . executive order issued

under Section 24 of the Executive Law," and suspended any such local laws. (Younger Decl.,

Ex. 18) These three Laws are in direct conflict with Executive Orders 202.28 and 202.48 which

a) limit the current eviction moratorium to commercial tenants with a substantial injury;

b) provide rent relief only for tenants facing late rent fees, and requires landlords to allow tenants

facing financial hardship to use security deposits as rent payments; c) prohibit "threats" only

regarding the use of security deposits to pay rent; and d) define the periods for which tenants can

seek relief. (Younger Decl., Exs. 23, 25) In contrast, the City's new Laws prohibit threats against

a wide group of residential and commercial tenants who may not be financially impacted by the

Pandemic, and allow individuals not facing financial hardship due to the Pandemic to avoid

paying rent and escape agreed guaranties for an uncertain period. Section 29-a gave the

Governor the emergency powers to set the procedures for attacking COVID-19 and it would sow

rampant confusion if cities could chart their own course in this time of crisis, thereby

undermining the Governor's Statewide emergency order.

## 2. *The Harassment and Guaranty Laws Are Field Preempted*

The three new City Laws are also preempted because the Legislature has occupied the

field of responding to the Pandemic in the real estate industry by conferring broad emergency

powers on the Governor under Section 29-a. In New York, field preemption occurs when: 1) "a

declaration of State policy evinces the intent of the Legislature to preempt local laws on the same

subject matter" or 2) "the Legislature's enactment of a comprehensive and detailed regulatory

scheme in an area in controversy is deemed to demonstrate an intent to preempt local laws."

*Chwick*, 81 A.D.3d at 169–70. "[W]hen the Legislature has demonstrated its intent to preempt

the field, all local ordinances are preempted, regardless of whether they actually conflict with the

State Law." *Id.* at 172. Even a local law that "merely makes minor additions . . . must be held

30

invalid" if it intrudes on a preempted field. *Lansdown Entm't Corp. v. New York City Dep't of Consumer Affairs*, 141 A.D.2d 468, 473 (1st Dep't 1988), *aff'd,* 74 N.Y.2d 761 (1989).

Here, the Legislature amended Section 29-a for the express purpose of granting the Governor broad emergency powers to address disasters by executive order, including this particular Pandemic through at least April 2021. N.Y. Exec. Law § 29-a. The Legislature made "these changes [to] ensure that the Governor has the necessary legal authority . . . to confront the [Pandemic.]" (Younger Decl., Ex. 16 at 1) And the Governor has used this authority to issue comprehensive Executive Orders to regulate landlord-tenant relationships during the Pandemic. (*See* Younger Decl. ¶¶ 36–43) Such a grant of exclusive powers to the Governor demonstrates the Legislature's intent to occupy the field of COVID-19 response regarding real estate. *See Walsh v. City of River Rouge*, 189 N.W.2d 318 (Mich. 1971).

The Supreme Court of Michigan came to precisely that conclusion in *Walsh*, where it considered whether the Michigan legislature preempted the field of emergency response by conferring broad emergency powers to the governor under that state's Emergency Powers of Governor Act. *Id.* at 326. There, Michigan's high court held that the comprehensive and broad grant of authority to a unitary executive in times of emergency demonstrated a legislative intent to occupy the field and preempt local laws. *Id*. New York courts likewise recognize that where the Legislature enacts a "comprehensive and detailed regulatory scheme," it is an indication by the Legislature that it intended to preempt that area of law. *Ba Mar, Inc. v. Cty. of Rockland*, 164 A.D.2d 605, 613 (2d Dep't 1991) (holding that the broad and detailed scope of the statutory scheme for mobile home park life evinced legislative intent to preempt this field).

Here, Section 29-a broadly confers emergency powers on the Governor to respond to this Pandemic, authorizing him to: issue "any" reasonable directive, specify the applicable

procedures and suspend conflicting laws during this Pandemic. The Governor exercised those powers to regulate the economic relationship between landlords and tenants during the Pandemic. Accordingly, Section 29-a evinces an intent that the Governor exercise exclusive authority to respond to the Pandemic as it impacts the Statewide real estate market.

The ERRA and TSHA, moreover, specify additional requirements and relief for residential renters and landlords alike, setting out a detailed rent subsidy system and permitting recovery of rent against non-paying tenants. *See supra*, Section F.3. These laws further confirm the Legislature's intent to occupy the field for real estate rent relief related to the Pandemic.

## II.   **Plaintiffs Will Likely Suffer Irreparable Harm Without an Injunction**

To show irreparable harm, "Plaintiffs must demonstrate that absent a preliminary injunction they will [likely] suffer an injury that is . . . actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotations omitted). This requires only "'a showing of *probable* irreparable harm,'" not "certainty." *Wenner Media LLC v. N. & Shell N. Am. Ltd.*, No. 05 CIV. 1286 (CSH), 2005 WL 323727, at *3 (S.D.N.Y. Feb. 8, 2005) (citation omitted) (emphasis in original).

