UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>The City of New York, a municipal entity, Bill de Blasio, as Mayor of the City of New York, Louise Carroll, Commissioner of New York City Department of Housing Preservation & Development, and Jonnel Doris, Commissioner of New York City Department of Small Business Services,<br><br>*Defendants.* | **DECLARATION OF CARLOS F. UGALDE ALVAREZ IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE AND DECLARATORY RELIEF**<br><br>20 CV 05301 (RA) |

      **CARLOS FERNANDO UGALDE ALVAREZ** declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the following is true and correct:

      1.     I am an Assistant Corporation Counsel in the office of James E. Johnson, Corporation Counsel of the City of New York, attorney for Defendants in the instant action.

      2.     I respectfully submit this declaration in support of Defendants' motion for an order and judgment dismissing the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and in opposition to Plaintiffs' motion for preliminary injunctive and declaratory relief.

      3.     This declaration is intended principally to put before the Court various pieces of publicly-available information which bear on Plaintiffs' and Defendants' motions.

**Chapter 23 of the New York State Laws of 2020**

4.       Attached as Exhibit "A" is a true and correct copy of Chapter 23 of the New York State Laws of 2020 ("Chapter 23").   Chapter 23 appropriated $40,000,000.00 for services and expenses related to the outbreak of coronavirus disease 2019 ("COVID-19"), and amended sections 20(2)(a) and 29-a of the New York Executive Law.  The amendment to N.Y. Executive Law § 29-a enabled the Governor to "issue any directive during a state disaster emergency" involving, among other things, an epidemic or disease outbreak so long as such directive is "necessary to cope with the disaster," and expanded the Governor's existing authority to temporarily suspend laws, rules or orders during such emergencies.  The amendment to N.Y. Executive Law § 29-a took effect on March 3, 2020 and is set to expire on April 30, 2021.

**Relevant Gubernatorial Executive Orders**

5.       Attached as Exhibit "B" is a true and correct copy of New York State Gubernatorial Executive Order ("EO") No. 202 dated March 7, 2020, which is also publicly available   at   https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf. By virtue of EO No. 202, the Governor, *inter alia*, declared, pursuant to N.Y. Executive Law § 28, a state disaster emergency, effective March 7, 2020, until September 7, 2020.  EO No. 202 further states, in relevant part, as follows:

a.       "on January 30, 2020, the World Health Organization designated the novel coronavirus, COVID-19, outbreak as a Public Health Emergency of International Concern";

b.       "on January 31, 2020, United States Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the entire United States to aid the nation's healthcare community in responding to COVID-19";

c.       "both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue";

d.       "New York State is addressing the threat that COVID-19 poses to the health and welfare of its residents and visitors."

Notably, by virtue of EO No. 202, the Governor "authorize[d] all necessary State agencies to take appropriate action to *assist local governments* and individuals in containing, preparing for, responding to and recovering from this state disaster emergency . . . ." (emphasis added).

6.     Attached as Exhibit "C" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.3 dated March 16, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.3.pdf.  By virtue of EO No. 202.3, the Governor, *inter alia*, directed that, no later than March 16, 2020 at 8:00 p.m., (i) "[a]ny restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises,"[1] and (ii) "[a]ny gym, fitness centers or classes, and movie theaters shall also cease operation."  Notably, EO No. 202.3 also states that "[n]o local government or political subdivision shall issue any local emergency order or declaration of emergency or disaster inconsistent with, conflicting with or superseding the foregoing directives, or any other executive order issued under Section 24 of the Executive Law and any local emergency order or any local administrative codes, charters, laws, rules or regulations, are hereby suspended with respect to any such order issued under such authority different or in conflict with Executive directives."

7.     Attached as Exhibit "D" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.5 dated March 18, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_5.pdf. By virtue of EO No. 202.5, the Governor, *inter alia*, directed that, "[e]ffective at 8 p.m. March 19, 2020, all indoor common portions of retail shopping malls with in excess of 100,000 square feet of retail space available for lease shall close and cease access to the public," except for "stores located within shopping malls, which have their own external entrances open to the public,

---

[1] They were still permitted to serve food or beverage for off-premises consumption.  *See* EO No. 202.3.

separate from the general mall entrance," so long as they comply with "the requirements of [EO No.] 202.3 that any restaurant shall limit itself to take out or delivery food services, and that any interior entrances to common areas of the mall remain closed and locked."

8.      Attached as Exhibit "E" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.6 dated March 18, 2020, which is also publicly available at  https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.6.pdf.   By virtue of EO No. 202.6, the Governor, *inter alia*, directed that, no later than March 20, 2020 at 8:00 p.m., "[a]ll businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize," and that "[e]ach employer shall reduce the in-person workforce at any work locations by 50%," except that these directives do not apply to "[a]ny essential business or entity providing essential services or functions," which include "essential retail including grocery stores and pharmacies."[2]

9.      Attached as Exhibit "F" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.7 dated March 19, 2020, which is also publicly available at  https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO%20202.7.pdf.      By virtue of EO No. 202.7, the Governor, *inter alia*, (i) ordered the closure of all barbershops, hair salons, tattoo or piercing parlors and related personal care services, including nail technicians, cosmetologists and estheticians, and the provision of electrolysis, laser hair removal services, by

---

[2] According to EO No. 202.6, essential businesses or entities include: "essential health care operations including research and laboratory services; essential infrastructure including utilities, telecommunication, airports and transportation infrastructure; essential manufacturing, including food processing and pharmaceuticals; essential retail including grocery stores and pharmacies; essential services including trash collection, mail, and shipping services; news media;  banks and related financial institutions; providers of basic necessities to economically disadvantaged populations; construction; vendors of essential services necessary to maintain the safety, sanitation and essential operations of residences or other essential businesses;  vendors that provide essential services or products, including logistics and technology support, child care and services needed to ensure the continuing operation of government agencies and provide for the health, safety and welfare of the public."

March 21, 2020 at 8:00 p.m., and (ii) modified "[t]he provisions of [EO No.] 202.6 requiring in-person work environment restrictions" so that, no later than March 21, 2020 at 8:00 p.m., non-essential businesses or entities "reduce the in-person workforce at any work locations by 75%."

