# EXHIBIT PP



Testimony of Dana Sussman
Deputy Commissioner, Policy and Intergovernmental Affairs
New York City Commission on Human Rights
Before the Committee on Housing and Buildings and Committee on Consumer Affairs and
Business Licensing on Int. 1936
April 28, 2020

Good afternoon Speaker Johnson, Committee Chairs Cornegy and Cohen, and Members of the
Housing and Buildings and Consumer Affairs and Business Licensing Committees. I am Dana
Sussman, Deputy Commissioner, Policy and Intergovernmental Affairs, at the New York City
Commission on Human Rights. Thank you for convening today's hearing to address the critical
needs of New Yorkers during the COVID-19 pandemic. We know that many of us are struggling
and may be mourning the loss of family, friends, and co-workers, and I want to take a moment to
acknowledge that.

As you likely know, the Commission is the local civil rights enforcement agency that enforces
the New York City Human Rights Law, one of the broadest and most protective anti-
discrimination and anti-harassment laws in the country, now totaling 26 protected categories
across nearly all aspects of city living: housing, employment, and public accommodations, in
addition to discriminatory harassment and bias-based profiling by law enforcement. By statute,
the Commission has two main functions. First, the Commission's Law Enforcement Bureau
enforces the City Human Rights Law, by investigating complaints of discrimination from the
public, initiating its own investigations on behalf of the City, and utilizing its in-house testing
program to help identify entities breaking the law. Second, through the Community Relations
Bureau which is comprised of Community Service Centers in each of the City's five boroughs,
the Commission provides free workshops on individuals' rights and businesses, employers' and
housing providers' obligations under the City Human Rights Law and creates engaging
programming on human rights and civil rights issues.

Before turning to Int. 1936, I'd like to highlight some of the important work that the Commission
is doing to address discrimination and harassment that we have seen emerging in the midst of the
current public health crisis posed by COVID-19. In the context of the COVID-19 pandemic, we
have seen a multitude of ways in which the City Human Rights Law intersects with rapidly
changing needs of New Yorkers in crisis. Starting in January, the Commission began to monitor
an increase in anti-Asian discrimination and harassment, including scapegoating, fearmongering,
and the spread of misinformation, as news about COVID-19 started to emerge. In February, the
Commission started to receive its first reports of New York City-based incidents of
discrimination and harassment targeting Asian New Yorkers. At the same time, the
Commission's East Asian Communities Liaison Flora Ferng and other members of the
community outreach team were working regularly with community leaders of Asian and Pacific
Islander (API) communities throughout New York City to provide information and resources
about the Commission's work.

From February through mid-April, the agency recorded 284 reports of harassment and
discrimination related to COVID-19, over 40% (115) of which identify incidents of anti-Asian
harassment or discrimination. By comparison, during this same time period in 2019, the

Commission received just five reports of anti-Asian discrimination. This influx in reports and cases resulted in the Commission's April 19 announcement of the formation of a COVID-19 Response Team to handle reports of harassment and discrimination related to the outbreak. The Response Team is comprised of staff from the Law Enforcement Bureau and the Community Relations Bureau working in coordination to quickly and efficiently track and respond to the sharp increase in reports of harassment and discrimination connected to the pandemic. The COVID-19 Response Team has taken action in 176 of those reports, including, for example, conducting early or emergency intervention, providing information on how to request a reasonable accommodation, referring the individual to another service or agency, or commencing an investigation. In addition, the Commission has opened active investigations into 26 matters spanning discrimination in housing, public accommodations, and employment on the basis of race, national origin, disability, and lawful source of income. Additionally, the Response Team has successfully resolved 10 matters of COVID-19-related harassment and discrimination so far.

The Commission's Community Relations Bureau (CRB) has also held bystander intervention trainings with the Center for Anti-Violence Education. The trainings provide techniques to safely de-escalate a bias incident in real time, and were recently piloted in Mandarin. In early March, CRB co-sponsored community forums in Sunset Park, Brooklyn and Manhattan's Chinatown educating Asian communities of their rights and protections under the law. The Commission also held virtual town halls, in partnership with sister agencies, elected officials, and community-based organizatoins highlighting workplace rights related to COVID-19, reporting discrimination and harassment related to COVID-19, and responding to hate and bias with restorative justice measures, among other topics. The Commission continues to produce and promote content to provide key information to impacted communities on their rights in several languages, including those spoken by Asian New Yorkers facing heightened harassment and discrimination due to COVID-19 stigma (Cantonese, Fujianese, Korean, Mandarin, and Tagalog). Commission staff currently speak over 30 languages. Shortly after the outbreak began, the Commission also launched an online resource page outlining New Yorkers' rights and protections from COVID-19 related discrimination in housing, employment, and public accommodations which is regularly updated. The page is available at nyc.gov/stopcovidhate. The Commission also currently has a paid campaign running on social media platforms directing people to our resources on their rights as they relate to COVID-19.

Turning now to Int. 1936: most cases of housing discrimination against a person with suspected or confirmed COVID-19, or against a person caring for someone with a suspected or confirmed case, are protected under the City Human Rights Law's broad protections based on actual or perceived disability and a person's association with someone with a disability. In addition, essential workers who may face housing discrimination because they are at risk of exposure to COVID-19 are covered by the City Human Rights Law's protections based on occupation. The Commission's Law Enforcement Bureau has directly received 228 COVID-19 related inquiries, 44 of which are in the housing context. The Commission has provided tenants and coop residents with information regarding the City's Human Rights law and, in some cases, contacted management companies or cooperative boards to advise them of their responsibilities under the law, where restrictions on residents to reduce the spread of COVID-19 did not allow for accommodations for residents with disabilities. For example, in situations in which buildings are not permitting or facilitating deliveries to the door of individuals with disabilities unable to exit

2

their apartment due to immunocompromised conditions, COVID-19 self-quarantine, or are unable to lift or otherwise carry packages or deliveries due to a disability, the Commission's Law Enforcement Bureau was able to intervened and provided inquirers with information about their rights to request a reasonable accommodation.

While Int. 1936 does not amend the City Human Rights Law, it does amend the Housing Maintenance Code's language on tenant harassment, which was modeled after language in the City Human Rights Law to protect against harassment based on a person's protected status. The addition of tenant harassment in the housing code in 2017 allows tenants to choose whether to file a discrimination claim with the Commission or to take a case to housing court. Because of the substantial overlap between existing protections in the City Human Rights Law and the Housing Maintenance Code, several of the protections contemplated in Int. 1936 already exist to protect tenants against harassment in housing. This is true for cases of both confirmed or suspected COVID-19, or when an individual has a relationship or association with someone with an actual or suspected case of COVID-19.

It is important to note that if a tenant chooses to bring a claim under this provision in housing court, they typically will be precluded from bringing the same claim at the Commission. Currently, remedies in housing court are limited to civil penalties ranging from $1,000 to $10,000, compared to remedies at the Commission which include uncapped compensatory damages to the victim, civil penalties of up to $250,000, and other affirmative relief. Because the remedies in housing court are more limited than at the Commission, it is vital that tenants understand the options available to them and are able to make an informed decision regarding the venue they choose. To the extent that New Yorkers experience discrimination or harassment with respect to any of the protected categories articulated in the City Human Rights, we encourage them to contact the Commission.

The Commission recognizes that people who have COVID-19, are at risk of contracting the virus, or are essential workers must be able to live safely and securely and should never, under any circumstances, have to contend with discrimination and harassment. We are committed to working with the Council to ensure that the devastating impacts of this public health crisis are not unnecessarily compounded, and that New Yorkers can live peacefully in their homes, free from harassment. We are acutely aware of the vulnerabilities of New Yorkers right now, and the Commission is ever more committed to defending the human rights of all New Yorkers, especially those impacted by COVID-19.



**Committee on Consumer Affairs and Business Licensing and**

**Committee on Housing and Buildings**

Intro 1912: A Local Law in relation to ceasing the taking and restitution of property and the execution of money judgments by the city sheriff and marshals due to the impacts of COVID-19

Testimony of Joseph Fucito,
Sheriff of the City of New York
New York City Department of Finance

April 28, 2020

Good afternoon members of the Committee on Consumer Affairs and Business Licensing and Committee on Housing and Buildings. I am Sheriff Joe Fucito, and I am here today to discuss proposed Intro-1912. Before I do, I want to take the time to thank the City Council for its efforts to tackle the many hardships facing New Yorkers during the COVID-19 pandemic and beyond. We have all been touched by this crisis, my office included, with the loss of loved ones. Sheriff's Public Safety Officer Serge Paul passed away last week after a brave struggle against COVID-19. He was a dedicated law enforcement officer, husband, and father, and I would be remiss if I did not publicly acknowledge his dedicated service and sacrifice.

The Sheriff's Office fully appreciates what we believe is the Council's intention to help provide relief to New Yorkers from debilitating seizures of property and monetary assets. However, Intro 1912 -- while well intentioned – raises significant legal concerns for my office. The work of our Office is integrally related to the work of the judicial system and governed by State law.

May I take a moment to provide a quick explanation about judgment enforcement matters. A "judgment" is the final outcome of a court case. A judgment resolves the contested issues and terminates a lawsuit, since it is regarded as the court's official pronouncement of the law on the action that was pending before it. The judgment states who has won the case and what remedies

are awarded to that prevailing party. Remedies may include money damages, injunctive relief, or both.

Judgments are enforced by "writs of execution" which can be addressed to the Sheriff or in New York City to the Marshal, commanding them to give the plaintiff possession of land; or to enforce the delivery of personal property which was the subject of the action; or to collect the amount of the judgment, depending on the relief sought in the underlying case.

As I've described, judgment and execution enforcement are mandates that come from the court. They are under the governance of the State court system and implemented through the State Civil Practice Law and Rules. Indeed, they represent the core function of the judiciary branch and the ultimate expression of its independent decision-making authority. We believe that Intro 1912 would require actions that interfere with this well-established structure.

The bill assigns duties to the Sheriff that presupposes the Sheriff has control over the judgment and execution process. However that is not the case. The Sheriff is an officer of the court and wholly guided by the exacting statutory steps set forth in the CPLR which preclude the Sheriff's personal judgment or outside review.

Courts have repeatedly held that a Sheriff cannot look behind court mandates or review them for error, and can be penalized for doing so. For these

reasons, it is our view that the Sheriff could not comply with the directives of Intro 1912 without violating the panoply of State laws that govern the Sheriff's role as the civil enforcement official of the courts.

In my role as Sheriff I am not a heartless bill collector, but rather an officer of the court who has the duty to enforce the laws enacted for the protection of the lives, persons, property, and health of our citizens. I hope that my testimony today has conveyed my passion for following the law and having the Office of the Sheriff working productively and cooperatively for the betterment of all New Yorkers.

Thank you for your time.  I will now take questions.



# TESTIMONY OF THE REAL ESTATE BOARD OF NEW YORK TO THE COMMITTEE ON HOUSING & BUILDINGS AND THE COMMITTEE ON CONSUMER AFFAIRS & BUSINESS LICENSING OF THE NEW YORK CITY COUNCIL ON INTRO NO. 1912 AND INTRO NO. 1936, AS PART OF THE COVID-19 PACKAGE

April 28, 2020

The Real Estate Board of New York (REBNY) is the City's leading real estate trade association representing commercial, residential, and institutional property owners, builders, managers, investors, brokers, salespeople, and other organizations and individuals active in New York City real estate. REBNY strongly supports policies that expand the local economy, grow and improve the City's housing stock, and create greater opportunities for all New Yorkers. Thank you to the City Council for the opportunity to provide REBNY's perspective regarding COVID-19 related legislation.

New York is facing an unprecedented crisis. New Yorkers are worried about their health and safety, and too many are worrying about how they will provide for themselves and their families.

REBNY and its members are committed to ensuring our fellow New Yorkers withstand this crisis safely in their homes. That is why before government or the courts acted, REBNY members representing over 150,000 rental units voluntarily pledged to not execute warrants of eviction for three months. With so much physical, emotional, and financial suffering going on now, no one should have to worry about losing their place to live during this crisis.

During this time of crisis, property owners are doing all they can to meet their responsibility of providing quality and safe housing for their tenants. However, as is the case with most businesses in this crisis, it has become increasingly difficult financially to find ways to cover the costs for utilities and maintenance, COVID-19 related cleaning and safety precautions, and the other already burdensome financial obligations they have including property taxes.

Very few industries or sectors have been shielded from the economic downtown brought by COVID-19, and the real estate industry is no exception. As we look for ways to encourage a robust but safe economic recovery, it is critical that policymakers recognize that one well-intentioned bill can have harmful consequences on other actors in ways that will hinder our ability to recover. Unfortunately, it does not appear that the bills being proposed in the package takes that into account.

Below please find more detailed comments on the bills under consideration today.

**BILL:** Intro No. 1912-2020

**SUBJECT:** Ceasing the taking and restitution of property and the execution of money judgments by the city sheriff and marshals due to the impacts of COVID-19.

**SPONSORS:** Speaker Johnson and Council Members Kallos, Van Bramer, Lander, Chin and Ayala



Intro 1912 prohibits the marshals and the City's sheriffs from the taking and restitution of property or the execution of money judgments until the later of the end of the state of emergency or September. For New Yorkers impacted by COVID-19, marshals and sheriffs would be barred from the taking and restitution of property or the execution of money judgments.

REBNY is opposed to Intro 1912 for numerous policy, practical, and legal reasons. REBNY understands the Council's concern for eviction proceedings and shares its pursuit of fairness and justice in the process, notably during the COVID-19 pandemic. It is why REBNY was the first group to announce that its members voluntarily instituted a 90-day eviction moratorium for their tenants to provide relief. Additionally, as the pandemic has continued, REBNY members have been proactive with their tenants to best address their specific needs as we weather this crisis together.

The powers and duties of marshals and sheriffs are embedded within New York State law, not local law.  The Council attempts to limit these duties through a local law.  It is misguided and conceivably, unlawful basis by the Council to usurp State authority.

Notwithstanding the above, from a practical perspective, property owners rely on the ability to collect rent to meet their expenses. According to data collected by the City of New York, nearly 30% of a tenant's rent goes to property taxes. In the past year, Class 2 properties experienced a 7.6% increase in property tax levy, a faster pace than that of the City as a whole, as the Rent Guidelines Board PIOC Report notes. Additionally, assessments rose 7.8% and the Class 2 levy share increased 0.4%. Rent also pays for utilities, insurance, maintenance, and other operating costs. As a result, not all property owners are able to forgo rental payments and simultaneously operate their properties at the same level for the next year.

Noticeably since Intro 1912 provides no contingency regarding a time period, an eviction moratorium could last indefinitely. There should be widespread concern on the impression that this legislation gives to tenants, particularly those who have the means to pay rent and will choose not to do so. The economic consequences of this misimpression could lead to widespread mortgage default, decreased property tax collection, and a subsequent decline in necessary city services for quality of life for tenants across the city.

Additionally, while this bill does allow for actions to be taken in connection with a matter under the jurisdiction of the family court, at a minimum, the bill also needs to allow for marshal action if an action is in connection with a matter under the jurisdiction of criminal court. For example, Safe Horizon, New York City's domestic violence hotline, has received a surge of 3,000 calls in April, after a decline in March. The family court system does not deal with the issuance of permanent and temporary orders of protection, often granted in criminal matters, which require the removal of an individual. We need sensible legislation that allows owners to maintain the warranty of habitability that protects the welfare of their tenants.

**BILL:** Intro No. 1936-2020

**SUBJECT:** Amending the definition of harassment to include threats based on a person having been impacted by COVID-19.

**SPONSORS:** Council Members Torres, Kallos, Van Bramer, Chin, Powers and Speaker Johnson



Intro 1936 amends the definition of harassment in the Housing Maintenance Code to include threats against an individual based on their status as a COVID-19 impacted person, their status as an essential employee, or their receipt of a rental concession or forbearance. Harassment would be punishable by a civil penalty of $2,000 to $10,000.

REBNY agrees wholeheartedly with the Council that protecting tenants from harassment of bad actors, notably during the COVID-19 crisis, should be a priority. However, it is important to clearly define what harassment means when most of the normal ways our society interacts with each other has changed.

With that said, REBNY has concerns surrounding how Intro 1936 will affect the conversations that are already happening between tenants and owners that could lead to solutions on rent relief. Notably, if either side of those conversations are now fearful that such conversations could be misconstrued as harassment, needed relief for tenants could be lost. Is one knock on the door to ask if the building notices have been received, which have been emailed at some points daily to alert tenants to changing executive orders, CDC guidance, and protocols on elevator usage, considered harassment? What about reminders to pick up packages?

Additionally, REBNY has concerns that surround the idea of creating a temporary protected class, and how a building owner understands what constitutes a protected class. As written, there does not seem to be a contingency on for how long a tenant could claim protected status relative to the COVID-19 disaster declaration, theoretically allowing for the protected class to be claimed well after the end of the current pandemic.

Additionally, extending the protected class to also cover individuals who have received a rent concession or forbearance for any rent owed also raises questions and concerns. As written, there is no clarity on what would occur if a tenant who has claimed protected status, for example, does not pay rent on a future unit under a different lease.

Finally, in our social distancing society, REBNY has concerns on if the bill addresses what could be misconstrued as harassment. For example, limitations on elevator usage are important but certainly will provide inconveniences for tenants. We encourage the Council to take these scenarios into consideration to best provide more clarity for building owners and tenants alike.


*CONCLUSION*

As we work to address reopening our economy while prioritizing the health and safety of all New Yorkers, we need to support proposals and actions that embrace collaboration. Additionally, we need to understand the reality that most small businesses and industries across our City need real and immediate relief.

Unfortunately, many of the proposals fall short on understanding that reality. REBNY is ready and willing to work with the Council and appropriate City agencies to find solutions that balances relief for both small businesses and workers, the obligations of owners, and the needs of tenants.



Thank you for the time and consideration of these points.

CONTACT:
Ryan Monell
Government Affairs, Director of City Legislative Affairs
Real Estate Board of New York (REBNY)
(937) 269-6889
rmonell@rebny.com

**Subject: The proposed Council Bill would be a destructive hit to Landlords**


Hi Laurie,

It was very nice to speak with you today.  I appreciate the time you spent listening to my concerns.

As I mentioned on our call, I am the owner of a small commercial building in the garment center, 230 West 39th Street, which has 16 stories and 60,000 sq. ft.  I have 24 tenants and only four of them have paid a portion of April's rent; the rest I have deferred for three months.  If the economic and pandemic situation, however, does not improve, I think they will need to defer their rent for a longer term.

While there may be some press reports of large commercial and office tenants continuing to pay rent, judging from the landlords I know, I doubt such reporting would be accurate.  Instead, I think it is more likely that NYC landlords, almost all if whom carry debt on their properties, would prefer not to broadcast to their lenders that they may have an issue collecting rents and therefore may not be able to service their debt.

Whether or not landlords are receiving their rental income, we still have to pay debt service, taxes, utility charges, insurance premiums and payroll to keep the lights on.  Generally, commercial and residential landlords have not been allowed to benefit from any of the emergency financing that SBA has made available to businesses and individuals across the country to alleviate the financial burdens caused by the pandemic.  Also, most banks are prohibiting borrowers from placing additional debt on their properties, even loans from the SBA, and even if the SBA debt would be subordinate to the bank loan.

In short, landlords rely on tenants to pay rent so they can pay their business expenses and keep their businesses operational for both their other tenants and to keep paying their employees.  Without rental income, a landlord can't keep the lights on.  If a landlord can't service the debt on the building, the bank will foreclose on the asset.  If many landlords end up in this predicament, the banks will not be able to keep up with foreclosures.  The snowball effect of allowing tenants to remain in their units for a year, without paying rent, without being subject to eviction or personal liability, will collapse the rental real estate market in NYC.

The aspects of the COVID-19 Legislative Relief Package that pertain to real estate (Int 1912-2020, Res 1277-2020, Int 1932-2020, Int1936-2020) if enacted, would destroy the rental real estate market in NYC and have disastrous, long reaching consequences. The only people who will enjoy a long term benefit from such legislation are extremely wealthy investors, sitting on massive reserves of cash.  When the destruction sowed by this legislation blankets the City, they will swoop in to cherry pick otherwise decent assets.   In fact, it was reported on by Costar today that Blackstone has set aside a mountain of cash to buy distressed real estate.

If this were to happen, the small businesses I have nurtured as an independent landlord will vanish as will the jobs of my union employees who manage my building.  I will lose my building

that I have invested in for 3 decades and my living as well.  The proposed legislation is tantamount to a taking of private property and my right and my employees rights to earn a living.

I would also like to take this opportunity to point out the unique obstacles that face both landlords and tenants in the Garment Center.  Unlike other commercial buildings located in business areas throughout the City where you will find diverse businesses, commercial buildings in the garment center primarily have garment related tenants.  Therefore, when the garment industry suffers, the landlords who house that sector will also suffer.  Forcing the landlords to carry the burdens of the distressed garment sector is fundamentally unjust.

