# EXHIBIT QQ

<u>Small Business Committee Staff:</u>
Stephanie Jones, Counsel
Noah Meixler, Policy Analyst
Aliya Ali, Principal Finance Analyst

<u>Consumer Affairs and Business Licensing Committee Staff:</u>
Balqees Mihirig, Senior Counsel
Leah Skrzypiec, Policy Analyst
Sebastian Bacchi, Senior Finance Analyst



## THE COUNCIL OF THE CITY OF NEW YORK

BRIEFING PAPER AND COMMITTEE REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION
Jeffrey Baker, Legislative Director
Rachel Cordero, Deputy Director for Governmental Affairs

### COMMITTEE ON SMALL BUSINESS
Hon. Mark Gjonaj, Chair

### COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING
Hon. Andrew Cohen, Chair

**April 29, 2020**

### OVERSIGHT: The Impact of COVID-19 on Small Businesses in New York City

| | |
|---|---|
| <u>INT. NO. 1846:</u> | By Council Members Torres and Chin |
| <u>TITLE:</u> | A Local Law to amend the administrative code of the city of New York, in relation to the disclosure of gratuity policies for delivery workers |

1

**INT. NO. 1895:**                          By Council Members Gjonaj, Kallos, Constantinides, and Brannan

TITLE:                                      A Local Law to amend the administrative code of the city of New York, in relation to food service establishments' packaging of food for delivery

**INT. NO. 1896:**                          By Council Members Gjonaj, Kallos, Constantinides, Brannan, and Gibson

TITLE:                                      A Local Law to amend the administrative code of the city of New York, in relation to the disclosure of commissions charged by third-party food delivery services

**INT. NO. 1897:**                          By Council Members Gjonaj, Constantinides, Brannan, and Gibson

TITLE:                                      A Local Law to amend the administrative code of the city of New York, in relation to the licensing of third-party food delivery services

**INT. NO. 1898:**                          By Council Members Gjonaj, Moya, Constantinides, Brannan, Rosenthal and Gibson

TITLE:                                      A Local Law to amend the administrative code of the city of New York, in relation to telephone order charges by third-party food delivery services

**INT. NO. 1907:**                          By Council Members Moya, Gjonaj, Brannan, Rosenthal and Gibson

TITLE:                                      A Local Law to amend the administrative code of the city of New York, in relation to prohibiting third-party food delivery services from limiting the purchase prices covered

-2-

establishments may charge on food and beverage orders

**PROPOSED INT. NO. 1908-A:**

By Council Members Moya, Gjonaj, Kallos, Brannan, Rosenthal, Gibson, Ayala, Van Bramer, Rivera and Cohen

TITLE:

A Local Law to amend the administrative code of the city of New York, in relation to fees charged by third-party food delivery services

**INT. NO. 1914:**

By Council Member Adams and the Speaker (Council Member Johnson)

TITLE:

A Local Law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19

**INT. NO. 1916:**

By Council Member Cohen

TITLE:

A Local Law in relation to requiring the department of consumer affairs to waive and refund all fees related to sidewalk cafe licenses that are due on or after January 1, 2020 until December 31, 2020, and providing for the repeal of such provision upon the expiration thereof

**INT. NO. 1921:**

By Council Members Gjonaj and Louis

TITLE:

A Local Law to amend the administrative code of the city of New York, in relation to requiring third-party food delivery services and food service establishments to display sanitary inspection letter grades online

**INT. NO. 1932:**

By Council Member Rivera and the Speaker (Council Member Johnson)

TITLE:

A Local Law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19

**<u>PRECONSIDERED INT. NO.   :</u>**

By Council Member Matteo

TITLE:

A Local Law in relation to requiring the mayor to issue a guidance on license and permit renewal deadline extensions, and requiring that no such licenses or permits be required to be renewed within 90 days after the COVID-19 emergency has ended, and providing for the repeal of such provision upon the expiration thereof

**<u>RES. NO. 1049:</u>**

By the Public Advocate (Mr. Williams) and Council Members Levin and Cabrera

TITLE:

A Resolution calling upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans

I.    **INTRODUCTION**

On April 29, 2020, the Committee on Small Business, chaired by Council Member Mark Gjonaj, and the Committee on Consumer Affairs and Business Licensing, chaired by Council Member Andrew Cohen, will hold a remote oversight hearing on "The Impact of COVID-19 on Small Businesses in New York City." The Committees will also hear a package of thirteen pieces of legislation designed to help small businesses in the City weather the negative impacts of the COVID-19 outbreak. Those invited to testify include representatives from the New York City Department of Small Business Services (SBS), representatives from the Department of Consumer and Worker Protection (DCWP) (formerly the Department of Consumer Affairs), representatives from the Office of Nightlife at the Mayor's Office of Media and Entertainment, representatives from third-party delivery platforms, small business advocates, chambers of commerce, Business Improvement Districts (BIDs), and other community-based non-profit organizations.

The package of legislation includes the following bills: (1)  Int. No. 1846 by Council Member Torres, a local law to amend the administrative code of the city of New York, in relation to the disclosure of gratuity policies for delivery workers; (2)  Int. No. 1895 by Council Member Gjonaj, a local law to amend the administrative code of the city of New York, in relation to food service establishments' packaging of food for delivery; (3) Int. No. 1896 by Council Member Gjonaj, a local law to amend the administrative code of the city of New York, in relation to the disclosure of commissions charged by third-party food delivery services; (4) Int. No. 1897 by Council Member Gjonaj, a local law to amend the administrative code of the city of New York, in relation to the licensing of third-party food delivery services; (5) Int. No.

1898 by Council Members Gjonaj and Moya, a local law to amend the administrative code of the city of New York, in relation to telephone order charges by third-party food delivery services; (6) Int. No. 1907 by Council Members Moya and Gjonaj, a local law to amend the administrative code of the city of New York, in relation to prohibiting third-party food delivery services from limiting the purchase prices covered establishments may charge on food and beverage orders; (7) Proposed Int. No. 1908-A by Council Members Moya and Gjonaj, a local law to amend the administrative code of the city of New York, in relation to fees charged by third-party food delivery services; (8) Int. No. 1914 by Council Member Adams and the Speaker (Council Member Johnson), a local law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19; (9) Int. No. 1916 by Council Member Cohen, a local law in relation to requiring the department of consumer affairs to waive and refund all fees related to sidewalk cafe licenses that are due on or after January 1, 2020 until December 31, 2020, and providing for the repeal of such provision upon the expiration thereof; (10) Int. No. 1921 by Council Members Gjonaj and Louis, a local law to amend the administrative code of the city of New York, in relation to requiring third-party food delivery services and food service establishments to display sanitary inspection letter grades online; (11) Int. No. 1932 by Council Member Rivera and the Speaker (Council Member Johnson), a local law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19; (12) Preconsidered Int. No.__ by Council Member Matteo, in relation to requiring the mayor to issue a guidance on license and permit renewal deadline extensions, and requiring that no such licenses or permits be required to be renewed within 90 days after the COVID-19 emergency has ended, and providing for the repeal of such provision upon the expiration thereof; and (13) Res.

-6-

No. 1049 by The Public Advocate (Mr. Williams), a resolution calling upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans.

## II.   BACKGROUND

In late December of 2019, a new virus, SARS-CoV-2, was detected in Wuhan, China and by January 30, 2020, the World Health Organization (WHO) declared that COVID-19, the disease caused by the SARS-CoV-2 virus, was now a Public Health Emergency of International Concern (PHEIC).[1] SARS-CoV-2 is not the first virus to pose a serious threat to modern civilization in recent decades. In 2003, the severe acute respiratory syndrome (SARS) was labelled the "first pandemic of the 21st century", because it spread quickly across continents, infected more than 8,000 people and killed nearly 800.[2] By comparison, COVID-19 has infected 2.5 million people across 210 countries, and has killed nearly 800,000 people as of April 22, 2020.[3]

The ease with which the virus spreads has caused governments across the globe to shut-down businesses, schools, religious and cultural institutions, and mandate various levels of social isolation. While this has helped to limit the spread of the virus, stay-at-home orders have had a catastrophic impact on economic markets and particularly small businesses.

### 1.   The Impact on Small Businesses Amid the COVID-19 Crisis

---

[1] World Health Organization "Rolling updates on coronavirus disease (COVID-19)", last updated April 18, 2020, available at: https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen.
[2] James W. DeLuc and M. Anita Barry "SARS, the first pandemic of the 21st century", *Emerging Infectious Diseases*, November 2004, vol. 10(11), e26, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3329048/.
[3] Worldometer "Countries where COVID-19 has spread", April 22, 2020, available at: https://www.worldometers.info/coronavirus/countries-where-coronavirus-has-spread/.

In New York, Governor Andrew Cuomo issued an executive order – New York State on PAUSE (PAUSE) – that closed all on-site, non-essential businesses, effective March 22, 2020, to help stop the spread of SARS-CoV-2.[4] The list of essential businesses that are still permitted to operate, to some degree, include:

- Health care operations – such as hospitals, medical labs, walk-in clinics, home healthcare, elder care, veterinaries, nursing homes, licensed mental health providers, and medical billing support personnel.

- Infrastructure – such as airports, public utilities, hotels, commercial shipping ports, and telecommunications.

- Manufacturing – such as food processing, pharmaceuticals, automobiles, household paper products, and chemicals.

- Retail – such as grocery stores, pharmacies, framer's markets, gas stations, restaurants (for take-out and delivery only), and convenience, hardware and pet food stores.

- Services – such as laundromats, postal services, trash and recycling collection, bicycle and automotive repair, funeral homes, and animal shelters.

- Financial Institutions – such as banks and lending institutions, insurance companies, and accounting firms.

---

[4] Governor Andrew Cuomo "Governor Cuomo signs the 'New York State on PAUSE' executive order", March 20, 2020, available at: https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order.

- Human Services Providers – such as food banks, homeless shelters and community care programs.

- Construction – insofar that it supports affordable housing, hospitals, roads, transit facilities, homeless shelters or schools.

- Public Health and Safety – such as law enforcement, fire and emergency services, building cleaners or janitors, and residential moving services.

- Logistical, Technological and Child Care Services – such as technology support for online services, child care programs, government owned or leased buildings and essential government services.

- Recreation – such as parks and open spaces (not including playgrounds), and boatyards and marinas.

- Professional Services – such as lawyers and real estate services.

- News Media; and

- Defense.[5]

Although this list covers a range of industries that are permitted to operate during PAUSE, a large proportion of New York's small (and large) businesses have still had to severely reduce their capacities. According to an analysis by the NYC Comptroller, the City's hotels are projected to only maintain an occupancy rate of 20 percent, while restaurant sales are expected to

---

[5] Empire State Development "Guidance for determining whether a business enterprise is subject to a workforce reduction under recent executive orders", April 19, 2020, available at: https://esd.ny.gov/guidance-executive-order-2026, last accessed April 22, 2020.

drop by a staggering 80 percent. Real estate and retail sales are both expected to decline by 20 percent.[6]

These figures for the restaurant industry reflect the results of a recent survey by the New York State Restaurant Association. According to their findings, sales have declined by 79 percent, and New York State restaurants are expected to lose $3.6 billion in sales revenue, in April alone.[7] Just over half (51 percent) of all restaurants have been able to move their operations online, and unemployment rates in this sector have skyrocketed, as 80 percent of restaurant workers have lost their jobs.[8]

Restrictions similar to PAUSE have been implemented across the country, which has caused a massive reduction in the number of small businesses operating. In their survey of small businesses (under 500 employees), the National Bureau of Economic Research found that 43 percent of businesses had closed due to COVID-19 and that they had reduced their staff by about 40 percent since January 2020.[9] The results were more severe in the Mid-Atlantic region, which includes New York, where 57 percent of businesses were closed, and staff employment decreased by 47 percent.[10] According to the survey's conclusion, about 20 percent of the nation's

---

[6] New York City Comptroller Scott M. Stringer "Comptroller Stringer: City must take immediate action to prepare for economic impacts of COVID-19 and protect vital services for most vulnerable New Yorkers", March 16, 2020, available at: https://comptroller.nyc.gov/newsroom/comptroller-stringer-city-must-take-immediate-action-to-prepare-for-economic-impacts-of-covid-19-and-protect-vital-services-for-most-vulnerable-new-yorkers/.

