UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>The City of New York, a municipal entity, Bill de Blasio, as Mayor of the City of New York, Louise Carroll, Commissioner of New York City Department of Housing Preservation & Development, and Jonnel Doris, Commissioner of New York City Department of Small Business Services,<br><br>*Defendants.* | 20 CV 05301 (RA) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTIVE AND DECLARATORY RELIEF**

**JAMES E. JOHNSON**
Corporation Counsel of the
City of New York
Attorney for Defendants
100 Church Street, 4th Floor
New York, NY 10007
Tel: (212) 356-2187
Fax: (212) 356-1148

August 12, 2020

Sheryl Neufeld,
Mark Muschenheim,
Pamela A. Koplik,
Carlos Fernando Ugalde Alvarez,
*of Counsel*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF RELEVANT FACTS ................................................................... 2

      A.     New York State's Response to the COVID-19 Pandemic ....................................................................................... 2

           1.     Ordered Closures and Shutdowns of Businesses and Entities ......... 3

           2.     The Suspension of Certain Landlord and Mortgagee Remedies ..... 4

           3.     The Emergency Rent Relief Act of 2020 ....................................... 6

      B.     The Challenged Laws ............................................................................ 6

           1.     Residential Harassment & the Residential Harassment Law .......... 6

           2.     Commercial Harassment & The Commercial Harassment Law ...... 7

           3.     The Guaranty Law ......................................................................... 8

ARGUMENT ........................................................................................................... 9

      POINT I ................................................................................................................ 9

THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY AS A MATTER OF LAW. ........................................................ 9

      A.     The Harassment Laws Do Not Violate Plaintiffs' First Amendment Rights. ......................................................................... 9

           1.     The Harassment Laws Do Not Implicate Plaintiffs' First Amendment Rights; They Neither Proscribe nor Inhibit Lawful Demands for Rent Due or Lawful Eviction Threats. ..................... 10

           2.     Even Assuming Arguendo that the Harassment Laws Implicate Plaintiffs' First Amendment Rights, They Pass Constitutional Muster. ....................................................................................... 14

      B.     The Guaranty Law Does Not Violate the Constitution's Contract Clause. .............................................................................. 17

1.    The Guaranty Law Does Not Substantially Impair Plaintiffs' Contracts. ...................................................................................18

2.    The City Had a Significant and Legitimate Public Interest in Enacting the Guaranty Law. ........................................................21

3.    The Guaranty Law Is a Reasonable and Necessary Means to Achieve the City's Significant and Legitimate Public Interest......23

C.    The Challenged Laws Are Not Preempted by New York State Law. ........................................................................................ 25

1.    The City's Power to Enact the Challenged Laws and to Act during a Disaster Emergency Is Established in State Law. ...........26

2.    The Challenged Laws Are Consistent with New York State Law and, Therefore, Are Not Conflict-Preempted. ......................28

3.    The New York State Legislature Has Not Field-Preempted the Response to COVID-19 or Landlord-Tenant Issues......................30

D.    The Harassment Laws Provide Sufficient Notice and Clear Standards and, Therefore, Do Not Violate Any Due Process Right........................................................................... 31

POINT II ......................................................................................................................... 32

PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF SHOULD BE DENIED IN ITS ENTIRETY. ......................................................... 32

A.    Plaintiffs Cannot Establish a Likelihood of Success on the Merits. ........................................................................................ 33

B.    Plaintiffs Have Failed to Show the Requisite Irreparable Harm.............................................................................. 33

C.    A Preliminary Injunction Is Not in the Public Interest....................................................................................................... 34

POINT III......................................................................................................................... 34

PLAINTIFFS' REQUEST FOR DECLARATORY RELIEF SHOULD BE DENIED IN ITS ENTIRETY......................................................................... 34

CONCLUSION................................................................................................................. 35

## TABLE OF AUTHORITIES

**Cases**                                                                              **Pages**

*1000 Northern of N.Y. Co. v. Great Neck Med. Assocs.*,
   7 A.D.3d 592 (2d Dep't 2004) ..................................................................................5

*A.B.C. Home Furnishings v. Town of E. Hampton*,
   947 F. Supp. 635 (E.D.N.Y. 1996) ..........................................................................10

*Able v. United States*,
   44 F.3d 128 (2d Cir. 1995)........................................................................................33

*Allied Structural Steel Co. v. Spannaus*,
   438 U.S. 234 (1978)..................................................................................18, 21, 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................9

*Ass'n of Surrogates & Supreme Court Reporters v. New York*,
   940 F.2d 766 (2d Cir. 1991)......................................................................................23

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008)..................................................................................................12

*Buffalo Teachers Fed'n v. Tobe*,
   464 F.3d 362 (2d Cir. 2006).......................................................18, 21, 22, 23, 24, 25

*Bush v. Vera*,
   517 U.S. 952 (1996)....................................................................................................9

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of N. Y.*,
   447 U.S. 557 (1980)............................................................................................14, 15

*Chambers v. Time Warner*,
   282 F.3d 147 (2d Cir. 2002)........................................................................................9

*City of N.Y. v. N.Y. State Div. of Hous. & Cmty. Renewal*,
   97 N.Y.2d 216 (2001) ...............................................................................................30

*Consolidated Edison Co. of N.Y. v Dep't of Envtl. Conservation*,
   71 N.Y.2d 186 (1988) ...............................................................................................30

*Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*,
   2020 N.Y. App. Div. LEXIS 3302 (1st Dep't June 4, 2020)...................................26

*Dickerson v. Napolitano*,
   604 F.3d 732 (2d Cir. 2010)................................................................................31, 32

**Cases**                                                                              **Pages**

*DJL Rest. Corp. v. City of New York*, 96 N.Y.2d 91 (2001) ....................................................27, 30

*Doran v. Salem Inn, Inc.*, 422 U.S. 922  (1975) ...........................................................34

*Dunn v. 583 Riverside Dr LP*,
    117 N.Y.S.3d 524 (Civ. Ct. N.Y. Cnty. Dec. 30, 2019) ........................................11

*Elmsford Apt. Assocs., LLC v. Cuomo*,
    No. 4062-20, 2020 U.S. Dist. LEXIS 115354 (S.D.N.Y. June 29, 2020) ..............5, 19, 20, 24

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*,
    459 U.S. 400 (1982)...............................................................18, 21, 23, 25

*Eric M. Berman, P.C. v City of N.Y.*,
    25 N.Y.3d 684 (2015) .............................................................................26

*Expressions Hair Design v. Schneiderman*,
    803 F.3d 94 (2d Cir. 2015)..........................................................................9

*Farrell v. Burke*,
    449 F.3d 470 (2d Cir. 2006)........................................................................32

*Florida Bar v. Went for It, Inc.*,
    515 U.S. 618 (1995)............................................................................14, 15

*Garcia v. N.Y.C. Dep't of Health & Mental Hygiene*,
    31 N.Y.3d 601 (2018) .........................................................................26, 28, 30

*Goldberg v. Danaher*,
    599 F.3d 181 (2d Cir. 2010).........................................................................9

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..............................................................................31

*Gross v FBL Fin. Servs.*,
    557 U.S. 167 (2009)..............................................................................12

*Hill v. Colorado*,
    530 U.S. 703 (2000)..............................................................................32

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)...............................................................................9

*Home Bldg. & Loan Asso. v. Blaisdell*,
    290 U.S. 398 (1934)..........................................................................22, 24, 25

**Cases**                                                                          **Pages**

*Int'l Bhd. of Teamsters v. E. Conference of Teamsters,*
   160 F.R.D. 452 (S.D.N.Y. 1995) ....................................................................34

*JSG Trading Corp. v. Tray-Wrap, Inc.,*
   917 F.2d 75 (2d Cir. 1990).............................................................................32

*Klein & Co. Futures Inc. v. Bd. of Trade of N.YC.,*
   464 F.3d 255 (2d Cir. 2006)...........................................................................26

*Kolari v. N.Y. Presbyterian Hosp.,*
   455 F.3d 118 (2d Cir. 2006)...........................................................................26

*N.Y. Pet Welfare Ass'n v. City of N.Y.,*
   850 F.3d 79 (2d Cir. 2017).............................................................................27

*N.Y. State Ass'n for Affordable Hous. v. Council of the City of N.Y.,*
   141 A.D.3d 208 (1st Dep't 2016) ..................................................................29

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
   272 F.3d 104 (2d Cir. 2001)...........................................................................14

*New York State Club Assn. v. City of N.Y.,*
   69 N.Y.2d 211 (1987), *aff'd* 487 U.S. 1 (1988)......................................28, 30

*One Wythe LLC v. Elevations Urban Landscape Design Inc.,*
   2020 N.Y. Misc. LEXIS 1477, 67 Misc. 3d 1207(A)
   (Civ. Ct. Kings Cnty. April 17, 2020) ...........................................................13

*People v. Nelson,*
   69 N.Y.2d 302 (1987) ....................................................................................31

*Perez v. Decker,*
   No. 10683-18, 2019 U.S. Dist. LEXIS 170185 (S.D.N.Y. Sep. 30, 2019).............34

*Plautz v. Eidlin-Quere,*
   Index No. 650770/10, 2011 N.Y. Misc. LEXIS 6782
   (Sup. Ct. N.Y. Cnty. July 13, 2011)..............................................................11

*Plaza Health Labs., Inc. v. Perales,*
   878 F.2d 577 (2d Cir. 1989)...........................................................................33

*Powell v. Fannie Mae,*
   No. 1359-16, 2017 U.S. Dist. LEXIS 15720 (S.D.N.Y. Feb. 2, 2017)..................35

**Cases**                                                                                                 **Pages**

*Prometheus Realty v. City of N.Y.*,
   Index No. 111132/08, 2009 N.Y. Misc. LEXIS 4247
   (Sup. Ct. N.Y. Cnty. July 31, 2009), *aff'd* 80 A.D.3d 206 (1st Dep't 2010)..........................13

*Renton v. Playtime Theatres*,
   475 U.S. 41, 106 S. Ct. 925 (1986)................................................................................15

*Safeco Ins. Co. of America v. Burr*,
   551 U.S. 47 (2007).......................................................................................................12

*Sanitation and Recycling Indus., Inc. v. City of N.Y.*,
   107 F.3d 985 (2d Cir. 1997).................................................................................18, 21

