## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> The City of New York, *a municipal entity*, Bill de Blasio, *as Mayor of the City of New York*, Louise Carroll, *Commissioner of New York City Department of Housing Preservation & Development*, and Jonnel Doris, *Commissioner of New York City Department of Small Business Services*, <br><br> *Defendants.* | Civ. No. 1:20-cv-05301-RA |

## BRIEF OF *AMICUS CURIAE* VOLUNTEERS OF LEGAL SERVICE
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE
## AND DECLARATORY RELIEF

VOLUNTEERS OF LEGAL SERVICE

Arthur Kats, Esq.
Director, Microenterprise Project
40 Worth St, Suite 820
New York, NY 10013
Tel: (347) 521-5721
Fax: (347) 521-5736
E-mail: akats@volsprobono.org

Michael J. Harris, Esq.
40 Worth St, Suite 820
New York, NY 10013
E-mail: mharris@volsprobono.org

*Attorneys for Volunteers of Legal Service*

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICUS CURIAE* ................................................................... 1

PRELIMINARY STATEMENT ................................................................................................ 2

ARGUMENT ...................................................................................................................... 3

I.     Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims ............................ 3

    A.   Plaintiffs lack standing for their First Amendment challenges and the Commercial Tenant Harassment Law does not violate the Due Process Clause ....................... 3

    B.   The Guaranty Law does not violate the Contracts Clause. .................................... 9

    C.   The Commercial Tenant Harassment Law and Guaranty Law are not preempted by New York State Law ........................................................................................ 14

        i. The Commercial Tenant Harassment Law and Guaranty Law are not conflict preempted ................................................................................................................ 15

        ii. The Commercial Tenant Harassment Law and Guaranty Law are not field preempted ................................................................................................................ 17

II.    An Injunction is Not in the Public's Interest .............................................................. 18

CONCLUSION ..................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ........................................... 9, 10, 11

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006)..................................................... 10

*Carrico v. City & County of San Francisco*, 656 F.3d 1002 (9th Cir. 2011) ........................... 8, 9

*Elmsford Apartment Associates, LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456 (S.D.N.Y. June 29, 2020)........................................................................................................ 12

*Eric M. Berman, P.C. v. City of N.Y.*, 25 N.Y.3d 684 (2015)................................................ 15, 17

*Garcia v. New York City Dep't of Health & Mental Hygiene*, 31 N.Y.3d 601 (2018)14, 15, 17, 18

*Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2007)...................................... 18

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) .................................................. 9, 12

*Leader v. Maroney*, 97 N.Y.2d 95 (2001)................................................................................... 5, 6

*N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013)............................. 18, 19

*New York State Ass'n for Affordable Hous. v. Council of City of N.Y.*, 141 A.D.3d 208 (1st Dep't 2016) ............................................................................................................................... 15

*One Wythe LLC v. Elevations Urban Landscape Design Inc.*, No. LT-77696-19/KI, 2020 NY Misc. LEXIS 1477 (Civ Ct, Kings County Apr. 17, 2020) ....................................................... 5

*Patrolmen's Benevolent Ass'n of City of N.Y. v. City of N.Y.*, 142 A.D.3d 53 (1st Dep't 2016).. 14

*Renne v. Geary*, 501 U.S. 312 (1991) ........................................................................................... 3

*Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 993 (1997) ...................... 10, 14, 23

*Silberberg v. Board of Elections v. N.Y.*, 216 F. Supp. 3d 411 (S.D.N.Y. 2016) ........................ 18

*Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54 (2d Cir. 2020) ............................... 11, 13

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)....................................................... 3, 4, 8

*Tunick v. Safir*, 209 F.3d 67 (2d Cir. 2000) ................................................................................... 5

*Twentieth Century Associates, Inc. v. Waldman*, 294 N.Y. 571 (1945) ................................. 12, 13

*Twentieth Century Associates, Inc. v. Waldman*, 326 U.S. 697 (1946) (*per curiam*).................. 13

*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010) ............................................. 8

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)................................ 18, 19

**Statutes**

N.Y.C. Admin. Code § 22-902 ......................................................................................... 6, 7, 8, 15

**Other Authorities**

17A MOORE'S FEDERAL PRACTICE - CIVIL § 124.22(3) (2020)....................................................... 5

**Constitutional Provisions**

N.Y. CONST. art. IX, § 2(c) ..................................................................................................... 14, 17

U.S. CONST. art III § 2 ..................................................................................................................... 3

U.S. CONST. art. I, § 10 ................................................................................................................... 8

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

Volunteers of Legal Service ("VOLS") was established as a non-profit organization in 1984 by New York City Bar leaders in response to severe federal budget cuts to pro bono civil legal services. The VOLS Microenterprise Project, one of VOLS' five population-based projects, assists New York City's underserved low- and moderate-income small business owners with legal issues that arise in connection with starting and operating a business. As a legal services provider under the New York City Commercial Lease Assistance Program since 2017, the VOLS Microenterprise Project has assisted countless small business owners with negotiating and drafting commercial leases and personal guaranties, and resolving commercial landlord-tenant disputes including instances of landlord harassment. A substantial portion of the VOLS Microenterprise Project's work since the pandemic reached New York City has been devoted to helping commercial tenants understand the rapidly shifting legal landscape and resolving disputes arising as a result of the crisis and the government-mandated closure of all non-essential businesses.

VOLS' purpose is to provide free civil legal services when and where they are needed most. As a non-profit organization working tirelessly to ensure that New York City's small business community survives the unprecedented and devastating effects of the COVID-19 pandemic, VOLS is intimately familiar with the issues currently facing small business owners. Accordingly, VOLS has a substantial interest in ensuring that the issues facing New York City's small business owners—who will be irreparably harmed by any judicial decision enjoining enforcement of the Laws challenged in this case—are adequately presented to the Court. To that end, and to ensure that the voice of the New York City small business community is heard in this

incredibly consequential suit, VOLS respectfully submits the herein *amicus* brief in aid of the Court.

