# EXHIBIT 20

Small Business Committee Staff:
Stephanie Jones, Counsel
Noah Meixler, Policy Analyst
Aliya Ali, Principal Finance Analyst



## THE COUNCIL OF THE CITY OF NEW YORK

COMMITTEE REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION
Jeffrey Baker, Legislative Director
Rachel Cordero, Deputy Director for Governmental Affairs

## COMMITTEE ON SMALL BUSINESS
Hon. Mark Gjonaj, Chair

**May 13, 2020**

| | |
|---|---|
| **PROPOSED INT. NO. 1898-A:** | By Council Members Gjonaj, Moya, Constantinides, Brannan, Rosenthal, Gibson, Perkins, Louis, Ayala, Lander, Chin, Koslowitz, Rivera, Ampry-Samuel, Vallone, Lancman and Holden |
| TITLE: | A Local Law to amend the administrative code of the city of New York, in relation to telephone order charges by third-party food delivery services during, and for 90 days after, a declared emergency that prohibits on-premises dining |
| **PROPOSED INT. NO. 1908-B:** | By Council Members Moya, Gjonaj, Kallos, Brannan, Rosenthal, Gibson, Ayala, Van |

|                                          |                                                                                                                                                                                 |
|------------------------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                                          | Bramer, Rivera, Cohen, Perkins, Louis, Lander, Chin, Koslowitz, Ampry-Samuel, Powers, Vallone, Lancman, Constantinides and Holden                                                |
| TITLE:                                   | A Local Law to amend the administrative code of the city of New York, in relation to fees charged by third-party food delivery services during, and for 90 days after, a declared emergency that prohibits on-premises dining |

**PROPOSED INT. NO. 1914-A:**

By Council Member Adams, the Speaker (Council Member Johnson), Kallos, Van Bramer, Chin, Louis, Ayala, Levin, Lander, Koslowitz, Rosenthal, Lancman, Constantinides and The Public Advocate (Mr. Williams)

TITLE:

A Local Law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19

**PROPOSED INT. NO. 1932-A:**

By Council Member Rivera, the Speaker (Council Member Johnson), Kallos, Van Bramer, Rosenthal, Chin, Ayala, Levin, Lander, Koslowitz, Louis, Vallone, Lancman and Constantinides

TITLE:

A Local Law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19

2

## I.      **INTRODUCTION**

On May 13, 2020, the Committee on Small Business, chaired by Council Member Mark Gjonaj, will hold a vote on four bills designed to help small businesses in the City weather the negative impacts of the COVID-19 outbreak: (1) Prop. Int. No. 1898-A by Council Members Gjonaj and Moya, a local law to amend the administrative code of the city of New York, in relation to telephone order charges by third-party food delivery services during, and for 90 days after, a declared emergency that prohibits on-premises dining; (2) Prop. Int. No. 1908-B by Council Members Moya and Gjonaj, a local law to amend the administrative code of the city of New York, in relation to fees charged by third-party food delivery services during, and for 90 days after, a declared emergency that prohibits on-premises dining; (3) Prop. Int. No. 1914-A by Council Member Adams and the Speaker (Council Member Johnson), a local law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19; and (4) Prop. Int. No. 1932-A by Council Member Rivera and the Speaker (Council Member Johnson), a local law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19.

The Committee previously heard testimony on these bills during a joint hearing on April 29, 2020, with the Committee on Consumer Affairs and Business Licensing, chaired by Council Member Andrew Cohen. Those who testified included representatives from the New York City Department of Small Business Services (SBS), representatives from the Department of Consumer and Worker Protection (DCWP) (formerly the Department of Consumer Affairs), representatives from third-party delivery platforms, small business advocates, chambers of commerce, Business Improvement Districts (BIDs), and other community-based non-profit organizations.

## II.     **BACKGROUND**

3

In late December of 2019, a new virus, SARS-CoV-2, was detected in Wuhan, China and by January 30, 2020, the World Health Organization (WHO) declared that COVID-19, the disease caused by the SARS-CoV-2 virus, was now a Public Health Emergency of International Concern (PHEIC).[1] COVID-19 has infected 4.2 million people across 212 countries, and has killed over 288,000 people as of May 12, 2020.[2]

The ease with which the virus spreads has caused governments across the globe to shut-down businesses, schools, religious and cultural institutions, and mandate various levels of social isolation. While this has helped to limit the spread of the virus, stay-at-home orders have had a catastrophic impact on economic markets and particularly small businesses.

A.        The Impact on Small Businesses Amid the COVID-19 Crisis

In New York, Governor Andrew Cuomo issued an executive order – New York State on PAUSE (PAUSE) – that closed all on-site, non-essential businesses, effective March 22, 2020, to help stop the spread of SARS-CoV-2.[3] The list of essential businesses that are still permitted to operate, to some degree, include:

- Health care operations – such as hospitals, medical labs, walk-in clinics, home healthcare, elder care, veterinaries, nursing homes, licensed mental health providers, and medical billing support personnel.

---

[1] World Health Organization "Rolling updates on coronavirus disease (COVID-19)", last updated April 18, 2020, available at: https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen.
[2] Worldometer "Countries where COVID-19 has spread", April 22, 2020, available at: https://www.worldometers.info/coronavirus/countries-where-coronavirus-has-spread/.
[3] Governor Andrew Cuomo "Governor Cuomo signs the 'New York State on PAUSE' executive order", March 20, 2020, available at: https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order.

- Infrastructure – such as airports, public utilities, hotels, commercial shipping ports, and telecommunications.

- Manufacturing – such as food processing, pharmaceuticals, automobiles, household paper products, and chemicals.

- Retail – such as grocery stores, pharmacies, framer's markets, gas stations, restaurants (for take-out and delivery only), and convenience, hardware and pet food stores.

- Services – such as laundromats, postal services, trash and recycling collection, bicycle and automotive repair, funeral homes, and animal shelters.

- Financial Institutions – such as banks and lending institutions, insurance companies, and accounting firms.

- Human Services Providers – such as food banks, homeless shelters and community care programs.

- Construction – insofar that it supports affordable housing, hospitals, roads, transit facilities, homeless shelters or schools.

- Public Health and Safety – such as law enforcement, fire and emergency services, building cleaners or janitors, and residential moving services.

- Logistical, Technological and Child Care Services – such as technology support for online services, child care programs, government owned or leased buildings and essential government services.

- Recreation – such as parks and open spaces (not including playgrounds), and boatyards and marinas.

- Professional Services – such as lawyers and real estate services.

- News Media; and

- Defense.[4]

Although this list covers a range of industries that are permitted to operate during PAUSE, a large proportion of New York's small (and large) businesses have still had to severely reduce their capacities. According to an analysis by the NYC Comptroller, the City's hotels are projected to only maintain an occupancy rate of 20 percent, while restaurant sales are expected to drop by a staggering 80 percent. Real estate and retail sales are both expected to decline by 20 percent.[5]

These figures for the restaurant industry reflect the results of a recent survey by the New York State Restaurant Association. According to their findings, sales have declined by 79 percent, and New York State restaurants are expected to lose $3.6 billion in sales revenue, in April alone.[6] Just over half (51 percent) of all restaurants have been able to move their operations online, and unemployment rates in this sector have skyrocketed, as 80 percent of restaurant workers have lost their jobs.[7]

---

[4] Empire State Development "Guidance for determining whether a business enterprise is subject to a workforce reduction under recent executive orders", April 19, 2020, available at: https://esd.ny.gov/guidance-executive-order-2026, last accessed April 22, 2020.

[5] New York City Comptroller Scott M. Stringer "Comptroller Stringer: City must take immediate action to prepare for economic impacts of COVID-19 and protect vital services for most vulnerable New Yorkers", March 16, 2020, available at: https://comptroller.nyc.gov/newsroom/comptroller-stringer-city-must-take-immediate-action-to-prepare-for-economic-impacts-of-covid-19-and-protect-vital-services-for-most-vulnerable-new-yorkers/.

[6] New York State Restaurant Association "Restaurant industry impact survey: New York State", April, 2020, available at:
https://www.nysra.org/uploads/1/2/1/3/121352550/restaurant_industry_impact_survey___new_york_state__2_.pdf.

[7] Id.

Restrictions similar to PAUSE have been implemented across the country, which has caused a massive reduction in the number of small businesses operating. In their survey of small businesses (under 500 employees), the National Bureau of Economic Research found that 43 percent of businesses had closed due to COVID-19 and that they had reduced their staff by about 40 percent since January 2020.[8] The results were more severe in the Mid-Atlantic region, which includes New York, where 57 percent of businesses were closed, and staff employment decreased by 47 percent.[9] According to the survey's conclusion, about 20 percent of the nation's employees work in "retail trade, leisure and hospitality and these sectors are particularly vulnerable to the current pandemic."[10]

B.        **Federal, State and Local Government Response to Help Small Businesses**

The nation's economy is dependent on its small businesses. There are approximately 27 million of these businesses across the country and they are responsible for employing 57 million workers.[11] When including the owners of these businesses, in addition to employees, that total comes to an estimated 85 million people.[12] According to the Small Business Administration, small businesses are responsible for creating two-thirds of the Country's new jobs.[13]  Given their vital role, it is crucial that they are either given alternative means to operate, in as lucrative a manner as

---

[8] Alexander W. Bartik et al. "How are small businesses adjusting to Covid-19? Early evidence from a survey", *National Bureau of Economic Research*, April 2020, available at:  https://www.nber.org/papers/w26989.pdf.
[9] https://www.nber.org/papers/w26989.pdf.
[10] Id.
[11] Information Station "How important are small businesses?", January 3, 2017, available at: https://informationstation.org/video/how-important-are-small-businesses/?utm_source=google&utm_medium=cpk&gclid=EAIaIQobChMI-Ymy3df86AIVGozICh0QRQPrEAAYASAAEgI7ivD_BwE.
[12] Id.
[13] United States Small Business Administration "Small Businesses generate 44 percent of U.S. economic activity", January 30, 2019", available at: https://advocacy.sba.gov/2019/01/30/small-businesses-generate-44-percent-of-u-s-economic-activity/.

possible, throughout the COVID-19 crisis, and/or are provided the necessary support to restart their operations once social distancing measures have been lifted.

