**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York 10036
Telephone: 212-336-2000
Facsimile: 212-336-2222

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias Bochner, and 287 7th Avenue Realty LLC, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> The City of New York, *a municipal entity*, Bill de Blasio, *as Mayor of the City of New York*, Louise Carroll, *Commissioner of New York City Department of Housing Preservation & Development,* and Jonnel Doris, *Commissioner of New York City Department of Small Business Services,* <br><br> *Defendants.* | Civ. No. 20-cv-5301 (RA) <br><br><br> **AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................1

Jurisdiction and Venue ...............................................................................................4

The Parties ..................................................................................................................5

Overview of the Applicable Law ...............................................................................12

    A.    The First Amendment to the U.S. Constitution .................................12

    B.    The Contracts Clause of the U.S. Constitution ...................................12

    C.    New York State Law ............................................................................12

Statement of Facts ......................................................................................................14

    A.    The COVID-19 Pandemic Spreads Globally and New York Becomes an Epicenter ........................................................................................14

    B.    The New York State Legislature Grants Governor Cuomo Emergency Powers to Address the COVID-19 Crisis .............................................15

    C.    Governor Cuomo Declares a Statewide Disaster Emergency to Address COVID-19 .............................................................................................17

    D.    Governor Cuomo Exercises His Emergency Powers to Address COVID-19 Pursuant to Duly Passed Legislation .....................................17

    E.    Governor Cuomo Issues Executive Orders and the Legislature Passes Laws that are Narrowly Tailored to Address Commercial and Residential Real Estate in New York .....................................................20

    F.    COVID-19 Is Adversely and Substantially Affecting New York's Commercial and Residential Real Estate Industries ...............................25

    G.    The New York City Council Passes COVID-19 Legislation Affecting New York City Real Estate .................................................................28

        1.    The Commercial Harassment Law ...........................................32

        2.    The Residential Harassment Law .............................................35

        3.    The Guaranty Law ...................................................................37

    H.    The Harassment Laws and the Guaranty Laws Inflict Constitutional Harm on Plaintiffs ...............................................................................39

        1.    The Harassment Laws Impermissibly Restrict Plaintiff's Commercial Speech ..................................................................39

        2.    The Laws Substantially Impair Plaintiffs' Contractual Rights .................41

        3.    The City's New Laws Deny Plaintiffs' Due Process Rights ....................44

## TABLE OF CONTENTS
### (continued)

**Page**

Claims for Relief........................................................................................................45

    First Claim For Relief
        Violation of the U.S. Constitution
        First Amendment and Fourteenth Amendment......................................45

    Second Claim For Relief
        Violation of the U.S. Constitution's Contracts Clause ..........................47

    Third Claim For Relief
        Preemption Under the New York State Law ..........................................50

    Fourth Claim For Relief
        Violation of the U.S. Constitution's Fourteenth Amendment Due Process Clause58

    Fifth Claim For Relief
        Violation of the New York State Constitution Free Speech Clause .....................60

    Sixth Claim For Relief
        Violation of the New York State Constitution Due Process Clause.....................60

Prayer for Relief.........................................................................................................62

Plaintiffs Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias Bochner, and 287 7th Avenue Realty LLC, through their attorneys, Patterson Belknap Webb & Tyler LLP, for their complaint against the Defendants (collectively the "City" or the "City of New York"), hereby allege as follows on personal knowledge, except as to matters not within their personal knowledge, which are alleged on information and belief.

## Introduction

1.     The economic effects of the COVID-19 pandemic ("the Pandemic") are far-reaching and well documented.  The Pandemic continues to impact countless small business owners in New York City, including food and beverage stores, retail outlets, small service providers, and indeed, property owners.  Three local laws, which the City of New York rushed to passage, however, are poised to make that situation worse, by running roughshod over vital and fundamental rights guaranteed to all Americans by the U.S. Constitution.  This new legislation burdens landlords and benefits tenants in ways that are not necessary to advance the City's policy goals.  And, these laws benefit a far wider segment of the tenant community than is needed to advance any legitimate governmental interests.

2.     Plaintiffs are entrepreneurs.  Each of them built a living and a future owning and managing properties in New York City that they rent to businesses and individuals.  The City's new legislation threatens those livelihoods by: a) silencing Plaintiffs' constitutionally protected speech; and b) stripping Plaintiffs' business contracts of a material term, and disrupting the reasonable expectations of the parties to the impacted leases.  All three City laws at issue, no doubt, sought to alleviate some of the economic impact of COVID-19.  But they sweep too broadly, sometimes benefitting well-capitalized tenants who need no relief, while leaving many small property owners, like Plaintiffs, struggling to get by.

3.     All three of these laws were hustled through the legislative process with little time for meaningful consideration and based on speculative evidence.  This was largely done with one purpose in mind: as the Speaker of the New York City Council explained, "[i]t's essential that New Yorkers get the rent cancellation they need."  But the impact of that policy on property owners, who have also suffered during the Pandemic, was ignored.

4.     In legislating for the benefit of a segment of New York's rental community—commercial and residential lessees—the City shifted the burden of the Pandemic from one segment of society to another—property owners—which is largely unable to shoulder it. Stripped of their ability to collect rental income, and with tax bills and mortgage payments quickly mounting, Plaintiffs are threatened with being left unable to reap the benefits of the livelihood they built from the ground up.  Without income from their properties, Plaintiffs will be unable to pay property taxes imposed by the City, as well as the day-to-day obligations owed on their properties.

5.     Notably, while this legislation may have sincere intentions—*i.e.*, assisting certain New Yorkers impacted by the COVID-19 crisis—the wide sweep of these new laws makes them extraordinarily overbroad.  For example, this legislation benefits:

a.     Well-capitalized, nationwide retailers seeking to re-negotiate or forego rent payments;

b.     Opportunistic residential tenants who have evaded paying rent even before the Pandemic; and

c.     Retailers, restaurants and bars that are fortunate to be backed by wealthy individuals or otherwise have the means to pay their rent.

2

6.      The City's new legislation—*i.e.*, the Commercial Harassment Law, the Residential Harassment Law (collectively the "Harassment Laws"), and the Guaranty Law (collectively the "Laws") (as described in Section G below)—is constitutionally defective for three main reasons.

7.      *First*, the Harassment Laws infringe upon the ability of property owners to make lawful requests for rent, and particularly to collect unpaid rent.  Plaintiffs count on their ability to collect rent as a critical means of support for their livelihood, and rely on those rent payments to pay property taxes to the City, maintain their buildings, and pay employees and contractors.  The challenged Laws squelch Plaintiffs' right to free commercial speech under the First Amendment to the U.S. Constitution.  And, as described above, the Harassment Laws are not tailored to meet the needs of tenants and property owners alike who most need relief from the Pandemic's effects. To the contrary, these three Laws benefit many who need no significant relief and burden others who need relief most.

8.      *Second*, the Guaranty Law re-writes Plaintiffs' contracts with their tenants, stripping Plaintiffs of remedies to enforce personal guaranties that were a material benefit of those agreements.  As a result, this new Law has the effect of destroying the economic value of those personal guaranties, thereby violating the Contracts Clause of the U.S. Constitution.

9.      *Third,* the City imposed these unlawful restrictions by adopting legislation it had no power to enact.  New York State laws that expressly empower New York's Governor, Andrew M. Cuomo ("Governor Cuomo"), to address the Pandemic in New York State, together with laws subsequently passed by the State, preempt the Harassment and Guaranty Laws.

10.     This year, the New York State Legislature (the "Legislature") granted Governor Cuomo broad emergency powers:  a) authorizing him to issue directives "necessary to allow

3

New York to manage, prepare, and respond to" COVID-19, and b) granting him the power to "provide for procedures reasonably necessary to enforce" those directives.  Exercising these powers granted by the Legislature, to date, Governor Cuomo has issued 62 executive orders responding to the COVID-19 crisis, including with respect to real estate.

11.     In June 2020, the Legislature also passed, and Governor Cuomo signed, the Emergency Rent Relief Act of 2020 ("the Rent Relief Act").  That law establishes a residential rent relief program for tenants who need assistance meeting their rent obligations due to loss of income as a result of the Pandemic.  Also, in June 2020, the Legislature enacted the Tenant Safe Harbor Act ("TSHA").  The TSHA prevents a court from issuing a warrant of eviction for any residential tenant or occupant that has experienced a financial hardship for nonpayment of rent that accrues or becomes due during the COVID-19 period.  The TSHA, however, specifically allows landlords to collect back rent through a summary proceeding and allows courts to enter money judgments for overdue rent.  The Rent Relief Act and the TSHA confirm that the Legislature has occupied the field with respect to the rent relief that is to be afforded to New Yorkers affected by the Pandemic.

12.     The City's recently enacted laws directly conflict with real estate legislation of both the Legislature and with Governor Cuomo's exercise of his legislatively delegated authority under the New York State Executive Law.  The Legislature also preempted the field of COVID-19 real estate relief through the various measures that it has enacted.

### Jurisdiction and Venue

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1331.  The Court has jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a).  These state-law claims arise from the same facts and circumstances as Plaintiffs' federal claims and are so related to those claims that they form part of the same case or controversy.

14.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this action occurred in the County of New York, which is located within this District.

**The Parties**

*Marcia Melendez*

15.     Plaintiff Marcia Melendez ("Melendez") is a resident of Brooklyn in the City of New York.  She was born in Jamaica in 1951.

16.     When she was a child, her family immigrated to England, and subsequently to the United States when she was 17 years old.  She obtained her Bachelor of Arts and Masters of Arts degrees from Brooklyn College.

17.     After graduation, she held jobs in both the private and public sectors.  In 1983, she decided to start her own business.  She first owned a flower shop, which she extended into a landscaping business with her husband.

18.     In 2000, Ms. Melendez and her husband purchased a property located at 547 Nostrand Ave., Brooklyn, New York.  Ms. Melendez had to scrape together the funds for the down payment on the property, and borrowed additional funds for renovations.  Since 2004, Plaintiff Jarican Realty Inc. has been the record owner of the property.

19.     Due to its condition, Ms. Melendez and her husband needed to perform a renovation of the property, and moved their flower shop to the commercial space on the ground floor of the building.

20.     In 2016, Ms. Melendez and her husband used funds they accumulated through the efforts of their small businesses to invest in the purchase of another property located at 283 East 55th St., Brooklyn, New York, through a limited liability company called 1025 Pacific LLC.

21.     In 2017, Ms. Melendez and her husband retired from running their flower shop and landscaping businesses.

22.     Ms. Melendez and her husband rely in substantial part on the rental income from their two properties to fund their retirement.  Since they do not have pensions or a 401(k) retirement account, their rental income and social security benefits are their only reliable sources of income.  To supplement their retirement income, Ms. Melendez currently also works part-time as a real estate broker.

*Jarican Realty Inc. and 1025 Pacific LLC*

23.     Plaintiff Jarican Realty Inc. ("Jarican") is a corporation incorporated under the laws of the State of New York.  Jarican was established in 2004 by Ms. Melendez and her husband.  Ms. Melendez serves as the Chairman of Jarican.

24.     Since 2004, Jarican is the record owner of the property located at 547 Nostrand Avenue, Brooklyn, New York.  This property has one commercial space that Jarican leases to a local coffee shop.  The mortgage obligation for this property is approximately $4,058 per month.

25.     Plaintiff 1025 Pacific LLC ("1025 Pacific") is a limited liability company established under the laws of the State of New York by Ms. Melendez and her husband in 2011.

26.     1025 Pacific purchased the property located at 283 East 55th St., Brooklyn, New York in 2016.  This property is a four-family property with three residential tenants.

