K9BPMELO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARCIA MELENDEZ, ET AL.,

                  Plaintiffs,

           v.                          20 CV 5301 (RA)
                                       Videoconference
                                       Oral Argument
THE CITY OF NEW YORK, ET AL.,

                  Defendants.

------------------------------x
                                       New York, N.Y.
                                       September 11, 2020
                                       3:35 p.m.

Before:

                    HON. RONNIE ABRAMS,

                                       District Judge


                 APPEARANCES VIDEOCONFERENCE


PATTERSON, BELKNAP, WEBB & TYLER, LLP
        Attorneys for Plaintiffs
BY:  STEPHEN P. YOUNGER
        ALEJANDRO HARI CRUZ


NEW YORK CITY LAW DEPARTMENT
        Attorneys for Defendants
BY:  PAMELA ANN KOPLIK
        CARLOS FERNANDO UGALDE ALVAREZ

K9BPMELO

1          (The Court and all parties appearing via videoconference)

2          THE COURT:  We are here for *Melendez v. The City of*

3    *New York*.  Could plaintiff please state the appearances.

4          MR. YOUNGER:  Yes.  It's Stephen P. Younger and

5    Alejandro Cruz from Patterson, Belknap on behalf of the

6    plaintiffs.  We are only seeing a blank screen.  I don't know

7    if you are.

8          THE COURT:  I can see you and I can see Ms. Koplik.  I

9    can't see anyone else.

10          (Pause)

11          Do you want to sign out and sign back in?  Sometimes

12    that helps.

13          MR. YOUNGER:  Yes.

14          (Pause)

15          THE COURT:  We are here to discuss plaintiff's motion

16    for preliminary injunction and defendant's motion to dismiss.

17    As I noted, this is a public proceeding.  Members of the public

18    are able to access this argument today through the public

19    call-in number.

20          We are holding the hearing via Skype for Business;

21    although, due to bandwidth issues, only the parties have access

22    to the video feed, but again, the public has access to the

23    audio feed.  The platform is a little bit new to us; so I

24    appreciate the parties' patience, and I think we've already

25    figured out and addressed some of the kinks.

K9BPMELO

1          I'm going to start with plaintiffs' counsel, and

2     before I hear you out, I just would like you to confirm which

3     plaintiffs are now bringing which claims with respect to the

4     Residential Harassment Law, Commercial Harassment Law, and

5     Guaranty Law.  So if you could just clarify that for me, I'd

6     appreciate it.

7          MR. YOUNGER:  Thank you.  I think, as a result of the

8     recent letters, there's no dispute about standing.  So just for

9     the record, as to the Residential Harassment Laws:  Plaintiffs

10    Melendez, 1025 Pacific, Yang and Haight Trade have standing;

11    for the Commercial Harassment Law:  Plaintiffs Melendez and

12    Jarican have standing; and then finally, for the Guaranty Law:

13    Plaintiffs Bochner and 287 7th Avenue have standing.

14          And I don't think that there should be any dispute

15    about that at this point.

16          THE COURT:  With respect to Bochner, he's not a party

17    to the pending motion for preliminary injunction, correct?

18          MR. YOUNGER:  Well, actually, we've filed a proposed

19    amended notice of motion to join him to the motion, and I

20    think, based on the city's letter, I didn't think they really

21    had an objection to that, since it's exactly the same issues as

22    were brought by plaintiffs.

23          THE COURT:  All right.  I'm just going to clarify

24    that.

25          Is that right, Ms. Koplik?

K9BPMELO

1          (Pause)

2          MS. KOPLIK:  Sorry.  I apologize.  I was on mute.

3          So the documents that were belatedly provided to us do

4   seem to establish that new plaintiffs appear to have standing.

5   We, I do not think, have an objection to the motion for

6   preliminary injunction being as to those plaintiffs as well.

7          Carlos, did you want to add anything to this?

8          MR. UGALDE ALVAREZ:  I don't have much to add.  I

9   would just note for the record that the notice of motion was

10  filed together with the letter that was filed on Wednesday at

11  12:00 p.m.; so we didn't really have an opportunity to respond

12  to that.  But I guess, you know, with respect to what

13  Ms. Koplik said, I don't think we have an objection for those

14  plaintiffs to be joined to the request.

15          THE COURT:  Okay.  All right.  Thank you.

16          Mr. Younger, do you want to get started?  I'm happy to

17  hear you out.

18          MR. YOUNGER:  Thank you.  I want to thank you for the

19  convenience of virtually today, your Honor.

20          Just for priority sake, I'm going to be addressing

21  First Amendment and preemption.  My colleague, Mr. Cruz, will

22  cover the contract clause.

23          THE COURT:  Okay.

24          MR. YOUNGER:  So in short, this case is about property

25  owners who are having serious troubles collecting rent because

K9BPMELO

1   of these three new city laws.  The Harassment Laws are

2   inhibiting them from taking routine steps to collect that rent,

3   and the Guaranty Law prevents landlords from enforcing personal

4   guaranties that are a critical remedy in the event of a

5   default.

6         THE COURT:  Okay.  So walk me through exactly what

7   your clients are prevented from doing, in your view?

8         MR. YOUNGER:  In our view, there are certain statutory

9   notices that they have to send before they can bring a claim.

10  They're required by law.  And so they can't send a rent demand,

11  and they can't send a follow up to that, what's known as a

12  dunning notice, and they can't even discuss the consequences of

13  the rent issue.  And that's set out in their declarations.

14        It's not disputed by the city.  They submitted no

15  evidence to dispute that statement.  And the reasonableness of

16  this is based on two facts; one, there is a huge, Draconian

17  penalty if they're wrong about this.  One, they have

18  substantial fines; two, punitive damages and even legal fees.

19        But second, if you look at Plaintiff Melendez, she was

20  the target of a harassment claim just for having demanded rent

21  from one of her residential tenants.  So she is reasonably in

22  fear of taking steps.

23        The problem is the city is taking this hyper-technical

24  view of these laws.  It's not borne out by the real world.

25  What's happening in the real world?  First, you see what's

K9BPMELO

happening to the plaintiffs, but you also see what's happening

in real lawsuits.  One, the two lawsuits by The Gap and Old

Navy, who have asserted harassment simply based on a rent

demand, which is what the city says can't happen.

Well, it's happening.  It's playing out in two major

cases in the City of New York.  They say it's just a

frustration-of-purpose case.  Wrong.  The complaint makes a

claim for harassment.  It's also set out in *The Maramont* case.

*Maramont* is suing for civil penalties, punitive damages and

legal fees simply because their landlord challenged their

ability to pay rent for the pandemic.  And so the real world is

showing us that this is the right interpretation.

THE COURT:  Have any courts ruled on that and found

harassment to exist just by virtue of sending rent demands,

follow-up notices or even eviction notices?

MR. YOUNGER:  Not as of yet.  You know, the courts are

severely underwater in the state.  The laws were only passed in

May but, you know, serious law firms in serious cases involving

well-financed tenants have made these arguments.  And which is

another problem with these laws, that they're being taken

advantage of by, you know, major corporations who shouldn't be

the benefit of a law like this.

The next thing is if you just look at the text of the

law, the text of the laws prevent threatening a tenant based on

their status of having been affected by the Covid-19.  Now,

K9BPMELO

1    it's conceded that the term "threat" must be read in its plain

2    meaning.  In the *Davila* case, the Second Circuit said "threat"

3    means making a declaration of loss or damages based

4    conditionally upon some future course, and that's exactly what

5    we have here.

6          The landlords would be threatening the tenants with a

7    loss, meaning having to pay rent, based on their future

8    conduct.  This is seen most dramatically in a trigger that the

9    city doesn't really mention, which is the rent concession

10   trigger.

11         You could be liable under this law simply because a

12   landlord did the right thing and said, you know, we're in the

13   summer, come back to me in November and you'll pay your rent

14   then.  When they don't pay the rent in November, they're

15   subject to harassment claims.  And that's true, in a survey

16   that we put before the Court, for two-thirds of the commercial

17   landlords in the city, just having done the right thing by

18   giving a rent concession.

19         Now, the city's argument is relying heavily on the

20   term "based on," but they admit that under typical causation

21   standards, it doesn't have to be the sole cause of the claim.

22   So, for example, as the city's amicus admits, in many cases,

23   the Covid-19 status will be the cause of the inability to pay

24   rent and that inability to pay rent would, in turn, be the

25   basis for the rent demand.

K9BPMELO

         So the two are inextricably intertwined.  In many of
these cases, just having the Covid status will mean they can't
pay rent.  They need to pay the rent.  So what the city points
to is a savings clause in this action, but --

         (Pause)

         THE COURT:  And we'll all, when we're not talking,
mute ourselves and myself included.

         But just to be clear, the Commercial Harassment Law
has a savings clause but the Residential Harassment Law does
not; is that right?

         MR. YOUNGER:  That's correct.  So this argument
doesn't apply to Residential Law, but even the Commercial Law,
the city admits, it doesn't say a rent demand.  And so what
they're saying is implied in that savings clause is that you
can make a rent demand, but that's contrary to New York law.