### A.   Defendants' Constitutional Violations Establish *Per Se* Irreparable Harms

Defendants' constitutional violations are sufficient—without more—to constitute irreparable harm. In this Circuit, such infringements create a presumption of irreparable harm. *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020).

This presumption applies to the First Amendment claims brought here, given that the challenged Laws impose a "direct limitation on speech." *Evergreen Ass'n v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014). As the Second Circuit has repeatedly reaffirmed, the "loss of

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).

This presumption also applies to impairment claims under the Contracts Clause. *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012); *see also Ass'n of Equip. Mfrs. v. Burgum*, No. 1:17-CV-151, 2017 WL 8791104, at *10 (D.N.D. Dec. 14, 2017), *aff'd*, 932 F.3d 727 (8th Cir. 2019); *Allen v. State of Minn.*, 867 F. Supp. 853, 859 (D. Minn. 1994); *W. Indian Co. v. Gov't of V. I.*, 643 F. Supp. 869, 882 (D.V.I. 1986), *aff'd*, 812 F.2d 134 (3d Cir. 1987). A Contracts Clause violation creates a presumption of harm because it subjects Plaintiffs to a business risk they specifically "bargained for and contracted to avoid," and the damages associated with such a risk are not easily calculable. *Ass'n of Equip. Mfrs.*, 2017 WL 8791104, at *10 (quotations omitted); *see also Donohue*, 886 F. Supp. 2d at 151.

B.     Plaintiffs Have Independently Demonstrated Irreparable Harm

Plaintiffs have also demonstrated irreparable harm here because these three Laws will make it difficult—if not impossible—for them to recover rent from a large portion of their tenants, even after the COVID-19 crisis is over, leading to the potential ruin of their businesses. (Mendez Decl. ¶ 30; Yang Decl. ¶¶ 36-38) *See Five Star Dev. Resort Communities, LLC v. iStar RC Paradise Valley LLC*, No. 09 CIV. 2085 (LTS), 2010 WL 1005169, at *4 (S.D.N.Y. Mar. 18, 2010) ("[A] threat to [a plaintiff's] ongoing financial viability can, in and of itself, [constitute] irreparable harm[.]") (citation omitted); *see also Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011), *as amended* (Mar. 7, 2012) (finding irreparable harm based on testimony that businesses would probably be "shut down"); *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993) ("[A] threat to the continued existence of a business can constitute irreparable injury.") (quotations omitted). This is particularly true here

33

given that the real property that these businesses own is unique, and its deprivation qualifies as irreparable harm. *See Five Star Dev. Resort Communities*, 2010 WL 1005169, at *3.

## III.     A Preliminary Injunction Is in the Public Interest

An injunction against these Laws is decidedly in the public interest. *First,* enforcement of an unconstitutional law is always contrary to the public interest. *See N.Y. Progress & Prot. PAC*, 733 F.3d at 486; *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). And here there are three unconstitutional Laws.

*Second,* the injunction would "aid[] the local economy." *Minard Run Oil*, 670 F.3d at 257. These constitutional violations will ravage the City's economy. Hamstrung in their efforts to collect rent, property owners are desperately struggling to meet their own financial obligations—including hefty property tax bills. (*See* Mendez Decl. ¶ 30; Yang Decl. ¶¶ 36-38) And the Laws will likely advance the blight on vacant storefronts. The City's largest source of revenue, *i.e.,* property taxes, is in serious jeopardy due to these Laws. This drastic decline in property tax revenues will endanger the City's budget—even its fiscal solvency—due to this expected drop in City revenues. (Younger Decl. ¶¶ 19-21) Shifting the burden of the Pandemic onto the shoulders of real estate owners, leaving them unable to fulfill their tax burden, would have a terrible impact on the City. This is not in the public interest.

## CONCLUSION

For all the foregoing reasons, this Court should enter an order: 1) granting Plaintiffs' motion for preliminary injunctive and declaratory relief, 2) enjoining the Defendants from enforcing the challenged Laws, *i.e.,* New York City Local Law 53 of 2020 (the Commercial Harassment Law), Local Law 56 of 2020 (the Residential Harassment Law) and Local Law 55 of 2020 (the Guaranty Law); 3) declaring that the Commercial Harassment Law and the Residential Harassment Law, as applied to Plaintiffs, violate the First Amendment, as well as the Free

Speech Clause of the New York Constitution; 4) declaring that the Guaranty Law, as applied to

Plaintiffs, violates the Contracts Clause; 5) declaring that the Commercial Harassment Law, the

Residential Harassment Law, and the Guaranty Law are preempted by New York State law; and

6) granting Plaintiffs' their reasonable attorneys' fees and costs; and 7) granting such other and

further relief as may be just and proper.

Dated:  July 22, 2020

Respectfully submitted,

By: _____

Stephen P. Younger
Alejandro H. Cruz
Hyatt M. Howard
Esther Y. Kim
Timothy H. Smith
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone No.:  (212) 336-2000
Facsimile No.:  (212) 336-2222

*Attorneys for Plaintiffs*