10.    Attached as Exhibit "G" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.8 dated March 20, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.8.pdf.  By virtue of EO No. 202.8, the Governor, *inter alia*, (i) modified the provisions of EO No. 202.6 so that, no later than March 22, 2020 at 8:00 p.m., non-essential businesses or entities "reduce the in-person workforce at any work locations by 100%," and (ii) prohibited the "enforcement of either an eviction of any tenant residential or commercial, or a foreclosure of any residential or commercial property for a period of ninety days."

11.    Attached as Exhibit "H" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.9 dated March 21, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.9.pdf.  By virtue of EO No. 202.9, the Governor, *inter alia*, temporarily modified N.Y. Banking Law § 39(2) "to provide that it shall be deemed an unsafe and unsound business practice, if in response to the COVID-19 pandemic, any bank which is subject to the jurisdiction of the Department shall not grant a forbearance to any person or business who has a financial hardship as a result of the COVID-19 pandemic for a period of ninety days."

12.    Attached collectively as Exhibit "I" are true and correct copies of New York State Gubernatorial Executive Order Nos. 202.13, 202.14 and 202.18 dated, respectively, March 29, 2020, April 7, 2020, and April 16, 2020, which are also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.13.pdf,

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.14_final.pdf,    and

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.18.pdf.    By virtue

of EO Nos. 202.13, 202.14 and 202.18, the Governor, *inter alia*, continued the in-person

business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7

and 202.8 until 11:59 p.m. on May 15, 2020, unless further extended by executive order.

      13.    Attached as Exhibit "J" is a true and correct copy of New York State

Gubernatorial Executive Order No. 202.16 dated April 12, 2020, which is also publicly available

at    https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.16_final.pdf.

By virtue of EO No. 202.16, the Governor, *inter alia*, temporarily suspended or modified N.Y.

Real Property and Proceedings Law § 711, N.Y. Real Property Law § 232-a, and N.Y. Multiple

Dwelling Law § 4(8)-(9), and any other law or regulation "to the extent that such laws would

otherwise create a landlord tenant relationship between any individual assisting with the response

to COVID-19 or any individual that has been displaced due to COVID-19, and any individual or

entity, including but not limited to any hotel owner, hospital, not-for-profit housing provider,

hospital, or any other temporary housing provider who provides temporary housing for a period

of thirty days or more solely for purposes of assisting in the response to COVD-19."

      14.    Attached as Exhibit "K" is a true and correct copy of New York State

Gubernatorial Executive Order No. 202.28 dated May 7, 2020, which is also publicly available at

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.28.pdf.  By virtue of

EO No. 202.28, the Governor, *inter alia*, (i) "continued the suspensions and modifications of

law, and any directives, not superseded by a subsequent directive, made by [EO No.] 202 and

each successor [EO] up to and including [EO No.] 202.14," with certain modifications, until June

6, 2020, and (ii) ordered:

a.    The temporary suspension or modification of N.Y. General Obligations Law §§ 7-103, 7-107 and 7-108, to, *inter alia*, (i) permit landlords and tenants to enter into written agreements for the application of security deposit funds to rental payment obligations, and (ii) require landlords to provide such relief to tenants that are eligible for unemployment insurance or benefits or are facing financial hardship due to the COVID-19 pandemic;

b.    The temporary suspension or modification of Real Property Law § 238-a(2) "to provide that no landlord, lessor, sub-lessor or grantor shall demand or be entitled to any payment, fee or charge for late payment of rent occurring during the time period from March 20, 2020, through August 20, 2020"; and

c.    That "[t]here shall be no initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for nonpayment of rent or a foreclosure of any residential or commercial mortgage, for nonpayment of such mortgage, owned or rented by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic for a period of sixty days beginning on June 20, 2020."

15.    Attached as Exhibit "L" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.29 dated May 8, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.29.pdf.   By virtue of EO No. 202.29, the Governor, *inter alia*, "continue[d] the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by [EO No.] . . . 202.16 . . . until June 7, 2020."

16.    Attached as Exhibit "M" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.31 dated May 14, 2020, which is also publicly available at   https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.31.pdf.    By virtue of EO No. 202.31, the Governor, *inter alia*, continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 until 11:59 p.m. on May 28, 2020, unless further extended by executive order, except that, as of 12:01 a.m. on May 15, 2020, such reductions and restrictions "no longer appl[ied] to Phase One

industries," which include retail (limited to curbside or in-store pickup or drop off), manufacturing and wholesale trade, in regions authorized for "Phase One" reopening.[3]

17.     Attached as Exhibit "N" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.34 dated May 28, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.34.pdf.  By virtue of EO No. 202.34, the Governor, *inter alia*, continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through June 27, 2020, unless further extended by executive order, except that, as of the date of EO No. 202.34, such reductions and restrictions no longer applied to business or entities eligible for "Phase One" reopening in regions authorized for "Phase One" reopening.

18.     Attached as Exhibit "O" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.35 dated May 29, 2020, which is also publicly available at  https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_35.pdf.     By virtue of EO No. 202.35, the Governor, *inter alia*, continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through June 28, 2020, unless further extended by executive order, except that, as of 1:00 p.m. on May 29, 2020, "the reductions and restrictions on the in-person workforce at non-essential businesses or other entities [] no longer appl[ied] to Phase Two industries," which include retail in-store shopping, rental, repair and cleaning businesses, and barbershops and hair salons (for limited services), in regions authorized for "Phase Two" reopening.[4]

---

[3]   New York City entered "Phase One" reopening on June 8, 2020.  *See* https://www1.nyc.gov/site/doh/covid/covid-19-businesses-and-facilities.page?fbclid=IwAR1a5YKbVTvP5Jl_yUjIP40K1DcwuopYcsBbJbQ5KgBriekj5AYxcg0CKUU.

[4]   New York City entered "Phase Two" reopening on June 22, 2020.  *See* https://www1.nyc.gov/site/doh/covid/covid-19-businesses-and-facilities.page?fbclid=IwAR1a5YKbVTvP5Jl_yUjIP40K1DcwuopYcsBbJbQ5KgBriekj5AYxcg0CKUU.

19.     Attached as Exhibit "P" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.36 dated June 2, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.36.pdf.   By virtue of EO No. 202.36, the Governor, *inter alia*, modified EO No. 202.7 "to allow for the opening of barbershops and hairs salons" in regions authorized for "Phase Two" reopening.