NYC garment businesses were already having trouble in 2019-2020 because of the Trump tariffs on imports.  When the pandemic hit in March, all the U.S. stores cancelled their orders.  The goods were ordered, paid for and manufactured by the tenant garment companies, however, when stores/buyers cancelled orders there was no place to ship those orders.  Then the "factors" (garment industry lenders) refused to pay the garment companies because there would be no outlet for the sales.  As a result, garment tenants are out all the funds they fronted to produce goods for the season they cannot sell.

Only the largest companies might be able to carry this kind of loss.  No one is buying product, not even the outlet sellers (TJ Maxx, Century 21, Walmart, etc). Many garment companies will not be able to pay rent.  When most tenants in a building are garment tenants, landlords in these buildings, especially smaller buildings with smaller sized businesses, will not have income.  The proposed legislation would mean I have to keep my building open, my lights on, for tenants who are not paying me, all for a sustained period of time.  During this time, your proposal offers me no tax relief and no debt relief.  What funds am I supposed to use to carry my tenants, my employees, my taxes and my mortgage for a year?

Kindly take the ramifications I have described of the proposed legislation into account before proceeding further on this path.  I am a small landlord who has worked hand in hand with my small tenants to help them grow.  I proudly take risks on new companies.  Where tenants don't have a track record and creditworthiness, they can provide good guy guaranties to secure their lease.  How else do you think these new "mom and pop" garment start-ups can get a literal foothold, a space of their own?  Your proposed legislation might help some struggling commercial endeavors muddle through a year of COVID downturn but it will also destroy the marketplace for small landlords who take chances on small start-up businesses.

I would appreciate a reply to this correspondence.

Sincerely yours,

Charles Hoppenstein
[choppenstein@gmail.com]

Personal Guarantee Release


Speaker Johnson - Thank you for all of your efforts in supporting small businesses in NYC during these unprecedented times.  Your proposed law that would release commercial tenants from personal guarantee would be life changing for me and many other small business owners.

3 years ago, when I took my life savings to open up a 20 seat, 6 employee restaurant in the West Village, the only way I could secure a lease was to provide a personal guarantee.  That guarantee entitles my landlord to 6 months rent (at $18,000 per month) ,other fees and my security deposit (3 months rent) should I request to vacate the premises prior to the end of the 10 year lease.  In the current situation i cannot afford to pay rent and i can not afford to give notice.  I will quickly run out of money either way.  I applied early on for the PPP and 2 other SBA loans, but I was not approved before the funds dried up.  I have filed loss of income claims with my insurance company to no avail. I am out of options.

If the personal guarantees stay in place I and many others will not only lose our business, our livelihoods and our investments in the business, but also spend every other dollar we have on commercial rent on a space that is unusable.  We will then be forced into bankruptcy to liquidate whatever little else we might have, to pay commercial rent on a location that has been forced to close.

I beg you to please help us.  Please step in and give us an opportunity to survive this disaster by getting rid of the personal guarantees.  I have accepted that my business will not survive this, but  I am hopeful with your help I and many small business owners will not be personally ruined as well.

Thank you and stay safe,

Joseph Conti
Owner - Shuraku Restaurant



**Testimony Submitted to the New York City Council Committee on Housing and Buildings, Jointly with the Committee on Consumer Affairs and Business Licensing**
**Re: Int. 1912**
April 28, 2020

On behalf of the New York State Association for Affordable Housing (NYSAFAH), we would like to thank Chair Cornegy and Chair Cohen for the opportunity to submit comments on the bills being heard at today's remote hearing.

NYSAFAH is the trade association for New York's affordable housing industry, with nearly 400 members, including developers, lenders, investors, attorneys, contractors, architects and others active in the financing, construction, and operation of affordable housing.

**Int. 1912**
The Covid-19 pandemic has created a crisis in the City's rental housing for tenants who have experienced an unexpected loss in income and for the owners trying to keep buildings afloat. On both fronts, these challenges are worse in our affordable housing stock. Our members are reporting higher degrees of rent non-payment than has been reported Citywide and the margins in affordable housing are much thinner than in their market rate counterparts.

This crisis requires a multifaceted solution and will certainly necessitate federal relief, which NYSAFAH has been advocating for with nonprofit and government partners nationwide. Int. 1912 is not a solution that benefits affordable housing in New York City.

Without question, there will be large swaths of tenants who are newly unable to pay all or part of their rent as a result of the ongoing emergency. NYSAFAH's members are communicating with their tenants regularly, encouraging them to discuss their situation so that payment agreements can be reached, concessions can be made, or voucher administrating agencies can be contacted if adjustments to subsidy vouchers are necessary.

Continuing to receive rent from tenants who are able pay the rent, because they are still working or because the enhanced unemployment benefits and stimulus funding allows

them to, is critical. Payments continue to be required on the mortgage, insurance, utilities, taxes, payroll and, vitally important, the building service workers necessary to keep the buildings clean and maintained.

Unfortunately, statewide calls for rent strikes, including of tenants who are able to pay the rent, have been persistent and largely unchallenged. Those who voluntarily do not pay rent make it more difficult for building owners to assist and meet halfway those who have no choice. They make it more difficult to keep building staff paid.

Against this backdrop, Int. 1912 bars City sheriffs from restitution of property or money judgments until September for all, and April 2021 for those impacted by Covid-19, broadly and loosely defined. It is the serious concern of the affordable housing industry that this bill with further disincentive rent payment in an already extremely vulnerable part of the housing stock.

Many tenants are in an extremely vulnerable position, as well. This cannot be denied. There must be a solution that involves flexibility on the part of government housing agencies with respect to reserves and cash flow payments, leniency and openness by banks and lenders, and massive federal relief in the form of tenant vouchers and larger direct stimulus payments. All of these must work in concert. However, we fear that Int. 1912 will instead incentivize tenants to make the rational decision to wait things out until September 2020 or April 2021 and press their luck. The bill kicks the can down the road, but it is affordable housing and those that reside in it and maintain it that disproportionally suffer in the meantime.

Int. 1912 does not require showing rent burden, or that the enhanced Unemployment Insurance received was insufficient to pay the rent. NYSAFAH supported the State's eviction moratorium, calling for it prior to its enactment. Evictions are not the goal; they are massively traumatic for families. But moratoriums during the height of the crisis must eventually be matched by the relief that allows tenants to stay in homes and buildings to stay operational, safe, clean and staffed. Int. 1912 is not that solution.

**Testimony of Kenneth Litwack**

*On Behalf of*

**The Marshals Association of the City of New York**

*Before the*

**New York City Council**
**Committees on Consumer Affairs and Business Licensing & Housing and Buildings**
**April 28, 2020**

*Regarding*

**Int. 1912-2020: Temporary Prohibition on Evictions and Money Judgments**

Good afternoon Chairmen Cornegy and Cohen and the rest of the committee members. I want to thank you for the opportunity to testify before you today.

My name is Kenneth Litwack and I serve as Special Counsel to the Marshals Association of the City of New York. I am here today to testify on behalf of the Association in opposition to Int. 1912.

In 1979, I was appointed Counsel and Inspector General to the New York City Sheriff after which, I became Director of the Marshals Bureau for the New York City Department of Investigation (DOI). This unit is responsible for regulating New York City Marshals pursuant to state law. Upon going into private practice, I became Counsel to the Marshals Association.

I want to state at the outset that Marshal's offices collectively employ 250 New Yorkers whose lives would be deeply impacted by long-term disruptions to their operations.

Our first objection to Int. 1912 is that the City Council does not have the jurisdiction or legal authority to enact such a measure. There is no statutory basis that would permit the City Council to terminate or restrain a Marshal or Sheriff's official functions. Marshals act pursuant to court orders which command them to act and are one part of a complex system where it is the duty of Judges to determine the special circumstances of a particular case.

Section 1609 (2) of the New York City Civil Court Act specifies that it is the Appellate Division, First and Second Departments which has the regulatory authority over Marshals. *See also Iorio v. City of New York, 96 Misc. 95S, 410 NYS 2d 195 (1978)*. A Marshal is an independent officer whose position was created by the State Legislature and whose powers and duties are prescribed by state statute. In addition to the Civil Court Act, Marshals and their powers are defined and regulated under section 105(s-1) of the New York State Civil Practice Law and Rules (CPLR), which also governs the enforcement of money judgements under Art. 52 and was extended in the recently-enacted state budget.

Furthermore, we believe that in addition to the state law that governs and regulates the Marshal's official duties, the issuance of Executive Order 202.8 by Governor Cuomo last month, clearly preempts any municipal ordinance regarding evictions as this type of action would indicate an intent by the City Council to occupy this field. Given the language and effect of Int. 1912 to restrict evictions and the execution of money judgments, we believe the proposed legislation is preempted by state law. I'll also

point out that Executive Order 202.8 only prohibited eviction and eviction proceedings but was silent on the execution of money judgments.

Our next objection is that while we understand the intent of this legislation is to help those in need who have been negatively impacted by COVID-19, we believe the proposed legislation actually hurts this constituency. If the proposed legislation were enacted as written it would negatively impact Small Claims Court and a needy plaintiff's ability to enforce a money judgment. As a result of this legislation, plaintiffs would have no way of recovering money they are legally entitled to which adds insult to injury during these trying times. New York City Marshals enforce approximately 2,000 – 2,500 money judgments in Small Claims Court per year.

It is also imperative that the Council considers the budget implications of this bill. We are a key part of an approximate $80 million in revenue that the City collects in judgments every year on parking, speed and red light camera violations as well as Environmental Control Board (ECB) violations. This is a significant source of annual revenue for the City of New York and is needed more than ever as the city's budget deficit continues to expand. Furthermore, the money judgments Marshals execute in these categories serve as a deterrent to this type of behavior and furthers the goals of the City's safety programs like Vision Zero.

Putting aside the objections I have laid out in my testimony, I'd like to conclude by providing the Council with some history of how evictions have been halted during previous crisis in New York City. For example, after the terrorist attacks on 9/11, we worked closely with the City to halt evictions, particularly in Lower Manhattan, for an extended period of time. After the devasting damage done by Hurricane Sandy, Marshals halted evictions in various parts of the city including the Rockaways. The court-ordered judgments and evictions are complex and any disruption will have a myriad of consequences. We need to be measured and thoughtful on how to approach these subjects during the COVID-19 crisis just as we have done in the past.

We look forward to working with the Council on this issue and I am happy to answer any questions you may have.

**Testimony of New Economy Project**
**Before the NYC Council's Committee on Consumer Affairs and Business Licensing**
Delivered by Andy Morrison, Campaigns Director
April 28, 2020

Thank you, Committee Chair Cohen and members of the Committee, for the opportunity to testify today. My name is Andy Morrison and I am the Campaigns Director at New Economy Project, an economic justice organization that works with community groups and low-income New Yorkers throughout New York City. New Economy Project's mission is to build a just economy, based on cooperation, racial, economic, and gender justice, and ecological sustainability.

Since our organization's founding in 1995, we have worked with hundreds of grassroots groups to challenge Wall Street banks and other corporations that harm New Yorkers and perpetuate poverty, inequality, and segregation. We also work with groups to build democratically-structured and community-controlled initiatives, including community land trusts and mutual housing, worker and financial co-ops, public banks, and more.

New Economy Project strongly supports Int. 1912 and we urge the Committee to bring the bill before the full body of the NYC Council, for the swiftest possible passage into law. We commend Speaker Johnson and other sponsors of this emergency legislation for their strong leadership. New Economy Project, along with thousands of New Yorkers and more than 60 groups statewide, has been pressing Governor Cuomo to institute an emergency statewide moratorium on predatory debt collection during the COVID-19 crisis. We are pleased that in the absence of state-level action, members of the NYC Council are taking this critical step to protect New Yorkers.

For the past 15 years, New Economy Project has run a free legal hotline for low-income New Yorkers. We have heard from thousands of New Yorkers harmed by discriminatory and abusive debt collection lawsuits. Since COVID-19 gripped New York City last month, our hotline has been flooded with a new spate of calls from low-income New Yorkers who are being hounded by debt collectors using judgments to freeze people's bank accounts and garnish their wages.

As has been well-documented, the debt collection industry is rife with bottom-feeding companies in the business of buying old, alleged debts on the cheap, then using our courts to pry away as much money as they can from low-income New Yorkers. The rapacious debt buyers that file these lawsuits are notorious for using deceptive and fraudulent practices to obtain automatic, or "default," judgments against thousands of New Yorkers, which they then use to freeze people's bank accounts or garnish their wages.

Amid the COVID-19 pandemic, predatory debt collection, which siphons wealth from and destabilizes so many low-income communities and communities of color throughout the City, has morphed into an urgent public health crisis. We must be clear: No New Yorker should find themselves blocked from their funds, unable to buy food, medicine or other necessities, because of a debt collection judgment.

New Economy Project urges the NYC Council to pass Int. 1912 immediately. We would recommend that the NYC Council follow up with a bill that strengthens the second part of Int. 1912, which would extend the moratorium until the second suspension date. Specifically, this follow-up legislation should:

- Require the NYC sheriff and marshals to:
  - Provide written notice to New Yorkers, at least 30 days in advance of any judgment enforcement, of their right to show that they qualify for this extended moratorium and the steps they should take to make such a showing; and
  - Provide this notice to New Yorkers at an address verified as a valid address by the person's bank or employer or other third party not acting as an agent of the judgment creditor;
- Empower the NYC Department of Consumer and Worker Protection to adopt emergency implementing regulations, in order to ensure compliance with these provisions;
- Explicitly allow New Yorkers to make the showing of proof required by section 3(a)(3) via a sworn detailed affidavit, without more; and
- Add a catch-all "other" provision that allows New Yorkers to offer their own explanation as to why they qualify for the extended moratorium.

Predatory debt collection is a vivid example of the profound racial and economic inequities that underlie the urgent public health and safety concerns we are now dealing with. Department of Health and Mental Hygiene data show a disproportionate concentration of COVID-19 cases in neighborhoods of color, home to so many frontline workers who are putting themselves at risk to keep our city running. These neighborhoods already face severe health and economic disparities. They are also the communities from which debt buyers systematically extract wealth, where calls from abusive debt collectors are part of everyday life.

New York City needs to take this action to ensure economic and racial justice, and community equity. As debt collectors continue callously to take people's money during COVID-19, they are further endangering low-wage service workers, elderly and disabled New Yorkers, and others who are at higher risk of severe illness from COVID-19.

Many of these New Yorkers are speaking out and sharing their stories, underscoring the need for bold actions to stop debt collection in New York City:

*"I just found out that my paycheck was garnished. I don't know what it's for. I can't afford to have any money taken away right now. My two daughters and two grandchildren live with me. I'm trying to support my family, but everything is uncertain. My job has cut the number of days that I go into work for safety reasons. One of my daughters lost her job because of coronavirus. This money that was taken from me could have gone toward a lot of other things that I'm worried about right now, like food, disinfecting supplies, and other things I need to keep my family healthy. I am overwhelmed trying to work and make sure my family is safe."* - Veronica, Brooklyn

*"I used to be homeless. Now I work as a home health aide and live in affordable housing I got through a lottery. A marshal started garnishing my paycheck in January. I found out it's for a really old judgment, but I never got court papers. I'm also a victim of identity theft, so I don't think this is even my debt. I went to court to try to stop the wage garnishment, but the court postponed my court date to March, and then again to June, because of coronavirus. The whole time the marshal kept garnishing my wages. I'm worried I'll have to go back to a shelter because of all this."* - Migdalia, Brooklyn

*"I work for the city finding emergency housing for fire victims. I just found out that 10% of my paycheck was garnished. Now I don't know if I'll be able to stock up on the insulin my son needs. He has Type 1 diabetes. I've also been delivering groceries to my mother, who lives close by. About a month ago I got a marshal's notice saying my wages would be garnished. I was about to go to court to try to stop it, but with COVID-19 hitting the city so hard, I decided I should stay at home for the sake of my family's health. I already live paycheck to paycheck, so if this garnishment goes on, taking care of my family during this crisis will be incredibly hard."* -Grace, Queens

*"I was laid off because of COVID-19. Then my family tried to get groceries and I found out my debit card wouldn't work. I checked my bank account and it was thousands of dollars overdrawn. I thought I'd been scammed. I spent hours on the phone with my bank trying to find out what happened. Finally they told me there was a judgment against me for a credit card from a few years ago. That's when my husband, who's disabled, was going through severe health issues. I have zero funds. I have no money. I'm at the breaking point."* - Veronica, The Bronx

*"I'm a single mother. I have three kids. My bank accounts were frozen in March. I found out it's for an old judgment that the city got against me. I never got court papers and I have no idea what the judgment is for. I found out that the city's lawyers don't even have my correct address. I had no money to pay my bills or prepare my family for this crisis,*

3

*but the lawyers said they wouldn't release my bank accounts unless I signed something saying I owe the debt." - Jilliann, The Bronx*

*"I went to buy toilet paper and other supplies early in the morning, when the supermarket was just open for seniors, but my debit card wouldn't work. Then I found out my account was frozen because of a credit card judgment. That account is where I get my Social Security disability benefits. I'm 61 and I have congenital heart failure, so I've been trying to stay home. I also live with my mom, who's 81, and I'm afraid of her getting sick. But I had to go to the post office to send a letter to the debt collectors. They just called me, and they didn't seem to care that I only get Social Security. They just kept asking how I'm going to pay." - G.W., Manhattan*

*"In March I found out a debt collector had frozen my bank accounts. I've never even heard of this debt collector. This is all the money I have in the world as I'm currently out of work due to the pandemic. I'm a substitute teacher, and with schools likely closed until the fall, I won't have any income for the next few months. Now I don't have enough money for rent. I also worry that my stimulus check will be directly deposited into my frozen accounts and not accessible. I need that money for urgent necessities like rent, food, and supplies for my family. I tried to find out how the direct deposit could be switched to paper check via mail but I couldn't locate that info, and the IRS website says do not call. This situation has put a terrible pressure on me and on my family. On top of all this, last week I was laid low with coronavirus-like symptoms, so I'm trying to rest and isolate myself." - Robert, Queens*

*"About six years ago I developed multiple autoimmune disorders which began to worsen. I had to stop working and have been forced to rely on family support. In March I received court papers for a credit card I had to stop paying six years ago. Battling three autoimmune disorders and multiple immune conditions puts me at very high risk for COVID-19. Going to court would put me in grave danger, but I'm panicked that the credit card company will get a judgment against me if I don't make the trip to court." - L.H., Manhattan*

*"I am a healthcare worker. I commute over two hours each way from my home in the Bronx to a clinic in Brooklyn, where I work 10-hour shifts. I am a single mother and the sole provider for my family. In the middle of March I got court papers in the mail saying I was being sued for a credit card I had been trying to pay off. I'm stressed out wondering if I'm supposed to miss work to go to court to answer this lawsuit right now. With this crisis, I need to prioritize caring for people at my clinic and making sure my family stays healthy. I'm worried that the court will say I owe this money if I don't fight*

*back, but I'm also worried about risking my health and the health of my loved ones."* -
Olga, The Bronx

These are just a few examples that underscore the pressing need for action to halt debt collection in New York City. We urge the Committee to move Int. 1912 forward so that the Council can pass this desperately-needed bill into law right away.

Thank you.



**THE BUILDING OWNERS AND MANAGERS ASSOCIATION OF
GREATER NEW YORK'S TESTIMONY ON INT. NO. 1912, A LOCAL
LAW IN RELATION TO CEASING THE TAKING AND RESTITUTION OF
PROPERTY AND THE EXECUTION OF MONEY
JUDGMENTS BY THE CITY SHERIFF AND MARSHALS DUE TO THE
IMPACTS OF COVID-19**

The Building Owners and Managers Association of Greater New York (BOMA New York) appreciates this opportunity to submit the below comments for the record. BOMA New York represents more than 750 property owners, managers, and building professionals who own or manage 400 million square feet of commercial space in New York City. We are an association within BOMA International, a federation of 90 US associations and 19 international affiliates that own and operate approximately 10.5 billion square feet of office space in the United States.

This bill is part of a packet of potential legislation that purports to add various protections for different groups who have or will be impacted by COVID-19 and the pandemic it has created. Although we appreciate the City Council's desires to help the City mend when this health crisis is mitigated or over, we feel that this and the other bills was rushed out without proper consultation with various stakeholders, including the commercial real estate community, and will undoubtedly cause significant obstacles to recovery.

Commercial real estate has been devastated by the COVID-19 outbreak. In the face of these challenges, our critical employees have worked diligently to keep buildings up and operational and open, even if most tenants have elected or been told to stay away. With spaces empty and with many tenants suffering unprecedented losses, commercial real estate has not been spared. The cost of keeping buildings open is significant, and those costs will only escalate as our tenants return in the new COVID-19 world, where a wide range of public health safety practices will need to be implemented in buildings that will impact budgetary bottom lines as well as create significant operational challenges.

Given never-before-seen nature of the impacts of this virus on New York City and its economy, it's critical that we find the right responses that help everyone get back up and running, and that do not create barriers and unforeseen consequences that hinder recovery. This bill, which would grant virtual immunity from eviction and other penalties to almost all tenants for up to (and possibly beyond) a year, is not the right solution.