[7] New York State Restaurant Association "Restaurant industry impact survey: New York State", April, 2020, available at: https://www.nysra.org/uploads/1/2/1/3/121352550/restaurant_industry_impact_survey__new_york_state__2_.pdf.

[8] Id.

[9] Alexander W. Bartik et al. "How are small businesses adjusting to Covid-19? Early evidence from a survey", *National Bureau of Economic Research*, April 2020, available at: https://www.nber.org/papers/w26989.pdf.

[10] https://www.nber.org/papers/w26989.pdf.

employees work in "retail trade, leisure and hospitality and these sectors are particularly vulnerable to the current pandemic."[11]

### 2.  Federal, State and Local Government Response to Help Small Businesses

The nation's economy is dependent on its small businesses. There are approximately 27 million of these businesses across the country and they are responsible for employing 57 million workers.[12] When including the owners of these businesses, in addition to employees, that total comes to an estimated 85 million people.[13] According to the Small Business Administration, small businesses are responsible for creating two-thirds of the Country's new jobs.[14]  Given their vital role, it is crucial that they are either given alternative means to operate, in as lucrative a manner as possible, throughout the COVID-19 crisis, and/or are provided the necessary support to restart their operations once social distancing measures have been lifted.

### a.  Federal Government Assistance

During this crisis, small businesses in New York City may apply for various assistance programs including funding distributed by the federal government through its Small Business Administration (SBA). These programs include the Paycheck Protection Program (PPP),[15] the Economic Injury Disaster Loan and Advance (EIDL) and the SBA Express Bridge Loans and

---

[11] Id.

[12] Information Station "How important are small businesses?", January 3, 2017, available at: https://informationstation.org/video/how-important-are-small-businesses/?utm_source=google&utm_medium=cpk&gclid=EAIaIQobChMI-Ymy3df86AIVGozICh0QRQPrEAAYASAAEgI7ivD_BwE.

[13] Id.

[14] United States Small Business Administration "Small Businesses generate 44 percent of U.S. economic activity", January 30, 2019", available at: https://advocacy.sba.gov/2019/01/30/small-businesses-generate-44-percent-of-u-s-economic-activity/.

[15] United States Small Business Administration "Paycheck Protection Program", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program-ppp (last visited on April 9, 2020).

Debt Relief programs. The federal government has also temporarily increased the unemployment insurance stipend that laid-off or furloughed workers may receive, which may have implications for the workforce of some small businesses.

*Paycheck Protection Program*

The Coronavirus, Aid, Relief, and Economic Security Act (CARES ACT) originally allocated about $349 billion in federal funds for PPP, with an additional $322 billion authorized by Congress in late April.[16] The program provides various types of employers, including small businesses, nonprofits, self-employed individuals and independent contractors, access to loans to cover payroll costs of up to $100,000 per employee, rent and mortgage interest prior to February 15, 2020, and utilities. Loans are calculated per employer or per location, and may be as high as 2.5 times the average monthly payroll for the one-year period before the loan application is submitted, to a cap of $10 million. Loans are calculated differently for seasonal and new employers. Employers of fewer than 500 workers may apply for these loans through a network of banks ranging from large to smaller banks.[17] Banks may not require applicants to supply collateral or personal guarantees, and applicants may only apply for one PPP loan.

PPP loans can be forgiven up to the value of eight weeks of payroll costs of up to $100,000 per employee, rent and mortgage interest prior to February 15, 2020, and utilities. To qualify for loan forgiveness, however, 75 percent of the amount loaned must be used for payroll

---

[16] Emily Cochrane and Jim Tankersley "Senate approves aid for small-business loan program, hospitals and testing", April 21, 2020, *New York Times*, available at: https://www.nytimes.com/2020/04/21/us/politics/congress-business-relief-ppp.html.

[17] In the recent funding allocation, $60 billion was set aside for lenders with less than $50 billion in assets. *See* Aaron Gregg and Renae Merle "How to get a small-business loan under the new $484 billion coronavirus aid package", April 23, 2020, *The Washington Post*, available at: https://www.washingtonpost.com/business/2020/04/22/small-business-loan-faq.

costs, and employee and salary levels must be maintained, or else the forgiven amount will be reduced. If not forgiven, PPP loans accrue at a one percent interest rate and must be paid back within two years, with an optional deferral of up to six months. There are no loan fees or prepayment penalties.

*Economic Injury Disaster Loan and Advance[18]*

Small businesses may apply for the SBA's existing Economic Injury Disaster Loan program (EIDL), which the CARES Act expanded upon. The existing program provides economic relief for small businesses of fewer than 500 employees or otherwise meets SBA size standards, self-employed persons, independent contractors and nonprofits in the form of loans of up to $2 million. To be eligible, entities must also demonstrate the ability to repay the loan. Interest rates are low (3.75 percent for small businesses and 2.75 percent for nonprofits) and feature long-term repayment plans of up to 30 years.

The CARES Act expanded upon this program to provide a loan advance. Eligible entities that can show a temporary loss of revenue can receive an advance of up to $10,000 upon successful application for an EIDL loan. That advance may be forgiven by the federal government.

*SBA Express Bridge Loans[19] and Debt Relief[20]*

---

[18] United States Small Business Administration "Economic injury disaster loan emergency advance", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/economic-injury-disaster-loan-emergency-advance (last visited on April 9, 2020).
[19] United States Small Business Administration "SBA Express Bridge Loans", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/sba-express-bridge-loans (last visited on April 9, 2020).
[20] United States Small Business Administration "SBA debt relief", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/sba-debt-relief (lasted visited on April 9, 2020).

The CARES Act allocated funds for SBA's Express Bridge Loan program and their Debt Relief program. The Express Bridge Loan program quickly provides funds of up to $25,000 for businesses eligible for SBA's 7(a) loans to overcome a temporary loss of revenue. SBA's Debt Relief program allows businesses that are eligible for SBA's 7(a), 504 and microloans to receive limited payment of principal, interest and fees on these loans. The 7(a), 504 and microloans are SBA's standard small business loan programs, which were established before the onset of COVID-19. The 7(a) loans are available for general business purposes, such as working capital, equipment, furniture, and land and building.[21] They are provided through a lender.[22] The 504 loans are issued by Certified Development Companies for long-term, fixed-asset financing for small businesses, such as the purchase and improvement of land and buildings.[23] Microloans are temporary, short-term loans of up to $50,000 to small businesses for general business purposes, and are offered by nonprofits.[24]

The federal government's PPP program, although heavily utilized, has raised some concerns. As of April 13, 2020, the program had issued about 1,661,367 loans totaling over $342 billion, with over 4,975 lenders participating.[25] However, a recent ranking of businesses receiving loans as a percentage of each state's eligible payroll revealed that New York State placed second to last, with only 23.1 percent of eligible businesses receiving a loan.[26] By

---

[21] United States Small Business Administration Office of Financial Assistance: Resources, 7(a) Loans", available at: https://www.sba.gov/offices/headquarters/ofa/resources/11428 (last visited on April 9, 2020).
[22] Id.
[23] United States Small Business Administration "Office of Financial Assistance: Resources, 504 Loans", available at: https://www.sba.gov/offices/headquarters/ofa/resources/4049 (last visited on April 9, 2020).
[24] *See* 13 CFR § 120.2 for the definition of this and other, traditional SBA loan programs.
[25] United States Small Business Administration "Paycheck Protection Program (PPP) Report: Approvals through 4/16/20", available at: https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf.
[26] Zachary Mider and Cedric Sam "Small-business rescue shows not all states are created equal", updated April 20, 2020,  *Bloomberg*, available at: https://www.bloomberg.com/graphics/2020-sba-paycheck-protection-program/.

contrast, Nebraska and North Dakota reached 74.7 percent and 71.5 percent respectively.[27] Further, some industries fared better than others, with the construction industry receiving the highest percentage of loans (13 percent) and restaurants receiving less than nine percent,[28] despite representing about 14 percent of companies employing under 500 people.[29] Of the restaurants who received loans, some reports allege that too many have gone to large chains, and a handful of these companies have received blowback for accepting loans. A Reuters article claimed that 25 percent of the initial $350 billion allocated to SBA loan programs went to fewer than two percent of the firms that got relief, with some of these being large, publicly-traded companies with "thousands of employees and hundreds of millions of dollars in annual sales."[30] Among these companies is the Ruth's Hospitality Group (owns 150 Ruth's Chris Steak Houses), Potbelly ($409.7 million in sales and 6,000 employees) and Shake Shack (8,000 employees). Both Ruth's Hospitality Group[31] and Shake Shack have agreed to return their loans, the latter of which citing an ability to raise the funds through other means.[32] Similarly, dozens of large companies with financial or legal problems have reportedly received significant loans through the program, according to an analysis of 200 publicly-traded companies that reported receiving a

---

[27] Id.

[28]  United States Small Business Administration "Paycheck Protection Program (PPP) Report: Approvals through 4/16/20", available at: https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf.

[29] Andy Sullivan, Howard Schneider and Ann Saphir "Main street bailout rewards U.S. restaurant chains, firms in rural states", April 17, 2020, *Reuters*, available at: https://www.reuters.com/article/us-health-coronavirus-usa-lending-analys/main-street-bailout-rewards-us-restaurant-chains-firms-in-rural-states-idUSKBN21Z3FL.

[30] Id.

[31] Peter Rudegeair, Heather Haddon and Ruth Simon "Ruth's Chris to repay loan amid outcry over rescue program", updated April 23, 2020, *The Wall Street Journal*, available at: https://www.wsj.com/articles/public-companies-have-to-repay-small-business-rescue-loans-11587670442.

[32] Luisa Beltran "Restaurant chains received many of the biggest PPP loans, updated April 23, 2020, *Barron's*, available at: https://www.barrons.com/articles/restaurant-chains-received-many-of-the-biggest-ppp-loans-51587573556.

total of $750 million through PPP.[33] Since it became known that large companies had been benefitting from PPP, the SBA published additional guidance emphasizing that businesses may only apply for the loan if, in good faith, they can certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant," and that public companies with "substantial market value" are unlikely to be able to make such a certification.[34] Companies who received the loan before this guidance and repay it before May 7, 2020 will be deemed to have certified in good faith.[35]

The manner in which PPP was offered to the public and the complexity of its terms and conditions may have contributed to a lack of success for many small business owners. Although the program began accepting applications on Friday, April 3, 2020, some large banks refused to participate at first, citing a lack of guidance from the federal government.[36] When more banks did begin to accept applications, there was confusion regarding what conditions the banks could apply. SBA authorized a last-minute raise from half a percent to a one percent interest rate, reportedly to address concerns from banks about being unable to service the loans at an interest rate of only half a percent.[37] Further, some large banks attached unexpected conditions to their

---

[33] Jessica Silver-Greenberg, David Enrich, Jesse Drucker and Stacy Cowley "Large, troubled companies got bailout money in small-business loan program", April 26, 2020, *The New York Times*, available at: https://www.nytimes.com/2020/04/26/business/coronavirus-small-business-loans-large-companies.html.

[34] United States Small Business Administration "Paycheck Protection Program Loans: Frequently Asked Questions (FAQs)" updated April 23, 2020, https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Frequently-Asked-Questions.pdf.

[35] Id.

[36] Brian Thompson "No small-business relief yet: False start on Paycheck Protection Program loans", April 3, 2020, *Forbes*, available at: https://www.forbes.com/sites/brianthompson1/2020/04/03/no-small-business-relief-yet-false-start-on-paycheck-protection-program-loans/#163172d034c4.