*In re Subway-Surface Supervisors Ass'n v. N.Y.C. Transit Auth.*
   *("Subway- Surface")*, 44 N.Y.2d 101 (1978).......................................................22

*Sullivan v. Nassau Cnty. Interim Fin. Auth.*,
   959 F.3d 54 (2d Cir. 2020)....................................................................................18, 23

*Tinnerello & Sons, Inc. v. Stonington*,
   141 F.3d 46 (2d Cir. 1998)..........................................................................18, 24, 25

*Tucker Anthony Realty Corp. v. Schlesinger*,
   888 F.2d 969 (2d Cir. 1989).........................................................................................33

*Turner Broad. Sys., Inc. v. Federal Communications Comm'n*,
   520 U.S. 180 (1997).....................................................................................................17

*Twentieth Century Assocs., Inc. v. Waldman*,
   294 N.Y. 571 (1945)....................................................................................................25

*United States Trust Co. v. New Jersey*,
   431 U.S. 1 (1977)..................................................................................................18, 24

*United States v. Missouri P. R. Co.*,
   278 U.S. 269 (1929).....................................................................................................13

*United States v. Nadi*,
   996 F.2d 548 (2d Cir. 1993).........................................................................................31

*United States v. Raines*,
   362 U.S. 17 (1960).......................................................................................................31

*United States v. Salerno*,
   481 U.S. 739 (1987).....................................................................................................31

**Cases**                                                                                      **Pages**

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)..............................................................................17

*White River Amusement Pub, Inc. v. Town of Hartford,*
    481 F.3d 163 (2d Cir. 2007)..................................................................15

*Wisdom Import Sales Co. v. Labatt Brewing Co.,*
    339 F.3d 101 (2d Cir. 2003)..................................................................33

*Zorn v. Howe,*
    276 A.D.2d 51 (3d Dep't 2000)............................................................29

**Statutes**

15 U.S.C. § 9058 ........................................................................................4

CARES Act § 3513 ...................................................................................19

Admin. Code § 22-902............................................................7, 8, 9, 11, 12, 13

Admin. Code § 22-903.......................................................................7, 11, 17

Admin. Code § 22-1005........................................................8, 9, 18, 19, 25

Admin. Code. § 27-2004........................................................6, 7, 11, 12

Admin Code § 27-2005..........................................................................6, 17

Admin. Code § 27-2115............................................................................17

N.Y. Banking Law § 9-x..............................................................................5

N.Y. General Obligations Law § 7-103......................................................5

N.Y. General Obligations Law § 7-107......................................................5

N.Y. General Obligations Law § 7-108......................................................5

N.Y. Multiple Dwelling Law § 4.................................................................5

N.Y. Municipal Home Rule Law § 10...................................................26, 27

N.Y. Municipal Home Rule Law § 11..........................................................27

**Statutes**                                                                                  **Pages**

N.Y. Real Property and Proceedings Law § 711 ................................................................5

N.Y. Real Property Law § 238-a ......................................................................................5

N.Y. Executive Law § Article 29-a .................................................................................2

N.Y. Laws 1978, ch. 640 ................................................................................................27

N.Y. Laws 1978, ch. 640, § 1 ...................................................................................27, 30

N.Y. Laws 2020, ch. 125, § 1 ..........................................................................................6

N.Y. Laws 2020, ch. 127, § 1 ..........................................................................................5

N.Y. Laws 2020, ch. 127, § 2 ..........................................................................................5

## PRELIMINARY STATEMENT

The two motions before the Court relate to Plaintiffs' challenges to three local laws passed by the New York City Council ("City Council") and approved by the Mayor over two months ago in the midst of the unprecedented crisis caused by the 2019 coronavirus ("COVID-19") pandemic.  As part of its effort to respond to the economic devastation brought on by this pandemic, the City Council passed Local Law No. 53-2020 (the "Commercial Harassment Law"), Local Law No. 55-2020 (the "Guaranty Law"), and Local Law No. 56-2020 (the "Residential Harassment Law") (collectively, the "Challenged Laws").  The Commercial Harassment Law and Residential Harassment Law (collectively, the "Harassment Laws") protect commercial and residential tenants from harassment by their landlords due to COVID-19.  In turn, the Guaranty Law protects owners of businesses that have been subject to certain operational restrictions during the pandemic and that have defaulted on their lease obligations between March 7, 2020 and September 30, 2020.  In such situations, it renders a personal liability provision in a commercial lease or other rental agreement unenforceable where the guarantor is a natural person and a non-tenant.  Without such protection, a landlord would be able to pursue that person's assets and lifesavings.  While providing basic protections to New Yorkers and small businesses, the Challenged Laws mitigate the adverse impacts of this crisis.

First, Plaintiffs' challenge to the constitutionality of the Harassment Laws as an unlawful restriction on speech—and as unconstitutionally vague—is based entirely on their complete mischaracterization of both local laws.  Plaintiffs allege that these laws prevent them from engaging in routine communications, such as lawful demands for rent.  However, Plaintiffs' interpretation is at odds with the laws' plain language, purpose, and legislative history, including the explicit text of the Commercial Harassment Law's committee report.  Simply put, the Harassment Laws do not prohibit landlords from demanding unpaid rent (even if such demand is

accompanied by a threat of eviction).  There can be no finding of harassment unless the threat is *based on* COVID-19 status and causes (or is intended to cause) a tenant to vacate property or to surrender or waive any rights in relation to such property.  Plaintiffs' attempts to challenge these laws are based on strained interpretations and mischaracterizations and do not state a claim.

Likewise, the Guaranty Law does not violate the Contract Clause.  Any contractual impairment caused by the Guaranty Law is not substantial as it is limited in time and scope and, further, sufficiently preserves Plaintiffs' contractual rights.  In an attempt to have this law stricken, Plaintiffs downplay the gravity of the crisis and the legitimate purpose that this law serves.  In the face of the emergency conditions created by the pandemic, the City Council made a reasonable and necessary determination that would protect struggling businesses and the economy as a whole.

Finally, Plaintiffs' claims that the Challenged Laws are preempted fail.  A simple reading of each of the State laws and gubernatorial executive orders relied upon by Plaintiffs indicates that there is no direct conflict with the Challenged Laws.  Furthermore, the implication that the State preempted the field of COVID-19 response not only is contrary to every recent directive issued by the Governor, but entirely disregards the constitutional and statutory framework that delegates police power to localities such as the City of New York.

### STATEMENT OF RELEVANT FACTS

**A.    New York State's Response to the COVID-19 Pandemic**

To address the public health emergency caused by COVID-19, the State has taken a number of legislative and executive measures that are relevant to this action.  The first of these was the State's March 3, 2020 enactment of Chapter 23 of the Laws of New York of 2020, which, *inter alia*, amended N.Y. Executive Law § 29-a to enable the Governor to issue directives necessary to cope with a disaster emergency and to expand his existing authority to temporarily

suspend laws, rules or orders during such emergencies. *See* Ex. A at 2-3.[1]  Following such enactment, the Governor, by Executive Order ("EO") No. 202 dated March 7, 2020, declared a state disaster emergency until September 7, 2020,[2] and since then, has issued 56 additional executive orders, which, *inter alia*, have temporarily suspended and modified certain laws and regulations. *See* Ex. B.

      1.      Ordered Closures and Shutdowns of Businesses and Entities

To reduce the spread of COVID-19, the Governor issued a number of directives requiring the closure of "non-essential" businesses, as well as the total or partial limitation of certain operations.  On March 16, 2020, the Governor ordered the closure of gyms, fitness centers and movie theaters, and the total cessation of on-premises service at restaurants and bars (except for service for off-premise consumption).  Ex. C (EO No. 202.3).  While gyms, fitness centers and movie theaters remain subject to such closure order, restaurants and bars were allowed to serve food or beverages in outdoor spaces in the City starting on June 22, 2020.  *See* Exs. Q-R (EO Nos. 202.38 & 202.39).  In addition to these restrictions, a myriad of other businesses were forced to close.  *See* Ex. D (EO No. 202.5) (ordering the closure of certain indoor retail shopping malls); Ex. F (EO No. 202.7) (ordering the closure of all barbershops, hair salons, tattoo or piercing parlors and related personal care services).[3]  By March 22, 2020 at 8:00

---

[1] Unless otherwise noted, exhibits referenced herein pertain to the exhibits annexed to the "Declaration of Carlos F. Ugalde Alvarez in Support of Defendants' Motion to Dismiss and in Opposition to Plaintiffs' motion for Preliminary Injunctive and Declaratory Relief" dated August 12, 2020 ("Ugalde Decl.").

[2] EO No. 202 states that the Governor "authorize[d] all necessary State agencies to take appropriate action to **assist** local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety."  Ex. B (emphasis added).

[3] In New York City, the malls covered by EO No. 202.5 have not reopened, barbershops and hair salons reopened on June 22, 2020, *see* Exs. O-P (EO Nos. 202.35 & 202.36), and tattoo or piercing parlors and related personal care services reopened on July 6, 2020, *see* Ex. S (EO Nos. 202.41).

p.m., the Governor had required all non-essential businesses or entities[4] to reduce the in-person workforce at any work locations by 100%.  Ex. G (EO No. 202.8).[5]   These shutdowns had devastating impacts on businesses and individuals, and the State and City governments responded accordingly.

2.        The Suspension of Certain Landlord and Mortgagee Remedies

Since mid-March, courts have suspended eviction proceedings, pending eviction orders, court-ordered auctions, residential foreclosure proceedings, and residential evictions in New York City.  *See* Exs. AA-DD.[6]  Furthermore, on March 20, 2020, the Governor prohibited the enforcement of evictions and foreclosures in connection with residential and commercial property for a period of ninety days.  *See* Ex. G (EO No. 202.8).  While this directive has since expired, the Governor ordered another enforcement moratorium—as well as a prohibition on the commencement of eviction, foreclosure or nonpayment proceedings[7]—between June 20, 2020 and August 19, 2020 with respect to property "owned or rented by someone that is eligible for

---

[4] This directive did not apply to essential businesses or entities, which include essential health care operations, essential infrastructure, essential manufacturing including food processing and pharmaceuticals, essential retail including grocery stores and pharmacies, trash collection, mail, banks and related financial institutions, construction, and services needed to ensure the continuing operation of government agencies and provide for the health, safety and welfare of the public.  Ex. E (EO No. 202.6).