## **PRELIMINARY STATEMENT**

This case comes before the Court in the midst of the worst global health crisis since the 1918 influenza pandemic. Without meaningful regard for the devastating effects of the current public health crisis on Americans across the nation, Plaintiffs ask this Court to enjoin New York City laws designed to lessen the economic impact on over 240,000 small businesses regularly employing over 3 million New Yorkers—the life-blood of New York City's economy.  The challenged Laws—Local Law 53 of 2020 (the "Commercial Tenant Harassment Law") and Local Law 55 of 2020 (the "Guaranty Law")—provide critical relief to small businesses at a time when their survival hangs in the balance. Enacted against the backdrop of New York City's struggling small business community, these Laws were necessary, reasonable, and well within the power of the City Council's authority.

An injunction is an extraordinary judicial remedy and should not be granted unless the party seeking one establishes: (1) irreparable harm; (2) a likelihood of success on the merits; (3) a balance of interests that tips in its favor; and (4) that the injunction is in the public's interest. As will be explained below, this Court should deny Plaintiffs' Motion for Preliminary Injunctive and Declaratory Relief because Plaintiffs have failed to demonstrate these bases for relief. Plaintiffs lack standing to challenge the Commercial Tenant Harassment Law under the First Amendment and that Law does not violate the Due Process Clause or the New York State doctrine of preemption. Similarly, the Guaranty Law violates neither the preemption doctrine nor the Contracts Clause. Moreover, critically important to this case, a preliminary injunction is not in the public interest. As federal stimulus aid and the eviction moratorium draw to an imminent

end, small business is on the brink.  Enjoining the relief provided by the challenged legislation would pave the way to potentially irreversible economic and cultural harm with massive commercial tenant displacement and would consequently further exacerbate the City's already struggling economy as it pursues a safe and equitable reopening.

## ARGUMENT

### I. Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims

A. Plaintiffs lack standing for their First Amendment challenges and the Commercial Tenant Harassment Law does not violate the Due Process Clause

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" imposing restraints on the cases that they may adjudicate. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014); *see* U.S. CONST. art III § 2. The doctrine of standing effectuates the limitations placed on federal courts by Article III and prevents "the judicial process from being used to usurp the powers of the political branches." *Driehaus*, 573 U.S. at 157. A party seeking to invoke the jurisdiction of the federal courts bears the burden of proving that it has standing. *Id.* at 158. Importantly, the Supreme Court has instructed that there is a presumption that federal courts lack jurisdiction. *See Renne v. Geary*, 501 U.S. 312, 316 (1991) ("We presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." (internal quotations omitted)).

In order to successfully prove standing, a plaintiff must show: (1) an injury-in-fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Id.* at 157–158. "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not 'conjectural' or 'hypothetical.''" *Id.* at 158. In the context of a pre-enforcement suit, "[a] plaintiff

satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, *but proscribed by a statute*, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159 (emphasis added). If a plaintiff cannot meet this standard, it cannot prove the existence of an injury-in-fact, and therefore lacks standing. *See id.*

Plaintiffs allege that the Commercial Tenant Harassment Law violates their First Amendment rights. (Compl. ¶¶ 138–155, ECF 1; Pls.' Mem. Supp. Prelim. Inj. 15–23, ECF 28.) In particular, Plaintiffs allege that the Law imposes content-based restrictions on protected commercial speech, prohibiting them from making lawful demands for rent and explaining the consequences of failure to pay rent to tenants. (Pls.' Mem. Supp. Prelim. Inj. 15, ECF 28.) Plaintiffs also concede that this is a pre-enforcement suit (Pls.' Mem. Supp. Prelim. Inj. 17 n. 6, ECF 28.), and as such, they must satisfy the standard articulated in *Susan B. Anthony List v. Driehaus* in order to establish that they have standing. *See Driehaus*, 573 U.S. at 159. However, they cannot carry their burden of meeting that standard.

Assuming, *arguendo*, that Plaintiffs seek to engage in a course of conduct affected with a constitutional interest (i.e., making lawful demands for rent and explaining the consequences of failing to pay rent), they cannot show that this conduct is "arguably . . . proscribed" by the Commercial Tenant Harassment Law. *Cf. id.* at 162–163. A review of the Law's text makes plain that the Commercial Tenant Harassment Law does not prohibit landlords from making lawful requests for rent or explaining the legal and/or contractual consequences of the failure to pay rent. Moreover, the legislative history of the Law confirms that it does not reach the speech that Plaintiffs seek to engage in. Because Plaintiffs cannot establish that the challenged Law arguably

proscribes their intended speech, and consequently, that they have standing, they cannot succeed on the merits of their First Amendment claim.

As of the date of this brief, no court in the State of New York has published any opinion construing the newly enacted Commercial Tenant Harassment Law and Plaintiffs have presented no authority showing that the Law actually reaches their intended speech.[1] Thus, this Court must attempt to construe the Law to determine whether it arguably reaches Plaintiffs' intended speech. Although the task of construing a state statute "properly belongs to a state court, which must decide which canons of construction it can and should apply," this Court can attempt to construe the statute as New York's highest court—the New York Court of Appeals—would if it had the opportunity. *See Tunick v. Safir*, 209 F.3d 67, 75 (2d Cir. 2000); 17A MOORE'S FEDERAL PRACTICE - CIVIL § 124.22(3) (2020) ("When state law is unsettled, the federal court must attempt to predict how the state's highest court would rule if confronted with the issue . . . In determining the meaning of state statutes, the federal courts apply the state's rules of statutory construction.").

The New York Court of Appeals applies the general rule that, "[i]n interpreting a statute, the starting point in any analysis must be the plain meaning of the statutory language," and "meaning and effect should be given to every word . . . ." *Leader v. Maroney*, 97 N.Y.2d 95, 104 (2001) Stated differently, "[w]ords are not to be rejected as superfluous where it is practicable to give each a distinct and separate meaning." *Id.* Moreover, the New York Court of Appeals has looked to the history of the legislation in confirming its construction of disputed statutory language. *See id.* ("Our analysis is buttressed by an examination of the legislative history behind

---

[1] We note that in a recent decision, the Civil Court of Kings County issued an opinion construing other aspects of the Commercial Tenant Harassment Law not relevant to the instant proceeding. *See One Wythe LLC v. Elevations Urban Landscape Design Inc.*, No. LT-77696-19/KI, 2020 NY Misc. LEXIS 1477, at *24–25 (Civ Ct, Kings County Apr. 17, 2020).