**Federal Government Assistance**

During this crisis, small businesses in New York City may apply for various assistance programs including funding distributed by the federal government through its Small Business Administration (SBA). These programs include the Paycheck Protection Program (PPP),[14] the Economic Injury Disaster Loan and Advance (EIDL) and the SBA Express Bridge Loans and Debt Relief programs. The federal government has also temporarily increased the unemployment insurance stipend that laid-off or furloughed workers may receive, which may have implications for the workforce of some small businesses.

*Paycheck Protection Program*

The Coronavirus, Aid, Relief, and Economic Security Act (CARES ACT) originally allocated about $349 billion in federal funds for PPP, with an additional $322 billion authorized by Congress in late April.[15] The program provides various types of employers, including small businesses, nonprofits, self-employed individuals and independent contractors, access to loans to cover payroll costs of up to $100,000 per employee, rent and mortgage interest prior to February 15, 2020, and utilities. Loans are calculated per employer or per location, and may be as high as 2.5 times the average monthly payroll for the one-year period before the loan application is submitted, to a cap of $10 million. Loans are calculated differently for seasonal and new

---

[14] United States Small Business Administration "Paycheck Protection Program", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program-ppp (last visited on April 9, 2020).
[15] Emily Cochrane and Jim Tankersley "Senate approves aid for small-business loan program, hospitals and testing", April 21, 2020, *New York Times*, available at: https://www.nytimes.com/2020/04/21/us/politics/congress-business-relief-ppp.html.

employers. Employers of fewer than 500 workers may apply for these loans through a network of banks ranging from large to smaller banks.[16] Banks may not require applicants to supply collateral or personal guarantees, and applicants may only apply for one PPP loan.

PPP loans can be forgiven up to the value of eight weeks of payroll costs of up to $100,000 per employee, rent and mortgage interest prior to February 15, 2020, and utilities. To qualify for loan forgiveness, however, 75 percent of the amount loaned must be used for payroll costs, and employee and salary levels must be maintained, or else the forgiven amount will be reduced. If not forgiven, PPP loans accrue at a one percent interest rate and must be paid back within two years, with an optional deferral of up to six months. There are no loan fees or prepayment penalties.

*Economic Injury Disaster Loan and Advance*[17]

Small businesses may apply for the SBA's existing Economic Injury Disaster Loan program (EIDL), which the CARES Act expanded upon. The existing program provides economic relief for small businesses of fewer than 500 employees or otherwise meets SBA size standards, self-employed persons, independent contractors and nonprofits in the form of loans of up to $2 million. To be eligible, entities must also demonstrate the ability to repay the loan. Interest rates are low (3.75 percent for small businesses and 2.75 percent for nonprofits) and feature long-term repayment plans of up to 30 years.

---

[16] In the recent funding allocation, $60 billion was set aside for lenders with less than $50 billion in assets. *See* Aaron Gregg and Renae Merle "How to get a small-business loan under the new $484 billion coronavirus aid package", April 23, 2020, *The Washington Post*, available at:
https://www.washingtonpost.com/business/2020/04/22/small-business-loan-faq.
[17] United States Small Business Administration "Economic injury disaster loan emergency advance", available at:
https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/economic-injury-disaster-loan-emergency-advance (last visited on April 9, 2020).

The CARES Act expanded upon this program to provide a loan advance. Eligible entities that can show a temporary loss of revenue can receive an advance of up to $10,000 upon successful application for an EIDL loan. That advance may be forgiven by the federal government.

*SBA Express Bridge Loans[18] and Debt Relief[19]*

The CARES Act allocated funds for SBA's Express Bridge Loan program and their Debt Relief program. The Express Bridge Loan program quickly provides funds of up to $25,000 for businesses eligible for SBA's 7(a) loans to overcome a temporary loss of revenue. SBA's Debt Relief program allows businesses that are eligible for SBA's 7(a), 504 and microloans to receive limited payment of principal, interest and fees on these loans. The 7(a), 504 and microloans are SBA's standard small business loan programs, which were established before the onset of COVID-19. The 7(a) loans are available for general business purposes, such as working capital, equipment, furniture, and land and building.[20] They are provided through a lender.[21] The 504 loans are issued by Certified Development Companies for long-term, fixed-asset financing for small businesses, such as the purchase and improvement of land and buildings.[22] Microloans are temporary, short-term loans of up to $50,000 to small businesses for general business purposes, and are offered by nonprofits.[23]

---

[18] United States Small Business Administration "SBA Express Bridge Loans", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/sba-express-bridge-loans (last visited on April 9, 2020).

[19] United States Small Business Administration "SBA debt relief", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/sba-debt-relief (lasted visited on April 9, 2020).

[20] United States Small Business Administration Office of Financial Assistance: Resources, 7(a) Loans", available at: https://www.sba.gov/offices/headquarters/ofa/resources/11428 (last visited on April 9, 2020).

[21] Id.

[22] United States Small Business Administration "Office of Financial Assistance: Resources, 504 Loans", available at: https://www.sba.gov/offices/headquarters/ofa/resources/4049 (last visited on April 9, 2020).

[23] *See* 13 CFR § 120.2 for the definition of this and other, traditional SBA loan programs.

10

The federal government's PPP program, although heavily utilized, has raised some concerns. As of April 13, 2020, the program had issued about 1,661,367 loans totaling over $342 billion, with over 4,975 lenders participating.[24] However, a recent ranking of businesses receiving loans as a percentage of each state's eligible payroll revealed that New York State placed second to last, with only 23.1 percent of eligible businesses receiving a loan.[25] By contrast, Nebraska and North Dakota reached 74.7 percent and 71.5 percent respectively.[26] Further, some industries fared better than others, with the construction industry receiving the highest percentage of loans (13 percent) and restaurants receiving less than nine percent,[27] despite representing about 14 percent of companies employing under 500 people.[28] Of the restaurants who received loans, some reports allege that too many have gone to large chains, and a handful of these companies have received blowback for accepting loans. A Reuters article claimed that 25 percent of the initial $350 billion allocated to SBA loan programs went to fewer than two percent of the firms that got relief, with some of these being large, publicly-traded companies with "thousands of employees and hundreds of millions of dollars in annual sales."[29] Among these companies is the Ruth's Hospitality Group (owns 150 Ruth's Chris Steak Houses), Potbelly ($409.7 million in sales and 6,000 employees) and Shake Shack (8,000 employees). Both Ruth's Hospitality Group[30] and Shake Shack have

---

[24] United States Small Business Administration "Paycheck Protection Program (PPP) Report: Approvals through 4/16/20", available at: https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf.

[25] Zachary Mider and Cedric Sam "Small-business rescue shows not all states are created equal", updated April 20, 2020, *Bloomberg*, available at: https://www.bloomberg.com/graphics/2020-sba-paycheck-protection-program/.

[26] Id.

[27] United States Small Business Administration "Paycheck Protection Program (PPP) Report: Approvals through 4/16/20", available at: https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf.

[28] Andy Sullivan, Howard Schneider and Ann Saphir "Main street bailout rewards U.S. restaurant chains, firms in rural states", April 17, 2020, *Reuters*, available at: https://www.reuters.com/article/us-health-coronavirus-usa-lending-analys/main-street-bailout-rewards-us-restaurant-chains-firms-in-rural-states-idUSKBN21Z3FL.

[29] Id.

[30] Peter Rudegeair, Heather Haddon and Ruth Simon "Ruth's Chris to repay loan amid outcry over rescue program", updated April 23, 2020, *The Wall Street Journal*, available at: https://www.wsj.com/articles/public-companies-have-to-repay-small-business-rescue-loans-11587670442.

agreed to return their loans, the latter of which citing an ability to raise the funds through other means.[31] Similarly, dozens of large companies with financial or legal problems have reportedly received significant loans through the program, according to an analysis of 200 publicly-traded companies that reported receiving a total of $750 million through PPP.[32] Since it became known that large companies had been benefitting from PPP, the SBA published additional guidance emphasizing that businesses may only apply for the loan if, in good faith, they can certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant," and that public companies with "substantial market value" are unlikely to be able to make such a certification.[33] Companies who received the loan before this guidance and repay it before May 7, 2020 will be deemed to have certified in good faith.[34]

The manner in which PPP was offered to the public and the complexity of its terms and conditions may have contributed to a lack of success for many small business owners. Although the program began accepting applications on Friday, April 3, 2020, some large banks refused to participate at first, citing a lack of guidance from the federal government.[35] When more banks did begin to accept applications, there was confusion regarding what conditions the banks could apply. SBA authorized a last-minute raise from half a percent to a one percent interest rate, reportedly to

---

[31] Luisa Beltran "Restaurant chains received many of the biggest PPP loans, updated April 23, 2020, *Barron's*, available at: https://www.barrons.com/articles/restaurant-chains-received-many-of-the-biggest-ppp-loans-51587573556.

[32] Jessica Silver-Greenberg, David Enrich, Jesse Drucker and Stacy Cowley "Large, troubled companies got bailout money in small-business loan program", April 26, 2020, *The New York Times*, available at: https://www.nytimes.com/2020/04/26/business/coronavirus-small-business-loans-large-companies.html.

[33] United States Small Business Administration "Paycheck Protection Program Loans: Frequently Asked Questions (FAQs)" updated April 23, 2020, https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Frequently-Asked-Questions.pdf.

[34] Id.