27.     The total tax obligations for both the 547 Nostrand Avenue and 283 East 55th St. properties are in excess of $20,500 for the most recent tax period.

28.     The total independent contractor fees for the maintenance of both properties total thousands of dollars on a monthly basis.

*Ling Yang*

29.      Plaintiff Ling Yang ("Yang") is a resident of Queens in the City of New York. She was born in the People's Republic of China in 1957.

30.      While in China, Ms. Yang observed the events of the Cultural Revolution, and the Chinese government's actions that caused the ruination of individual businesses.  The Chinese government would frequently confiscate people's money and businesses for distribution to others.  As such, although Ms. Yang was a successful businesswoman in China, she decided to move to the United States for the promise of economic and personal freedom.

31.      In 1994, Ms. Yang immigrated to the United States from China.

32.      She arrived in the United States, unable to speak, read, or write English and with very little money.

33.      From 1994 until 2002, Ms. Yang worked hard to support herself and her family by working as a housekeeper, as a nanny, in restaurants, at a clothing factory, and, at times, by delivering food.

34.      In 2002, after 8 years of working, she started a retail store in Manhattan, which she operated for approximately five years.  She used the savings she amassed through her jobs, and the assets from her former life in China to start this business.

35.      In 2010, Ms. Yang started working in a small transport company in which she owned a small percentage in another partner's share.  The company operated for approximately six years.

36.      In 2019, she started a cabinet business, which she currently operates from the commercial space in 4118 Haight St., Flushing, New York.  Her other businesses are no longer in operation.

37.     In 2012, through a limited liability company called Haight Trade LLC, she bought the building located at 4118 Haight St., in Flushing, New York.  Ms. Yang further works as the superintendent for this building.  Her responsibilities include cleaning the premises on a daily basis and performing small repairs.

38.     Several years later, through a limited liability company called Top East Realty LLC, she purchased the property located at 4059 College Point Blvd., in Flushing, New York. The down payment for this purchase was borrowed through a home equity loan, which is guaranteed by the property located at 4118 Haight St., Flushing NY.

39.     Ms. Yang invested in these buildings using money from selling all of her assets in China, and from the life savings she earned from the businesses she worked in.

40.     Ms. Yang's son, who is a co-shareholder of Haight Trade LLC and Top East Realty LLC, served in the United States Army and lives with a disability connected to his military service.  Regardless, Ms. Yang and her family have strived to provide for themselves. She plans to use the buildings to support herself and her family after she reaches retirement, once she satisfies more of the mortgage obligations on the properties.

*Haight Trade LLC and Top East Realty LLC*

41.     Plaintiff Haight Trade LLC ("Haight Trade") is a limited liability company established by Ms. Yang under the laws of the State of New York in 2011.  It is the record owner for the property located at 4118 Haight St., Flushing, New York.  This property has one commercial space and six residential units.

42.     The tax and mortgage obligations on the 4118 Haight St. property total approximately $12,000 per month.  The maintenance expenses for this property is approximately $2,000 per month.

43.     Plaintiff Top East Realty LLC ("Top East") is a limited liability company established by Ms. Yang under the laws of the State of New York in 2014.  It is the record owner of the three commercial spaces in a condominium building located at 4059 College Point Blvd., Flushing, New York.

44.     The aggregate tax and mortgage obligations on the 4059 College Point Blvd. property amount to approximately $20,000 per month.  In addition, this property has common charge payments for the maintenance of the building.  The amount of the common charge depends on the monthly maintenance needs.  Last month, the common charge was $1,800.

45.     Both Haight Trade and Top East are not yet profitable because all of the rent payments from leases on the property need to be used to meet various financial obligations and expenses.

*Elias Bochner*

46.     Plaintiff Elias Bochner ("Bochner") is a resident of Brooklyn in the City of New York.

47.     In June 1980, Mr. Bochner and his family purchased the property located at 287 7th Avenue, New York, NY, City through a general partnership named 177 West 26th Street Associates.

48.     In 2009, Mr. Bochner created a new limited liability company named 287 7th Avenue Realty LLC, which now owns that property and has assumed the obligations and liabilities from 177 West 26th Street Associates related to that property.

49.     They first purchased this property, as well as three other properties located elsewhere in the City and New Jersey, in order to house a family retail business owned by

Mr. Bochner and other members of his family, which includes Mr. Bochner's parents-in-law who are Holocaust survivors.

50.     In 2011, Mr. Bochner and his family moved the retail business outside of the City, and began leasing the commercial space located at 287 7th Avenue, New York City, NY to commercial tenants. Currently, Mr. Bochner and his family operate their retail business from commercial spaces outside of the City that they lease from other landlords.

51.     Mr. Bochner's family and five other families depend on rental payments from 287 7th Avenue, New York City, NY, as well as the three other properties located elsewhere in the City and New Jersey for their income.  Their reliance on the rental income has increased over the years as the revenue from the retail business has decreased.

*287 7th Avenue Realty LLC*

52.     287 7th Avenue Realty LLC ("287 7th Avenue") is a limited liability company established in 2009.

53.     287 7th Avenue owns the property located at 287 7th Avenue, New York, NY, which is a mixed use building with one commercial space.

54.     287 7th Avenue relies on rental payments to pay for its tax obligations and operational expenses.

55.     The tax obligations for 287 7th Avenue, New York City, NY, total approximately $70,000 a year.  On July 1, 2020, the tax obligation due for the time period January 1, 2020 to June 30, 2020 was approximately $35,000.

56.     287 7th Avenue pays 5% of the rental payments to a management company to pay for the management and maintenance of that property.

*The City of New York*

57.     Defendant City of New York is a municipal entity created under the laws of the State of New York.

*Bill de Blasio*

58.     Defendant Bill de Blasio is the Mayor of New York City ("Mayor de Blasio"). Mayor de Blasio is New York City's Chief Executive and is charged with enforcement of, among other things, the laws and ordinances of New York City, including New York City's Housing Maintenance Code.

*Louise Carroll*

59.     Defendant Louise Carroll ("Commissioner Carroll") is the Commissioner of New York City's Department of Housing Preservation & Development ("HPD").  Commissioner Carroll is an employee of New York City, and she is the principal administrator for HPD. Commissioner Carroll is responsible for the operations of HPD and the application of HPD's policies, including, but not limited to, the enforcement of New York City's Housing Maintenance Code.

*Jonnel Doris*

60.     Defendant Jonnel Doris ("Commissioner Doris") is the Commissioner of New York City's Department of Small Businesses Services ("SBS").  Commissioner Doris is an employee of New York City, and he is the principal administrator for SBS.  Commissioner Doris is responsible for the operations of SBS and the application of SBS's policies, including, but not limited to, the enforcement of New York City's Administrative Code.

61.     Defendants Mayor de Blasio, Commissioner Carroll, and Commissioner Doris will be collectively referred to herein as the "City Officers," and will be referred to jointly with the City of New York as "the City."

**Overview of the Applicable Law**

62.     Plaintiffs bring this action to enforce their rights under, *inter alia*, the First and Fourteenth Amendments to the U.S. Constitution, the Contracts Clause of the U.S. Constitution, and New York State Law.

**A.     The First Amendment to the U.S. Constitution**

63.     Under the First Amendment to the U.S. Constitution, "Congress shall make no law. . . abridging the freedom of speech. . . . ."  This prohibition extends to municipalities through the Fourteenth Amendment to the U.S. Constitution.

64.     The First Amendment protects lawful speech related to the economic interests of the speaker and its audience from government restrictions, known as "commercial speech."

65.     A government may prohibit lawful commercial speech only where it can prove that the restriction directly advances and is no more extensive than necessary to serve a substantial government interest.

**B.     The Contracts Clause of the U.S. Constitution**

66.     Under the U.S. Constitution, no State shall pass any law "impairing the Obligation of Contracts."  Known as the Contracts Clause, this provision restricts the power of States to disrupt contractual arrangements through legislative action.  It applies equally to municipal ordinances.

**C.     New York State Law**

***New York State Emergency Powers Law***

67.     The New York Constitution makes the New York State Governor the State's "Commander in Chief."  Under the New York Constitution, the Legislature is empowered to pass laws that are necessary to properly ensure continuity of government operations during a crisis.

12

68.     Article 2-B of the New York Executive Law provides the statutory framework for declarations of state and local emergencies.  Amended by the Legislature in March 2020 to address the Pandemic, Section 29-a of Article 2-B specifically authorizes the Governor—on his own or at the request of an authorized local official—to declare a disaster emergency and confers broad powers on the Governor to respond to a disaster emergency, including by temporarily suspending local laws and providing procedures reasonably necessary to enforce any executive order.  The Governor may take such actions through executive order.

69.     The New York Constitution also authorizes cities to adopt local laws relating to their "property, affairs or government" so long as such laws are not "inconsistent with the provisions of [the New York State] constitution or any general law."

70.     Local municipalities, like New York City, have a narrowly defined set of powers to address localized emergencies.  Those powers are subordinate to state law and federal law.

### The Rent Relief Act

71.     New York's Rent Relief Act establishes an emergency interim rental relief assistance program for residential tenants who have been substantially impacted by COVID-19.  To qualify for relief, tenants must satisfy certain economic indicators.  If those requirements are satisfied, this law allows those tenants' landlords to receive a capped subsidy in order to account for the loss in rental income caused by missed rent payments from tenants impacted by COVID-19.

### The Tenant Safe Harbor Act

72.     The State's TSHA prevents a court from issuing a warrant of eviction against any residential tenant or occupant that has experienced "financial hardship" based on nonpayment of rent that accrues or becomes due during the COVID-19 period.  The COVID-19 period runs from

March 7, 2020 until the Governor's executive orders on non-essential gatherings expire.  Under the TSHA, a court may examine the tenant's "financial hardship" by analyzing a tenant's pre- and post-COVID lawful income, eligibility for governmental benefits, and liquid assets.  The TSHA expressly allows landlords to collect back rent in a summary proceeding and allows courts to impose money judgments for overdue rents.

**Statement of Facts**

**A.  The COVID-19 Pandemic Spreads Globally and New York Becomes an Epicenter**

73.     Since December 2019, COVID-19, the respiratory disease caused by a novel coronavirus, has spread to 215 countries and territories, infecting more than 12 million people and leading to the death of more than 550,000 people, as of the time of this filing.  To date there is no known cure, vaccine, or anti-viral treatment for COVID-19.

74.     On January 21, 2020, the U.S. Centers for Disease Control and Prevention confirmed the first U.S. case of COVID-19.  A few days later, on January 24, 2020, the World Health Organization ("WHO") declared a global health emergency, identifying COVID-19 as a "public health emergency of international concern."  Then, on January 31, 2020, the U.S. declared the COVID-19 outbreak a public health emergency.  As part of the emergency, the U.S. imposed certain quarantines of Americans for the first time in more than half a century.

75.     As the number of COVID-19 cases shot up globally in March 2020, New York State became the epicenter of the outbreak in the U.S.  On March 1, 2020, New York State confirmed its first COVID-19 case.  Days later, on March 3, 2020, a second case of the virus was confirmed in Westchester County.  And, by March 31, 2020, New York State reported 75,795 COVID-19 cases and 1,929 deaths.

76.     As of July 9, 2020, there have been more than 403,000 confirmed COVID-19 cases across the State, with more than 31,000 deaths.  New York has the highest number of confirmed cases and related deaths of any state in the United States.

**B.      The New York State Legislature Grants Governor Cuomo Emergency Powers to Address the COVID-19 Crisis**

77.     In response to the Pandemic, in March 2020, as part of the 2020 New York State Budget, the Legislature conferred broad emergency powers on Governor Cuomo in order to address COVID-19.  That grant of authority came in the form of a budget-based amendment— duly passed by both houses of the Legislature and signed by Governor Cuomo—to Section 29-a of the New York State Executive Law ("Section 29-a").