         And I'd like to cite the *Farnham* case, 83 N.Y. 2d 520,
where the Court of Appeals has said exceptions have to be
narrowly construed.  You can't read things into exceptions.  If
they're not in the exception, they aren't in the statute.  So
rent demands are not saved by this savings clause.

         But even if the city was right about the First
Amendment, they're not saved still because we still have the
State constitutional protections.  As we know, the New York
State Constitution is written more broadly because we have a
history in New York, which predates the Bill of Rights,

K9BPMELO

1    protecting free expression and it includes both the word

2    "restrain" and "abridge."

3            And so this negates the city's entire argument when

4    you get to the State Constitution because, as the *Acara* case

5    said, it protects against incidental impacts on free speech.

6    So it's not just a direct abridgment nor a direct prohibition.

7    It's an incidental effect.  As the Court of Appeals has said,

8    the test is who is hit by a statute, not just who it's aimed

9    at.  And clearly here, these defendants have been hit by this

10   statute.

11           So if I could --

12           THE COURT:  No.  Sorry, I was just going to ask you.

13   Have the courts considered the constitutionality of the New

14   York State Harassment Laws pre-Covid?  So not these particular

15   provisions, but I understand that section F7 was recently

16   added.  I think I said State, but I meant city Harassment Laws

17   have been around for a while, and I'm wondering, in your view,

18   if there's a distinction in terms of the constitutionality of

19   the other Harassment Laws and these newer ones?

20           MR. YOUNGER:  Yeah, and so the one case that they cite

21   is the *Prometheus* case and, first, it wasn't a free speech

22   challenge; it was only a due process challenge.  And, second,

23   it dealt with the words "threats of force."  You know, a threat

24   of force is something different than a threat based on a rent

25   concession, or something which is so broad that it covers

K9BPMELO

1    millions and millions of New Yorkers.

2          These are threats that would be more in the

3    traditional sense, where you'd know, when you were making the

4    threat, that you had, you know, done something bad.  You had

5    threatened someone because of their race.  You threatened

6    someone by using force against them or changing their locks.

7          Here, a lot of the triggers, you wouldn't even know.

8    How would you know whether a tenant is caring for someone who

9    has Covid?  How would you know they are partly unemployed?

10   Some of these triggers are just so widely cast, that really

11   what they are intended to do is to cancel rent, which is

12   something that the Speaker or City Council said when he

13   introduced these bills.

14         So if I could turn to the *Central Hudson* test?

15         THE COURT:  Yes, why don't you?  And while you're

16   talking about *Central Hudson*, I'd also like to hear if more

17   recent decisions, like *Reed* and *Sorrell*, affect the

18   applicability of *Central Hudson* in your view.  But, please, go

19   ahead.

20         MR. YOUNGER:  Yes.  So in the Second Circuit, the

21   Second Circuit has said, we still apply *Central Hudson* even in

22   the face of *Sorrell*.  There has been some question, but most

23   circuits have said, we still go with *Central Hudson*; so I think

24   we're obliged in the Second Circuit to follow *Central Hudson*.

25         But it is now the city's burden, not ours, to show two

K9BPMELO

things:  One, that these laws directly advance a substantial

interest; and two, that they're narrowly tailored.  In our

view, they flunk both.

On the advancement prong, they can't rely on just

speculation or conjecture.  And you heard the city say, we have

boxes and boxes of testimony, but there's not a single piece of

testimony about any harassment by a landlord of a tenant, not a

single piece of evidence.

You can -- you know, we've had four rounds of briefing

here and nobody's pointed to any of that.  All that they've

said -- the only thing they could muster is that someone

remarked that landlords may resort to threats -- "may" --

without any proof, without any citation of anything.  And you

can look at the *Wollschlaeger* case, where the 11th Circuit

said:  Six anecdotes were insufficient.  This is just pure

speculation.

But I think that the second point is that there's so

many less-restrictive alternatives that are obvious here.  One,

they could have had an injury requirement.  Then you wouldn't

have these major corporations, like The Gap and Old Navy,

invoking these laws.  Two, they could have had a direct

causation test, or they could have explicitly excluded rent

demands in the savings clause.  There's so many things they

could have done so that you would not have infringed on free

speech rights.

K9BPMELO

1      But I think the most important thing is these laws are

2  so broad, so far reaching, they cover virtually anybody that's

3  been in New York since last March, and so that is the

4  antithesis of a narrowly drawn statute.

5      They do not challenge our data, which is in the

6  declaration, showing each one of these classes, how many people

7  fall into it, and it's millions and millions of people.  They

8  don't challenge the data from this recent survey showing that

9  two-thirds of all small property owners surveyed have given a

10 rent concession; so they're at risk of harassment.

11     And by the way, the rent-concession prong has advanced

12 none of the interests that they said.  How does giving a rent

13 concession that someone doesn't pay amount to harassment of a

14 tenant?  I mean, it doesn't advance their interest at all.

15 They've never even explained it.

16     And the fact that well-capitalized tenants, like The

17 Gap and Old Navy and Maramont, can take advantage of these laws

18 means that they're not narrowly tailored and that they violate

19 free speech.

20     So unless there are other questions on free speech, I

21 would like to turn it over to my colleague, Mr. Cruz.

22     Oops, I think you're muted.

23     THE COURT:  Just to follow up on your points regarding

24 harassment, don't tenants, even tenants that are not in

25 financial distress, also need protection from harassment by

K9BPMELO

1    landlords?

2              MR. YOUNGER:  Well --

3              THE COURT:  I mean, what if a landlord threatens a

4    tenant who's an essential worker, for example, you know, like a

5    doctor or a nurse or someone who is, you know, sick with Covid?

6    So it's not based on economic need?

7              MR. YOUNGER:  That would be a valid argument if it

8    wasn't so broadly drawn, right, if you didn't have it covering,

9    you know, virtually any New Yorker.  If there was a narrowly

10   tailored, you know, prescription here about people that -- and

11   you had something which was directly tied to that status, you

12   might have an argument.

13             But given that, you know, someone like The Gap can

14   claim to be harassed, given that someone got a rent concession

15   and now hasn't paid that rent concession can claim to be

16   harassed, it is so overly broad that it's far beyond what that

17   purpose that they say it serves actually, you know, goes about

18   doing.

19             THE COURT:  I also wanted to ask about your vagueness

20   argument.  Is your challenge facial or as applied?

21             MR. YOUNGER:  Well, I will turn to Mr. Cruz for that.

22             THE COURT:  Okay.

23             MR. CRUZ:  Good afternoon, your Honor.

24             THE COURT:  Good afternoon.

25             MR. CRUZ:  So as to your Honor's question, with

K9BPMELO

1    respect to the vagueness challenge, I think on this front the

2    issue here is that these particular laws, No. 1, leave

3    plaintiffs, and frankly probably many other New Yorkers,

4    guessing as to what's covered.  So this is, as applied to them,

5    to the extent they are subject to these laws, clearly, and they

6    are there left to wonder.  And I think that -- you know, that's

7    point one.

8            And the second point, as for the second prong of the

9    vagueness challenge under the Fourteenth Amendment, you're

10   looking at the fact that for many of the reasons that

11   Mr. Younger articulated about the law and many of the reasons

12   that the law, for example, with respect to what Covid-19 status

13   is or isn't, doesn't provide any enforcement mechanism or at

14   least guidance has to how this law has to be enforced.

15           So I think this law straddles the two prongs of the

16   vagueness challenge.  And to the extent the plaintiffs here are

17   subject to the Fourteenth Amendment, this is something that

18   would be applied to them, but I think it's much broader than

19   that as well.

20           THE COURT:  My understanding, you're not challenging

21   Governor Cuomo's Executive Order 202.28, which prohibits

22   landlords from harassing, threatening or engaging in any

23   harmful act to compel a tenant to enter into an agreement to

24   use his security deposit as rent.

25           An executive order does not define threaten.  So my

K9BPMELO

| | |
|---|---|
| 1 | question is:  Why are these Harassment Laws void for vagueness |
| 2 | but that executive order is not? |
| 3 | MR. CRUZ:  Well, I think the executive order that you |
| 4 | just read, your Honor, is very different from the statute here. |
| 5 | As we point out in the briefing, the statute here takes the |
| 6 | word "threaten," which as a matter of law and which is |
| 7 | uncontested by the defendants, by the city, has a definition |
| 8 | that is much broader than what is defined in that executive |
| 9 | order that you read. |
| 10 | And just to be clear, we are not challenging any of |
| 11 | the Governor's executive orders.  But to the extent that -- I |
| 12 | think the language that your Honor just quoted, it's not merely |
| 13 | a broad, sort of all-encompassing, ambiguous threat; anything |
| 14 | that has to do with rent and any kind of consequences I throw |
| 15 | at you.  The Governor's executive order there tailors as to |
| 16 | what is a threat and tells you what the result has to be to |
| 17 | become a threat.  And I think there's a big difference between |
| 18 | the words of that executive order and the statute here, which |
| 19 | is much broader. |
| 20 | THE COURT:  All right.  You may proceed. |
| 21 | MR. CRUZ:  Thank you, your Honor. |
| 22 | So I want to address the contract clause issues, and |
| 23 | if your Honor -- if it works for your Honor, I want to |
| 24 | highlight a couple of points, first, with respect to the issue |
| 25 | of the substantial impairment; and second, with respect to the |

K9BPMELO

1    reasonableness and necessity and sort of fit between the

2    Guaranty Law or lack of fit, is our position, between the

3    Guaranty Law and the purported purpose.

4            So, first, the contracts clause, to implicate the

5    contracts clause in the first place, we need to talk about what

6    the substantial impairment is.  And I think it's worth stepping

7    back for a moment to think about just how uniquely substantial

8    this particular impairment is because the Guaranty Law

9    permanently extinguishes debt obligations that were central to

10   the parties' reasonable expectations when they entered that

11   guaranty agreement, and it does that with no recourse to the

12   landlord ever.