20.     Attached as Exhibit "Q" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.38 dated June 6, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO-202.38-final.pdf.     By virtue of EO No. 202.38, the Governor, *inter alia*, (i) "continued the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by [EO No.] 202 and each successor [EO] up to and including [EO No.] 202.14," until July 6, 2020, and (ii) modified the directive contained in EO No. 202.3 "to allow a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space."

21.     Attached as Exhibit "R" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.39 dated June 7, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_39.pdf.   By virtue of EO No. 202.39, the Governor, *inter alia*, (i) modified the directive contained in EO No. 202.38 "that allowed a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space . . . to explicitly limit such activity to those regions that are in Phase 2 of the re-opening," and (ii) "continue[d] the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by [EO No.] 202.15, through 202.21, and including 202.29, as contained in Executive Order 202.29 until July 7, 2020."

22.     Attached as Exhibit "S" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.41 dated June 13, 2020, which is also publicly available at   https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.41_.pdf.     By virtue of EO No. 202.41, the Governor, *inter alia*, (i) modified EO No. 202.7 "to allow for the opening of such personal care services, and only to the extent and in regions consistent with Department of Health guidance promulgated for Phase Three reopening," and (ii) continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through July 13, 2020, unless further extended by executive order, except that, as of June 12, 2020, "the reductions and restrictions on the in-person workforce at non-essential businesses or other entities [] no longer appl[ied] to Phase Three industries," which include restaurants, food services, and personal care businesses, in regions authorized for "Phase Three" reopening.[5]

23.     Attached as Exhibit "T" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.45 dated June 26, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.45.pdf.  By virtue of EO No. 202.45, the Governor, *inter alia*, continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through July 26, 2020, except that, as of June 26, 2020, "the reductions and restrictions on the in-person workforce at non-essential businesses or other entities [] no longer appl[ied] to Phase Four

---

[5]   New York City entered "Phase Three" reopening on July 6, 2020.  *See* https://www1.nyc.gov/site/doh/covid/covid-19-businesses-and-facilities.page?fbclid=IwAR1a5YKbVTvP5Jl_yUjIP40K1DcwuopYcsBbJbQ5KgBriekj5AYxcg0CKUU.

industries," which include film and music production and low-risk indoor and outdoor arts and entertainment, in regions authorized for "Phase Four" reopening.[6]

24.     Attached as Exhibit "U" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.48 dated July 6, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.48.pdf.   By virtue of EO No. 202.48, the Governor, *inter alia*, (i) modified "[t]he directive contained in [EO No.] 202.41, that discontinued the reductions and restrictions on in-person workforce at non-essential businesses or other entities in Phase Three industries or entities . . . in eligible regions, . . . only to the extent that indoor food services and dining continue to be prohibited in New York City, and (ii) "continued the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by [EO No.] 202 and each successor [EO] up to and including [EO No.] 202.14," through August 5, 2020, except for:

a.     EO No. 202.9's directives and temporary modification of N.Y. Banking Law § 39(2), which were superseded by Chapters 112 and 126 of the New York State Laws of 2020;

b.     EO No. 202.28's directive prohibiting the initiation of a proceeding or enforcement of either an eviction of any residential tenant, for nonpayment of rent or a foreclosure of any" residential mortgage, for nonpayment of such mortgage, which was superseded by Chapters 112, 126, and 127 of the New York State Laws of 2020.

25.     Attached as Exhibit "V" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.49 dated July 7, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.49.pdf.     EO  No. 202.49 did not further extend EO No. 202.16's temporary suspension or modifications of N.Y.

---

[6]   New   York   City   entered   "Phase   Four"   reopening   on   July   20,   2020.   *See* https://www1.nyc.gov/site/doh/covid-19-businesses-and-facilities.page?fbclid=IwAR1a5YKbVTvP5Jl_yUjIP40K1DcwuopYcsBbJbQ5KgBriekj5AYxcg0CKUU.

Real Property and Proceedings Law § 711, N.Y. Real Property Law § 232-a, and N.Y. Multiple Dwelling Law § 4(8)-(9), which was effective until July 7, 2020 pursuant to EO No. 202.39.

26.    Attached as Exhibit "W" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.50 dated July 9, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.50.pdf.    By virtue of EO No. 202.50, the Governor, *inter alia*, modified EO No. 202.5's directive "that required closure to the public of all indoor common portions of retail shopping malls, as extended, and as continued and modified in [EO No.] 202.48, . . . to allow such malls to open in regions of the state that are in Phase Four of the state's reopening, so long as such malls adhere to Department of Health issued guidance, effective 12:01am on Friday, July 10, 2020."

27.    Attached as Exhibit "X" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.53 dated July 21, 2020, which is also publicly available at   https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_53.pdf.      By virtue of EO No. 202.53, the Governor, *inter alia*, (i) continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through August 20, 2020, except that, as of July 20, 2020, the indoor common portions of retail shopping malls and places of low-risk indoor arts and entertainment continue to be closed in New York City, and (ii) modified EO No. 202.50's directive "that allowed indoor common portions of retail shopping malls to open in regions that have met the public health and safety metrics to enter Phase Four of the State's reopening, . . . to provide that indoor common portions of shopping malls continue to be closed in the New York City region."

28.    Attached as Exhibit "Y" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.55 dated August 5, 2020, which is also publicly

available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.55.pdf. By virtue of EO No. 202.55, the Governor, *inter alia*, (i) "continue[d] the directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.21, and Executive Order 202.27, 202.28, 202.29, 202.30, 202.38, 202.39, and 202.40, as continued and contained in Executive Order 202.48, 202.49, and 202.50 for another thirty days through September 4, 2020," and (ii) temporarily suspended or modified N.Y. Real Property and Proceedings Law § 711, N.Y. Real Property Law § 232-a, and N.Y. Multiple Dwelling Law § 4(8)-(9), and any other law or regulation in the same manner as EO No. 202.16 until September 4, 2020.