At a time when the economy is disrupted and there is virtually no new lease signing, it is in no one's interest to evict, or have evicted, existing tenants in commercial buildings. That is why

building owners and managers are negotiating and working with tenants to find practical solutions to short-term financial issues to make sure tenants can stay. This bill would likely take many tenants out of those negotiations, as they could rely on blanket immunity to protect them. A year of no rent would destroy the real estate industry and take away their important tax revenues from the City. It would also lead to workers in commercial buildings losing their jobs.

Furthermore, many of the tenants we are negotiating with are large and sophisticated retail companies, law firms, hedge funds, and other such companies that do not need the protections this bill would offer to a very wide range of tenants. Again, the City intervening here will only raise obstacles to finding solutions that will cost everyone time and money.



77 Sands Street
Brooklyn, NY 11201
randolphbeer.com
@randolphbeer

April 26th, 2020

**<u>VIA ELECTORNIC DELIVERY</u>**

NYC Council Speaker Corey Johnson
City Hall Office
New York, NY 10007

**RE:**  Proposed COVID-19 Relief Bill, Protecting NYC Small Businesses

Dear Speaker Johnson,

First, I want to thank you and the rest of the Council, on behalf of my company and myself personally, for the COVID-19 relief bill being proposed.  While the purpose of this letter is to emphasize the importance of a specific small business protective measure under consideration, as a 20-year New Yorker I could not be more enthusiastically in support of what the Council is proposing in all aspects.

I am currently raising a family in Brooklyn, where I have lived for the past 10 years after spending 10 prior in Manhattan.  My parents were from the Bronx and Queens and I am here for the long haul.  My partners and I started our restaurant business on Broome Street over 15 years ago with 4 employees and a small bar/cafe.  Today we have 3 full-service restaurants (2 with small breweries) and 80 employees (pre-crisis) who are all NYC residents. We have been an owner-operated, DIY company since the beginning and we have survived throughout the years by catering to locals.  2020 was set up to be our biggest year ever in hiring and growth as we just signed a new lease for a 4th location in January, which at this point is untenable and a tremendous stress unfortunately.  While our future is uncertain in this moment, we are reassured by the fact that our local government understands what we are dealing with and has the courage and resolve to act in support of businesses like ours.

Regarding the small business protective measures under consideration, the suspension of commercial lease guaranties in COVID-19 impacted situations is, by far, the one that gives me the most comfort as I lie awake every night thinking about how my company and family will survive the crisis.  I believe this measure is a profoundly fair solution to a problem in which both tenants and landlords equally share no fault yet also equally cannot escape.  In support of this proposal, I want to share with you how this measure would mean the difference between survival and bankruptcy for my small business specifically, a tried and true NYC restaurant company.

We guarantee leases through a holding company, owned by founders and employees, whose assets include 100% of our restaurant businesses and which also serves as our company's centralized employer.  In the case of our most recent lease, for which the project has not yet started, the depletion funds to cover COVID-19 losses has made moving forward a guaranteed path to insolvency.  We informed the landlord about this and attempted to negotiate, explaining that both parties are better off if we remain solvent.  The landlord prefers to simply wait since our holding company has guaranteed the lease (full 15-year term), and therefore all of our existing restaurants are on the hook indirectly.  Should we secure financial relief or start to recoup losses after we can open, this landlord's recovery potential and leverage will grow.  We are paralyzed and forced to consider starting a project we cannot fund and spending ourselves into insolvency as a preferable strategic option to waiting for the landlord to force us into bankruptcy as we begin to recover from the crisis.

77 Sands Street
Brooklyn, NY 11201
randolphbeer.com
@randolphbeer



Landlords and tenants, and everyone else, knows that economic circumstances have changed in a dramatic fashion, and at a speed, never before seen in our lifetime.  Small business owners have had no choice but to accept these circumstances in real time, reset their expectations and either throw the towel in or begin to make the sacrifices necessary to survive.  We now desperately need our landlords to acknowledge these same circumstances and either negotiate with us accordingly or allow us to accept a calculable loss and move on.  Suspending guarantees is the only way to force this fair and earnest negation, based on the market conditions of today.  It is absolutely essential to the survival of small businesses in our city.

Finally, I am reminded, as many have been, about hurricane Sandy and the fears we faced then.  Compared to COVID-19 Sandy somehow feels small, but it was still devastating.  We were a smaller and younger company with just one restaurant during Sandy.  We were shut down, broke and unsure when, or if, we'd be able to re-open.  We made the decision to drive upstate and borrow a family member's gas-powered generator and charcoal grill.  We opened our downtown restaurant for the community and offered free food, coffee and beer.  We used plug-in, string lights and candles and cooked with a grill on the sidewalk.  We became the only place open for blocks and drew our neighbors to us.  Our make-shift operation lasted for about 2 days before we ran out of gas for the generator.  Despite offering everything for free, our neighbors insisted that we accept payment.  The whole experience became our company's most defining moment.  We went from a new and unknown spot to a neighborhood institution.  Our significance in the community was instantly solidified and we built friendships and loyalties that we still enjoy today.  We're not yet exactly sure how, but we think this crisis presents the same type of defining opportunity for our company, and our industry.  What the Council is currently proposing will help us all get form where we are now to that moment and for that we are beyond grateful.

If there is anything we can do to assist in this matter, please do not hesitate to contact me.


Sincerely,

Dave Plate
CEO, Randolph Beer
dave@randolphbeer.com
646-242-3496

77 Sands Street
Brooklyn, NY 11201
randolphbeer.com
@randolphbeer



  

  

# Virus relief package... NO

Good morning.  I am a resident of Chelsea and a small business owner.  I am reading about the proposed virus relief package, and when I read it I think that the council is out of touch with the reality of nyc life.  I live in a small coop building that has retail stores.

The tenant protections in the legislation would bar marshals and sheriffs from collecting debts or performing evictions for residential or commercial tenants affected by the virus until next April and give renters more time to repay their rent

Our coop is made up of 10 families, and we rely on the rent from the commercial stores that we have.  We are obviously willing to share the burden of this virus with them, but we cannot possibly go until next April before collecting any rent.  All you would be doing is transferring the loss from them to us.  Who helps us out?  Maybe you should work to have NYC lower the property taxes of every building that forgives rent.

Everyone thinks that all landlords are these cash rich corporate entities, but that is certainly not the case in NYC.  As I mentioned, I am a small business owner who has been severely impacted by this.  On top of that, you want me to bail out other businesses?

John J. Kennedy, CDMM®

JK Daily Money Management LLC

646-924-5605

johnk@jkmoneymgmt.com

www.jkmoneymgmt.com





In support of your COVID-19 bill for commercial tenant relief

Dear Speaker Johnson,

I'm a small business owner in your district (I opened a new food hall called The Deco Food + Drink at 231 W. 39th St. in the Garment District in December 2019), and I'm writing to express my strong support for the bill that you recently introduced to the City Council to nullify personal liability provisions in commercial leases like mine (including in the good guy guaranty, which I have in my lease) where the commercial tenant was impacted by COVID-19.

In my case, we shut down the food hall on March 17, 2020 in response to NYS and NYC government orders. I very much hope to re-open the food hall when the COVID dust settles, but uncertainty about my rent obligations is a huge barrier to my business's ability to survive. If passed, your bill would have a significant positive effect on leveling the playing field between commercial tenants and our landlords when the time comes to renegotiate our leases (which will absolutely need to happen in the majority of cases for hospitality business owners -- otherwise, a large swath of us will go out of business for sure).

Thank you for what you're doing to persuade your fellow council members of the critical importance of this bill. I very much hope that the council votes to enact your proposal.

Sincerely,

Doris


--

Doris Huang

Owner, The Deco Food + Drink

doris@thedeconewyork.com

650-283-8884

Covid19 Legislative Relief Package / I am a friend and Nieghbor of Stefan Campbell

Dear Mr. Johnson,

I SUPPORT THIS PACKAGE.

You are doing a fantastic job for us hard working citizens. As a restaurateur this is more important than EVER.

Thank you for all that you do.

Good luck Wednesday and be well,
Judi Wong


cafecluny.com
theodeonrestaurant.com
cafeluxembourg.com

As a small landlord with a family owned building I am shocked to see some of the proposals being used to "protect" rights of certain groups.   As our governor has said many times, we are ALL in this together and this is no time to politicize the issue.  As the mayor and many council members seek to use this pandemic as a means to solidify their base and secure "favors" from the electorate in order to get elected, they are using very short sited plans to do this.  Putting in place programs that allow tenants to withhold and potentially walk away for rents for 12 months does nothing to help the city's situation.  Small landlords do not have unlimited supply of working capital to keep buildings running up to the City's high standards.  Compliance with all the regulations that were in effect prior the pandemic plus requirement to continue operating without any income to provide necessary updates will cause major defaults/bankruptcies.  If the City's plan is to have landlords walk away from their buildings so that the city can take over and resell at a later date for a profit , then go ahead and pass the bills.  Otherwise the city itself will reap the pain of the bills it passes today as a "landlord" for all these buildings.   It simply provides you with a city full of people who will make the same demands of you that they make of us. And without the rents , the City will not be able to make any improvements and we will have 5 boroughs of "NYCHA" apartments-no heat, no service, etc.

Landlords want to be part of the solution and there has to be a middle ground where we can work with those tenants that can't pay and those that can.  We are not the bad guys here.


guillermo garcia

tgcllc@yahoo.com

Proposed regulations

I wanted to reach out in support of several of the city councils' proposed new policies aimed at supporting small businesses in New York City.

I am a small business owner and operator in the West Village, with a casual cafe called Village Den. Although a successful eatery, our margins are thin as are all restaurants, especially with New York commercial rents.

I stand strongly in favor of your proposed bill to provide relief to commercial renters in the form of pausing evictions and debt collections for both residential and commercial properties until April 2021.

I also strongly stand in favor of your proposed bill that will suspend personal liability provisions in commercial leases.

I lastly appreciate your proposal to waive annual sidewalk fees.

Please let me know if my voice can be of any help in this moving forward.

Best Regards,

Lisle Richards
Owner
Village Den
[lisle@themetric.com]

Tax Relief along with eviction moratorium!

Dear Council Speaker Corey Johnson,

I am writing about the proposed new eviction law  that the New York City Council is currently considering- a new local law that will declare a moratorium on evictions until April 2021, a move instigated by the pandemic.

While this addresses a problem that is real and for which this law represents a humanitarian solution it will set into motion a humanitarian disaster for building owners who will be destroyed by not being able to pay their real estate taxes if a tenant is paying no rent and no tax relief for the building owner is forthcoming.

Those of us building owners paying dizzying real estate taxes will be out of our homes in desperation. For example: the many coops in Soho who rely on our ground floor tenant's rent to pay our taxes. I am the president of just such a building. Our tenants simply cannot cover the taxes by a long stretch given how high those taxes are currently with no rental income for many months under this law as it is written.

Our commercial tenant is part of an ecosystem that includes us as well.  Tenants and building owners both need relief if the humanitarian aim of this law will work.

Please rewrite the proposed eviction law to include a tax freeze for building owners.

Sincerely,
Sarah Walker
Board President
138 Prince Street
NY, NY 10012
917-270-5775

COVID-19 Relief Package

David McGoldrick
Partner and Manager
Marjen & Family LLC and Marmelade LLC
124 East 72nd Street
New York, NY 10021

Dear Council Members,

First, I hope that you are doing well and staying healthy. Obviously, these are very trying times and the safety of our families and communities is of paramount importance.

I am writing to express my concern over proposals that are being considered by the City Council to protect New York City tenants during this crisis. Let me say that my family and I have been landlords in New York since the 1940s, and I think a survey of our tenants would confirm that we have always been diligent and responsive to them and their needs, but now I AM WORRIED ABOUT LOSING OUR BUILDINGS!

Obviously, there's so much trouble going around right now that there is plenty to share, and we are willing to do our part to keep our city safe and successful, but I do not think that the proposals being considered by the City Council will achieve that objective. In fact, they will, by virtue of human nature, do just the opposite. Both residential and commercial tenants are practically being encouraged to withhold their rents and eventually to walk away from their leases when grace periods expire. It simply cannot be so one-sided. The City Council must take into account the health and financial well-being of both landlords and tenants in crafting legislation. As it is now, it seems as if landlords are slated to be the city's safety net, with no discussion of how landlords are supposed to keep up with taxes, insurance, utilities, maintenance and so on, to provide the services that keep tenants safe and secure.

If this sort of legislation passes, building owners will essentially have no way to enforce the collection of rent from anyone claiming, without any evidence, to have been negatively impacted by the COVID-19 crisis. While it is understandable that there is concern for tenants, this sort of sweeping mandate will be devastating for owners. Any relief and protection for tenants must be coupled with the same for landlords, whether that entails measures to abate or delay collection of property taxes or many of the other bills that owners must pay, and to make it incumbent on tenants to show that they are unable to pay their rent due to COVID-19, and to make arrangements for them to catch up when the economic situation improves. If owners aren't extended commensurate relief then the outlook for the residential housing stock will be bleak indeed: tax defaults, mortgage defaults, reduced or non-existent maintenance, and the exposure of landlords to predatory lenders and buyers; people and entities who do not have the same devotion to fair play and the responsibilities that tenants and landlords must share.

I know it's not easy to come up with a comprehensive plan, but you must not implement a shoot from the hip solution that ignores the complexity of the existing system and instead imposes a draconian and unsustainable burden on just one group of stakeholders.

Thank you for your time. Be well.

Sincerely,

David McGoldrick
david@1919films.com

Stop trying to punish business and property owners. These stories are insane and reflect how out of touch leftists and leftist politicians are with reality. I'm convinced you're all traitors trying to destroy the city and country as a whole. Also shutting down evictions and making it seem it's ok to not pat rent is also insane and irresponsible. You're turning this city into a cesspool.

https://therealdeal.com/2020/04/24/grocers-well-shut-down-if-city-council-mandates-rona-bonus/

https://ny.eater.com/2020/4/22/21231018/nyc-restaurant-coronavirus-city-council-legislation

*Sent from phone*

David Brotsky
212.863.9665
https://davidbrotsky.com
Location and Production Services
Licensed Real Estate Professional

virus relier package

To Whom It May Concern,

I, like most of my colleagues in the bar and restaurant industry, are obviously watching the proceedings of the City Council with bated breath. I'd like to offer an individual case for your consideration - mine - hoping it might shed just a little more light on the situation. My tavern, The Ginger Man, opened in 1996 and has been a midtown Manhattan (36th Street) favorite since then, especially with the craft beer movement community. We have run fundraisers for environmental causes, disaster relief efforts, and have worked closely with our neighborhood and local police department. For our employees, hundreds since we opened, we make sure that their workplace is friendly, fair, and safe. No employee, or vendor, or government agency has had invoices go unpaid, or even had to wait for payment, in our near quarter of a century of doing business. Seems unlikely, I know, but this is a matter of record. After 20 years of wonderful New York business and experiences our lease expired 5 years ago and we found ourselves, coincidentally, with a new owner of our space. This new landlord, only occasionally in New York, rewarded us for our efforts with a doubling of our rent - far in excess of what our neighbors were paying, and when I complained he responded by putting the condo common charges *on top of* the 100% increase. *O*ur business life changed overnight, and what was a pleasure for all became difficult, but we pressed on. However, he wasn't done with us - he demanded a personal guarantee, defined and qualified by a Good Guy Guarantee. This guarantee, as you know, came into being in NYC to add some measure of sanity to PG's - LL's could have their guarantee, and tenants could have a way out; standard clauses have a 3 month notice of intent to close, forfeit of all security deposits, and a handover of the keys. If the tenant was current in rent, he could walk away. Not so with my LL - he devised a milestone formula - I could only give notice, with *six* months notice, only every two years. He gave me no choice but to sign on to these terms. Regarding the PG formula, I thought the likelihood of major catastrophe happening exactly when when one of those 2 year opportunities passed was was far fetched, and that I wouldn't have to worry about it. The last window was this past January. So, with my nearly $55,000 rent I am looking at financial ruin if he were successful in enforcing the PG for another 2 years. Aside from being patently unfair and bad for business in the city, the logic is lacking - if the space in question (11 E36th St) was rentable at $55,000 a month, why would any LL need to have more than 5 months security to do so (my 2 month's security deposit + the 3 months of notice)? In this scenario, he is demanding 2 years.
I hope the City Council moves to remove these onerous PG's, and also to provide necessary rent relief for our industry.

Thank you.

Sincerely,

Robert Precious
bptgm1@gmail.com

Ümit Yolcu

Good afternoon Mr. speaker, I'm pleased to see you and the council taking a much needed initiative in providing assistance to essential workers, as many of us across the city have had our hours cut in response to the ongoing situation. I feel it would be very beneficial to a lot of struggling individuals and families working through this pandemic to keep our great city running as best we can, and the added bonuses would mean a world of difference in providing financially for our loved ones. Im sure the great members of our council will get this passed without delay, and im writing to you today to request that upon passage it also be applied to all essential workers retroactively, dating back to the beginning of the shutdown, when we all as a city began to feel the impacts of COVID across many areas of life. I appreciate you taking the time to read this and will look forward to seeing you all take the needed steps to protect our essential employees in these times of uncertainty.

Best regards,

Ümit Yolcu

Commercial rents

On commercial leases for stores that the store owner gave personal guarantees. All small business owners make their dream their small business , they'll do most anything to go into business including giving their personal guarantee putting themselves and their family into catastrophic ruin.

Please outlaw any such practice,  especially in this time of virus.
Also taxi medallion owners whose medallion has collapsed,  have lost everything, they also should be treated equally.

MICHAEL SIMON <nycmls@aol.com>

Commercial rent help for small business

My family has a small business.  The measures you have proposed with regard to tenants having large commercial rents would be very helpful to us and may have the effect of saving our business.

Thank you.  I hope you are successful in this effort.

Margie Katz

<margie.katz@icloud.com>

# Small business owner in FiDi received notice of default

I am writing to you to pass along information that is pertinent to the proposed new legislation.  I have owned and operated a small business in NYC for 20 years and am currently located in the financial district.  I have been at that location for over 5 years and have a 10 year lease.

We have struggled to stay afloat but have managed to remain current with all of our vendors and our landlord through March of this year. We are in the entertainment business on the production side and have no way to produce revenue during this health crisis.

I received a "Default Notice" on Monday, April 20 with a 5 day cure.  There is no $ to pay the balance of my April rent.

It certainly seems extreme to receive a "Default Notice" already especially since I was current through March, but our landlord, Moinian, is obviously taking a very aggressive stance.

I felt you should have this information from another small business owner.

Sincerely,

**David Baker**
**ENDEAVOR** studios
endeavorstudios.com
212-645-2641
90 John Street
Suite 301
NYC 10038
Fulton St. Subway Station
**2,3,4,5,A,C,J,Z** Trains



Hello Mr. Reynoso and Mr. Johnson
As a resident of Greenpoint, I am writing to you in support of several options being discussed at today's meeting. They include the following:

Pushing for Open Streets- the proposed 75 miles is a bare minimum for a city of 8.5 million and over 6000 miles of roads- I urge you to push for many times that number- perhaps 10% of roads could be closed, at 600 miles, giving millions of New Yorkers safe space to breath and be outside- as well as creating safe zones for essential workers to move about the city and avoid and heavily overcrowded subways. This could work to open up bike lanes, as well as bus only lanes- again reducing subway use.

Rent/eviction freeze- Please support the rent/eviction freeze, as New Yorkers need to be able to continue living in their homes safely and without the worry of becoming homeless- particularly in a crisis. We already have tens of thousands of homeless, each of whom should be given a guaranteed apartment- there are thousands if not tens of thousands of empty apartments across the city-USE YOU MASSIVE AUTHORITY as the City Council to force these apartments to be rented out to those who need them. You have the power- USE IT.

Essential worker benefits- as the first city in the US to offer full medical coverage, you must make this process instantaneous and paperwork free- while also heavily promoting it to all New Yorkers. All workers, not just essential workers, need a job and payment guarantee, with special attention paid to those keeping us all alive- food workers, hospital staff, etc. We must make it as safe as possible for them to continue supporting all of us- see the above comments as well.

The above are a good starting point. As the wealthiest city in the US, and one of the wealthiest in the world, I expect to see you support ALL New Yorkers through this crisis and beyond, guaranteeing us a decent quality of life no matter what.

Thank you, and I look forward to watching what you do,
Cameron Shore
--
Cameron Shore
*M.Arch, CCNY 2017*
<cameronbshore@gmail.com>



Advancing research and debate
on housing, neighborhoods,
and urban policy

School of Law
Wagner School of Public Service

**Written Testimony of Matthew Murphy, Executive Director, NYU Furman Center
to the New York City Council**

**Joint Hearing of the Committee on Housing and Buildings and
Committee on Consumer Affairs and Business Licensing**

April 28, 2020

On behalf of the NYU Furman Center, thank you for the opportunity to submit testimony on
**Int. No. 1912 - Ceasing the taking and restitution of property and the execution of money
judgments by the city sheriff and marshals due to the impacts of COVID-19.** My name is
Matthew Murphy and I am the Executive Director of the NYU Furman Center. We appreciate
today's hearing on COVID-19 Relief, and the Council's consideration of the significant housing
challenges faced by New Yorkers as a result of the pandemic's economic impacts.