[37] "SBA increases rate, clarifies terms on Paycheck Protection Program loans", *ABA Banking Journal*, April 2, 2020, https://bankingjournal.aba.com/2020/04/treasury-sba-to-increase-rate-on-paycheck-protection-program-loans/; Michela Moscufo "How to get, and give, Paycheck Protection Program loans through the SBA", April 3, 2020, *Forbes*, available at: https://www.forbes.com/sites/michelamoscufo/2020/04/03/how-to-get-and-give-paycheck-protection-program-loans-through-the-sba/#3f766faa27e8.

applications, like having a previous banking relationship with them before February 15, 2020.[38] A few weeks after the lending program began, it ran out of funds,[39] seemingly validating concerns from some experts that the program was not sufficiently well-funded, or disbursing funds quickly enough.[40]

The federal government's EIDL program quickly experienced funding shortages as well. For many applicants, a cap of $2 million per borrower was significantly reduced to $15,000.[41] Furthermore, although the program was touted as featuring a quick turnaround on payments, many applicants waited weeks for approval and found that the amount disbursed to them was much less than the initial approval amount.[42] In a survey of 885 small business owners conducted by the National Federation of Independent Business the day after the SBA's EIDL and PPP programs ran out of funds, 80 percent were still waiting to hear about their loan applications.[43]

Immigrant communities in NYC may have had even more difficulty applying to and obtaining federal funds, which would considerably impact the City's economy. Immigrant

---

[38] *See e.g.* Bank of America "Small Business Administration Paycheck Protection Program application" available at: https://about.bankofamerica.com/promo/assistance/latest-updates-from-bank-of-america-coronavirus/small-business-assistance, (last visited April 8, 2020); JPMorgan Chase & Co "Paycheck Protection Programs FAQs & useful tips", available at: https://recovery.chase.com/cares1/ppp-faqs#accordion-1586386467723-1-panel, (last visited April 8, 2020); and Wells Fargo "Small Business Administration Paycheck Protection Program", available at: https://update.wf.com/coronavirus/paycheckprotectionprogram/, (last visited April 8, 2020).

[39] Stephen Gandel "Paycheck Protection Program out of money: Thousands of small businesses shut out", *CBS News*, April 16, 2020, available at: https://www.cbsnews.com/news/paycheck-protection-program-out-of-money-small-businesses-shut-out.

[40] Jim Tankersley "Virus throws millions out of work, and Washington struggles to keep pace", April 9, 2020 *The New York Times*, available at: https://www.nytimes.com/2020/04/09/business/coronavirus-unemployment-washington.html?action=click&module=Top%20Stories&pgtype=Homepage.

[41] Stacy Cowley "Small Businesses Wait for Cash as Disaster Loan Program Unravels", April 9, 2020, *The New York Times*, available at: https://www.nytimes.com/2020/04/09/business/smallbusiness/small-business-disaster-loans-coronavirus.html.

[42] *Id.*

[43] National Federation of Independent Business "80% of PPP applicants are still urgently waiting for financial assistance" April 20, 2020, available at: https://www.nfib.com/content/press-release/economy/80-of-ppp-applicants-are-still-urgently-waiting-for-financial-assistance.

workers make up 45 percent of the city's workforce[44] and own one-half of New York City's businesses.[45] In some neighborhoods, immigrant-owned businesses employ up to 42 percent of the neighborhood population.[46] Yet, there have been questions surrounding whether undocumented immigrants can be eligible for the PPP program, since it requires an Employee Identification Number or Social Security Number on its program application.[47] The application originally required business owners to be U.S. citizens or permanent residents.[48] In the past, SBA placed additional restrictions and requirements on access to loans for non-citizens.[49]

In addition, certain features of the federal government's PPP program may disproportionately disadvantage minority business owners from obtaining loans. A loophole allowing bank servicers to prefer businesses with a previous lending relationship may lead to the exclusion of many minority businesses.[50] Many microbusinesses in New York City may have not previously applied for loans or lines of credit, and therefore may not have relationships with local banks.[51] The Congressional Black Caucus has recognized the "history and legacy" of racial inequality in the banking system, and as banks default to lending to businesses to which they

---

[44] Mayor's Office of Immigrant Affairs "State of Our Immigrant City: Annual Report", March 15, 2018, available at: https://www1.nyc.gov/assets/immigrants/downloads/pdf/annual-report-2018.pdf.

[45] Id.

[46] Lena Afridi "The Displacement Crisis of Immigrant-Owned Small Businesses", February 15, 2018, *Shelter Force,* available at: https://shelterforce.org/2018/02/15/displacement-crisis-immigrant-owned-small-businesses/.

[47] United States Small Business Administration "Paycheck Protection Program: Borrower application form", effective April 3, 2020, available at: https://www.sba.gov/sites/default/files/2020-04/PPP-Borrower-Application-Form-Fillable.pdf.

[48] See Emily Guerin "Massive Federal Loan Program for Small Businesses Off to Rocky Start", April 3, 2020, *LAist*, https://laist.com/2020/04/03/small_business_ppp_paycheck_protection_program_loans_stimulus_coronavirus.php.

[49] *See* United States Small Business Administration "SBA Eligibility Questionnaire, for Standard 7(a) Guaranty", available at: https://www.sba.gov/sites/default/files/bank_eligibility_questionnaire_0.pdf; and Kimberly Rotter and Dawn Papandrea "What Are SBA Loan Requirements?",  February 28, 2020, *U.S. News & World Report*, available at: https://loans.usnews.com/complete-list-of-sba-loan-requirements.

[50] Mary Alice Parks "Minority-owned small businesses face unique, steep hurdles amid coronavirus cash crunch", April 8, 2019, *ABC News*, available at*:* https://abcnews.go.com/Health/minority-owned-small-businesses-face-unique-steep-hurdles/story?id=70011898.

[51] Id.

have lent money before, minority-owned businesses could be disproportionately denied and excluded.[52]

For those with access to COVID-19 funding programs, there are drawbacks to consider. Although the federal government's PPP program offers loan forgiveness, there are significant conditions to satisfy. Seventy-five percent of the PPP loan's forgiven amount must be spent on payroll costs, a condition that appears to have taken shape late in the process.[53] If 75 percent of the forgiven amount must be spent on payroll costs, that may leave less for businesses to spend on obligations such as rent and utilities, which may be disproportionately higher in our City.[54] Some businesses may decide, and some have decided, that the program is too risky, or that it is more valuable to their employees to lay them off, so that employees may collect a higher salary through the federal government's expanded unemployment insurance program.[55] If a business does not qualify for full forgiveness of the loan, PPP requires the small business owner to pay off the loan within two years, after a six-month deferral.[56] Small businesses in the City may be concerned about being able to pay back these loans, and about being burdened with more debt.

For many small businesses in the City, dealing with an unpredictable and contagious virus that has already significantly disrupted the ability of many to earn revenue makes

---

[52] Id.

[53] United States Small Business Administration "Interim Final Rule: Business Loan Program Temporary Changes; Paycheck Protection Program", Issued April 2, 2020, available at: https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf.

[54] Greg Iacurci "Your  Forgivable Loan May Be Undercut by This Provision of the Paycheck Protection Program", updated April 9, 2020, *CNBC*, available at: https://www.cnbc.com/2020/04/07/this-part-of-paycheck-protection-program-could-reduce-forgivable-loans.html.

[55] Jim Tankersley "Virus Throws Millions Out of Work, and Washington Struggles to Keep Pace", April 9, 2020, *The New York Times*, available at: https://www.nytimes.com/2020/04/09/business/coronavirus-unemployment-washington.html?action=click&module=Top%20Stories&pgtype=Homepage.

[56] United States Small Business Administration "Paycheck Protection Program", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program.

borrowing money a risky endeavor. With the exception of SBS's Employee Retention Grant Program, which was only available for the smallest of City businesses (1-4 employees), almost all the funding available to businesses have taken the form of loans. There are concerns about whether the City's economy will strengthen quickly enough to satisfy the terms of these loans, and businesses might struggle to pay off additional debt (even at low or no interest rates) after this sustained period of closure and reduced income. A 2019 survey conducted by the Federal Reserve found that as many as 70 percent of small businesses have outstanding debt.[57] Similarly, a 2016 JPMorgan study concluded that most small businesses did not have enough cash reserves to carry them through a significant economic downturn, with the median independent restaurant having only enough extra cash to last them 16 days.[58]

    b.  <u>New York State Assistance</u>

In addition to closing 100 percent of non-essential businesses statewide, the PAUSE executive order provides a 90-day moratorium on residential and commercial evictions.[59] Since commercial rent is typically the largest cost and greatest concern for business owners,[60] the 90-day moratorium provides short-term relief to businesses. The Governor's moratorium on

---

[57] Federal Reserve Banks "Small Business Credit Survey: 2019 Report on Employer Firms", available at: https://www.fedsmallbusiness.org/medialibrary/fedsmallbusiness/files/2019/sbcs-employer-firms-report.pdf. Also *see* Bridget Bartolini "City's Small Businesses Need Rent Stabilization to Survive COVID-19, Advocates Say", April 6, 2020, *City Limits*, available at: https://citylimits.org/2020/04/06/citys-small-businesses-need-rent-stabilization-to-survive-covid-19-advocates-say.
[58] *See* Bridget Bartolini, id.
[59] Governor Andrew M. Cuomo "Video, Audio, Photos & Rush Transcript: Governor Cuomo Signs the "New York State on Pause" Executive Order", March 20, 2020, https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-signs-new-york-state-pause-executive-order.
[60] Association for Neighborhood & Housing Development "The Forgotten Tenants: New York City's Immigrant Small Business Owners", March, 2019), available at: https://anhd.org/report/forgotten-tenants-new-york-citys-immigrant-small-business-owners.

commercial rent is only for a 90-day period, however, and there is currently little guidance over whether evictions will resume after the 90 days is over.

Beyond the Governor's Executive Order pausing commercial evictions, New York State is not currently administering any specific programs to provide relief to small businesses. NYS's Empire State Development (ESD) has information on its website about the SBA's COVID-19 loan programs, including resources on how businesses can apply for relief.[61] ESD's website directs businesses to other existing relief efforts as well, such as a pro bono legal advice service for small businesses applying for the Paycheck Protection Program.[62]

c.   New York City Assistance

Support for New York City's small businesses from local government has been provided in numerous ways. Financial aid, through loans and grants programs, has been offered through the Department for Small Business Services (SBS). Meanwhile, the Department of Consumer and Worker Protection (DCWP) has also provided assistance by reducing regulatory burdens through pausing some of the fees that it administers and extending deadlines for various renewals.

*Small Business Services*

On March 8th, Mayor de Blasio announced that SBS would create two financial relief programs, the Employee Retention Grant Program and Small Business Continuity Loan Fund, to

---

[61] Empire State Development "Apply for Small Business Administration (SBA) COVID-19 Loans", available at: https://esd.ny.gov/small-business-administration-sba-covid-19-loans.
[62] Id.

provide financial relief to small businesses during the crisis.[63] To qualify for either program, businesses were required to provide documentation proving that over a two-month period in 2020 their revenues decreased by 25 percent due to COVID-19.[64] Businesses with fewer than five employees were eligible for the Employee Retention Grant Program, which provided a grant covering up to 40 percent of a business's payroll for two months, with a maximum amount of $27,000.[65] On April 3rd, SBS stopped accepting applications to the grant program.[66] The Small Business Continuity Loan Fund provided a zero-interest loan to businesses with fewer than 100 employees for up to $75,000.[67]  As of April 8th, SBS paused application intake for the loan fund due to an overwhelming number of applications.  Accordingly, small businesses in NYC can now only apply to the SBA programs to receive necessary financial relief.[68]

According to SBS, the NYC Employee Retention grant program provided assistance to 1,200 small businesses. SBS allocated $10 million to the program, and small businesses received an average amount of $7,800.[69] SBS is expecting to give out $20 million in loans through the Small Business Continuity Loan Fund. Before the fund closed online applications on

---

[63] Office of the Mayor "Mayor de Blasio Provides Updates on New York City's COVID-19 Response", March 8, 2020, available at:  https://www1.nyc.gov/office-of-the-mayor/news/124-20/mayor-de-blasio-provides-on-new-york-city-s-covid-19-response.