[5] In New York City, these restrictions no longer applied to: (a) "Phase One" industries by June 8, 2020; (a) "Phase Two" industries by June 22, 2020; (a) "Phase Three" industries by July 6, 2020; and "Phase Four" industries by July 20, 2020.  *See* Exs. M, O & S-T (EO Nos. 202.31, 202.35, 202.41 & 202.45); Ugalde Decl. ¶¶ 16 n. 3, 18 n.4 & 22 n.5.

[6] However, as of June 20, 2020 and June 24, 2020, Housing Court is holding virtual conferences in certain eviction and foreclosure proceedings, respectively.  *See* Exs. BB-CC.

[7] The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which was enacted on March 27, 2020, also prohibited the filing of new eviction cases based on non-payment of rent, as well as the charging fees for non-payment, by housing providers participating in certain federal housing rental programs from March 27, 2020 to July 25, 2020.  *See* 15 U.S.C. § 9058.

unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic." *See* Ex. K (EO No. 202.28).[8]

       As of June 17, 2020, residential mortgagees cannot commence foreclosure actions based on non-payment, unless they are in compliance with N.Y. Banking Law § 9-x.[9]  *See* N.Y. Banking Law § 9-x(4); *see also* Ex. EE.  Moreover, as of June 30, 2020, courts cannot issue warrants of eviction or judgments of possession for non-payment of rent due during the COVID-19 period against residential tenants or occupants who suffered a financial hardship during that period.[10]  Ex. GG (N.Y. Laws 2020, ch. 127, § 2(1)).[11]  Nonetheless, courts may still award monetary judgments for rent due and owing in a summary proceeding.  *Id.* § 2(3).[12]

       Notwithstanding the foregoing, these executive orders did not suspend a landlord's or mortgagee's "right to initiate a common law breach of contract action in the New York State Supreme Court to redress a tenant's [or mortgagor's] failure to perform its payment obligations under his or her lease or mortgage."  *Elmsford Apt. Assocs., LLC v. Cuomo*, No. 4062-20, 2020 U.S. Dist. LEXIS 115354, at *12 (S.D.N.Y. June 29, 2020) (McMahon, J.) (citing *1000 Northern of N.Y. Co. v. Great Neck Med. Assocs.*, 7 A.D.3d 592 (2d Dep't 2004)).

---

[8] This directive no longer applies to residential tenants and mortgagors because it was superseded, in part, by Chapters 112, 126, and 127 of the New York State Laws of 2020.  *See* Ex. U (EO No. 202.48).

[9] N.Y. Banking Law § 9-x(2)(b) requires certain regulated financial institutions to grant mortgage forbearances with respect to certain mortgagors, which demonstrate financial hardship due to COVID-19 during the period of March 7, 2020 through September 4, 2020 (*see* Ex. Y (EO No. 202.55)), for up to 360 days.

[10] Currently, the COVID-19 period consists of March 7, 2020 through September 4, 2020 (*see* Ex. Y (EO No. 202.55)).  Ex. GG (N.Y. Laws 2020, ch. 127, § 1).

[11] Plaintiffs refer to Chapter 127 as the "Tenant Safe Harbor Act" or "TSHA."

[12] The Governor also temporarily modified and suspended a number of laws relating to landlords and tenants: (a) N.Y. Real Property and Proceedings Law § 711, N.Y. Real Property Law § 232-a, and N.Y. Multiple Dwelling Law § 4(8)-(9) (relating to the creation of landlord-tenant relationships in connection with the provision of temporary housing); (b) N.Y. General Obligations Law §§ 7-103, 7-107 and 7-108 (relating to the application of security deposit funds to rental payment obligations); (c) Real Property Law § 238-a(2) (prohibiting the collection of any payment, fee or charge for late payment of rent occurring during the time period from March 20, 2020 through August 20, 2020).  *See* Exs. J & K (EO Nos. 202.16 & 202.28).  These modifications remain in effect until September 4, 2020.  *See* Ex. Y (EO No. 202.55).

3.      The Emergency Rent Relief Act of 2020

On June 17, 2020, the Legislature enacted Chapter 125, which is known as the "Emergency Rent Relief Act of 2020" and provides for "an interim residential rent relief program to support households impacted by the COVID-19 pandemic."  Ex. FF (N.Y. Laws 2020, ch. 125, § 1).  Under such program, landlords receive rental subsidies in connection with applicants determined to be eligible households during the coverage period.  *Id.*

**B.      The Challenged Laws**

The Challenged Laws were passed by the City Council by an overwhelming majority, signed by the Mayor and took effect on May 26, 2020.  *See* Ugalde Decl. ¶¶ 55-56. Despite their relatively quick adoption, the City Council received thousands of pages of written testimony, reviewed surveys, articles, and reports, held six public hearings, and heard hours of oral testimony from representatives from the New York City Department of Small Business Services ("SBS"), the New York City Commission on Human Rights, the New York City Department of Housing Preservation and Development ("HPD"), the Real Estate Board of New York ("REBNY"), small business advocates, chambers of commerce, and community-based non-profit organizations.  *See id.* ¶¶ 41-54.

1.      Residential Harassment & the Residential Harassment Law

New York City Administrative Code ("Admin. Code") § 27-2005(d) prohibits an owner of a dwelling from harassing tenants or occupants lawfully entitled to occupancy of such dwelling.  An act or omission constitutes "harassment," in the residential context, if such act or omission: (i) "causes or is intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy"; and (ii) is set forth in the list of acts or omissions.  *Id.* § 27-2004(a)(48).  In relevant part, the Residential Harassment Law amended the definition of "harassment" in Admin. Code. §

27-2004(a)(48) to include—in the list of covered acts or omissions—"threatening any person lawfully entitled to occupancy of such dwelling unit *based on* such person's actual or perceived status as an essential employee,[13] status as a person impacted by COVID-19,[14] or receipt of a rent concession or forbearance for any rent owed during the COVID-19 period."[15]  *Id.* § 27-2004(a)(48)(f-7) (emphasis added).  This amendment builds on the existing prohibition against "threatening any person lawfully entitled to occupancy of such dwelling unit based on" a number of attributes, which include, age, race, creed, color, national origin, and gender.  *Id.* § 27-2004(a)(48)(f-5).

### 2.     Commercial Harassment & The Commercial Harassment Law

Admin. Code § 22-902(a) prohibits a landlord from "engag[ing] in commercial tenant harassment."  An act or omission constitutes "commercial tenant harassment" if such act or omission: (i) "would reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property"; and (ii) is set forth in the list of acts or omissions.  *Id.* § 22-902(a).  Admin. Code § 22-902(b) provides that "[a] landlord's lawful termination of a tenancy, lawful refusal to renew or extend a lease or other rental agreement, or lawful reentry and repossession" cannot constitute "commercial tenant harassment."  Relatedly,) states that none of

---

[13] "Essential employee" means "a person employed by or permitted to work at or for a business classified as an essential business by the New York state department of economic development in accordance with [EO No.] 202.6." *Id.* § 27-2004(a)(48)(f-7)(3).

[14] "Person impacted by COVID-19" means a person who: (i) "was diagnosed with COVID-19"; (ii) "is experiencing symptoms of COVID-19 and seeking a medical diagnosis"; (iii) has or had a household member who was diagnosed with COVID-19; (iv) "was providing care for a family member or a member of such person's household who was diagnosed with COVID-19"; (v) "became unemployed, partially unemployed, or could not commence employment as a direct result of COVID-19 or the state disaster emergency declared in [EO No.] 202"; and (vi) "became primarily responsible for providing financial support for the household of such person because the previous head of the household died as a direct result of COVID-19." *Id.* § 27-2004(a)(48)(f-7)(4).

[15] The "COVID-19 period" is March 7, 2020 through September 30, 2020.  *Id.* § Admin. Code § 22-903(b 27-2004(a)(48)(f-7)(2).

the statutory provisions relieve a commercial tenant "of the obligation to pay any rent for which the commercial tenant is otherwise liable," and that any monetary remedy "shall be reduced by any amount of delinquent rent or other sum for which a court finds such commercial tenant is liable." The Commercial Harassment Law amended the definition of "commercial tenant harassment" to include—in the list of covered acts or omissions—"threatening a commercial tenant based on . . . the commercial tenant's status as a person or business impacted by COVID-19,[16] or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period."[17] *Id.* § 22-902(a)(11).

3.   The Guaranty Law

The Guaranty Law added Admin. Code § 22-1005, entitled "Personal liability provisions in commercial leases," which renders unenforceable "[a] provision in a commercial lease or other rental agreement involving real property located within the city that provides for one or more natural persons who are not the tenant . . . to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent . . . owed by the tenant under such agreement, . . . against such natural persons if" two conditions are satisfied. First, the tenant must meet one of the following criteria: (a) "was required to cease serving patrons food or beverage for on-premises consumption or to cease operation under [EO No.] 202.3"; (b) "was a non-essential retail establishment subject to in-person limitations under guidance issued by the New York state department of economic development pursuant to [EO No.] 202.6"; or (c) "was required to close to members of the public under [EO No.] 202.7." *Id.* §

---

[16] A "business impacted by COVID-19" is one which: (i) "was subject to seating, occupancy or on-premises service limitations pursuant to an [EO] issue[d] by the governor or mayor during the COVID-19 period"; or (ii) "its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for" (a) "the same three-month period in 2019" or (b) "for the months of December 2019, January 2020, and February 2020 and such revenue loss was the direct result of the COVID-19 state disaster emergency." *Id.* § 22-902(a)(11)(c).

[17] The "COVID-19 period" is March 7, 2020 through September 30, 2020. *See id.* § 22-902(a)(11)(a).

22-1005(1).  Second, "[t]he default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and September 30, 2020, inclusive."  *Id.* § 22-1005(2).  The Guaranty Law also amended Admin. Code § 22-902(a) to include—in the list of covered acts or omissions that could constitute "commercial tenant harassment"—"attempting to enforce a personal liability provision that the landlord knows or reasonably should know is not enforceable pursuant to [Admin. Code § 22-1005]."