[the statute].""). In view of these principles, it is clear that the Commercial Tenant Harassment Law does not reach Plaintiffs' intended speech.

The Commercial Tenant Harassment Law proscribes the harassment of a commercial tenant. *See* N.Y.C. Admin. Code § 22-902(a). Under the Law, commercial tenant harassment includes "any act or omission by or on behalf of a landlord that would reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law," and includes one or more statutorily enumerated acts. *Id.* Among the enumerated acts, and as relevant to this case, the Commercial Tenant Harassment Law prohibits "threatening a commercial tenant based on . . . [its] status as a person or business impacted by COVID-19, or [its] receipt of a rent concession or forbearance . . . during the COVID-19 period." N.Y.C. Admin. Code § 22-902(a)(11). Importantly, the Law's explicit safe harbor for landlords clarifies that "[a] landlord's lawful termination of a tenancy, lawful refusal to renew or extend a lease or other rental agreement, or lawful reentry and repossession of the covered property" does not constitute commercial tenant harassment. N.Y.C. Admin. Code § 22-902(b).

By its plain text, the Commercial Tenant Harassment Law does not prohibit Plaintiffs from making lawful requests for rent or explaining the consequences of failing to pay rent. In their argument Plaintiffs focus entirely on the statute's use of the word "threatening" without regard to the remaining elements of the Commercial Tenant Harassment Law. (*See* Pls.' Mem. Supp. Prelim. Inj. 17–18, ECF No. 28.) This, the Plaintiffs may not do. *See Maroney*, 97 N.Y.2d at 104 ("[M]eaning and effect should be given to every word in a statute."). Based on its text, the Commercial Tenant Harassment Law requires a showing of three main elements: (1) a threat; (2) *based on a commercial tenant's status as a person or business impacted by COVID-19 or receipt*

*of a rent concession or forbearance*; (3) that would reasonably cause a commercial tenant to vacate covered property or surrender rights under a lease. *See* N.Y.C. Admin. Code § 22-902(a) (emphasis added).

A landlord's threat of eviction based on the failure of a commercial tenant to pay rent is, in and of itself, not a threat based on the commercial tenant's status as a person or business impacted by COVID-19 or receipt of a rent concession, as defined by the statute. To be sure, a business could be impacted by COVID-19 or have received a rent concession or forbearance but still be paying the rent to which the landlord is contractually entitled. Although in many cases a business's status as having been impacted by COVID-19 may be the cause of its inability to pay rent, that characteristic may not be the sole reason or basis for a landlord's actions under the Law.  Plaintiffs in this case concede that they do not seek to "threaten" their tenants with eviction on this basis, but rather solely to demand contractual compliance (i.e., the payment of rent). (Pls.' Mem. Supp. Prelim. Inj. 18, ECF 28.) Thus, although the COVID-19 pandemic may be the basis for a commercial tenant's inability to pay rent, the Law places no restriction on that tenant's landlord from seeking contractual compliance.

The text of the Law further demonstrates that the Commercial Tenant Harassment Law does not reach the speech that Plaintiffs allege it does. The Law expressly states that a landlord's "lawful termination of a tenancy" does not constitute commercial tenant harassment. Plaintiffs concede that "before landlords can even commence non-payment proceedings in court, they must first make rent demands." (Pls.' Mem. Supp. Prelim. Inj. 19 n. 9, ECF 28.) It follows that, in order to give meaning and effect to N.Y.C. Admin. Code § 22-902(b), lawful rent demands made in furtherance of a lawful termination of a lease predicated upon non-payment of rent is neither

precluded nor affected by § 22-902(a)(11). Nor can the statute prohibit a landlord from communicating with its tenant the lawful consequences of failing to pay rent.

This is also consistent with the legislative history of the Law, which explicitly provides that nothing in the Law is intended to limit "*the right of a landlord to terminate a tenancy, refuse to renew or extend a lease or other rental agreement, or reenter and repossess property . . . and the obligation of a commercial tenant to continue paying rent owed*." (Kats Decl. ¶ 19, Ex. 20 at 35 (emphasis added).) The text of the statute, as buttressed by its legislative history, shows that it does not reach the speech that Plaintiffs allege it does and therefore does not arguably proscribe their intended conduct. *Cf. Driehaus*, 573 U.S. at 162–163. Thus, Plaintiffs have not established an injury-in-fact, thereby failing to establish standing necessary to invoke the jurisdiction of this Court. This Court therefore need not inquire further on Plaintiffs' Motion for Preliminary Injunctive and Declaratory Relief concerning the Commercial Tenant Harassment Law because without standing, Plaintiffs have no likelihood of succeeding on the merits.[2]

The Ninth Circuit came to precisely this conclusion in a case quite similar to this one. In *Carrico v. City & County of San Francisco*, the plaintiffs, a non-profit association of landlords and two landlords in their individual capacities, filed suit alleging that a San Francisco ordinance prohibiting residential landlords from attempting to coerce tenants to vacate with offers of money accompanied by threats violated the First Amendment and Due Process Clause. 656 F.3d 1002, 1004 (9th Cir. 2011). On appeal, the Court of Appeals for the Ninth Circuit *sua sponte* requested briefing on whether the parties satisfied the requisite test for standing in a pre-

---

[2] The Law does not violate the Due Process Clause because, in accordance with the above interpretation, it gives a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" *See VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010). To be sure, the statute sets forth a clear and unambiguous definition of "impacted by COVID-19," and makes clear that any threats on that basis constitute commercial tenant harassment. *See* N.Y.C. Admin. Code § 22-902(a)(11)(b)–(c). As such, it is not void for vagueness.

enforcement suit. *Id.* at 1005. The Court then held that the plaintiffs' "conclusory allegation" that the challenged law impacted their operations as landlords was insufficient to establish standing. *Id.* at 1006.