[35] Brian Thompson "No small-business relief yet: False start on Paycheck Protection Program loans", April 3, 2020, *Forbes*, available at: https://www.forbes.com/sites/brianthompson1/2020/04/03/no-small-business-relief-yet-false-start-on-paycheck-protection-program-loans/#163172d034c4.

address concerns from banks about being unable to service the loans at an interest rate of only half a percent.[36] Further, some large banks attached unexpected conditions to their applications, like having a previous banking relationship with them before February 15, 2020.[37] A few weeks after the lending program began, it ran out of funds,[38] seemingly validating concerns from some experts that the program was not sufficiently well-funded, or disbursing funds quickly enough.[39]

The federal government's EIDL program quickly experienced funding shortages as well. For many applicants, a cap of $2 million per borrower was significantly reduced to $15,000.[40] Furthermore, although the program was touted as featuring a quick turnaround on payments, many applicants waited weeks for approval and found that the amount disbursed to them was much less than the initial approval amount.[41] In a survey of 885 small business owners conducted by the

---

[36] "SBA increases rate, clarifies terms on Paycheck Protection Program loans", *ABA Banking Journal*, April 2, 2020, https://bankingjournal.aba.com/2020/04/treasury-sba-to-increase-rate-on-paycheck-protection-program-loans/; Michela Moscufo "How to get, and give, Paycheck Protection Program loans through the SBA", April 3, 2020, *Forbes*, available at: https://www.forbes.com/sites/michelamoscufo/2020/04/03/how-to-get-and-give-paycheck-protection-program-loans-through-the-sba/#3f766faa27e8.

[37] *See e.g.* Bank of America "Small Business Administration Paycheck Protection Program application" available at: https://about.bankofamerica.com/promo/assistance/latest-updates-from-bank-of-america-coronavirus/small-business-assistance, (last visited April 8, 2020); JPMorgan Chase & Co "Paycheck Protection Programs FAQs & useful tips", available at: https://recovery.chase.com/cares1/ppp-faqs#accordion-1586386467723-1-panel, (last visited April 8, 2020); and Wells Fargo "Small Business Administration Paycheck Protection Program", available at: https://update.wf.com/coronavirus/paycheckprotectionprogram/, (last visited April 8, 2020).

[38] Stephen Gandel "Paycheck Protection Program out of money: Thousands of small businesses shut out", *CBS News*, April 16, 2020, available at: https://www.cbsnews.com/news/paycheck-protection-program-out-of-money-small-businesses-shut-out.

[39] Jim Tankersley "Virus throws millions out of work, and Washington struggles to keep pace", April 9, 2020 *The New York Times*, available at: https://www.nytimes.com/2020/04/09/business/coronavirus-unemployment-washington.html?action=click&module=Top%20Stories&pgtype=Homepage.

[40] Stacy Cowley "Small Businesses Wait for Cash as Disaster Loan Program Unravels", April 9, 2020, *The New York Times*, available at: https://www.nytimes.com/2020/04/09/business/smallbusiness/small-business-disaster-loans-coronavirus.html.

[41] Id.

National Federation of Independent Business the day after the SBA's EIDL and PPP programs ran out of funds, 80 percent were still waiting to hear about their loan applications.[42]

Immigrant communities in NYC may have had even more difficulty applying to and obtaining federal funds, which would considerably impact the City's economy. Immigrant workers make up 45 percent of the city's workforce[43] and own one-half of New York City's businesses.[44] In some neighborhoods, immigrant-owned businesses employ up to 42 percent of the neighborhood population.[45] Yet, there have been questions surrounding whether undocumented immigrants can be eligible for the PPP program, since it requires an Employee Identification Number or Social Security Number on its program application.[46] The application originally required business owners to be U.S. citizens or permanent residents.[47] In the past, SBA placed additional restrictions and requirements on access to loans for non-citizens.[48]

In addition, certain features of the federal government's PPP program may disproportionately disadvantage minority business owners from obtaining loans. A loophole allowing bank servicers to prefer businesses with a previous lending relationship may lead to the

---

[42] National Federation of Independent Business "80% of PPP applicants are still urgently waiting for financial assistance" April 20, 2020, available at: https://www.nfib.com/content/press-release/economy/80-of-ppp-applicants-are-still-urgently-waiting-for-financial-assistance

[43] Mayor's Office of Immigrant Affairs "State of Our Immigrant City: Annual Report", March 15, 2018, available at: https://www1.nyc.gov/assets/immigrants/downloads/pdf/annual-report-2018.pdf.

[44] Id.

[45] Lena Afridi "The Displacement Crisis of Immigrant-Owned Small Businesses", February 15, 2018, *Shelter Force,* available at: https://shelterforce.org/2018/02/15/displacement-crisis-immigrant-owned-small-businesses/.

[46] United States Small Business Administration "Paycheck Protection Program: Borrower application form", effective April 3, 2020, available at: https://www.sba.gov/sites/default/files/2020-04/PPP-Borrower-Application-Form-Fillable.pdf.

[47] See Emily Guerin "Massive Federal Loan Program for Small Businesses Off to Rocky Start", April 3, 2020, *LAist*, https://laist.com/2020/04/03/small_business_ppp_paycheck_protection_program_loans_stimulus_coronavirus.php.

[48] *See* United States Small Business Administration "SBA Eligibility Questionnaire, for Standard 7(a) Guaranty", available at: https://www.sba.gov/sites/default/files/bank_eligibility_questionnaire_0.pdf; and Kimberly Rotter and Dawn Papandrea "What Are SBA Loan Requirements?",  February 28, 2020, *U.S. News & World Report*, available at: https://loans.usnews.com/complete-list-of-sba-loan-requirements.

exclusion of many minority businesses.[49] Many microbusinesses in New York City may have not previously applied for loans or lines of credit, and therefore may not have relationships with local banks.[50] The Congressional Black Caucus has recognized the "history and legacy" of racial inequality in the banking system, and as banks default to lending to businesses to which they have lent money before, minority-owned businesses could be disproportionately denied and excluded.[51]

      For those with access to COVID-19 funding programs, there are drawbacks to consider. Although the federal government's PPP program offers loan forgiveness, there are significant conditions to satisfy. Seventy-five percent of the PPP loan's forgiven amount must be spent on payroll costs, a condition that appears to have taken shape late in the process.[52] If 75 percent of the forgiven amount must be spent on payroll costs, that may leave less for businesses to spend on obligations such as rent and utilities, which may be disproportionately higher in our City.[53] Some businesses may decide, and some have decided, that the program is too risky, or that it is more valuable to their employees to lay them off, so that employees may collect a higher salary through the federal government's expanded unemployment insurance program.[54] If a business does not qualify for full forgiveness of the loan, PPP requires the small business owner to pay off the loan

---

[49] Mary Alice Parks "Minority-owned small businesses face unique, steep hurdles amid coronavirus cash crunch", April 8, 2019, *ABC News*, available at: https://abcnews.go.com/Health/minority-owned-small-businesses-face-unique-steep-hurdles/story?id=70011898.

[50] Id.

[51] Id.

[52] United States Small Business Administration "Interim Final Rule: Business Loan Program Temporary Changes; Paycheck Protection Program", Issued April 2, 2020, available at: https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf.

[53] Greg Iacurci "Your  Forgivable Loan May Be Undercut by This Provision of the Paycheck Protection Program", updated April 9, 2020, *CNBC*, available at: https://www.cnbc.com/2020/04/07/this-part-of-paycheck-protection-program-could-reduce-forgivable-loans.html.

[54] Jim Tankersley "Virus Throws Millions Out of Work, and Washington Struggles to Keep Pace", April 9, 2020, *The New York Times*, available at: https://www.nytimes.com/2020/04/09/business/coronavirus-unemployment-washington.html?action=click&module=Top%20Stories&pgtype=Homepage.

within two years, after a six-month deferral.[55] Small businesses in the City may be concerned about being able to pay back these loans, and about being burdened with more debt.

For many small businesses in the City, dealing with an unpredictable and contagious virus that has already significantly disrupted the ability of many to earn revenue makes borrowing money a risky endeavor. With the exception of SBS's Employee Retention Grant Program, which was only available for the smallest of City businesses (1-4 employees), almost all the funding available to businesses have taken the form of loans. There are concerns about whether the City's economy will strengthen quickly enough to satisfy the terms of these loans, and businesses might struggle to pay off additional debt (even at low or no interest rates) after this sustained period of closure and reduced income. A 2019 survey conducted by the Federal Reserve found that as many as 70 percent of small businesses have outstanding debt.[56] Similarly, a 2016 JPMorgan study concluded that most small businesses did not have enough cash reserves to carry them through a significant economic downturn, with the median independent restaurant having only enough extra cash to last them 16 days.[57]

**New York State Assistance**

In addition to closing 100 percent of non-essential businesses statewide, the PAUSE executive order provides a 90-day moratorium on residential and commercial evictions.[58] Since

---

[55] United States Small Business Administration "Paycheck Protection Program", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program.
[56] Federal Reserve Banks "Small Business Credit Survey: 2019 Report on Employer Firms", available at: https://www.fedsmallbusiness.org/medialibrary/fedsmallbusiness/files/2019/sbcs-employer-firms-report.pdf. Also *see* Bridget Bartolini "City's Small Businesses Need Rent Stabilization to Survive COVID-19, Advocates Say", April 6, 2020, *City Limits*, available at: https://citylimits.org/2020/04/06/citys-small-businesses-need-rent-stabilization-to-survive-covid-19-advocates-say.
[57] *See* Bridget Bartolini, id.
[58] Governor Andrew M. Cuomo "Video, Audio, Photos & Rush Transcript: Governor Cuomo Signs the "New York State on Pause" Executive Order", March 20, 2020, https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-signs-new-york-state-pause-executive-order.

commercial rent is typically the largest cost and greatest concern for business owners,[59] the 90-day moratorium provides short-term relief to businesses. The Governor's moratorium on commercial rent is only for a 90-day period, however, and there is currently little guidance over whether evictions will resume after the 90 days is over.

Beyond the Governor's Executive Order pausing commercial evictions, New York State is not currently administering any specific programs to provide relief to small businesses. NYS's Empire State Development (ESD) has information on its website about the SBA's COVID-19 loan programs, including resources on how businesses can apply for relief.[60] ESD's website directs businesses to other existing relief efforts as well, such as a pro bono legal advice service for small businesses applying for the Paycheck Protection Program.[61]

### New York City Assistance

Support for New York City's small businesses from local government has been provided in numerous ways. Financial aid, through loans and grants programs, has been offered through the Department for Small Business Services (SBS). Meanwhile, the Department of Consumer and Worker Protection (DCWP) has also provided assistance by reducing regulatory burdens through pausing some of the fees that it administers and extending deadlines for various renewals.