78.     Section 29-a is a provision of Article 2-B of the N.Y. Executive Law, which was initially passed by the Legislature in 1978 in order to grant New York's Governor extensive powers during times of emergency.  Those powers include: a) using or lending to localities equipment, supplies, facilities, and state personnel; b) distributing medicine, medical supplies, and food; c) performing work on public and private lands that is essential to protect public health and safety; and d) temporarily suspending, among other things, specified provisions of statutes, local laws, and orders.

79.     Article 2-B also created a Disaster Preparedness Commission ("the Disaster Commission"), consisting of State government officials and certain members appointed by the Governor.  In the event of a State disaster, a locality is to prepare a local recovery and redevelopment plan that is to be submitted to the Disaster Commission, unless the local legislative body deems it unnecessary or impractical, in which case the Disaster Commission can comment on the local determination.  The local government's plan is to be adopted by the

locality within ten days of receiving the Disaster Commission's comments, and it is deemed the official policy for the recovery and redevelopment efforts of the municipality.

80.     Recognizing that the Governor would need to take swift, decisive action to confront, curtail, and conquer a crisis of the magnitude posed by COVID-19, the Legislature significantly expanded the emergency powers that Section 29-a vests in the Governor.  The amendment's memorandum of support explained that its purpose was "to allow the Governor to issue directives when a state disaster emergency is declared to allow for appropriate response to such disaster."  That memorandum further recited that the "legislation is necessary to allow New York to manage, prepare, respond to, and contain such threat, and to respond with appropriate action to protect public health and welfare.  New York [State] received its first positive case [of COVID-19] on March 1, and more are expected.  These changes ensure the Governor has the necessary legal authority for the Governor to confront these emergencies."

81.     The recently amended Section 29-a now reads as follows: "[s]ubject to the state constitution, the federal constitution and federal statutes and regulations, the governor may by executive order temporarily suspend any statute, local law, ordinance, or orders, rules or regulations, or parts thereof, of any agency during a state disaster emergency, if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster or if necessary to assist or aid in coping with such disaster.  *The governor, by executive order, may issue any directive during a state disaster emergency declared in the following instances: . . . epidemic, disease outbreak. . . .*" (emphasis added)

82.     Furthermore, in order to effectuate those gubernatorial directives, the amendment specifies that the Governor "may provide for procedures reasonably necessary to enforce such directives."

83.     Along with this grant of emergency powers to the Governor, the Legislature approved a $40 million emergency appropriation "to allow for protection of the health and safety of New Yorkers due to the threat of the novel coronavirus."

84.     Governor Cuomo's expanded powers under Section 29-a to address the COVID-19 emergency currently expire on April 30, 2021.

## C.     Governor Cuomo Declares a Statewide Disaster Emergency to Address COVID-19

85.     On March 7, 2020, Governor Cuomo declared a state of disaster emergency for the entire state of New York.

86.     He declared this emergency under Section 28 of Article 2-B of the New York Executive Law.  That provision provides, in part, that "[w]henever the governor, on his own initiative or pursuant to a request from one or more chief executives, finds that a disaster has occurred or may be imminent for which local governments are unable to respond adequately, he shall declare a disaster emergency by executive order."

87.     Executive Order No. 202, in which Governor Cuomo declared the emergency, recites that "a disaster is impending in New York State, for which the affected local governments are unable to respond adequately" and therefore the Governor "declar[ed] a State disaster emergency for the entire State of New York."

## D.     Governor Cuomo Exercises His Emergency Powers to Address COVID-19 Pursuant to Duly Passed Legislation

88.     On March 7, 2020, the same day that Governor Cuomo declared a state disaster emergency, using the newly conferred powers from the recently amended version of Section 29-a, he began issuing directives to address the threat from COVID-19.  Each of these directives cites the authority that the Legislature granted to the Governor in amended Section 29-a.

89.     In Executive Order No. 202, Governor Cuomo directed the "implementation of the State Comprehensive Emergency Management Plan and authorize[d] all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and society."

90.     Within that same executive order, Governor Cuomo exercised his authority under Section 29-a of the New York Executive Law to temporarily suspend or modify certain statutes, local laws, ordinances, rules, and regulations that if complied with during the state disaster emergency would prevent, hinder, or delay action necessary to cope with the disaster emergency or assist in aiding or coping with the disaster.[1]

---

[1] Specifically, in his first order, the Governor temporarily suspended or modified the following laws, ordinances, and regulations:  Section 112 of the State Finance Law, Section 163 of the State Finance Law and Article 4-C of the Economic Development Law, Section 97-G of the State Finance Law, Section 359-a, Section 2879, and 2879-a of the Public Authorities Law, Sections 375, 385 and 401 of the Vehicle and Traffic Law, Sections 6521 and 6902 of the Education Law, Subdivision 6 of Section 2510 and Section 2511 of the Public Health Law, Section 224-b and Subdivision 4 of Section 225 of the Public Health Law, Subdivision 2 of Section 2803 of the Public Health Law, Subdivision 3 of Section 273 of the Public Health Law and Subdivisions 25 and 25-a of Section 364-j of the Social Services Law, Section 400.9 and Paragraph 7 of Subdivision f of Section 405.9 of Title 10 of the NYCRR, Section 400.11 of Title 10 of the NYCRR, Section 405 of Title 10 of the NYCRR, Subdivision d and u of Section 800.3 of Title 10 of the NYCRR, Paragraph 3 of Subdivision f of Section 505.14 of Title 18 of the NYCRR, Sections 8602 and 8603 of the Education Law, and Section 58-1.5 of Title 10 of the NYCRR, Subdivision 4 of Section 6909 of the Public Health Law, Subdivision 6 of section 6527 of the Education Law, and Section 64.7 of Title 8 of the NYCRR, Section 596 of Title 14 of the NYCRR, Section 409-i of the Education Law, and Article 7 of the Public Officers Law, Section 41 of the General Construction Law, Section 3002 of the Public Health Law, Section 24 of the Executive Law; Sections 104 and 346 of the Highway Law, Sections 1602, 1630, 1640, 1650, and 1660 of the Vehicle and Traffic Law; Section 14(16) of the Transportation Law; Sections 6-602 and 17-1706 of the Village Law; Section 20(32) of the General City Law; Section 91 of Second Class Cities Law; Section 19-107(ii) of the New York City Administrative Code; and Section 107.1 of Title 21 of the New York Codes, Rules and Regulations.  Since that date, he has

91.     Since issuing Executive Order No. 202, as of September 2, 2020, Governor Cuomo has issued 62 executive orders to address COVID-19.  All of these executive orders have been issued to facilitate a timely, uniform, and effective response to COVID-19, allowing New York State to prevent its medical system from being overrun, protect the health and welfare of New Yorkers, and stem the tide of the Pandemic.  And, these orders have helped to address what is a Statewide – and indeed, global – emergency.

92.     For example, in Executive Order No. 202.3, Governor Cuomo used his legislatively-delegated authority to direct that no city or town issue any orders that conflict with or supersede the Governor's executive orders.  To the extent such local orders existed, those orders were suspended.

93.     Governor Cuomo also issued stay-at-home orders, mandating the closure of all businesses deemed non-essential.  He did so in Executive Order No. 202.8 issued on March 20, 2020.  That executive order provides that "[a]ll business and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize.  Each employer shall reduce the in-person workforce at any work locations by 100%. . . ."[2]  Only "essential" businesses under the executive order were exempt.

94.     Governor Cuomo also issued guidelines on social distancing.  Those guidelines provide that, while in public, people should maintain six feet distance from one another.  Under those guidelines, individuals should limit outdoor and recreational activities to non-contact and

temporarily suspended or modified a multitude of other laws, including several pertaining to real estate, including, but not limited to, Sections 7-103, 7-107, and 7-108 of the General Obligations, Subdivision 2 of Section 238-a of the Real Property Law, Section 711 of the Real Property and Proceedings Law, Section 232-a of the Real Property Law, and Subdivisions 8 and 9 of section 4 of the Multiple Dwelling Law, Real Property Tax Law Article 5, and Section 1212 of Real Property Tax Law, and Section 1512(1) of the Real Property Tax Law.

[2] Executive Order No. 202.8.

avoid activities where they come in close contact with people.  Those guidelines also provide

that individuals should limit the use of public transportation and, when using public transit, they

should space out six feet from one another.  The guidelines further advise that individuals who

are ill should not leave their homes unless to receive medical care or after a telehealth visit to

determine if it is in the best interest of their health.

95.     Furthermore, on May 4, 2020, Governor Cuomo promulgated a four-phase re-

opening plan for New York State.  That plan includes a number of triggers based on available

public health data, including a region's infection rate, the health care system's capacity to absorb

a potential resurgence in new cases, the capacity of diagnostic testing to detect and isolate new

cases, and contact-tracing capacity.

96.     The Governor has implemented that plan across the State, and all regions of the

State are currently in the process of re-opening.

**E.     Governor Cuomo Issues Executive Orders and the Legislature Passes Laws
that are Narrowly Tailored to Address Commercial and Residential Real
Estate in New York**

97.     In response to the impact of COVID-19 on the commercial and residential real

estate industries, and pursuant to the emergency powers granted to him by the Legislature,

Governor Cuomo issued Executive Orders Nos. 202.8, 202.9, 202.16, 202.28, and 202.48.  Each

of those orders carefully circumscribes the applicable rules and procedures that govern both the

commercial and residential real estate industries during the Pandemic.  Those orders specify,

among other things:  a) the class of tenants who are eligible for relief by virtue of being impacted

by COVID-19; b) the time period for which those tenants may seek relief; and c) the type of

relief those tenants may seek during the COVID-19 crisis.  Specifically, those orders provide for,

among other things, the following:

20

a.      A moratorium on the enforcement of an eviction of any commercial

tenant, or a foreclosure of any commercial property for a period of sixty

days beginning June 20, 2020 (and previously this moratorium applied to

residential tenants and foreclosures of residential mortgages), provided

that the nonpayment of rent is by someone that is eligible for

unemployment insurance or benefits under state or federal law or

otherwise facing hardship due to the Pandemic (Executive Order No.

202.28);

b.      A directive to the Superintendent of the Department of Financial Services

to ensure that under reasonable and prudent circumstances that any

licensed or regulated entities provide to any consumer in the State of New

York an opportunity for a forbearance of payments for a mortgage for any

person or entity facing financial hardship due to the Pandemic.  The

Superintendent was directed to promulgate emergency regulations to

require that applications for such forbearance be made widely available for

consumers, and that such applications are to be granted in all reasonable

and prudent circumstances solely for the period of such emergency

(Executive Order No. 202.9);

c.      A directive prohibiting the creation of a landlord-tenant relationship

between any individual assisting with the response to COVID-19 or any

individual that has been displaced due to COVID-19, on the one hand, and

any individual or entity, including, but not limited to any hotel owner,

hospital, not-for-profit housing provider, hospital, or any other temporary

21

housing provider, on the other hand, who provides temporary housing for a period of thirty days or more solely for purposes of assisting in the response to COVID-19 (Executive Order No. 202.16);

d.      Authorization for landlords and tenants or licensees of residential properties, on the consent of the tenant or licensee, to enter into a written agreement through which the security deposit and any interest accrued thereon, is to be used to pay rent that is in arrears or will become due.  If the amount of the deposit represents less than a full month of rent payment, the consent of the tenant or licensee does not constitute a waiver of the remaining rent due and owing for that month.  Landlords shall provide such relief to tenants or licensees who so request it that are eligible for unemployment insurance or benefits under state or federal law or are otherwise facing financial hardships due to the Pandemic. (Executive Order No. 202.28);

e.      A requirement that any security deposit used as a payment of rent shall be replenished by the residential tenant or licensee, which is to be paid at the rate of 1/12 the amount used as a rent per month.  The payments to replenish the security deposit are to become due and owing no less than 90 days from the date of the usage of the security deposit as rent (Executive Order No. 202.28); and

f.      A prohibition against demands for any payment, fees, or charges for late rent payments made by landlords, lessors, sub-lessors or grantors against

22

residential tenants during the time period from March 20, 2020 through August 20, 2020 (Executive No. 202.28).