13           So, for example, with Mr. Bochner, this is going to

14   mean for his business a loss of over a hundred thousand dollars

15   in rent that was never paid to him by the tenant and that was

16   guaranteed to that business by the principal of the tenant.

17   That's almost a year and a half of taxes.  And we know from his

18   declaration that the tax liability on that building, we know

19   from his declaration, that he individually has already had to

20   go into his pocket for about $35,000 to keep that building up

21   to date on its taxes.

22           And I don't want to forget Ms. Yang, who's no longer a

23   plaintiff as to the contract clause.  But the reason for that

24   is because, as in the Contract Law -- the Guaranty Law, excuse

25   me.  But the reason for that is because she was forced to

1    settle by extinguishing her claim voluntarily for any back rent

2    just to get the tenant out and get a new tenant in.  And I

3    think that's how much pressure the Guaranty Law puts on

4    landlords because they need to get that back rent.  Ms. Yang

5    couldn't get it, and she needed to keep her property.

6            Nothing in the law, in the Guaranty Law, preserves

7    what's taken away.  Nothing in the law makes property owners

8    whole.  Nothing in the law provisions relief on any

9    circumstances tied to its purpose, which is, according to the

10   City Council Speaker, to help small businesses.

11           And on the other side of the equation, this law

12   creates an incredible windfall for guarantors, your Honor, who

13   in the very first instance, as a material inducement to get a

14   landlord to sign a lease, promise to backstop the default on

15   that lease, and they promise to do it personally.  And they

16   received the benefit of their tenant being considered

17   creditworthy in signing that lease.

18           Now, the city, I think, as notable, cites not a single

19   case in their briefing where a court has upheld something like

20   this, which is the targeted extinction of a private debt

21   obligation in perpetuity, with no mechanism to make it whole.

22           THE COURT:  Wait.  Just let me stop.  When you say "in

23   perpetuity," I mean, right now, the Guaranty Law is expected to

24   end September 20th, right?  But there was mention in a recent

25   letter that it might be extended to March 2021.

K9BPMELO

1        MR. CRUZ:  Well, your Honor, I think there's -- I'm

2   sorry.  I didn't mean to interrupt you.

3        THE COURT:  No, no, no.  Go ahead.  I was going to

4   follow up on your point about there being a deadline, but then

5   I was also subsequently going to ask if the city did decide to

6   extend the Guaranty Law, how that plays into the analysis.

7        MR. CRUZ:  Well, I think the short answer as to how

8   the potential extension plays into the Guaranty Laws, that it's

9   only going to weaken the city's position because it's only

10  going to make the impairment here even more substantial.

11       I want to break this apart, your Honor, because your

12  question implicates a very important piece of what the nature

13  of this impairment is.  I say it's permanent and I say it's in

14  perpetuity because the city points and says, look, there's a

15  temporal limitation on this law.  It's only for six months.  It

16  may become a year, and it may become later.

17       But the fact is is that temporal limitation doesn't

18  make it not permanent because it only defines the scope of

19  what's taken away.  Right now, there are six months' of a debt

20  that a guarantor promised to pay that are completely

21  extinguished.  And the text of this statute is telling.  It

22  says:  These guaranties shall not be enforceable -- full

23  stop -- against such natural persons if the following

24  conditions are met.

25       And the condition as to time, I think interestingly,

K9BPMELO

1   in the statute -- if you read it, it's clear -- is that the

2   default or other event causing such natural persons to become

3   fully or partially liable occurred between March and September.

4        So it's not that the debt is delayed in this case,

5   such as it was in the *Elmsford* case that Judge McMahon decided

6   a couple of months ago.  This is six months of debt, maybe

7   more, that goes away forever and can never be collected or

8   enforced by the person who -- by the landlord.  And I think

9   that what's notable too is even if they try to enforce it, they

10  would be subject to a harassment claim by the person against --

11  by the guarantor themselves.

12       I'm sorry, your Honor.  You may be on mute.

13       THE COURT:  I know.  I'm sorry.  I'm sorry.  I had a

14  couple of particular questions about Bochner.  Has he tried to

15  recoup the rent owed to him from March through September by any

16  other means?  So this is just another way of asking:  Why is

17  the personal guaranties his only recourse?

18       MR. CRUZ:  Well, your Honor, this gets to the core of

19  why people enter these personal guaranties.  I think as a

20  factual matter, Mr. Bochner has many months of unpaid rent, and

21  as is in his declaration, Sunburger has given him a six-months'

22  notice, as is required under their good-guy guaranty, and

23  mailed him the key.  They say, we're going to give you

24  possession in September.

25       And so I think when you sort of look at the

K9BPMELO

relationship between the lease and the guaranty -- and this is

part of the city's argument -- why did they need the guaranty?

Why is the impairment so substantial if they still have

remedies under the leases?

          But the remedy under the lease is not real anymore.

The tenant is -- tenants, just like many, as Mr. Golino says,

and this is undisputed -- is probably judgment proof.  There

are no substantial assets and eviction is not a real

possibility right now because of the eviction moratorium.

          The city also claims that Mr. Bochner might be able to

recover late fees, but again, you can't get that from an empty

tenant.  And that's the reason these guaranties are sought

because, for example, especially with small businesses, the

guaranty that is signed, along with the lease, is something

that inures to the benefit of both parties.

          Why?  Because for the landlord, it gives the landlord

comfort that there is something behind the lease obligation,

rather than an empty shell company that signs the lease.  But

for the small business that is trying to lease space to open

that business, to get itself started up and to be profitable,

that business may not have credit and certainly that company

that is going to be the tenant doesn't have credit.  So the

guaranty creates a creditworthy situation that landlords are

willing to bring into their space, and it creates the benefit

of credit for the tenant himself by backstopping the

K9BPMELO

1   possibility of a lease default.

2          So at this point, I think getting directly to your

3   question, Mr. Bochner, with already having received a notice

4   that the tenant is going to default, already having received

5   the keys, and having no way to get the rent that he is entitled

6   to under the guaranty, the only thing he can resort to -- short

7   of eviction because eviction is not allowed right now -- is the

8   guaranty itself.

9          And that is the reason behind the guaranty.  It's

10  supposed to be -- if you read from Mr. Bochner's lease, it's an

11  unequivocal promise by the individual to pay that rent, and I

12  think notably, it's to pay rent in the case of default, when

13  things go wrong and the tenant can't pay.

14          THE COURT:  How is this analysis different from that

15  in the wage freeze cases in which State employees never get the

16  raises that they contracted for?

17          MR. CRUZ:  I think it's different for a couple of

18  reasons, your Honor.  I think we're talking both about *Buffalo*

19  *Teachers* and the recent *Nassau County* case from the Second

20  Circuit, which I think the Second Circuit actually said was a

21  replay of the *Buffalo Teachers*.

22          The analysis was the same and several aspects of those

23  cases are very different.  No. 1, the purpose is entirely

24  different.  Here, no one disputes that Covid has created

25  injuries and problems for everyone in New York, but the

purported purpose here of the Guaranty Law is to help small
businesses.

And that's a law that is very narrow and does not
inure to the benefit of the public, which is different from
*Buffalo Teachers*, for example, where the benefit to the public
was, one, solving a fiscal crisis for the entire City of
Buffalo and the frozen wages were going to inure to the benefit
of the public fisc.  These are benefits that would inure to the
entire City of Buffalo and get that budget balanced.

I think as a second means of distinction, we have to
consider that one of the things that the Second Circuit took
into account in *Buffalo Teachers* is that the wage freeze was
temporary.  That wage freeze was not going to go on forever.
It had to be reconsidered on a periodic basis by the city to
ensure it was only in effect for a limited period of time.  And
it was conditioned -- and this is sort of the next part of the
analysis -- it was conditioned to fit the shape of the
emergency.

Here, it's very different.  Again, this is an
extinction of a debt forever.  The six months or a year of debt
goes away permanently, with no means of enforcement.  Once the
current pandemic, once the crisis has passed, whenever that is,
landlords can still not collect the six months, half the year,
of income that's being taken away here.

And I think the third thing that's important to keep

K9BPMELO

in mind about the wage freeze cases is that to the extent the

impairment was no doubt substantial, and Second Circuit held

that in both cases, the means of shaping the impairment to the

shape of the -- to sort of fit the emergency was a means that

balanced it over several different stakeholders.