29.     Attached as Exhibit "Z" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.55.1 dated August 6, 2020, which is also publicly available                                                                                          at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.55.1.pdf.  By virtue of EO No. 202.55.1, the Governor, *inter alia*, modified EO No. 202.55 "to include all suspensions and modifications, not superseded by a suspension or modification in a subsequent Executive Order for the Executive Orders listed in 202.55; and provided further, Executive Orders 202.48, 202.49, and 202.50 are continued in their entirety, through September 4, 2020."

**Relevant Orders of the Chief Administrative Judge of the N.Y. State Unified Court System**

30.     Attached as Exhibit "AA" is a true and correct copy of Administrative Order No. AO/68/20 dated March 16, 2020, which is also publicly available at https://www.nycourts.gov/whatsnew/pdf/AO-68-20.pdf.   By virtue of AO/68/20, the Chief Administrative Judge of the Courts promulgated procedures and protocols in response to the pandemic and, with respect to "Housing matters," ordered that: (i) "[a]ll eviction proceedings and pending eviction orders shall be suspended statewide, and court-ordered auctions of property

shall be postponed, until further notice"; (ii) "[a]ll residential foreclosure proceedings shall be suspended statewide until further notice"; and (iii) "effective March 13, 2020, residential evictions in New York City have been stayed, and the New York City Housing Court has been directed not to issue new eviction warrants when a party has not appeared in court."

31.     Attached as Exhibit "BB" is a true and correct copy of Administrative Order No. AO/127/20 dated June 18, 2020, which is also publicly available at https://www.nycourts.gov/whatsnew/pdf/AO-127-20.pdf.  AO/127/20 states that it took effect on June 20, 2020 and that it will continue "in effect for such time as state and federal emergency measures addressing the COVID-19 pandemic amend or suspend statutory provisions governing eviction proceedings, or until further order."  By virtue of AO/127/20, the Chief Administrative Judge of the Courts ordered, *inter alia*, as follows:

> Consistent with prior and current gubernatorial Executive Orders (EO/202.8, EO/202.14, EO/202.28, EO/202.39) and Administrative Order AO/68/20, RPAPL eviction matters commenced on or before March 16, 2020 shall continue to be suspended until further order; eviction proceedings filed after March 16, 2020 shall, upon the filing of a petition (if no answer is filed thereafter) or the filing of an answer, be suspended until further order.  Notwithstanding the foregoing, eviction matters in which all parties are represented by counsel shall be eligible for calendaring for virtual settlement conferences.

32.     Attached as Exhibit "CC" is a true and correct copy of Administrative Order No. AO/131/20 dated June 23, 2020, which is also publicly available at https://www.nycourts.gov/whatsnew/pdf/AO-131-20.pdf.  AO/127/20 states that it took effect on June 24, 2020 and that it will continue "in effect for such time as state and federal emergency measures addressing the COVID-19 pandemic amend or suspend statutory provisions governing eviction proceedings, or until further order."  By virtue of AO/131/20, the Chief Administrative Judge of the Courts ordered, *inter alia*, as follows:

> Consistent with prior and current gubernatorial Executive Orders (EO/202.8, EO/202.14, EO/202.28, EO/202.39) and Administrative Order AO/68/20,

foreclosure matters commenced on or before March 16, 2020 shall continue to be suspended until further order; foreclosure proceedings filed after March 16, 2020 shall, upon the filing of a petition (if no answer is filed thereafter) or the filing of an answer, be suspended until further order; initial mandatory settlement conferences in residential foreclosure pursuant to CPLR 3408 shall not be scheduled; and foreclosure auctions shall continue to be suspended until further order.  Notwithstanding the foregoing, foreclosure matters in which all parties are represented by counsel shall be eligible for calendaring for both initial and follow-up virtual settlement conferences; lenders may move for a judgment of foreclosure and sale on the ground that a property is vacant and abandoned; and lenders may move to discontinue a pending case.

33.    Attached as Exhibit "DD" is a true and correct copy of Administrative Order No. AO/143/20 dated July 7, 2020, which is also publicly available at https://www.nycourts.gov/whatsnew/pdf/AO-143-20.pdf.  AO/143/20 states that it took effect on July 7, 2020 and that it will "remain in effect until further order."  By virtue of AO/143/20, the Chief Administrative Judge of the Courts stated, *inter alia*, that the directives set forth in AO/127/20 and AO/131/20 "continue in full force and effect."

**Chapter 112 and 126 of the New York State Laws of 2020**

34.    Attached collectively as Exhibit "EE" are true and correct copies of Chapter 112 of the New York State Laws of 2020 ("Chapter 112") and Chapter 126 of the New York State Laws of 2020 ("Chapter 126").  Chapter 112 amended the N.Y. Banking Law by adding a new section "9-x," relating to the forbearance of residential mortgage payments. Chapter 126 further amended the provisions of N.Y. Banking Law § 9-x.  Both chapters were enacted and went into effect on June 17, 2020.

35.    N.Y. Banking Law § 9-x requires, *inter alia*, New York regulated banks, trust companies, private bankers, savings banks, safe deposit companies, savings and loan associations, credit unions, investment companies, and mortgage servicer entity subject to supervision by the New York State Department of Financial Services (defined as "regulated institutions") to "grant [a] forbearance of all monthly payments due with respect to [a] mortgage

secured by [a] qualified mortgagor's[7] primary residence in New York for a period of up to one hundred eighty days to any such qualified mortgagor, with the option to extend the forbearance of such monthly payments for up to an additional one hundred eighty days provided that this extension is subject to the mortgagor demonstrating continued financial hardship."[8]

36.     Notwithstanding, the obligation to grant forbearance is limited in certain respects.  For example, a regulated institution is not required to grant a forbearance if it has insufficient "capital and liquidity to meet its obligations and to operate in a safe and sound manner."  N.Y. Banking Law § 9-x(6).  Also, there is no such obligation if the mortgage was "made, insured, purchased or securitized by any agency or instrumentality of the United States, any government sponsored enterprise, or a federal home loan bank, or a corporate governmental agency of the state constituted as a political subdivision and public benefit corporation, or the rights and obligations of any lender, issuer, servicer or trustee of such obligations, including servicers for the Government National Mortgage Association."  *Id.* § 9-x(5).

37.     Notably, N.Y. Banking Law § 9-x(4) states that adherence to the provisions of N.Y. Banking Law § 9-x "shall be a condition precedent to commencing a foreclosure action stemming from missed payments."