The NYU Furman Center advances research and debate on housing, neighborhoods, and urban
policy. This includes preparing essential data and analysis that helps policymakers, community
organizations, and many others to examine pressing policy issues. The New York City Council
funds the NYU Furman Center to provide data for the real estate and affordable housing
community in New York City. As a provider of information on housing issues, we submit some
of our recent data on eviction filings trends to assist in understanding and quantifying issues
related to today's hearing.

We recently completed extensive data analysis of eviction filing trends from 2010-2019. The
complete findings will be released in June with our annual *State of New York City's Housing and
Neighborhoods* report. Given the critical timing of today's hearing topic, however, we would like
to highlight a few findings for the Council. We hope that this information can assist the
Council's deliberations by establishing a baseline for eviction filing trends prior to the pandemic,
highlighting disparities in eviction filings between communities, and shedding light on the
demographics of areas with the highest eviction filing rates.

Using administrative data from the New York State Office of Court Administration, we analyzed
all private eviction filings in New York City housing courts from 2010 to the present. In addition
to analyzing summary statistics, we were able to examine filing patterns and demographic
correlations at the ZIP Code level. To help inform Council, we provide some key findings on the
scale of eviction filings in New York City:

- In 2019, there were 139,615 filings, down almost 17% from 2018. Citywide, the number
  of eviction filings initiated decreased between 2010 and 2019.
- The risk of eviction is not equally distributed across communities. Areas of the city with
  lower incomes and larger Black and Hispanic populations had some of the highest
  eviction filing rates.



Advancing research and debate
on housing, neighborhoods,
and urban policy

School of Law
Wagner School of Public Service

- The vast majority of eviction cases are related to non-payment of rent. The median amount sought in non-payment cases for 2020 (prior to the moratorium) was around $3,000.
- Based on the previous 4-year average, we estimate that there would typically have been around 27,000 eviction filings in March and April 2020, and another 13,000 filings in May.

While this analysis cannot nor does not predict future filing trends, it is our hope that it helps contextualize the issues you will discuss and debate.

Additionally, we would also like to provide findings from an analysis that we completed in March 2020 that examined the professions most vulnerable to job loss during the COVID-19 pandemic. We conducted this analysis to help inform understanding about the workers who may be at risk for non-payment of rent. We found the following:

- Out of almost 3.2 million households in New York City, almost 1,032,000 (totaling nearly 3.5 million people) had at least one household member that worked in an occupation vulnerable to job loss, and that person earned about 67 percent of the total income for the household.
- Lower income workers are significantly more likely to rely on employment income from jobs that are prone to job loss.
- The majority of households with at least one member working in a vulnerable occupation and income under $150,000 were renters.

Thank you again for the opportunity to submit this testimony and the attached appendix. We hope that this information is helpful and would be happy to provide any additional housing data or analysis to the Council.

**Appendix 1**

**NYU Furman Center Written Testimony to the New York City Council**
**April 28, 2020**



Sources: New York State Office of Court Administration's Universal Case Management
System, NYU Furman Center

**Appendix 1**

**NYU Furman Center Written Testimony to the New York City Council**
**April 28, 2020**



Private Eviction Filings
New York City: Jan-May, 2015-2019

Black line = 4yr average
Gray lines = individual years

Sources: New York State Office of Court Administration's Universal Case
Management System, NYU Furman Center

Pending legislation on tenant protections

Speaker Johnson,

Some tenants are concerned about landlords tacking on fines for late payment of rents which may be written into lease riders. When considering legislation to protect renters who are unable to pay rents now, I suggest that a ban be explicitly included to prevent this from happening. Thanks.

Rosalie Grossman
151 W. 16th St.
mailto:rggrossmandsw@gmail.com



April 28, 2020

Dear Chair Cohen and Members of the Committee on Consumer Affairs & Business Licensing:

United for Small Business NYC ("USBnyc") is a coalition of community organizations across New York City fighting to protect small businesses and non-residential tenants from the threat of displacement, with a focus on owner-operated, minority-run businesses that serve low-income and minority communities. The threat of displacement to New York City's small businesses and non-profits has been exacerbated by the COVID-19 crisis.

Our members and clients (small businesses, sole proprietorships, cooperatives, street vendors, and non-profits who provide goods and services to the public) are seeing a catastrophic drop in income, up to 100 percent. Because of this, we need swift action to protect small businesses and non-residential tenants from displacement and closure. We applaud the relief package introduced by Speaker Corey Johnson and Members of the Council, including one bill before this committee: Intro 1912-2020.

The extensions proposed by Intro 1912 of the current eviction moratorium address a growing concern of small businesses regarding their ability to continue occupying their commercial spaces due to the economic devastation caused by the coronavirus pandemic. While this policy offers some relief for small businesses attempting to survive through this crisis, the relief is only temporary. Without further legislation or government action, once the moratorium is over, small businesses will be liable for back rent owed during the periods they were closed due to the virus with no projection that their revenues will be restored to pre-pandemic levels, let alone increase beyond those levels to cover this additional debt. The legislature should not presume that property owners will, at their own discretion, agree to suspend or reduce payments of rent.

We would like to highlight three concerns we hope the Council will take into consideration as this bill proceeds through the legislative process, in order to strengthen the effect of this bill and include all small businesses it intends to protect.

First, many small businesses in the City rent workspaces under license agreements which tend to include provisions allowing licensors to terminate agreements after one late payment and enter the space to take possession of the business' belongings, essentially conducting an eviction that would otherwise be illegal if the business was a residential tenant. Unfortunately, if a property owner or licensor of commercial space decides to exercise their contractual right to re-enter and take possession when a licensee defaults, Intro 1912 would not apply as there is no court-ordered warrant of eviction in this situation.

Secondly, the protected party under this bill should more clearly include commercial tenants who are named personally on a lease or rental agreement. Sometimes small business owners do not name their business as the tenant on a commercial lease (typically because they had not formed a legal entity by the time the lease was executed, they could not afford to form a legal entity, or the property owner preferred to name the business owner personally as the tenant). As a result, if the property owner files an eviction proceeding against the small business tenant, the named respondent is a natural person. Under this bill, if the protected party is not a named business, it must fall within the definitions under § 3(b)(1). To prevent any confusion for commercial tenants named personally under their lease agreements, language should be added to ensure this bill applies to such tenants.



Finally, pursuant to § 3(a) of the bill, the second moratorium extension would not apply to a tenant who has "effectively waived" its opportunity to show the court that it has suffered substantial loss of income due to the coronavirus. This exception can be an issue (and lead to more litigation) for commercial tenants who were improperly served, corporate tenants who were unable to get representation in court, or tenants who otherwise were unable to appear in court.

Our coalition supports Intro 1912 and the Council's intent to provide some relief to the City's most vulnerable small business owners and their employees. However, the small business community should not be expected to continue paying rent without income in a city where commerce has come to a halt. We urge the Council to take additional measures of rent relief are necessary to ensure small businesses are as prepared for the long-term economic effects of the virus as possible.  The City should exercise its power under the State Home Rule Law to do so[1].

Sincerely,
United for Small Business NYC
- Association for Neighborhood & Housing Development
- Brooklyn Legal Services Corporation A
- Chhaya CDC
- Cooper Square Committee
- Municipal Arts Society of New York
- NYC Artist Coalition
- NYC Network of Worker Cooperatives
- Street Vendor Project, Urban Justice Center
- TakeRoot Justice
- Volunteers of Legal Service
- Women's Housing and Economic Development Corporation

---

[1] *See* New York State Constitution, Article IX. The powers of local governments to act in their own jurisdiction are meant to be construed broadly by the courts. N.Y. Mun. Home Rule L. § 51 (providing that home rule powers "shall be liberally construed"); N.Y. Stat. Local Gov. § 20(5) (same). Article IX authorizes local governments to adopt local laws in a wide range of fields including the government, protection, order, conduct, safety, health and well-being of persons or property within the locality. N.Y. Const. art. IX, § 2(c)(ii)(10); Municipal Home Rule Law § 10(1)(ii)(a)(12); N.Y. City Charter § 28(a). In addition to the Home Rule powers enumerated above and granted by the Constitution and specific State statutes, municipalities have police powers.
Legislation which has for its object the promotion of the public welfare and safety, falls within the scope of the police power and must be submitted to even though it imposes restraints and burdens on the individual.
*People v. Ortiz*, 479 NYS2d 613, 620 (2nd Dept 1984). The police power has been defined generally as the power to regulate persons and property for the purpose of securing the public health, safety, welfare, comfort, peace and prosperity of the municipality and its inhabitants. *Village of Carthage v. Frederick*, 122 N.Y. 268 (1890) (affirming local law imposing responsibilities on owners of real property in its limits). In New York State, it is as old as cities themselves. Further, it is "a proper exercise of the City's police power to regulate … businesses in the public interest," *Short Stop Industrial Catering*, 127 Misc.2d 363, 366 (Sup. Ct. N.Y. Co 1985), and there is no exclusion for the regulation of real estate businesses.

**IN OPPOSITION to Int. 1912-2020 - Joint Hearing of the Committee on Housing & Buildings and the Committee on Consumer Affairs and Business Licensing**

I work for a small landlord - a mom and pop shop who operate on thin margins. Landlords, like the place I work for, account for 60% of rent-stabilized units throughout the city. These 60% own less than 50 units each.

Many of these hardworking people, like the ones I work for, are out in their buildings personally cleaning and disinfecting door handles, rails, elevator buttons etc. – risking contracting COVID-19 in order to keep their tenants safe.  These same people are on-call 24/7 for their tenants and buildings.  Yet these same people are being demonized by the likes of State Senators Michael Gianaris, Julia Salazar, and Mayor DeBlasio and thrown under the bus when the city and state advocate that tenants should stop paying rent altogether.

Not only should tenants stop paying rent but now the city wants to rob landlords of, not only their income, but their only restitution for their hard-earned revenue.

While Michael Gianaris, Julia Salazar, and DeBlasio are pushing for rent strikes – who will bear the burden when these 60% cannot afford their July 1st tax bills because no income is being received; and no tax forgiveness or even deferment is being extended by the city or state? And yet the city charges interest to late payers of 7 – 18% COMPOUNDED DAILY.

Meanwhile the SBA and NYC's dismal "attempts" to provide loans to small business has fallen flat on its face.  No small-time landlord I know of has been the beneficiary of one of these much-needed loans.  Instead the money is shelled out to large corporations and corporate landlords leaving that 60% of small-time landlords to rely heavily on a few tenants who are able to pay their rents.

Taxes have been deferred federally; individuals are receiving stimulus checks of $1,200.00 (households $3,400.00).  Unemployment claims have been provided with an additional $600.00 weekly – making it more lucrative for some to stay on unemployment rather than go back to work (I managed one such tenant who has been asked to return to work but has declined as she is making more on unemployment).  This has been done so that people CAN pay their rent and meet their obligations.  And yet this proposed bill and rhetoric spewed by our city and state "representatives" tell people otherwise.

This rent, that the city and state are telling people not to pay, is the very same rental income that property owners need to pay their property taxes, water and sewer, utilities, mortgage payments, fuel costs, payroll for superintendents and janitors to maintain and operate their buildings.  Not to mention money to pay to contractors for repairs and improvements to the buildings where these same tenants reside.  This harkens back memories to the abyss of NYC in the 1970s and 80s where similar actions lead us down this path once before.

As Landlords are the biggest taxpayers in NYC, we should take an socioeconomic view of this proposal:

- Less income yields less tax payments collected by the city and state (and less money to maintain buildings and hire employees);
- devalued properties because of less income and more deterioration (higher unemployment for supers, janitors and contractors, more people out of work; apartment & building conditions deteriorate without money for renovations),
- which in turn yield less demand (people were fleeing NYC & NYS for the last decade which has ramped up exponentially now!!) lower rents and empty apartments yield still lower income (no recourse to collect delinquent rents)
    - People living rent free during the moratorium while landlords are expected to maintain services and are issued copious violations if this is not done.
- less taxes billed on decreased assessed values = still lower tax revenue for NYC & NYS

No other sector has been asked to bear such a burden as what the city and state are asking of the real estate industry.  Something you are asking of your biggest taxpayers and biggest source of revenue that allows the city and state to operate.  Those who provide shelter to millions of New Yorkers, whom many have personal relationships with the landlords, who are working with their tenants during this time to ensure that their financial obligations are not overwhelming to their families.

Tenants are being told not to pay their rent, but no one is telling tenants how their living conditions can deteriorate if there is no money to repair buildings, maintain staff and cover other costs.  And if these buildings deteriorate, and those 60% of mom and pop landlords lose their buildings because of the financial burden created by the city – who will run those buildings and care for those tenants?  Will the city take over the buildings?  Need I remind you that the New York City Housing Authority is in fact New York City's very own "worst landlord".

And to these 60% of mom and pop landlords who have no pensions, whose entire families' livelihoods rely on these buildings, what will be done with them when they lose everything?  They will be forced on to food stamps and rental assistance programs – creating a further burden on the system.  Will they also be told not to pay their rent when it comes time?

Consider the disastrous outcome of what is being proposed here.  You are proposing to kill the backbone of New York City – meanwhile states and corporations alike are bailed out and provided a safety net.

Free things never made anyone richer.  In fact, it promulgates the cycle of poverty, but also seemingly creates a dependent voter base.  The politization of this pandemic at the expense of people's livelihoods has been sickening to watch.  It needs to stop here and now.

.



52 E. 13TH STREET, SUITE 3A
NEW YORK, N.Y. 10003
E-MAIL : OFFICE@TOPAZMGMT.COM
TEL: 212-278-0061
FAX: 212-398-9068

April 28, 2020

New York City Council
Committee on Housing and Buildings

Dear Chairperson,

We are writing to submit testimony that the City Council's proposed new rules will impose an unreasonable burden on property owners and managers.

First, Intro. 1912 gives tenants no incentives to pay their rent on time or cooperate with landlords to come to a mutual agreement on payment plans. It also provides no recourse for landlords if tenants decide to leave without paying their rent and break their leases, as is currently happening. It in essence gives tenants 1 year period of not having to pay rent without compensating landlords for any loss revenue. Landlords still have to pay their mortgages, real estate taxes, water/sewer bills and all the other operating expenses on top of that. This is an unreasonable burden to impose of landlords at a time of national crisis and dwindling revenues as we negotiate with tenants to reduce their monthly payments.

Second, Intro. 1936 is a vaguely written law that imposes a blanket restriction from talking to tenants about their rental payments. NYC already has one of the nation's toughest, if not toughest, anti-harassment laws for tenants. Imposing a new vaguely worded law would serve no purpose other than to score political points while people are dying, losing their jobs and otherwise suffering. The City Council would better serve the whole of the population by finding ways to help tenants get financial assistance and lobbying Albany to address both sides of the rental equation by also getting landlords assistance by reducing their tax burden, their water burden and their mortgage burden. The last one can be addressed by making sure any landlord or consumer taking mortgage forbearance will not be penalized for doing so by making sure banks don't blacklist consumers or landlords for taking mortgage forbearance during a national crisis.

Thank you for your time and consideration,

Ameet Sachdev
Member



**Testimony**
**New York City Council**
**Committee on Housing and Buildings**
**Jointly with the Committee on Consumer Affairs and Business Licensing**

**Tuesday, April 28, 2020**

The Brooklyn Chamber of Commerce is among the largest and most influential business advocacy organizations in New York, having spent the last hundred years developing and promoting policies that drive economic development and advance its members' interests. The Brooklyn Chamber is the voice of Brooklyn's business community, offering the promotion, support and advocacy businesses need to continue creating jobs and opportunities in their communities.

We submit testimony today regarding Introduction 1912 of 2020 regarding the moratorium on evictions through April 21, 2021 or 7 months after the state or federal moratoriums on evictions expire. We understand that the purpose of this bill is to protect commercial and residential tenants. Here at the Brooklyn Chamber of Commerce we have been working around the clock to help our small businesses weather the COVID-19 crisis and offer them the support, tools, and resources that they need to survive. We have seen firsthand how difficult it is for them cover basic expenses such as salaries and rent at a time when many have been mandated to close and others have been forced to pivot to a completely new business model that does not offer them the same amount as revenue.

Nonetheless, we believe Intro. 1912 will not help our businesses where it matters most – by offering them resources and support to keep their enterprises alive. It does not provide them financial relief from taxes or other payments owed to city government. In addition, it is unclear whether New York City government has the authority to revise the authorizing state law that permits marshals and sheriffs to enforce evictions and other civil judgments. Furthermore, eviction proceedings should be tied to state mandates regarding moratoriums on evictions. When the state re-authorizes evictions, every eviction still must go through a due process in civil court. Because of this process, we do not understand why the city would prevent eviction actions from taking place for 7 months or more past the time when the state has authorized evictions to take place.

Thank you for your consideration and for your support of New York City's small businesses.

Respectfully submitted:
Randy Peers, President & CEO

# TAKEROOT JUSTICE

**Testimony of Priya Sreenivasan before the New York City Council Committee on Housing and Buildings**

*April 28, 2020*

Thank you for allowing me the opportunity to provide testimony. My name is Priya Sreenivasan and I am a legal intern with the Housing Rights Practice at TakeRoot Justice. We write today to comment on Intro 1936, which would amend the definition of harassment to include threats based on an individual's status as a person impacted by COVID-19.

TakeRoot Justice, formerly the Community Development Project at the Urban Justice Center, has a long history of providing legal services and support on housing issues in New York City's low-income neighborhoods, particularly within immigrant communities and communities of color. Through working in partnership with tenant associations, community-based organizations, and city- and state-wide coalitions, we advocate with tenants for policies to stop predatory landlords and to fight for safe housing. As a member of Stabilizing NYC - a coalition of eighteen grassroots organizations, a citywide housing advocacy organization, and TakeRoot Justice, we collectively work to combat tenant harassment and preserve affordable housing.

As the COVID-19 pandemic has unfolded, our practice has adapted to ensure that our work is responsive to the needs of the communities we serve. We have launched a dedicated COVID-19 hotline for our partner organizations across the boroughs, are providing legal research support to coalitions, and have developed materials for virtual Know Your Rights training for tenants. We also have been making hundreds of phone calls to pre-existing clients to check-in and monitor their landlords' behavior.

In our work, we have already started to see landlords retaliate against their tenants for their inability to pay rent as a result of being impacted by COVID-19. We recently worked in a building with tenants who were unable to afford their rent as a result of loss of income because during COVID-19, there has been reduced demand for their freelancing services. The tenants asked their neighbors to withhold rent in solidarity, and in response, the landlord accused the tenants of committing tortious interference. Tenants in the building received a letter from attorneys at Belkin Burden Goldman that threatened to sue tenant leaders in New York Supreme Court if anyone in the building withheld rent a result of their organizing efforts. We anticipate that other landlords may similarly harass tenants who are not able to pay rent due to the

impact COVID-19, and we support the proposed amendment to the harassment definition insofar as it offers some of these tenants potential legal recourse.

However, we are concerned about the exclusion of a vast number of tenants from the definition of people "impacted by COVID-19". As written, the definition leaves out a critical mass of tenants who have been able to keep their jobs but still lost income as a result of reduced hours, rates, or commissions. In 2019, the New York City Mayor's Office of Media and Entertainment partnered with the Freelancers Union and Upwork to release a report that estimated one in three New York City workers (approximately 1.3 million) engaged in freelance work in the previous 12 months.[1] Many of these individuals, along with tenants with jobs not counted in this report, have had their incomes diminished as a result of COVID-19, yet would not be entitled to protection from harassment under this bill.

From our work, it is clear this is not an abstract concern; rather, it is the reality we see. The tenants who received the letter from Belkin Burden mentioned above are an example of tenants who would be excluded from this bill. We hope that this legislation will be a starting point for offering tenants affected by COVID-19 a mechanism to protect themselves against harassment, and that it will be expanded to provide protection to all tenants who need it.


Thank you for your time.



Priya Sreenivasan
Legal Intern
TakeRoot Justice

---

[1] Freelancers Union, New York City Mayor's Off. in Media & Ent., & Upwork. *Freelancing in New York City 2019.* https://www1.nyc.gov/assets/mome/pdf/freelancing-ny-report-09062019.pdf.