[64] Id.

[65] NYC Department of Small Business Services "NYC Employee Retention Grant Program", (as of April 2, 2020), available at: https://www1.nyc.gov/nycbusiness/article/nyc-employee-retention-grant-program. Program information is still available at: https://www.paulweiss.com/media/3979874/nyc2-employee-retention-grant-program-summary_4-6.pdf.

[66] Id.

[67] NYC Department of Small Business Services "NYC Small Business Continuity Loan Program", (as of April 7, 2020) available at: https://www1.nyc.gov/nycbusiness/article/nyc-small-business-continuity-loan-program. Program Information still available at: https://www.natlawreview.com/article/nyc-financial-assistance-businesses-impacted-covid-19

[68] Id.

[69] Sophia Chang, "Funds Are Coming For Small Businesses, But Some Will Have To Wait", April 1, 2020, *Gothamist*, available at: https://gothamist.com/news/funds-are-coming-small-businesses-some-will-have-wait.

April 5th, over 15,000 businesses initially applied, and 8,500 businesses completed applications.[70]

However, some city advocates have raised concerns about access to these funds. SBS was swift to offer their grant and loan programs, acting quickly to bridge an important funding gap before the federal government established their own, but the rollout was flawed. The program initially required business owners to supply documentation demonstrating a drop in revenue in the two consecutive months of 2020, when the full effects of COVID-19 were not yet felt by many businesses.[71] The program eventually allowed business owners to supply information for March 2020, which may have allowed many more business to be eligible.[72] It was also unclear whether non-profit organizations were eligible for SBS's programs, until the website reflected that non-profits were eligible for the Employee Retention Grant Program, but not the Small Business Continuity Loan Fund.[73] While applications were quickly accepted for the Employee Retention Grant Program, the Fund was not available for weeks afterward, and the website confusingly displayed a "Pre-Application" form that did not actually register anyone for consideration to receive funds.[74] Some users felt that SBS had not provided clear information on

---

[70] Id.

[71] Moshe Schulman, Alexis Percival and Patrick Cournot "The Paycheck Protection Program Is Failing: Small Businesses Such as Ours Won't Survive without a Lot More Help", April 16, 2020, *The Atlantic*, available at: https://www.theatlantic.com/ideas/archive/2020/04/relief-small-business/610066/, ("Last month, de Blasio announced a $75,000 interest-free loan available to local businesses that could prove a 25 percent decrease in sales over a two-month period in comparison with sales in the same two months in 2019. Only recently did we meet the threshold, since our drop-off was so sudden, starting in the second week of March, unlike restaurants in Chinatown, for instance, that closed in February. As of last week, applications were closed. Our attorneys think they can push ours through since they created an account in time, but the money is presumed to have dried up.")
[72] *See* NYC Department of Small Business Services "Participation Affidavit", available at: https://www1.nyc.gov/html/sbs/downloads/pdf/COVID19_SBCL_participation_affidavit_form.pdf.
[73] *See* NYC Department of Small Business Services "Assistance & Guidance for Businesses Impacted Due to Novel Coronavirus", available at: https://www1.nyc.gov/site/sbs/businesses/covid19-business-financial-assistance.page (last viewed on April 24, 2020). Page has since been updated to reflect the fact that the programs are no longer being offered.
[74] *See* id.

the terms of their programs, and that the online application process contained many technical glitches.[75] One user claimed to have lost her application entirely after the SBS website crashed.[76]

Small business owners who are not conversant in English may have had difficulty understanding the terms and conditions, and how to apply to the programs, without materials available in other languages. SBS took weeks to translate application materials on their website, and even then only translated certain materials, with text on the website being translated by browser tools.[77] Further, it is unknown how much outreach was done to immigrant communities through representative organizations or otherwise.

Some critics felt that the requirements for the Employee Retention Grant Program were not inclusive enough. Eligibility was limited, with only the very smallest businesses employing 1-4 people able to receive a grant.[78] This may have excluded many restaurants, since they may typically employ more than four personnel, such as a manager, servers, bus staff, cooks and hosts.

---

[75] Sophia Chang, "Funds Are Coming For Small Businesses, But Some Will Have To Wait", April 1, 2020, *Gothamist*, available at: https://gothamist.com/news/funds-are-coming-small-businesses-some-will-have-wait.

[76] Id.

[77] *See* NYC Department of Small Business Services "Assistance & Guidance for Businesses Impacted Due to Novel Coronavirus", available at: https://www1.nyc.gov/site/sbs/businesses/covid19-business-financial-assistance.page (last viewed on April 24, 2020). Page has since been updated to reflect the fact that the programs are no longer being offered, but materials had not been translated as of March 20, 2020. See also a tweet publicizing an SBS guide in languages other than English from NYC Mayor's Office of Immigrant Affairs, March 24, 2020, available at: https://twitter.com/NYCImmigrants/status/1242484476057354240. Re-tweeted by NYC Department of Small Business Services on March 24, 2020, available at: https://twitter.com/nyc_sbs.

[78] NYC Department of Small Business Services "NYC Employee Retention Grant Program", (as of April 2, 2020), available at: https://www1.nyc.gov/nycbusiness/article/nyc-employee-retention-grant-program. Program information is still available at: https://www.paulweiss.com/media/3979874/nyc2-employee-retention-grant-program-summary_4-6.pdf.

In the midst of struggles and confusion regarding SBS's grant and loan programs, the programs abruptly ended without much notice.[79] This may have closed the door on many small businesses who had intended to apply for the programs, but did not have a chance to do so, or were not yet able to gather the necessary documentation materials. Some users claimed that SBS failed to communicate the most basic aspect of the programs: that funds were limited and that time was of the essence.[80] One user termed it a "lottery" and expressed frustration that business decisions were made based upon the programs' promises.[81] According to one SBS loan processer, the programs may have had as much as half a billion dollars in loan requests, and only $20 million in funds to provide.[82] Despite getting at least 600 applications for the SBS loan program, the funding may have only been enough to provide loans for 250 to 400 businesses.[83] Council Speaker Corey Johnson has called for an expansion of the program from a maximum of $75,000 per business to $250,000 per business.[84]

*Department of Consumer and Worker Protection*

In addition to financial assistance through loans and grants, City support for small businesses has also come through  DCWP. DCWP licenses more than 75,000 businesses in more than 50 industries and enforces key consumer protection, licensing, and workplace laws that

---

[79] Rachel Holliday Smith "Half a Billion Dollars' Needed from $20M City Small Business Loan Pool", April 16, 2020, *The City*, available at: https://thecity.nyc/2020/04/de-blasios-usd20m-nyc-small-business-loan-program-falls-short.html.
[80] Id.
[81] Id.
[82] Id.
[83] Id.
[84] New York City Council "New York City Council Speaker Corey Johnson Proposes $12 Billion Relief Plan to Help Workers and Businesses Impacted by COVID-19", March 19, 2020, available at: https://council.nyc.gov/press/2020/03/19/1888/.

apply to countless more. DCWP regularly plays a key role in city initiatives involving small businesses.

As the COVID-19 crisis continues to unfold, DCWP has announced several measures to assist small businesses by alleviating various regulatory burdens. In March 2020, DCWP ceased collecting sidewalk café consent fees that were due and, shortly thereafter, commenced refunds for restaurants that had already paid their fees.[85] Though sidewalk café consent fees vary depending on the size, location, and whether it is enclosed or unenclosed, they typically cost restaurants thousands of dollars.[86] There are approximately 1,400 sidewalk cafes in the City, representing an annual revenue of between $11 million to $12 million. Most restaurants pay these fees in a four-part installment plan over a one-year period at a monthly interest rate of 1.5 percent.[87] Three installments remain for the year, and restaurants could still be required to pay the remaining installments if the state of emergency is lifted. Given the significant losses many restaurants have suffered; some restaurants may not have the ability to cover any remaining payments that come due.

DCWP also extended renewal deadlines for most licenses that expire during the pendency of the state of the emergency.[88] The Mayor subsequently issued an emergency executive order

---

[85] Mayor's Executive Emergency Order No. 105, April 4, 2020, available at:
https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-105.pdf.
[86] See NYC Department of Consumer Affairs "2018 consent fees for street space: For unenclosed and small unenclosed sidewalk café", available at: https://www1.nyc.gov/assets/dca/downloads/pdf/businesses/Sidewalk-Cafe-Consent-Fees.pdf.
[87] R.C.N.Y. §2-45.
[88] NYC Department of Consumer Affairs "Does your consumer affairs license expire February through June 2020?", available at: https://www1.nyc.gov/assets/dca/downloads/pdf/businesses/Does-Your-Consumer-Affairs-License-Expire-February-through-June-2020.pdf.

extending deadlines for all city licenses and permits.[89] However, some city agencies still appear to be requiring businesses to renew their permits, creating some confusion in certain industries.[90]

The declaration of the state of emergency has also led to an uptick of businesses and workers alike reaching out to DCWP for assistance with regard to the City's worker protection laws, including the Fair Workweek Law, Paid Safe and Sick Leave Law, and the Temporary Schedule Change Law. In response, DCWP published guidance specific to addressing employer obligations during the COVID-19 state of emergency. The guidance also included information on state and federal employment laws.[91] However, some industries have criticized the Mayor for not suspending enforcement of the Fair Workweek and Temporary Schedule Change Laws entirely. The National Restaurant Association argued that businesses cannot afford premium pay for last minute schedule changes, which are necessary in light of employees falling ill and sudden decreased staffing needs.[92]

On March 17, 2020, DCWP promulgated an emergency Rule under the City's Consumer Protection Law that makes price gouging illegal for any personal or household good or any service that is needed to prevent or limit the spread of or treat COVID-19.[93] Leading up to the state of emergency, the agency received almost 1,000 complaints of price gouging on items such

---

[89] Mayor's Emergency Executive Order No. 107, § 4, April 14, 2020, available at: https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-107.pdf.
[90] See e.g. Department of Buildings, "COVID-19 Response: Administrative Enforcement (AEU) and Licensing Units Updates," available at: https://www1.nyc.gov/assets/buildings/pdf/covid19_aeu-licensing_response_sn.pdf.
[91] NYC Department of Consumer and Worker Protection "Update about Workplace Laws as NYC Seeks to Stop the Spread of the New Coronavirus (COVID-19)", available at: https://www1.nyc.gov/assets/dca/downloads/pdf/workers/Complying-with-NYC-Workplace-Laws-During-COVID-19.pdf.
[92] Letter from Keith Stephenson, National Restaurant Association, to Mayor de Blasio (March 20, 2020), on file.
[93] NYC Department of Consumer Affairs "Department of Consumer and Worker Protection issues emergency rule that makes price gouging illegal for any item or service needed to limit the ppread of Coronavirus", March 17, 2020, available at: https://www1.nyc.gov/site/dca/media/pr031720-DCWP-Emergency-Rule-Price-Gouging-Illegal.page.

as hand sanitizer and masks. By April 8th, the Department had received more than 7,200 complaints and had issued 2,700 violations.[94] While many of these violations have been issued to egregious offenders,[95] some businesses have raised concerns that DCWP is failing to address price gouging in the supply chain by wholesalers.[96]

### 3.  Industry Challenges During COVID-19

The various governmental approaches to support small businesses during this crisis have provided some measure of relief for small business owners and their employees; however, there are range of outstanding issues that continue to make operating a business during the pandemic particularly difficult. The vast array of departments and agencies have made it difficult for businesses to navigate and, as discussed, there have been numerous limitations to the government programs that are further compounded by the technological and language barriers that some small business owners also face. This comes on top of the other issues that small businesses have to navigate during this crisis range from trying to make rent and payroll, finding suppliers and moving retail online, to negotiating insurance claims, delivery commissions, and bank loans.