## ARGUMENT

### POINT I

### THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY AS A MATTER OF LAW.

Plaintiffs seek relief declaring as unconstitutional, and enjoining, the Challenged Laws.[18]  *See generally* Compl.  Yet, government enactments are presumed to be constitutional.  *Bush v. Vera*, 517 U.S. 952, 992 (1996).  "Because [this] motion . . . presents a pure legal question, . . . the district court is equipped to make a determination on the merits."  *Goldberg v. Danaher*, 599 F.3d 181, 183 (2d Cir. 2010).  To survive a Rule 12(b)(6) motion, a pleading must contain sufficient factual matter, accepted as true, so as to make a claim plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[19]

### A.    The Harassment Laws Do Not Violate Plaintiffs' First Amendment Rights.

---

[18] Plaintiffs appear to assert facial challenges on the basis of their preemption and vagueness claims and as-applied challenges on the basis of their free speech and Contracts Clause claims.  *See* Compl. ¶¶ 172, 223, 229; *see also* Plaintiffs' Br. at 34-35.  A party challenging a law as unconstitutionally vague on its face carries the heavy burden of showing that it "is impermissibly vague in all of its applications," *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982), or, in the very least, that it "reaches a substantial amount of constitutionally protected conduct," *Expressions Hair Design v. Schneiderman*, 803 F.3d 94, 118 (2d Cir. 2015) (citation omitted).

[19] In assessing a Rule 12(b)(6) motion, a court may look to documents attached to the complaint or incorporated by reference, documents that are "integral" to Plaintiffs' claims, and matters of public record.  *Chambers v. Time Warner*, 282 F.3d 147, 152-53 (2d Cir. 2002).

Plaintiffs claim that the Harassment Laws violate the First Amendment to the United States Constitution by "impos[ing] content-based restrictions on lawful speech as applied to Plaintiffs because they proscribe and inhibit lawful demands for rent" and because they do not "advance a substantial interest through means that are no more extensive than necessary."[20] Compl. ¶¶ 172-73, 176.  Plaintiffs' First Amendment claim fails primarily because it relies upon an outright mischaracterization of the Harassment Laws: the plain meaning of the Harassment Laws does not preclude landlords from making lawful demands for unpaid rent.  Additionally, the claim fails because the Harassment Laws directly and materially advance a substantial governmental interest and are narrowly drawn.[21]

     1.    <u>The Harassment Laws Do Not Implicate Plaintiffs' First Amendment Rights; They Neither Proscribe nor Inhibit Lawful Demands for Rent Due or Lawful Eviction Threats.</u>

Plaintiffs' erroneous argument that the Harassment Laws proscribe and inhibit speech is based on the false premise that the laws prohibit lawful demands for rent.  In fact, lawful demands for rent are not prohibited.  Rather, the Harassment Laws seek to prohibit landlords from threatening tenants with improper demands or statements on the basis of the tenants' status as impacted by COVID-19.  Moreover, the Commercial Harassment Law specifically provides that "[a] landlord's lawful termination of a tenancy, lawful refusal to renew

---

[20] Plaintiffs also allege a violation of Article I, Section 8 of the New York State Constitution.  Compl. ¶¶ 235, 238.  While New York State courts have found that Article I, Section 8 of the New York State Constitution affords greater protections than the First Amendment, that is not the case here where the Harassment Laws do not abridge speech, and further, even if they did, there is a legitimate basis for the regulation.  *See A.B.C. Home Furnishings v. Town of E. Hampton*, 947 F. Supp. 635, 643-44 (E.D.N.Y. 1996).  Thus, for the same reasons, Plaintiffs' state free speech claim fails.

[21] Because the Complaint does not allege that Plaintiff 1025 Pacific LLC leases property to commercial tenants, *see* Compl. ¶ 26, Plaintiff 1025 Pacific LLC failed to plead sufficient facts to maintain standing to challenge the Commercial Harassment Law.  In turn, because the Complaint does not allege that Plaintiffs Jarican Realty Inc. and Top East Realty LLC lease property to residential tenants, *see* Compl. ¶¶ 24, 43, Plaintiffs Jarican Realty Inc. and Top East Realty LLC failed to plead sufficient facts to maintain standing to challenge the Residential Harassment Law.

or extend a lease or other rental agreement, or lawful reentry and repossession" cannot constitute "commercial tenant harassment." Admin. Code § 22-902(b). Relatedly, Admin. Code § 22-903(b) states that none of the statutory provisions relieve a commercial tenant "of the obligation to pay any rent for which the commercial tenant is otherwise liable." The City Council had these provisions in mind when considering the bill that became the Commercial Harassment Law. *See* Ugalde Decl., Ex. III at 35 (committee report explicitly referencing Admin. Code §§ 22-902(b), 22-903(b)). Plaintiffs attempt to minimize the import of Admin. Code § 22-902(b) by calling it the "savings provision" and insinuating that courts are likely to gloss over this provision. *See* Plaintiffs' Br. at 19, n. 9. However, speculating on what courts may gloss over in making determinations does not translate into stating a First Amendment claim.

As for the Residential Harassment Law, courts construing an earlier definition of tenant harassment have held that lawful demands for rent do not amount to unlawful harassment. *See Dunn v. 583 Riverside Dr LP*, 117 N.Y.S.3d 524, 525-26 (Civ. Ct. N.Y. Cnty. Dec. 30, 2019) (rejecting a tenants' claim that receipt of a mere rent demand "is frivolous or conduct that constitutes harassment"); *Plautz v. Eidlin-Quere*, Index No. 650770/10, 2011 N.Y. Misc. LEXIS 6782, at *19-20 (Sup. Ct. N.Y. Cnty. July 13, 2011). The Residential Harassment Law does not displace this well-settled principle. As the local law explains, the purpose of the anti-harassment provisions is to prevent landlords from harassing tenants "*lawfully entitled to occupancy*" into vacating their units, not to preclude landlords from collecting arrears. Admin. Code § 27-2004(a)(48).

Moreover, Plaintiffs ignore the language in the Harassment Laws that prohibits harassment "based on" the person or entity's COVID-19 status. Admin. Code § 22-902(a)(11); Admin. Code § 27-2004(a)(48). The City Council's intentional use of the words "based on"

conveys "but for" causation.  *See Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 63-64 & n.14 (2007) (observing that "[i]n common talk, the phrase 'based on' indicates a but-for causal relationship and thus a necessary logical condition" and that the statutory phrase, "based on," has the same meaning as the phrase, "because of" (internal quotation marks omitted)); *Gross v FBL Fin. Servs.*, 557 U.S. 167, 176-177 (2009) (the phrase "based on" is commonly understood to mean that something is created in reliance on identified factors); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653-654 (2008) (recognizing that the phrase, "by reason of," requires at least a showing of "but for" causation (internal quotation marks omitted)).  Contrary to Plaintiffs' mistaken impression, the Harassment Laws are not triggered simply by the fact that a party has one of the covered COVID-19 statuses.  Ignoring the "but-for" causation implicated by the phrase "based on" is fatal to Plaintiffs' claims.  The only proscribed conduct is threatening a tenant based upon or, as a result of, his or her COVID-19 status.  An unlawful communication under the Harassment Law, would include, for example, a landlord's threat to terminate of a lease because of the tenant's status as an essential worker and the risk of that person potentially infecting others in the building.  Therefore, any lawful demand for rent and/or threat of eviction based upon a simple failure to pay rent or other lawful demands (without regard to COVID-19 status) is not proscribed by the Harassment Laws.

Plaintiffs also seemingly argue that the Harassment Laws inhibit commercial speech because the term "threatening" is undefined.  *See* Plaintiffs' Br. at 17-18.  However, the Admin. Code already proscribes threatening any person based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, etc., *see* Admin. Code §§ 22-902(a)(11)(i), 27-2004(a)(48)(f-5), with no apparent confusion as to what threatening means.  In fact, New York State courts upheld the local law that prohibited landlords from harassing their tenants, *i.e.*, Local Law

No. 7 of 2008, and the definition of "harassment," which included "making express or implied threats that force will be used[.]"  In that case, it was held that Local Law No. 7 "is a valid exercise of the powers conferred upon municipalities pursuant to the Municipal Home Rule Law" and that "the passage of Local Law No. 7 is a rational legislative response to what the City Council has determined is the potential for a growing problem of tenant harassment in New York City." *Prometheus Realty v. City of N.Y.*, Index No. 111132/08, 2009 N.Y. Misc. LEXIS 4247, at *11-12 (Sup. Ct. N.Y. Cnty. July 31, 2009), *aff'd* 80 A.D.3d 206, 213 (1st Dep't 2010).  The Court further stated that "Local Law No. 7 contains clear and precise language which puts building owners on notice of what constitutes harassment." *Id.* at *15.

Finally, relying on a single case from New York City Civil Court, Plaintiffs further erroneously claim that "existing caselaw defines prohibited 'harassment' based on its impact on the tenant, not on the landlord's intent" and imply that this is proof of improper content-based restriction on commercial speech.  *See* Plaintiffs' Br. at 22 & n. 5; Golino Aff. ¶ 87 (citing *One Wythe LLC v. Elevations Urban Landscape Design Inc.*, 2020 N.Y. Misc. LEXIS 1477, 67 Misc. 3d 1207(A) (Civ. Ct. Kings Cnty. April 17, 2020)).  However, both Admin. Code § 22-902 and *One Wythe*, 2020 N.Y. Misc. LEXIS 1477 at *23-25, make clear that the standard is whether a landlord's actions would "reasonably cause" a tenant to vacate or waive its rights. The standard is thus an objective one.  In sum, Plaintiffs' erroneous allegation that the Harassment Laws constitute improper content-based restriction on commercial speech based upon *One Wythe* is without merit.[22]

---

[22] To overcome the enormous hurdle of the plain meaning rule, *United States v. Missouri P. R. Co.*, 278 U.S. 269, 278 (1929) ("[W]here the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended."), Plaintiffs erroneously rely on an unrelated lawsuit brought by Gap and Old Navy for rescission of their lease.  *See* Plaintiffs' Br. at 21.  In that lawsuit, Gap and Old Navy claimed that the rental agreement was void because the purpose of the agreement was frustrated by

Accordingly, the Harassment Laws do not proscribe lawful demands for rent and thus do not inhibit or even implicate Plaintiffs' First Amendment rights.