In *Carrico*, the Court noted that "[m]ere allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (internal quotations omitted). The Court rejected the plaintiff's argument that her desired conduct was arguably proscribed by the challenged law even though the plaintiff's tenant sued her alleging that certain conduct violated the law because the plaintiff's suit concerned "*the City's* ability to enforce [the Law]," and not a private party's. *Id.* at 1008. "That a private individual has invoked [the law] for his own ends does not remotely imply that the City endorses a similarly expansive interpretation." *Id.* So too here. That a tenant could theoretically allege that ordinary rent demands fall within the scope of the Commercial Tenant Harassment Law does not make it so, especially when no court in the State has held as much. The Plaintiffs cannot establish that their conduct is arguably proscribed by the Commercial Tenant Harassment Law and the Court lacks standing to reach the merits of their claim.

B.  <u>The Guaranty Law does not violate the Contracts Clause.</u>

The Contracts Clause of the U.S. Constitution provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. CONST. art. I, § 10; *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978). Although on its face, the Contracts Clause appears absolute, the Supreme Court has recognized that it is not "the Draconian provision that its words might seem to imply." *Allied Structural Steel*, 438 U.S. at 240; *see Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934) ("The prohibition [of the Contracts Clause] is not an absolute one and is not to be read with literal exactness like a mathematical formula.") Rather,

9

the Contracts Clause must give way to "the police power of a state to protect the general welfare

of its citizens, a power which is 'paramount to any rights under contracts between individuals.'"

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006). To that end, "state laws that

impair an obligation under a contract do not necessarily give rise to a viable Contracts Clause

claim." *Id.* at 368.

 In analyzing whether a law violates the Contracts Clause, the Court must ask whether: (1)

the contractual impairment is substantial; and, if so, (2) whether the law serves a legitimate

public purpose such as remedying a general social or economic problem; and, if so, (3) whether

the means chosen to accomplish the purpose are reasonable and necessary. *Buffalo Teachers*, 464

F.3d 368. In assessing whether a contractual impairment is substantial, the primary consideration

is "the extent to which reasonable expectations under the contract have been disrupted. *Id.*;

*Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 985, 993 (1997) (citing *Allied

Structural Steel*, 438 U.S. at 244). "Impairment is greatest where the challenged government

legislation was wholly unexpected." *Sanitation & Recycling*, 107 F.3d at 993. If a contractual

impairment is substantial, the next step is to examine the state's justification. *Id.* The challenged

law must have a legitimate public purpose, and it must be aimed at "remedying an important

general social or economic problem rather than providing a benefit to special interests." *Id.*

(internal quotations omitted). Finally, if a law substantially impairs contractual obligations and

the state has a legitimate purpose in enacting the law, a court must ask whether the law is

"specifically tailored to meet the societal ill it is supposedly designed to ameliorate." *Id.*

 Plaintiffs allege that the Guaranty Law violates the Contracts Clause because it "strip[s]

them of critical personal guaranties," without which they would not have entered into leases with

local commercial tenants. (Compl. ¶¶ 156, 159, ECF 1; Pls.' Mem. Supp. Prelim. Inj. 23–28,

ECF 28.) Plaintiffs contend that the contractual impairment is substantial because it "not only disrupts, but actually destroys the reasonable expectations of the parties to commercial lease agreements." (Pls.' Mem. Supp. Prelim. Inj. 24, ECF 28.) Moreover, Plaintiffs boldly assert—in the midst of a pandemic that has caused an economic crisis that threatens to upend the small business community in New York City—that "the Guaranty Law is not aimed at addressing [the economic] emergency in any legitimate way." (Pls.' Mem. Supp. Prelim. Inj. 26, ECF 28.) Finally, Plaintiffs argue that even if the government had a legitimate purpose in enacting the Guaranty Law, the Law is not reasonable and necessary to serve that purpose. (Pls.' Mem. Supp. Prelim. Inj. 26, ECF 28.) Because the Law does not substantially impair Plaintiffs' contractual rights, it does not violate the Contracts Clause and the Court need not address whether the Law is reasonable and necessary to serve a legitimate government purpose. Moreover, even if the Court concludes that the Guaranty Law does substantially impair Plaintiffs' contracts, the Law is reasonable and necessary to serve a legitimate government purpose.

The severity of a contractual impairment measures "the height of the hurdle the state legislation must clear." *Allied Structural Steel*, 438 U.S. at 245. "Minimal alterations of contractual obligations may end the inquiry at its first stage." *Id.* Moreover, the primary consideration in evaluating the substantiality of a contractual impairment is the extent to which reasonable expectations have been disrupted, which in turn "depends, in part, on whether legislative action was foreseeable. . . . " *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020). Because legislative action modifying the contractual obligations between commercial landlord and tenant during an economic and public health crisis was foreseeable, and because the Guaranty Law only affects a minimal, time-limited impairment of Plaintiffs' agreements, the Law does not substantially impair their contracts. *See Sullivan*, 959 F.3d at 644;

*see generally Twentieth Century Associates, Inc. v. Waldman*, 294 N.Y. 571 (1945), *cert. dismissed*, 326 U.S. 697 (1946).

In *Twentieth Century Associates, Inc. v. Waldman*, the New York Court of Appeals addressed a New York State law retroactively limiting the maximum amount of rent that a commercial landlord could collect from its commercial tenant in New York City, notwithstanding preexisting contractual provisions to the contrary. 294 N.Y. at 577–578. The statute challenged in that case was enacted in response to a declared public emergency resulting from World War II. *Id.* at 577–579. In sustaining the validity of the statute and rejecting challenges based on the Contracts Clause, the New York Court of Appeals held that:

> "The principle is firmly established today that all contracts are subject to the police power of the State, and, when emergency arises and the public welfare requires modification of private contractual obligations in the public interest, the question is not whether 'legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end.'" *Waldman*, 294 N.Y. at 580 (quoting *Blaisdell*, 290 U.S. at 438).