*Small Business Services*

On March 8th, Mayor de Blasio announced that SBS would create two financial relief programs, the Employee Retention Grant Program and Small Business Continuity Loan Fund, to

---

[59] Association for Neighborhood & Housing Development "The Forgotten Tenants: New York City's Immigrant Small Business Owners", March, 2019), available at: https://anhd.org/report/forgotten-tenants-new-york-citys-immigrant-small-business-owners.
[60] Empire State Development "Apply for Small Business Administration (SBA) COVID-19 Loans", available at: https://esd.ny.gov/small-business-administration-sba-covid-19-loans.
[61] Id.

provide financial relief to small businesses during the crisis.[62] To qualify for either program, businesses were required to provide documentation proving that over a two-month period in 2020 their revenues decreased by 25 percent due to COVID-19.[63] Businesses with fewer than five employees were eligible for the Employee Retention Grant Program, which provided a grant covering up to 40 percent of a business's payroll for two months, with a maximum amount of $27,000.[64] On April 3rd, SBS stopped accepting applications to the grant program.[65] The Small Business Continuity Loan Fund provided a zero-interest loan to businesses with fewer than 100 employees for up to $75,000.[66] As of April 8th, SBS paused application intake for the loan fund due to an overwhelming number of applications. Accordingly, small businesses in NYC can now only apply to the SBA programs to receive necessary financial relief.[67]

According to SBS, the NYC Employee Retention grant program provided assistance to 1,200 small businesses. SBS allocated $10 million to the program, and small businesses received an average amount of $7,800.[68] SBS is expecting to give out $20 million in loans through the Small

---

[62] Office of the Mayor "Mayor de Blasio Provides Updates on New York City's COVID-19 Response", March 8, 2020, available at: https://www1.nyc.gov/office-of-the-mayor/news/124-20/mayor-de-blasio-provides-on-new-york-city-s-covid-19-response.

[63] Id.

[64] NYC Department of Small Business Services "NYC Employee Retention Grant Program", (as of April 2, 2020), available at: https://www1.nyc.gov/nycbusiness/article/nyc-employee-retention-grant-program. Program information is still available at: https://www.paulweiss.com/media/3979874/nyc2-employee-retention-grant-program-summary_4-6.pdf.

[65] Id.

[66] NYC Department of Small Business Services "NYC Small Business Continuity Loan Program", (as of April 7, 2020) available at: https://www1.nyc.gov/nycbusiness/article/nyc-small-business-continuity-loan-program. Program Information still available at: https://www.natlawreview.com/article/nyc-financial-assistance-businesses-impacted-covid-19

[67] Id.

[68] Sophia Chang, "Funds Are Coming For Small Businesses, But Some Will Have To Wait", April 1, 2020, *Gothamist*, available at: https://gothamist.com/news/funds-are-coming-small-businesses-some-will-have-wait.

Business Continuity Loan Fund. Before the fund closed online applications on April 5th, over 15,000 businesses initially applied, and 8,500 businesses completed applications.[69]

However, some city advocates have raised concerns about access to these funds. SBS was swift to offer their grant and loan programs, acting quickly to bridge an important funding gap before the federal government established their own, but the rollout was flawed. The program initially required business owners to supply documentation demonstrating a drop in revenue in the two consecutive months of 2020, when the full effects of COVID-19 were not yet felt by many businesses.[70] The program eventually allowed business owners to supply information for March 2020, which may have allowed many more business to be eligible.[71] It was also unclear whether non-profit organizations were eligible for SBS's programs, until the website reflected that non-profits were eligible for the Employee Retention Grant Program, but not the Small Business Continuity Loan Fund.[72] While applications were quickly accepted for the Employee Retention Grant Program, the Fund was not available for weeks afterward, and the website confusingly displayed a "Pre-Application" form that did not actually register anyone for consideration to receive funds.[73] Some users felt that SBS had not provided clear information on the terms of their

---

[69] Id.

[70] Moshe Schulman, Alexis Percival and Patrick Cournot "The Paycheck Protection Program Is Failing: Small Businesses Such as Ours Won't Survive without a Lot More Help", April 16, 2020, *The Atlantic*, available at: https://www.theatlantic.com/ideas/archive/2020/04/relief-small-business/610066/, ("Last month, de Blasio announced a $75,000 interest-free loan available to local businesses that could prove a 25 percent decrease in sales over a two-month period in comparison with sales in the same two months in 2019. Only recently did we meet the threshold, since our drop-off was so sudden, starting in the second week of March, unlike restaurants in Chinatown, for instance, that closed in February. As of last week, applications were closed. Our attorneys think they can push ours through since they created an account in time, but the money is presumed to have dried up.")

[71] *See* NYC Department of Small Business Services "Participation Affidavit", available at: https://www1.nyc.gov/html/sbs/downloads/pdf/COVID19_SBCL_participation_affidavit_form.pdf.

[72] *See* NYC Department of Small Business Services "Assistance & Guidance for Businesses Impacted Due to Novel Coronavirus", available at: https://www1.nyc.gov/site/sbs/businesses/covid19-business-financial-assistance.page (last viewed on April 24, 2020). Page has since been updated to reflect the fact that the programs are no longer being offered.

[73] *See* id.

programs, and that the online application process contained many technical glitches.[74] One user claimed to have lost her application entirely after the SBS website crashed.[75]

Small business owners who are not conversant in English may have had difficulty understanding the terms and conditions, and how to apply to the programs, without materials available in other languages. SBS took weeks to translate application materials on their website, and even then only translated certain materials, with text on the website being translated by browser tools.[76] Further, it is unknown how much outreach was done to immigrant communities through representative organizations or otherwise.

Some critics felt that the requirements for the Employee Retention Grant Program were not inclusive enough. Eligibility was limited, with only the very smallest businesses employing 1-4 people able to receive a grant.[77] This may have excluded many restaurants, since they may typically employ more than four personnel, such as a manager, servers, bus staff, cooks and hosts.

---

[74] Sophia Chang, "Funds Are Coming For Small Businesses, But Some Will Have To Wait", April 1, 2020, *Gothamist*, available at: https://gothamist.com/news/funds-are-coming-small-businesses-some-will-have-wait.
[75] Id.
[76] *See* NYC Department of Small Business Services "Assistance & Guidance for Businesses Impacted Due to Novel Coronavirus", available at: https://www1.nyc.gov/site/sbs/businesses/covid19-business-financial-assistance.page (last viewed on April 24, 2020). Page has since been updated to reflect the fact that the programs are no longer being offered, but materials had not been translated as of March 20, 2020. See also a tweet publicizing an SBS guide in languages other than English from NYC Mayor's Office of Immigrant Affairs, March 24, 2020, available at: https://twitter.com/NYCImmigrants/status/1242484476057354240. Re-tweeted by NYC Department of Small Business Services on March 24, 2020, available at: https://twitter.com/nyc_sbs.
[77] NYC Department of Small Business Services "NYC Employee Retention Grant Program", (as of April 2, 2020), available at: https://www1.nyc.gov/nycbusiness/article/nyc-employee-retention-grant-program. Program information is still available at: https://www.paulweiss.com/media/3979874/nyc2-employee-retention-grant-program-summary_4-6.pdf.

In the midst of struggles and confusion regarding SBS's grant and loan programs, the programs abruptly ended without much notice.[78] This may have closed the door on many small businesses who had intended to apply for the programs, but did not have a chance to do so, or were not yet able to gather the necessary documentation materials. Some users claimed that SBS failed to communicate the most basic aspect of the programs: that funds were limited and that time was of the essence.[79] One user termed it a "lottery" and expressed frustration that business decisions were made based upon the programs' promises.[80] According to one SBS loan processer, the programs may have had as much as half a billion dollars in loan requests, and only $20 million in funds to provide.[81] Despite getting at least 600 applications for the SBS loan program, the funding may have only been enough to provide loans for 250 to 400 businesses.[82] Council Speaker Corey Johnson has called for an expansion of the program from a maximum of $75,000 per business to $250,000 per business.[83]

*Department of Consumer and Worker Protection*

In addition to financial assistance through loans and grants, City support for small businesses has also come through DCWP. DCWP licenses more than 75,000 businesses in more than 50 industries and enforces key consumer protection, licensing, and workplace laws that apply to countless more. DCWP regularly plays a key role in city initiatives involving small businesses.

---

[78] Rachel Holliday Smith "Half a Billion Dollars' Needed from $20M City Small Business Loan Pool", April 16, 2020, *The City*, available at: https://thecity.nyc/2020/04/de-blasios-usd20m-nyc-small-business-loan-program-falls-short.html.
[79] Id.
[80] Id.
[81] Id.
[82] Id.
[83] New York City Council "New York City Council Speaker Corey Johnson Proposes $12 Billion Relief Plan to Help Workers and Businesses Impacted by COVID-19", March 19, 2020, available at: https://council.nyc.gov/press/2020/03/19/1888/.

As the COVID-19 crisis continues to unfold, DCWP has announced several measures to assist small businesses by alleviating various regulatory burdens. In March 2020, DCWP ceased collecting sidewalk cafe consent fees that were due and, shortly thereafter, commenced refunds for restaurants that had already paid their fees.[84] Though sidewalk cafe consent fees vary depending on the size, location, and whether it is enclosed or unenclosed, they typically cost restaurants thousands of dollars.[85] There are approximately 1,400 sidewalk cafes in the City, representing an annual revenue of between $11 million to $12 million. Most restaurants pay these fees in a four-part installment plan over a one-year period at a monthly interest rate of 1.5 percent.[86] Three installments remain for the year, and restaurants could still be required to pay the remaining installments if the state of emergency is lifted. Given the significant losses many restaurants have suffered; some restaurants may not have the ability to cover any remaining payments that come due.