98.     On June 6, 2020, Governor Cuomo also issued Executive Order 202.38, which renewed Executive Order 202.28 for an additional 30 days without modifying the eviction moratorium's end date of August 19, 2020.

99.     Additionally, on July 6, 2020, the Governor issued Executive Order 202.48.  This order provides for the continuation of the moratorium on commercial evictions and commercial foreclosures that had been provided for in earlier executive orders.  And recognizing that the Legislature had created its own protections against residential evictions and foreclosures through the TSHA and State Banking Law, this Executive Order ended the Governor's moratorium against residential evictions and residential mortgage foreclosures.

100.     Moreover, in June 2020, the Legislature—recognizing that the Pandemic had imposed severe rent burdens on tenants across the state—passed the Rent Relief Act.  The Rent Relief Act establishes an interim residential rent relief program.  Under the Act, property owners receive rental assistance vouchers on behalf of tenants who have experienced an increase in rent burden between April 1 and July 31, 2020 because of a loss of income as a result of COVID-19.  Under the Rent Relief Act, eligible tenants are limited to those with rents that exceed more than 30% of their household income, and those whose household income is 80% of their area median income prior to March 7, 2020.  The subsidy consists of a voucher paid to property owners for the gap between their pre-COVID-19 rent burden and their new rent burden, up to 125% of fair market rent.

101.     Also, in June 2020, the Legislature passed further legislation, the TSHA, to protect residential tenants.  The TSHA built on protections afforded to tenants in Governor

Cuomo's executive orders.  That Act prohibits courts from evicting for nonpayment of rent residential tenants who have experienced financial hardships that accrued during a defined COVID-19 period.  The COVID-19 period refers to the time between March 7, 2020 and a to-be-determined date on which Governor Cuomo's COVID-19 related restrictions on non-essential gatherings expire.  The TSHA bars courts from evicting residential tenants experiencing financial hardship for unpaid rent during that time.  In determining if a tenant has experienced a financial hardship during the COVID-19 period, a court must consider the tenant's income both before and during the COVID-19 period, the tenant's liquid assets, and the tenant's eligibility for disability, unemployment insurance, or other benefits under state or federal law, including cash assistance, supplemental nutrition assistance program, supplemental security income, and the home energy assistance program.  Notably, the TSHA does not prohibit a landlord from commencing or a court from awarding a judgment for rent due and owing in a summary proceeding.

102.    On July 1, 2020, New York State launched the New York Forward fund.  This $100 million fund is aimed at providing working capital loans to small businesses, including, among others, small landlords.  Under the program, small landlords can apply for a 60-month, no fee loan with a 3% fixed interest rate.

103.    Through these executive orders and this legislation, the State established the ground rules between landlords and their tenants in order to manage the fallout from COVID-19 in the residential and commercial real estate markets.  Indeed, under these orders, both commercial and residential tenants that have suffered substantial injury as a result of the Pandemic have been afforded substantial protections designed to mitigate the economic impact of COVID-19.

24

104.     Governor Cuomo and the Legislature set these emergency ground rules for the landlord-tenant relationship—such as unpaid rent, evictions, and the repossession of rental property from holdover tenants—in a careful, circumscribed manner intended to benefit those who have suffered substantial hardship from the Pandemic.  These orders are all temporary.  None of the orders permanently modifies the contractual relationships between property owners and tenants.  Property owners will still be able to initiate eviction proceedings against non-paying tenants.  Property owners will still also be able to recover rent during this period.  Furthermore, property owners will be able to recoup security deposits because tenants are required to promptly replenish a redirected security deposit.  Even more, the eviction moratorium applies only to renters who are "eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic."

105.     These directives have been enacted with a comprehensive Statewide perspective on real estate in New York State.  That perspective recognizes that the uniformity of applicable rules in an industry as complex as real estate is critical.  Markets across the state are impacted and influenced by other markets.  The interconnectedness of the markets means that market participants across New York State experience both the ameliorative effects and adverse effects of local government acts.  Indeed, actions by just one local authority may upset the delicate balance of the policy preferences made by the State, and the Governor, who has been specifically authorized by the Legislature to implement such important and balanced measures.

**F.     COVID-19 Is Adversely and Substantially Affecting New York's Commercial and Residential Real Estate Industries**

106.     Across the world and especially within the U.S., COVID-19 has decimated the economy.  New York State is no different.  In April alone, New York State lost more than 1.8 million jobs, sending the unemployment rate soaring to 14.5%, the highest level on record.

In addition, since the crisis began, New York State has paid over $10 billion in unemployment benefits, approximately 400% more than the State paid last year.

107.    The economic carnage wrought by COVID-19 has had a devastating impact on the commercial and residential real estate industries in New York State.  Public health restrictions implemented to impede the spread of the disease—such as Governor Cuomo's stay-at-home orders and closure of non-essential businesses—have deeply affected everyday businesses.  Facing mandatory closures and/or limited hours, business owners reduced their workforce through furloughs, layoffs, or terminations.

108.    These circumstances have hobbled the ability of both residential and commercial property owners to generate income, in the form of rent, from their tenants.

109.    Nationwide, survey data indicates that property owners are unable to collect rent from nearly a third of all their commercial tenants.  Property owners' inability to collect from retail tenants is particularly acute, with property owners nationwide unable to collect from almost 50% of all retail tenants, according to Datex Property Solutions.

110.    This problem is even more pronounced in New York, with some commercial landlords reporting as many as 80% of their commercial tenants failing to pay rent.

111.    Such reports coincide with surveys depicting dire circumstances industrywide. For example, Green Street Advisors, a real estate financial advisory firm, released research showing that owners of 30,000 strip malls in the U.S. received only between 30% and 50% of April rent.  A Community Housing Improvement Program ("CHIP") survey reported that property owners received just 34% of commercial rental payments in May.

112.    Unfortunately, not all instances of non-payment are driven by financial deprivation: a major commercial landlord reported that a number of their commercial tenants who are financially sound with resources to pay rent have decided not to pay rent at all.

113.    The situation is similar for residential property owners and their tenants. Without a steady salary, wages, or other predictable sources of income, some residential tenants have struggled to pay rent, and in some cases, were unable to pay rent entirely.

114.    According to one recent CHIP survey, nearly a quarter of residential tenants in May did not pay rent, which is up from about 20% in the month of April. Another survey found comparable results. The Rent Stabilization Association ("RSA") similarly reported that residential rent collections in May were down 15 to 20 percent.

115.    COVID-19's effects are particularly acute for New York City's real estate market. Real estate is one of New York City's key economic engines, with real estate taxes accounting for more than half of the City's tax revenue. Accordingly, a steep drop in rental income presents a potential catastrophe for New York City. If New York City property owners (like Plaintiffs) cannot generate enough income to pay their property tax bills—which are due each July and January—New York City will be starved of an enormous revenue stream that, among other things, funds salaries for teachers and firefighters, trash collection, and the City's public hospitals.

116.    Unable to collect contractually agreed-upon rent, many property owners in New York State are or will soon find themselves in financial distress. This decline in rental income threatens the abilities of property owners, including Plaintiffs, to pay their own bills, including taxes, mortgages, and employee salaries. Without money to pay their property tax bills, many property owners are in jeopardy of losing their properties. Notwithstanding the financial distress

in which a substantial number of property owners find themselves, many, including Plaintiffs, are doing what they can to assist distressed tenants under similar financial stress.

## G. The New York City Council Passes COVID-19 Legislation Affecting New York City Real Estate

117.   After hasty consideration, on May 13, 2020, the New York City Council passed its own set of legislation, purportedly aimed at addressing the adverse effects of the Pandemic on the real estate industry.  On that day, the New York City Council passed three bills:  Int. No. 1914-A (the "Commercial Harassment Law"), Int. No. 1932-A (the "Guaranty Law"), and Int. No. 1936-A (the "Residential Harassment Law").  The Commercial Harassment Law is New York City Local Law 53 of 2020; the Guaranty Law is New York City Local Law 55 of 2020; and the Residential Harassment Law is New York City Local Law 56 of 2020.

118.   Each of these bills was introduced in the New York City Council a mere three weeks earlier on April 22, 2020.  Within a week of their introduction, the Council rushed each bill through a set of virtual hearings.  On April 28, 2020, the Committee on Housing and Buildings and the Committee on Consumer Affairs and Business Licensing held a hearing by Zoom on the Residential Harassment Law.  The next day, on April 29, 2020, the Committee on Consumer Affairs and Business Licensing held a Zoom hearing on the Commercial Harassment Law.  That same day the Committee on Small Business held a hearing on the Guaranty Law.

119.   At these hearings, only vague and anecdotal evidence was offered in support of the bills.  For example, a not-for-profit representative claimed that her organization had been "hearing" reports from tenants who had allegedly been harassed because the landlords believed that the tenants had lost income.  She cited no empirical evidence to substantiate these hearsay reports.  Another representative from an advocacy organization, which operates a hotline for

tenants, mentioned receiving "one call" about tenant harassment related to COVID-19; and that case of harassment did not involve a landlord, but a roommate of the tenant.

120.    HPD, New York City's chief agency tasked with investigating claims of tenant harassment, reported at the hearings that of the sixty harassment claims it had received since the outbreak of COVID-19, the majority of claims concerned heat or hot water.  HPD did not report any harassment claims involving "threatening" speech.  Far from illustrating a comprehensive picture of the problem that the bills were ostensibly designed to address, the hearings turned up scant evidence of any problem at all.

121.    The hearings did reveal, however, that pre-existing laws already provided effective means to address some of the purported problems the bills sought to address.  For example, Dana Sussman, the Deputy Commissioner for Policy and Intergovernmental Affairs at the New York City Commission on Human Rights, testified that "several of the protections contemplated in [the Residential Harassment Law] already exist" in "the City Human Rights Law and the Housing Maintenance Code."  According to Deputy Commissioner Sussman, "most cases of housing discrimination against a person with suspected or confirmed COVID-19, or against a person [caring] for someone with a suspected or confirmed case, are protected under the City Human Rights Law's broad protections based on actual or perceived disability or a person's association with someone with a disability.  In addition, essential workers who may face housing discrimination because they are at risk of exposure to COVID-19 are protected by the City Human Rights Law's protections based on lawful occupation."

122.    The hearings also made clear that the City Council ignored the impact of the bills (and COVID-19) on New York City's property owners.  For example, Council Member Justin Brannan spotlighted his "concerns that [the Guaranty Bill] may end up helping Louis Vuitton as

much it helps Louise['s] [P]izza."  And, Council Member Peter Koo warned that the City

"need[ed] to address th[e] ecosystem as a whole and find a comprehensive solution for all,"

including "small landlords who are struggling to make payments and meet their obligations."

Indeed, at the hearings, a tenants' rights group highlighted a critical challenge facing landlords—

the majority of whom the group identified as "small landlords who own one or two buildings" —

*i.e.*, "tenants who can pay but who are [nonetheless] going to withhold rent out of solidarity."