          The teachers would not get their wage freeze, but it

was prospective.  It did not act retroactively.  So teachers

would keep their salaries and, in the future, they would be

given wage freezes.  Those wage freezes were delayed.  And at

the same time, the city was not able to recoup as much money as

it wanted to.

          And there was actually, I think, I believe the Second

Circuit looked at some of the legislative history in Buffalo

that said that there were sort of other alternatives considered

and the city wanted to do more, but it couldn't.  So that

balanced the burden.  It didn't just take from one and create a

zero sum gain.

          So I think there are a lot of different distinctions

between the wage freeze cases and this one at stage here.

          THE COURT:  All right.  You may proceed.  Thank you.

          MR. CRUZ:  Thank you.

          I think, you know, that brings us into the realm of

the necessary and -- the reasonable and necessary prong of the

analysis, your Honor, when talking about those types of cases.

          And I think regarding that prong, that issue of stay

K9BPMELO

between the shape of the crisis and the shape of the impairment

at stake, the city, I think, they argue for sort of deference

across the board.  And I think that that argument is very

misplaced if you look at the case law, your Honor.  Because for

nearly 90 years now the Supreme Court has consistently

evaluated "reasonable" and "necessity" under the contracts

clause by assessing a challenged law's fit with the purported

interest, especially where there's no dispute that a broad

community crisis exists.

        And they look at three main pieces here:  The

impairment that's in place is temporary; that the impairment is

conditioned on the shape of the crisis; and that there's a

means to make people whole.  And the Supreme Court has never

characterized this as a rational-basis test, not once.

        What is clear, though -- what is clear is that the

starting point of the analysis as to what's reasonable and

necessary starts with the severity of the impairment that we've

been talking about now because this impairment is far more

substantial than most of the examples you see in the case, and

it results in the nullification forever of a half year of

income, and is inconsistent with the parties' reasonable

expectation.

        Because when you enter these guaranty agreements, the

reasonable expectation is simple, if there's a default, this

other person is going to pay, and that's what that other person

K9BPMELO

1    signs up for.  And this suggests that, I think, this Court

2    needs to engage in a more searching analysis here than what the

3    city suggests to analyze that -- to address, No. 1, does the

4    impairment extinguish the economic bargain under the contract?

5    And this is one of the most important factors that courts look

6    at because debt repudiation is simply not a part of the

7    analysis.  And like I said before, the Guaranty Law flunks that

8    test because it takes the debt and extinguishes it with no

9    recourse and forever.

10            Second.  The impairment has to be temporary and

11   limited to the duration of the emergency.  Now, defendants say

12   in their briefs, they argue that this is shaped temporally to

13   the shape of the emergency because these six months were a

14   reasonable estimation of the emergency.  But again, that's not

15   right because all that says is that six months of income are

16   extinguished completely as a debt.  So, and as we know, that

17   may get extended to a year, perhaps more.

18            Now, the third thing is that the impairment has to be

19   limited to reasonable conditions as to relief eligibility and

20   the amount at issue.  And that's not present here either.  This

21   serves a much broader swath of businesses than it needs to, and

22   there's really no conditions on who it affects.

23            And the fourth thing I think, and this came up in the

24   *Elmsford* case that the city cites, Judge McMahon found it very

25   important -- and courts long have found it important, all the

K9BPMELO

1    way from the *Blaisdel* case to the recent *Elmsford* case –- to

2    look at whether the impairment –- whether legislation that

3    creates a substantial impairment has a mechanism to make people

4    whole.  And the Guaranty Law has none.

5         And I think that analysis, your Honor, is really

6    summed up nicely by the Supreme Court in its decision in *Allied*

7    *Structural Steel*, and that summary is at page 250.  But it goes

8    through very succinctly about the law not being temporary, it's

9    irrevocable, it's retroactive, and it was a law that only

10   applied to a very narrow group of people, as opposed to a broad

11   public purpose.

12        So the one other aspect that I think is notable about

13   the Guaranty Law, your Honor, and I think deserves a look, has

14   to do with the cases that tell us that contractual impairment

15   is affecting narrow classes of people at the expense, the zero

16   sum expense, of other classes, speaks to a legislative

17   impairment that is not reasonable and necessary to achieve a

18   broad public purpose.

19        Now, courts examining, for example, a restriction on

20   commercial leasing recognize that where a law benefited a

21   narrow class of commercial tenants, with the potential for

22   unintended consequence, and taking money out of that class'

23   pockets and putting it into another, that was too narrow to

24   serve any broad purpose, even if there was a legitimate one.

25        And I think here Speaker Johnson said in the hearing

K9BPMELO

for this that the purpose here is to help small business

owners, but this is not an instance where that assistance is

going to accrue to the public fisc, like in *Buffalo Teachers*.

THE COURT:  But why not?  I mean, isn't it important

for small businesses to have people who are willing to act as

guarantors?

MR. CRUZ:  I think it's very important for people who

are willing to act for small businesses, to have people that

are willing to act as guarantors.  But I think the distinction,

again, between a broad public purpose of helping small

businesses is even narrower.  This is a law that is aimed at

taking debt of guarantors and extinguishing it forever.

And what's important is, and this is what you don't

find in cases that uphold impairments, it is done at the

expense and at the targeted expense of another narrow class of

people.  And I think that the key cases to look at here, your

Honor, are the Eighth Circuit's decision in the *Equipment*

*Manufacturing* case, where there they had an example of a case

of a -- of legislation that affected the relationships,

contractual relationships between manufacturers and

distributors of a lot of different farm equipment.

And to the extent those laws, as the Eighth Circuit

said, directly adjusted the rights and responsibilities of

those narrow classes of contracts, despite what the legislature

thought might have accrued to the public, that was too narrow

K9BPMELO

1    to serve any public purpose.

2            And I think here the issue is really that what the

3    Guaranty Law succeeds in doing is taking money from one group

4    and giving it to another group.  And Ms. Yang is a great

5    example of that because she was forced to completely give up

6    that six months of rent without the ability to enforce her

7    guaranty, just to get another income stream in the door.

8            And, your Honor, the last point I just want to come

9    back to -- and I think we hit on this briefly but I think it's

10   worth thinking about twice -- is that the city brings up the

11   idea that the remedies between leases and guaranty agreements

12   are somehow interchangeable.  I think for the reasons I talked

13   about, that Judge McMahon spoke of in the *Elmsford* decision,

14   leases are completely distinct and they have their own set of

15   remedies.

16           But the key here is that the guaranty is a distinct

17   contractual obligation between the landlord and a third party,

18   not the landlord and the tenant.  And it's always meant to be

19   independent of the lease obligations, with different reasonable

20   expectations, different parties, different obligations and

21   different remedies.

22           And I think, as a practical matter, the idea that

23   they're interchangeable doesn't work because of all of those

24   distinctions and the fact that the guaranty is put in place as

25   a remedy of last resort when remedies scale under the lease.

K9BPMELO

1          And then as a matter of law, I think if you look at

2     the *Worthen* case from the Supreme Court -- and this is one of

3     the depression-era cases that came along with *Blaisdel*, but

4     it's one of the seminal cases in this area -- the Supreme Court

5     there struggled with the issue that held and I think that case

6     stands for the proposition that even taking one remedy away

7     under a contract, even if there are other remedies to be had,

8     it's sufficient to create an unconstitutional impairment under

9     the contracts clause.

10          So with that, unless your Honor has further questions,

11     I'm going to turn it back to --

12          THE COURT:  I don't.  I have one more question for

13     Mr. Younger on the First Amendment issue.

14          MR. CRUZ:  Thank you, your Honor.

15          THE COURT:  Thanks.

16          I just want to look again at the Commercial Harassment

17     Law, and I know we talked a little bit about the savings clause

18     and the fact that there's a savings clause in the Commercial

19     Harassment Law and that there isn't one in the Residential

20     Harassment Law.

21          But what's the harm here to your clients, what are you

22     worried about, given that there is this very clear language

23     that a landlord's lawful termination of a tenancy, lawful

24     refusal to renew or extend a lease or other rental agreement or

25     lawful reentry and repossession cannot constitute commercial

K9BPMELO

1    tenant harassment?

2              MR. YOUNGER:  None of those things are suing for rent.

3    They have to do with terminating a lease or getting the tenancy

4    back, which you can't do, given the moratorium.  None of them

5    have to do with a lawsuit to sue to collect rent or a demand

6    for such rent, and the city's admitted that.  The city's

7    admitted that those words don't appear there.

8              In fact, they're relying on a different savings

9    clause, a savings clause about nothing relieves a tenant from

10   having to pay rent.  But that also does not say that you can

11   send a rent demand, and the case law in New York is very clear.

12   If you're relying on a savings clause, you read it narrower.

13   You don't read words into it.  If it's not in there, it's

14   here's the law, and then here are the things we take out of it.

15   You have to read it narrowly.

16             You can't imply something into a savings clause, and

17   that's what the city is trying to do is to imply that, well,

18   you know, you can also be saved by sending a rent demand

19   because those words aren't in the statute.

20             THE COURT:  Okay.  And then lastly, I'm going to ask

21   you just to be very brief with respect to preemption because

22   I'm going to have to adjourn today at 5:00 and I want to give

23   defense counsel adequate time.