**Chapter 125 of the New York State Laws of 2020**

---

[7] The term "qualified mortgagor" is defined by N.Y. Banking Law § 9-x(1).  In order to qualify as such, a mortgagor must, *inter alia*, demonstrate financial hardship as a result of COVID-19 during the "covered period," which is defined as "March 7, 2020 until the date on which none of the provisions that closed or otherwise restricted public or private businesses or places of public accommodation, or required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason . . . continue to apply in the county of the qualified mortgagor's residence."  *Id.* § 9-x(1).

[8] "If any qualified mortgagor has already received a forbearance pursuant to [EO No.] 202.9 of two thousand twenty, the time of such forbearance shall be considered as part of the requirement of this section to provide a forbearance of up to one hundred eighty days, and any extension thereof pursuant to this section."  N.Y. Banking Law § 9-x(2)(b).

38.     Attached as Exhibit "FF" is a true and correct copy of Chapter 125 of the New York State Laws of 2020 ("Chapter 125"), which is known as the "Emergency Rent Relief Act of 2020."   Chapter 125 was enacted and went into effect on June 17, 2020, and is set to expire on July 31, 2021.   Among other things, Chapter 125 directs the New York State Commissioner of Housing and Community Renewal "to establish and implement an interim residential rent relief program to support households impacted by the COVID-19 pandemic." Under such program, "[a] rental subsidy shall be provided in the form of a voucher . . . directly to the owner of the dwelling unit for applicants determined to be eligible households during the coverage period in an amount equal to the difference between the applicant's rent burden on March 1, 2020 and their rent burden during the month or months assistance is requested for."

**Chapter 127 of the New York State Laws of 2020**

39.     Attached as Exhibit "GG" is a true and correct copy of Chapter 127 of the New York State Laws of 2020 ("Chapter 127"), which was enacted and went into effect on June 30, 2020.   Chapter 127 provides, *inter alia*, that "[n]o court shall issue a warrant of eviction or judgment of possession against a residential tenant or other lawful occupant that has suffered a financial hardship during the COVID-19 covered period[9] for the non-payment of rent that accrues or becomes due during the COVID-19 covered period."     Ex. GG, § 2(1). Notwithstanding, Chapter 127 does "not prohibit any court from awarding a judgment for the rent due and owing to a successful petitioner in a summary proceeding under article 7 of the real property actions and proceedings law." *Id.* § 2(3).

---

[9] Chapter 127 defines "COVID-19 covered period" as "March 7, 2020 until the date on which none of the provisions that closed or otherwise restricted public or private businesses or places of public accommodation, or required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason . . . continue to apply in the county of the tenant's or lawful occupant's residence." Ex. GG, § 1.

**The Challenged Local Laws & Their Relevant Legislative History**

40.     On April 22, 2020, during its stated meeting, the New York City Council ("City Council") introduced the following three bills that, as amended, became Local Law No. 53 of 2020 (the "Commercial Harassment Law"),[10] Local Law No. 55 of 2020 (the "Guaranty Harassment Law"),[11] and Local Law No. 56 of 2020 (the "Residential Harassment Law")[12]: (a) Introduction ("Intro.") No. 1914 (a true and correct copy of which is attached as Exhibit "HH"); (b) Intro. No. 1932 (a true and correct copy of which is attached as Exhibit "II"); and (c) Intro. No. 1936 (a true and correct copy of which is attached as Exhibit "JJ").  A true and correct copy of the transcript of the April 22, 2020 stated meeting is attached as Exhibit "KK."

41.     Attached as Exhibit "LL" is a true and correct copy of the "Committee Report of the Infrastructure and Governmental Affairs Divisions" dated April 28, 2020, which was prepared in advance of the April 28, 2020 hearing before the City Council's Committees on Housing and Buildings and on Consumer Affairs and Business Licensing on Intro. No. 1936. The committee report states, in relevant part, as follows:

a.     "The outbreak of the novel coronavirus, COVID-19, in the City of New York has resulted in a myriad of concerns for many New Yorkers, including loss of income, food insecurity and housing instability," Ex. LL at 3;

---

[10]  The legislative history for the Commercial Harassment Law, including the legislative record documentation attached to this declaration, is available in the City Council's website at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4424937&GUID=EA82E496-2E94-43A6-8C1D-4D279AE425FD&Options=ID%7cText%7c&Search.

[11]  The legislative history for the Guaranty Law, including the legislative record documentation attached to this declaration, is available in the City Council's website at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4424954&GUID=C2A4AC16-7409-465E-B5A4-A84F6E7989FB&Options=ID|Text|&Search.

[12]  The legislative history for the Residential Harassment Law, including the legislative record documentation attached to this declaration, is available in the City Council's website at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4425102&GUID=4A05D415-0BF2-4980-98A9-C0EABB57E397&Options=ID|Text|&Search.

b.   "In an effort to manage the spread of the virus, Governor Andrew Cuomo issued an executive order, and subsequent continuing executive orders, to bring the State to a 'PAUSE,' which ordered the closing of all businesses deemed 'nonessential,'" Ex. LL at 3;

c.   "In an analysis of the potential economic impacts of the pandemic on NYC households, the New York University Furman Center 'estimate[s] that about 1,405,000 (or 34 percent) of the city's wage earners may be at risk of income loss' as a result of mass layoffs or workplace closures, and that there are nearly 1,032,000 New York City households with at least one wage earner in an occupation more vulnerable to income loss," Ex. LL at 3 (citing *What are the Housing Costs of Households Most Vulnerable to Job Layoffs? An Initial Analysis*, NYU FURMAN CENTER (Mar. 30, 2020), *available at* https://furmancenter.org/thestoop/entry/what-are-the-housing-costs-of-households-most-vulnerable-to-job-layoffs-an, a printout copy of which is annexed as Exhibit "MM");

d.   "Additionally, the number of unemployment claims filed with the State has skyrocketed since the 'PAUSE': approximately 144,000 claims were filed in New York City the week of March 22, 2020, up 2,637% from the same period in 2019," Ex. LL at 3-4 (citing Corina Knoll, Azi Paybarah, Jacob Mensche and Elaine Chen, *11 Numbers That Show How the Coronavirus Has Changes N.Y.C.*, THE N.Y. TIMES, (Apr. 20, 2020), *available at* https://www.nytimes.com/2020/04/20/nyregion/coronavirus-nyc-numbers-unemployment.html, a printout copy of which is annexed as Exhibit "NN");

e.   "Although the eviction moratoriums serve as temporary stopgaps to allow tenants to remain in their apartments, they do not provide any kind of relief to tenants for rent owed during the moratoriums. Further, they do not guarantee that tenants unable to pay rent will be able to stay in their apartments once the moratoriums are lifted, or that tenants will be safe from landlord harassment on the basis of having been impacted by the virus," Ex. LL at 4.