123 William St., 16th floor
New York, NY 10038
T: 212-810-6744
F: 212-619-0653

Law, research, and
policy for organizing

**TAKEROOTJUSTICE.ORG**

2



1



April 28, 2020

**Testimony of Community Housing Improvement Program
at a Joint Hearing of the Committee on Housing and Buildings and
the Committee on Consumer Affairs and Business Licensing
Re: Intros. 1912 and 1936 of 2020**

Good afternoon and thank you for the opportunity to provide testimony to the Committees on Housing and Buildings and Consumer Affairs and Business Licensing. My name is Joseph Condon and I am providing this testimony on behalf of the Community Housing Improvement Program, also known as CHIP. CHIP is an organization made up primarily of small- and medium-sized owners and operators of rent-stabilized housing in NYC. We have about 4,000 members who own and operate about 400,000 units of rental housing. Our members run hands-on small businesses by managing their own buildings and becoming long-term fixtures in their communities. More than 50% of CHIP members have owned their property for 20 or more years. They know their buildings; they know their employees; they know their tenants. Many of our members also sit on local clubs or civic associations, some on their community boards. During the COVID-19 pandemic, our members and their businesses are on the front lines, making sure people have a safe, clean, properly functioning apartment building to live in while we shelter in place. Many CHIP members go beyond this minimum standard.

Because our members are long-term owners with community ties, they are extremely sympathetic to the painful financial circumstances that COVID-19 has created. In fact, many of our members have worked with their tenants who are currently experiencing temporary financial difficulties. According to an internal survey of CHIP members conducted earlier this month, more than 50% of owners who responded have either worked out payment plans or are currently doing so with tenants whose financial circumstances have been impacted by COVID-19. Another 25% of our members who responded stated that they expected to offer discounts, forbearances, or payment plans on a case-by-case basis moving forward. Almost all of our members have provided information on available governmental benefits to their tenants.

But some of our members are also experiencing financial strain. And the rest are nervous for what May and June will be. For CHIP members, the utmost concern is their ability to provide safe, clean, and quality housing to the residents of this city. And just like any other small business, without paying customers, it cannot survive. According to a recent survey of CHIP members, more than 40% of owners who responded said they would not be able to pay all their monthly operating expenses (e.g., salaries, utilities, property taxes, or mortgages) if they could not collect any rent for one month. After collecting no rent for two months, the number grew to 75%. And it is worth noting that small multifamily building owners were not eligible for the Paycheck Protection Program that was part of the federal government's stimulus package to help small businesses.

Unfortunately, despite this being a time where we need to put politics aside, many so-called tenant activists are using the COVID-19 crisis as an opportunity to push a political agenda rather than addressing the real needs of people during this time. Calling for city-wide rent strikes without concern for the negative impacts of putting small- and medium-sized property owners out of business is irresponsible. Canceling rent without also providing relief for the expenses of small property owners is not a workable option and should not be realistically considered by these committees without providing commensurate relief on the expense side for property owners. Relief in the area of property taxes is a necessary complement to any moratorium. The ripple effects of not doing so will be felt most by building employees, management staff, maintenance contractors such as carpenters, plumbers, and exterminators, just to name a few.

Property taxes are the biggest single operating expense for rent-stabilized building owners. Between 30 and 40% of a tenant's rent payment goes to the City in the form of property taxes and other charges and fees. In some ways, the City is just as reliant on those rent payments as the property owner. As someone once said, "even the people you pay rent to have to pay rent." We think it is unfair to CHIP members for this Council to propose moratoriums that effectively prohibit rent collection for a certain period of time without also providing complimentary relief for owners who must still pay operational expenses during that time. By only focusing on one side of the equation, these proposals add fuel to the political fire of the anti-housing activists who are calling for a rent strike for all. This is one of the main reasons CHIP opposes Int. 1912-2020.

Further, assuming that no one can pay rent ignores the significant benefits already disbursed—and yet to be disbursed—by the state and federal governments to those who have lost income during these difficult times. We understand that not everyone who has lost income will be eligible for those benefits, and that the benefits may not completely make up for lost income for those who are eligible. CHIP members are working with these tenants to figure things out. Indeed, property owners and managers are in the best position to deal with the variety of circumstances tenants are facing. But if everyone else who can pay rent just stops, the ability of an owner to provide relief to those who can't get it anywhere else is significantly diminished.

Another specific concern regarding Int. 1912-2020 is lack of distinction between tenants in arrears as a result of COVID-19 and its secondary effects, and tenants who were in arrears long before the pandemic arrived. As currently drafted, the moratorium would cover these pre-existing arrears.

Int. 1912-2020 would also prevent evictions based on nuisance activity; criminal conduct; illegal subletting, profiteering, and subdivision; or other misuses of an apartment that endanger other tenants in the building, or at the very least impair their quality of life. While a building owner is likely to be able to work out something with a tenant who is experiencing genuine financial difficulties because of COVID-19, should the tenant who was four months in arrears before the pandemic struck receive the same immunity from legal process? Should a person who is profiteering from their rent-stabilized apartment by using it as an illegal hotel be protected because their income was reduced, giving them a license from the government to refuse to pay rent?

In sum, Int. 1912-2020 sends a strong signal from the Council that tenants do not have to pay rent because owners cannot even attempt to collect those arrears for almost one year. While the Council continues to recite kumbaya rhetoric of everyone working together in this time of crisis, its actions belie its words. Where is the relief to property owners who will be forgoing the rent while their expenses continue to accrue? Where is the seven-month extension on property taxes due to the City? CHIP members are doing what they can to provide relief to their tenants, but they cannot do it alone. We are asking the Council for help.

Aside from the practical concerns over the bill Int. 1912-2020 also suffers from multiple legal infirmities that make a legal challenge inevitable, and an injunction against its enactment and/or enforcement more likely than normal.

First, Int. 1912-2020 is expressly pre-empted by §1(5) of the Local Emergency Housing Rent Control Act of 1962 ("The Urstadt Law") which, in relevant part, precludes the New York City government from enacting any "local law… subject[ing any housing accommodations] to more stringent or restrictive provisions of regulation and control [of residential rents or eviction] than those presently in effect."  By forbidding NYC marshals and the NYC Sheriff from executing any warrants of eviction during "suspension periods" of its own determination, Int. 1912-2020 would subject all housing accommodations in the City of New York that are named in warrants of eviction to more stringent and restrictive regulation of eviction than those presently in effect, under existing statutes as supplemented by the governor's Executive Order No. 202.8 (90-day statewide eviction moratorium).  Therefore, Int. 1912-2020 is facially invalid and unenforceable.  See Mayer v. City Rent Agency, 46 N.Y.2d 139 (1978) (striking down NYC local law pre-empted by Urstadt).

Second, Int. 1912-2020 vastly oversteps the boundaries of the City of New York's local legislative powers under the home-rule provisions of the New York State Constitution and the Municipal Home Rule Law.  "The home rule provisions of the Constitution and the legislation implementing it list several subjects about which local governments are given the power to legislate." Council of City of New York v. Bloomberg, 6 N.Y.3d 380, 392 (2006).  The enforceability of judgments issued by the New York City Housing Court and other New York State courts is **not** among these enumerated subjects.  NY Const., art. 9, §2(c)(ii)(1)-(10); Municipal Home Rule Law §10(1)(ii)(a)(1)-(14). Therefore, should Int. 1912-2020 be enacted, it will not be able to withstand a challenge on home-rule grounds in the New York State courts.  See Bloomberg (striking down NYC local law based on pre-emption by Municipal Home Rule Law, among other grounds).

CHIP has equally grave constitutional concerns with regard to Int. 1936-2020, which would expand the definition of residential tenant harassment (intent rebuttably presumed) to include "threatening any person lawfully entitled to occupancy of a dwelling unit based on such person's actual or perceived... status" as the member of a new protected class for purposes of tenant harassment: "an essential employee, status as a person impacted by COVID-19, or receipt of a rent concession or forbearance for any rent owed during the COVID-19 period," defined in the same way as the "first suspension period" under Int. 1912-2020 above, that is, from March 7, 2020 through, at the earliest, September 30, 2020.

While it is certainly a laudable goal to attempt to deter anyone from "threatening" tenants based on the current pandemic's direct or indirect effect on them, we argue that the lack of any definition at all of "threatening" or "based on" in this bill—or anywhere else in the Housing Maintenance Code, for that matter—makes Int. 1936-2020 void for vagueness under the New York City Charter (Chap. 45, §1046(c)(1)), the New York State Constitution (Art. I, §6), and the United States Constitution (14th Amendment).   In the absence of any such definition, the City Council puts property owners on unconstitutionally deficient notice of what it is that gives rise to the devastating rebuttable presumption of intent to harass tenants.  Does "threatening… based on" include warning a tenant via a late rent notice and then by a notice to sure—as the law mandates—that the failure to pay arrears by a date certain will result in eviction proceedings once the COVID-19 moratorium expires?  What exactly is the modicum of evidence required to prove discriminatory intent?  The tenant's hearsay account of a past request for payment?  Or even a third party's account of a past event, allegedly demonstrating the owner's intent to discriminate against that particular tenant, or any tenant suffering from the primary or secondary effects of the pandemic?   Unless the Council will add language to Int. 1936-2020 that puts all the foregoing questions to rest, CHIP respectfully urges that this bill be rejected by these committees, and by the full Council if it gets that far.

4

       In fine, CHIP urges these committees, and the City Council as a whole, to either radically amend or reject both Int. 1912-2020 and Int. 1936-2020, based upon the decimation of small building owners that the former bill would cause; and based upon the legal infirmities of both bills, which are so grievous that they are likely to be tied up in the courts long after the COVID-19 pandemic has subsided.

*City Council Committee on Housing & Buildings and the Committee on Consumer Affairs*
*Remote Hearing - April 28, 2020*
*Oksana Mironova, Housing Policy Analyst, Community Service Society of New York*

My name is Oksana Mironova and I am a housing policy analyst with the Community Service Society of New York. Thank you for the opportunity to present comments on the COVID-19 Relief Package, as it pertains to tenants.

The pandemic has intensified the city's ongoing housing crisis, already a daily reality for four in ten low-income New Yorkers who are homeless or housing insecure. Before March 2020, many low-income New Yorkers were spending a substantial portion of their earnings on rent. For example, our research has shown that the median rent to income ratio for low-income rent stabilized households bypassed the severe rent burden threshold, increasing from 40 percent in 2002 to 52 percent in 2017.



FIGURE 1.    SHARE OF LOW-INCOME RENTERS EXPERIENCING HOUSING HARDSHIPS (2019)

*Source: 2019 CSS Unheard Third survey.*

After decades of climbing housing costs, low-income renters were already experiencing high rates of housing hardships. In 2019, 30 percent fell behind on rent, 20 percent had utilities shut off, 19 percent had to move in with other people, and 15 percent were threatened with an eviction.

It is therefore unsurprising that many renters have been unable to save money. The vast majority of low-income renters—70 percent—had less than $1000 in savings for an emergency, like an unexpected loss of income or a hospitalization. Further, there are major disparities in savings by race among renters across all incomes. Sixty three percent of black renters and 60 percent of Latinx renters report having less than $1,000 in savings, as compared to 43



Figure 2. Savings by race and Latinx origin, NYC tenants (2019)

| | under $1K | $1K-$10K | $10K+ |
|---|---|---|---|
| Black | 63% | 23% | 14% |
| Latinx | 60% | 24% | 16% |
| Asian | 43% | 30% | 27% |
| White | 41% | 19% | 40% |

*City Council Committee on Housing & Buildings and the Committee on Consumer Affairs*
*Remote Hearing - April 28, 2020*
*Oksana Mironova, Housing Policy Analyst, Community Service Society of New York*

percent of Asian renters and 41 percent of white renters. This is in line with national research, which points to a broadening racial wealth gap across all socioeconomic levels. Most black and Latinx renters, and the vast majority of low-income renters do not have one months' worth of rent in savings. And, the sudden onset of the pandemic has disproportionately impacted these communities.

The pandemic not only created an impossible situation for New Yorkers who were already homeless or housing insecure, but is now bringing many others closer to the edge. Our research has showed that more than 126,000 low- and moderate-income renters in the private market have minimal savings and have lost much or all of their income as of late March. This number will increase dramatically in May.

Expanded unemployment insurance—covering more workers, with higher weekly benefits–will help some, but will leave out important segments of the New York City workforce, like undocumented workers. The stimulus check will offer some reprieve as well, but is a one-time payment that also excludes undocumented New Yorkers. In the short term, delays in unemployment insurance claims processing have been a huge problem, because many renters lack savings to get by, even for even a few weeks.

New York State has a 90-day eviction moratorium in place, set to expire in mid-June. First, we need to extend the moratorium, because we know that the economic effects of the pandemic will be with us for a long time. We support Intro 1912, which would pause evictions until September 2020 for all tenants, and until April 2021 for those directly impacted by the pandemic. We also support Intro 1936, which would amend the definition of harassment in the Housing Maintenance Code to include COVID-19 status – no one should be discriminated against because they got sick.

Second, we need some sort of rent relief that is universally available and easily accessible to anyone impacted by COVID-19, especially undocumented New Yorkers. Without it, we are going to see a major spike in evictions whenever the moratorium is lifted.

Looking toward the long term, we need to expand right to counsel to give more tenants a fighting chance in housing court. Further, we need to develop programs that allow mission-driven nonprofit developers, or tenants themselves, to acquire properties that will come up for sale, or go into foreclosure in the wake of the pandemic. This could include laws that give tenants, nonprofits, or the city the right of first refusal, paired with targeted funding to support acquisition.

Thank you for the opportunity to provide comments on the COVID-19 Relief Package. If you have any questions, you can reach me at omironova@cssny.org.

4/28/20

Dear Honorable Members of the NYC Council,

I know that you are considering passing a new legislation in the wake of this Covid-19 Pandemic, to allow tenants to not pay rent.
I would like to ask Council members who are in favor of this a legislation, few questions.

**Landlords are currently providing crucial and essential services to tenants. Those essential services can only continue if landlords could collect rent.**

Specifically

1. How are landlords expected to pay for heat and hot water if tenants are not going to pay rent.
2. How do you expect a landlord to pay for the water and sewage that allows tenants to take showers and go to the bathroom.
3. Landlords are paying supers and porters to put out the garbage, and to clean/mop public spaces. How do landlords provide this without the critical cash flow that comes from rent collection.
4. How does City Council expect a landlord to pay property taxes without rent?
   - Property taxes have skyrocketed in the last 3 years to a level that is equal to 35% of rental income. We are in essence collecting taxes on behalf of the city.
5. Why is landlord trying to collect rent, termed as "Harassment". Is a landlord not entitled to collect rent for proving shelter, heat, hot water, cleaning services etc.?

   Why are we even using the term "Harrasment"? All we want to do is collect rent on an apartment so we could pay our 1) property taxes 2) Super 3) the oil company for delivering oil 4) ConEdison for the running elevator

6. Why is the Government throwing all the burden of this pandemic on the landlords only?
   Why is the city council not considering a bill to allow people to walk into the local supermarket pick up some groceries and walk out without paying.

Thank you,

- David Chemtob
  917-681-5401

To the esteem members of the City Council:

As someone who's been managing NYC rent regulated property for over 30 years, but who is not a landlord, I've come to appreciate all arguments from both sides of the aisle in the on-going, now more than ever, contentious issue of housing.  Notwithstanding my professional occupation I am also a father of two millennials who themselves are dealing with the high cost of housing here in the City.   So I'm both an employee of the landlord/tenant industry and someone who needs to help subsidize his two children in the landlord/tenant world.

With respects to the current proposed legislation before you, may I ask rhetorically, why are you looking to create solutions to problems that don't exist, especially during a crisis of such global proportions? This is a society threatening pandemic we're all dealing with.  Everyone person I know is going out of their way to talk to their tenants to find workable solutions to something that for many of us we've never seen the likes of before.  I cannot imagine that some landlord is out there making threatening overtures to tenants at this time.  Forgive me for wearing blinders, but I just don't see it happening.

We manage over a 1000 units between 28 properties and I have to say the conversations we're having with tenants these days are some of the most sincere and genuinely human conversations we've ever had.  We hear the anxiety and concerns in their voices; for some we hear fear.  But I can assure you our reactions aren't to disregard the epic proportions this crisis is having on all people.  If anything I see people in this industry rising to the top with their hands held out for anyone who needs it.

We hear how appreciative our tenants are to see our maintenance people out there on the front lines *every single day* doing what they can to keep buildings as clean as we can.  They appreciate us being here.  There's a new found sense of appreciation that I think we're all feeling for everyone who is helping each and every one of us to get through this.  I think some people are even taking comfort in just talking to people in our office as it's a form of distraction from their own thoughts while they remain home.

Now more than ever, please, I beg you, do not widen the divide that separates us, but do what you can to bring us together. If you are truly – *truly* – interested in helping your constituents during this extremely difficult time, set aside your feelings of animosity and revenge for property owners and use the occasion instead to let your humanity be the example.  Help us to help them.

Please be well and stay safe.

Steven J. Lavelle, CPM CMCA AMS
Director of Operations
Ventura Land Corp.



## Council of New York Cooperatives & Condominiums

**TESTIMONY TO THE COMMITTEE ON HOUSING & BUILDINGS AND COMMITTEE ON CONSUMER AFFAIRS**

**Regarding Int. 1912 and Int. 1936**

**April 28, 2020**

The Council of New York Cooperatives & Condominiums is a membership organization providing information, education and advocacy for housing cooperatives and condominiums located throughout the five boroughs of New York City and beyond. More than 170,000 New York families make their homes in CNYC member buildings, which span the full economic spectrum from very modest, income-restricted housing to solid middle class apartment complexes to upscale dwellings. The common thread is that these buildings are owed by their residents and operate as self-governing representative democracies.

Today our City, State, and Nation face an unparalleled health and economic crisis. New Yorkers are suffering greatly and it is understandable that the City Council is looking for solutions. However, we write today to raise concerns about the cumulative impact of the legislation being considered today and at upcoming hearings which is meant to help commercial tenants but may hurt homeowners.

There are around 100,000 households throughout the five boroughs in co-op buildings that have commercial space and may be lucky enough to have commercial tenants during this difficult time. The owners and shareholders in these buildings are not large real estate companies – they are average citizens and families. These citizens and families rely on the rental income from commercial tenants to offset their monthly maintenance and other carrying-costs.

Many co-ops and condos are working collaboratively with their commercial tenants to establish payment plans and other ways to weather this crisis together. It is almost always of mutual interest to find a way forward that prevents commercial tenants from needing to end a lease or vacate a site, especially during these hard economic times when finding another tenant would be extremely difficult. However, the legislation being considered today could mean that a co-op or condo might be forced to wait until April 2021 to see any rent payments from a commercial tenant. We are deeply concerned about the impact this might have on the operations of our members who are already facing rising operating costs across the board.

CNYC shares a desire to find relief for those New Yorkers who need it most. However, we must caution against any broad legislation which could have major negative consequences for our City's homeowners. We look forward to working with the City Council to address these issues and countless others during this difficult time for all.



April 28, 2020

New York City Council
Committee on Housing and Buildings

RE: Intro. 1912

To Whom It May Concern:

J & L Holding Corporation is a family owned and operated property management company and I am writing to express my concern about the proposed Intro. 1912.

While I understand the desire to protect tenants under the circumstances before us with the Covid-19 pandemic, but the general idea of this proposal blatantly ignores the economic reality owners face in the name of political pandering.

How are we supposed to pay our property taxes in July and January if you are, in essence, allowing tenants to not pay rent during a time period when two real estate tax payments are due?

How can you explain shifting the financial burden to one group as you have proposed?

With the logic proposed, why are you not going after every other business?  Why is it that we are being vilified?

The proposal puts the financial burden solely on the backs of property owners.  The proposal is one sided, short sighted and a politically motivated attempt at a "solution". It is simple solution to a complicated problem that does not solve any problems, it only makes things worse.

I urge you to look at the bigger picture when considering the approval of Intro.  1912.

Yours truly

JP Rutigliano

1140 Bronx River Avenue – Bronx, NY  10472 – 718.620.2200 – Fax 718.620.1870

TESTIMONY OF THE QUEENS & BRONX BUILDING ASSOCIATION

April 28 and 29, 2020

My name is Robert Altman, representing the Queens & Bronx Building Asociation, and I am submitting this testimony on Int. Nos. 1912, 1914, 1932 and 1936.  But in general, let me express the Association's general concern that the Council be very careful about inadvertently using the COVID-19 pandemic situation as a means to protect populations who before the current pandemic had already been delinquent in their obligations.  We understand the Council's desire to minimize the damage from the pandemic, but COVID-19 should not be used as a sword by already problematic individuals.  Some of the overly broad legislation will frankly protect bad actors without the need to do so.

For example, in Intro. No. 1912, what if the protected person had, in fact, become delinquent in his or her responsibilities before COVID-19, but because of COVID-19 now fits in the law.  Moreover, what if a person is not tested for COVID-19 but now uses the generalities of this law to seek protection.  Theoretically, with tele-medicine consultations, it is quite easy to know what the law allows for and seek a consultation without even really having ANY symptoms!  It is not like a doctor can provide a full examination through tele-medicine and determine if a patient is faking symptoms or a situation is real.  At least a person should test positive for the virus or as part of a defense in a court of law, show that he or she had contracted the virus either though a positive test, or at least, showing signs of the antibodies after the fact.  (And that should also be true for any relatives the person is claiming they needed to care for.)

But even worse causation issues exist in Int. No. 1914.  Here a person is assumed to be impacted if another member of the household had COVID-19.  But what if that person was not the primary caregiver?  In the law, mere partial caregiving is sufficient (and when part it must be is not defined).  What if the person continued to live as if everything was normal?  COVID-19 must at least be the cause of the hardship, not an incidental situation.