### a.  Debt Collection

Businesses who experience a drop in revenue due to COVID-19 may face added legal pressure to meet financial obligations. Commercial leases may contain provisions imposing

---

[94] Priscilla DeGregory "NYC files law suits against stores for coronavirus price gouging", April 8, 2020, *New York Post,* available at: https://nypost.com/2020/04/08/nyc-files-lawsuits-against-stores-for-coronavirus-price-gouging/.

[95] Andrew Denney " Coronavirus in NY: UES pharmacy fines for drastically marking up face masks", March 25, 2020, available at: https://nypost.com/2020/03/25/coronavirus-in-ny-ues-pharmacy-fined-for-drastically-marking-up-face-masks/.

[96] Priscilla DeGregory "NYC files law suits against stores for coronavirus price gouging", April 8, 2020, New York Post, available at: https://nypost.com/2020/04/08/nyc-files-lawsuits-against-stores-for-coronavirus-price-gouging/.

personal liability on the tenant for non-payment of rent. These personal guarantees can make the business, which may otherwise shield the owner from liability due to its corporate structure, answerable in a court of law for any unpaid debts or damages.[97] Similarly, businesses who have signed confessions of judgment in exchange for cash advances may be on the hook for unpaid debts. In these documents, businesses sign away their legal right to contest claims against them for non-payment, and these documents may be used to effectuate a judgment against them.[98] Although the dangers of this practice were brought to light last year during an examination of taxi medallion loans,[99] and New York State subsequently banned the practice for out-of-state debtors,[100] the issue remains for New York City businesses.[101] Without recourse, landlords and debt servicers may resort to threats, which continues to make protecting businesses from harassment an important issue as the City grapples with the effects of COVID-19.

b. <u>Third-Party Delivery Platforms</u>

Before the spread of COVID-19, online food delivery services were becoming an increasingly popular way for consumers to dine. Online restaurant orders have grown 23 percent

---

[97] *See* NYC Department of Small Business Services "Comprehensive Guide to Commercial Leasing in New York City" available at: https://www1.nyc.gov/assets/sbs/downloads/pdf/about/reports/commercial-lease-guide-accessible.pdf, p. 22; and Hayden Field "5 most common red flags entrepreneurs should know before signing a commercial real estate lease in New York", June 6, 2019, *Entrepreneur*, available at: https://www.entrepreneur.com/article/334848.
[98] *See* Rachel Holliday Smith, Christine Chung, Gabriel Sandoval and Josefa Velasquez "New York businesses struggle with debts after reform left them out", February 25, 2020, *The City*, available at: https://thecity.nyc/2020/02/ny-businesses-struggle-with-debts-after-reform-shut-them-out.html.
[99] Brian M. Rosenthal "'They were conned': How reckless loans devastated a generation of taxi drivers", May 19, 2019, *The New York Times*, available at: https://www.nytimes.com/2019/05/19/nyregion/nyc-taxis-medallions-suicides.html.
[100] *See* N.Y. CPLR § 3218; Dan M. Clark "NY Gov. Cuomo Signs Measure to Curb Creditors' Abuse of Confessions of Judgment", August 30, 2019, *Law.com*, available at: https://www.law.com/newyorklawjournal/2019/08/30/ny-gov-cuomo-signs-measure-to-curb-creditors-abuse-of-confessions-of-judgment/.
[101] Rachel Holliday Smith, Christine Chung, Gabriel Sandoval and Josefa Velasquez "New York businesses struggle with debts after reform left them out", February 25, 2020, *The City*, available at: https://thecity.nyc/2020/02/ny-businesses-struggle-with-debts-after-reform-shut-them-out.html.

annually from 2013 to 2017,[102] and UBS predicts that by 2030, the global online food ordering market could grow to $365 billion, up from $35 billion in 2018.[103] A 2019 survey conducted by the National Restaurant Association found that 60 percent of consumers ordering takeout used a third-party delivery service.[104]

The four major third-party delivery platforms utilize different commission models to remain profitable in this overcrowded and competitive marketplace. Grubhub is the largest platform operating in New York City, accounting for over 60 percent of meal delivery sales.[105] Grubhub charges restaurants a 10 percent fee for all orders delivered by a Grubhub courier,[106] and charges restaurants higher commissions in exchange for increased visibility on their platform.[107] Uber Eats and DoorDash account for around 17 percent of City meal delivery sales.[108] Uber Eats charges restaurants a 30 percent fee for orders delivered by Uber couriers,[109] and a 15 percent fee for orders that are made on the Uber Eats website but delivered by a

---

[102] The NPD Group "Feeding the growing appetite for restaurant apps,
https://www.npd.com/wps/portal/npd/us/news/infographics/2018/feeding-the-growing-appetite-for-restaurant-apps/.
[103] USB Investment Bank "Is The Kitchen Dead?", June 18, 2018, available at:
https://www.ubs.com/global/en/investment-bank/in-focus/2018/dead-kitchen.html
[104] Hudson Riehle and Melissa Wilson "Harnessing Technology to Drive Off-Premises Sales", 2019, National Restaurant Association, available at:
https://www.restaurant.org/Downloads/PDFs/Research/research_offpremises_201910.
[105] Kathryn Roethel Rieck, "Which company is winning the food delivery war?", April 21, 2020, *Second Measure*, available at: https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/
[106] Grubhub "Grubub Pricing", available at:  https://learn.grubhub.com/wp-content/uploads/2018/08/Grubhub_One-Pager_Pricing-Overview_Final.pdf
[107] David Yaffe-Bellany, "New York vs. Grubhub", September 30, 2019, *The New York Times*, available at:
https://www.nytimes.com/2019/09/30/business/grubhub-seamless-restaurants-delivery-apps-fees.html
[108] Kathryn Roethel Rieck, "Which company is winning the food delivery war?", April 21, 2020, *Second Measure*, available at: https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/.
[109] Julie Littman "Delivery by the numbers: How top third-party platforms compare", October 3, 2019, *Restaurant Dive*, available at: https://www.restaurantdive.com/news/delivery-by-the-numbers-how-top-third-party-platforms-compare/564279/.

restaurant's delivery worker.[110] Doordash charges restaurants promotion fees, marketing fees, and subscription fees.[111] Similar to Grubhub, DoorDash charges restaurants a commission fee "in exchange for promoting and featuring the Merchant…on the DoorDash Platform," and for all orders delivered by DoorDash couriers (know as "Dashers").[112] Postmates accounts for just under five percent of delivery sales in the City.[113] Under the Postmates model, restaurants do not pay a fee for using Postmates couriers, but pay a standard commission fee "based on the contract signed" by the restaurant upon joining the platform.[114]

While third-party delivery platforms provide restaurants a unique marketing and delivery service, small businesses have accused these platforms of acting in a predatory manner. In 2018, a class action lawsuit was filed in the United States District Court for the Eastern District of Philadelphia against Grubhub. According to the plaintiff, an owner of a local Indian restaurant chain, Grubhub had committed wrongful conduct, including, but not limited to, "withholding commissions for sham telephone food orders, depriving more than 80,000 restaurants of revenues and profits that rightfully belong to them."[115] Another class action lawsuit was filed in the United States District Court for the Southern District of New York in April 2020 against all four third-party delivery platforms.[116] The lawsuit alleges that all third-party delivery platforms have violated U.S. antitrust law by requiring restaurants to charge delivery customers and dine-in

---

[110] Uber "How do fees work on Uber Eats", available at: https://help.uber.com/ubereats/article/how-do-fees-work-on-uber-eats?nodeId=65d229e2-a2b4-4fa0-b10f-b36c9546cf55

[111] DoorDash "Terms of Service - United States DoorDash Merchants", available at: https://help.doordash.com/merchants/s/terms-of-service-us?language=en_US#payment-fees-and-taxes

[112] Id.

[113] Id.

[114] Postmates "Payment FAQ", available at: https://support.postmates.com/merchant/articles/226618648-article-Payment-FAQ

[115] *TIFFIN EPS, LLC v. GrubHub, Inc*, 2:18-cv-05630-PD, Complaint, p. 2l.5., available at: https://cdn.vox-cdn.com/uploads/chorus_asset/file/16288289/Grubhub_lawsuit.pdf.

[116] The four platforms are Grubhub Inc. (which also does business as Seamless), DoorDash Inc., Postmates Inc., and Uber Technologies, Inc., which is the parent company of Uber Eats.

customers the same price for each menu items, while imposing "exorbitant" fees of 10 percent to 40 percent of revenue to process delivery orders.[117] The City Council has conducted two oversight hearings this legislative session on the rise of third-party delivery platforms in the City.[118] During these hearings, small businesses and advocates have highlighted issues they experienced from using these platforms, including high commission fees, restrictions on menu pricing, and erroneous fees they are forced to pay from consumer phone calls that do not result in orders.[119]

Due to the stay-at-home orders issued across the country and the inability for customers to dine-in at restaurants, third-party delivery services are likely to further increase their profits during the COVID-19 pandemic. Governor Cuomo's Executive Order 202.6 limited restaurants to take-out and delivery only,[120] leading restaurants to join third-party delivery platforms to maintain business. The administration issued an updated COVID-19 related guidance sheet for business owners on March 16th, advising restaurants and food services to join food delivery platforms.[121] The issues restaurants typically experience while operating on a third-party delivery platform are likely to become more common as restaurants shift their businesses to this model.

---

[117] Jonathan Stempel, "Grubhub, DoorDash, Postmates, Uber Eats are sued over restaurant prices amid pandemic" April 13ᵗ, 2020, *Reuters*, available at: https://www.reuters.com/article/us-health-coronavirus-food-delivery-laws-idUSKCN21V2C1.
[118] New York City Council "Oversight – The Changing Market for Food Delivery", June 6, 2019, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=705634&GUID=0BC09A92-5DB4-496B-90EE-BF75DF712131&Options=info|&Search=; and New York City Council "Oversight: 'Ghost Kitchens' 'Virtual Restaurants' and the Future of the Restaurant Industry", February 6, 2020, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=759804&GUID=B42220FE-417A-484C-B7CF-51725F784A71&Options=info|&Search=
[119] Id.
[120] Empire State Development "Guidance for determining whether a business enterprise is subject to a workforce reduction under recent executive orders," available at: https://esd.ny.gov/guidance-executive-order-2026
[121] Flatiron District "Guidance for business owners – Updated March 16, 2020: Tips for addressing changes in customer behavior due to the Novel (New) Coronavirus (COVID19)", available at:

Third-party platforms have acknowledged that high commission fees are unsustainable for restaurants during COVID-19. During an interview with MarketWatch, Grubhub CEO Matt Maloney was asked whether restaurants could survive on deliveries alone during the pandemic. Maloney responded, "Not in the long-term. The industry isn't large enough for all restaurants to survive just on delivery, but they can survive for a matter of weeks potentially. It's definitely not a long-term solution to bridge across restaurants."[122] Maloney meanwhile acknowledged that the pandemic has led Grubhub to expand their business: "We've received 10 to 15 times our usual new restaurant leads. This interest has led to four to five times more new restaurant go-lives compared to our previous record-breaking day."[123]

While third-party delivery platforms may profit from the global health pandemic, they have implemented COVID-19 related programs to help benefit local businesses. Grubhub announced a program deferring commission fees for impacted independent restaurants to increase restaurants' cash flow.[124] Uber Eats has waived the delivery fee on all orders for over 100,000 independent restaurants.[125] Doordash is reducing commission fees by 50 percent for over 150,000 restaurants in the U.S., Canada and Australia,[126] and offering new restaurants the

---

https://www.flatirondistrict.nyc/uploaded/files/COVID-19/COVID-19%20Guidance%20for%20Business%20Owners%20-%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.pdf

[122] Elisabeth Buchwald, "Restaurants can't survive on delivery alone, says Grubhub CEO Matt Maloney", March 23, 2020, *MarketWatch*, available at: https://www.marketwatch.com/story/restaurants-wont-be-able-to-survive-on-delivery-only-says-grubhub-ceo-matt-maloney-2020-03-21

[123] Id.