> 2.    Even Assuming Arguendo that the Harassment Laws Implicate Plaintiffs' First Amendment Rights, They Pass Constitutional Muster.

Assuming *arguendo* the Harassment Laws regulate Plaintiffs' speech, the Harassment Laws implicate only commercial speech, which has been defined as "expression related solely to the economic interests of the speaker and its audience," or, alternatively, as speech "proposing a commercial transaction."[23]  *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of N. Y.*, 447 U.S. 557, 561-62 (1980) [hereinafter "*Central Hudson*"].  In such case, the Harassment Laws nevertheless survive review because the City's interest in protecting COVID-19-impacted tenants far outweighs Plaintiffs' interests in threatening their tenants based on COVID-19 status, and the Harassment Laws are narrowly tailored to advance a substantial government interest.  While non-misleading commercial speech is protected under the First Amendment, it is entitled to less extensive protection than other "constitutionally guaranteed expression."  *Central Hudson*, 447 U.S. at 562; *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001) ("Commercial speech is subject to 'less stringent constitutional requirements' than are other forms of speech.").  Restrictions on commercial speech are subject to the intermediate scrutiny test set forth in *Central Hudson*.  *See Florida Bar*, 515 U.S. at 623.  If the restriction is on non-misleading and lawful speech, the government must: (i) "assert a substantial

---

the pandemic, and, further, that the Harassment Laws protect them from requests to enforce terms under a contract that is now void.  While Gap and Old Navy mention the Harassment Laws in their complaint, they also mention the gubernatorial EOs.  *See* Younger Decl., Ex. 5 at ¶ 24.  Plaintiffs' attempt to argue that Gap and Old Navy's mere assertions are some type of proof that the Harassment Laws prohibit landlords from making routine requests for rent is belied by the text of the laws and the legislative record.

[23] Insofar as the Harassment Laws regulate commercial speech that concerns unlawful activity or is misleading, they cannot violate Plaintiffs' First Amendment rights.  *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 623-24 (1995) ("Under *Central Hudson*, the government may freely regulate commercial speech that concerns unlawful activity or is misleading.").

interest in support of its regulation"; (ii) "demonstrate that the restriction on commercial speech directly and materially advances that interest"; and (iii) show that "the regulation must be 'narrowly drawn.'"  *Id.* at 624 (quoting *Central Hudson*, 447 U.S. at 564-65).

    As a preliminary matter, Plaintiffs concede the first prong of the *Central Hudson* three-part test—*i.e.*, that the City had a substantial interest in enacting the Harassment Laws.  *See* Plaintiffs' Br. at 19, n. 10 ("Plaintiffs do not contend that Defendants are incapable of identifying a substantial government interest, given the impact of the Pandemic.").

    With respect to the second prong, while the City must demonstrate that the Harassment Laws sought to promote a substantial interest, the City is not required to conduct a specific study to conclusively prove that its regulation will actually accomplish its intended goal. *See Renton v. Playtime Theatres*, 475 U.S. 41, 51-52, 106 S. Ct. 925, 931 (1986); *see also White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 171 (2d Cir. 2007) ("[T]o demonstrate that an ordinance furthers a substantial government interest, a municipality must show that in enacting the legislation, it relied upon some evidence reasonably believed to be relevant to the problem of negative secondary effects. . . .  Based on this standard, the Supreme Court has upheld ordinances where a city conducted hearings and reviewed a report on the experience of other cities; expressly relied on the evidentiary foundation in prior judicial opinions as well as the city's own findings; and relied on a study conducted many years prior to the enactment of the ordinance (internal quotations and citations omitted)).

    Here, the City met its burden since the City Council conducted several committee hearings on the Harassment Laws, heard multiple hours of relevant oral testimony, reviewed hundreds of pages of written testimony, which included accounts from landlords and tenants, considered reports and articles on the economic impact of the pandemic, and concluded that

COVID-19-impacted tenants were vulnerable to landlord harassment on the basis of their status. *See* Ugalde Decl. ¶¶ 41-54; Exs. GGG at 2 & III at 33, 35 (committee reports on the Harassment Laws); *cf.* Ex. PP at 1-2 ("From February through mid-April, the [New York City Commission on Human Rights] recorded 284 reports of harassment and discrimination related to COVID-19, over 40% (115) of which identify incidents of anti-Asian harassment or discrimination. By comparison, during this same time period in 2019, the Commission received just five reports of anti-Asian discrimination.")  In doing so, the City Council identified a substantial interest of the City that the Harassment Laws directly and materially advance.

As for the third prong, the Harassment Laws are, contrary to Plaintiffs' allegations, narrowly tailored to proscribe the conduct of harassing residential or commercial tenants *based upon* their status as persons impacted by COVID-19.  Plaintiffs mischaracterize the Harassment Laws as inhibiting lawful demands for rent, and then based upon this mischaracterization allege that the Harassment Laws should have been more narrowly tailored to only apply to those tenants that actually suffered financial hardship.  *See* Plaintiffs' Br. at 22. However, as shown in Point I(A)(1), *supra*, the scope of these laws is much narrower.  These laws' intended purpose, and the City's substantial interest in enacting them, was to proscribe harassment, not only for those that have actually suffered financial hardship, but others who are conceivable targets of harassment such as those that have or had COVID-19 or the City's essential workers, who may be at greater risk of contracting COVID-19.

Plaintiffs cherry-pick comments from unnamed legislators and public testimony to demonstrate that the City Council failed to consider narrower alternatives.  *See* Plaintiffs' Br. at 9-10, 12, 22.  However, a regulation will not be invalidated simply because some alternative exists that might be less restrictive of speech.  *See Turner Broad. Sys., Inc. v. Federal*

*Communications Comm'n*, 520 U.S. 180, 217 (1997); *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989) ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.").   The City Council was under no obligation to accept every comment uttered during a committee hearing, as hearings are one of several important steps in the legislative process.   In any event, Plaintiffs' other suggested avenue (for narrower tailoring) is to use government funds to pay for rent, Plaintiffs' Br. at 22, again is based on a mischaracterization.   The Harassment Laws neither prohibit lawful demands for rent nor do they provide rent relief.   A rent relief program is a completely different policy from banning threatening behavior based on a person or business's COVID-19 status, and, further, was not possible due to the fiscal crisis and the City's budgetary constraints.   Finally, Plaintiffs' assertion that the Harassment Laws were superfluous due to existing EOs and other Federal, State and local housing protections, Plaintiffs' Br. at 22-23, is likewise without merit.   The Harassment Laws add legal remedies for tenants faced with harassment based on their COVID-19 status. *See, e.g.*, Admin. Code §§ 27-2005(d), 27-2115 & 22-903.

### B.     The Guaranty Law Does Not Violate the Constitution's Contract Clause.

Plaintiffs' claim that the Guaranty Law violates the Contract Clause of the United States Constitution, Compl. ¶ 184, fails as a matter of law.[24]   The Contract Clause—which is

---

[24] The Complaint only alleges that Plaintiff Top East Realty has personal guaranties impaired by the Guaranty Law.  *See* Compl. ¶¶ 157, 161.  However, the two leases and related documents produced by Plaintiff Top East Realty in response to Defendants' limited document requests demonstrate that it actually does not have standing to challenge the Guaranty Law.  With respect to the "lease" between Top East Realty and CCB of Jamaica Inc. Dba Surpass Preparatory Center, which is unsigned, Plaintiff produced a standalone "Guaranty" that has not been executed, and is therefore ineffective.  *See* Ex. UUU at YANG00000006.  Nor can Plaintiff Top East Realty LLC maintain standing on the basis of the other lease and guaranty: the guarantor to that contractual arrangement is also a tenant under the lease, *see id.*,

found in Article I, Section 10, Clause 1 of the Constitution—provides that "[n]o State shall pass any . . . Law . . . impairing the Obligation of Contracts."  While "phrased in absolute terms, the Supreme Court has not interpreted the Clause absolutely to prohibit the impairment of either private or government contracts." *Tinnerello & Sons, Inc. v. Stonington*, 141 F.3d 46, 52 (2d Cir. 1998) (citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977)); *Sanitation and Recycling Indus., Inc. v. City of N.Y.*, 107 F.3d 985, 993 (2d Cir. 1997) [hereinafter, "*Sanitation*"].  The extent to which States may exercise their police powers to the detriment of private contracts is determined by applying the three-part test articulated in *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1982) [hereinafter, "*Energy Reserves*"]. *See Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020); *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) [hereinafter, "*Buffalo Teachers*"].

      1.    <u>The Guaranty Law Does Not Substantially Impair Plaintiffs' Contracts.</u>

      The first—and threshold—inquiry is whether the law "has, in fact, operated as a substantial impairment of a contractual relationship."  *Energy Reserves*, 459 U.S. at 411. Whether a law operates as a substantial impairment "depends upon 'the extent to which reasonable expectations under the contract have been disrupted.'"  *Sullivan*, 959 F.3d at 64 (quoting *Sanitation*, 107 F.3d at 993).  Such reasonableness depends on a number of factors, such as: (i) "the extent to which the challenged provision provides for 'gradual applicability or grace periods,'" *id.* (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978));

---

Ex. VVV at YANG00000015, YANG00000020 (noting that the "TENANT" under the lease is "Home Decor Expo/Khalid Yehia" and that the guarantor is "Khalid Yehia"), and to challenge the Guaranty Law, Plaintiffs must, at a minimum, have or have had a personal liability or guaranty agreement that is effective during the period of March 7, 2020 to September 30, 2020 with an individual who is not the commercial tenant under a lease.  *See* Admin. Code § 22-1005.  Regardless, whether or not any Plaintiff can cure any deficiency with respect to standing, Plaintiffs' Contract Clause claim still fails because the Guaranty Law passes constitutional muster.

and (ii) "the extent to which the law . . . prevents the party from safeguarding or reinstating his rights," *Elmsford Apt. Assocs., LLC*, 2020 U.S. Dist. LEXIS 115354 at *37.