*Waldman* is key here for two primary reasons: First, it shows that Plaintiffs were on notice of the government's ability to modify their contractual relations with their tenants in times of economic crisis, as the City Council did in enacting the Laws challenged here. *See Elmsford Apartment Associates, LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *13 (S.D.N.Y. June 29, 2020) ("Because past regulation puts industry participants on notice that they may face further government intervention in the future, a later-in-time regulation is less likely to violate the [C]ontracts [C]lause where it covers the same topic [as the prior regulation] and shares the same overt legislative intent to protect [the parties protected by the prior regulation].'"). Plaintiffs cannot complain that their reasonable expectations were frustrated by the Guaranty Law because that Law does not even go as far as the retroactive restrictions

12

sustained in *Waldman*.[3] Because their reasonable expectations were not frustrated by this foreseeable regulation of the commercial landlord-tenant relationship, Plaintiffs' contractual rights have not been substantially impaired. *See Sullivan*, 959 F.3d at 644 ("The substantiality of an impairment depends upon 'the extent to which reasonable expectations under the contract have been disrupted,'" which in turn "depends, in part, on whether legislative action was foreseeable.").

Even assuming, *arguendo*, that Plaintiffs' contractual rights were substantially impaired, *Waldman* remains important for a second reason: After analyzing the statute challenged in *Waldman*, the Court explicitly upheld the regulation as "a most reasonable and legitimate remedy, carefully designed as appropriate to the public ends [] and the accomplishment of the legislative purpose." 294 N.Y. at 581. Important to the Court's holding in *Waldman* was the fact that the challenged statute was "temporary, since the operation of the statute [was] dependent upon the continuance of the emergency . . . ." *Id.* at 582. So too here, where the Guaranty Law only suspends personal guaranties for the months of March through September 2020, the months most heavily impacted by the present public emergency.  And, on appeal to the U.S. Supreme Court in *Waldman*, the Court held simply, "[t]he appeal is dismissed for want of a substantial federal question." *Twentieth Century Associates, Inc. v. Waldman*, 326 U.S. 697 (1946) (*per curiam*). The Guaranty Law similarly poses no substantial federal question, because it does not substantially impair contractual obligations, and even if it does, the Law is reasonable and

---

[3] The law challenged in *Waldman* took effect on January 24, 1945 and retroactively limited commercial rent in New York City to 15% above rents charged on March 1, 1943. As such, it actually deprived landlords of all rents above that amount regardless of their contractual entitlement to any of those amounts. *See Waldman*, 294 N.Y. at 577–578. Here, the Guaranty Law does not, on its face, deprive landlords of the rents to which they are entitled. Rather, it only forecloses them from enforcing personal guaranties against individual guarantors for defaults occurring during the six-month period during which the City was most dramatically affected by the pandemic. The commercial tenant, however, remains liable for the rents owed. This, combined with the fact that most commercial leases span a range of five to ten years and personal guaranties are only affected for a period of six months, shows that the Guaranty Law affects only a minimal impairment of Plaintiffs' contracts.

necessary to serve the government's legitimate interest in protecting New York City's small business owners from being pushed to the brink of personal bankruptcy, which would further exacerbate the present economic crisis.[4]

      C.  <u>The Commercial Tenant Harassment Law and Guaranty Law are not preempted by New York State Law.</u>

"Under New York's constitutional 'home rule' provision, municipalities are accorded 'broad police powers . . . relating to the welfare of their citizens,' provided local governments refrain from adopting laws that are inconsistent with the Constitution or state statutes." *Patrolmen's Benevolent Ass'n of City of N.Y. v. City of N.Y.*, 142 A.D.3d 53, 58 (1st Dep't 2016); *see* N.Y. CONST. art. IX, § 2(c). A local law may be preempted by state law where: (1) there is a direct conflict with a state statute (i.e., conflict preemption); or (2) where the legislature has articulated its intent to occupy the particular field (i.e., field preemption). *Garcia v. New York City Dep't of Health & Mental Hygiene*, 31 N.Y.3d 601, 617 (2018) "The preemption doctrine represents a fundamental limitation on home rule powers and embodies the untrammeled primacy of the legislature to act . . . with respect to matters of state concern." *Id.* (internal quotations omitted). However, the New York Court of Appeals has cautioned courts not to apply the preemption doctrine too broadly, lest the powers of local government be rendered illusory. *Id.*

      Plaintiffs contend that the Commercial Tenant Harassment Law and the Guaranty Law are preempted by New York State law. (Pls.' Mem. Supp. Prelim. Inj. 28–32, ECF 28.) In

---

[4] Plaintiffs allege that "extinguishing Plaintiffs' personal guaranties in [the] fashion [chosen by the City Council] is unreasonable because the Guaranty Law is not tailored at all to meet the societal ill it ostensibly seeks to ameliorate: i.e., the impact of the Pandemic on the City's small businesses." (Pls.' Mem. Supp. Prelim. Inj. 27, ECF 28.) Their argument, however, doesn't hold water because "[w]hen reviewing a law that purports to remedy a pervasive economic or social problem," a court's analysis must be "carried out with a healthy degree of deference to the legislative body that enacted the measure." *Sanitation & Recycling*, 107 F.3d at 994.

particular, Plaintiffs contend that the Laws are conflict preempted, because they conflict with certain state legislative enactments, and field preempted, because "the Legislature has occupied the field of responding to the Pandemic in the real estate industry . . . ." (Pls.' Mem. Supp. Prelim. Inj. 28–32, ECF 28.) Plaintiffs offer little if any authoritative precedent to support such a broad-sweeping application of the preemption doctrine, and if this Court were to accept such an approach, the powers of local government in a place as unique as New York City would be rendered illusory. *See Garcia*, 31 N.Y.3d at 617.