DCWP also extended renewal deadlines for most licenses that expire during the pendency of the state of the emergency.[87] The Mayor subsequently issued an emergency executive order extending deadlines for all city licenses and permits.[88] However, some city agencies still appear to be requiring businesses to renew their permits, creating some confusion in certain industries.[89]

---

[84] Mayor's Executive Emergency Order No. 105, April 4, 2020, available at: https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-105.pdf.
[85] See NYC Department of Consumer Affairs "2018 consent fees for street space: For unenclosed and small unenclosed sidewalk café", available at: https://www1.nyc.gov/assets/dca/downloads/pdf/businesses/Sidewalk-Cafe-Consent-Fees.pdf.
[86] R.C.N.Y. §2-45.
[87] NYC Department of Consumer Affairs "Does your consumer affairs license expire February through June 2020?", available at: https://www1.nyc.gov/assets/dca/downloads/pdf/businesses/Does-Your-Consumer-Affairs-License-Expire-February-through-June-2020.pdf.
[88] Mayor's Emergency Executive Order No. 107, § 4, April 14, 2020, available at: https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-107.pdf.
[89] See e.g. Department of Buildings, "COVID-19 Response: Administrative Enforcement (AEU) and Licensing Units Updates," available at: https://www1.nyc.gov/assets/buildings/pdf/covid19_aeu-licensing_response_sn.pdf.

The declaration of the state of emergency has also led to an uptick of businesses and workers alike reaching out to DCWP for assistance with regard to the City's worker protection laws, including the Fair Workweek Law, Paid Safe and Sick Leave Law, and the Temporary Schedule Change Law. In response, DCWP published guidance specific to addressing employer obligations during the COVID-19 state of emergency. The guidance also included information on state and federal employment laws.[90] However, some industries have criticized the Mayor for not suspending enforcement of the Fair Workweek and Temporary Schedule Change Laws entirely. The National Restaurant Association argued that businesses cannot afford premium pay for last minute schedule changes, which are necessary in light of employees falling ill and sudden decreased staffing needs.[91]

On March 17, 2020, DCWP promulgated an emergency Rule under the City's Consumer Protection Law that makes price gouging illegal for any personal or household good or any service that is needed to prevent or limit the spread of or treat COVID-19.[92] Leading up to the state of emergency, the agency received almost 1,000 complaints of price gouging on items such as hand sanitizer and masks. By April 8th, the Department had received more than 7,200 complaints and had issued 2,700 violations.[93] While many of these violations have been issued to egregious

---

[90] NYC Department of Consumer and Worker Protection "Update about Workplace Laws as NYC Seeks to Stop the Spread of the New Coronavirus (COVID-19)", available at:
https://www1.nyc.gov/assets/dca/downloads/pdf/workers/Complying-with-NYC-Workplace-Laws-During-COVID-19.pdf.
[91] Letter from Keith Stephenson, National Restaurant Association, to Mayor de Blasio (March 20, 2020), on file.
[92] NYC Department of Consumer Affairs "Department of Consumer and Worker Protection issues emergency rule that makes price gouging illegal for any item or service needed to limit the ppread of Coronavirus", March 17, 2020, available at: https://www1.nyc.gov/site/dca/media/pr031720-DCWP-Emergency-Rule-Price-Gouging-Illegal.page.
[93] Priscilla DeGregory "NYC files law suits against stores for coronavirus price gouging", April 8, 2020, *New York Post,* available at: https://nypost.com/2020/04/08/nyc-files-lawsuits-against-stores-for-coronavirus-price-gouging/.

offenders,[94] some businesses have raised concerns that DCWP is failing to address price gouging in the supply chain by wholesalers.[95]

### C.        Third-Party Delivery Services

Even before the COVID-19 outbreak, online delivery services – platforms such as Grubhub, Uber Eats, DoorDash or Postmates connecting consumers to delivery and take-out from a range of local restaurants – have been a popular way for consumers to dine. According to the survey by the National Restaurant Association, around 60 percent of consumers nationwide ordering takeout used a third-party delivery service.[96] The real estate research firm CBRE predicts that by 2022, 70 percent of online delivery sales will occur on a third-party delivery platform.[97]

Restaurant owners may decide to list their businesses on third-party delivery services to expand their marketing and delivery services. Third-party delivery services have successfully driven web traffic to their own sites, making it less popular to order from restaurants directly. They can utilize Google ads to place themselves at the top of restaurant search results, and benefit from sophisticated search engine optimization, leaving restaurants' websites buried low in the search results or in between ads for services like Uber Eats or Doordash.[98] The platforms may integrate with other web services where related web traffic may be directed. Grubhub, for example, has

---

[94] Andrew Denney " Coronavirus in NY: UES pharmacy fines for drastically marking up face masks", March 25, 2020, available at: https://nypost.com/2020/03/25/coronavirus-in-ny-ues-pharmacy-fined-for-drastically-marking-up-face-masks/.

[95] Priscilla DeGregory "NYC files law suits against stores for coronavirus price gouging", April 8, 2020, New York Post, available at: https://nypost.com/2020/04/08/nyc-files-lawsuits-against-stores-for-coronavirus-price-gouging/.

[96] Hudson Riehle and Melissa Wilson, *Harnessing Technology to Drive Off-Premises Sales*, National Restaurant Association, (2019) https://www.restaurant.org/Downloads/PDFs/Research/research_offpremises_201910.

[97] Richard Barkham Et. al. *2019 U.S. Food In Demand Series: Restaurants,* CBRE Research, (November 13, 2019), http://cbre.vo.llnwd.net/grgservices/secure/US%20Food%20in%20Demand%20Restaurants%20November%202019.pdf?e=1580227024&h=921d142a16987e8b83de8d99d3cdeb8c

[98] ChowNow, "Is Your Restaurant's Search Engine Traffic Being Hijacked?", July 2, 2019, available at: https://get.chownow.com/blog/is-your-restaurant-search-engine-traffic-being-hijacked.

established a partnership with Yelp to integrate their delivery service into Yelp restaurant listings, so that if a web user views a listing and chooses to order delivery through that listing, the order is placed through Grubhub.[99] Yelp also has an agreement to list a Grubhub-owned phone number for restaurants on its listings, so that calls placed through the number may result in charges on the restaurant.[100] By contrast, smaller restaurants may not have the means to create their own apps or websites that drive web traffic to their own sites rather than to third-party delivery platforms,[101] especially when faced with the sudden impacts of COVID-19. Further, if a restaurant does not have an agreement with a given third-party platform, that platform may act to redirect web traffic from the restaurant to others it partners with through the setup of a decoy page.[102]

As expected, third-party platforms have reported a considerable uptick in order volume during the COVID-19 pandemic.[103] Grubhub's CEO Matt Maloney acknowledged that the pandemic has led Grubhub to expand their business: "We've received 10 to 15 times our usual new restaurant leads. This interest has led to four to five times more new restaurant go-lives compared to our previous record-breaking day."[104] In their first quarter 2020 results, Grubhub's CFO Adam Dewitt acknowledged, "COVID-19 has driven a significant uptick in new diners and

---

[99] Grubhub, "Yelp and Grubhub Complete Online Ordering Integration", March 19, 2018, available at: https://media.grubhub.com/media/press-releases/press-release-details/2018/Yelp-and-Grubhub-Complete-Online-Ordering-Integration/default.aspx.

[100] Jaya Saxena, "Yelp Funnels Users' Calls through Grubhub to Help Collect Widely Criticized Referral Fees from Restaurants", *Eater*, August 6, 2019, available at: https://www.eater.com/2019/8/6/20756799/yelp-grubhub-phone-numbers-referral-fees-restaurants.

[101] Lauren Stine, "Diners are delivery platform-loyal, study says", *Restaurant Dive*, August 26, 2019, available at: https://www.restaurantdive.com/news/diners-are-delivery-platform-loyal-study-says/561641/

[102] ChowNow, "Is Your Restaurant's Search Engine Traffic Being Hijacked?", July 2, 2019, available at: https://get.chownow.com/blog/is-your-restaurant-search-engine-traffic-being-hijacked.

[103] Susie Cagle, "'Fees are murder': delivery apps profit as restaurants forced to close doors", *The Guardian*, April 3, 2020, available at: https://www.theguardian.com/world/2020/apr/03/delivery-app-restaurants-coronavirus-california.

[104] Elisabeth Buchwald, "Restaurants can't survive on delivery alone, says Grubhub CEO Matt Maloney", March 23, 2020, *MarketWatch*, available at: https://www.marketwatch.com/story/restaurants-wont-be-able-to-survive-on-delivery-only-says-grubhub-ceo-matt-maloney-2020-03-21.

orders from existing users as most restaurant dining rooms have been temporarily closed nationwide."[105]

*Commission Fees*

The four major third-party delivery platforms in New York City utilize different commission models that can charge the restaurant as high as 30 percent or more per order. Grubhub/Seamless, the largest platform operating in New York City, accounts for over 60 percent of meal delivery sales.[106] The company charges restaurants a 10 percent fee for all orders delivered by a Grubhub courier,[107] and additional marketing commission in exchange for increased visibility on their platform, up to around 20 percent.[108] There are also additional processing fees.[109] Orders may include phone calls, which Grubhub determines via an algorithm to be orders: such phone calls are charged commission fees of an average of the last six orders placed.[110] Uber Eats and DoorDash each account for around 17 percent of City meal delivery sales.[111] Uber Eats charges

---

[105] "Grubhub Reports First Quarter 2020 Results", Grubhub, May 6, 2020, available at: https://media.grubhub.com/media/press-releases/press-release-details/2020/Grubhub-Reports-First-Quarter-2020-Results/default.aspx

[106] Kathryn Roethel Rieck, "Which company is winning the food delivery war?", April 21, 2020, *Second Measure*, available at: https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/

[107] Grubhub, "Grubub Pricing", available at: https://learn.grubhub.com/wp-content/uploads/2018/08/Grubhub_One-Pager_Pricing-Overview_Final.pdf

[108] David Yaffe-Bellany, "New York vs. Grubhub", September 30, 2019, *The New York Times*, available at: https://www.nytimes.com/2019/09/30/business/grubhub-seamless-restaurants-delivery-apps-fees.html

[109] Grubhub, "Grubub Pricing", available at: https://learn.grubhub.com/wp-content/uploads/2018/08/Grubhub_One-Pager_Pricing-Overview_Final.pdf.

[110] Adrienne Jeffries, "Yelp is Screwing Over Restaurants By Quietly Replacing Their Phone Numbers", August 6, 2019, available at: https://www.vice.com/en_us/article/wjwebw/yelp-is-sneakily-replacing-restaurants-phone-numbers-so-grubhub-can-take-a-cut.