123.    Some Council members openly challenged the bills' proposed approaches and

offered alternatives that were not pursued.  For example, Council Member Fernando Cabrera

questioned if it made "more sense to have the state come up with a fund to pay for [] rent, just

like Delaware."  But this alternative went nowhere within the Council (although the Legislature

later embraced it on the State level through the Rent Relief Act).  Rather than consider less

burdensome and more narrowly-tailored alternatives to the proposed bills, the City Council

charged headlong through the legislative process to approve these bills.

124.    Not only were the policy prescriptions that the bills offered questioned at these

hearings, but some Council members doubted the very constitutionality of the bills.  Council

members objected that some of the bills violated the express provisions of the U.S. Constitution

and even cited the Council's lack of authority to pass such laws.

125.    The committee reports for each of the respective bills confirm the Council's lack

of meaningful consideration of the policy issue at stake and the failure to even try to tailor the

bills' prohibitions to the scope of a real problem.

126.    The analysis that purported to support the Commercial Harassment Law consisted

of a mere summary of the terms of that bill.  Nowhere within the legislative analysis was there

any meaningful attempt to support the legislation with empirical data.  Also absent from the

analysis was how the means adopted in this proposed bill were tailored to address the purported issue of harassment of those impacted by COVID-19.  Furthermore, the report's analysis makes clear that the City Council did not consider less burdensome alternatives to the measures proposed in the bill.  The analysis merely describes what the Commercial Harassment Law would do.

127.     The City Council's legislative analysis for the Guaranty Law was equally empty. The committee report merely summarized the bill's terms.  The Council provided no factual justification for this bill, no analysis of the bill's scope, and no consideration of any alternatives to the bill that might have been less burdensome or more narrowly tailored.

128.     The committee report on the Residential Harassment Law took the same approach, offering no substantive analysis, no factual support, and no indication that the Council had reviewed less restrictive alternatives to the Residential Harassment Law's prohibitions on commercial speech.

129.     Despite the absence of supporting evidence to justify the bills' enactment, on May 26, 2020, Mayor de Blasio signed the three bills into law.  He did so at a signing ceremony which also purported to be a public hearing – with only three speakers.  And the Mayor glossed over the bills' over-inclusiveness – making it appear as though the bills only affected those who were most directly impacted by COVID-19.

130.     In total, the public and any interested parties had just 21 days to comment on these bills, which are affecting and will affect the livelihoods of thousands of New Yorkers, including Plaintiffs.  And that process produced legislation that went well beyond what was necessary to achieve they City's policy goals.

### 1.    The Commercial Harassment Law

131.    The Commercial Harassment Law amended Section 22-902 of the N.Y.C. Administrative Code and forever creates a new form of "harassment" that makes it extraordinarily difficult to collect back rent owed during a specified time period.  That section of the City's Administrative Code provides, in part, that commercial tenant harassment includes "any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property, and (ii) includes . . . threatening a commercial tenant based on [a protected characteristic.]"

132.    The Commercial Harassment Law extended the protection within Section 22-902 of the N.Y.C. Administrative Code to prohibit landlords from "threatening" a commercial tenant based on either:  i) the "tenant's status as a person or business impacted by COVID-19"; or ii) the "tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period."  Violations of this harassment prohibition are punishable by a civil penalty of $10,000 to $50,000.  There is a savings provision within Section 22-902(b) of the N.Y.C. Administrative Code, that provides "[a] landlord's lawful termination of a tenancy, lawful refusal to renew or extend a lease or other rental agreement, or lawful reentry and repossession of the covered property shall not constitute commercial tenant harassment for purposes of this chapter." But that provision fails to address whether representations and communications concerning unpaid rent and the consequences of not paying rent are deemed "threatening" under the Commercial Harassment Law.

133.    Notably, the Commercial Harassment Law does not even define the term, "threatening."

134.    This law broadly defines "impacted by COVID-19" for both businesses and persons.  A person "impacted by COVID-19" is:

      a.    a person who was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

      b.    a person who is a member of a person's household who was diagnosed with COVID-19;

      c.    a person who was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

      d.    a person who had primary caregiving responsibility for a member of their household who was unable to attend school or another facility that was closed as a direct result of the COVID-19 State disaster emergency and such school or facility care was required in order for the person to work;

      e.    a person who was unable to reach the person's place of business because of a quarantine imposed as a direct result of the COVID-19 State disaster emergency or because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

      f.    a person who became primarily responsible for providing financial support for his or her household because the previous head of household died as a result of COVID-19; and

      g.    a person whose business was closed as a direct result of the COVID-19 state disaster emergency.

135.    A business "impacted by COVID-19" is defined in similarly sweeping terms. Under the Commercial Harassment Law, a "business is impacted by COVID-19" if:  i) the

business had to shut down for the COVID-19 period because it was subject to certain executive orders by the governor or mayor; and ii) its revenues during any three-month period were less than 50% of its revenues for the same three-month period in 2019 or less than 50% of its aggregate revenues for the month of December 2019, January 2020, and February 2020 and such revenue loss was the direct result of the COVID-19 state disaster emergency.

136.    Nowhere in the Commercial Harassment Law's definition of "impacted by COVID-19" for businesses or persons is there any substantial injury requirement that accounts for the individual's or business's ability to pay.  Although the bill has a short-term revenue threshold, it does not measure the profits of the business, much less the capital behind it. Without such requirements, businesses eligible for the relief afforded by the Commercial Harassment Law include entities that do not actually warrant financial assistance at all, including publicly held entities with substantial capital.  The Commercial Harassment Law's provision regarding harassment due to a "tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period," moreover, would allow a property owner who granted a rent forbearance in light of COVID-19 to face allegations of harassment for attempting to collect that rent later.

137.    The Commercial Harassment Law defines the "COVID-19 period" as "March 7, 2020 through the later of: (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of any tenant, residential or commercial, set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and extended thereafter, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and

economic security, or CARES, act and any subsequent amendments to such section or (iii)

September 30, 2020, inclusive."

### 2.    The Residential Harassment Law

138.    The Residential Harassment Law amended Section 27-2004(a)(48) of the N.Y.C.

Administrative Code.  That section provides, in part, that residential tenant harassment includes

"any act or omission by or on behalf of an owner that (i) causes or is intended to cause any

person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to

surrender or waive any rights in relation to such occupancy, and (ii) includes . . . threatening any

person lawfully entitled to occupancy of such dwelling unit based on [a protected

characteristic]."

139.    The Residential Harassment Law extended the protection within Section 27-

2004(a)(48) of the N.Y.C. Administrative Code to prohibit landlords from "threatening" a

residential tenant who has:  i) "actual or perceived status as an essential employee"; ii) "status as

a person impacted by COVID-19"; or iii) received "a rent concession or forbearance for any rent

owed during the COVID-19 period. . . ."

140.    Like the Commercial Harassment Law, the Residential Harassment Law fails to

define the term, "threatening."

141.    Under the Residential Harassment Law, the "COVID-19 period" is defined as:

"March 7, 2020 through the later of (i) the end of the first month that commences after the

expiration of the moratorium on enforcement of evictions of any tenant residential or commercial

set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and

extended thereafter or (ii) September 30, 2020, inclusive."  Violations of the Residential

Harassment Law are punishable by a civil penalty of $2,000 to $10,000.

142.   Also, like the Commercial Harassment Law, the Residential Harassment Law broadly defines "impacted by COVID-19."  A person "impacted by COVID-19" is:

    a.   a person who was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

    b.   a person who has a member of their household who was diagnosed with COVID-19;

    c.   a person who was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

    d.   a person who became unemployed, partially unemployed or could not commence employment as a direct result of COVID-19 or the state of disaster emergency declared in Governor Cuomo's Executive Order No. 202; and

    e.   a person who became primarily responsible for providing financial support for their household because the previous head of household died as a result of COVID-19.

143.   Again, as with the Commercial Harassment Law, the Residential Harassment Law contains no substantial economic injury requirement in order to invoke eligibility for relief.  The Law, instead, grants a windfall to well-off and well-to-do persons who may otherwise have the means to pay their contractually agreed rent but choose not to do so, thus imperiling the livelihoods of landlords like Plaintiffs.  The Residential Harassment Law's provision regarding harassment due to a "tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period," moreover, would allow a property owner who granted a rent

forbearance in light of COVID-19 to face allegations of harassment for attempting to collect that

rent later.

### 3.    The Guaranty Law

144.    The Guaranty Law amended the N.Y.C. Administrative Code adding new

§22-1005, which forever prohibits landlords from enforcing personal guaranties executed to back

up lease obligations of certain commercial tenants impacted by COVID-19 for defaults that

accrued from March 7, 2020 until September 30, 2020.  Specifically, this Law prevents property

owners from holding personal guarantors of certain commercial tenants liable for debt

obligations incurred when specified conditions are met that are spelled out in Governor Cuomo's

executive orders, namely:  i) the tenant had to stop serving patrons food or beverage on the

premises or had to cease operations under Governor Cuomo's Executive Order 202.3; ii) the

tenant was a non-essential retail business owner subject to in-person limitations under Governor

Cuomo's Executive Order 202.6; or iii) the tenant was required to close to the public under

Governor Cuomo's Executive Order 202.7 (which covers businesses like cosmetologists).  If any

one of those conditions has been met and there is a lease provision holding one or more natural

persons, other than the tenant, liable upon the tenant's default, the property owner is barred from

enforcing that guaranty—forever—in order to collect unpaid rent, utilities, fees, building

maintenance charges, or taxes owed by the tenant for defaults occurring during the period

between March 7, 2020 and September 30, 2020.

145.    The Guaranty Law also amends N.Y.C. Admin. Code § 22-902(a) to define

"harassment" as including an attempt to enforce a personal liability provision that is covered by

this Law.

146.    In many situations, including that of Plaintiffs Yang and Bochner, personal

guaranties are a critical inducement for commercial owners to enter into leases with commercial

tenants.  This is because owners rely on such guaranties to secure the tenant's rental obligations under a commercial lease.  These guaranties allow property owners to properly mitigate the potential risk of tenants defaulting under their leases.  This facilitates making commercial properties available to a broader swath of tenants, particularly small businesses, who might otherwise not have access to particular properties.  Without these guaranties, the underlying leases would be rendered virtually worthless.  This difficulty was explicitly recognized during the Council hearing on the Guaranty Law.

147.    Within New York City's commercial real estate industry, a common type of personal guaranty is often referred to as a "good guy" guaranty.  A "good guy" guaranty is a limited personal guaranty given by an individual (who is not the tenant but may have a relationship to the tenant), who typically agrees to be personally liable for unpaid rent through: a) the date when the tenant surrenders vacant possession of the premises to the landlord, or b) such later date when the landlord and guarantor may agree (for example, 90 days after the "surrender date").  "Good guy" guaranties are a typical subset within the range of guaranty agreements that are executed in connection with commercial lease agreements between New York City property owners and local businesses that lack substantial assets.

148.    Guaranties are critical to commercial leases because, as a practical matter, many lease defaults cannot be effectively enforced against local commercial tenants absent a personal guaranty.  Many landlords would not have entered into their commercial leases without guaranties.  In the same vein, many small businesses without substantial assets or credit would be deprived of the ability to lease space unless there is an option for some form of personal guaranty, which gives property owners legal recourse should a small business fail or need to leave its leased property.

**H.     The Harassment Laws and the Guaranty Laws Inflict Constitutional Harm
on Plaintiffs**

**1.     The Harassment Laws Impermissibly Restrict Plaintiff's
Commercial Speech**

149.     The Commercial Harassment Law and the Residential Harassment Law are

chilling and infringing the commercial speech rights of Plaintiffs Melendez, Jarican, and

1025 Pacific ("Melendez Plaintiffs").

150.     The Melendez Plaintiffs have had difficulty collecting rent payments from their

commercial and residential tenants since prior to the Pandemic.  Starting in November 2019, one

of the residential tenants residing at 283 East 55th St., Brooklyn, New York failed to make

timely rent payments.