24             So on preemption, what State law do the Harassment

25   Laws conflict with?

K9BPMELO

1           MR. YOUNGER:  Okay.  So they conflict with three laws:

2      One, first, section 29(a), which gives the Governor power to

3      both issue directives and specify the procedures for its

4      directives.  One of those directives he specifically -- this is

5      202.3 and then repeated later on in things like 202.55.1.  He

6      says:  I am preempting and suspending any inconsistent local

7      law.  So he's already done that.

8           Two.  The city's laws are trying to spell out the

9      consequences of the Governor's closure orders.  The legislature

10     gave that power to the Governor.  The Governor is the only one

11     that has the power to specify the process for enforcing his

12     orders.  Yet, the city is trying to take that power from him.

13          But then there is a third conflict, as well, and this

14     is the basic conflict.  Essentially, if you look at all of

15     these laws together, first, 29(a) and then the Safe Harbor Act

16     and the Rent Relief Act, together they have a carefully crafted

17     policy.  You cannot bring an eviction proceeding.  You get rent

18     relief in some limited ways.  Like, you know, you can't get a

19     late fee.  You can't -- you know, you can have your security

20     deposit used.  But those laws specifically say that you can

21     bring a rent claim, and that's the inconsistency here.

22          And what's never mentioned in the city's brief is the

23     Guaranty Law.  So the State law specifically says you can sue

24     for rent.  The Guaranty Law specifically says you can't sue the

25     guarantor for rent.  A complete clash.  But you don't just have

K9BPMELO

1    a clash, you can also have a conflict if there are added

2    protections and added burdens.

3           But there's a second point, which is barely mentioned

4    in the city's brief, which is field preemption.  We have a

5    crisis here in New York, and we have one leader of that crisis.

6    It's the Governor.  He's been appointed by the legislature in

7    section 29 as the leader, the commander in chief under our

8    Constitution.

9           And that Governor has laid out very, very specific --

10   and you pointed to some of them -- you know, areas of Covid-19

11   relief in real estate.  And the legislature itself, in both the

12   Safe Harbor Act and the Rent Relief Act, come up with a

13   carefully balanced plan.

14          And one of the things that the Court of Appeals said

15   in *Albany Builders*, which is not disputed, is if you have a

16   statewide industry, like the real estate industry, preemption

17   is even more important.  And we see that, you know, really

18   critically today with so many people leaving the city to go

19   upstate.  Our real estate markets are interconnected.

20          So it would just be a maelstrom if every county and

21   city could create their own sets of Covid-19 real estate laws,

22   when the State legislature and the Governor have already done

23   that.  It would upset that balance.

24          THE COURT:  Sorry.  Let me, on field preemption,

25   executive order 202.3 prohibits local governments from "issuing

K9BPMELO

1    any local emergency order inconsistent with, conflicting with,

2    or superseding the foregoing directives."

3           I mean, why doesn't that implicitly allow local

4    ordinances that don't conflict or supersede the executive

5    orders?

6           MR. YOUNGER:  Well, there are two points.  One, it

7    also suspends any laws that are in conflict with the directive,

8    and we believe for three reasons they're in conflict.

9           But even that aside, if you have field preemption,

10   field preemption says, you know, if you can imply from a

11   comprehensive scheme -- and it's a very comprehensive scheme

12   of, you know, first, a moratorium on evictions, and then in

13   exchange for that, certain protections around rent, but you can

14   still sue for rent.  If you then add further prohibitions on

15   collecting rent, it upsets that comprehensive scheme, and

16   that's the point of field preemption.  And you see it from a

17   comprehensive set of regulations like this.

18          THE COURT:  Okay.  All right.  Well, thank you.

19          I'm going to hear from defense counsel now.

20          Thanks very much.

21          MR. YOUNGER:  Thank you.

22          THE COURT:  And I just want to start with one quick

23   question on standing.  I want to be clear on the city's

24   position on standing.  Your position is that plaintiffs had

25   standing to challenge the Harassment Laws even though there's

K9BPMELO

1    ultimately no injury, in your view; is that right?

2            (Pause)

3            MS. KOPLIK:  I'm sorry.

4            THE COURT:  It's all right.

5            MS. KOPLIK:  Okay.  So I'm sort of taken aback a bit.

6    I'm just looking for -- Okay.  So the plaintiffs do have

7    standing.  However, we did not argue in our brief that it was a

8    standing -- there was any standing issue based upon a 12(b)(1)

9    motion.

10           We argued, and we thought the better argument was,

11   that they failed to state a claim.  They failed to state a

12   claim because the harassment laws do not prohibit or prescribe

13   demands, lawful demands for rent.  It seemed to us a bit

14   circular to say there was no injury in fact and, therefore,

15   they didn't have -- that the Court lacked subject matter

16   jurisdiction based upon a 12(b)(1) argument.

17           THE COURT:  All right.  Okay.  Thank you.  You may

18   proceed.

19           MS. KOPLIK:  So the instant action challenges three

20   local laws passed by the City Council and approved by the Mayor

21   in the midst of an unprecedented crisis caused by the Covid-19

22   pandemic.  The Commercial Harassment Law and Residential

23   Harassment Laws protect commercial and residential tenants from

24   harassment by their landlords due to Covid-19.

25           The Guaranty Law protects owners of businesses that

K9BPMELO

have been subject to certain operational restrictions during

the pandemic and that have defaulted on their lease obligations

between March 7 and September 30, 2020.

Just by way of introduction and as a roadmap for the

Court, we were -- we will address the plaintiffs' -- why

plaintiffs' challenges fail in the following order.  We'll

first address plaintiffs' First Amendment free speech and New

York State free speech claims.  Then we'll address plaintiffs'

Fourteenth Amendment vagueness due process claim.  Then we will

address plaintiffs' contract clause claim.  Then we'll address

plaintiffs' conflict and field preemption claims, and we will

conclude with why a preliminary injunction should not be

granted and why preliminary declaratory relief should not be

granted.

We will begin with plaintiffs' First Amendment free

speech claims.  Plaintiffs' First Amendment free speech claims

fail as a matter of law.  The Harassment Laws do not implicate

plaintiffs' First Amendment rights.  Plaintiffs' entire

argument is based on the false premise that the Harassment Laws

restrict their commercial speech by prescribing lawful demands

for unpaid rent or lawful descriptions of consequences for

failing to pay rent.

In fact, lawful demands for rent are not prescribed.

Rather, the Harassment Laws prohibit landlords from threatening

tenants with demands or statements on the basis of the tenant's

K9BPMELO

1    Covid-19 status.

2            THE COURT:  Yes, so let's talk about what that means,

3    "on the basis," right?  So I understand that the law aims to

4    protect essential workers, people who are sick and caretakers,

5    right?

6            MS. KOPLIK:  Right.

7            THE COURT:  But I want to focus on section F7.4.4, a

8    person who has become unemployed, partially unemployed, or

9    could not commence employment as a direct result of Covid-19 or

10   the State disaster emergency.  So can a landlord ask their

11   tenant for rent if they know the tenant has lost his job in

12   light of Covid?

13           MS. KOPLIK:  It's not a matter of knowing that the

14   person has a protected Covid status.  It's asking if you can

15   make lawful demands for rent if rent is owed.  What's

16   prescribed is that it's based on the protected Covid status; so

17   that is the reason that the landlord is making unlawful demands

18   for rent and threatening.

19           Just because a landlord knows that a tenant does not

20   have employment, as your Honor is questioning, does not mean

21   that the demand for rent is based upon the fact that the tenant

22   doesn't have a job.

23           THE COURT:  But why would a landlord ever ask for rent

24   or demand rent because someone lost their job?  That makes no

25   sense.  The question that I have, again, is:  Can a landlord

K9BPMELO

 1      ask for rent even if he or she or it knows that a tenant has

 2      lost his or her job due to Covid?

 3                  MS. KOPLIK:  Yes.

 4                  THE COURT:  And can they ask again?  Like, and then

 5      the person says:  You know, I lost my job due to Covid; so I

 6      can't pay my rent.  Can they ask again?  In a follow up --

 7                  MS. KOPLIK:  It certainly is a facts-and-circumstances

 8      test.  So if it's repeated, if it's, you know, targeted

 9      toward -- you know, like there was a case that was not on this

10      particular law.  I don't recall that it was as to, you know,

11      directing -- requesting demands for rent from minors, that kind

12      of thing.

13                  It's this repeated onslaught, demands for rent, then

14      it could rise to the level of harassment, but simply making

15      demands for rent and sending notices saying if rent is not

16      going to be forthcoming, these are the consequences, those are

17      not prescribed by the statute.

18                  THE COURT:  Why not?  I mean, what is more threatening

19      than to threaten that someone will be evicted?  What does it

20      mean to threaten someone if it doesn't mean that you're telling

21      them that if they're not paying their rent, they're going to be

22      evicted?

23                  MS. KOPLIK:  The question is not whether it's a

24      threat.  The question is whether it arises to the level of

25      harassment.  So I mean, the law prescribes, you know,

K9BPMELO

threatening that rises to the level of harassment.  You know,

semantically, I suppose saying the consequences could be deemed

a threat, but that threat is because the landlord lawfully

wants to collect -- hopefully, lawfully wants to collect money.