42.   Attached as Exhibit "OO" is a true and correct copy of the transcript of the April 28, 2020 hearing held by the City Council's Committees on Housing and Buildings and on Consumer Affairs and Business Licensing on Intro. No. 1936.  During this hearing, oral testimony was submitted by representatives from the New York City Commission on Human Rights, the New York City Department of Housing Preservation and Development ("HPD") and the Real Estate Board of New York ("REBNY"), housing advocates, and non-profit organizations.

43.     Attached as Exhibit "PP" is a true and correct copy of the written testimony, which consists of a total of 107 pages, received by the City Council's Committees on Housing and Buildings and on Consumer Affairs and Business Licensing in connection with their April 28, 2020 hearing on Intro. No. 1936.  The written testimony on Intro. 1936 includes testimony from the Deputy Commissioner of Policy and Intergovernmental Affairs of the New York City Commission on Human Rights, REBNY, the New York City Community Housing Improvement Program ("CHIP"), and The Legal Aid Society.

44.     Attached as Exhibit QQ" is a true and correct copy of the "Briefing Paper and Committee Report of the Governmental Affairs Divisions" dated April 29, 2020, which was prepared in advance of the April 29, 2020 hearing (entitled "OVERSIGHT: The Impact of COVID-19 on Small Businesses in New York City") before the City Council's Committees on Small Business and on Consumer Affairs and Business Licensing held a hearing on Intro Nos. 1914 and 1932.  The committee report discusses the impact of COVID-19 on small businesses, as well as the need for legislation to address such impact.  It states, in relevant part, as follows:

a.      "In New York, Governor Andrew Cuomo issued an executive order – New York State on PAUSE (PAUSE) – that closed all on-site, non-essential businesses, effective March 22, 2020, to help stop the spread of SARS-CoV-2," Ex. QQ at 8;

b.      "Although this list covers a range of industries that are permitted to operate during PAUSE, a large proportion of New York's small (and large) businesses have still had to severely reduce their capacities," Ex. QQ at 9;

c.      "According to an analysis by the NYC Comptroller, the City's hotels are projected to only maintain an occupancy rate of 20 percent, while restaurant sales are expected to drop by a staggering 80 percent. Real estate and retail sales are both expected to decline by 20 percent," Ex. QQ at 9-10 (citing New York City Comptroller Scott M. Stringer, *Comptroller Stringer: City must take immediate action to prepare for economic impacts of COVID-19 and protect vital services for most vulnerable New Yorkers* (March 16, 2020), available at https://comptroller.nyc.gov/newsroom/comptroller-stringer-city-must-take-immediate-action-to-prepare-for-economic-impacts-of-covid-19-and-protect-vital-services-for-most-vulnerable-new-yorkers/, a printout copy of which is attached as Exhibit "RR");

d.    "These figures for the restaurant industry reflect the results of a recent survey by the New York State Restaurant Association. According to their findings, sales have declined by 79 percent, and New York State restaurants are expected to lose $3.6 billion in sales revenue, in April alone. Just over half (51 percent) of all restaurants have been able to move their operations online, and unemployment rates in this sector have skyrocketed, as 80 percent of restaurant workers have lost their jobs," Ex. QQ at. 10 (citing New York State Restaurant Association, *Restaurant industry impact survey: New York State* (April 2020), available at https://www.nysra.org/uploads/1/2/1/3/121352550/restaurant_industry_impact_survey___new_york_state__2_.pdf, a copy of which is attached as Exhibit "SS");

e.    "In their survey of small businesses (under 500 employees), the National Bureau of Economic Research found that 43 percent of businesses had closed due to COVID-19 and that they had reduced their staff by about 40 percent since January 2020. The results were more severe in the Mid-Atlantic region, which includes New York, where 57 percent of businesses were closed, and staff employment decreased by 47 percent. According to the survey's conclusion, about 20 percent of the nation's employees work in 'retail trade, leisure and hospitality and these sectors are particularly vulnerable to the current pandemic,' Ex. QQ at 10-11 (citing Alexander W. Bartik et al., *How are small businesses adjusting to Covid-19? Early evidence from a survey*, NAT'L BUREAU OF ECON. RESEARCH (April 2020), available at https://www.nber.org/papers/w26989.pdf, a copy of which is attached as Exhibit "TT");

f.    "The nation's economy is dependent on its small businesses. There are approximately 27 million of these businesses across the country and they are responsible for employing 57 million workers. When including the owners of these businesses, in addition to employees, that total comes to an estimated 85 million people," Ex. QQ at 11 (citing *How important are small businesses?*, INFO. STATION (Jan. 3, 2017), available at https://informationstation.org/video/how-important-are-small-businesses/?utm_source=google&utm_medium=cpk&gclid=EAIaIQobChMI-Ymy3df86AIVGozICh0QRQPrEAAYASAAEgI7ivD_BwE, a printout copy of which is attached as Exhibit "UU");

g.    "According to the Small Business Administration, small businesses are responsible for creating two-thirds of the Country's new jobs," Ex. QQ at 11 (citing United States Small Business Administration, *Small Businesses generate 44 percent of U.S. economic activity* (Jan. 30, 2019), available at https://advocacy.sba.gov/2019/01/30/small-businesses-generate-44-percent-of-u-s-economic-activity/, a printout copy of which is attached as Exhibit "VV");

h.    "Given their vital role, it is crucial that they are either given alternative means to operate, in as lucrative a manner as possible, throughout the COVID-19 crisis, and/or are provided the necessary support to restart their operations once social distancing measures have been lifted," Ex. QQ at 11;