And these same issues exist in Int. No. 1932 and 1936 because it basically uses the same definitions and thus has the same flaws.  Moreover, Intro. No. 1932 changes the dynamic of liability.  If the business is ruined, the guarantor now has no reason to leave quickly (under a personal good guy guaranty, the guarantor will want to leave early to limit liability) and the landlord then must institute proceedings, proceedings which the Council is seeking to stymie.  It leaves the Landlord in a ridiculous situation.  And again, what if the issues of the entity are pre and post-COVID-19.

And I gather because the Landlord is getting no revenue because the Council is not really allowing it, the Council is willing to (i) forego all property taxes due to COVID impacts defined in the legislation, (ii) forego all water bills due to the COVID impacts defined in the legislation, (iii) pay a landlord's heating, cooling, electric, mortgage and operating payments which may not be impacted by an executive order because

many loans are not of the type that are delayed (and mind you, must still be paid). The Council must make provisions for this as not every landlord is a deep pocket.  And I gather if a small landlord is using the money for its obligations, such as retirement, the Council is willing to subsidize such small landlords.  And for larger landlords, I gather the Council is ready to provide funds so the Landlord can pay its employees.

Finally, all of the legislation ignores basic economics.  No rationale landlord wants to use the pandemic as an excuse to harm a tenant or collect against good people.  Recent rent law changes basically make it difficult to do so, and in the coming recession, harming good tenants who should be good again is bad economics.  In the last recession, Landlords worked with good tenants who came upon tough times.  But the Council seems to forget that.  Trying to re-let vacant space in a bad economy, only means a landlord will face months of no rent and then the market rent will probably be much less anyway.  The Council's legislation ultimately fails to understand basic economics.  And it fails on basic fairness because it allows that those who are not impacted by the pandemic to take advantage of it without showing a need for assistance.  Such blanket legislation is a boondoggle of the highest degree.

**For Submission to the New York City Council Committee on Housing and Buildings**

Thank you for this opportunity to submit my testimony during these trying times.  I am an owner of rent stabilized apartments in the borough of Brooklyn and would like to testify to the following:

- The Housing Stability Act of 2019 passed by the NYS Legislature last year severely impacted my financial situation by decreasing revenue in the form of what I can charge my tenants in rent, increase in expenses, specifically in legal fees due to the extended time it takes to now evict a tenant, and removal of any growth rate in rents due to the removal of IAI's and the vacancy bonus when tenants vacate an apartment.
- Covid-19 has further exasperated my financial situation with an increase in tenants not paying rent and a current rent strike being promoted by various legislators for political purposes.
- By extending Gov. Cuomo's freeze on evictions from the current 90 days to an additional 360 days will drive me to foreclosure.  I will not be able to evict non- paying tenants and without that rent, I will not be able to pay my mortgage.
- My bank in turn pays real estate property taxes and water and sewer taxes through my monthly payments which will mean the City of New York will be severely impacted as well.
- Housing Court rarely results in evictions, even before the Housing Stability Act passed in 2019. However, it is the most effective way for Landlords to collect rent arrears.
- By extending the eviction moratorium (which will be immediately challenged in court for lack of authority since only New York State has the authority to do so) will only exasperate a difficult situation for all parties involved, including tenants, landlords, and the City of New York.
- 

This is not an exaggeration, but current reality.

**/s/ Rosario Parlanti**

As a small landlord with a family owned building I am shocked to see some of the proposals being used to "protect" rights of certain groups.   As our governor has said many times, we are ALL in this together and this is no time to politicize the issue.  As the mayor and many council members seek to use this pandemic as a means to solidify their base and secure "favors" from the electorate in order to get elected, they are using very short sited plans to do this.  Putting in place programs that allow tenants to withhold and potentially walk away for rents for 12 months does nothing to help the city's situation. Small landlords do not have unlimited supply of working capital to keep buildings running up to the City's high standards.  Compliance with all the regulations that were in effect prior the pandemic plus requirement to continue operating without any income to provide necessary updates will cause major defaults/bankruptcies.  If the City's plan is to have landlords walk away from their buildings so that the city can take over and resell at a later date for a profit , then go ahead and pass the bills.  Otherwise the city itself will reap the pain of the bills it passes today as a "landlord" for all these buildings.   It simply provides you with a city full of people who will make the same demands of you that they make of us. And without the rents , the City will not be able to make any improvements and we will have 5 boroughs of "NYCHA" apartments-no heat, no service, etc.

Landlords want to be part of the solution and there has to be a middle ground where we can work with those tenants that can't pay and those that can.  We are not the bad guys here.

**IN OPPOSITION to Int. 1912-2020 - Joint Hearing of the Committee on Housing & Buildings and the Committee on Consumer Affairs and Business Licensing**

I work for a small landlord - a mom and pop shop who operate on thin margins. Landlords, like the place I work for, account for 60% of rent-stabilized units throughout the city. These 60% own less than 50 units each.

Many of these hardworking people, like the ones I work for, are out in their buildings personally cleaning and disinfecting door handles, rails, elevator buttons etc. – risking contracting COVID-19 in order to keep their tenants safe.  These same people are on-call 24/7 for their tenants and buildings.  Yet these same people are being demonized by the likes of State Senators Michael Gianaris, Julia Salazar, and Mayor DeBlasio and thrown under the bus when the city and state advocate that tenants should stop paying rent altogether.

Not only should tenants stop paying rent but now the city wants to rob landlords of, not only their income, but their only restitution for their hard-earned revenue.

While Michael Gianaris, Julia Salazar, and DeBlasio are pushing for rent strikes – who will bear the burden when these 60% cannot afford their July 1st tax bills because no income is being received; and no tax forgiveness or even deferment is being extended by the city or state? And yet the city charges interest to late payers of 7 – 18% COMPOUNDED DAILY.

Meanwhile the SBA and NYC's dismal "attempts" to provide loans to small business has fallen flat on its face.  No small-time landlord I know of has been the beneficiary of one of these much-needed loans.  Instead the money is shelled out to large corporations and corporate landlords leaving that 60% of small-time landlords to rely heavily on a few tenants who are able to pay their rents.

Taxes have been deferred federally; individuals are receiving stimulus checks of $1,200.00 (households $3,400.00).  Unemployment claims have been provided with an additional $600.00 weekly – making it more lucrative for some to stay on unemployment rather than go back to work (I managed one such tenant who has been asked to return to work but has declined as she is making more on unemployment).  This has been done so that people CAN pay their rent and meet their obligations.  And yet this proposed bill and rhetoric spewed by our city and state "representatives" tell people otherwise.

This rent, that the city and state are telling people not to pay, is the very same rental income that property owners need to pay their property taxes, water and sewer, utilities, mortgage payments, fuel costs, payroll for superintendents and janitors to maintain and operate their buildings.  Not to mention money to pay to contractors for repairs and improvements to the buildings where these same tenants reside.  This harkens back memories to the abyss of NYC in the 1970s and 80s where similar actions lead us down this path once before.

As Landlords are the biggest taxpayers in NYC, we should take an socioeconomic view of this proposal:

- Less income yields less tax payments collected by the city and state (and less money to maintain buildings and hire employees);
- devalued properties because of less income and more deterioration (higher unemployment for supers, janitors and contractors, more people out of work; apartment & building conditions deteriorate without money for renovations),
- which in turn yield less demand (people were fleeing NYC & NYS for the last decade which has ramped up exponentially now!!) lower rents and empty apartments yield still lower income (no recourse to collect delinquent rents)
  - People living rent free during the moratorium while landlords are expected to maintain services and are issued copious violations if this is not done.
- less taxes billed on decreased assessed values = still lower tax revenue for NYC & NYS

No other sector has been asked to bear such a burden as what the city and state are asking of the real estate industry.  Something you are asking of your biggest taxpayers and biggest source of revenue that allows the city and state to operate.  Those who provide shelter to millions of New Yorkers, whom many have personal relationships with the landlords, who are working with their tenants during this time to ensure that their financial obligations are not overwhelming to their families.

Tenants are being told not to pay their rent, but no one is telling tenants how their living conditions can deteriorate if there is no money to repair buildings, maintain staff and cover other costs.  And if these buildings deteriorate, and those 60% of mom and pop landlords lose their buildings because of the financial burden created by the city – who will run those buildings and care for those tenants?  Will the city take over the buildings?  Need I remind you that the New York City Housing Authority is in fact New York City's very own "worst landlord".

And to these 60% of mom and pop landlords who have no pensions, whose entire families' livelihoods rely on these buildings, what will be done with them when they lose everything?  They will be forced on to food stamps and rental assistance programs – creating a further burden on the system.  Will they also be told not to pay their rent when it comes time?

Consider the disastrous outcome of what is being proposed here.  You are proposing to kill the backbone of New York City – meanwhile states and corporations alike are bailed out and provided a safety net.

Free things never made anyone richer.  In fact, it promulgates the cycle of poverty, but also seemingly creates a dependent voter base.  The politization of this pandemic at the expense of people's livelihoods has been sickening to watch.  It needs to stop here and now.

.

# Rhumbline Realty Management Company
73 E. Merrick Road
Freeport, NY 11520
631.757.2758
rhumblinemanagement@gmail.com

April 28, 2020

RE: The New York City Council Committee on Housing and Buildings
Intro: 1912 & 1936

Last month when Governor Cuomo announced the shut down of the state due to Covid-19 he also ordered the suspension and prohibition of eviction cases for 90 days.  That order effectively announced to tenants that they didn't have to pay their rent for three months if they didn't want to.

At about the same time a group of state senators and representatives proposed a bill that would have allowed tenants to not pay rent at all. Fortunately that bill was not approved.  I reached out to Senator Hoylman, who was a sponsor of this bill, and explained to him that it was absurd to place the weight of the Covid pandemic squarely on the shoulders of the apartment building owners.

It is unfortunate that my retail tenants have all been closed by the Governor's order so they are unable to pay their rent.  They have no reserves and I already have to bear the burden of that lost income.

It is absurd for the government, city or state, to legislate a rent suspension for residential tenants.  Fortunately, the majority of my tenants are either still employed or are now receiving unemployment benefits or had cash reserves and are able to continue paying their rent.  Some have asked if I am waiving the rent and I tell them no but pay what you can.  I tell them that if they are able then they should pay their rent.  Unfortunately, some of my tenants think that they should not have to pay their rent because of the current situation whether or not they do have the ability to pay.

The retail market was already in a sorry state prior to the Covid outbreak. Many retail businesses will not survive and many property owners will not survive without their rents.  I have applied for EIDL assistance loans in the event that I do not have the resources to continue to pay my bills but I have not received any response from the SBA with regard to those applications.

One of my stores was vacant for all of 2019 because of the already weak retail market. I gave my new tenant three months free rent to build out his store and he was supposed to open at the beginning of April. He is prohibited from opening and has no ability to pay his rent. The situation is already dire enough, we don't need politicians that are looking for votes to make matters worse. It is one thing for an owner to manage his finances with a store that he cannot rent but it is a totally different matter for the government to step in and tell an owner that he loses all of his rights and is prohibited from collecting rent or pursuing his legal rights.

Intro 1912 seeks to delay the enforcement of monetary judgements and warrants of eviction until April 2021. That effectively tells tenants that they don't have to pay their rent for a year if they don't want to. Is the city going to take over all of the buildings that owners cannot afford to keep because of the effects of this legislation? The city cannot now manage the buildings it has. I would be thrown in jail if I ran my properties the way the city does. What about tenants that were already in default prior to the Covid outbreak? If they were unable to pay before now they are being told that they don't have to pay and there is nothing that the owner can do. This is starting to sound like communism.

Intro 1936 seeks to increase the potential for harassment claims if an owner tries to negotiate a payment plan with a tenant that has not paid their rent. In my experience, owners always want to negotiate with tenants whether that occurs before a case in court or once a case has started. We never want to leave money decisions up to the courts because we know that the courts will always decide in favor of the tenants.

We do not need the government taking over our properties and businesses any more than they already have. Property values have already dropped more than 20% since the revision of the housing laws that went into effect last year. The city and state should stop trying to make housing affordable on the backs of private property owners. I suggest that the city and state utilize existing programs like SCRIE and DRIE to help tenants keep their rents affordable. The burden should not be placed on private property owners when the government fails to come up with a plan to assist tenants.


Cordially,

Paul Kampa

Intro 1912 will make it impossible for us to pay our property taxes and water bills in the foreseeable future. We have several eviction proceedings already in the courts, measures that we were forced to take as a last resort after several attempts to work with the tenants.

Obviously, these eviction proceedings have been paused because of the pandemic. The situation is detrimental to our rent-paying tenants and our building because the last rent payment received from these delinquent tenants was in 2018.

If Intro 1912 passes, we would be facing 30-plus months of no rent revenue from multiple tenants, in addition to those tenants now facing hardship due to COVID-19.

Lincoln Eccles

## RIS NYC LLC

56-23 55th Avenue, Maspeth, NY 11378
646.588.8393
www.risnyc.com



April 27, 2020

## Testimony by Mike Gordon on Council Intro 1912

My name is Mike Gordon and I am speaking on behalf of RIS NYC LLC - Republic Immobilization Services. Our company is partnered with New York City to manage and enforce the traffic violation program with the overall goal of keeping our streets safe and accessible. Thank you for the opportunity to submit testimony with regard to Council Introduction 1912.

RIS and its 56 employees work closely with the NYC Sheriff and the NYC Marshals to help manage the balancing of traffic flow, last-block delivery of consumer goods and accessibility for urgent care services within and around the City.

Ultimately, our service ensures vehicles which should not be on City streets are removed and scofflaw offenders, which have accumulated numerous violations, honor them. By enforcing violations, which include multiple ignored parking tickets, red light camera violations, unresolved speed zone violations, fictitious and invalid plates, and improperly parked vehicles blocking fire/life/safety access, we are opening accessibility to residential, commercial, and public safety needs.

In addition to assisting with traffic management our services generate $60 million in annual revenue for the city; revenue which would likely not otherwise be captured.

While we all know that accessibility and revenue are important, the reality is that the real value of the work we do is the service we provide to help ensure the City can achieve its ambitious Vision Zero goals. The City Council and the DeBlasio Administration have led the nation on a program to create safer streets for both pedestrians and motorists. This enforcement measure would also be in line with the City's recently announced initiative to close 40 miles of streets to cars, so that pedestrians have more room to stay socially distant. The work we do, again in partnership with City Officials, is crucial to making those goals a reality. We know too well that vehicle owners who ignore summonses are the same ones who block hydrants, stall efforts to clean city streets, run red lights and don't carry insurance.

Intro 1912 would suspend the enforcement of monetary judgements for vehicle violations by both the City Sheriff and City Marshals. While we understand the good intentions behind this legislation, we submit to the Committee that with regard to the booting and towing program we manage, it will have the unintended consequence of making our streets less safe.  At a time when our focus should be better management of the public streets for the safety of pedestrians and motorists, this bill takes the City in the wrong direction.

Our company is committed to working with the Council to make our streets safer and we urge you to reject any initiative that would result in allowing the "car culture" to exploit a crisis.

Thank you for your consideration.

I am Willy Chavarria owner of Palmer Trading Company Corp. tax ID # 27-3607950 located at 67 West Street Brooklyn, New York 11222.  We are a mens fashion label and web store business operating out of the studio space. We have been open for over 10 years. I have been struggling to keep my employees and pay rent for our studio space for the business during the government shut down. The building owner has not offered forgiveness of any rent during the period of the shutdown. I am requesting that City Council of New York request rent forgiveness for months when our business must be closed.

I have applied for all available assistance including PPP and Disaster Releif Loan but have not yet received any support. Of course if I do receive a loan it will be used entirey for rent and payroll, but it will be impossible for my small business to recover from the months of needed back paid rent. It must be

We are unable shut down and move out for several reasons one of them including reasons also associated with the shutdown.
We have  contacted local Law enforcement several weeks ago and we were informed that we should not be congregating or moving until the stay home order has ended.
This would be a risk to our health and others, and could result in court summons.
In addition necessary services and business' are closed which makes moving out even more unrealistic.

City and state governments have ordered us to stay home, so as tenants we really have no other option.

We can not follow the local laws for safety and health as well if we are to follow the guidance of the building management to either pay the rent or move out.

Thank you for considering this request.

Sincerely,

Willy Chavarria

**What can the City Council do to provide real housing solutions for both Tenants and  Home Providers?**

I and many other home owners I speak to are very distressed by the recent package of legislation proposed by the City Council as a response to the COVID-19 pandemic.

This legislation will be incredibly detrimental to housing providers across my community and New York City.

Throughout this crisis, property owners have gone above and beyond to make sure our residents are safe.  They work around the clock to source enough protective equipment for building workers. They regularly disinfecting common areas, managing deliveries, and making regular and emergency repairs to apartment units. Sadly, at least 19 building workers have succumbed to the virus across the city - we honor them and their heroic service while continuing to work under challenging conditions. Many other property owners are also working to accommodate tenants who have been financially impacted, instituting payment plans and other relief where needed.

Rental payments go to taxes, wages for building staff, and ongoing maintenance - it is not pure profit. Not all property owners are able to forgo rental payments and simultaneously operate their properties for the next year.

Additionally, many home providers supported the initial 90-day eviction moratorium so all New Yorkers would have a home where they could shelter in place while officials evaluated the potential impact of the virus. We should be focused on rental subsidies, vouchers, and the revival of FEMA's mortgage and rental assistance program that saved many New York families after 9-11. These are proven solutions that help tenants and property owners, while ensuring New York City can continue to collect tax revenue.

However, if home providers don't receive rental payments until April 2021, then they are unable to pay property taxes, insurance costs, fuel, electricity, management costs, concierges, or mortgage payments. If these buildings can't meet basic financial obligations, they risk defaulting on mortgages and an inability to provide property taxes - which hurts their ability to provide quality and safe housing for New Yorkers when they need it the most.

As we work to address reopening our economy while prioritizing the health and safety of all New Yorkers, we need to support proposals and actions that embrace collaboration. Additionally, we need to understand the reality that most small businesses and industries across our City need real and immediate relief. We want you to advocate for realistic, balanced, and legal policy solutions that help renters at their time of need while ensuring buildings can continue to operate during this time of crisis.

Thank you for your time and service.

Sincerely,

Jimmy Santis

4/28/20

Dear Honorable Members of the NYC Council,

I know that you are considering passing a new legislation in the wake of this Covid-19 Pandemic, to allow tenants to not pay rent.
I would like to ask Council members who are in favor of this a legislation, few questions.

**Landlords are currently providing crucial and essential services to tenants. Those essential services can only continue if landlords could collect rent.**

Specifically

1. How are landlords expected to pay for heat and hot water if tenants are not going to pay rent.
2. How do you expect a landlord to pay for the water and sewage that allows tenants to take showers and go to the bathroom.
3. Landlords are paying supers and porters to put out the garbage, and to clean/mop public spaces. How do landlords provide this without the critical cash flow that comes from rent collection.
4. How does City Council expect a landlord to pay property taxes without rent?
   - Property taxes have skyrocketed in the last 3 years to a level that is equal to 35% of rental income. We are in essence collecting taxes on behalf of the city.
5. Why is landlord trying to collect rent, termed as "Harassment". Is a landlord not entitled to collect rent for proving shelter, heat, hot water, cleaning services etc.?

   Why are we even using the term "Harrasment"? All we want to do is collect rent on an apartment so we could pay our 1) property taxes 2) Super 3) the oil company for delivering oil 4) ConEdison for the running elevator

6. Why is the Government throwing all the burden of this pandemic on the landlords only?
   Why is the city council not considering a bill to allow people to walk into the local supermarket pick up some groceries and walk out without paying.

Thank you,

- David Chemtob
  917-681-5401

### Testimonial against intro 1912 and 1936

*Prohibit City Marshals and the City's Sheriffs from the taking and restitution of property or the execution of money judgments until the later of the end of the COVID-19 crisis, or September. For residential and commercial tenants impacted by COVID-19, Marshals and Sheriffs would be barred from enforcing warrants of eviction or monetary judgments until April 2021.*

We have legal action against 3 tenants who have not paid rent since 2018. They have been taking advantage of me and living for free for over 2 years. Intro 1912 will allow this to continue for another year. I cannot afford to house these tenants who do not contribute to paying for building operations. For example, water/sewer, garbage removal, taxes, payroll, etc.. Moreover, now that people are home all day due to public safety issues of COVID19, tenants are using more water/sewer and making more garbage. The pandemic is causing operating expenses to dramatically increase. To keep buildings clean, we have spent 200% more this month on cleaning labor and supplies compared to the same period last year.

Intro 1912 was written to help tenants but it will end up hurting more tenants instead. If landlords are incurring a loss every month, it will lead to maintenance issues and an overall lower quality of living for tenants.