[124] Grubhub "COVID-19 Impact, Delivery Safety and Supporting Local Restaurants", March 18, 2020, available at: https://blog.grubhub.com/health-and-safety

[125] Uber "A company that moves people is asking you not to move", available at: https://www.uber.com/au/en/coronavirus/?_ga=2.191168042.1434603565.1587677057-1914018361.1587677057

[126] DoorDash "The latest on Coronavirus (COVID-19)", available at:  https://get.doordash.com/covid-updates#businesses

ability to join their platform and pay zero commissions for 30 days.[127] Postmates is temporarily waiving commission fees for businesses in the San Francisco Bay Area, LA, Sacramento and Detroit.[128]

While each platform has developed programs to aid restaurants during the pandemic, it remains unclear whether these campaigns are providing restaurants relief. Grubhub announced a program in early April, Supper for Support, offering customers $10 off on orders over $30 every day from 5:00-9:00 pm.[129] However, Grubhub continued to charge restaurants during this promotion "on the non-discounted product rather than the amount paid by the customer."[130]

To ensure restaurants can remain profitable throughout the pandemic while operating on these platforms, municipalities sought to cap the fees third-party delivery platforms charge restaurants. Chicago City Council Member Scott Waguespack introduced an ordinance making it unlawful for a third-party food delivery service to charge a covered establishment a fee that totals more than five percent of per online order.[131] Mayor London Breed of San Francisco similarly issued a mayoral declaration making it unlawful for a third-party delivery service to charge restaurants "a fee per online order for the use of its service that totals more than 15 percent of the purchase price of such online order."[132] The Mayor's cap will remain in effect

---

[127] DoorDash "COVID-19 merchant financial assistance", available at:
https://help.doordash.com/merchants/s/article/COVID-19-Merchant-Financial-Assistance?language=en_US
[128] Postmates "Postmates Coronavirus (COVID-19) Response", March 16 2020, available at:
https://blog.postmates.com/postmates-coronavirus-covid-19-response-94eef5b1bbc2
[129] Grubhub "Supper for support", April 3, 2020, available at: https://blog.grubhub.com/support-local-restaurants
[130] Grubhub "Grubhub for restaurants", available at:  https://lp.grubhub.com/supper-for-support-terms-conditions-4-15-f/
[131] City of Chicago Office of the City Clerk "Ordinance", April 22, 2020, available at:
https://files.constantcontact.com/58ea69d3101/e58501f0-4a68-4625-b689-f14570f4cde6.pdf
[132] Office of the Mayor San Francisco, London N. Breed "Ninth Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated February 25, 2020", available at:
https://sfmayor.org/sites/default/files/NinthMayoralSupplement.pdf

through the remainder of the local emergency, or until businesses are permitted to reopen for dine-in services, whichever comes first.[133] The Hospitality Alliance has similarly been calling for New York City to cap commission fees on third-party delivery platforms to 10 percent per order.[134]

## III.   CONCLUSION

While many of SBS and DCWP's COVID-19 initiatives are positive steps serving the interests of consumers, workers and small businesses, this hearing represents an opportunity for both departments and industry representatives alike to address concerns and potential areas for improvement. The Council seeks to gain a better understanding of the issues City small business owners are experiencing as a consequence of COVID-19, and how effective the Administration has been in offering support. The Council is also interested in learning about what the future small business landscape may look like in the City after social restrictions are lifted, and what types of relief will be necessary to ensure this sector of the City's economy remains vibrant.

## IV.   **BILL ANALYSIS**

### **Int. No. 1846**

Int. 1846 requires food service establishments, retail stores and other commercial businesses that deliver goods, to disclose to consumers such establishments' gratuity policies for delivery personnel. Section one of this bill adds a new Subchapter 7 to Title 20 of Administrative Code titled "Delivery Workers." New section 20-1271 sets out the definitions. New section 20-

---

[133] Eve Batey "San Francisco Emergency Order says delivery apps must cap restaurant fees at 15 percent", April 10, 2020, *Eater San Francisco*, available at: https://sf.eater.com/2020/4/10/21216546/san-francisco-delivery-cap-doordash-grubhub-uber-eats-postmates-caviar.

[134] *See* NYC Hospitality Alliance "Restaurant rescue & save nightlife plan", available at: https://thenycalliance.org/information/updated-9-point-mitigation-and-support-plan (last viewed on April 27, 2020).

1272 requires food, retail and commercial establishments to disclose the following information in relation to delivery worker gratuities prior to the consumer placing an order:

1.      The proportion or fixed amount of each gratuity that is distributed to the worker who delivered the goods purchased, including whether such gratuity is required to be shared with other workers;

2.      How gratuities are distributed to delivery workers, whether immediately or otherwise, and in what form of payment, whether cash or otherwise; and

3.      The amount of each gratuity that is used to compose each delivery worker's base wage.

Where an establishment employs the services of a third-party delivery company, they are required to provide the abovementioned information to such company to ensure compliance with the gratuity disclosure requirements of this bill. New section 20-1273 prohibits establishments and third-party delivery companies from providing inaccurate information in gratuity disclosures. To prove accuracy and compliance, subdivision b of this section requires establishments and third-party delivery companies to maintain records demonstrating the gratuity disclosure was provided to the customer and the content of such disclosure. Such records must be maintained for three years for each customer transaction. The civil penalties for any violations of this bill are between $250 and $1,000 for each violation. Each calendar day during which a person is found to have violated this subchapter shall be considered a separate violation, even if such violation affects more than one customer. Civil penalties are recoverable at the Office of

Administrative Trials and Hearings. If enacted, this local law would take effect 180 days after it becomes law.

### Int. No. 1895

This bill would require DOHMH to establish rules requiring restaurants to package food destined for delivery in tamper-evident packaging to decrease the risk that food is tampered with before reaching the customer. Violations would be punishable by a civil penalty of up to $100 for each violation.

### Int. No. 1896

This bill would require that third-party delivery services, entities that provide restaurants with online order and delivery services, disclose to consumers any commission, fees, or other monetary payments imposed on participating restaurants, except that restaurants may decline the disclosure of such information. Violations would be punishable by a civil penalty of not less than $250 nor more than $1000 for each violation, which would accrue daily.

### Int. No. 1897

This bill would require third-party delivery services, entities that provide restaurants with online order and delivery services, to obtain a license in order to provide their service to restaurants in the City. Application terms and fees would be determined by DCWP. The department could refuse to issue or renew a license, or suspend or revoke a license, if the third-party food delivery services violates the conditions of the license, including engaging in misleading advertising or deceptive trade practices. Third-party delivery services who violate license conditions may also be subject to penalties determined by the department.

### Int. No. 1898

The bill would prohibit third-party delivery services, entities that provide restaurants with online order and delivery services, from charging restaurants for telephone orders with customers that did not actually occur. Violations would be punishable by a civil penalty of not less than $250 and not more than $1,000 for each prohibited action that affects a restaurant.

**Int. No. 1907**

This bill would prohibit third-party delivery services, entities that provide restaurants with online order and delivery services, from limiting the menu prices restaurants may charge on food and beverage orders. Violations of this prohibition would result in civil penalties of not less than $1,000 per violation. Civil penalties would accrue for each day in violation.

**Proposed Int. No. 1908-A**

This bill would prohibit third-party food delivery services, entities that provide restaurants with online order and delivery services, from charging restaurants more than a 10% fee per order for the use of their service. During a declared emergency, when a state of emergency is in effect in the city and restaurants are prohibited from offering food for consumption on-premises, third-party food delivery services would be limited to charging restaurants delivery fees only, up to a total of 10% per order. All other types of fees, such as advertising or processing fees, would be prohibited. Violations of these prohibitions would be subject to civil penalties of not less than $1,000 per violation, with the amount determined by the Commissioner of DCWP. Civil penalties would accrue for each day and for each restaurant charged a fee in violation of a prohibition.

**Int. No. 1914**

This bill provides additional commercial tenant protections in the law by making threatening a commercial tenant based on their status as a COVID-19 impacted business or person a form of harassment punishable by a civil penalty of $10,000 to $50,000.

### Int. No. 1916

Int. 1916 requires the Department of Consumer Affairs to waive all sidewalk café fees, including consent fees, that are due on or after January 1, 2020 until December 31, 2020. If fees were already paid, the Department is required to issue a full refund. If enacted, this bill takes effect immediately and is retroactive to January 1, 2020.

### Int. No. 1921

Int. 1921 creates a new subchapter 22 in chapter 5 of the Administrative Code titled "THIRD-PARTY FOOD DELIVERY SERVICES." This bill requires food service establishments and third-party food delivery services to display online the sanitary inspection letter grades assigned by the Department of Health and Mental Hygiene. New section 20-845 sets out the relevant definitions. New section 20-846 requires third-party delivery services to display sanitary inspection letter grades whenever a food service establishment appears in a list of results from which a consumer may select. The letter grades are also required to be displayed whenever a food service establishment's menu or menu items are displayed to a consumer. Food service establishments that operate their own websites, mobile applications or other internet-based services that offer online ordering capabilities are also required to display their sanitary inspection grades. New section 20-847 creates a penalty of $100 per violation. Each failure to display a letter grade assigned to a food service establishment in violation of this subchapter shall be considered a separate violation. If enacted, this bill takes effect one year after it becomes law.

-39-

**Int. No. 1932**

This bill would prohibit the enforcement of personal liability provisions in commercial leases or rental agreements involving a COVID-19 impacted tenant where the default or other trigger event happened during the COVID-19 state of emergency. Threatening to or attempting to enforce such a provision would also be considered a form of harassment.

**Preconsidered Int. No. ____**

This bill requires the Mayor to publish guidance online listing all City licenses and permits covered by section four of his Emergency Executive Order Number 107 issued on April 14, 2020. Such guidance would confirm exactly which licenses are not required to be renewed during the COVID-19 state of emergency. This bill also requires the Mayor to publish guidance on renewal dates and procedures for such licenses and permits no later than 14 days before the state of emergency ends, with no renewal deadlines until 90 days after the emergency has ended.

**Res. No. 1049**

This resolution calls upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans. Confessions of judgment, which are documents some businesses sign as a condition of receiving a business loan, can be used by a lender to obtain a judgement against a borrower for any unpaid debts without any further notification. Although New York State has recently prohibited the use of confessions of judgment for out-of-state businesses, they may still be used for New York businesses, and confessions of judgment have been filed in New York courts since the onset of the COVD-19 outbreak, when some businesses have been unable to make loan payments due to closures or decreases in revenue.

-40-

Int. No. 1846

By Council Members Torres, Chin and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to the disclosure of gratuity policies for delivery workers

Be it enacted by the Council as follows:

Section 1. Chapter 12 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 7 to read as follows:

Subchapter 7

Delivery Workers

§ 20-1271 Definitions. As used in this subchapter, the following terms have the following meanings:

Base wage. The term "base wage" means money paid, whether by the hour or otherwise, to a delivery worker by an employer in exchange for work performed, not including gratuities, bonuses, allowances, shift differentials or other monetary payments that may contribute to such worker's total compensation.

Covered establishment. The term "covered establishment" means any food service establishment, retail store or other commercial business that offers, in a single commercial transaction over the internet, whether directly or through a third-party application, the sale and same-day delivery of goods to customers from one or more retail locations within the city.

Food service establishment. The term "food service establishment" means any establishment inspected pursuant to the restaurant grading program established pursuant to subdivision a of section 81.51 of the health code of the city of New York.

-41-

Goods. The term "goods" means any merchandise, product or ware offered for sale, including but not limited to food products, groceries, meals and non-food products.

Gratuity. The term "gratuity" means a sum of money, paid voluntarily by a customer, when or after ordering goods for delivery from a covered establishment, in addition to the price of such goods and other mandatory charges such as taxes and fees, where such voluntary sum is paid through a third-party application that allows the customer to choose the amount of the voluntary sum and that refers to the sum as a gratuity or tip, or by another, similar name that would suggest to a reasonable person that the sum, or a substantial portion thereof, would be received by the worker delivering the order in addition to the worker's base wage.