The Guaranty Law does not substantially impair Plaintiffs' contractual relationships. First and foremost, any impairment caused by the Guaranty Law is limited. It only operates to render a qualifying personal guaranty unenforceable when a tenant fails to make a required payment under a lease or other rental agreement, causing the individual-guarantor's personal liability, between March 7, 2020 and September 30, 2020. *See* Admin. Code § 22-1005(1)(b). This time period was tailored to provide relief in response to the crisis: March 7, 2020 is the effective date of New York State's disaster emergency declaration (*see* EO No. 202); and the September 30, 2020 date was a reasonable estimate for the end of the crisis.[25]

Moreover, any contractual impairment caused by the Guaranty Law is limited in scope. As it only impairs one of various contractual and legal remedies available to commercial landlords for the collection of rent, taxes or other expenses, the Guaranty Law "sufficiently safeguards [such landlords'] ability to realize the benefit of their bargain." *Elmsford Apt. Assocs., LLC*, 2020 U.S. Dist. LEXIS 115354 at *37, 41. At its core, a lease is an agreement between a landlord and a tenant, whereby the landlord promises to grant a tenant a right to occupancy in exchange for the tenant's promise to make certain payments in the future. The Guaranty Law does not render unenforceable or diminish Plaintiffs' (i) right to recover the tenant's rental payments during the applicable time period (which is the central term of a lease), (ii) right to enforce the tenant's rental obligation in a court proceeding (through eviction or nonpayment proceedings or breach of contract actions), or (iii) ability to apply security deposit

---

[25] Indeed, other governmental edicts temporarily altering rights in response to the COVID-19 pandemic have used the same end date. *See, e.g.*, CARES Act § 3513 (suspending, effective March 13, 2020, all payments due for certain loans held by the U.S. Department of Education through September 30, 2020); https://www.cdc.gov/media/releases/2020/s0716-cruise-ship-no-sail-order.html (extending a "No Sail Order" for cruise ships through September 30, 2020).

funds towards unpaid rent.  *See* Exs. TTT & VVV (Plaintiffs Jarican Realty Inc.'s and Top East Realty LLC's leases produced to Defendants in this action setting forth their contractual remedies against tenants).  Rather, the Guaranty Law only prevents landlords from pursuing the personal assets of a natural person who guaranteed a commercial tenant's performance under a lease during the worst crisis that has affected this country and the world in many years.  Such impairment does not, and cannot, rise to the level of a substantial impairment under the Contract Clause.

This Court faced a very similar question less than two months ago in *Elmsford Apt. Assocs., LLC*, which involved a Contract Clause challenge to the security deposit and eviction moratorium directives set forth in EO No. 202.28.  *See* 2020 U.S. Dist. LEXIS 115354 at *35-46.  This Court held that the Contract Clause claims failed as a matter of law because, in large part, these directives did not diminish tenants' rental obligations, and the landlords still had a "suite of contractual remedies" at their disposal.  *Id.* at *42, 45.  Despite noting that "[e]victing a tenant . . . in New York is a slow, cumbersome and extremely tenant-favorable process," *id.* at *9-10, this Court did not consider such fact as a dispositive factor, *id.* 42-43, 45.  Rather, the Court stated that a "landlord can collect all he is owed at the end of the day by the simple expedient of going to some court when the courts are fully reopened," and that "[t]he fact that landlords would prefer not to avail themselves of their legal remedies — because it is often not worth the trouble to pursue a deadbeat tenant — does not mean that the state has impaired their contractual rights," *id.* at *42-43.  While the directives at issue in *Elmsford Apt. Assocs., LLC* differ in certain respects to the Guaranty Law's provisions, they are alike in that they have limited applicability, and that they sufficiently safeguard landlords' ability to realize the benefit

of their commercial lease arrangements.   As there can be no substantial impairment of a

contractual relationship, Plaintiffs' Contract Claim fails as a matter of law.

>    2.    The City Had a Significant and Legitimate Public Interest in Enacting the
>          Guaranty Law.

Since there is no substantial impairment, there is no hurdle to clear, and this

Court's inquiry should end without the need to address the remaining prongs.   *See Allied*

*Structural Steel Co.*, 438 U.S. at 245.   However, even if, assuming *arguendo,* there is a

substantial impairment, then the second question is whether the government had a "significant

and legitimate public purpose behind the regulation . . . such as the remedying of a broad and

general social or economic problem."   *Energy Reserves*, 459 U.S. at 411-12.   "A legitimate

public purpose is one 'aimed at remedying an important general social or economic problem

rather than providing a benefit to special interests.'"   *Buffalo Teachers*, 464 F.3d at 368 (quoting

*Sanitation*, 107 F.3d at 993).

It is undisputed that the COVID-19 pandemic (as well as the fears of contracting

COVID-19), and the resulting gubernatorial closure orders, have decimated businesses across the

City, and especially small retail businesses that rely on a continuous revenue stream from

consumers.   *See* Plaintiffs' Br. at 26 (". . . Plaintiffs do not dispute that the Pandemic presents an

economic emergency for small business owners . . . ."); Ugalde Decl. ¶¶ 41, 44; *see also* Ex. QQ

at 9-11 (City Council committee report noting findings of studies and surveys that highlight the

pandemic's negative economic impact on businesses and, primarily, small businesses).   Due to

their size and limited assets, small businesses are often required to secure personal guaranties

from their principals to enter into commercial leases.   *See* Compl. ¶ 137; Ugalde Decl. ¶ 44(j) &

Ex. QQ at 28-29.   Because closures and business restrictions naturally translate into decreased

revenue and likely non-payment of rent, individual-guarantors have become exposed to liability

despite the fact that the tenants' inability to meet their rental obligations was likely caused by circumstances that were unforeseen and outside of the tenants' control.   Given that small businesses are the lifeblood of the City's and the nation's economy, *see* Ugalde Decl. ¶ 44(f)-(g) & Ex. QQ at 11 (citing to Small Business Administration's finding that small businesses create two-thirds of net new jobs and drive innovation and competitiveness), in enacting the Guaranty Law, the City sought to address this emergency and provide relief to a section of the small business community—*i.e.*, individual-guarantors of commercial tenants affected by the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.6 and 202.7— who otherwise might have lost their entire livelihoods, including personal assets, and possibly been forced into bankruptcy.

While not disputing the existence of an economic emergency for small business owners, Plaintiffs argue that the Guaranty Law "is not aimed at addressing that emergency in any legitimate way" because Defendants have improperly transferred the economic burdens experienced by tenants onto their landlords—regardless of their respective financial situations." Plaintiffs' Br. at 26.  In support of their proposition, Plaintiffs selectively quote language from *Buffalo Teachers* and an Eighth Circuit case.  However, *Buffalo Teachers* actually supports the City's position.   In that case, the Second Circuit upheld a wage freeze that prohibited the payment of raises that unions had previously negotiated with the City of Buffalo, and stated that "the legislative interest in addressing a fiscal emergency is a legitimate public interest."  *Buffalo Teachers*, 464 F.3d at 368-69 (citing *Home Bldg. & Loan Asso. v. Blaisdell*, 290 U.S. 398, 444-48 (1934) (upholding statute impairing mortgages in light of the Great Depression); *In re Subway-Surface Supervisors Ass'n v. N.Y.C. Transit Auth. ("Subway- Surface")*, 44 N.Y.2d 101, 112-14 (1978) (upholding statute freezing municipal wages due to City fiscal emergency)).

Any implication that commercial tenants and personal guarantors covered by the Guaranty Law represent a special interest is misplaced. Almost every legislative enactment or regulation will benefit some and harm others. Whether or not a law transfers burdens is not the applicable test; rather, the test is whether the law seeks to remedy "an important general social or economic problem." *Buffalo Teachers*, 464 F.3d at 368. Despite the fact that the Guaranty Law provides immediate potential benefits to certain guarantors, some of whom are the principals of commercial corporate tenants, its primary purpose is to remedy the social and economic problems that would follow if personal liability provisions were enforced under the current circumstances, and, further, to promote the rehabilitation of the small business community.

Finally, Plaintiffs' argument ignores the fact that the City also took legislative actions to assist struggling landlords during the pandemic. *See* Ugalde Decl. ¶¶ 60-62 & Exs. PPP-SSS (local laws and resolutions that operate together to reduce the interest rates for nonpayment of taxes on certain real property by property owners who were impacted by COVID-19).

3.    <u>The Guaranty Law Is a Reasonable and Necessary Means to Achieve the City's Significant and Legitimate Public Interest.</u>

The final inquiry in the *Energy Reserves Group* test is "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Energy Reserves*, 459 U.S. at 412 (internal quotation marks omitted); *Sullivan*, 959 F.3d at 64 (interpreting this inquiry as "whether the means chosen to accomplish th[e] purpose are reasonable and necessary"); *see also Ass'n of Surrogates & Supreme Court Reporters v. New York*, 940 F.2d 766, 771 (2d Cir. 1991) ("[L]egislation which impairs the obligations of private contracts is tested under the contract clause by reference to a rational-basis test."). "As is

customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *United States Tr. Co. v. New Jersey*, 431 U.S. 1, 22-23 (1977).  Moreover, as the Guaranty Law impairs private and public contracts alike, the Court "must accord substantial deference to the [City's] conclusion that its approach reasonably promotes the public purposes for which [it] was enacted." *Elmsford Apt. Assocs., LLC*, 2020 U.S. Dist. LEXIS 115354 at *36 (quoting *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998)); *see also Buffalo Teachers*, 464 F.3d at 369.

The Guaranty Law is a reasonable and necessary means to achieve the legitimate purpose identified above for various reasons.  First, as noted in Point I(C)(1), the temporal scope of the Guaranty Law is limited because it only renders a qualifying personal guaranty unenforceable when a default or other event causing the individual-guarantor's personal liability occurs between March 7, 2020 and September 30, 2020.  *See Buffalo Teachers*, 464 F.3d at 371; *see also Blaisdell*, 290 U.S. at 447; *Allied Structural*, 438 U.S. at 242-43.