### i.     The Commercial Tenant Harassment Law and Guaranty Law are not conflict preempted.

"Under the doctrine of conflict preemption, a local law is preempted by a state law when 'a right or benefit is expressly given . . . by . . . State law which has then been curtailed or taken away by the local law.'" *New York State Ass'n for Affordable Hous. v. Council of City of N.Y.*, 141 A.D.3d 208, 214–215 (1st Dep't 2016). If a local law prohibits what a state law explicitly allows, or explicitly allows what a state law prohibits, the local law is conflict preempted. *See id.* at 215.; *see also Eric M. Berman, P.C. v. City of N.Y.*, 25 N.Y.3d 684, 690 (2015) "The crux of conflict preemption is whether there is 'a head-on collision between the . . . ordinance as it is applied' and a state statute." *Ass'n for Affordable Hous.*, 141 A.D.3d at 215. "[T]he fact that both the [s]tate and local laws seek to regulate the same subject matter does not in and of itself give rise to an express conflict." *Garcia*, 31 N.Y.3d at 617 (internal quotations omitted). Because neither the Commercial Tenant Harassment Law nor the Guaranty Law conflict with state law, they are not conflict preempted.

Plaintiffs argue that the Commercial Tenant Harassment Law is preempted by the Tenant Safe Harbor Act ("TSHA"), Emergency Rent Relief Act ("ERRA"), and Governor Cuomo's Executive Orders 202.28 and 202.48. (Pls. Mem. Supp. Prelim. Inj. 28, ECF 28.)  When properly

construed, however, the Commercial Tenant Harassment Law does not prohibit landlords from making lawful demands for rent as Plaintiffs suggest. *See* Section II A, *supra*. Rather, it prohibits landlords from making threats on the basis of a *commercial* tenant's status as being impacted by COVID-19 or its receipt of a rent concession or forbearance, which is not even remotely addressed by the TSHA or ERRA.[5] Nor does the Commercial Tenant Harassment Law conflict with Governor Cuomo's Executive Orders providing a moratorium on evictions, because the Law places no limitations on a landlord's right to lawfully evict a tenant. *See* N.Y.C. Admin. Code § 22-902(b). Thus, the Commercial Tenant Harassment Law does not collide head-on with a state statute or Governor Cuomo's Executive Orders and it is not conflict preempted.

Similarly, the Guaranty Law does not conflict with state law because it does not deprive Plaintiffs of the right to sue commercial tenants for outstanding rent. It merely protects the individual guarantor from personal liability for defaults occurring in the narrowly-defined, time-limited COVID-19 period, while leaving untouched a landlord's right to sue the commercial tenant. Thus, the Guaranty Law does not collide head-on with state law. It does not prohibit what state law explicitly permits. The Law merely complements the Executive Orders addressing the commercial landlord-tenant relationship, filling in the gaps that they left open. It is not conflict preempted.

---

[5] We note that the TSHA and ERRA do not apply to commercial tenants. To the extent that Plaintiffs assert that the Residential Tenant Harassment Law conflicts with these laws, we take no position. To the extent that Plaintiffs assert "these three laws [i.e., the Residential Harassment Law, the *Commercial Tenant Harassment Law*, and the *Guaranty Law*] curtail residential rent collection that is expressly permitted under the TSHA and facilitated by rent subsidies of the ERRA," they are simply incorrect. (Pls.' Mem. Supp. Prelim Inj. 28, ECF 28.) Neither the Commercial Tenant Harassment Law nor the Guaranty Law have any bearing on residential tenants. They do not curtail residential rent collection.

### ii. The Commercial Tenant Harassment Law and Guaranty Law are not field preempted.

In addition to conflict preemption, a local law may be preempted when the legislature "has indicated its intent to occupy the particular field." *Garcia*, 31 N.Y.3d at 617; *Eric M. Berman*, 25 N.Y.3d at 690. The state legislature can either expressly indicate its intent to occupy the field or it may do so by implication. *Garcia*, 31 N.Y.3d at 618. "Intent to preempt the field may be implied from the nature of the subject matter being regulated and the purpose and scope of the state legislative scheme, including the need for [s]tate-wide uniformity in a given area." *Id.* (internal quotations omitted). A local law must yield to state law where the State has "created a *comprehensive and detailed* regulatory scheme with regard to the subject matter that the local law attempts to regulate. . . ." *Id.* (emphasis added).  However, "[t]he mere fact that the legislature has enacted specific legislation in a particular field does not necessarily lead to the conclusion that broader agency regulation of the same field is foreclosed." *Id.* at 620. The primary consideration is legislative intent. *Id.*

Plaintiffs contend that the Commercial Tenant Harassment Law and Guaranty Law are field preempted because "the Legislature has occupied the field of responding to the Pandemic in the real estate industry by conferring broad emergency powers on the Governor . . . ." (Pls.' Mem. Supp. Prelim. Inj. 30, ECF 28.) In presenting this argument Plaintiffs do not rely on New York precedent likely because, to the knowledge of *Amicus*, there is no New York authority supporting the breadth of their interpretation of the preemption doctrine. To be sure, Plaintiffs' reasoning, carried to its logical conclusion, suggests that no municipality could enact any law in response to the pandemic because that authority has already been conferred upon the Governor. Such a holding would likely run afoul of the Municipal Home Rule embodied in the New York State Constitution. *See* N.Y. CONST. art. IX, § 2(c).

This Court should decline to decide as a matter of first impression in the State of New York the extent to which the preemption doctrine allows the Legislature to deprive a municipality of any lawmaking authority in response to a public health emergency, lest the entire growing body of local laws enacted by municipalities within the State in urgent response to the pandemic be opened to wholesale invalidation. In any event, because the Legislature and Governor were silent as to harassment and personal liability on guaranties of commercial leases, the delegation of emergency powers to the Governor does not demonstrate the Legislature's intent to occupy the field because such legislative action neither stated so explicitly nor established a "comprehensive and detailed regulatory scheme with regard to the subject matter that the local law attempts to regulate. . . ." *See Garcia*, 31 N.Y.3d at 618. Neither the Commercial Tenant Harassment Law nor the Guaranty Law are field preempted.