[111] Kathryn Roethel Rieck, "Which company is winning the food delivery war?", April 21, 2020, *Second Measure*, available at: https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/.

restaurants a 30 percent fee for orders delivered by Uber couriers,[112] and a 15 percent fee for orders that are made on the Uber Eats website but delivered by a restaurant's delivery worker.[113] Doordash charges restaurants promotion fees, marketing fees, and subscription fees, totaling about 30 percent.[114] Similar to Grubhub, DoorDash charges restaurants a commission fee "in exchange for promoting and featuring the Merchant…on the DoorDash Platform," and for all orders delivered by DoorDash couriers (known as "Dashers").[115] Postmates accounts for just under five percent of delivery sales in the City.[116] Under the Postmates model, restaurants do not pay a fee for using Postmates couriers, but pay a standard commission fee "based on the contract signed" by the restaurant upon joining the platform.[117] If working with a platform that varies its commission fees when a restaurant uses its own delivery couriers, restaurants may choose to separately contract with services like Relay that can deliver food instead of a third-party platform. It is believed that

---

[112] Julie Littman, "Delivery by the numbers: How top third-party platforms compare", October 3, 2019, *Restaurant Dive*, available at: https://www.restaurantdive.com/news/delivery-by-the-numbers-how-top-third-party-platforms-compare/564279/.

[113] Uber, "How do fees work on Uber Eats", available at:  https://help.uber.com/ubereats/article/how-do-fees-work-on-uber-eats?nodeId=65d229e2-a2b4-4fa0-b10f-b36c9546cf55

[114] DoorDash "Terms of Service - United States DoorDash Merchants", available at: https://help.doordash.com/merchants/s/terms-of-service-us?language=en_US#payment-fees-and-taxes; DoorDash, "Merchant FAQs", available at: https://get.doordash.com/faq.

[115] DoorDash "Terms of Service - United States DoorDash Merchants", available at: https://help.doordash.com/merchants/s/terms-of-service-us?language=en_US#payment-fees-and-taxes

[116] Kathryn Roethel Rieck, "Which company is winning the food delivery war?", April 21, 2020, *Second Measure*, available at: https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/.

[117] Postmates "Payment FAQ", available at: https://support.postmates.com/merchant/articles/226618648-article-Payment-FAQ

New York City, which has long had food delivery,[118] has tens of thousands of delivery couriers,[119] many of which work for independent companies like Relay.[120]

City restaurateurs have expressed difficulty remaining financially profitable while contracting with third-party delivery services, even before dine-in restrictions associated with COVID-19. The City Council had previously conducted two oversight hearings this legislative session related to the rise of third-party delivery platforms in the City.[121] During these hearings, small businesses and advocates highlighted issues they experienced from using these platforms, including high commission fees, restrictions on menu pricing, and erroneous fees they were forced to pay from consumer phone calls that do not result in orders.[122] Third-party delivery services' practices have also been challenged in court. In 2018, a class action lawsuit was filed in the United States District Court for the Eastern District of Philadelphia against Grubhub. According to the plaintiff, an owner of a local Indian restaurant chain, Grubhub had committed wrongful conduct, including, but not limited to, "withholding commissions for sham telephone food orders, depriving more than 80,000 restaurants of revenues and profits that rightfully belong to them."[123] Another

---

[118] Willa Glickman, "What the Apps That Bring Food to Your Door Mean for Delivery Workers", *The New York Review of Books*, September 29, 2019, https://www.nybooks.com/daily/2019/09/20/what-the-apps-that-bring-food-to-your-door-mean-for-delivery-workers/.

[119] Id.; Wilfred Chan, "I am a New York food courier. Right now, it's worse than you think", *The Guardian*, April 3, 2020, https://www.theguardian.com/world/2020/apr/03/food-courier-coronavirus-pandemic-new-york.

[120] Lisa Fickensher, "NYC seeks to limit fees by food apps like Grubhub during emergencies", *New York Post*, April 23, 2020, https://nypost.com/2020/04/23/nyc-council-to-press-food-deliverers-to-stop-charging-restaurants-fees/.

[121] New York City Council "Oversight – The Changing Market for Food Delivery", June 6, 2019, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=705634&GUID=0BC09A92-5DB4-496B-90EE-BF75DF712131&Options=info|&Search=; and New York City Council "Oversight: 'Ghost Kitchens' 'Virtual Restaurants' and the Future of the Restaurant Industry", February 6, 2020, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=759804&GUID=B42220FE-417A-484C-B7CF-51725F784A71&Options=info|&Search=

[122] Id.

[123] *TIFFIN EPS, LLC v. GrubHub, Inc*, 2:18-cv-05630-PD, Complaint, p. 2l.5., available at: https://cdn.vox-cdn.com/uploads/chorus_asset/file/16288289/Grubhub_lawsuit.pdf.

class action lawsuit was filed in the United States District Court for the Southern District of New York in April 2020 against all four third-party delivery platforms.[124] The lawsuit alleges that all third-party delivery platforms have violated U.S. antitrust law by requiring restaurants to charge delivery customers and dine-in customers the same price for each menu items, while imposing "exorbitant" fees of 10 percent to 40 percent of revenue to process delivery orders.[125]

With COVID-19 dine-in restrictions in place and restaurants relying on delivery and take-out, high commission fees from third-party delivery services have reportedly made it even more difficult for the City's restaurants to survive. GrubHub CEO Matt Maloney has acknowledged that high commission fees are unsustainable for restaurants during COVID-19. During an interview with MarketWatch, he was asked whether restaurants could survive on deliveries alone during the pandemic. Maloney responded, "Not in the long-term. The industry isn't large enough for all restaurants to survive just on delivery, but they can survive for a matter of weeks potentially. It's definitely not a long-term solution to bridge across restaurants."[126] Feedback from restaurants has validated Maloney's view. Restauranteurs testified at the Committee's recent hearing on the impacts of COVID-19 that the high commission fees are not leaving them with enough money to keep their doors open. Evan Franca, owner of Brooklyn Crepe & Juice, compared the amount he typically made from orders placed before dine-in restrictions, when about 20 percent of his orders would come through the third-party platforms, with current orders through platforms constituting

---

[124] The four platforms are Grubhub Inc. (which also does business as Seamless), DoorDash Inc., Postmates Inc., and Uber Technologies, Inc., which is the parent company of Uber Eats.

[125] Jonathan Stempel, "Grubhub, DoorDash, Postmates, Uber Eats are sued over restaurant prices amid pandemic" April 13ᵗ, 2020, *Reuters*, available at: https://www.reuters.com/article/us-health-coronavirus-food-delivery-laws-idUSKCN21V2C1.

[126] Elisabeth Buchwald, "Restaurants can't survive on delivery alone, says Grubhub CEO Matt Maloney", March 23, 2020, *MarketWatch*, available at: https://www.marketwatch.com/story/restaurants-wont-be-able-to-survive-on-delivery-only-says-grubhub-ceo-matt-maloney-2020-03-21

as much as 80 percent of his total order volume.[127] The fees as high as 30 percent leave him with insufficient revenue to cover his expenses.[128] Similarly, the owner of The Expat in upper Manhattan shed light on the high marketing fees he was paying through Grubhub's phone order charges, which he claimed were mostly erroneous, required staff time to audit, and which were raised during the COVID-19 crisis.[129] Restaurant owners have made similar claims in recent articles, citing the burden of the fees as dining restrictions have made platform orders a high percentage of sales, and criticizing Grubhub's phone order charges for their inaccuracy.[130]

Perhaps because of the disproportionate financial burden high commission fees would place on restaurants during the pandemic, each of the four major third-party platforms developed their own COVID-19 relief programs. Grubhub's program deferred commission fees for a set period.[131] Uber Eats has waived the delivery fee on all orders for over 100,000 independent restaurants on its app[132] and is collecting zero fees for all pick-up orders until June 30.[133] Doordash is reducing commission fees by 50 percent for over 150,000 restaurants in the U.S., Canada and Australia,[134] and offering new restaurants the ability to join their platform and pay zero

---

[127] Testimony of Evan Franca, Owner of Brooklyn Crepe & Juice, Hearing of the Committee on Small Business and the Committee on Consumer Affairs and Business Licensing, April 29, 2020.

[128] Id.

[129] Testimony of Andrew Ding, Owner of The Expat, Hearing of the Committee on Small Business and the Committee on Consumer Affairs and Business Licensing, April 29, 2020.

[130] Rebeca Ibarra, "Grubhub And Other Apps Hold Restaurants 'Hostage' In A Delivery-Only NYC, Owners Say", *Gothamist*, May 7, 2020, https://gothamist.com/food/grubhub-and-other-apps-hold-restaurants-hostage-delivery-only-nyc-owners-say; Susie Cagle, "'Fees are murder': delivery apps profit as restaurants forced to close doors", *The Guardian*, April 3, 2020, available at: https://www.theguardian.com/world/2020/apr/03/delivery-app-restaurants-coronavirus-california.

[131] Grubhub "COVID-19 Impact, Delivery Safety and Supporting Local Restaurants", March 18, 2020, available at: https://blog.grubhub.com/health-and-safety

[132] Uber "A company that moves people is asking you not to move", available at: https://www.uber.com/au/en/coronavirus/?_ga=2.191168042.1434603565.1587677057-1914018361.1587677057

[133] Uber, "0% Service Fee for Pickup", available at: https://help.uber.com/restaurants/article/0-service-fee-for-pickup?nodeId=613e8d1e-c9b7-4dff-9541-5cff075e3cc5 (last visited on May 11, 2020).