151.      Similarly, the commercial tenant in 527 Nostrand Ave. Brooklyn, NY—a local

coffee shop—did not pay any rent from February 2020 onwards, despite the fact that it has

remained open as an essential business under Governor Cuomo's Executive Order 202.8.

152.     Prior to the passage of the two Harassment Laws, the Melendez Plaintiffs

regularly sent communications to the delinquent tenants concerning unpaid rent.

153.     Plaintiff 1025 Pacific sent the delinquent residential tenant notices of late rent,

sought to recover the unpaid rent in housing court, and sought to evict the residential tenant.  The

residential tenant has since paid rent for November 2019, as well as for the period December

2019 through March 2020.

154.     On April 27, 2020, Plaintiff Jarican further sent the coffee shop a dispossess

notice through an attorney.

155.     These communications were made in accordance with the Melendez Plaintiffs'

normal business practices and applicable law, and pursuant to the terms of the leases in place

with those tenants.

39

156.    The Melendez Plaintiffs never threatened physical violence or any other unlawful repercussions for the tenant's failure to pay rent.

157.    Upon learning of the Harassment Laws, however, the Melendez Plaintiffs have refrained from issuing any further notices for fear of being accused of engaging in "harassment" under the Harassment Laws.  In fact, the residential tenant has previously accused Ms. Melendez and Plaintiff 1025 Pacific of harassment for simply demanding unpaid rent.

158.    If not for the Harassment Laws, the Melendez Plaintiffs would have served additional notices on all delinquent tenants to recover all delinquent rent payments.

159.    The two properties owned by the Melendez Plaintiffs have various obligations and expenses that are funded almost entirely by the rent rolls from the tenants.  The total tax obligations for both properties for the period of January 1, 2020 to June 30, 2020 are in excess of $20,500.  The mortgage obligation for the property located at 547 Nostrand Ave., Brooklyn, NY is approximately $4,058 per month.  The properties also have expenses arising from independent contractor fees including plumbers and electricians that total thousands of dollars on a monthly basis.

160.    From March 2020 to June 2020, the Melendez Plaintiffs have incurred losses of thousands of dollars as a direct consequence of the tenants' failure to meet their rent obligations. If their rental income decreases any further, one or more of the companies may not have sufficient assets to continue as a going concern while also meeting tax, mortgage and maintenance obligations.  Indeed, due to the lack of rent payments, the Melendez Plaintiffs were not able to meet their full property tax obligations on July 1, 2020.

161.    The Residential Harassment Law is also chilling the speech of Ms. Yang and Plaintiff Haight Trade.

40

162.    The property located at 4118 Haight St. Flushing, NY has six residential units. However, only four of those units are occupied, and only one of those tenants has paid rent from March 2020 to June 2020.  The remaining three tenants have not paid any rent for the period from March 2020 to June 2020.

163.    Prior to the outbreak of COVID-19, in accordance with Plaintiff Yang and Plaintiff Haight Realty's normal business practices, applicable law, and the terms of their leases, they sent notices of late rent and sought to recover unpaid rent in housing court.  They never threatened physical violence or any other illegal consequences from the tenant's failure to pay rent.

164.    Upon learning of the Residential Harassment Law, however, Plaintiffs Yang and Haight Realty have stopped even mentioning to the residential tenants the contractual consequences of their continued failures to pay rent for fear that such statements would be considered "harassment" under the law.

165.    Haight Realty has mortgage and tax obligations totaling approximately $12,000 a month, and maintenance expenses of approximately $2,000 a month.

166.    Because all of the rent payments from the residential tenants are needed to pay for these obligations and expenses, failure to collect full rent payments could put Plaintiff Haight Realty in severe financial difficulty.

## 2.    The Laws Substantially Impair Plaintiffs' Contractual Rights

167.    The Guaranty Law substantially alters leasing arrangements between commercial landlords and their tenants by stripping them of critical personal guaranties, thereby violating the Contracts Clause of the U.S. Constitution.  Most small business tenants execute a lease in the name of a corporate entity—without substantial credit—which is formed solely for the purpose of entering the lease; this is typically done with the knowledge and consent of the landlord.  As a

practical matter, this makes the guaranty a property owner's only effective remedy to regain possession of the leased premises and to recover unpaid rent, absent protracted court proceedings.

168.    In 2006, 177 West 26th Street Associates entered into a lease agreement with Sunburger 1 LLC ("Sunburger") which agreed to a good guy guaranty with a six-month notice provision.  In 2009, 287 7th Avenue assumed all of 177 West 26th Street Associates' liabilities and obligations.

169.    For property owners like Plaintiff 287 7th Avenue, personal guaranties such as good guy guaranties avoid a worst-case scenario in which a small business tenant with little to no assets tries to avoid paying its rent under the lease agreement.  As a practical matter, when dealing with a small business having little to no assets of its own, a landlord can only enforce the lease if there is a personal guaranty.

170.    Plaintiff Bochner would not have entered into leases with local commercial tenants on behalf of his real estate companies in the absence of personal guaranties.  Without a personal guaranty, the risk of having a small business as a tenant would be so great as to be prohibitive.  Such personal guaranties are critical because commercial leases cannot be enforced against local commercial tenants, most of whom have very few assets, without a personal guaranty.

171.    Because the Guaranty Law suspends enforcement of personal guaranties, landlords have no means under their commercial leases to collect unpaid rent from business tenants who have little to no assets of their own—even if the tenants surrender possession.  For commercial tenants who fail to pay rent between March 2020 and September 2020, this new Law will render these leases virtually valueless during this period.

172.    For example, with respect to Sunburger's lease agreement, the principal of

Sunburger provided a good guy guaranty with a six month notice provision.  Starting in

December 2019, Sunburger failed to pay its full rent obligations.  On March 20, 2020, Sunburger

provided notice of its intent to surrender the property on September 20, 2020.  Since that date,

Sunburger has not paid any rent.  On June 30, 2020, Sunburger returned the keys to the premises

by mail.

173.    Pursuant to the good guy guaranty which backs up the commercial lease

agreement, Sunburger's principal would be liable for all unpaid rent until September 20, 2020,

the date of surrender.  But because of the Guaranty Law, Plaintiffs Bochner and 287 7th Avenue

cannot enforce the good guy guaranty against the guarantor for defaults between March 7, 2020

and September 30, 2020.  This new Law deprives Plaintiffs Bochner and 287 7th Avenue of

more than $110,000 of rental income that they fully and reasonably expected to be able to

recover under the commercial lease with Sunburger.

174.    The tax obligations for the property located at 287 7th Avenue, New York City,

NY total approximately $70,000 a year.  The property also has management and maintenance

obligations of 5% of the rental payments.

175.    Because the rent payments are needed to pay for these obligations, a failure to

collect full rent payments could put Plaintiff 287 7th Avenue in severe financial difficulty.

Indeed, Plaintiff Bochner had to pay the $35,000 in taxes due on July 1, 2020 using his personal

funds.

176.    Plaintiff Top East Realty likewise has a personal guaranty in its lease agreement

with a home décor business, and would not have entered into the lease agreement absent this

personal guaranty.  The principal of the home décor business agreed to guarantee "the full

43

performance and observance of all the agreements to be performed and observed by Tenant."
But because of the Guaranty Law, Plaintiffs Yang and Top East Realty cannot enforce the agreed
guaranty against the guarantor for defaults during the period of the Guaranty Law.  This new
Law has deprived Plaintiff Yang of at least several months of rental income that she fully and
reasonably expected to be able to recover under her lease with this business.  Indeed, in the
absence of the ability to enforce the personal guaranty and not having received rent payments
since March 2020, Plaintiff Yang and Top East Realty LLC had to buy out the defaulting tenant
to ensure that they could regain possession of the premises.

177.    Plaintiff Top East Realty's tax and mortgage obligations total approximately
$20,000 monthly and the common charge for last month was approximately $1,800.

178.    Because the rent payments owed on its commercial properties are needed to pay
for these obligations and expenses, a failure to collect full rent payments could put Plaintiff Top
East Realty in severe financial difficulty.

179.    Although Plaintiffs Haight Realty and Top East Realty have each received a
three-month deferral of mortgage payments from their lender, the bank has indicated that it will
seek to collect on the mortgage loans if these Plaintiffs seek any additional deferrals.  The bank
further charged an additional $16,500 in interest for the deferred three months.  If the bank
accelerates the repayment of either mortgage loan, the Yang Plaintiffs will not be able to obtain
further loans from other banks as Plaintiff Yang's personal credit has already been severely
impacted.  These properties could further be at risk of a foreclosure.

3.    **The City's New Laws Deny Plaintiffs' Due Process Rights**

180.    The Commercial Harassment Law, in part, prohibits: "*threatening* a commercial
tenant based on. . . .the commercial tenant's status as a person or business impacted by COVID-

19 or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period. . ."

181.    The Residential Harassment Law, in part, outlaws "*threatening* any person lawfully entitled to occupancy of such dwelling unit based on such person's actual or perceived status as an essential employee, status as a person impacted by COVID-19, or rent concession or forbearance for any rent owed during the COVID-19 period. . ."

182.    Significantly, the Commercial Harassment and the Residential Harassment Laws fail to define the proscribed conduct of "threatening" and fail to give Plaintiffs and members of the public a reasonable opportunity to ascertain what constitutes "threatening" conduct.  These Laws also fail to provide explicit standards that would permit Defendants to avoid resolution of complaints on an *ad hoc* and subjective basis.  As a result, these Laws deny Plaintiffs their Due Process rights to fair notice.

**Claims for Relief**

**First Claim For Relief**

**Violation of the U.S. Constitution**
**First Amendment and Fourteenth Amendment**
**42 U.S.C. § 1983 and 28 U.S.C. § 2201**
**(Against All Defendants)**

183.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182.

184.    At all relevant times, Defendants, their agents and their employees were persons acting under color of State law.

185.    At all relevant times, Plaintiffs were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit under 42 U.S.C. § 1983.

186.    The First Amendment of the U.S. Constitution, as incorporated through the Fourteenth Amendment, prohibits a state or municipality from abridging the freedom of speech.

45

187.    The Harassment Laws impose content-based restrictions on lawful speech as applied to Plaintiffs because they proscribe and inhibit lawful demands for rent, including, but not limited to, representations and communications concerning unpaid rent, and the consequences of not paying rent.  These communications relate solely to the economic interests of Plaintiffs and their tenants.  These communications include routine rent demand notices and discussions about the consequences flowing from unpaid rent and efforts to collect rent.

188.    Defendants cannot show that the Harassment Laws advance a substantial interest through means that are no more extensive than necessary.  Critically, the Harassment Laws are not narrowly drawn, but instead they benefit persons and entities who have access to other assets and/or failed to suffer a substantial injury due to the Pandemic.

189.    These Harassment Laws shift to property owners the responsibility for the economic burden caused by COVID-19 that is ravaging the real estate industry both within New York City and around New York State.  In enacting the Harassment Laws, the New York City Council relied on vague and anecdotal evidence to justify these Laws.  The Council also ignored any tailoring analysis as is evident from both the Council's hearings on the Laws and the committee reports on them.  Indeed, New York City officials have testified that pre-existing laws sufficiently addressed the harms that the Harassment Laws were intended to address. Furthermore, both the Legislature, through laws it has enacted, and Governor Cuomo, pursuant to the power the Legislature delegated to him, have issued a host of Statewide narrowly tailored laws, executive orders, rules, and guidance to ameliorate the effects of the Pandemic on tenants and landlords alike.

190.    Because of Defendants' actions, Plaintiffs have suffered or will imminently suffer irreparable harm from the denial of their rights under the First Amendment.