THE COURT:  Yes, I guess just going back to what you

initially said.  Give me an example of what would constitute

threatening a tenant based on the fact that they've become

unemployed because of Covid.  Like what would that look like?

MS. KOPLIK:  Okay.  So perhaps a tenant makes demands

saying, you know, you have to -- you know, you have to pay me

all the rent that's due through the year because you're

unemployed, and if you don't pay me now, I know you're going to

have other costs.  And it's not a lawful demand for what is due

and owing.

THE COURT:  But just to be clear, the city's position

is that you can ask a tenant for rent under this law, right?

MS. KOPLIK:  Correct.

THE COURT:  You can demand rent, right?

MS. KOPLIK:  Correct.

THE COURT:  And then you can follow up if that rent is

not paid?

MS. KOPLIK:  Correct.

THE COURT:  And then you can send an eviction notice

if that rent is not paid, right?  You can pursue eviction?

MS. KOPLIK:  Correct.

K9BPMELO

1      THE COURT:  But in your view, that is not threatening

2  someone -- and I just want to get the language out -- that's

3  not harassing someone or threatening a lawful tenant?  That

4  doesn't constitute a threat to a lawful tenant to say:  If you

5  don't pay me your rent, I know you're out of a job because of

6  Covid, but if you don't pay your rent, I'm going to try and get

7  you evicted?  That is not harassment in your view under this

8  law?

9      MS. KOPLIK:  Under this law, if it is repeated,

10  argumentative threats, then it is prescribed.  If it's lawful

11  for what is owed, it's not.  If the tenant says because you

12  don't have a job, I am doing this, then --

13      THE COURT:  That just seems so untethered to reality

14  that that's the problem, that landlords are going after people

15  saying, you know, you have to pay me more than you owe me; you

16  have to pay me in advance because now I know you don't have a

17  job.  That doesn't happen very often, does it?

18      I mean, the concern is if you know someone has Covid

19  and -- excuse me, let me rephrase that.  If you know someone

20  lost his or her job due to Covid and can't pay rent, the

21  question is, can you threaten to get them evicted because of

22  that, even though the cause of them not being able to pay rent

23  is due to Covid is based on them not being able to pay their

24  rent because they lost their job due to Covid?

25      MS. KOPLIK:  Your Honor, regarding the residential

K9BPMELO

1    harassment clause, the case of *Dunn v. 583 Riverside Drive* held

2    in an earlier definition of the Residential Harassment Law, it

3    rejected the tenant's claim that the receipt of a mere rent

4    demand is frivolous or conduct that constitutes harassment.

5           So, you know, this is basically an extension of, you

6    know, prior types of harassment and there is no -- there's no

7    reason to treat the challenged laws differently.  Lawful

8    demands for rent is not prescribed.

9           THE COURT:  Why is the absence of a savings clause in

10   the Residential Harassment Law, when there is a savings clause

11   in the Commercial Harassment Law, not evidence that the

12   legislature intended to allow demands for rent in the

13   commercial setting but not in the residential setting?

14          (Pause)

15          Sorry, do you need a minute?  Can you hear me?

16          MS. KOPLIK:  I could hear you.  I'm sorry, your Honor.

17   I'm trying to get my head around your question.  I do not know

18   the reason why there is an absence of the savings provision in

19   the Residential Harassment Law.  I do know that courts have

20   interpreted the Residential Harassment Law not to construe a

21   simple demand for rent as harassment.

22          MR. UGALDE ALVAREZ:  If I may add, your Honor, I would

23   just add to that, as well, that the savings clause was already

24   in the statute prior to the enactment of the Harassment Laws

25   that are being challenged here.

K9BPMELO

1          The Harassment Laws, and our position is that the

2     Harassment Laws are clear.  The meaning of the statute is clear

3     and, therefore, the savings clause is just an additional, you

4     know, point of evidence to show to the Court that a simple

5     demand for rent, accompanied with a threat of eviction, is not

6     harassment under the Harassment Law.

7          THE COURT:  But is that true with respect to the

8     Residential Harassment Law?  Because I don't see it in that

9     law.  I only see it in the Commercial Harassment Law.

10          MR. UGALDE ALVAREZ:  So, your Honor, the Residential

11     Harassment Law does not have an express savings law in the same

12     manner that the Commercial Harassment Law does.  My point is

13     that that savings clause was already in place prior to the

14     enactment of these laws.

15          THE COURT:  Okay.

16          MR. UGALDE ALVAREZ:  Our position is that the

17     Harassment Laws are clear, and the savings clause is just an

18     additional -- it's just additional evidence that simple demand

19     for rent, accompanying with threats of eviction, are not

20     prescribed.

21          THE COURT:  The Commercial Harassment Law prohibits

22     landlords from threatening a commercial tenant based on, among

23     other things, that they were impacted by Covid-19, a

24     description that includes businesses closed down due to the

25     government's executive orders.  But doesn't that include

K9BPMELO

1     virtually every business in the city?  I'm happy for either one

2     of you to answer that.

3             MS. KOPLIK:  Your Honor, can you repeat the question,

4     please?

5             THE COURT:  Yes.  So the Commercial Harassment Law

6     prohibits landlords from threatening a commercial tenant based

7     on, among other things, the fact that they were impacted by

8     Covid-19.

9             But that description includes virtually every

10    business, you know, in the city, right, I mean, because you

11    have so many businesses that were closed down due to the

12    government's executive orders?

13            MR. UGALDE ALVAREZ:  Your Honor, I can answer the

14    question.  I think it's important to look at the specific

15    definition in the statute.  It says:  A business is impacted by

16    Covid if -- and one of the conditions is -- if it was subject

17    to a seating, occupancy or on-premises service limitation

18    pursuant to an executive order issued by the Governor or Mayor

19    during the Covid-19 period.

20            That language does not cover every executive order

21    issued by the Governor.  It only covers those executive orders

22    that specifically limited on-premises service in those

23    businesses.  There are distinctions in the executive order.

24    Executive order 202.3 specifically is one of those orders which

25    affected restaurants, bars.

K9BPMELO

1      But at least the way -- you know, in my view, it does

2   not cover every executive -- or I think the language is

3   specific.

4      THE COURT:  All right.  So I want to ask questions

5   about the Commercial Harassment Law, very similar to the ones I

6   asked about the residential ones.  So if a business doesn't

7   have enough money to pay rent because it was closed due to

8   Covid, why is it not threatening that business, based on the

9   fact that they were impacted by Covid, to threaten to evict

10  them for not paying rent?

11     I mean, what would even constitute threatening a

12  commercial tenant based on the fact that they were closed as a

13  result of Covid?  I mean, what does that look like?

14     MS. KOPLIK:  Your Honor, I think that, you know, it's

15  really important to focus on the "based on" language, and there

16  needs to be some sort of causation.  The cases that we cited,

17  that the Harassment Laws prohibit harassment based on a

18  person's or entity's Covid status, the laws are not triggered

19  merely because a tenant has one of the covered statuses.

20     It's triggered because there's a "but for" causation

21  between the plaintiffs -- between the owners', you know,

22  requests or demands for rent and that status.  The plaintiffs

23  do not address any of the case law cited by the defendants

24  interpreting the meaning of "based on."

25     They never argued that -- they cite to one case, a

1    Title VII retaliation claim, showing that the retaliatory

2    motive was that plaintiff need not show that the retaliatory

3    motive was the only cause of an employer's action.  But

4    defendants never argued that the "based on" language mandates

5    that the harassment be solely based upon the person's or

6    entity's Covid status.  It's that there has to be a "but for"

7    causation.  So in the --

8         THE COURT:  You don't think this is kind of confusing?

9    Because, you know, you have "based on" but it really doesn't

10   seem, as I said earlier, all that tethered to reality to

11   suggest that landlords are going to go after tenants because

12   they don't have money.  That's not what's happening in reality.

13        What's happening in reality is that a lot of people

14   are out of jobs and can't pay their rents and had to close

15   their businesses, right?

16        And so is this not going to be confusing for, you

17   know, a whole host of landlords?  Is it not vague as to what a

18   landlord can and can't do to a person or a business that has

19   been harmed by Covid?

20        MS. KOPLIK:  There's nothing in the statute that says

21   that lawful demands for rent cannot be made, your Honor.  Even

22   insofar as the -- you know, based upon a rent concession or

23   forbearance.  Only threats based upon a prior receipt of a rent

24   concession or forbearance is not lawful under the Harassment

25   Laws, not demands for rent after a tenant receives.

K9BPMELO

1          It's based upon -- clearly, there are other reasons

2     why other Covid statuses, why, you know, landlords may harass

3     tenants.  It could be because the -- they're, you know, told

4     that this is a business of essential workers, or perhaps this

5     is a, you know, situation where the workers have already

6     contracted Covid.

7          THE COURT:  No, I understand.  As I said earlier, I

8     completely understand the need for a law that protects people

9     who are essential employees, who are people who have Covid or

10    have family members who have Covid.  I understand that.