i. "The various governmental approaches to support small businesses during this crisis have provided some measure of relief for small business owners and their employees; however, there are [a] range of outstanding issues that continue to make operating a business during the pandemic particularly difficult, " Ex. QQ at 28;

j. "Businesses who experience a drop in revenue due to COVID-19 may face added legal pressure to meet financial obligations.  Commercial leases may contain provisions imposing personal liability on the tenant for non-payment of rent. These personal guarantees can make the business, which may otherwise shield the owner from liability due to its corporate structure, answerable in a court of law for any unpaid debts or damages," Ex. QQ at 28-29 (citing N.Y.C. Dep't of Small Business Services, *Comprehensive Guide to Commercial Leasing in New York City*, available at https://www1.nyc.gov/assets/sbs/downloads/pdf/about/reports/commercial-lease-guide-accessible.pdf, a printout copy of which is attached as Exhibit "WW"; Hayden Field, *5 most common red flags entrepreneurs should know before signing a commercial real estate lease in New York*, ENTREPRENEUR (June 6, 2019), available at https://www.entrepreneur.com/article/334848, a printout copy of which is attached as Exhibit "XX");

k. "Without recourse, landlords and debt servicers may resort to threats, which continues to make protecting businesses from harassment an important issue as the City grapples with the effects of COVID-19," Ex. QQ at 29.

45.     Attached as Exhibit "YY" is a true and correct copy of the transcript of the April 29, 2020 hearing held by the City Council's Committees on Small Business and on Consumer Affairs and Business Licensing on Intro Nos. 1914 and 1932.  During this hearing, oral testimony was submitted by representatives from the New York City Department of Small Business Services ("SBS"), REBNY, small business advocates, chambers of commerce and non-profit organizations.

46.     Attached collectively as Exhibit "ZZ-1," "ZZ-2," "ZZ-3," "ZZ-4," and "ZZ-5" are a true and correct copies of the written testimony, which together consists of a total of 949 pages, received by the City Council's Committees on Small Business and on Consumer Affairs and Business Licensing in connection with their April 29, 2020 hearing on Intro Nos. 1914 and 1932.  The written testimony on Intro Nos. 1914 and 1932 includes testimony from

SBS, REBNY, United for Small Businesses NYC, Volunteers of Legal Service (VOLS), CHIP, and The Legal Aid Society.

47.    On May 13, 2020, the City Council amended: (a) Intro. No. 1914 as Intro. No. 1914-A (a true and correct copy of which is attached as Exhibit "AAA"); (b) Intro. No. 1932 as Intro. No. 1932-A (a true and correct copy of which is attached as Exhibit "BBB"); and (c) Intro. No. 1936 as Intro. No. 1936-A (a true and correct copy of which is attached as Exhibit "CCC").

48.    Attached as Exhibit "DDD" is a true and correct copy of Intro. No. 1914-A's "Plain Language Summary" document that is prepared by the City Council, which states, in relevant part, that Intro. No. 1914-A "would make threatening a commercial tenant based on their status as a COVID-19 impacted business or person a form of harassment punishable by a civil penalty of $10,000 to $50,000."

49.    Attached as Exhibit "EEE" is a true and correct copy of Intro. No. 1932-A's "Plain Language Summary" document that is prepared by the City Council, which states, in relevant part, that Intro. No. 1932-A would:

a.    "temporarily prohibit the enforcement of personal liability provisions in commercial leases or rental agreements involving a COVID-19 impacted tenant";

b.    "apply to businesses that were impacted by mandated closures and service limitations in the Governor's Executive Orders"; and

c.    "cover[] (1) businesses that were required to stop serving food or beverages on-premises (restaurants and bars); (2) businesses that were required to cease operations altogether (gyms, fitness centers, movie theaters); (3) retail businesses that were required to close and/or subject to in-person restrictions; and (4) businesses that were required to close to the public (barbershops, hair salons, tattoo or piercing parlors and related personal care services)."

50.    Attached as Exhibit "FFF" is a true and correct copy of Intro. No. 1936-A's "Plain Language Summary" document that is prepared by the City Council, which states, in

relevant part, that Intro. No. 1936-A "would amend the definition of harassment in the Housing Maintenance Code to include threats against an individual based on their status as a COVID-19 impacted person, their status as an essential employee, or their receipt of a rental concession or forbearance."

51.     Attached as Exhibit "GGG" is a true and correct copy of the "Committee Report of the Infrastructure Division" dated May 13, 2020, which was prepared in advance of the May 13, 2020 hearing to be held before the City Council's Committee on Housing and Buildings on Intro. No. 1936-A.  It states, in relevant part, that "Proposed Int. No. 1936-A would expand the definition of tenant harassment to protect individuals who may be harassed due to their status as an essential employee or a person impacted by COVID-19, or whether they received a rent concession or forbearance for any rent owed during the COVID-19 crisis."  Ex. GGG at 2.

52.     Attached as Exhibit "HHH" is a true and correct copy of the transcript of the May 13, 2020 hearing held by the City Council's Committee on Housing and Buildings on Intro. No. 1936-A.  During the hearing, the Committee on Housing and Buildings approved Intro No. 1936-A by a vote of 9 to 1.

53.     Attached as Exhibit "III" is a true and correct copy of the "Committee Report of the Governmental Affairs Divisions" dated May 13, 2020, which was prepared in advance of the May 13, 2020 hearing to be held before the City Council's Committee on Small Business on Intro Nos. 1914-A and 1932-A.  This committee report, which largely incorporates language from the April 29, 2020 committee report, states, in relevant part, that "[n]othing in this [Intro. No. 1914-A] is intended to limit any of the rights or obligations of landlords or commercial tenants under the existing harassment law as set forth in chapter 9 of title 22 of the Administrative Code, including but not limited to (1) the right of a landlord to terminate a

tenancy, refuse to renew or extend a lease or other rental agreement, or reenter and repossess property under section 22-902(b) and (2) the obligation of a commercial tenant to continue paying rent owed under section 22-903(b)." Ex. DDD at 35.

54.     Attached as Exhibit "JJJ" is a true and correct copy of the transcript of the May 13, 2020 hearing held by the City Council's Committee on Small Business on Intro. Nos. 1914-A and 1932-A.  During the hearing, the Committee on Small Business approved Intro Nos. 1914-A and 1932-A each by a vote of 5 to 0.