April 27, 2020

The New York City Council's Committees on Consumer Affairs and Business Licensing and Housing and Buildings

Re:  Testimony regarding Intro 1912-2020

Dear Councilmembers:

Thank you for this opportunity to testify regarding Intro 1912-2020 which would bar marshals and city sheriffs from executing money judgments or seizing property during the current COVID-19 crisis.

Manhattan Legal Services is part of Legal Services NYC (LSNYC), the largest civil legal services provider in the country, with offices in the Bronx, Brooklyn, Queens, Staten Island and Manhattan.  LSNYC fights poverty and seeks racial, social and economic justice for low-income New Yorkers.  For over fifty years, LSNYC has challenged systemic injustices and ensured the well-being of communities across the city. This work includes preventing evictions and preserving housing; demanding access to high-quality education, health care, and economic security; ensuring safety and stability for survivors of domestic violence and immigrants; and fighting for the dignity and respect of all New Yorkers.

LSNYC provides full representation to low-income New Yorkers in the areas of consumer law, including, but not limited to, representing consumers who are defending debt collection lawsuits, as well as advocating for those whose bank accounts have been restrained, or whose wages are being garnished, and filing affirmative cases against debt collectors for violations of the Fair Debt Collection Practices Act.

### THE IMPACT OF INTRO 1912-2020 ON CONSUMERS

Many of our clients find out for the first time that a debt collector has obtained a judgment against them when their bank account is restrained, or their paycheck is garnished.  Many of these judgments were obtained years ago through sewer service, where the court papers were never served on our clients, or were served, but sent to an out of date address.  In our experience, the vast majority of our clients have meritorious defenses to these judgments, but never had the opportunity to present them to a court because they were unaware that they had been sued.

A majority of our clients are low-income people of color, who have been disproportionately impacted by the COVID-19 crisis, both in terms of job loss and in terms of having higher rates of infection. Although Intro 1912-2020 aims to prevent those already struggling economically as a



result of COVID-19 from further economic loss by suspending the enforcement and seizure of assets, the bill does not completely address how this would be accomplished. This lack of detail could lead to a different result than that intended by the City Council.

As an initial observation, the bill as written does not prevent a debt collector's attorney from restraining a bank account, which requires no intervention from a sheriff or a marshal. Under existing law, a restraint placed on an account will "freeze" the account for a year. In our experience, this is the most common action taken by debt collectors when attempting to collect a debt. As a result, if the bill is passed in its current form, debt collectors could employ an attorney to place a restraint that will prevent the consumer from accessing desperately needed money in their bank account.

As to sheriffs and marshals, the bill states that no execution will be permitted until the party against whom it is sought has been given a "a reasonable opportunity to show the court having jurisdiction over the matter that such party suffered a substantial loss of income because of COVID-19 and such court has found that such party has not suffered such a loss or has effectively waived such opportunity." However, the bill does not explain when or how the hearing will be provided. The bill also does not include any requirement about how consumers will be notified of their right to show the court that they have suffered a substantial loss of income due to COVID-19.

Because of COVID-19, court operations are severely limited and a consumer's only current option when faced with a restraint or levy is to file an order to show cause with the appropriate court. In order to file an order to show cause, many of our clients would need to physically go to the court. Many of our clients have limited access to computers or other technology that would allow them to file an order to show cause without going to court, and at this point, the courts' approach to remote applications for stays is not uniform.

Most of our consumer clients are elderly and/or disabled, and of these, many are limited English proficient. They struggle to file orders to show cause during normal times, when they can visit a legal services office or take advantage of the court's access to justice programs such as CLARO and Volunteer Lawyers for the Day. During this crisis, consumers are at a loss to know what to do or where to turn to when they receive notice of a garnishment or restraint. Since many of these judgments were obtained by default, the consumer may not even know which court entered the judgment.

If the City Council's intention is to ensure due process to consumers, the mechanism for triggering that due process should be defined. There are procedures that are already used in other legal contexts that could be implemented to address these concerns.

For example, before taking action to enforce a money judgment, the debt collector could be required to send a notice to the consumer notifying him or her of the existence of the judgment (including the court caption and index number) and informing the consumer of the types of income that are protected from collection under the New York State Exempt Income Protection Act ("EIPA"). Under EIPA, consumers receive an exemption form they can complete and return

to the creditor to explain why their income is exempt.  A similar form could be adopted for Intro 1912, informing the consumer of the temporary suspension of enforcement of judgments with a check list where the consumer could indicate their eligibility for the suspension.

Notices could also be sent to consumers to inform them of their due process rights under Intro 1912, similar to the notices included on summonses in consumer credit transactions, which inform the consumer of the risk to their assets and advise them of their right to consult with an attorney. To ensure that limited English proficient consumers are protected, the notices should be sent out in the consumer's first language.

If debt collectors are required to send notices prior to enforcement, we would caution that the process should also include a requirement that the debt collector verify the address to make sure it is a valid.  Many default judgments are obtained after the debt collector served court papers to an out-of-date address and often debt collectors seek to enforcement money judgments years after the judgments are obtained, meaning that consumers have since moved.

Given the broad economic impact of COVID-19, it appears that most consumers would be eligible for the suspension of the enforcement of judgments.  In the interests of efficiency and taking into account the court's reduced capacity, a r possible approach would be to create a presumption that the consumer is entitled to the protection and the debt collector has the burden to establish otherwise. This would be similar to requirements that prior to filing a housing court case, the landlord has an affirmative duty to establish that a tenant is not in the military or dependent on someone in the military by making an investigation and submitting a sworn affidavit to the court.

Intro 1912 protects consumers who have experienced substantial harm as a result of the coronavirus.  The definition of substantial harm included in the act largely tracks the definition contained in the CARES Act relating to establishing eligibility for Pandemic Unemployment Assistance ("PUA"), but does not contain a similar catchall provision in the list of harms, or specifically provide for self-certification of eligibility. Without this language, consumers may have more difficulty in taking advantage of the protections of Intro 1912-2020.

If self-certification is not provided for, a court might ask consumers to present evidence of substantial harm at a hearing or as a condition of having an order to show cause signed. Because many low-income consumers have lost work at businesses that may not reopen, including small businesses that do not maintain extensive records, they could have difficulty obtaining documentation relating to their loss of employment.  Similarly, if they lacked medical coverage, there may have been barriers to their making formal attempts to seek a medical diagnosis. In our experience, judges have declined to sign orders to show cause filed by consumers seeking to stop debt collection when they have submitted a sworn affidavit without written documentation, even when no documentation was required by law. Specifically providing that self-certification is sufficient to establish substantial harm would obviate this concern.

In addition, the impact consumers have experienced may not fit in to any of the listed categories. Creating a catchall category and allowing consumers to submit alternative proof, such as letters from a community-based organization could address this concern.  For example, Real Property

Law 227-c was recently amended to broaden the categories of documentation a domestic violence victim can submit to establish his or her domestic violence status in order to take advantage of the protections afforded by that provision.

We believe that ensuring clarity and transparency of the consumer's due process rights will benefit both the consumer and the debt collector by eliminating unnecessary litigation.

Please do not hesitate to contact me at 646-442-3143 for further information.

Respectfully submitted,

Mary McCune
Senior Staff Attorney
Consumer Law Specialist

# TAKEROOT JUSTICE

**New York City Council**
**Committee on Housing and Buildings Jointly with the**
**Committee on Consumer Affairs and Business Licensing**

**Written Testimony of TakeRoot Justice in Support of Int. No. 1912**
**By: Cheryl Walker, Stephanie Storke, and Tedmund Wan**

*April 28, 2020*

Introduction

TakeRoot Justice thanks the New York City Council for the opportunity to submit this written testimony in support of Int. No. 1912.

Following 18 years of impact as the Community Development Project of the Urban Justice Center, TakeRoot Justice launched as an independent organization in July 2019. The mission of TakeRoot Justice is to provide legal, participatory research and policy support to strengthen the work of grassroots and community-based groups in New York City to dismantle racial, economic and social oppression. We do this by partnering with grassroots and community-based groups, who take the lead in determining the priorities and goals for our work, as we believe that community organizing should be at the center of any effort to create sustainable, systemic change. Our office represents residential and commercial tenants, as well as consumers.

On behalf of TakeRoot Justice, we would first like to thank the City Council and Mayor for taking steps to protect tenants, small businesses, essential workers and the homeless, who are at the epicenter of the unprecedented global COVID-19 pandemic.

Impacts of Unprecedented Circumstances

COVID-19 has laid bare our city's underlying housing crisis and lack of social safety net. As in any crisis, New York's most vulnerable citizens face the greatest consequences. Millions in our city have lost their jobs or fallen ill. They, and many more, face a grim choice between paying rent and buying basic necessities. So many New Yorkers lived paycheck to paycheck, and therefore lacked sufficient savings to withstand the fact their paycheck is now gone. This economic situation is particularly dire for communities of color, who have also disproportionately suffered health-wise from the pandemic.

Clearly, the pandemic will exact an enormous financial, emotional, and physical toll on many throughout New York City. But, the City can blunt this toll by passing Int. No. 1912,

which bars marshals and sheriffs from evicting all residential or commercial tenants or collecting debts until at least September 2020, and from evicting or collecting from those most-directly affected by COVID-19 until at least April 2021.

Residential Tenants

First, the residential tenant protections of Int. No. 1912 would avert a looming crisis in evictions and homelessness.

Housing has become the front-line defense against the COVID-19 pandemic. The ability to retain access to housing and remain in it is a life or death situation. Once the Governor's eviction moratorium ends on June 20, 2020 renters who have been unable to pay their rent will be left unprotected. Housing courts will swell with new cases, and many people will be evicted and become homeless.

This wave of evictions will not only have a brutal social impact but will also pose a threat to public health and safety, and will overwhelm the City's emergency housing providers. Overcrowded shelters will present a nightmare for public health officials attempting to stop the spread of this pandemic, unless the Council passes Int. No. 1912.

Keeping people safe in their homes—and not homeless—is one of the most effective ways to protect the health and economic well-being of our neighbors. We are in a massive public health crisis, and nobody should be put out onto the street or be forced into an apartment right now. Extending the eviction moratorium will allow the most vulnerable New Yorkers to weather the crisis, get healthy, and get back on their feet by resuming their jobs, education, and lives after the outbreak has ended.

Consumer Protections

In addition to suspending evictions, Int. No. 1912 temporarily bars city marshals and sheriffs from executing on money judgments against New Yorkers. Low-income New Yorkers have always been harmed by wage garnishment and bank freezes (the two most common forms of enforcing judgments). Now, though, these New Yorkers would be especially harmed, as they face lost wages and no easy way to return to work. This harm would be most pronounced in communities of color, where consumer debt is highest and where the effects of COVID-19 have been the worst.

The state and federal governments have failed to protect New York's consumers from such ill-timed debt collection. It falls to the City Council to remediate this harm.

At any given time, there are tens of thousands of unsatisfied money judgments against the consumers and citizens of New York City. Often, these judgments are unsatisfied because the consumer never even knew that they had been sued and unwittingly defaulted. Many more are unsatisfied because an individual simply does not have the income necessary to both satisfy the judgment and pay their family's living expenses. When one or more income earners in a family loses their employment due to the COVID-19 crisis, the damage caused by enforcing money judgments will only be exacerbated. This is especially troubling when many families' budgets were already stretched to the limit before the current pandemic.

Although Attorney General James issued a guidance to prevent banks and debt collectors from satisfying money judgment with CARES Act stimulus funds, such guidance is not legally binding and does not go far enough to protect New Yorkers' other hard-earned resources from garnishment. Similarly, although the state and federal governments provided myriad forms of relief to homeowners, student loan borrowers, and even large businesses, neither government does enough to protect low-income communities that are often saddled with large consumer debt loads.

Moreover, without clear legal directive to stop all garnishments, many families with funds that are legally exempt from judgment execution will inevitably still have their funds improperly garnished by banks. While the Exempt Income Protection Act has been in effect for more than a decade, bank personnel who are ill-informed continue to illegally freeze exempt funds. Affected consumers frequently require lengthy legal services interventions to access their exempt funds. An unequivocal stay on all garnishments and levies contemplated in Int. No. 1912 will leave no room for bank employees' confusion, and no excuses for banks to fail to observe legal mandates to leave exempt income exempt.

Further, the failure to stop money judgment enforcement is not only a financial scourge on low-income families, it is also a threat to public health and safety. When banks freeze a consumer's account, the consumer often must go to a bank branch several times to even discover the reason for the freeze, let alone unfreeze the account. This is true even when the funds were erroneously levied. Similarly, to vacate an improperly obtained default judgment, a consumer must personally go to the courthouse and file papers, go to a post office to mail the papers, then appear in court on a later date to challenge the judgment. These trips--to banks, to courts, to post offices—inevitably increase the chance that consumers, or court and bank employees who have been deemed essential, will be exposed to the COVID-19 disease. Neither judgment debtors nor essential workers should be subjected to such risks and contradict public health policy just so a debt collector can garnish funds that a family may need to put food on the table.

Lastly, in addition to residential tenants and consumers, Int. No. 1912 protects commercial tenants, by creating an eviction moratorium for these tenants as well. From our office's work with the Commercial Leases Assistance Program, we know that small business tenants face many of the same problems that residential tenants do. In particular, they also face dire economic consequences from COVID-19 that are exacerbated by underlying inequalities.

Small Businesses

In the best of times, the small business tenants we represent often experience landlord harassment and have severely limited rights under their written leases—if they are lucky to have a written lease at all. Many of our clients are sole proprietors, dependent on the income from their businesses to earn a livelihood for their families. Often, even if their businesses are incorporated, landlords require small business tenants to execute personal guarantees, making a tenant personally liable under a commercial lease.

New York's small business tenants now face unprecedented challenges and we must act to protect them. To ensure this moratorium will provide the most protection possible, we recommend that the moratorium remain in effect, even where a tenant has "effectively waived"

the opportunity to demonstrate substantial loss of income due to COVID in a court of law. The waiver will disproportionately affect business owners and tenants who may be unable to represent themselves in court due to illness, corporate clients who are unable to afford or secure legal representation because they cannot represent themselves, and tenants who may be improperly served. Additionally, we recommend that a party who has suffered a substantial loss of income include a commercial tenant or guarantor who is personally liable under a commercial lease agreement.

<u>Closing</u>

While the protections afforded under Int. No. 1912, are important, we believe they are insufficient in and of themselves to address the needs of the most vulnerable New Yorkers. Our clients and partners desperately need rent relief. Otherwise, the least protected New Yorkers will be forced to shoulder the enormous economic cost of this pandemic. Residents and small business owners who find themselves without any source of income are facing grim realities. While we understand that the City may not have the legal authority to legislate on residential rents, it can take action to protect commercial tenants. We hope that the City will act swiftly to support such efforts at all levels of government.

On behalf of TakeRoot Justice, we thank you for standing up for New York City residents, consumers, and small business owners in this time of crisis. We ask that the Council seize this opportunity to pass Int. No. 1912 to fashion a more just society as we emerge from the COVID-19 crisis.


On behalf of TakeRoot Justice,

**Cheryl Walker**
Staff Attorney, Capacity Building

**Stephanie Storke**
Staff Attorney, Housing Justice

**Tedmund Wan**
Staff Attorney, Consumer Justice

123 Williams St., 16th floor
New York, NY 10038
T: 212-810-6744
F: 212-619-0653

Law, research, and
policy for organizing

**TAKEROOTJUSTICE.ORG**

City Council Legislation

To whom it may concern;

Hope this email finds you well and safe!
In these devastating times when everyone is going through so many hardships,
we have been apprised that the city wants to pass legislation regarding mostly
stopping evictions till April 2021.  This will immediately result in lots of tenants
not paying the rent because there's no consequence they can get from the owner.
And they know that the owners hands are tied.
Such a situation will result in terrible hardships for the owners.
How will a building owner be able to pay his tax bill if his revenues are
tremendously cut?!
How will a owner pay for maintenance if there's no revenue to cover his
expenses???!!!
Does the city council want to see tenants in rotten apartments because the owner
can't afford repairs?!?!
How is a building owner supposed to survive these times if only the tenants
hardships are taken into account?!
Something needs to be done that's fair for everyone involved.
We urge the city council to consider property owners facing hardships in these
times just like tenants; and do what's fair to everyone!

Thanking in advance!
Stay safe!

---
*Chany Friedman*
*Five Star Management*
52 Bakertown RD.
Monroe, NY 10950
646-238-9669
chanymgmt@gmail.com

Do Not Kill NYC Housing

To whom it may concern,

I hope this letter finds everybody healthy and safe,

I'm writing to you today as an owner from buildings in Manhattan, Brooklyn and Bronx.
we are all suffering at this time with so many people are sick and so many people are dying we are all in deep pain.

But NYC Landlords are already in deep pain way before this pandemic started. The cost to keep a building running NY City went up tremendously the city increased the Texas with big numbers the same with the water.

in additional the insurance cost double the last few years but the New York City let as increase in the last five years only with a few percent combined.

In the last year since USA have a trade war with China the price of material when up between 30 and 50%

The minimum wage is going up yearly with a big percentage.

The past summer the Legislature passed new laws, which is a real recipe for bankruptcy for all owners!

In addition to that, we were notified about laws proposed to stop eviction for the coming months or even longer.

It is very difficult for us to continue, when the tenants don't feel obligated to pay, and subconsciously they know that nothing can be done from the management side.

Realize, that it is a cause and effect situation. If we don't receive their monthly payments, we are unable to provide them with repairs, maintenance etc. and I believe you don't want to see them live in neglected apartments.

The way the New York legislator is dealing with the landlords we going to go back to the 1960s and 70s which everybody threw away their buildings, New York looked like a slum for many years.

please don't trash so much hard-working people their work-their money- and effort.

In 2-5 years from now the people in New York will not forgive you.

Therefore I'm asking the legislature, Please! Please! do not pass through that law and do what is fair for everyone.

Sincerely,

Barry Weiss
Apple Estates LLC.
51 Forest Road Suite 316-17
Monroe, NY 10950
845-782-3337 Ext. 101
barrymgmt@gmail.com

Do Not Stop Eviction

To whom it may concern,

Hope you're doing well in these unusual times!

NYC housing laws has drastically changed in the past years. Resulting plenty of difficulties for the building owners.

For instance, I had a tenant living in an apartment close to 30 years, the tenant's monthly rent was $800. When the tenant moved out, I had to renovate the apartment and put in at least $40,000. I was confident with my decision knowing that with a 20% increase, plus the Vacancy longevity bonus I'll have the money throughout the years. During the renovations the new laws passed, not allowing the landlord to take any raise.

The $800 every month, is far from paying off the expenses, which leads me to a monthly deficit!! The $40,000 I invested, is challenging me to pay the essential expenses, and puts me in a risk of losing the building.

Another tenant ours, just left her apartment. We can't afford even a simple paint job!!! In such neglected apartments you want to find the NYC residents living???

Furthermore, the law that was now introduced; **"A landlord cannot evict a tenant even after crisis is over"** this will really bring all building owners and tenants in big trouble.

I really beg to you, please do the maximum you can to prevent this law, and give the opportunity for the building owners to earn their money as it should be.

Thank you!!


**Bryan Bragg**
**Greenlake Estates LLC**
**Bronx, New York**
NYC Realty
<nycrealty9669@gmail.com>

Testimony to the City Council Committee on Housing & Buildings and the Committee on
Consumer Affairs and Business Licensing

April 28, 2020

Ava Farkas
Executive Director, Met Council on Housing

Thank you Speaker Johnson and the Committee on Housing & Buildings and the Committee on
Consumer Affairs and Business Licensing

I'm pleased to testify in strong support of Intros 1912 which and Intro 1936.

Met Council's mission is to fight for Housing as a human right. The fact that it is **not** a human
right has exacerbated this current COVID-19 Crisis and its health impacts. 92,000 are homeless
and cannot shelter in place, and if we do not have a plan post eviction-moratorium then millions
more will find themselves in the same predicament.

I want to thank the City Council for supporting one of the critical services that Met Council
provides which is our tenant rights hotline and is now more important than ever. Our hotline
calls are confirming what everyone knows, that tenants who were barely able to afford their
rents before the pandemic are completely unable to now. Our hotline calls have gone from
questions about getting repairs to questions almost exclusively about inability to pay the rent
either due to layoff, reduction in hours, or roommates' layoff or reduction in hours.

We also have gotten at least one call from a health care worker whose roommate and primary
tenant have been harassing her into leaving the apartment before her sublease is up (and also
trying to force her to find her replacement) so Intro 1936 is critically important.

We also conducted a survey of our base with 556 people responding and found the following
information:
- 80% of people said that they will have problems paying the rent due to COVID-19
- 58% were not able to pay in April and an additional 28% will not be able to pay in May
- 60% were already paying over 30% of their income in rent

Both of these bills will provide a critical stop-gap measure and are an important first step to hold
things in place and give the Governor time to do his job of protecting the 5 million tenants in
NYS by Canceling Rent. Without relief from Albany we are just kicking the crisis down the road.