Third-party application. The term "third-party application" means a person who provides a website, mobile application or other internet service that allows a customer to order goods from a covered establishment and arranges for the delivery of those goods to such customer.

§ 20-1272 Disclosure. a. Before or at the same time as a gratuity is solicited from a customer in connection with the purchase and delivery of a good from a covered establishment through a third-party application, such third-party application shall disclose the following information, in plain and simple language and in a conspicuous manner, to such customer about its policies and the policies of such covered establishment regarding gratuities for delivery workers in connection with the delivery of purchased goods:

1. The proportion or fixed amount of each gratuity that is distributed to the worker who delivered the goods purchased, including whether such gratuity is required to be shared with other workers;

2. How gratuities are distributed to delivery workers, whether immediately or otherwise,

and in what form of payment, whether cash or otherwise; and

3. The amount of each gratuity that is used to compose each delivery worker's base wage.

b. Each covered establishment shall provide such disclosure to each third-party application through which such goods are being offered for delivery to customers to allow compliance with subdivision a.

§ 20-1273 Accuracy of representations; recordkeeping. a. No covered establishment or third-party application may misstate or misrepresent any information in the disclosure required by section 20-1272.

b. Such covered establishments and third-party applications shall maintain records demonstrating the provision of such disclosure to customers, and substantiating all the information therein, for three years from the date of each customer's transaction.

§ 20-1274 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter is liable for a civil penalty of not less than $250 nor more than $1,000 for each violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings. For the purposes of this section, each calendar day during which a person is found to have violated this subchapter shall be considered a separate violation, even if such violation affects more than one customer.

§ 2. This local law takes effect 180 days after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

SJ

LS #10612
6/20/19

Int. No. 1895

By Council Members Gjonaj, Kallos, Constantinides, Brannan, Perkins, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to food service establishments' packaging of food for delivery

Be it enacted by the Council as follows:

Section 1. Chapter 15 of title 17 of the administrative code of the city of New York is amended by adding a new section 17-1508 to read as follows:

§ 17-1508 Packaging food for delivery. a. For purposes of this section, the term "tamper-evident packaging" means a package having one or more indicators or barriers to entry which, if breached or missing, can reasonably be expected to provide visible evidence to consumers that tampering has occurred.

b. The department shall by rule establish standards and procedures to decrease the risk that food packaged by food service establishments for delivery is tampered with in transit. Such procedures may include, but need not be limited to, requiring food service establishments to use tamper-evident packaging when packaging food for delivery.

c. The department shall by rule establish civil penalties for any food service establishment that does not meet the standards established pursuant to this section and the rules promulgated hereunder. Such penalties shall not exceed $100 for each violation.

§ 2. This local law takes effect 120 days after it becomes law, except that the department shall take such measures as are necessary for implementation of section 17-1508 of the administrative code of the city of New York, as added by section one of this local law, including the promulgation of rules, before such date.

SG

-45-

LS # 13268
1/14/20

Int. No. 1896

By Council Members Gjonaj, Kallos, Constantinides, Brannan, Gibson Perkins and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to the disclosure of commissions charged by third-party food delivery services

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

Third Party Food Delivery Services

§ 20-845 Definitions. As used in this subchapter, the following terms have the following meanings:

Covered establishment. The term "covered establishment" means any food service establishment that offers, in a single commercial transaction over the internet, whether directly or through a third-party application, the sale and same-day delivery of food to customers from one or more retail locations within the city.

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Commission disclosure. a. When a final price is disclosed to a customer, and before a transaction occurs, for the purchase and delivery food from a covered establishment

through a third-party delivery service, such third-party delivery service shall disclose to such customer, in plain and simple language and in a conspicuous manner, any commission, fee, or any other monetary payment imposed by the third-party delivery service on such covered establishment as a term of a contract or agreement between the parties in connection with the covered establishment utilizing the third-party delivery service.

b. Any covered establishment may decline to disclose to customers the commission charged by a third-party delivery service. If a covered establishment has declined to have such a commission disclosed to customers, the requirement of subdivision a of this section shall not apply with respect to such covered establishment.

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter is liable for a civil penalty of not less than $250 nor more than $1,000 for each violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings. For the purposes of this section, each calendar day during which a person is found to have violated this subchapter shall be considered a separate violation, even if such violation affects more than one customer.

§ 20-848 Injunctive relief. In addition to any other relief available by law, the commissioner may seek any relief available under article 63 of the civil practice law and rules in a proceeding against any person alleged to be in violation of any provision of this subchapter.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

JK
LS #11768
2/21/2020

Int. No. 1897

By Council Members Gjonaj, Constantinides, Brannan, Gibson, Perkins, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to the licensing of third-party food delivery services

Be it enacted by the Council as follows:

Section 1. Chapter 2 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 36 to read as follows:

Subchapter 36

Third-Party Food Delivery Services

§ 20-565 Definitions. As used in this subchapter, the following terms have the following meanings:

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-565.1 License required. It shall be unlawful for any person to operate a third-party food delivery service without first having obtained a license thereof issued pursuant to this subchapter.

§ 20-565.2 Application and fees. a. An application for any license required under this subchapter or for any renewal thereof shall be made to the commissioner in such form or manner as the commissioner shall prescribe by rule.

b. There shall be a biennial fee for a license to operate a third-party food delivery service. Such fee shall be no less than $500, as determined by the commissioner.

§ 20-565.3 Issuance of license. A license to operate a third-party food delivery service shall be granted in accordance with the provisions of this subchapter and any rules promulgated by the commissioner thereunder. The commissioner may refuse to issue to an applicant any license required under this subchapter based upon a determination made after due notice and opportunity to be heard that such applicant has engaged in conduct which would constitute a basis for license suspension or revocation as set forth in section 20-565.4 of this subchapter.

§ 20-565.4 Renewal, suspension and revocation of license. In addition to any powers of the commissioner and not in limitation thereof, the commissioner may, after due notice and opportunity to be heard, refuse to renew any license required under this subchapter and may suspend or revoke such license if the person holding such license, or, where applicable, any of its officers, principals, directors, members, managers, employees, or stockholders owning more than ten percent of the outstanding stock of the corporation, has been found to have:

a. Repeated violation of any provision of this subchapter or any rules promulgated thereunder; or

b. Made a material false statement or concealed a material fact in connection with the filing of any application pursuant to this subchapter or have been found to have committed fraud or misrepresentation upon a customer; or

c. Engaged in untrue, misleading or deceptive advertising, or deceptive or unconscionable trade practices as described in chapter five of title twenty of this code and any rules promulgated thereunder; or

d. Not paid, within the time permitted by law, any civil penalty or judgment duly imposed pursuant to the provisions of this subchapter or any rule promulgated thereunder.

§ 20-565.5 Penalties and enforcement. a. Any person who violates, or causes another person to violate, a provision of this subchapter or any rule promulgated pursuant to such subchapter, shall be guilty of an offense punishable by fines and civil penalties imposed by the commissioner.

b. A proceeding to recover any civil penalty pursuant to this section shall be commenced by the service of a summons or notice of violation which shall be returnable to the office of administrative trials and hearings.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

SJ
LS #13018
2/21/20

Int. No. 1898

By Council Members Gjonaj, Moya, Constantinides, Brannan, Rosenthal, Gibson, Perkins, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to telephone order charges by third-party food delivery services

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

Third Party Food Delivery Services

§ 20-845 Definitions. As used in this subchapter, the following terms have the following meanings:

Covered establishment. The term "covered establishment" means any food service establishment that offers, in a single commercial transaction over the internet, whether directly or through a third-party application, the sale and same-day delivery of food to customers from one or more retail locations within the city.

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Telephone orders. No third-party delivery service may charge a commission from a covered establishment for a telephone order that does not result in an actual transaction

between the covered establishment and a customer during such telephone call, or that exceeds the established commission rate between the third-party delivery service and covered establishment.

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter is liable for a civil penalty of not less than $250 nor more than $1,000 for each violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings. For the purposes of this section each instance in which a prohibited action affects a covered establishment shall constitute a separate violation.

§ 20-848 Injunctive relief. In addition to any other relief available by law, the commissioner may seek any relief available under article 63 of the civil practice law and rules in a proceeding against any person alleged to be in violation of any provision of this subchapter.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

JK
LS #12594
2/21/2020

Int. No. 1907

By Council Members Moya, Gjonaj, Brannan, Rosenthal, Gibson, Perkins, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to prohibiting third-party food delivery services from limiting the purchase prices covered establishments may charge on food and beverage orders

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

Third-Party Food Delivery Services

§ 20-845 Definitions. For the purposes of this subchapter, the following terms have the following meanings:

Covered establishment. The term "covered establishment" means any food service establishment that offers, in a single commercial transaction over the internet, whether directly or through a third-party food delivery service, the sale and same-day delivery of food to customers from one or more retail locations within the city.

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Online order. The term "online order" means an order placed by a customer through a platform provided by a third-party food delivery service.

Purchase price. The term "purchase price" means the menu price of a food order from a covered establishment. Such term therefore excludes taxes, gratuities and any other fees that may make up the total cost to the customer of a food order.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Prohibited limits on purchase prices. It shall be unlawful for third-party food delivery services to, by contract or any other means, impose on covered establishments any requirement regarding the purchase prices that covered establishments may charge for food or beverages ordered through such application or through any other means.

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter shall be subject to a civil penalty of not less than $1,000 per violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings. For the purposes of this section, each calendar day during which a person is found to have violated this subchapter shall be considered a separate violation, even if such violation affects more than one covered establishment.

§ 20-848 Injunctive relief. In addition to any other relief available by law, the commissioner may seek any relief available under article 63 of the civil practice law and rules in a proceeding against any person alleged to be in violation of any provision of this subchapter.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

SJ

LS #9163
2/21/20

Proposed Int. No. 1908-A

By Council Members Moya, Gjonaj, Kallos, Brannan, Rosenthal, Gibson, Ayala, Van Bramer, Rivera, Cohen, Perkins and Louis

A Local Law to amend the administrative code of the city of New York, in relation to fees charged by third-party food delivery services

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

Third-Party Food Delivery Services

§ 20-845 Definitions. For the purposes of this subchapter, the following terms have the following meanings:

Covered establishment. The term "covered establishment" means any food service establishment that offers, in a single commercial transaction over the internet, whether directly or through a third-party food delivery service, the sale and same-day delivery of food to customers from one or more retail locations within the city.

Declared emergency. The term "declared emergency" means any time during which a state of emergency has been declared by the president of the United States, the governor of the state of New York or the mayor of the city, and is in effect in the city, and during which all food service establishments in the city are prohibited from providing food for consumption on-premises.

Delivery fee. The term "delivery fee" means a fee charged by a third-party food delivery service to cover the cost of providing a covered establishment with a service that delivers food from such establishment to customers. The term does not include any other fee that may be

charged by a third-party food delivery service to a covered establishment, such as fees for listing or advertising the covered establishment on the third-party food delivery service platform or fees related to processing the online order.

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Online order. The term "online order" means an order placed by a customer through a platform provided by a third-party food delivery service.

Purchase price. The term "purchase price" means the menu price of an online order. Such term does not include taxes, gratuities and any other fees that may make up the total cost to the customer of an online order.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Service fees. a. It shall be unlawful for a third-party food delivery service to charge a covered establishment a fee for the use of their service that totals more than 10% of the purchase price of each online order.

b. Subdivision a of this section notwithstanding, during a declared emergency it shall be unlawful for any third-party food delivery service to charge a covered establishment a delivery fee that totals more than 10% of the purchase price of each online order, and it shall be unlawful during such declared emergency for a third-party food delivery service to charge a covered establishment any fee for the use of their services other than a delivery fee.