Second, through its legislative process, the City Council considered other alternatives and opted to narrow the scope of the law.  *See Buffalo Teachers*, 464 F.3d at 371.  For instance, the bill draft that was originally introduced—*i.e.*, Intro. No. 1932 (*see* Ex. II)—was vastly reduced in scope in Intro. No. 1932-A, which was enacted as the Guaranty Law.[26]  In fact, the Guaranty Law, as enacted, only covers commercial tenants subject to the in-person business and workplace restrictions set forth in EO Nos. 202.3, 202.6, and 202.7.  Thus, the Guaranty Law only applies (i) to a limited set of essential businesses, *i.e.*, those affected by EO No. 202.3, and (ii) to non-essential businesses.  On the other hand, the original proposed bill would have

---

[26] Had the City enacted Intro. No. 1932, which is the original bill proposed at the City Council, the Guaranty Law would have covered any business that either: (a) was subject to seating, occupancy or in-person service limitations set forth in any executive order; or (b) experienced during any three-month period during the COVID-19 period a revenue shortfall of at least 50% of its revenues (i) for the same period in 2019 or (ii) for the months of December 2019, January 2019, and February 2020.  *See* Ex. II.

covered all essential and non-essential businesses alike as long as they met certain revenue-loss requirements.  The scope of the Guaranty Law is further narrowed by its own terms.  Even if the conditions in Admin. Code § 22-1005(1)-(2) are met, the Guaranty Law does not apply to a personal liability provision unless it provides for personal liability of a natural person who is not the commercial tenant.  *Id.* § 22-1005.  In other words, if the guarantor is an entity or a tenant, the Guaranty Law does not apply.  As noted earlier, Plaintiff Top East Realty's "Guaranty" with Home Decor's principal is not impaired in any way by the Guaranty Law because the guarantor is also a tenant under the lease.  *See* Section I(B)(1), *supra*.

Finally, the fact that alternatives to the Guaranty Law's provisions may exist does not make the Guaranty Law unreasonable or unnecessary.  *Buffalo Teachers*, 464 F.3d at 372 ("[W]e find no need to second-guess the wisdom of picking the wage freeze over other policy alternatives, especially those that appear more Draconian, such as further layoffs or elimination of essential services."); *see also Blaisdell*, 290 U.S. at 447-48 ("Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned."); *Sal Tinnerello & Sons*, 141 F.3d at 54 ("[I]t is not the province of this Court to substitute its judgement for that of . . . a legislative body.").  In view of the unprecedented emergency to which it responds, there can be no doubt that the Guaranty Law, in the words of *Energy Reserves Group*, "is of a character appropriate to the public purpose justifying the legislation's adoption."[27]

## C.   The Challenged Laws Are Not Preempted by New York State Law.

---

[27] In *Twentieth Century Assocs., Inc. v. Waldman*, 294 N.Y. 571, 580 (1945), the Court of Appeals upheld a law establishing a rent ceiling for commercial spaces that was enacted during a public emergency because "[i]n the light of the emergency which called into play the police powers of the State in this case, we are unable to say that the measures taken in the public interest were unreasonable or inappropriate to curb the evils arising from the emergency and to accomplish the public purposes declared in the statute."

Plaintiffs' claim that New York State law preempts the Challenged Laws, Compl. ¶¶ 195-223, fails.[28]  Under New York law, "[a] local law will be preempted either where there is a direct conflict with a state statute (conflict preemption) or where the legislature has indicated its intent to occupy the particular field (field preemption)."  *Garcia v. N.Y.C. Dep't of Health & Mental Hygiene*, 31 N.Y.3d 601, 617 (2018) (quoting *Eric M. Berman, P.C. v City of N.Y.*, 25 N.Y.3d 684, 690 (2015)).  Plaintiffs cannot establish conflict or field preemption.

1.   <u>The City's Power to Enact the Challenged Laws and to Act during a Disaster Emergency Is Established in State Law.</u>

The doctrine of preemption "'represents a fundamental limitation on home rule powers and embodies the untrammeled primacy of the [l]egislature to act . . . with respect to matters of State concern."  *Garcia*, 31 N.Y.3d at 617 (internal citations and quotations omitted).  Plaintiffs' preemption argument completely overlooks this carefully-crafted, critical framework.

"It has long been recognized that under home rule, [the City] has broad policing power to act in furtherance of the welfare of its citizens," *Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 2020 N.Y. App. Div. LEXIS 3302, at *6-7 (1st Dep't June 4, 2020).  The New York State Constitution provides that, in furtherance of "[e]ffective local self-government and intergovernmental cooperation," "[e]very local government, except a county wholly included within a city, shall have a legislative body elective by the people thereof," and "[e]very local government shall have power to adopt local laws as provided by" Article IX.  N.Y. CONST., art. IX, § 1.  It also provides that the City "shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law" (i) "relating to its property, affairs or government," *id.* § 2(c)(i); *see also* N.Y. Municipal Home Rule Law §

---

[28] Furthermore, the Court should decline to exercise pendent jurisdiction over this state law claim given that the federal claims must be dismissed and a balancing of the values of judicial economy, convenience, fairness, and comity tip in Defendants' favor.  *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006); *Klein & Co. Futures Inc. v. Bd. of Trade of N.YC.*, 464 F.3d 255, 262 (2d Cir. 2006).

10(1)(i), and (ii) "relating to . . . [t]he government, protection, order, conduct, safety, health and well-being of persons or property therein" "whether or not they relate to the [City's] property, affairs or government," N.Y. CONST., art. IX, § 2(c)(ii)(10).  This general police power of local governments is "construed liberally in New York."  *N.Y. Pet Welfare Ass'n v. City of N.Y.*, 850 F.3d 79, 92-93 (2d Cir. 2017) (citing N.Y. CONST., art. IX, § 3(c)).

"To implement article IX, the Legislature enacted the [New York] Municipal Home Rule Law . . . [which] gives a municipality, such as the City of New York, the power to enact local laws for the 'protection and enhancement of its physical and visual environment' and for the 'government, protection, order, conduct, safety, health and well-being of persons or property therein." *DJL Rest. Corp. v. City of New York*, 96 N.Y.2d 91, 94 (2001) (internal citation omitted) (quoting N.Y. Municipal Home Rule Law §§ 10(1)(ii)(a)(11)-(12)).  While N.Y. Municipal Home Rule Law § 11 sets forth restrictions on the City's ability to adopt local laws, none of those restrictions concern disaster- and emergency-related issues or real estate or landlord-tenant matters.[29]

In the context of emergency and disaster response, the Legislature has delegated broad legislative and executive powers to the City of New York.  State and local powers during disasters and emergencies are set forth in Article 2-B of the N.Y. Executive Law, which was added by Chapter 640 of the Laws of New York of 1978 ("Chapter 640").  In enacting Chapter 640, the New York State Legislature clearly intended for disasters and emergencies to be

---

[29] Pursuant to this authority, the City Charter vests the City's legislative power in the City Council, N.Y.C. Charter § 21, and states that the City Council has the "power to adopt local laws which it deems appropriate, which are not inconsistent with the provisions of this charter or with the constitution or laws of the United States or this state, for the good rule and government of the city; for the order, protection and government of persons and property; for the preservation of the public health, comfort, peace and prosperity of the city and its inhabitants . . . ." *Id.* § 28(a).

addressed through "joint efforts, public and private," and cooperation between every level of government, "federal, state and local." N.Y. Laws 1978, ch. 640, § 1.

>    2.    The Challenged Laws Are Consistent with New York State Law and, Therefore, Are Not Conflict-Preempted.

"[A] local law is inconsistent [with state law] where [it] prohibit[s] what would be permissible under [s]tate law, or impose prerequisite additional restrictions on rights under [s]tate law, so as to inhibit the operation of the State's general laws." *Garcia*, 31 N.Y.3d at 617 (internal quotations marks omitted). However, the New York Court of Appeals has "cautioned that reading conflict preemption principles too broadly risks rendering the power of local governments illusory." *Id.* (citing *New York State Club Assn. v. City of N.Y.,* 69 N.Y.2d 211, 221 (1987), *aff'd* 487 U.S. 1 (1988)). It has thus stated "conflict preemption is generally found only 'when the State specifically permits the conduct prohibited at the local level' or there is some other indication that deviation from state law is prohibited," *id.* at 617-18 (quoting *New York State Club Assn.*, 69 N.Y.2d at 222)).

Plaintiffs fail to articulate any direct conflict between the Challenged Laws and any of the EOs or State laws they cite. Plaintiffs argue that EO No. 202.3—which suspends any local law that is "in conflict with" the Governor's executive orders—creates a conflict without setting forth any actual conflict. *See* Plaintiffs' Br. at 29-30. If anything, EO No. 202.3 implies that the City Council had the authority to enact the Challenged Laws, s*ee* Ex. C (". . . [A]ny local administrative codes, charters, laws, rules or regulations, are hereby suspended with respect to any such order issued under such authority different or in conflict with Executive directives."). Plaintiffs also claim that the Challenged Laws conflict with EO Nos. 202.9, 202.16, 202.28 202.38 and 202.48, which, *inter alia*, imposed an eviction moratorium and provided rent relief for certain tenants. Compl. ¶ 200; Plaintiffs' Br. at 30. This argument fails because it incorrectly

assumes that the Harassment Laws prohibit landlords from making routine requests for rent or involve rent relief.  Furthermore, none of the Challenged Laws have altered any of the prohibitions contained in the EOs or deviated from any rights conferred by the EOs.  Rather, they have simply conferred additional rights and protections that are not contemplated by State law.  *See Zorn v. How*e, 276 A.D.2d 51, 55 (3d Dep't 2000) (upholding local law against preemption challenge where "the local ordinance *supplements*, rather than supplants, the State legislation" (emphasis added)).

Plaintiffs' allegations that the Challenged Laws conflict with the Tenant Safe Harbor Act ("TSHA") and the Emergency Rent Relief Act of 2020 ("ERRA") are likewise without merit.  Plaintiffs argue that TSHA is in direct conflict with the Residential Harassment Law because under the TSHA landlords are permitted to bring actions for back rent.  The false implication is that the Tenant Harassment Law prohibits bringing such a suit.  *See* Plaintiffs' Br. at 28-29.  But, nothing in the Harassment Laws prohibits or hinders bringing actions of any kind including actions for rent arrears.  Plaintiffs' allegations that the Challenged Laws are preempted based upon conflicts with the ERRA similarly fail.  Plaintiffs argue that the ERRA, which provides for a rental assistance vouchers to struggling tenants, is in conflict with the Residential Harassment Law because it establishes different criteria for assessing tenants' eligibility for rental assistance, and applies to a slightly different time period.  Plaintiffs Br. at 28-29.  This argument lacks merit because the Residential Harassment Law merely prohibits harassment based on COVID-19 status.  It does not change eligibility for any state voucher program.  Moreover, a difference in applicable dates is immaterial.  In short, there is no conflict of any kind, let alone a "head-on collision," between the Challenge Laws and State law.  *N.Y. State*

*Ass'n for Affordable Hous. v. Council of the City of N.Y.*, 141 A.D.3d 208, 215 (1st Dep't 2016).