## II.   An Injunction is Not in the Public's Interest

In order to successfully prove entitlement to a preliminary injunction, Plaintiffs bear the burden of establishing that the balance of equities tips in their favor and that the preliminary injunction is in the public's interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013); *Silberg v. Board of Elections v. N.Y.*, 216 F. Supp. 3d 411, 416 (S.D.N.Y. 2016). "A preliminary injunction is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Silberg*, 216 F. Supp. 3d at 416 (quoting *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2007)). This is so because, a preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies." *Grand River*, 481 F.3d at 66. Importantly, when determining whether to award a preliminary injunction, "in each case, courts must balance the competing

claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotations omitted). Moreover, "[i]n exercising their sound discretion, *courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction*." *Id.* (internal quotations omitted) (emphasis added).

Plaintiffs seek to enjoin enforcement of the Commercial Tenant Harassment Law and Guaranty Law, alleging in only two short paragraphs that to do so would be in the public interest. (Pls.' Mem. Supp. Prelim. Inj. 34, ECF 28.) According to Plaintiffs, "enforcement of an unconstitutional law is always contrary to the public interest," and an injunction would "aid [] the local economy." (*Id.*) Respectfully, Plaintiffs' assertion that the Laws are unconstitutional and their conclusion with respect to the local economy are patently false. As already explained above, none of the Laws challenged in this case violate the Constitution. Although it is true that "securing First Amendment rights is in the public interest," Plaintiffs cannot show that the Commercial Tenant Harassment Law violates the First Amendment because it does not reach their intended speech and they lack standing with respect to that claim. *Cf. N.Y Progress* 733 F.3d at 488–489. Nor can Plaintiffs show that the Commercial Tenant Harassment Law violates the Due Process Clause or that the Guaranty Law violates the Contracts Clause. *See* Sections IA–B, *supra*. Moreover, contrary to Plaintiffs' cursory assumption that an injunction would aid the local economy, it would in fact cause irreparable harm to the vast majority of the City's small businesses, which provide employment to the vast majority of the City's workers and are indisputably the economic heart and soul of New York and the United States of America.

In 2014, small businesses generated $5.9 trillion, or 43.5% of the $13.6 trillion private, non-farm U.S. economy. (Kats Decl. ¶ 8, Ex. 7 at 4.) In New York, small businesses "[f]rom

19

mom-and-pop corner stores to medical practices to computer software start-ups," similarly "play a vital role in [the local] economy." (*Id.* ¶ 9, Ex. 8 at 1.) In 2016, for example, small businesses in New York State employed 4.1 million people, or 50.2% of the private work force, and created 139,058 new jobs. (*Id.* ¶ 10, Ex. 9 at 133.) Small businesses employing fewer than 20 employees experienced the largest gains, creating 89,213 jobs. (*Id.*) And New York City's small business community is no less impressive. Small businesses represent 98% of New York City's employers and provide employment for over 3 million people—about half of the City's workforce. (*Id.* ¶ 11, Ex. 10 at 1.) Put simply, "small businesses drive economic growth and contribute to the quality of life in communities across New York and the nation." (*Id.* ¶ 9, Ex. 8 at 4.) And the Laws challenged in this case were designed with the specific goal of protecting small businesses and their owners.

Despite their inarticulable importance to the local economy, small businesses are indisputably struggling in light of the economic crisis provoked by the COVID-19 pandemic. To be sure, since Governor Cuomo issued Executive Order No. 202.8 on March 20, 2020, all non-essential businesses remained closed throughout New York City until at least June 8, 2020, when the City officially entered Phase 1 of the Governor's Four Phase New York Forward Reopening Plan.[6] (*Id.* ¶ 6, Ex. 5.) Executive Order No. 202.8, while properly designed to ameliorate the public health consequences of the COVID-19 pandemic, caused drastic declines in or the entire elimination of revenue for small businesses required to close their doors. (*Id.* ¶ 14, Ex. 11, Ex. 12, Ex. 13.) As a consequence, the majority of small business owners were left without the

---

[6] New York State opened up in four phases. On June 8, 2020, when New York City officially entered Phase 1, only the following industries were permitted to open: construction, agriculture, forestry, fishing and hunting, retail (limited to curbside or in-store pick-up), manufacturing, and wholesale trade. Thus, even then there were still heavy restrictions on small businesses and many remained closed. For example, restaurants were not permitted to open until Phase 2, which the City entered into on June 22, 2020, and even then, they were (and continue to be) limited to outdoor seating. Tattoo and piercing parlors remained closed until Phase 3, which the City entered into on July 6, 2020.

means to meet ongoing financial obligations, especially the exorbitant commercial rents that continued to accrue despite their inability to operate out of their commercial premises. (*Id.* ¶ 14, Ex. 11, Ex. 12, Ex. 13.)

The once bustling Times Square is illustrative of just how badly businesses in New York City were affected by the COVID-19 pandemic. In the midst of the pandemic, Times Square—an area that employs 180,000 people, provides 15% of New York City's economic output, and generates $2.5 billion in tax revenue for the City—stood still. (*Id.* ¶ 7, Ex. 6 at 3.) Once trafficked by 350,000–400,000 people per day, foot-traffic declined by over 90% to less than 35,000 people per day during the pandemic. (*Id.* ¶ 7, Ex. 6 at 1.) It is hard to overstate just how badly the City's business landscape was affected. And small businesses were the hardest hit. With little to no revenue during the three-month-long, government-mandated closure of all non-essential businesses, many small businesses teeter on the edge of permanent closure but for the Governor's executive orders providing a moratorium on the execution of evictions. The small business landscape that once made New York City the most diverse city in the world for entrepreneurs, is ailing, and will not be able to survive absent the limited relief provided by the challenged Laws.

It is against this backdrop that the New York City Council enacted the Laws challenged in this case, with the noble and irrefutable goal of protecting the City's economic backbone. The Council recognized that commercial tenants needed the protections of the Commercial Tenant Harassment Law to protect against unfounded and unlawful threats by overzealous landlords insensitive or ignorant to the crisis that small business owners currently face. To be sure, many commercial tenants lack the sophistication and bargaining power that their landlords possess, and might be compelled to forgo rights under their leases in response to an unfounded threat. (*See id.*

¶ 24–28.) Moreover, given that landlords often decide the fate of their small business tenants and have, as Plaintiffs clearly demonstrate, their own financial interests at stake, they could be pushed to threaten commercial tenants with eviction solely on frivolous grounds, such as a tenant's status as being impacted by COVID-19. (*See* ¶ 14, Ex. 11, ¶ 22f.)