[134] DoorDash "The latest on Coronavirus (COVID-19)", available at:  https://get.doordash.com/covid-updates#businesses

commissions for 30 days.[135] Postmates is temporarily waiving commission fees for businesses in the San Francisco Bay Area, LA, Sacramento and Detroit.[136]

Some municipalities have already acted to limit commission fees to address the negative impacts the fees were having on restaurants during the pandemic. Mayor London Breed of San Francisco issued a mayoral declaration making it unlawful for a third-party delivery service to charge restaurants "a fee per online order for the use of its service that totals more than 15 percent of the purchase price of such online order."[137] Mayor Breed's cap will remain in effect through the remainder of the local emergency, or until businesses are permitted to reopen for dine-in services, whichever comes first.[138] Chicago City Council Member Scott Waguespack introduced an ordinance making it unlawful for a third-party food delivery service to charge a covered establishment a fee that totals more than five percent of per online order.[139] The Hospitality Alliance and the Chambers of Commerce have also been calling for New York City to cap commission fees on third-party delivery platforms to 10 percent per order.[140]

---

[135] DoorDash "COVID-19 merchant financial assistance", available at:
https://help.doordash.com/merchants/s/article/COVID-19-Merchant-Financial-Assistance?language=en_US

[136] Postmates "Postmates Coronavirus (COVID-19) Response", March 16 2020, available at:
https://blog.postmates.com/postmates-coronavirus-covid-19-response-94eef5b1bbc2

[137] Office of the Mayor San Francisco, London N. Breed "Ninth Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated February 25, 2020", available at:
https://sfmayor.org/sites/default/files/NinthMayoralSupplement.pdf

[138] Eve Batey "San Francisco Emergency Order says delivery apps must cap restaurant fees at 15 percent", April 10, 2020, *Eater San Francisco*, available at: https://sf.eater.com/2020/4/10/21216546/san-francisco-delivery-cap-doordash-grubhub-uber-eats-postmates-caviar.

[139] City of Chicago Office of the City Clerk "Ordinance", April 22, 2020, available at:
https://files.constantcontact.com/58ea69d3101/e58501f0-4a68-4625-b689-f14570f4cde6.pdf

[140] *See* NYC Hospitality Alliance "Restaurant rescue & save nightlife plan", available at:
https://thenycalliance.org/information/updated-9-point-mitigation-and-support-plan (last viewed on April 27, 2020); Testimonies of Robert Bookman and Andrew Rigie, NYC Hospitality Alliance, Hearing of the Committee on Small Business and the Committee on Consumer Affairs and Business Licensing, April 29, 2020; Testimony of the borough Chambers of Commerce, Hearing of the Committee on Small Business and the Committee on Consumer Affairs and Business Licensing, April 29, 2020.

### D.        Commercial Leases and Evictions

As the effects of COVID-19 have reached many businesses across the City, commercial tenants may face pressure from their landlords to meet rental obligations when they do not have the funds to do so. In order to collect rent from commercial tenants, landlords may seek to enforce provisions in commercial leases that impose personal liability on business owners for non-payment of rent, utilities or taxes. Provisions that hold a business owner personally liable in the event they are unable to pay rent are common in small business leases.[141] In order to prevent the seizure of personal assets or property, an owner must turn in the keys to the property, effectively ending their lease.

Gabriel Stulman, who owns five restaurants in Manhattan, articulated his concerns with the personal liability clauses in his leases.[142] If he closes down his restaurant before the lease term expires, in order to avoid paying the landlord for entire lease term Stulman must pay any rent in arrears plus an additional three to six months. Stulman considers this "impossible to pay," as his restaurant already owes hundreds of thousands of dollars in bills.[143] Such a predicament may leave him "personally bankrupt" and "at risk of losing the entirety of [his] life savings".[144] Stulman also cites the hopelessness of relief efforts such as PPP, which, in order to qualify for the maximum amount of loan forgiveness, would provide him without enough funds to pay his workers, but not make his rent: "In the event that we are approved for any of the PPP Loans we applied for (still crossing our fingers), the 25 percent that can be used for non-payroll expenses in most cases won't

---

[141] NYC Department of Small Business Services, Comprehensive Guide to Commercial Leasing in New York City, pg. 21, https://www1.nyc.gov/assets/sbs/downloads/pdf/about/reports/commercial-lease-guide-accessible.pdf.
[142] Erika Adams, "'I Am Preparing For This Possibility of Going Bankrupt and Belly Up'", April 30, 2020, *Eater*, available at: https://ny.eater.com/2020/4/30/21242840/gabriel-stulman-restaurants-nyc-city-council-legislature-coronavirus.
[143] Id.
[144] Id.

even be sufficient to cover the arrears owed in rent, so there definitely won't be any aid in future months [for] rent, utilities, etc."[145]

Without recourse, landlords may resort to threats, which continues to make protecting businesses from harassment an important issue as the City grapples with the effects of COVID-19.

## III.   <u>CONCLUSION</u>

The various governmental approaches to support small businesses during this crisis have provided some measure of relief for small business owners and their employees; however, there are range of outstanding issues that continue to make operating a business during the pandemic particularly difficult. The vast array of departments and agencies have made it difficult for businesses to navigate and, as discussed, there have been numerous limitations to the government programs that are further compounded by the technological and language barriers that some small business owners also face. This comes on top of the other issues that small businesses have to navigate during this crisis range from trying to make rent and payroll, paying delivery commissions, finding suppliers and moving retail online, and securing bank loans.

## IV.   <u>LEGISLATIVE ANALYSIS</u>

**Proposed Int. No. 1898-A**

This bill would prohibit any third-party delivery service from charging restaurants for telephone orders that do not result in an actual transaction during the call.

The prohibition would apply only to periods when a state of emergency is in effect in the city and restaurants are prohibited from offering food for consumption on-premises, plus an additional 90 days thereafter. Violations would be subject to civil penalties of up to $500 per

---

[145] Id.

restaurant per day. The bill would take effect on the same date that local law proposed in Int. No. 1908-B would take effect.

**Proposed Int. No. 1908-B**

This bill would restrict the fees that third-party food delivery services may charge restaurants during states of emergency when restaurants are prohibited from offering food for consumption on-premises, plus an additional 90 days thereafter. During such time periods, third-party delivery services would be prohibited from charging more than a 15 percent fee to a restaurant per order for providing delivery services, and more than a 5 percent fee to a restaurant per order for all other types of charges. Therefore, a third-party delivery service that provides its own delivery service to a restaurant could charge the restaurant a maximum 20 percent fee for an order placed through the platform (15 percent for the provision of delivery services, plus 5 percent for other fees such as marketing, listing, or credit card processing). A restaurant that does not utilize the delivery service of a third-party platform can be charged no more than a 5 percent fee per order placed through the platform.

Included in these limits would be orders placed through a third-party delivery app, utilizing a third-party delivery service forwarding phone number, or any other order placed through or with the assistance of a third-party delivery service.

Violations of the prohibitions in this bill would be subject to civil penalties of up to $1,000 per restaurant per day. The Corporation Counsel would be empowered to enforce the bill's provisions by instituting civil action against third-party delivery services in violation, and by conducting investigations pursuant to such civil action.

This bill would take effect seven days after becoming law.

**Proposed Int. No. 1914-A**

34

This bill provides additional commercial tenant protections in the law by making threatening a commercial tenant based on their status as a COVID-19 impacted business or person a form of harassment punishable by a civil penalty of $10,000 to $50,000.

Nothing in this bill is intended to limit any of the rights or obligations of landlords or commercial tenants under the existing harassment law as set forth in chapter 9 of title 22 of the Administrative Code, including but not limited to (1) the right of a landlord to terminate a tenancy, refuse to renew or extend a lease or other rental agreement, or reenter and repossess property under section 22-902(b) and (2) the obligation of a commercial tenant to continue paying rent owed under section 22-903(b).

### Proposed Int. No. 1932-A

This bill would temporarily prohibit the enforcement of personal liability provisions in commercial leases or rental agreements involving a COVID-19 impacted tenant. This would apply to businesses that were impacted by mandated closures and service limitations in the Governor's Executive Orders. Specifically, it covers (1) businesses that were required to stop serving food or beverages on-premises (restaurants and bars); (2) businesses that were required to cease operations altogether (gyms, fitness centers, movie theaters); (3) retail businesses that were required to close and/or subject to in-person restrictions; and (4) businesses that were required to close to the public (barbershops, hair salons, tattoo or piercing parlors and related personal care services). Threatening to or attempting to enforce such a provision would also be considered a form of harassment.

Prop. Int. No. 1898-A

By Council Members Gjonaj, Moya, Constantinides, Brannan, Rosenthal, Gibson, Perkins, Louis, Ayala, Lander, Chin, Koslowitz, Rivera, Ampry-Samuel, Vallone, Lancman and Holden

A Local Law to amend the administrative code of the city of New York, in relation to telephone order charges by third-party food delivery services during, and for 90 days after, a declared emergency that prohibits on-premises dining

Be it enacted by the Council as follows:

1     Section 1. Section 20-845 of the administrative code of the city of New York, as added by

2     a local law for the year 2020 amending the administrative code of the city of New York, relating

3     to fees charged by third-party food delivery services, as proposed in introduction number 1908-B

4     for the year 2020, is amended by adding a new definition of "telephone order" in alphabetical order

5     to read as follows:

6     Telephone order. The term "telephone order" means an order placed by a customer to a

7     food service establishment through a telephone call forwarded by a call system provided by a third-

8     party food delivery service.

9     § 2. Chapter 5 of title 20 of the administrative code of the city of New York is amended by

10    adding a new section 20-847 to read as follows:

11    § 20-847 Telephone orders. a. No third-party food delivery service may charge any fee

12    from a food service establishment for a telephone order if a telephone call between such

13    establishment and a customer does not result in an actual transaction during such telephone call.

14    b. The requirements of this section apply only during a declared emergency and for a period

15    of 90 days after the end of a declared emergency.

16    § 3. Subdivision a of section 20-848 of the administrative code of the city of New York, as

17    added by a local law for the year 2020 amending the administrative code of the city of New York,

1   relating to fees charged by third-party food delivery services, as proposed in introduction number

2   1908-B for the year 2020, is amended to read as follows:

3       a. Any person that violates any provision of [this subchapter] <u>section 20-846</u> or any rule

4   promulgated pursuant [to this subchapter] <u>thereto</u> shall be subject to a civil penalty that shall not

5   exceed $1,000 per violation. <u>Any person that violates any provision of section 20-847 or any rule</u>

6   <u>promulgated pursuant thereto shall be subject to a civil penalty that shall not exceed $500 per</u>

7   <u>violation.</u> Violations under this subchapter shall accrue on a daily basis for each day and for each

8   food service establishment charged a fee in violation of this subchapter or any rule promulgated

9   pursuant to this subchapter. A proceeding to recover any civil penalty authorized pursuant to this

10   subchapter may be brought in any tribunal established within the office of administrative trials and

11   hearings or within any agency of the city designated to conduct such proceedings.