191.    Plaintiffs are entitled to a declaration that Defendants violated their First Amendment right to freedom of speech.

192.    Plaintiffs are also entitled to preliminary and final injunctive relief, enjoining the Harassment Laws.

193.    Plaintiffs are entitled to recover their attorneys' fees and costs.

**Second Claim For Relief**

**Violation of the U.S. Constitution's Contracts Clause**
**42 U.S.C. § 1983 and 28 U.S.C. § 2201**
**(Against All Defendants)**

194.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 193.

195.    At all relevant times, Defendants, their agents and their employees were persons acting under color of State law.

196.    At all relevant times, Plaintiffs were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit under 42 U.S.C. § 1983.

197.    Article 1, Section 10, Clause 1 of the U.S. Constitution provides "[n]o State shall . . . pass. . . any . . . law impairing the obligation of contacts."

198.    Defendants impaired Plaintiffs' obligations under their lease contracts and/or their personal guaranty contracts by enacting the Guaranty Law.

199.    The Guaranty Law—by virtue of making personal guaranties unenforceable—has: i) substantially impaired the contractual obligations provided for in Plaintiffs' commercial leases (the law relieves guarantors from their personal guaranty obligations); ii) disrupted Plaintiffs' reasonable expectations under those leases that Plaintiffs would be able to exercise the personal guaranty clauses in the event that a tenant defaulted under their lease; iii) stripped Plaintiffs' leases of an essential right and remedy, consisting of the exercise of such personal guaranty clauses, which were material terms on which the Plaintiffs reasonably relied in entering into the

47

leases; and iv) rendered these leases virtually valueless during the period covered by this Law.

Due to the effects of the Guaranty Law, Plaintiffs cannot invoke the personal guaranty provisions

of their contacts in order to recover back rent accrued as a result of any defaults that occurred

between March 7 and at least September 30, 2020.  Because the Guaranty Law guts the

economic value of the Plaintiffs' leases, this new City provision runs afoul of the U.S.

Constitution.

200.    Importantly, as with the Harassment Laws, the Guaranty Law is framed in

sweeping and overly inclusive terms.  As a result, it nullifies guaranties for parties who have

substantial resources at their disposal and who do not warrant governmental intervention.  As a

result, this Law is not reasonable in its approach to invalidating these contracts.

201.    Combined with the Guaranty Law's demonstrable violation of the Plaintiffs'

Constitutional rights, the Commercial Harassment Law only compounds those harms; the

Commercial Harassment Law further results in these leases being rendered economic nullities.

With this Law's proscriptions against routine rent requests and efforts to collect overdue rent,

landlords cannot collect the back rents that are contractually overdue.  Thus, the serious

economic situation of property owners is made even more precarious by this new Law.  By

virtue of the Guaranty Law, there is no effective remedy to enforce delinquent rent obligations.

And, by virtue of the Commercial Harassment Law, there is also no means for landlords to

collect back rent.  The Commercial Harassment Law and the Guaranty Law, operating in

tandem, destroy the economic vitality of Plaintiffs' leases, and unfairly foist all of the economic

burden and responsibility of this crisis in the real estate market onto Plaintiffs without any

assurance of repayment.

202.    The Guaranty Law is not a reasonably necessary means of achieving a legitimate public purpose.  Defendants failed to consider other policy alternatives for accomplishing that purpose and/or failed to consider the substantial impairment of the contractual obligations on par with other policy alternatives.  Indeed, the Defendants impermissibly imposed a drastic impairment when other more moderate courses would have equally fit any legitimate purpose the Defendants sought to advance.  The Guaranty Law could have made its relief contingent on a showing by the guarantors of substantial economic harm should the guaranty be enforced – as various State laws and Executive Orders have done.  The Guaranty Law also could have adopted a more even-handed approach between landlords and tenants, such as by providing landlords with vouchers or alternative forms of reimbursement of their lost rent given the Law's nullification of these valuable guaranties.  Even more, the Guaranty Law could have made the enforcement of the guaranties during the pendency of the Pandemic temporarily unenforceable, rather than making them forever unenforceable for defaults arising during the time period defined in the Guaranty Law.

203.    Defendants acted unreasonably in light of the surrounding circumstances.

204.    As a direct, immediate, and proximate result of Defendants' actions, Plaintiffs have sustained and will sustain injury and damages, including, but not limited to, deprivation of their rights under the U.S. Constitution.

205.    Defendants' substantial impairment of these contractual obligations has proximately caused, and will continue to cause, Plaintiffs to suffer irreparable injury and damage, including:  i) substantial disruption of their reasonable expectations under their leases that guaranty obligations would be enforceable to collect rent; ii) substantial interference with Plaintiffs' ability to collect rent and any other charges or fees; iii) economic damages which are

irreparable, including the potential loss of unique real property interests; iv) deprivation of their rights under the U.S. Constitution to engage in protected speech; v) injury to Plaintiffs' reputation; vi) virtual destruction of the economic value of these leases; and viii) other concrete and substantial injury.

206.    Plaintiffs are entitled to injunctive relief enjoining the enforcement of the Guaranty Law.

207.    Plaintiffs are also entitled to a declaratory judgment that Defendants' actions have violated Plaintiffs' rights under the Contracts Clause.

208.    Plaintiffs are entitled to recover their attorneys' fees and costs.

### Third Claim For Relief

### Preemption Under the New York State Law
### 28 U.S.C. § 2201
### (Against All Defendants)

209.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 208.

210.    All three Laws—the Residential Harassment Law, the Commercial Harassment Law, and the Guaranty Law—directly conflict with New York State Law, both as passed by the Legislature and as implemented by Governor Cuomo through various Executive Orders, and legislate in a field fully occupied by the Legislature.

211.    The Harassment Laws and the Guaranty Law directly conflict with the Legislature's grant of emergency power to Governor Cuomo because they seek to regulate conduct in conflict with the manner in which the Governor has explicitly suspended and modified State and local laws.

212.    Specifically, Governor Cuomo has temporarily suspended, among other things, Sections 7-103, 7-107, and 7-108 of the General Obligations Laws, Subdivision two of Section 39 of the Banking Law, and Subdivision 2 of Section 238-a of the Real Property Law.

50

Furthermore, through his executive orders, Governor Cuomo has prohibited local governments from issuing any local emergency order or declaration of emergency or disaster inconsistent with, conflicting with, or superseding Governor Cuomo's executive orders.

213.    Governor Cuomo has also temporarily suspended any local emergency order or any local administrative codes, charters, laws, rules or regulations issued under such authority different or in conflict with Governor Cuomo's executive orders.

214.    The Harassment Laws and the Guaranty Law further conflict with the procedures and processes Governor Cuomo has promulgated in his executive orders, through the express grant of authority from the Legislature, to govern the commercial and real estate industries during the Pandemic.  By amending Section 29-a of the Executive Law, the Legislature conferred on Governor Cuomo the broad power to "provide for procedures reasonably necessary to enforce" his issued executive orders.  Using that power, Governor Cuomo has set forth a number of detailed procedures in the real estate industries.

215.    Specifically, Governor Cuomo has issued among other things, the following orders:

> a.    A moratorium on the eviction of any commercial tenant or foreclosing on any commercial property for sixty days beginning June 20, 2020 (and previously this moratorium applied to residential tenants and foreclosures of residential mortgages), so long as the nonpayment of rent is by someone who is eligible for unemployment insurance or benefits under state or federal law or otherwise facing hardship due to the crisis (Executive Order No. 202.28);

b.     A directive to the Superintendent of the Department of Financial Services to make sure that, under reasonable and prudent circumstances, any licensed or regulated entities provide consumers in the State an opportunity to obtain forbearance of mortgage payments for any person or entity facing financial hardship due to the Pandemic. The Superintendent was directed to promulgate emergency regulations to require that applications for such forbearance be made widely available for consumers, and that such applications are to be granted in all reasonable and prudent circumstances solely for the period of such emergency (Executive Order No. 202.9);

c.     A directive prohibiting the creation of a landlord-tenant relationship between any individual who assists with the response to COVID-19 or any individual who has been displaced due to COVID-19, on the one hand, and any individual or entity, including, but not limited to any hotel owner, hospital, not-for-profit housing provider, hospital, or any other temporary housing provider, on the other hand, who provides temporary housing for a period of thirty days or more solely for purposes of assisting in the response to COVID-19 (Executive Order No. 202.16);

d.     Authority for landlords and tenants or licensees of residential properties, with the consent of the tenant or licensee, to enter into a written agreement under which the security deposit and any interest accrued thereon, is to be used to pay rent that is in arrears or will become due. If the amount of the deposit represents less than a full months' rent, the consent of the tenant or

52

licensee does not constitute a waiver of the remaining rent due and owing for that month.  Landlords shall provide such relief to tenants or licensees who so request it that are eligible for unemployment insurance or benefits under state or federal law or are otherwise facing financial hardships due to the Pandemic (Executive Order No. 202.28);

e.  A requirement that any security deposit used as a payment of rent is to be replenished by the residential tenant or licensee, which is to be paid at the rate of 1/12 the amount used as a rent per month.  These payments to replenish the security deposit are to become due not less than 90 days from the date when the security deposit is used toward rent (Executive Order No. 202.28); and

f.  A prohibition against demands for any payment, fees, or charges for late rent payments made by landlords, lessors, sub-lessors or grantors against residential tenants during the period March 20, 2020 through August 20, 2020 (Executive No. 202.28).

216.  On June 6, 2020, Governor Cuomo also issued Executive Order 202.38, renewing Executive Order 202.28 for 30 days without modifying the eviction moratorium's end date of August 19, 2020.

217.  Furthermore, on July 6, 2020, the Governor issued Executive Order No. 202.48, providing for the continuation of the moratorium on commercial evictions and commercial foreclosures.  This executive order ended the moratorium against residential evictions and residential mortgage foreclosures because the Legislature created protections against residential evictions and residential foreclosures through the TSHA and state banking law.

218.     Acting under the emergency powers delegated to him by the Legislature, together with legislation passed by the Legislature, Governor Cuomo has issued these various executive orders and has established the processes and procedures to manage the fallout in the residential and commercial real estate markets from COVID-19.

219.     Governor Cuomo's executive orders, together with acts of the Legislature, set the terms, parameters and procedures for the extent of rent relief to be made available to individuals and businesses affected by the Pandemic.  For example, tenants may pay rent using security deposits, landlords are prevented from bringing eviction actions against struggling tenants while being fully able to bring rent collection suits, and banks are encouraged to allow owners to go into forbearance if they are unable to pay their mortgages due to tenants who have defaulted on their leases.  These measures have been implemented in a balanced and careful way to respect the rights, obligations, and circumstances of both property owners and their tenants.

220.     And, the Governor has maintained stability, to the extent possible in these dire circumstances, in New York's real estate markets.  In the main, these directives are narrowly drawn to focus their benefit on those New Yorkers who have been substantially impacted by COVID-19.

221.     The Harassment Laws and the Guaranty Law, however, impede, and indeed conflict with, the carefully balanced procedures set forth in the Governor Cuomo's executive orders because they prescribe a wholly different set of procedures that property owners and tenants must abide by during the pendency of the Pandemic.  Further, the real estate markets in this State are inter-connected such that a Statewide solution of this nature is imperative.

222.     The Residential Harassment Law also directly conflicts with the Legislature's actions in passing both the Rent Relief Act and the TSHA.

54

223.    The Residential Harassment Law directly conflicts with the Rent Relief Act.  That Act establishes a comprehensive interim residential rent relief program, which operates on a Statewide basis.  Instead of inhibiting rent collection efforts, the program created by this Act provides landlords with rental assistance vouchers on behalf of eligible tenants who experienced an increase in rent burden between April 1 to July 31, 2020 because of a loss of income as a result of COVID-19.