11         But looking at the Commercial Harassment Law, it talks

12    about threatening a lawful tenant based on a tenant's status as

13    a person, business impacted by Covid.  I mean, is that not

14    pretty broad as to how a business or person could be impacted

15    by Covid?  And why can that not include economic impact?

16         It's not just limited to people who had Covid or might

17    spread Covid, but who were impacted.  And it goes on to say

18    that a business impacted by Covid is one that was subject to

19    seating, occupancy or on-premises service limitations pursuant

20    to an executive order issued by the Governor or Mayor,

21    et cetera, et cetera.

22         I mean, you know what it says.  But I'm just trying to

23    figure out what is this Commercial Harassment Law really

24    preventing in real life?  What is it preventing?

25         MR. UGALDE ALVAREZ:  Your Honor, if I may add, I think

K9BPMELO

1    all of these hypotheticals have been focused on plaintiffs'

2    intended speech, which they define as demand for rent

3    accompanied with threat of eviction.

4              The issue is that these laws are not focused on that.

5    They also are trying to prevent other acts or omissions that

6    could constitute a threat based on these impacted statuses.

7    So, you know, it is a little bit hard to think about all these

8    hypotheticals because it is a highly intensive factual question

9    that has to be decided by a judge.  But I think it's important

10   to recognize that the language is broad and covers other

11   situations.

12             It may be threats of force, it may be other types of

13   threats that are based on these protected statuses.  The same

14   way that, at least in the Commercial Harassment Law context,

15   that same subsection, subsection 11(1) has a list of protected

16   categories like age, race, creed, color and national origin.

17             The threat itself does not have to be specific to

18   what -- while a demand for threat accompanied with -- a demand

19   for rent accompanied with a threat of eviction could constitute

20   threat under the statute, it still has to be based on the

21   protected category.

22             And there could be other types of acts or omissions

23   that wouldn't be demands for rent, wouldn't be accompanied by

24   threats of eviction that could be threats against a commercial

25   tenant based on a protected category.

K9BPMELO

1          So I think it has to be also mentioned that we're not

2     only talking about demands for rent that are covered by these

3     statutes and that the City Council intended to prescribe to

4     protect these tenants.

5          THE COURT:  Again, I understand the need to protect

6     essential employees and persons who may have Covid.  I think to

7     the extent that there is ambiguity, I think it's focused on

8     people who have been harmed financially, right, so at least in

9     part.

10          All right.  You can proceed.  I don't know if you want

11     to talk about the contract clause.

12          MS. KOPLIK:  Well, we did have a lot more to say

13     about, you know, the *Central Hudson* test and plaintiffs' State

14     free speech claim.

15          THE COURT:  Go ahead.

16          MS. KOPLIK:  Okay.  So even if the Harassment Laws

17     implicate plaintiffs' First Amendment rights, the city's

18     interest in -- they only implicate commercial speech.  And the

19     city met its burden on showing that it has a substantial

20     interest and that the laws directly and materially advance that

21     interest.

22          The city relied on a lot of evidence in the hearings.

23     Plaintiffs tried to play this down, but there were several

24     committee hearings, multiple hours of oral testimony, hundreds

25     of pages of written testimony.  They considered reports and

K9BPMELO

1    articles on the economic impact of the pandemic.

2            Under *National Electric Manufacturers Association*,

3    commercial speech is subject to a less-stringent constitutional

4    requirement than other forms of speech.  This law is narrowly

5    tailored.  It prescribes harassment based on the Covid status.

6            Plaintiffs mischaracterize the law as inhibiting

7    lawful demands for rent.  They cherry pick comments from

8    unnamed legislatures, and they don't look at the public

9    testimony as a whole.

10           They allege that they should have been more narrowly

11   tailored to apply to tenants who actually suffered a financial

12   hardship.  But substantial government interest was to prescribe

13   harassment not just for those who suffered financial hardship

14   but for others who could be targets of harassment, as we've

15   already discussed, such as those who have Covid-19 or essential

16   workers.  Plaintiffs' State free speech claim should also be

17   dismissed.

18           The Court should decline to exercise supplemental

19   jurisdiction.  To the extent that it decides to exercise

20   supplemental jurisdiction, the Court should dismiss, for the

21   same reasons, that the plain meaning of the Harassment Laws

22   does not prescribe plaintiffs from making lawful demands for

23   rent.

24           In *Central Hudson*, the court stated:  The New York

25   State Constitution does not afford heightened free speech

K9BPMELO

protections to commercial speech.  We also cited to *Clear Channel Outdoor, Inc. v. City of New York*.

Plaintiffs never articulated a reason why their State free speech claims should differ and only said that it should mirror their First Amendment arguments.  Regarding the cases cited, none of the cases cited by plaintiffs support that the State Constitution is more protective than the federal Constitution in the -- in free speech claims.

Your Honor, just also one thing on the void-for-vagueness claim.  The Harassment Laws give plaintiffs a reasonable opportunity to know what conduct is prohibited and provide, on their face, explicit standards for courts to rely upon when reviewing harassment claims.

The Court -- also, the plaintiffs should not be allowed to expand their previously argued First Amendment vagueness claim for a Fourteenth Amendment vagueness claim that they are now seemingly trying to assert.  And on that note, I can turn it over to Carlos Ugalde for the guaranty clause.

THE COURT:  Thank you.

MR. UGALDE ALVAREZ:  Thank you.  In the interest of time, I'm just going to address a few of the arguments that opposing counsel was making in the context of the contract clause claim.

First of all, opposing counsel, once again, mentions the Yang plaintiffs who have now withdrawn their contract

K9BPMELO

1    clause claim.  Just for the record, your Honor, and as we

2    repeatedly stated, the Yang claimants do not have standing to

3    challenge the Guaranty Law under the contract laws because the

4    guarantor at issue in that contractual relationship was also a

5    tenant under the lease, and the Guaranty Law does not cover

6    those types of guaranties.

7         With respect to the substantial impairment prong, your

8    Honor, I think we have to emphasize what the inquiry is.  It

9    has to substantially impair plaintiffs' contractual

10   relationships.

11        Plaintiffs attempt to separate the guaranty agreement

12   and the lease agreement, but that cannot be done.  They are

13   inextricably intertwined, your Honor.  We've cited to an

14   Appellate Court case in the State of New York, Second

15   Department, which confirms that the lease and the guaranty

16   agreement are part of the same transaction and that the

17   guaranty is entered into to induce the landlord to enter into a

18   lease with the commercial tenants.

19        Plaintiffs' own declarants have confirmed that.  They

20   even say that the guaranty agreement benefits the tenants.

21   Their attempt to separate both agreements cannot -- you know,

22   has to be rejected.  And, therefore, given that the inquiry is

23   whether or not the Guaranty Law substantially impairs

24   plaintiffs' contractual relationships, we do have to consider

25   the remedies under the lease when determining, you know, where

K9BPMELO

1       there has been substantial impairment.

2               We have pointed -- even though the Bochner plaintiffs

3       came in basically a few days ago, we can point to several

4       remedies under the lease, which are clearly entered into and

5       agreed upon by tenant and the landlord; so that the landlord

6       can enforce the central term of the lease, which is to recover

7       unpaid rent.

8               That is also the central term of the guaranty

9       agreement, but the guaranty agreement just simply adds a remedy

10      so that the landlord can go after the guarantor when the tenant

11      does not pay.  The implication of that is that, in the context

12      of this emergency, your Honor, due to the closure orders, we

13      have a number of businesses, like restaurants, bars, which are

14      closed and clearly are unable to pay rent as a result, which

15      would give the landlords an ability to go after the assets of

16      these guarantors, which are generally the same principals of

17      those commercial tenants.

18              And that is clearly the goal that the City Council was

19      trying to achieve in enacting the Guaranty Law.  However, and I

20      don't want to jump to the next prong, but I do want to note

21      that the goal or the purpose of the statute is to respond to

22      the crisis, the economic crisis that is ensuing as a result of

23      the Covid-19 pandemic.  While this measure is specific to these

24      to commercial tenants and guarantors, it is clearly a measure

25      to address one of the worst crises that this country and this

K9BPMELO

1    city has ever faced.

2              THE COURT:  Can I ask you something?

3              MR. UGALDE ALVAREZ:  Yes, your Honor.

4              THE COURT:  I wanted to hear your response to

5    plaintiffs' counsel's argument regarding the fact that this

6    extinguishes the debt that the guarantor has forever, and why

7    was that appropriate here?  And why does that withstand

8    constitutional muster?

9              MR. UGALDE ALVAREZ:  Right.  Your Honor, so I think

10   it's worth going back to one of the questions you asked

11   opposing counsel.  Specifically, you pointed to *Buffalo*

12   *Teachers*, and a set of other cases where there were wage

13   freezes.

14             While in those cases the measure was temporary, the

15   impairment was also permanent in that for the time period that

16   the regulation in those cases was present, clearly, the

17   teachers were not receiving the wages they should have been

18   receiving.  That is the same situation here, that the Guaranty

19   Law is temporary in that it has a limited time period, from

20   March 7 to September 30th.  And, therefore, for defaults

21   occurring during that time period, the landlord would not be

22   able to recoup any default from the guarantor itself, but that

23   was also the case in these other cases.