55.     Attached as Exhibit "KKK" is a true and correct copy of the City Council's stated meeting, where Intro. Nos. 1914-A, 1932-A, and 1936-A were passed as local laws by votes of 47-3, 44-6 and 47-3, respectively.

56.     Attached as Exhibit "LLL" is a true and correct copy of a letter from the City's Office of the Mayor dated May 26, 2020, indicating that the Mayor signed Intro. Nos. 1914-A, 1932-A, and 1936-A.

57.     Attached as Exhibit "MMM" is a true and correct copy of the Commercial Harassment Law, which took effect on May 26, 2020.

58.     Attached as Exhibit "NNN" is a true and correct copy of the Guaranty Law, which took effect on May 26, 2020.

59.     Attached as Exhibit "OOO" is a true and correct copy of the Residential Harassment Law, which took effect on May 26, 2020.

**City Council's Laws and Resolutions to Reduce Interest Rates for Nonpayment of Taxes on Certain Real Property by Property Owners Who Were Adversely Affected by COVID-19**

60.     On June 25, 2020, the City Council passed Local Law No. 62 of 2020 (a true and correct copy of which is attached as Exhibit "PPP") and Local Law No. 63 of 2020 (a

true and correct copy of which is attached as Exhibit "QQQ").  Although signed by the Mayor on July 7, 2020, these local laws took effect on June 25, 2020.

61.     On June 25, 2020, the City Council also passed Resolution No. 1349 of 2020 (a true and correct copy of which is attached as Exhibit "RRR"), which adopted "an interest rate of 7.5 percent . . . for a portion of Fiscal Year 2021 for the non-payment of taxes on real property with an assessed value over $250,000 for property owners adversely affected by COVID-19 as authorized by" Local Law No. 62 of 2020.[13]

62.     On June 25, 2020, the City Council also passed Resolution No. 1350 of 2020 (a true and correct copy of which is attached as Exhibit "SSS").  By virtue of Resolution No. 1350 of 2020, the City Council adopted "an interest rate of zero percent . . . for a portion of Fiscal Year 2021 for the non-payment of taxes on real property with an assessed value of $250,000 or less for property owners adversely affected by COVID-19 as authorized by" Local Law No. 63 of 2020.[14]

**Contracts Produced by Plaintiffs Jarican Realty Inc. and Top East Realty LLC**

63.     In response to "Defendants' Limited Requests for the Production of Documents in Advance of Responding to Plaintiffs' Complaint and Motion for Preliminary Injunctive and Declaratory Relief" dated July 28, 2020, on July 31, 2020, Plaintiff Jarican Realty Inc. produced a document Bates stamped as MELENDEZ00000001 through

---

[13] The interest rate for the non-payment of taxes on properties with an assessed value of over $250,000, or over $250,000 per residential unit for cooperative apartments, was established at 18% per annum for Fiscal Year 2021 by the City Council by virtue of Resolution No. 1347 of 2020.  *See* https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4579027&GUID=73EBBADD-E91C-488B-8A7E-3E87E9A302F4&Options=ID|Text|&Search=1347.

[14] The interest rate for the non-payment of taxes on properties with an assessed value of not more than $250,000, or not more than $250,000 per residential unit for cooperative apartments, was established at 3.25% for the first quarter of Fiscal Year 2021 and 5% for the remainder of Fiscal Year 2021 by the City Council by virtue of Resolution No. 1348 of 2020.  *See* https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4579030&GUID=BB48C27C-F1F9-4556-ADFA-8D6E340911BD&Options=ID|Text|&Search=1348.

MELENDEZ00000033 (a true and correct copy of which is attached hereto as Exhibit "TTT"),

and Plaintiff Top East Realty LLC produced two documents, respectively, Bates stamped as

YANG00000001 through YANG00000014 (a true and correct copy of which is attached hereto

as Exhibit "UUU") and YANG00000015 through YANG00000032 (a true and correct copy of

which is attached hereto as Exhibit "VVV").[15]

64.     The document Bates stamped as MELENDEZ00000001 through

MELENDEZ00000033 consists of (i) an "Agreement of Lease (Net Lease)" dated February 1,

2017, entered into between Plaintiff Jarican Realty Inc. (as landlord) and Furman's Lab LLC (as

tenant), in connection with the property located at 547 Nostrand Avenue, Brooklyn, NY 11216

(*see* Ex. TTT at MELENDEZ00000001-29), and (ii) a "Good Guy Guaranty" signed by

principals of the tenant (*see* Ex. TTT at MELENDEZ00000030-33).

65.     The document Bates stamped as YANG00000001 through

YANG00000014 consists of (i) an "Agreement of Lease" in connection with the property located

at 40-59 College Point Blvd., 2nd Floor, Flushing, Queens, NY, which is not executed by the

parties (*see* Ex. UUU at YANG00000001-5), (ii) a "Guaranty," which is unsigned (*see* Ex. UUU

at YANG00000006), and a signed "Rider to Lease Agreement" (*see* Ex. UUU at

YANG00000007-14).

66.     The document Bates stamped as YANG00000015 through

YANG00000032 consists of (i) an "Agreement of Lease" dated September 1, 2015, executed

between Plaintiff Top East Realty LLC (as "OWNER") and "Home Decor Expo" and "Khalid

Yehia" (as "TENANTS") in connection with the property located at 40-59 College Point Blvd.,

Flushing, Queens, NY, which expires on August 31, 2020 (*see* Ex. VVV at YANG000000015-

---

[15] These documents have been duly redacted in accordance with the Court's applicable rules, including
Federal Rule of Civil Procedure 5.2.

19), (ii) a "Guaranty," which is signed by tenant Khalid Yehia (*see* Ex. VVV at YANG00000020), and a signed "Rider to Lease" (*see* Ex. VVV at YANG00000021-32).

   **WHEREFORE**, for the reasons stated in Defendants' papers, Defendants respectfully request that this Court grant Defendants' motion to dismiss the Complaint and deny Plaintiffs' motion for preliminary injunctive and declaratory relief.

Dated:      New York, New York
            August 12, 2020


                           /s/ Carlos Fernando Ugalde Alvarez
                           **CARLOS FERNANDO UGALDE ALVAREZ**