**WRITTEN TESTIMONY IN SUPPORT OF INTRO 1912-2020:**

Ceasing the taking and restitution of property and the execution of money judgments by the city sheriff and marshals due to the impacts of COVID-19

**PRESENTED TO:**

The New York City Council's Committees on Consumer Affairs and Business Licensing and Housing and Buildings

**ON BEHALF OF:**

Bromberg Law Office, P.C.

Brooklyn Bar Association Volunteer Lawyers Project

Law Office of Ahmad Keshavarz

The Legal Aid Society

Lincoln Square Legal Services, Inc. at Fordham Law School

Mobilization for Justice

National Center for Law and Economic Justice

New York Legal Assistance Group

Queens County Bar Association Volunteer Lawyers Project

TakeRoot Justice

Teamsters Local 237 City Employees Union

**HEARING DATE: APRIL 28, 2020**

This written testimony is submitted by consumer advocates, who work on behalf of consumers, in support of Intro 1912 ("the Proposal"), which would require New York City marshals and sheriffs to cease the taking of property and the execution of money judgments during the current public health crisis until sufficient time has passed. We work on behalf of consumers, many of whom are low-wage workers, are immigrants, have limited English proficiency, or are financially insecure. Through our work on behalf of these consumers, we are uniquely positioned to understand the unique harm caused by the execution of money judgments, particularly during these unprecedented times of the COVID-19 crisis. We fully support the cessation of the execution of money judgments, and applaud the Council for taking this vital step to protect vulnerable New Yorkers during this difficult time.

**The Need for Intro 1912**

Many New Yorkers have already experienced job loss at unprecedented rates, and more and more are facing the prospect of crippling financial insecurity. Enforcement of judgments through bank account restraints, levies, and/or wage garnishment presents an emergency situation for New Yorkers. During the current COVID-19 crisis, and in the months and years to come, enforcement of money judgments will loom large and inflict severe consequences on a substantial number of New Yorkers. Even before the crisis, debt collection lawsuits inundated New York City courts. Hundreds of thousands of judgments (many by default, without proper notice to the consumer) have been entered in consumer credit transactions in New York City Civil Court over the past decade alone.  The economic havoc the crisis has inflicted on so many will cause many New Yorkers to rely on credit and incur additional debt, which will mean an increase in debt collection litigation and the entry of more money judgments.

Because of improper service, many consumers only find out for the first time that they were sued when they receive a wage garnishment or their bank account is restrained. Without a cessation of judgment enforcement, these New Yorkers will face the choice of asserting their rights in court, and possibly risking the health and safety of themselves and others, or suffer through this unprecedented time without access to much-needed funds.

The New Yorkers who are most vulnerable to judgment enforcement are those who have the most to lose: the working poor, whose income is subject to garnishment, and/or who may have scraped together enough savings in a bank account to pass the threshold for automatic bank restraints. One example of a working poor New Yorker is D.C., age 37, is a Hispanic domestic violence survivor and single mother of two children who lives in Queens. After she fled her abuser, she lived on credit and tried to start her own business, which ultimately failed.  She then joined the gig economy and started working as for-hire vehicle driver to make ends meet.  Like tens of thousands of other people in New York City, she was sued by a debt collector, who

obtained a judgment against her, and then used that judgment to start garnishing her meager ride-share earnings. D.C.'s story is like so many other New Yorkers who are currently facing and who face the fearful prospect of judgment enforcement, and who would benefit from Intro. 1912.

By requiring marshals and sheriffs to halt executions and takings, the Council is acting to protect the financial security of the most vulnerable New Yorkers during an unprecedented crisis, and at a time when our state and federal governments are not taking action in this important area.

**Concerns with the Proposal and Suggested Changes**

While we fully support the goal of the Proposal: to reduce the risk of income execution and bank levies, we have some concerns about certain provisions in the Proposal and respectfully suggest that certain elements of the bill be clarified to better protect New Yorkers. As explained in more detail below, our comments pertain to Section 3 of the Proposal, which applies to judgment execution during the period between the first and second suspension dates, defined in Section 2. **Because Section 3 does not go into effect until after the first suspension date expires, which is at the earliest, September 30, 2020, we urge the City Council to implement the remainder of the Proposal and immediately prohibit execution of money judgments while it considers the following suggestions.**

The Proposal requires marshals and sheriffs to provide the party against whom they are executing "a reasonable opportunity to show the court having jurisdiction over the matter that such party suffered a substantial loss of income because of COVID-19." (Intro. 1912 § 3(a)(3).) The Proposal is silent as to the nature, format, or frequency of this notice. We suggest that the Proposal require a clear and easily understandable notice of the process be given to consumers as a pre-condition to enforcement.

We also have concerns about the address that might be relied on for any notice. In our experience, many of the judgments that debt collectors seek to enforce were obtained on default, and notice of the court action was served at an outdated address. Therefore, the Proposal should require the marshal or sheriff to verify with a third party the current address of the party against whom they are executing to ensure that any notices sent to the consumer will actually be received. Any notice should also be easily readable and available in languages other than English.

As currently drafted, the Proposal requires the consumer to demonstrate to a court that they have "suffered a substantial loss of income because of COVID-19." (Intro. 1912 § 3(a)(3).) We have concerns about the fairness of placing the burden of proof on vulnerable consumers who, to be able to invoke the protections of this Proposal, necessarily have to have been adversely affected by COVID-19.

3

We also have questions about the procedure itself, and what evidence will constitute proof, as well as the quantity and quality of such proof. We urge the Council to clarify the procedure by which consumers would show that they have suffered a substantial loss of income due to COVID-19: for example, the Proposal should clarify whether consumers will have to appear in person and testify at a hearing. Any procedure and proof requirement also must take into account the obstacles consumers faced in seeking medical diagnosis or treatment, the likely lack of written documentation to establish they have sought medical help, the fact that many business establishments that employed consumers are closed and may not re-open, and the fact that consumers may no longer have access to proof of events that occurred months before the collection is attempted. Any proof a consumer is able to obtain may also be of questionable evidentiary value, through no fault of their own.

The Proposal allows a sheriff or marshal to enforce a judgment against someone who has suffered substantial loss of income because of COVID-19 if a court finds the consumer "has not suffered such a loss or has effectively waived such opportunity." (Intro. 1912 § 3(a)(3).) The Proposal does not specify what would inform a court's finding or the basis for determining that a consumer has waived their opportunity to make a COVID-19-related assertion. No consumer should waive such "opportunity" to show they have been adversely affected by COVID-19 because, for example, they default on a hearing, or do not understand the procedure.

The Proposal includes several specific examples of proof that consumers may use to show they have suffered a substantial loss of income because of COVID-19. (Intro. 1912 § 3(b)(1)(a)-(j).) We recommend that the Council add a catchall provision under which consumers can assert reasons not included in the list to establish they should not be subject to judgment enforcement because of a COVID-19-related reason.

In conclusion, thank you for the opportunity to submit this testimony and offer comments on the Council's Proposal to protect tenants and consumers during the COVID-19 crisis. We respectfully request that the Council immediately enact Sections 1, 2, and 4 of the Proposal, and take into consideration the above requests for clarifications regarding Section 3. We remain willing and available to discuss these concerns in more detail and to provide model language if doing so would be helpful.


*Please contact Carolyn Coffey at Mobilization for Justice (ccoffey@mfjlegal.org), Tashi Lhewa at The Legal Aid Society (tlhewa@gmail.com), or Sarah Rosenthal at New York Legal Assistance Group (srosenthal@nylag.org) for any questions about this testimony.*

# THE LEGAL AID SOCIETY

**The Legal Aid Society**
**199 Water Street, 3rd Floor**
**New York, NY 10038**
**(212) 577 3300**

**Testimony of The Legal Aid Society Before The New York City Council Committee on Housing and Buildings and Committee on Consumer Affairs and Business Licensing on Int. 1912-2020 and 1936 -2020.**

**April 28, 2020**

**Introduction**

Thank you Chairpersons Cornegy and Cohen, and members of the Committees on Housing and Buildings, and Consumer Affairs and Business Licensing, for the opportunity to testify on behalf of The Legal Aid Society ("the Society"), the nation's oldest and largest not-for-profit legal services organization. We welcome this opportunity to endorse and share our view on legislation that would temporarily halt the seizure of property and execution of money judgments by city sheriff and marshals, as well as, expand the definition of harassment to include threats based on a person having been impacted by COVID-19.

Through a network of borough, neighborhood, and courthouse-based offices in 26 locations in New York City, and more than 2,000 attorneys, paralegals, social workers, investigators and support staff, along with volunteer help coordinated by the Society's Pro Bono program, we provide comprehensive legal services to fulfill our mission that no New Yorker

1

should be denied access to justice because of poverty. Through three major practices – Civil, Criminal, and Juvenile Rights – the Society handles approximately 300,000 cases a year in city, state, and federal courts. This includes over 50,000 individual civil matters and law reform cases which benefit over 2 million low-income families and individuals. The Society acts as one of New York City's first responders, protecting and enforcing the legal rights of families and individuals through long-term advocacy for the right to counsel in criminal defense or juvenile justice issues, and by directly addressing emergent and systemic issues our client communities face.

The Society's Civil Practice improves the lives of low-income New Yorkers who struggle daily to buy food, pay rent, achieve or maintain self-sufficiency, and keep their families healthy and safe. Through sixteen neighborhood and courthouse-based offices in all five boroughs and 23 city-wide and special projects, the Society's Civil Practice provides direct legal assistance to low income individuals. In addition to individual assistance, the Society represents clients in law reform litigation, advocacy and neighborhood initiatives, and provides extensive back up support and technical assistance to community organizations.

The Society commends the Committees for holding today's hearings on both bills which will provide relief to numerous New Yorker who are currently on the edge of homelessness and financial distress. We strongly support the passage of the bills and have some suggested recommendations to strengthen the legislation.

## **Intro. 1912-2020**

We strongly support the passage of Intro. 1912-2020, which will temporarily halt the taking and restitution of property and execution of money judgments by city sheriffs and

marshals. As you are aware, the COVID-19 pandemic is causing devastating and lasting economic hardship that disproportionately impacts low- and moderate-income New Yorkers and communities of color. This has caused numerous low- and moderate-income New Yorkers to default or fall behind on financial obligations, including medical bills, credit card payments, auto loans, student loans and rent.

The COVID-19 pandemic has amplified New York City's ongoing housing crisis in ways that are impossible to ignore. Housing insecurity is a brutal fact of life for many New Yorkers. Forty-four percent of New York City renters are rent burdened, and four out of ten low-income people in New York are either homeless or severely rent burdened.[1]  Even in a strong economy, a budget overwhelmed by housing costs increases a family's risk of food insecurity, lack of access to proper medical care and eviction. With little room for savings, a reduction in work hours or an unexpected expense may cause turmoil and ultimately, displacement. Similar to the COVID-19 pandemic, involuntary displacement is not born equally in New York City, where low-income black and Latinx households are most impacted by eviction and homelessness.[2]

Housing insecurity now impacts a far broader range of households than it did earlier this year. Reeling from a sudden loss of income, low- and moderate-income renters on the precipice, rent burdened and without savings, have now fallen off of a financial cliff.  Stay-at-home orders triggered mass layoffs and shuttered businesses and entire industries. A weekly survey, conducted by public health experts over the course of the pandemic, found that one in three New

---

[1] Center for Budget and Policy Priorities, *New York Federal Rental Assistance Fact Sheet*, (Dec. 10, 2019), *available at:* https://www.cbpp.org/research/housing/federal-rental-assistance-fact-sheets#NY.
[2] Oksana Mironova, Community Service Society, *Where Have All the Affordable Rentals Gone?* (May 2019), *available at*: https://www.cssny.org/publications/entry/where-have-all-the-affordable-rentals-gone; NYU Furman Center, *COVID-19 Cases in New York City, a Neighborhood-Level Analysis*, (Apr. 10, 2020), *available at*: https://furmancenter.org/thestoop/entry/covid-19-cases-in-new-york-city-a-neighborhood-level-analysis.

Yorkers did not pay their rent or mortgage in April.[3] Sixty-two percent of those who were unable to pay their rent stated that they feared eviction.

While New Yorkers are now protected from eviction by Governor Andrew Cuomo's 90-day eviction moratorium, the economic landscape is unlikely to be dramatically altered by the end of the state moratorium on June 20.[4] By June 20, renters will owe months of rental arrears and fees; many will promptly face eviction proceedings seeking thousands of dollars of debt and dispossession. Far from solving the crisis, the end of this short-term moratorium will be catastrophic for renters who have not received a paycheck in months.

The eviction of any one household is a tragedy; eviction of thousands of rental households is a humanitarian crisis. The loss of a home is not the only consequence of eviction, which it can have devastating, long-term negative effects on employment outcomes, school performance and physical and mental health.[5] Mass displacement will undermine recovery efforts for the foreseeable future and traumatize entire communities. Because truly affordable housing is in limited supply in New York City, many renters will have no choice but to double-up with friends or family or enter a shelter system already strained by an intractable homelessness crisis. It is likely that among those evicted will be people sick with COVID-19 or asymptomatically and unknowingly carrying the virus.

---

[3] *CUNY New York City COVID-19 Survey Week 5 (April 10-12)*, CUNY Graduate School of Public Health & Health Policy, *available at* https://sph.cuny.edu/research/covid-19-tracking-survey/week-5/.
[4] See, N.Y. Executive Order 202.8, (March 20, 2020), *available at*:
https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.8.pdf
[5] See, e.g., Matthew Desmond and Carl Gershenson, *Housing and Employment Insecurity Among the Working Poor*, (2016), *available at*:
https://scholar.harvard.edu/files/mdesmond/files/desmondgershenson.sp2016.pdf?m=1452638824.

Other jurisdictions have recognized that an effective response to this impending eviction crisis includes an eviction moratorium that extends passed the state of emergency.[6]  New York should be leading this issue, and we strongly support the passage of legislation that will allow our communities a chance to remain intact as we recover from the global pandemic.

New Yorkers face financial challenges beyond eviction. The hardship imposed by money judgments include a nine percent post-judgment statutory interest rate; systemic and systematic improper service of process, and failure to apply existing laws when vacatur of judgments are sought; and abusive debt collection practices in connection with financial services and products, such as credit cards, auto loans and leases, rental arrears, student loans, and medical debt.

Enforcement of judgments through bank account restraint, levies, and wage garnishment presents a dire situation for the hundreds of thousands of New Yorkers who have been impacted by the economic devastation in the wake of the pandemic. At a time when almost half of all New Yorkers do not have even $400 in cash to pay for emergency expenses, consumers across the state are now confronted with loss of income due to illness and workplace closures related to the pandemic.[7] Many other jurisdictions and some agencies have temporarily suspended enforcement of judgments, but there remains a tremendous need to cease enforcement for the vast majority of the remaining judgment debtors.[8] It is critical that this bill pass to provide temporary relief to New Yorkers facing limited income and savings from execution of money judgments.

---

[6] *Covid-19 Housing Policy Scorecard*, The Eviction Lab, *available at*: https://evictionlab.org/covid-policy-scorecard/.

[7] Cargill, C., Maury, M., & Wimer, C. (June 2019), *Spotlight on Emergency Expenses*, *available at* https://robinhoodorg-production.s3.amazonaws.com/uploads/2019/06/EMERGENCY-EXPENSE-REPORT_6_19_FINAL.pdf.

[8] *Governor Cuomo and Attorney General James Temporarily Suspend State Debt Collection in Response to Coronavirus*. (March 17, 2020), *available at* https://www.governor.ny.gov/news/governor-cuomo-and-attorney-general-james-temporarily-suspend-state-debt-collection-response; U.S. Department of Education. *Secretary DeVos Directs FSA to Stop Wage Garnishment, Collections Actions for Student Loan Borrowers, Will Refund More Than $1.8 Billion to Students, Families*, (March 25, 2020), *available* at https://content.govdelivery.com/accounts/USED/bulletins/28317e2.

An increasing number of judgement debtors have approached the Society in the last few weeks seeking assistance due to frozen bank accounts and garnished wages. For example, a client who was working from home last week discovered that her debit card was not working due to a restraint on her bank account by Capital One Bank. The client was the sole wage earner in her family, until she was let go on March 20, 2020 as a result of her employer's inability to pay employees due to the current pandemic. The bank account contained her last paycheck and retirement funds that her disabled husband cashed, to pay for back due rent. Without access to her bank account she was unable to pay for food, medication, and rent for her family. There are numerous other similarly situated New Yorkers facing ongoing debt collection, and we expect a drastic increase in the immediate aftermath of this crisis.

The Society suggests the following supportive amendments, which will further the bill's goal of reducing the harm of judgment enforcement during the current pandemic. We suggest the bill clarify what constitutes a "reasonable opportunity to show the court having jurisdiction over the matter that such party suffered a substantial loss of income because of COVID-19." There must be clarity about the procedure by which one would show they "suffered a substantial loss of income."  It is critical that the process be easily understandable and accessible by the many judgment debtors and renters who will need to prepare for and make this showing without the assistance of an attorney. Over 95 percent of consumers are unrepresented in debt collection cases, and *pro se* legal assistance programs for consumer debtors, such as the Civil Legal Advice and Resource Office (CLARO) and Volunteer Lawyer for the Day (VLFD), have temporarily closed due to the ongoing public health emergency.[9]  In housing court, while the majority of landlords are represented by attorneys, most tenants appear *pro se*.[10]

---

[9] The New York State courts estimated in 2014 that 98% of consumers were unrepresented in debt collection cases. *See* N.Y. State Chief Judge Jonathan Lippman, *Law Day Remarks: Consumer Credit Reforms* 1 (transcript) (Apr. 30, 2014). That percentage has slightly decreased to 96% of consumers in 2017 following an increase in civil legal

Similarly, a 'reasonable opportunity' to make such a showing must ensure address verification, as numerous default judgments that are being enforced were obtained by service of process on incorrect addresses.[11] Last, in listing the circumstances under which a judgment debtor or renter would be considered to have "suffered a substantial loss of income" due to COVID-19, it is important that there be a catchall provision for those who faced loss of income due to COVID-19 but are not enumerated in the listed situations.

### Intro. 1936-2020

We support and urge the passage of Intro 1936-2020, which amends the definition of harassment in the Housing Maintenance Code to include threats against an individual based on their status as a COVID-19 impacted person, their status as an essential employee, or their receipt of a rental concession or forbearance for any rent owed during the COVID-19 period. Access to safe and stable housing is critically important for New Yorkers at a time when landlords increasingly look to force tenants to leave their homes or otherwise give up their rights under law. Lack of housing would force thousands of tenants to survive on the streets and face increased risks for both contracting COVID-19 and experiencing serious complications from the virus. Homeless New Yorkers cannot isolate at home or practice social distancing in congregate shelters. Those who contract COVID-19 are at a high-risk of serious complications due to high rates of underlying health conditions such as diabetes, heart disease, asthma, and COPD.

The Society is concerned about reports of tenants facing increasing harassment related to COVID-19, especially senior tenants. Our experience with harassment includes baseless eviction

---

services funding; According to 2018 data from the New York City Civil Court, out of a total of 100,186 consumer credit filings, attorney answers were filed in only 3,892 actions -- which is a rate of representation of only 3.88%.
[10] New York City Office of Civil Justice, *Universal Access to Legal Services*: *A Report on Year One of Implementation in New York City*, (2018).
[11] Creditors obtained more than approximately 700,000 default judgments in consumer credit actions filed between 2008 and 2016.

cases, illegal rent demands, vague nuisance allegations, withholding of repairs and maintenance, and repeated buyout offers. With the eviction moratorium issued by Governor Cuomo and other legislative measures to temporarily halt evictions,[12] we have seen landlords resort to harassment to remove tenants facing financial challenges due to the pandemic. The bill provides necessary relief to tenants facing "self-help evictions" and other forms of harassment during a public health emergency.

We recommend that the bill include an additional definition of "a person impacted by COVID-19." We propose including a catchall provision for a person who may have been impacted by COVID-19 for purposes of the legislation but does not fall into the listed categories.

## Conclusion

We applaud the Committees for holding today's hearing on these critically important bills. They will go a long way to protect low income and vulnerable New Yorkers trying to survive while facing unemployment and financial distress. Thank you for your leadership on these issues and for the opportunity to testify. We look forward to working with the Committees and the City Council in the coming months.

Respectfully submitted,

Adriene Holder, Attorney-in-Charge, Civil Practice
Judith Goldiner, Attorney-in-Charge, Civil Law Reform Unit

---

[12] See, e.g., N.Y.S. Assembly Bill A10290/N.Y.S. Senate S08192, "Tenant Safe Harbor Act" (prohibits landlords from evicting tenants for non-payment of rent that accrued during the current state of emergency and for six months after its eventual end.) *available at*: https://nyassembly.gov/leg/?bn=A10290&term=2019; N.Y.S. Assembly Bill A10224/N.Y.S. Senate Bill S8125A (suspends rent payment for 90 days for those who lost their jobs or had to close their businesses because of COVID-19.) *available at*: https://www.nysenate.gov/legislation/bills/2019/s8125

Tashi Lhewa, Of Counsel
Caryn Schreiber, Of Counsel
The Legal Aid Society
199 Water Street
New York, New York 10038
(212) 577-3557