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter shall be subject to a civil penalty of not less than $1,000 per violation, with the exact amount determined by a rule promulgated by the commissioner of consumer affairs. Violations shall accrue on a daily basis for each day and for each covered establishment charged a fee in violation of this subchapter or any rule promulgated pursuant to this subchapter. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings.

§ 20-848 Injunctive relief. In addition to any other relief available by law, the commissioner may seek any relief available under article 63 of the civil practice law and rules in a proceeding against any person alleged to be in violation of any provision of this subchapter.

§ 2. This local law takes effect immediately.

SJ
LS #9163
4/20/20 10:30 AM

Int. No. 1914

By Council Members Adams, the Speaker (Council Member Johnson), Kallos, Van Bramer, Chin, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Paragraph 11 of subdivision a of section 22-902 of the administrative code of the city of New York, as added by local law number 185 for the year 2019, is amended to read as follows:

11. threatening a commercial tenant based on (i) such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence[,] or status as a victim of sex offenses or stalking, or (ii) the commercial tenant's status as a person or business impacted by COVID-19, or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period; provided that for the purposes of this paragraph:

(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

(b) a person is "impacted by COVID-19" if such person experienced one or more of the following situations:

(1) the person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of the person's household was diagnosed with COVID-19;

(3) the person was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

(4) a member of the person's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) the person was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(6) the person was unable to reach their place of business because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(7) the person became the breadwinner or major supporter for a household because the head of the household died as a direct result of COVID-19;

(8) the person's business is closed as a direct result of the COVID-19 state disaster emergency; and

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issue by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019 and February 2020;

§ 2. This local law takes effect immediately.

LS # 14764
4/20/20 4:37PM

Int. No. 1916

By Council Members Cohen, Chin, Powers, Yeger, Louis and Ayala

A Local Law in relation to requiring the department of consumer affairs to waive and refund all fees related to sidewalk cafe licenses that are due on or after January 1, 2020 until December 31, 2020, and providing for the repeal of such provision upon the expiration thereof

Be it enacted by the Council as follows:

Section 1. Emergency waiver of sidewalk cafe fees. a. Notwithstanding any inconsistent provision of law or rule, the department of consumer affairs shall waive all fees related to sidewalk cafe licenses issued pursuant to subchapter 6 of chapter 2 of title 20 of the administrative code, including, but not limited to, revocable consent fees, for which the payment due date falls on or after January 1, 2020 until December 31, 2020. The department shall issue refunds for all sidewalk cafe license fees paid by licensees on or after January 1, 2020 until December 31, 2020.

b. This section does not apply to new sidewalk cafe license applications filed with the department of consumer affairs on or after March 30, 2020.

c. The department shall have the authority to promulgate any rules necessary to administer the provisions of this section.

§ 2. This local law takes effect immediately and is retroactive to and deemed to have been in effect as of January 1, 2020.

§ 3. This local law expires and is deemed repealed on January 1, 2021.

BAM
LS #14484
3/31/2020 6:08 p.m.

Int. No. 1921

By Council Members Gjonaj, Louis, Powers, Cohen and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to requiring third-party food delivery services and food service establishments to display sanitary inspection letter grades online

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

THIRD-PARTY FOOD DELIVERY SERVICES

§ 20-845 Definitions. For the purposes of this subchapter, the following terms have the following meanings:

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Letter grade. The term "letter grade" means the sanitary inspection grade issued by the department of health and mental hygiene pursuant to section 81.51 of the health code of the city of New York.

Menu. The term "menu" means a written list of the names or images of a food item or items and the prices of such items, that is the primary writing of a food service establishment from which a person makes an order selection.

Menu item. The term "menu item" means any food item that a customer may select for purchase from a food service establishment.

-65-

Online order. The term "online order" means an order placed by a customer through a platform provided by a third-party food delivery service or a food service establishment.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Display of letter grades required. a. Every third-party food delivery service shall display the letter grade assigned to each food service establishment in a conspicuous manner to persons using such service. Such letter grade shall be displayed adjacent to the name of each food service establishment whenever such name appears on a list of food service establishments that can be selected by a person to make an online order. Such letter grade shall also be displayed conspicuously whenever the menu or menu items of a food service establishment are displayed for selection by persons using such service.

b. Every food service establishment that operates a website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from such food service establishment, shall conspicuously and prominently post its letter grade on such website, mobile application or other internet service.

c. The department may establish by rule additional requirements relating to the display of such letter grades.

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter shall be subject to a civil penalty of not less than $100

per violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter

may be brought in any tribunal established within the office of administrative trials and hearings

or within any agency of the city designated to conduct such proceedings. For the purposes of this

section, each failure to display a letter grade assigned to a food service establishment in violation

of this subchapter shall be considered a separate violation.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

BAM
LS #13959
2/28/20

Int. No. 1932

By Council Member Rivera, the Speaker (Council Member Johnson), Kallos, Van Bramer, Rosenthal, Chin and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Chapter 10 of title 22 of the administrative code of the city of New York is amended by adding a new section 22-1004 to read as follows:

§ 22-1004. Personal liability provisions in commercial leases. a. Definitions. For the purposes of this section, the following terms have the following meanings:

COVID-19. The term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV.

COVID-19 period. The term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive.

COVID-19 state disaster emergency. The term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020.

Impacted by COVID-19. The term "impacted by COVID-19" means:

1. With respect to an individual, that the individual experienced one or more of the following situations:

(a) the individual was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

(b) a member of the individual's household was diagnosed with COVID-19;

(c) the individual was providing care for a family member or a member of the individual's household who was diagnosed with COVID-19;

(d) a member of the individual's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work;

(e) the individual was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(f) the individual was unable to reach their place of business because of the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

 (g) the individual became the breadwinner or major support for a household because the head of the household died as a direct result of COVID-19; or

 (h) the individual's business closed as a direct result of the COVID-19 state disaster emergency.

2. With respect to a business, that (i) the business was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issued by the governor or mayor during the COVID-19 period or (ii) the revenues of the business during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in

2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019, and February 2020.

Personal liability provision. The term "personal liability provision" means, with respect to a commercial lease or other rental agreement involving real property and to which a business is a party as tenant, a term that provides for an individual to become wholly or partially personally liable for an obligation of such business arising under such lease or agreement upon the occurrence of a default or other event.

b. No personal liability provision of a commercial lease or other rental agreement involving real property and to which a business impacted by COVID-19 is a party as tenant may be enforced against an individual where the default or other event allowing for such enforcement occurs during the COVID-19 period.

§ 2. Subdivision a of section 22-902 of the administrative code of the city of New York, as amended by local law number 185 for the year 2019, is amended to read as follows:

a. A landlord shall not engage in commercial tenant harassment. Except as provided in subdivision b of this section, commercial tenant harassment is any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property, and (ii) includes one or more of the following:

1. using force against or making express or implied threats that force will be used against a commercial tenant or such tenant's invitee;

2. causing repeated interruptions or discontinuances of one or more essential services;

3. causing an interruption or discontinuance of an essential service for an extended period of time;

4. causing an interruption or discontinuance of an essential service where such interruption or discontinuance substantially interferes with a commercial tenant's business;

5. repeatedly commencing frivolous court proceedings against a commercial tenant;

6. removing from a covered property any personal property belonging to a commercial tenant or such tenant's invitee;

7. removing the door at the entrance to a covered property occupied by a commercial tenant; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying a key to the new lock to the commercial tenant occupying the covered property;

8. preventing a commercial tenant or such tenant's invitee from entering a covered property occupied by such tenant;

9. substantially interfering with a commercial tenant's business by commencing unnecessary construction or repairs on or near covered property; [or]

10. engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business;

11. threatening a commercial tenant based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence, status as a victim of sex offenses or stalking;

12. requesting identifying documentation that would disclose the citizenship status of a commercial tenant, an invitee of a commercial tenant or any person seeking entry to the covered property in order to patronize such commercial tenant; [or]

13. unreasonably refusing to cooperate with a tenant's permitted repairs or construction activities[.]; or

14. threatening to or implementing a personal liability provision that is not enforceable pursuant to section 22-1004 of the code; provided that for the purposes of this paragraph:

(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

(b) a person is "impacted by COVID-19" if such person experienced one or more of the following situations:

(1) the person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of the person's household was diagnosed with COVID-19;

(3) the person was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

(4) a member of the person's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) the person was unable to reach the person's place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(6) the person was unable to reach the person's place of business because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(7) the person became the breadwinner or major support for a household because the head of the household died as a direct result of COVID-19; or

(8) the person's business is closed as a direct result of the COVID-19 state disaster emergency;

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issued by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019, and February 2020; and

(d) the term "personal liability provision" has the meaning set forth in section 22-1004 of the code;

§ 3. This local law takes effect immediately.

LS # 14817
4/20/20 4:31PM

Preconsidered Int. No.

By Council Member Matteo

A Local Law in relation to requiring the mayor to issue a guidance on license and permit renewal deadline extensions, and requiring that no such licenses or permits be required to be renewed within 90 days after the COVID-19 emergency has ended, and providing for the repeal of such provision upon the expiration thereof

Be it enacted by the Council as follows:

Section 1. Emergency extension of renewal deadlines for licenses and permits due to COVID-19. a. The mayor or his designee shall publish guidance that includes a list of all city licenses and permits covered by section 4 of the mayor's emergency executive order number 107 for the year 2020. Such guidance shall be published online no later than 14 days after the enactment of this local law.

b. The mayor or his designee shall update the guidance published pursuant to subdivision a to include information about renewal procedures and deadlines for such licenses and permits and shall publish such updated guidance online no later than 14 days prior to the end of the emergency declared by the mayor's executive order number 98 for the year 2020, as such order may be extended. A failure to publish such guidance shall not limit the mayor's authority to end the emergency declared by the mayor's executive order number 98 for the year 2020, as such order may be extended.

c. No city license or permit covered by section 4 of the mayor's emergency executive order number 107 for the year 2020 shall be required to be renewed during the COVID-19 state of emergency and for a period of 90 days after such emergency has ended.

d. For the purposes of this local law, the term "COVID-19 state of emergency" means the period of time from the effective date of this local law until the state of emergency declared

-75-

pursuant to the governor's executive order number 202 for the year 2020, as such order may be extended, and the mayor's executive order number 98 for the year 2020, as such order may be extended, have both expired with respect to the city of New York.

§ 2. This local law takes effect immediately and expires and is deemed repealed 100 days after the COVID-19 state of emergency has ended.

BAM
LS #14873
4/23/2020 12:00 p.m.

Res. No. 1049

Resolution calling upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans.

By the Public Advocate (Mr. Williams) and Council Members Levin, Cabrera and Louis

Whereas, There are currently 11,938 active taxicab medallions operating in New York City; and

Whereas, Many medallions owners take out business loans to finance the purchase of their vehicles; and

Whereas, Some of the business loans that medallion owners take out include a document known as a "confession of judgment," where the borrower waives the right to due process if the debt is unpaid and there is a dispute; and

Whereas, Once signed, a "confession of judgment" can be used by the lender to obtain a judgment against the borrower without any further notification; and

Whereas, The Federal government currently has prohibitions on the use of confessions of judgment in consumer loans, but not for business loans; and

Whereas, The United States Federal Trade Commission has recently called for the elimination of confessions of judgment in small business lending contracts; and

Whereas, Many states have also banned confessions of judgment practices for business loans, but New York State does not prohibit them; and

Whereas, A recent New York Times expose revealed that "confession of judgment" documents may have been used by lenders to influence some borrowers applying for taxi medallion loans; and

Whereas, According to the New York Times, some of the documents they reviewed show that some medallion borrowers admitted to defaulting on their loans even before the loan was approved; and

Whereas, A "confession of judgment" can be used by banks and other lending institutions as a document in predatory lending practices, a loophole that should be closed; now, therefore, be it

Resolved, That the Council of the City of New York calls upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans.

LS 9151, 9153, 11030, 11060
RA
7/18/2019