Plaintiffs' conflict preemption claim thus fails.[30]

3.     <u>The New York State Legislature Has Not Field-Preempted the Response</u>
<u>to COVID-19 or Landlord-Tenant Issues.</u>

To preempt a field, the Legislature must "expressly articulate its intent to occupy

a field" or "do so by implication." *Garcia*, 31 N.Y.3d at 618 (quoting *DJL Rest. Corp.*, 96

N.Y.2d at 95). Such intent "may be implied from the nature of the subject matter being regulated

and the purpose and scope of the [s]tate legislative scheme, including the need for [s]tate-wide

uniformity in a given area." *Id.* (internal quotation marks omitted). Courts may infer such intent

"from a declaration of State policy by the Legislature or from the legislative enactment of a

comprehensive and detailed regulatory scheme in a particular area." *N.Y. State Club Ass'n*, 69

N.Y.2d 211 at 217. "[T]he mere fact that the Legislature has enacted specific legislation in a

particular field does not necessarily lead to the conclusion that broader agency regulation of the

same field is foreclosed," *Garcia*, 31 N.Y.3d at 620 (quoting *Consolidated Edison Co. of N.Y. v*

*Dep't of Envtl. Conservation*, 71 N.Y.2d 186, 193 (1988)).

Plaintiffs seemingly argue that field preemption covers any action to confront the

pandemic, at least insofar as the landlord-tenant relationship and the real estate market is

concerned. *See* Plaintiffs' Br. at 30-31. That argument fails. The N.Y. Executive Law

specifically contemplates local action. *See* N.Y. Laws 1978, ch. 640, § 1. The current pandemic

is a massive public health and economic crisis. None of the EOs or State laws that Plaintiffs cite

---

[30] Finally, although not argued in their moving papers, Plaintiffs allege that "the Residential Harassment Law conflicts with New York's longstanding Urstadt Law . . . ." Compl. ¶ 216. For similar reasons, this argument is without merit. "[T]he Urstadt Law was intended to check City attempts, whether by local law or regulation, to expand the set of buildings subject to rent control or stabilization, and particularly to do so in the teeth of State enactments aimed at achieving the opposite effect." *City of N.Y. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 97 N.Y.2d 216, 227 (2001). As the Residential Harassment Law does not operate to expand rent control or stabilization, it cannot be preempted by the Urstadt Law.

- 30 -

evince an intent to preclude local legislative bodies from taking action to address the impact of these twin crises insofar as they relate to the real estate market. The EOs at issue explicitly authorize State agencies to "assist local governments" (Ex. B (EO No. 202)) and were not designed to preempt the field. Moreover, the TSHA, which places a moratorium on residential evictions due to non-payment of rent, and the ERRA, which provides for residential rent vouchers, were not so expansive to preempt the Challenged Laws.

### D.   The Harassment Laws Provide Sufficient Notice and Clear Standards and, Therefore, Do Not Violate Any Due Process Right.

Plaintiffs claim that the Harassment Laws violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution *on their face* because they are unconstitutionally vague. *See* Compl. ¶¶ 226-30.[31] "Facial challenges are generally disfavored" since courts are reluctant to rely on speculation, *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010), or to formulate constitutional law that is broader than the particular facts before the Court. *United States v. Raines*, 362 U.S. 17, 21 (1960); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge . . . [is] the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Furthermore, "vagueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the statute's facial validity." *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993).

Plaintiffs' vagueness claim fails regardless of whether it is construed as a facial or an as-applied claim. "[A]n enactment is void for vagueness if its prohibitions are not clearly defined," *i.e.*, if the law fails to (i) "give[] the person of ordinary intelligence a reasonable

---

[31] Plaintiffs also allege a violation of the State Due Process Clause. Compl. ¶¶ 241-45. Because the legal standards applicable to state vagueness challenges are identical to their federal counterparts, *see People v. Nelson*, 69 N.Y.2d 302, 307 (1987), Plaintiffs' State Due Process claim fails for the same reasons, *infra*.

opportunity to know what is prohibited" and (ii) "provide[] explicit standards for those who apply [it]." *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972).  In determining the first prong of this test, the Court must ask whether the Harassment Laws "'present[] an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed.'" *Dickerson*, 604 F.3d at 745-46 (internal citations omitted).  In determining the second prong, Plaintiffs must show that the Harassment Laws "authorize[] or even encourage[] arbitrary and discriminatory enforcement."  *Dickerson*, 604 F.3d at 747 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  This issue presents the Court with two questions: "(1) Whether the 'statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement,' and, if not, (2) whether, 'even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition.'"  *Id.* at 748 (quoting *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006)).

Because Plaintiffs' vagueness arguments mirror their First Amendment arguments and reflect a severe misconstruction of the Harassment Law, these arguments fail for the same reasons set forth in Point I(A)(1), *supra*.  In short, the Harassment Laws give Plaintiffs and other landlords, a reasonable opportunity to know what conduct is prohibited, and provide, on their face, explicit standards for courts to rely upon when reviewing harassment claims.

### POINT II

### PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF SHOULD BE DENIED IN ITS ENTIRETY.

A preliminary injunction "is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990).  In the Second Circuit, a moving party may meet the standard for a preliminary injunction if it: (i) "show[s] irreparable harm"; and (ii) "either a likelihood of success on the merits or 'sufficiently

serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Id.* (internal citations omitted).   However, "the less rigorous fair-ground-for-litigation standard" is not available here, "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989); *see also Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995).

### A.   Plaintiffs Cannot Establish a Likelihood of Success on the Merits.

The arguments set forth in Point I in support of Defendants' motion to dismiss, *supra*, conclusively establish that Plaintiffs' claims fail as a matter of law.   For those reasons, Plaintiffs are unable to demonstrate a likelihood of success on the merits of their claims. Because a likelihood of success must be shown here, *see Plaza Health*, 878 F.2d at 580, Plaintiffs' request for preliminary injunctive relief must be denied.

### B.   Plaintiffs Have Failed to Show the Requisite Irreparable Harm.

Plaintiffs argue that constitutional violations are sufficient to demonstrate irreparable harm.   Plaintiffs' Br. at 32 (citation omitted).   The irreparable injury requirement dovetails with the requirement that Plaintiffs demonstrate a likelihood of success on the merits of their claims, and as Plaintiffs cannot establish a likelihood of success on the merits, they also fail to establish irreparable harm.   Plaintiffs also argue that the Challenged Laws "will make it difficult—if not impossible—for [Plaintiffs] to recover rent from a large portion of their tenants, even after the COVID-19 crisis is over, leading to the potential ruin of their businesses." Plaintiffs' Br. at 33.   This argument fails for two reasons.   First, the harm must be "certain and imminent harm *for which a monetary award does not adequately compensate*." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003) (emphasis added).   "A monetary loss will not suffice unless the movant provides evidence of damage that cannot be

rectified by financial compensation." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). Plaintiffs have failed to submit such evidence or explain why a monetary award would not compensate them. Second, the Harassment Laws do not prevent or prohibit Plaintiffs (a) from making lawful demands for rent or (b) either (i) from recovering unpaid rent in the form of a monetary judgment either in a summary proceeding or in an action, or (ii) from recovering possession of the premises through an eviction proceeding. Similarly, the Guaranty Law only prevents Plaintiff from recovering rent due during the COVID-19 period through enforcement of a personal guaranty or liability provision. These arguments are insufficient to demonstrate irreparable harm and, thus, Plaintiffs' motions must be denied.

### C. A Preliminary Injunction Is Not in the Public Interest.

Finally, Plaintiffs argue that an injunction is in the public interest because (a) "enforcement of an unconstitutional law is always contrary to the public interest," and (b) "the injunction would aid[] the local economy." Plaintiffs' Br. at 34 (citations and quotation marks omitted). As noted above, in enacting the Challenged Laws, the City sought to address widespread social and economic harms exacerbated by the COVID-19 pandemic. Plaintiffs' own view—which is hardly supported by expert opinion—of what "would aid[] the local economy" is self-serving and insufficient to prevail on this prong.[32]

### POINT III

### PLAINTIFFS' REQUEST FOR DECLARATORY RELIEF SHOULD BE DENIED IN ITS ENTIRETY.

Plaintiffs also seek declaratory relief. *See* Plaintiffs' Br. at 34. Plaintiffs' request should be denied. First, there is no such thing as *preliminary* declaratory relief. *See Doran v.*

---

[32] Plaintiffs fail to argue that the balance of the equities tips in their favor. The balance of the equities tips in Defendants' favor because, in the face of massive public health and economic crises, those most impacted by the COVID-19 pandemic warrant recognition and protection.

*Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *Perez v. Decker*, No. 10683-18, 2019 U.S. Dist. LEXIS 170185, at \*33 (S.D.N.Y. Sep. 30, 2019).   Second, insofar as Plaintiffs' request is for final declaratory relief, such request is improper, as Plaintiffs cannot obtain ultimate relief by virtue of a pre-answer motion.  *See Int'l Bhd. of Teamsters v. E. Conference of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y. 1995); *see also Powell v. Fannie Mae*, No. 1359-16, 2017 U.S. Dist. LEXIS 15720, at \*6 (S.D.N.Y. Feb. 2, 2017).[33]  Finally, even if the Court were to consider such a motion, Plaintiffs' request for declaratory relief should be denied in its entirety for the same reasons set forth in Points I and II.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion for preliminary injunctive and declaratory relief and grant Defendants' motion to dismiss.

Dated:      New York, New York
            August 12, 2020

                              **JAMES E. JOHNSON**
                              Corporation Counsel of the City of New York
                              Attorney for Defendants


                              By:_____/s/_____
                                  Pamela A. Koplik
                                  Carlos Fernando Ugalde Alvarez
                                  100 Church Street, 4th Floor
                                  New York, New York  10007
                                  E-mails: pkoplik@law.nyc.gov
                                             cugalde@law.nyc.gov

---

[33] For the same reason, *i.e.,* that it is ultimate relief sought, Plaintiffs' request for attorneys' fees and costs should be denied at this stage.