It was well within the power of the City Council, acting as the elected body responsible to New York City's public, to decide that commercial tenants needed the protections of the Commercial Tenant Harassment Law, and this Court should not second-guess that decision. The Commercial Tenant Harassment Law properly acknowledges that brick-and-mortar small business tenants deserve to be free from threats on the basis of their status as being impacted by an ongoing pandemic affecting all New Yorkers and Americans alike. Such threats would be intolerable as a general matter, but especially as small businesses struggle to survive in the face of extreme and unprecedented adversity. To permit such threats would only add insult to the injury small businesses already face.  Commercial tenant harassment begets greater displacement, which results in widespread retail vacancy, exacerbated unemployment, and loss of economic empowerment in some of the most marginalized and underserved commercial corridors of the City.  The permanent loss of small businesses due to harassment also results in cultural loss to and increased risk of residential displacement in those communities, which rely heavily upon local small businesses for accessible, affordable, and culturally essential goods and services.  An injunction enjoining enforcement of the Commercial Tenant Harassment Law is not in the public interest.

Similarly, the Guaranty Law properly recognizes and addresses the struggles and needs of the small business community currently ailing in New York. As Plaintiffs' concede, the Guaranty Law was enacted "so that city business owners don't face the loss of their businesses

and also personal bankruptcy." (Pls.' Mem. Supp. Prelim. Inj. 26, ECF 28.) Even accepting as true Plaintiffs' claims that "COVID-19 affects small business owners who are tenants and landlords alike," it was well within the prerogative of the City Council to decide that landlords were better situated than their commercial tenants to overcome the economic impact of the pandemic. *See, e.g.*, *Sanitation & Recycling*, 107 F.3d at 994 ("When reviewing a law that purports to remedy a pervasive economic or social problem, [a court's] analysis is carried out with a healthy degree of deference to the legislative body that enacted the measure."). Moreover, the City Council correctly determined that in order to prevent business owners from facing the loss of their businesses and also personal bankruptcy, the protections provided by the Guaranty Law are necessary both for owners and the local economy.

"Even the best-managed small businesses are in a very vulnerable position as they try to weather the shutdown of much of the U.S. economy during the coronavirus crises." (Kats Decl. ¶ 16, Ex. 15, at 1.) A report by the Federal Reserve Bank of New York shows that 86% of small businesses would have to take some action if faced with a two-month revenue loss, with 47% having to rely on personal funds and 17% having to close permanently. (*Id.* ¶ 16, Ex. 16 at ii, 5.) Moreover, 59% of small businesses used personal guaranties to secure debt. (*Id.* ¶ 19, Ex. 16 at 7.) We have no doubt that if the Guaranty Law is enjoined, many small businesses and their owners will be pushed into both business and personal bankruptcy, further exacerbating the present economic crisis. This is especially so given that "[o]wners' personal finances remain deeply intertwined with the finances of their businesses," and only about 20% of "healthy" businesses have sufficient cash reserves to continue normal operations if faced with a two-month revenue loss. (*Id.* ¶ 16–17, Ex. 16 at ii, 8, Ex. 17 at 1.) And New York City small businesses were closed for not two, but three months, during which time many produced no revenue at all.

Although they are of paramount importance to our national and local economy, small businesses generally lack sufficient capital to weather the effects of a crisis as significant as the COVID-19 pandemic, and the Guaranty Law ensures that their owners don't succumb along with their businesses.

The Guaranty Law unquestionably serves the public interest by lessening the economic impact of the COVID-19 pandemic on the owners of the 230,000 + small businesses located in New York City alone. As many as one-third of those businesses may not reopen once the crisis passes and their owners should not have to fall alongside them. (*Id.* ¶ 30–31, Ex. 22 at 4.) Starting a business represents a path out of poverty for many low-income New Yorkers. As the City Council determined, to hold business owners personally liable for defaults on commercial leases occurring during the well-defined, time-limited period when they were not even able to access their commercial premises or generate revenue would not only be grossly inequitable, but would also set the City's economy further back. Rescinding the Guaranty Law would also disproportionately affect immigrants and small business owners of color, who have built the diverse business landscape that defines the City of New York. (*Id.* ¶ 31, Ex. 22 at 34.)

If this Court enjoins enforcement of the Personal Guaranty Law, small business owners throughout New York City will be pushed into both business and personal bankruptcy, eliminating the possibility of remaining in or returning to microentrepreneurship, and further exacerbating the ongoing economic crisis.  On the other hand, by affording small business owners limited protection from personal liability during the height of the crisis, the Guaranty Law not only avoids widespread and life-long personal financial ruin but also the ability of microentrepreneurs to reenter the economy and reopen businesses throughout New York City in aid of sustained economic recovery.  The City Council recognized that without protections like

the Guaranty Law, streets throughout New York City will be lined with empty storefronts—lost employment, lost income and livelihood, and lost sales and real estate tax revenue—reflective of the betrayal of our so-called economic backbone. An injunction enjoining enforcement of the Guaranty Law is not in the public interest.

## **CONCLUSION**

For the foregoing reasons, Volunteers of Legal Service respectfully requests that the Court deny Plaintiffs' Motion for Preliminary Injunctive and Declaratory Relief and grant Defendants' Motion to Dismiss this case.

Respectfully Submitted,

VOLUNTEERS OF LEGAL SERVICE
*Proposed Amicus Curiae*

/S/ Arthur Kats_____
Arthur Kats, Esq.
Michael J. Harris, Esq.
Director, Microenterprise Project
40 Worth St, Suite 820
New York, NY 10013
Tel: (347) 521-5721
Fax: (347) 521-5736
E-mail: akats@volsprobono.org