12       § 4. This local law takes effect on the same date that a local law for the year 2020 amending

13   the administrative code of the city of New York, relating to fees charged by third-party food

14   delivery services, as proposed in introduction number 1908-B for the year 2020, takes effect.

JK
LS #12594
5/5/2020 6:21PM

This page is intentionally left blank.

Proposed Int. No. 1908-B

By Council Members Moya, Gjonaj, Kallos, Brannan, Rosenthal, Gibson, Ayala, Van Bramer, Rivera, Cohen, Perkins, Louis, Lander, Chin, Koslowitz, Ampry-Samuel, Powers, Vallone, Lancman, Constantinides and Holden

A Local Law to amend the administrative code of the city of New York, in relation to fees charged by third-party food delivery services during, and for 90 days after, a declared emergency that prohibits on-premises dining

Be it enacted by the Council as follows:

1    Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is

2    amended by adding a new subchapter 22 to read as follows:

3                                        SUBCHAPTER 22

4                          THIRD-PARTY FOOD DELIVERY SERVICES

5        § 20-845 Definitions. For the purposes of this subchapter, the following terms have the

6    following meanings:

7        Declared emergency. The term "declared emergency" means the period during which a

8    state disaster emergency has been declared by the governor of the state of New York or a state of

9    emergency has been declared by the mayor, such declaration is in effect in the city, and all food

10   service establishments in the city are prohibited from providing food for consumption on-premises.

11       Delivery fee. The term "delivery fee" means a fee charged by a third-party food delivery

12   service for providing a food service establishment with a service that delivers food from such

13   establishment to customers. The term does not include any other fee that may be charged by a

14   third-party food delivery service to a food service establishment, such as fees for listing or

15   advertising the food service establishment on the third-party food delivery service platform or fees

16   related to processing the online order.

1       Food service establishment. The term "food service establishment" has the same meaning

2   as provided in subdivision s of section 81.03 of the health code of the city of New York.

3       Online order. The term "online order" means any order placed by a customer through or

4   with the assistance of a platform provided by a third-party food delivery service, including a

5   telephone order.

6       Purchase price. The term "purchase price" means the total price of the items contained in

7   an online order that are listed on the menu of the food service establishment where such order is

8   placed. Such term does not include taxes, gratuities and any other fees that may make up the total

9   cost to the customer of an online order.

10      Third-party food delivery service. The term "third-party food delivery service" means any

11  website, mobile application or other internet service that offers or arranges for the sale of food and

12  beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from,

13  no fewer than 20 food service establishments located in the city that are owned and operated by

14  different persons.

15      § 20-846 Fee limits during declared emergencies. a. It shall be unlawful for a third-party

16  food delivery service to charge a food service establishment a delivery fee that totals more than

17  15% of the purchase price of each online order.

18      b. It shall be unlawful for a third-party food delivery service to charge a food service

19  establishment any fee or fees other than a delivery fee for the use of their service greater than 5%

20  of the purchase price of each online order. Any fees or other charges from a third-party food

21  delivery service to a food service establishment beyond such maximum 5% fee per order, and a

22  delivery fee collected pursuant to subdivision a of this section, are unlawful.

1    c. The requirements of this section apply only during a declared emergency and for a period

2    of 90 days after the end of a declared emergency.

3    § 20-848 Penalties and enforcement. a. Any person that violates any provision of this

4    subchapter or any rule promulgated pursuant to this subchapter shall be subject to a civil penalty

5    that shall not exceed $1,000 per violation. Violations under this subchapter shall accrue on a daily

6    basis for each day and for each food service establishment charged a fee in violation of this

7    subchapter or any rule promulgated pursuant to this subchapter. A proceeding to recover any civil

8    penalty authorized pursuant to this subchapter may be brought in any tribunal established within

9    the office of administrative trials and hearings or within any agency of the city designated to

10   conduct such proceedings.

11   b. A civil action may be brought by the corporation counsel on behalf of the city in any

12   court of competent jurisdiction to recover any or all of the following:

13   1. Any civil penalty authorized pursuant to this section;

14   2. Injunctive relief to restrain or enjoin any activity in violation of this section;

15   3. Restitution of an amount not to exceed the amount of fees collected by a third-party food

16   delivery service that exceeded the maximum amounts permitted pursuant to this subchapter;

17   4. attorneys' fees and costs, and such other remedies as a court may deem appropriate.

18   c. The corporation counsel may initiate any investigation to ascertain such facts as may be

19   necessary for the commencement of a civil action pursuant to this section, and in connection

20   therewith shall have the power to issue subpoenas to compel the attendance of witnesses and the

21   production of documents, to administer oaths and to examine such persons as are deemed

22   necessary.

1          § 2. This local law takes effect seven days after it becomes law.

SJ
LS #9163
5/5/20 6:21 PM

This page is intentionally left blank.

Proposed Int. No. 1914-A

By Council Members Adams, the Speaker (Council Member Johnson), Kallos, Van Bramer, Chin, Louis, Ayala, Levin, Lander, Koslowitz, Rosenthal, Lancman, Constantinides and The Public Advocate (Mr. Williams)

A Local Law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19

<u>Be it enacted by the Council as follows:</u>

Section 1. Paragraph 11 of subdivision a of section 22-902 of the administrative code of the city of New York, as added by local law number 185 for the year 2019, is amended to read as follows:

11. threatening a commercial tenant based on <u>(i)</u> such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence[,] <u>or</u> status as a victim of sex offenses or stalking<u>, or (ii) the commercial tenant's</u> <u>status as a person or business impacted by COVID-19, or the commercial tenant's receipt of a rent</u> <u>concession or forbearance for any rent owed during the COVID-19 period; provided that for the</u> <u>purposes of this paragraph:</u>

<u>(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of</u> <u>the first month that commences after the expiration of the moratorium on enforcement of evictions</u>

-47-

of any tenant, residential or commercial, set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and extended thereafter, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

(b) the term "impacted by COVID-19" means a person who has experienced one or more of the following situations:

(1) such person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of such person's household was diagnosed with COVID-19;

(3) such person was providing care for a family member or a member of such person's household who was diagnosed with COVID-19;

(4) a member of such person's household for whom such person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster

-48-

emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) such person was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency or because such person was advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(6) such person became primarily responsible for providing financial support for the household of such person because the previous head of the household died as a direct result of COVID-19;

(7) such person's business is closed as a direct result of the COVID-19 state disaster emergency; and

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issue by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same three-month period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2020, and February 2020 and such revenue loss was the direct result of the COVID-19 state disaster

emergency. A revenue loss shall be deemed to be the direct result of the COVID-19 state disaster

emergency when such disaster emergency was the proximate cause of such revenue loss;

§ 2. This local law takes effect immediately.

LS # 14764
5/5/20 5:18PM

-50-

Proposed Int. No. 1932-A

By Council Member Rivera, the Speaker (Council Member Johnson), Kallos, Van Bramer, Rosenthal, Chin, Ayala, Levin, Lander, Koslowitz, Louis, Vallone, Lancman and Constantinides

A Local Law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Chapter 10 of title 22 of the administrative code of the city of New York is amended by adding a new section 22-1005 to read as follows:

§ 22-1005. Personal liability provisions in commercial leases. A provision in a commercial lease or other rental agreement involving real property located within the city that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, shall not be enforceable against such natural persons if the conditions of paragraph 1 and 2 are satisfied:

1. The tenant satisfies the conditions of subparagraph (a), (b) or (c):

-51-

(a) The tenant was required to cease serving patrons food or beverage for on-premises consumption or to cease operation under executive order number 202.3 issued by the governor on March 16, 2020;

(b) The tenant was a non-essential retail establishment subject to in-person limitations under guidance issued by the New York state department of economic development pursuant to executive order number 202.6 issued by the governor on March 18, 2020; or

(c) The tenant was required to close to members of the public under executive order number 202.7 issued by the governor on March 19, 2020.

2. The default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and September 30, 2020, inclusive.

§ 2. Subdivision a of section 22-902 of the administrative code of the city of New York, as amended by local law number 185 for the year 2019, is amended to read as follows:

a. A landlord shall not engage in commercial tenant harassment. Except as provided in subdivision b of this section, commercial tenant harassment is any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property, or

-52-

to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property, and (ii) includes one or more of the following:

1. using force against or making express or implied threats that force will be used against a commercial tenant or such tenant's invitee;

2. causing repeated interruptions or discontinuances of one or more essential services;

3. causing an interruption or discontinuance of an essential service for an extended period of time;

4. causing an interruption or discontinuance of an essential service where such interruption or discontinuance substantially interferes with a commercial tenant's business;

5. repeatedly commencing frivolous court proceedings against a commercial tenant;

6. removing from a covered property any personal property belonging to a commercial tenant or such tenant's invitee;

7. removing the door at the entrance to a covered property occupied by a commercial tenant; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying a key to the new lock to the commercial tenant occupying the covered property;

8. preventing a commercial tenant or such tenant's invitee from entering a covered property occupied by such tenant;

9. substantially interfering with a commercial tenant's business by commencing unnecessary construction or repairs on or near covered property; [or]

10. engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business;

11. threatening a commercial tenant based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence, status as a victim of sex offenses or stalking;

12. requesting identifying documentation that would disclose the citizenship status of a commercial tenant, an invitee of a commercial tenant or any person seeking entry to the covered property in order to patronize such commercial tenant; [or]

13. unreasonably refusing to cooperate with a tenant's permitted repairs or construction activities[.]; or

14. attempting to enforce a personal liability provision that the landlord knows or reasonably should know is not enforceable pursuant to section 22-1005 of the code.

-54-

§ 3. This local law takes effect immediately.

LS # 14817
5/5/20 7:33PM