224.    The Rent Relief Act sets forth in detail the criteria to determine tenants' eligibility for relief and the criteria for the subsidy to be paid to landlords.  Specifically, the Rent Relief Act allows tenants to participate in the program only if they:  i) have a rent burden, defined as more than 30% of their household income, both prior to March 7, 2020 and at the time of the application, ii) make 80% of the area median income prior to March 7, 2020 and at the time of the application; and iii) have lost income between April 1 and July 31, 2020.

225.    And the Rent Relief Act makes clear that landlords who have tenants that are eligible for the program may receive a voucher paid to them for the gap between the pre-COVID-19 rent burden and the new rent burden, up to 125% fair market rent.

226.    Notwithstanding the detailed provisions within the Rent Relief Act concerning eligibility for rental assistance, the time period for which tenants can claim rental assistance, and the rental vouchers that landlords can receive, the Residential Harassment Law discards and replaces those detailed provisions of the Rent Relief Act in favor of their own restrictions.

227.    The Residential Harassment Law adopts an entirely different set of criteria for assessing tenants' eligibility for rental assistance on account of COVID-19, without regard for any objective test for injury.  The Residential Harassment Law further applies a different time horizon during which relief might be sought and adopt different standards and remedies to

55

address the financial impact of the Pandemic on tenants, shifting the financial burden to property owners.

228.    Moreover, the Residential Harassment Law directly conflicts with the TSHA. That Act—which builds on the interim and tailored rent relief systems for those impacted by COVID-19 developed by the Legislature and the Governor—prevents courts from evicting residential tenants for nonpayment of rent accrued between March 7 and when the COVID-19 related restrictions on non-essential gatherings expire.

229.    Under the TSHA, this relief is contingent on a tenant's financial hardship.  In assessing a tenant's financial hardship, a court must look to a tenant's:  (i) income both before and after the COVID-19 period; (ii) liquid assets; and (iii) eligibility for benefits, disability, and unemployment insurance under state and federal law.

230.    Significantly, the TSHA expressly allows for landlords to sue and authorizes courts to issue money judgments in a summary proceeding to collect unpaid rent.  Despite the TSHA's detailed provisions about which tenants have suffered financial hardship due to COVID-19 and the remedies that are available to landlords during the pendency of the COVID-19 crisis, the City Laws adopt their own eligibility rules and remedies and inhibit the collection of rent that the TSHA specifically allows.  As opposed to the TSHA, the Residential Harassment Law applies a different time horizon during which relief might be sought and adopt different standards and remedies to address the financial impact of the Pandemic on tenants, shifting the financial burden to property owners.

231.    There is a further conflict:  the Residential Harassment Law conflicts with New York's longstanding Urstadt Law, which years ago removed home rule of residential rental regulation from New York City to New York State.

232.     The law was intended to check municipal attempts to expand rental regulations in certain circumstances.  But, in enacting the Residential Harassment Law, the Defendants exceeded the bounds of what was permissible under the New York State Constitution.  Before the Residential Harassment Law, Plaintiffs were not prohibited from making lawful demands for rent, including, but not limited to, representations and communications concerning unpaid rent and the consequences of not paying rent.  But now, such demands are proscribed and inhibited by the Residential Harassment Law.  Because the Residential Harassment Law is a rental regulation that exceeds the contours of what New York State has made legal concerning the collection of rent, the Residential Harassment Law stands in conflict with the provisions of the Urstadt Law, and thus, is preempted.

233.     Moreover, through its amendment of Section 29-a of the Executive Law, which conferred sweeping emergency powers on Governor Cuomo to manage, prepare and respond to the Pandemic, the Legislature occupied the field of COVID-19 response, particularly with regard to real estate matters.

234.     In March 2020, as part of the 2020 Budget, the Legislature, conferred emergency powers on Governor Cuomo to address COVID-19.  The Legislature conferred those powers by amending Section 29-a of New York's Executive Law.  That statute already conferred broad authority on the Governor to respond to a Statewide disaster state of emergency, such as temporarily suspending or modifying local law.  By amending that law to expressly allow Governor Cuomo to issue "any directive" during an "epidemic" or "disease outbreak" and to effectuate those directives by empowering the Governor to "provide for procedures reasonably necessary to enforce [those] directives," the Legislature made clear its intent to occupy the field of COVID-19 response.  In doing so, the Legislature authorized the Governor, by executive

order, to manage, prepare, respond, and contain New York State's COVID-19 response.  As reflected in Section 29-a's legislative history, "these changes ensure that the Governor has the necessary legal authority for the Governor to confront the" Pandemic.

235.    The Harassment Laws and the Guaranty Laws impermissibly conflict with State law regarding COVID-19.  This conflict is particularly acute in times of emergency such as this, when it is critical that matters be administered on a Statewide basis.

236.    Because New York State law preempts local law on this subject, none of the laws—neither the Harassment nor the Guaranty Laws—can be enforced.

237.    The New York City Council exceeded its authority in passing and Mayor de Blasio exceeded his power in signing, the Commercial Harassment Law, the Residential Harassment Law, and the Guaranty Law.  In enacting those Laws, the City of New York and its officers acted without power under the New York Constitution and acted arbitrarily, capriciously, in excess of their jurisdiction and/or in violation of lawful procedure.

238.    Plaintiffs are entitled to a declaration that the Harassment Laws and the Guaranty Law are preempted by New York State Law.

239.    Plaintiffs are entitled to preliminary and final injunctive relief, enjoining the Harassment Laws and the Guaranty Laws.

**Fourth Claim For Relief**

**Violation of the U.S. Constitution's Fourteenth Amendment Due Process Clause**
**42 U.S.C. § 1983**
**(Against All Defendants)**

240.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 239.

241.    The Due Process Clause of the Fourteenth Amendment prohibits statutes that fail to provide people of ordinary intelligence a reasonable opportunity to understand the conduct governed by the statute as well as statutes that authorize or encourage arbitrary and

discriminatory enforcement.  Furthermore, statutes must provide explicit standards for those who apply them to avoid resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

242.    The Commercial Harassment Law, in part, prohibits:  "*threatening* a commercial tenant based on. . . . the commercial tenant's status as a person or business impacted by COVID-19 or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period. . . ."

243.    The Residential Harassment Law, in part, bars "*threatening* any person lawfully entitled to occupancy of such dwelling unit based on such person's actual or perceived status as an essential employee, status as a person impacted by COVID-19, or rent concession or forbearance for any rent owed during the COVID-19 period . . ."

244.    The portions of these Laws that are highlighted above violate the Due Process Clause of the Fourteenth Amendment on their face.  These parts of the Residential Harassment Law and the Commercial Harassment Law fail to give members of the public, including Plaintiffs, a reasonable opportunity to ascertain what constitutes "threatening" conduct; and fail to specify clear standards so that parties to rent disputes can avoid resolution of complaints on an *ad hoc* and subjective basis.

245.    Plaintiffs are entitled to a declaratory judgment that the portions of the Commercial Harassment Law and the Residential Harassment Law italicized above are void.

246.    Plaintiffs are entitled to preliminary and final injunctive relief, enjoining the Harassment Laws.

247.    Plaintiffs are entitled to recover their attorneys' fees and costs.

**Fifth Claim For Relief**

**Violation of the New York State Constitution Free Speech Clause**
**28 U.S.C. § 2201**
**(Against All Defendants)**

248.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 247.

249.    Article 1, § 8 of the New York State Constitution provides, "Every citizen may freely speak, write and publish his sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of speech."

250.    For the same reasons that Defendants violated Plaintiffs' First Amendment rights under the U.S. Constitution, as alleged above, Defendants have violated Plaintiffs' rights to free speech guaranteed by the New York State Constitution.

251.    Article 1 of the New York State Constitution contains corollary provisions for the First Amendment's Free Speech Clause that are interpreted consistently with, and at times more broadly than, the U.S. Constitution.

252.    The New York State Constitution's free speech provision is at least as protective as, if not more than, its federal counterpart, including with respect to commercial speech.

253.    Plaintiffs are entitled to a declaration that Defendants violated their right to free speech under the New York State Constitution.

254.    Plaintiffs are entitled to preliminary and final injunctive relief, enjoining the Harassment Laws.

**Sixth Claim For Relief**

**Violation of the New York State Constitution Due Process Clause**
**28 U.S.C. § 2201**
**(Against All Defendants)**

255.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 254.

60

256.     As with the Due Process Clause of the Fourteenth Amendment of the U.S., the

New York State Constitution's Due Process Clause prohibits statutes that fail to give people of

ordinary intelligence a reasonable opportunity to understand the conduct governed by the statute

as well as statutes that authorize or encourage arbitrary and discriminatory enforcement.

257.     As alleged above, the Commercial Harassment Law, in part, prohibits:

"*threatening* a commercial tenant based on. . . . the commercial tenant's status as a person or

business impacted by COVID-19 or the commercial tenant's receipt of a rent concession or

forbearance for any rent owed during the COVID-19 period. . ."

258.     Also, as alleged above, the Residential Harassment Law, in part, bars

"*threatening* any person lawfully entitled to occupancy of such dwelling unit based on such

person's actual or perceived status as an essential employee, status as a person impacted by

COVID-19, or rent concession or forbearance for any rent owed during the COVID-19

period. . . ."

259.     The portions of these Laws that are highlighted above violate the Due Process

Clause of the New York State Constitution on their face.  These parts of the Residential

Harassment and Commercial Harassment Laws fail to provide members of the public, including

Plaintiffs, with a reasonable opportunity to ascertain what constitutes "threatening" conduct; and

fail to specify clear standards so that parties to rent disputes can avoid resolution of complaints

on an *ad hoc* and subjective basis.

260.     Plaintiffs are entitled to a declaratory judgment that the Commercial Harassment

Law and the Residential Harassment Law italicized above are void.

261.     Plaintiffs are entitled to preliminary and final injunctive relief, enjoining these

Harassment Laws.

61

**Prayer for Relief**

Plaintiffs pray for judgment in their favor and the following relief:

a.  Plaintiffs are entitled to preliminary and final injunctive relief enjoining enforcement of the Harassment Laws and the Guaranty Law.

b.  Plaintiffs are entitled to a declaratory judgment that Defendants violated their rights to free speech under the First Amendment to the U.S. Constitution.

c.  Plaintiffs are entitled to a declaratory judgment that Defendants' actions have violated Plaintiffs' rights under the Contracts Clause of the U.S. Constitution.

d.  Plaintiffs are entitled to a declaratory judgment that the Harassment Laws and the Guaranty Law are preempted by New York State law.

e.  Plaintiffs are entitled to a declaratory judgment that the portions of the Commercial Harassment Law and the Residential Harassment Law italicized above are void under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

f.  Plaintiffs are entitled to a declaratory judgment that Defendants violated their rights to free speech under the New York State Constitution.

g.  Plaintiffs are entitled to a declaratory judgment that the portions of Commercial Harassment Law and the Residential Harassment Law italicized above are void under the Due Process Clause of the New York State Constitution.

h.  Granting Plaintiffs their attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1988, and as otherwise allowed by law; and

        i.      Granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
        September 2, 2020

                    Respectfully submitted,

                    By:

                    Stephen P. Younger
                    Alejandro H. Cruz
                    Hyatt M. Howard
                    Esther Kim
                    Timothy H. Smith
                    PATTERSON BELKNAP WEBB & TYLER LLP
                    1133 Avenue of the Americas
                    New York, New York 10036
                    Telephone No.:  (212) 336-2000
                    Facsimile No.:  (212) 336-2222

                    *Attorneys for Plaintiffs*