24             I would also point to *Twentieth Century Associates v.*

25   *Waldman*, which is a New York Court of Appeals case.  In that

K9BPMELO

case, the regulation at issue was a rent ceiling on commercial

spaces that was tied to the crisis that ensued after the World

War, World War II.  And in that case, obviously, the rent

ceiling, while temporary, prevented the commercial landlords

from getting a benefit that they would have otherwise received,

and that is the same situation here, your Honor.

There was also -- and just going back to the point

regarding the fact that the guaranty and that the lease has to

be considered.  Since they're part of the same contract

relationship, I do want to address plaintiffs' counsel's

comment that the remedies from their lease are illusory.

*Elmsford Apartment Associates*, a recent case in this

circuit -- in this district, while that case involved a

different type of regulation, which is temporary in its own

sense, in that case, the court completely rejected any

implication that remedies, such as going to court to enforce a

lease to seek eviction or to get a judgment for unpaid rent, is

illusory.  That was completely rejected.  The court -- so

that's what I would say about that, your Honor.

In terms of the -- and I think, your Honor, in terms

of the second prong, which is, you know, whether or not the

city had a significant, legitimate interest, I think I have

already addressed that.  But I do want to point out several

cases, including *Buffalo Teachers*, that explicitly held that

addressing fiscal and economic emergencies are deemed

K9BPMELO

1    legitimate public interests.

2            And finally, your Honor, and I think this is the last

3    couple of statements that I will make regarding the contract

4    clause.  With respect to the third prong, which is whether the

5    impairment is based upon reasonable conditions and is of a

6    character appropriate to the public purpose, justifying the

7    legislation, I do want to note that plaintiffs' counsel is

8    trying to merge this test with the first -- this prong with the

9    first prong of the analysis.

10           Opposing counsel cited *Elmsford Apartments* in support

11   of their arguments with respect to this prong.  However,

12   *Elmsford Apartment* ended the inquiry after the first prong.  So

13   there was no reasoning that could really help plaintiffs in

14   that regard.

15           But I think the important things to note, your Honor,

16   is that there is substantial deference owed to the City

17   Council.  The test is, you know, whether or not the legislation

18   is self-serving.  In this case, the Guaranty Law impairs

19   private and public contracts alike and, therefore, substantial

20   deference is owed.

21           THE COURT:  Just let me stop you there.

22           MR. UGALDE ALVAREZ:  Yes, your Honor.

23           THE COURT:  Just, why don't you -- and I know we're a

24   little past 5:00, but I don't want to cut you off.

25           Just tell me why this is reasonable and necessary to

K9BPMELO

advance the public interest?  Why is it that you have to

extinguish these debts entirely to advance the public interest

here?

MR. UGALDE ALVAREZ:  Well, your Honor, I just -- you

know, the city's position is not -- is that the Guaranty Law is

only impairing one remedy that's available to the landlord.  So

it does not extinguish the debt, which is the unpaid rent.  The

landlord can still go after --

THE COURT:  But these are in situations, as a

practical matter, the tenants can't pay, right?  That's why the

guaranty kicks in in the first place.  So as a practical

matter, the guaranty is the way to recoup the losses.  No?

MR. UGALDE ALVAREZ:  So, your Honor, two things.  In

situations where there is no guaranty, the only remedy that a

landlord would have is to enforce the remedies under the lease.

The point that plaintiffs are making is that -- is making is

that these tenants, these commercial tenants, presumably have

no assets and, therefore, they can't really recover.

But what we're talking about here, the Guaranty Law

covers a very specific set of businesses.  There is --

notwithstanding plaintiffs' contentions, there is an injury

requirement in the statute.  It only covers restaurants or

bars, gyms, fitness centers, movie theaters, personal care

services, and non-essential retail businesses.  So there is an

injury requirement, and these businesses, by nature, have

K9BPMELO

1  assets such as inventory and equipment.

2         So I think it is important to know that the Guaranty

3  Law is not only reasonable because it is narrow to only cover

4  businesses that have been affected by the closure orders issued

5  by the Governor in response to the Covid-19 pandemic, but those

6  businesses by being -- by virtue, retail businesses,

7  restaurants or bars, do have assets.  So the claim that it's

8  just illusory to be able to enforce lease remedies against

9  these commercial tenants has to be rejected.

10         Additionally, your Honor, with respect to this prong,

11 the Guaranty Law is based upon reasonable conditions.  It

12 only -- as I previously mentioned in relation to my comment

13 regarding the Yang plaintiffs -- it only covers natural persons

14 that are guarantors, who are not tenants.  There is an injury

15 requirement, as I just said.

16         There was narrowing in that the City Council

17 considered other alternatives.  Specifically, the Council

18 proposed initially a legislation that would have covered

19 virtually every business in the city that would have met a

20 revenue loss requirement.  The Council, recognizing that the

21 law needed to be, you know, tied to the crises and to the

22 actual need, narrowed the law to only cover the businesses that

23 have been affected by closure orders.

24         And finally, your Honor, the temporal scope that I had

25 already mentioned in the context of the first prong, but all of

K9BPMELO

1    these measures, your Honor, make it clear that the character of

2    the Guaranty Law was appropriate to the public --

3             THE COURT:  You talk about the temporal -- I didn't

4    mean to cut you off, but when you talk about the temporal

5    scope, you mean because it's limited in terms of time?  But

6    isn't the city seeking to expand the time, the temporal scope

7    of the provision?

8             MR. UGALDE ALVAREZ:  Your Honor, with respect to the

9    proposed legislation, I have two things to say.  The city's

10   position is that that should not be considered in the analysis

11   at this stage.

12            First of all, that legislation has not become law and,

13   therefore, is not part of this challenge.  And secondly, as

14   noted in the letter that we submitted when we notified the

15   Court about this proposed legislation, that legislation is

16   subject to change.  You know, it has to go through committees

17   and has to be referred to the City Council for a vote.

18            So there still could be amendments made to that

19   legislation, but more importantly, it's not part of the law yet

20   and it's not part of this challenge and should not be

21   considered in the analysis at this stage.

22            But, your Honor, my final point with respect to the

23   contract clause is that the Guaranty Law is of a character

24   appropriate to the public purpose.  As noted, the public

25   purpose here, which is significant and legitimate, is to

K9BPMELO

1   address the economic crisis.  And the law itself was narrowed

2   by time period.  The time period is tied to the crisis, and the

3   businesses that are protected are businesses that have been

4   affected by the closure orders.

5          So, your Honor, I think that's all I have for the

6   contract clause.

7          THE COURT:  Thank you very much.

8          So we're really running over.  I'm just going to ask

9   plaintiffs' council if you have just one short, you know, brief

10  rebuttal, but keep it very short, please.

11         MR. YOUNGER:  Yes, I'll do my best.  I think I'm

12  unmuted now.

13         I want to follow up your Honor's question about

14  unemployment.  This is a critical question because it points

15  out what the VOLS' amicus said.  The unemployment is the cause

16  of the nonpayment, and that is 730,000 New Yorkers just there.

17  But it's not just that, it also includes people who couldn't

18  start a job.  So you have more New Yorkers who will say, I

19  couldn't get to my job; I couldn't start my new job; so I

20  couldn't pay my rent.  So it shows just how circular this thing

21  is.

22         And the same with rent concession.  You didn't pay

23  your rent concession and, thus, you're guilty of harassment.  I

24  think that counsel for the city misstated the commercial

25  harassment.  If you look at subdivision 7(c), it's not confined

K9BPMELO

1    to the Governor's orders that are in-premises.  It is any

2    closure as a result of the State disaster emergency, and that's

3    virtually every business in the city, as your Honor said.

4            And your Honor pointed out a Covid-19 diagnosis, but

5    bear in mind, 40 percent of the people who were diagnosed had

6    no symptoms; so they're not even affected really and, yet, they

7    can take the benefit of this law.  And that points up why the

8    lack of a substantial injury requirement makes this completely

9    overbroad.

10           In terms of the guaranty issue, the city hasn't cited

11   a single case where a court has upheld a private debt that has

12   been forever extinguished with no remedy to the plaintiff.

13   There's not a single case that they've cited for that.

14           And they try to say, well, there are these other

15   remedies and they point to *Elmsford*.  Well, look at the

16   application of *Elmsford* here.  You can't evict, and you can't

17   sue the only person that has assets.  They try to speculate

18   about things.  Well, they might have fixtures.  Everywhere you

19   notice, as the Golino declaration says, that those are covered

20   by other liens.

21           And if you look, come back to Mr. Bochner, over a

22   hundred thousand dollars he's out.  That is substantial injury

23   by any stretch of the imagination.  Thank you.

24           THE COURT:  Thank you all for your advocacy.  I'm

25   going to reserve decision.  I hope you all stay safe and

K9BPMELO

1    healthy.  Thank you for your advocacy today.

2               And thank you, Rose.  Thank you to the court reporter.

3               Have a nice weekend.

4               MR. YOUNGER:  Thank you, your Honor.  We appreciate

5    it.

6               MS. KOPLIK:  Thank you.

7               MR. UGALDE ALVAREZ:  Thank you, your Honor.

8               (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25