**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MELENDEZ, *et al*.,

                    Plaintiffs,

          v.

THE CITY OF NEW YORK, *et al*.,

                    Defendants.

---

No. 20-CV-5301 (RA)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

In the spring of this year, the COVID-19 pandemic ravaged New York, hitting the state harder than nearly anywhere else on earth.  In response, New York State enacted a slate of statutes, administrative orders, and executive orders aimed at combatting both the public health and economic devastation wrought by the disease.  New York City, the epicenter of the outbreak within the state, passed multiple local ordinances of its own, aiming to achieve the same goals. Three of those ordinances are being challenged here today.

The first of these three laws is "the Residential Harassment Law," which amended a decade-old ordinance prohibiting residential landlords from harassing tenants out of their lawfully-occupied dwellings.  The Residential Harassment Law added to the existing law a prohibition on harassment of "person[s] impacted by COVID-19," a term broadly defined to include essential workers, those diagnosed with COVID, caretakers of those with COVID, and persons unemployed or with additional financial responsibilities as a direct result of the pandemic.

The second of the laws, "the Commercial Harassment Law," likewise amended a pre-existing ordinance prohibiting commercial landlords from harassing tenants out of their lawfully-occupied properties. It added a similar prohibition on harassment of those "impacted by COVID-19," a term the law broadly defined to include those diagnosed with COVID, caretakers of those with COVID, persons who could not attend work because of quarantine or child-care difficulties, and businesses closed as a direct result of the pandemic.

The third law, entitled "Personal Liability Provisions in Commercial Leases," is known as the "Guaranty Law." This law limits the ability of commercial landlords to enforce a "personal guaranty"—that is, a contractual promise by a third-party, typically the principal of the business-tenant, to pay rent, utilities, or taxes in the event that the tenant defaults on those payments. The Guaranty Law only applies when the guarantor is a natural person other than the tenant, and only covers payments due between March 2020 and March 2021, but its effects are permanent: the landlord may never collect from the personal guarantor for those payments, even after the pandemic ends.

The three plaintiffs challenging these laws today are the owners of small commercial and residential buildings in Brooklyn, Queens, and Manhattan. They allege that the laws cause them severe economic harm by impeding their ability to profit from their properties. Specifically, they claim that the Harassment Laws prevent them from pursuing routine efforts to collect rent from their tenants, while the Guaranty Law prevents them from recouping income pursuant to personal guaranties in connection with defaulting businesses. They urge this Court to find that these laws violate three constitutional rights: the right to free speech, the right to due process, and the Contract Clause.

Plaintiffs have expressed some legitimate concerns, and the Court recognizes the toll the pandemic has taken on them, in addition to their tenants, all New Yorkers, and millions more around the world. Nonetheless, for the reasons articulated below, the Court cannot conclude that these three challenged laws violate any of Plaintiffs' constitutional rights. First, because the Court finds—as the City insists—that the Harassment Laws do not prevent landlords from making routine rent demands, these laws do not implicate Plaintiffs' free speech rights. Moreover, because the Harassment Laws are sufficiently clear on what constitutes harassment, the Court further concludes that these laws do not violate due process. And because this Circuit's jurisprudence affords broad deference to the good-faith efforts of policymakers to regulate in the interest of the public good, the Court must conclude that the Guaranty Law does not violate the Contract Clause. Finally, the Court holds that these ordinances are not in conflict with the State's efforts to respond to the pandemic, and so they are not preempted.

Plaintiffs' suit is thus dismissed in its entirety.

## BACKGROUND[1]

### I. The State's Response to the Pandemic

The New York State Legislature, together with the Chief Administrative Judge of the New York Courts and the Governor, have responded to the COVID-19 crisis with numerous state-

---

[1] In adjudicating a motion to dismiss, a court may consider not only the facts set forth in the complaint, but also "documents attached thereto and incorporated by reference therein, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 67 (2d. Cir. 1998), matters of public record such as case law and statutes, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d. Cir. 1998), and matters of judicial notice. *See Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)." *In re Doubleclick Privacy Litig.*, 154 F. Supp. 2d 497, 506 (SDNY 2001). In this opinion, the Court relies on those facts alleged in Plaintiffs' Amended Complaint, as well as the legislative history that accompanied the passage of the three laws at issue, and several publicly-available resources published by the City and State governments and submitted to the Court, of which the Court takes judicial notice.

wide regulations aimed to protect the health, safety, and economic wellbeing of the people of New York.

On March 3, 2020, the New York State Legislature amended section 29-a of the New York Executive Law, granting the Governor the power to "issue any directive during a state disaster emergency" that the Governor deemed "necessary to cope with the disaster." S*ee* SB S7919; N.Y. Exec. Law Art. 2-B § 29-a. The amendment also expanded the Governor's existing authority to temporarily suspend "any statute, local law, ordinance, or orders, rules or regulations," as necessary to aid with coping with the disaster. *Id*.

Following this expansion in authority, the Governor passed a series of executive orders— over seventy as of the date of this opinion. *See* Executive Orders, governor.ny.gov/executive-orders (last visited November 25, 2020). On March 7, 2020, the Governor passed EO 202, which declared a state of emergency in New York until September 7, 2020. N.Y. Exec. Order No. 202 (Mar. 7, 2020), Dkt. 38 Ex. B.[2] The order "authorize[d] all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency." The Governor subsequently filed a series of executive orders mandating the closure of the vast majority of businesses in the state. *See, e.g*., N.Y. Exec. Order No. 202.3 (Mar. 16, 2020), Dkt. 29 Ex. 18 (prohibiting bars and restaurants from serving food or beverages on premises and closing gyms and movie theatres); N.Y. Exec. Order No. 202.5 (Mar. 18, 2020), Dkt. 38 Ex. D (closing indoor malls, amusement parks, aquariums, zoos, and arcades); N.Y. Exec. Order No. 202.6 (Mar. 18, 2020),

---

[2] The declaration of a State disaster emergency has since been extended; at present, the declaration will remain in effect through December 3, 2020. N.Y. Exec. Order No. 202.72 (November 3, 2020).

Dkt. 38 Ex. E (closing all non-essential businesses); N.Y. Exec. Order No. 202.7 (Mar. 19, 2020), Dkt. 29 Ex. 20 (ordering barbershops, salons, and tattoo parlors to close).[3]

The Governor also passed a series of executive orders regulating commercial and residential real estate. For example, Executive Order 202.8 announced a ninety-day moratorium on commercial and residential evictions and foreclosures. N.Y. Exec. Order No. 202.8 (Mar. 20, 2020), Dkt. 29 Ex. 21. Executive Order 202.9 instructed the Superintendent of the Department of Financial Services to ensure that "any person or entity facing a financial hardship due to the COVID-19 pandemic" be given the opportunity for a forbearance of mortgage payments. N.Y. Exec. Order No. 202.9 (Mar. 21, 2020), Dkt. 38 Ex. H. Executive Order 202.28 mandated that residential landlords allow tenants facing financial hardships due to the pandemic to use their security deposits to pay past-due rent, and prohibited landlords from demanding late payment fees for rent due and owing from March to August. N.Y. Exec. Order No. 202.28 (May 7, 2020), Dkt. 29 Ex. 23.[4]

In June 2020, the state legislature passed a series of laws further regulating real estate. On June 17 it passed the Emergency Rent Relief Act ("ERRA"), which is to remain in effect until July 2021. 2020 Sess. Law News of N.Y. Ch. 125 (S. 8419) § 3, Dkt. 29 Ex. 26. Section 2.2 of the act authorized the state housing commissioner to establish a residential rent relief program for those affected by COVID-19. *Id*. § 2.2. Section 2.4 provided for rental subsidies, capped at 125 percent fair market rent, to be paid directly to landlords in the form of a rent-voucher. *Id*. §

---

[3] Since then, many, but not all, of these businesses have been permitted to re-open in a limited capacity. *See*, *e.g.*, N.Y. Exec. Order No. 202.36 (June 2, 2020), Dkt. 38 ¶ 19 (permitting barbershops and hair salons to reopen in some parts of the state); N.Y. Exec. Order No. 202.38 (June 16, 2020), Dkt. 29 Ex. 24 (permitting restaurants to serve food and beverages outside).
[4] In May of this year, the constitutionality of this executive order was litigated in the case of *Elmsford Apt. Assocs., LLC v. Cuomo*, no. 20-CV-4062 (CM), 2020 U.S. Dist. LEXIS 115354, 2020 WL 3498456 (S.D.N.Y. June 29, 2020). The law was upheld.

2.4. Priority for these vouchers is to be given to those with greatest social and economic need. *Id*. § 2.7. That same day, the legislature amended the State Banking Law, adding § 9-x, which requires all entities regulated by the New York Department of Financial Services to grant forbearance on all monthly mortgage payments for up to 180 days, subject to certain restrictions. N.Y. C.L.S. Bank § 9-x (2020), Dkt. 39. Ex. EE. On June 30, the legislature passed the Tenant Safe Harbor Act ("TSHA"). 2020 Sess. Law News of N.Y. Ch. 125 (S. 8192-B), Dkt. 29 Ex. 27. The TSHA prohibits courts from issuing warrants of eviction against those residential tenants who have suffered financial hardship during the COVID-19 period—a period of time defined to include "March 7, 2020 until the date on which none of the . . . Executive Order[s] issued in response to the COVID–19 pandemic continue to apply in the county of the tenant's or lawful occupant's residence." *Id*. §§ 1, 2.1. The TSHA instructed courts to consider factors such as change in income and liquid assets in determining whether a tenant suffered "financial hardship." *Id*. § 2.2(b). Section 3 of the law provided that—notwithstanding the other restrictions it imposed—courts may still award a judgment for rent due and owing in a summary proceeding. *Id* § 3.

Finally, the Chief Administrative Judge of the New York Courts issued a series of administrative orders, prohibiting the initiation of foreclosures on commercial properties and suspending commercial and residential evictions. *See*, *e.g.*, N.Y. Admin. Order No. 68/20 (Mar. 16, 2020), Dkt. 38 Ex. AA (suspending all eviction proceedings until further notice); N.Y. Admin. Order No. 157/20 (July 23, 2020), Dkt. 56 Ex. C (prohibiting the initiation of foreclosures on commercial mortgages for non-payment if the property owner is facing financial hardships due to COVID-19); N.Y. Admin. Order No. 160A/20 (Aug. 13, 2020), Dkt. 56 Ex. D (continuing to prohibit the initiation of eviction proceedings for commercial tenants if the tenant

is facing financial hardships due to COVID-19 and suspending all residential eviction proceedings commenced after March 1).

## II.  The City's Response to the Pandemic

New York City's City Council also passed a host of local ordinances to combat the pandemic's economic impact.  Of relevance here are three of those laws, passed on May 26, 2020: the Residential Harassment Law, the Commercial Harassment Law, and the Guaranty Law.

### A.  The Residential Harassment Law

New York City Administrative Code ("Admin. Code") § 27-2005(d), which was enacted pre-COVID, prohibits an owner of a dwelling from "harassing" tenants or occupants lawfully entitled to occupancy of such dwelling.  Admin Code § 27-2005(d).  Section 27-2004(a)(48) of the Code defines harassment as "any act or omission by or on behalf of an owner that (i) causes or is intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy," and (ii) includes certain acts or omissions, ranging from repeated failure to correct hazardous housing-code violations to changing the locks without consent.  *Id*. §27-2004(a)(48).  Prior to the pandemic, one of the offending acts or omissions that constituted harassment was "threatening any person lawfully entitled to occupancy of such dwelling unit based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence, status as a victim of sex offenses or stalking, lawful source of income or because children are, may be or would be residing in such dwelling unit."  *Id*. § 27-2004(a)(48)(f-5).  Local Law No. 56-2020, known as "the Residential Harassment

Law," amended this definition by adding a new form of harassment: "threatening any person lawfully entitled to occupancy of such dwelling unit based on such person's actual or perceived status as an essential employee, status as a person impacted by COVID-19, or receipt of a rent concession or forbearance for any rent owed during the COVID-19 period." *Id*. § 27-2004(a)(48)(f-7); Dkt. 38 Ex. OOO. The law defines the relevant terms "COVID-19 period," "essential employee," and "person impacted by COVID-19," but it does not define the term "threaten," nor did earlier versions of the law.[5]

The Residential Harassment Law may be enforced by the City, N.Y. Real Prop. Acts. Law § 770, or private persons, Admin. Code § 27-2115(h)(1) (providing a private cause of action for enforcement of the Residential Harassment Law). Violations are punishable by a civil penalty of between $2,000 and $10,000, as well as attorneys' fees and punitive damages. See Admin. Code §§ 27-2115(m)(2), 27-2115(o).

---

[5] The relevant definitions are as follows:

"[T]he term 'COVID-19 period' means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of any tenant residential or commercial set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and extended thereafter or (ii) September 30, 2020, inclusive[.]" Admin Code § 27-2004(a)(48)(f-7)(2).

"[T]he term 'essential employee' means a person employed by or permitted to work at or for a business classified as an essential business by the New York state department of economic development in accordance with executive order number 202.6, as issued by the governor on March 18, 2020 and extended thereafter[.]" *Id*. § 27-2004(a)(48)(f-7)(3).

"[T]he term 'person impacted by COVID-19; means a person who has experienced one or more of the following: (i) such person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; (ii) a member of such person's household was diagnosed with COVID-19; (iii) such person was providing care for a family member or a member of such person's household who was diagnosed with COVID-19; (iv) such person became unemployed, partially unemployed, or could not commence employment as a direct result of COVID-19 or the state disaster emergency declared in executive order number 202, as issued by the governor on March 7, 2020; or (v) such person became primarily responsible for providing financial support for the household of such person because the previous head of the household died as a direct result of COVID-19[.]" *Id*. § 27-2004(a)(48)(f-7)(4).

### B. The Commercial Harassment Law

Local Law No. 53-2020, known as "the Commercial Harassment Law," made a similar amendment to the City's pre-existing law prohibiting harassment of commercial tenants. Admin Code § 22-902(a)(11); Dkt. 38 Ex. MMM. Section 22-902 of the Administrative Code forbids a landlord from harassing a commercial tenant. The provision defines harassment as "any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property" and (ii) includes one of a list of prohibited actions. *Id*. Section 22-902(a)(11)(i) already prohibited threatening a commercial tenant based on "actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence[,] or status as a victim of sex offenses or stalking." *Id*. § 22-902(a)(11)(i). The Commercial Harassment Law added a new form of harassment: "threatening" a commercial tenant based on "the commercial tenant's status as a person or business impacted by COVID-19, or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period." *Id*. § 22-902(a)(11)(ii). As with the Residential Harassment Law, the Commercial Harassment Law defines the relevant terms "COVID-19 period" and "impacted by COVID-19," but it does not define the term "threaten," nor did earlier versions of the law.[6] Unlike the Residential Harassment Law, the Commercial Harassment Law

---

[6] The relevant definitions are as follows:
"[T]he term 'COVID-19 period' means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of any tenant, residential or commercial, set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and extended thereafter, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive[.]" Admin. Code. § 22-902(a)(11)(a).

includes a savings clause providing that "[a] landlord's lawful termination of a tenancy, lawful refusal to renew or extend a lease or other rental agreement, or lawful reentry and repossession" cannot constitute "commercial tenant harassment." *Id*. § 22-902(b). The law also states that none of the ordinance's provisions relieve a commercial tenant "of the obligation to pay any rent for which the commercial tenant is otherwise liable." *Id*. § 22-903(b).

---

"[T]he term 'impacted by COVID-19' means a person who has experienced one or more of the following situations:

(1) such person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis . . .
(2) a member of such person's household was diagnosed with COVID-19;
(3) such person was providing care for a family member or a member of such person's household who was diagnosed with COVID-19;
(4) a member of such person's household for whom such person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;
(5) such person was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency or because such person was advised by a health care provider to self-quarantine due to concerns related to COVID-19;
(6) such person became primarily responsible for providing financial support for the household of such person because the previous head of the household died as a direct result of COVID-19;
(7) such person's business is closed as a direct result of the COVID-19 state disaster emergency[.]" *Id*. § 22-902(a)(11)(b).

"[A] business is 'impacted by COVID-19' if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issue by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same three-month period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2020, and February 2020 and such revenue loss was the direct result of the COVID-19 state disaster emergency. A revenue loss shall be deemed to be the direct result of the COVID-19 state disaster emergency when such disaster emergency was the proximate cause of such revenue loss[.]" *Id*. § 22-902(a)(11)(c).

Violations of the Commercial Harassment Law are punishable by a civil penalty of between $10,000 and $50,000, as well as attorneys' fees and punitive damages. *See id*. §§ 22-903(a).

### C. The Guaranty Law

Local Law No. 55-2020, entitled "Personal Liability Provisions in Commercial Leases"—but referred to herein as the "Guaranty Law"—provides that:

> A provision in a commercial lease or other rental agreement involving real property located within the city that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, shall not be enforceable against such natural persons if the conditions of paragraph 1 and 2 are satisfied.

*Id*. § 22-1005. The first requirement for the Guaranty Law to apply is that either

> (a) The tenant was required to cease serving patrons food or beverage for on-premises consumption or to cease operation under executive order number 202.3 issued by the governor on March 16, 2020; (b) The tenant was a non-essential retail establishment subject to in-person limitations under guidance issued by the New York state department of economic development pursuant to executive order number 202.6 issued by the governor on March 18, 2020; or (c) The tenant was required to close to members of the public under executive order number 202.7 issued by the governor on March 19, 2020.

*Id*. § 22-1005(1). The second requirement is that "[t]he default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and September 30, 2020, inclusive." *Id*. § 22-1005(1). On September 28, 2020, the Guaranty Law was extended to encompass all those liabilities that accrued between September 30, 2020 and March 31, 2021. *Id*.; Dkt. 69.

Each of these three local laws were passed relatively quickly. They were each introduced during a New York City Council meeting on April 22, 2020. Ugalde Decl. ¶ 40 & Dkt. 28 Ex.

KK.  On April 28, 2020, the Council's Committee on Housing and Building and the Committee on Consumer Affairs and Business Licensing released a report discussing, *inter alia*, the Residential Harassment Law.  Dkt. 38 Ex. LL.  The report discussed the perceived need for legislative action above and beyond the above-cited state laws and EOs, noting that "[a]lthough the eviction moratoriums serve as temporary stopgaps to allow tenants to remain in their apartments, they do not . . . guarantee . . . that tenants will be safe from landlord harassment on the basis of having been impacted by the virus."  *Id.* at 4.

The next day, the committees released a report discussing the pandemic's effect on small businesses and the need for laws like the Commercial Harassment Law and the Guaranty Law.  Dkt. 38 Ex. QQ.  The report noted that while the State's efforts "to support small businesses during this crisis have provided some measure of relief for small business owners and their employees," there were a "range of outstanding issues that continue to make operating a business during the pandemic particularly difficult."  *Id*. at 28.  Specifically, the report expressed concern with "[b]usinesses who experience a drop in revenue due to COVID-19 . . . fac[ing] added legal pressure to meet financial obligations," including "personal liability" for their owners, *id*. at 28–29, which could result in those persons facing personal bankruptcy and the loss of "the entirety of [their] life savings."  *Id*. 32; *see also* Dkt. 29 Ex. 31 (testimony of Speaker Johnson recognizing that "[l]osing your home is hard enough.  But imagine someone coming after your home, as well, while your business is closed").  The report also noted that "[w]ithout recourse, landlords and debt servicers may resort to threats, which continues to make protecting businesses from harassment an important issue as the City grapples with the effects of COVID-19."  Dkt. 38 Ex. LL at 29.

The committees also held a series of open hearings on the laws, inviting feedback from "a broad spectrum of stakeholders including tenants, property owners, the Marshals, Sheriff[s], the advocates, and the public, so that the Council can get a better perspective on both sides of the issue." Dkt. 29 Ex. 33 at 11. During the April 28 hearing on the proposed Residential Harassment Law, the committees heard testimony from representatives from the New York City Commission on Human Rights, the New York City Department of Housing Preservation and Development ("HPD") and the Real Estate Board of New York ("REBNY"), housing advocates, and non-profit organizations, Dkt. 38 Ex. OO, and received written testimony from the Deputy Commissioner of Policy and Intergovernmental Affairs of the New York City Commission on Human Rights, REBNY, the New York City Community Housing Improvement Program ("CHIP"), and the Legal Aid Society, Dkt. 38 Ex PP. During the April 29 hearing on the proposed Commercial Harassment Law and Guaranty Law, the committees continued to hear from the Deputy Commissioner of Policy and Intergovernmental Affairs of the New York City Commission on Human Rights, REBNY, the New York City Community Housing Improvement Program ("CHIP"), and the Legal Aid Society, Dkt. 38 Ex. YY, and received almost 1,000 pages of written testimony from representatives from the New York City Department of Small Business Services ("SBS"), REBNY, United for Small Businesses NYC, Volunteers of Legal Service ("VOLS"), CHIP, and the Legal Aid Society. Dkt. 38 Exs. ZZ-1, ZZ-2, ZZ-3.

During these hearings, the majority of speakers—both council members and community stakeholders—expressed support for the three laws. Some spoke of the harms they believed the laws would ameliorate. For example, with regard to the Harassment Laws, Councilmember Adams noted that businesses are "vulnerable to harassment from landlords in search of ways to collect" and emphasized that "the threat of harassment will particularly impact the city's small

independently owned and immigrant owned businesses, many of which were operating on thin margins and struggling to pay rent even before this crisis."  Dkt. 29 Ex. 34 at 26; *see also* Dkt. 29 Ex. 33 at 94 (Deputy Commissioner for Policy Intergovernmental Affairs at the New York City Commission on Human Rights reporting that "[f]rom February through mid-April, the agency recorded 284 reports of harassment and discrimination related to COVID-19").  Concerning the Guaranty Law, Councilmember Rivera  relayed the concerns of small business owners who feared their landlords "going after their personal life savings and asset[s]."  Dkt. 29 Ex. 31 at 29–30; *see also* Dkt. 29 Ex. 37 at 32 (small business owner explaining that enforcement of a personal liability provision "may leave him 'personally bankrupt' and 'at risk of losing the entirety of [his] life savings'").  Several speakers, meanwhile, expressed reservations about the laws' efficiency and legality.  *See*, *e.g.*, Dkt. 29 Ex. 33 at 99 (representative from the New York City Commission on Human Rights noting that "[s]everal of the protections contemplated in [the Harassment Laws] already exist to protect tenants against harassment in housing"); Dkt. 29 Ex. 34 at 214 (project members from the Asian American Federation noting that Harassment Laws don't change the fact that small businesses can't pay rent); *id*. 219–20 (representative from Real Estate Board of New York "agree[ing] wholeheartedly" that tenants should be protected from harassment of any kind during COVID-19, but urging the City to clearly define what harassment means to prevent certain acts from being misconstrued as harassment); *see also* Dkt. 29 Ex. 31 at 56 (Councilmember Yeger arguing that the Guaranty Law violates the Contract Clause).

All three laws passed just over a month after they were first introduced.  Ugalde Decl. ¶ 40, 57–59.

### III. Plaintiffs

Three local landlords, Marcia Melendez, Ling Yang, and Elias Bochner, each claim to have been harmed by these three local laws.

Plaintiff Marcia Melendez, through Plaintiffs Jarican Realty Inc. and 1025 Pacific LLC, owns two properties in Brooklyn. Melendez Decl. ¶¶ 3–6. Retired, Melendez and her husband rely on rent payments from their two properties to fund their retirement, pay for maintenance of their properties, and to pay the tax and mortgage obligations on the properties. *Id.* ¶¶ 13-18. According to the complaint, "[p]rior to the outbreak of COVID-19, in accordance with [her] normal business practices, [Melendez] sent [her] delinquent residential tenant notices of late rent and sought to recover unpaid rent in Housing Court." *Id.* ¶ 21. Multiple tenants, both commercial and residential have not paid rent during the COVID period. *Id.* ¶¶ 20–25. Fearful that she would be accused of harassment under these new laws, Melendez has not sent these tenants demand notices. *Id.* ¶ 29. This concern stems in part from the fact that Melendez's residential tenant had previously accused her of "harassment" for seeking payment of late rent even before this law went into effect. *Id.* ¶ 21. Due to the thousands of dollars in unpaid rent from March through June, Melendez has been unable to pay the full amount of her tax obligations to the city from January 1, 2020 through June 30, 2020. *Id.* ¶ 16, 30.

Plaintiff Ling Yang owns two properties in Queens with her two sons, through their companies, Plaintiffs Haight Trade LLC and Top East Realty LLC. Yang Decl. ¶¶ 3–6. All rent payments go to paying tax and mortgage obligations as well as maintenance for the properties. *Id.* ¶19. Yang similarly used to send notices of late rent, but "[s]ince [she] learned of the Residential Harassment Law, however, [she] ha[s] stopped even mentioning to the residential tenants the consequences of their continued failures to pay rent out of fear that such statements

could be considered 'harassment' under the City's Law." *Id.* ¶ 35. Due to the rent payment she has not received, Yang may be unable to pay her property taxes going forward. *Id.* ¶ 20, 36–37. In her commercial leases, Yang has included a personal guaranty clause. Dkt. 38 Exs. UUU, VVV.[7] Yang states that she requires personal guaranties for all her commercial tenants because "[a]bsent a personal guaranty, the risk of having a small business as a tenant would be so great as to be prohibitive." Yang Decl. ¶31.

Plaintiff Elias Bochner, through his company 287 7th Avenue Realty LLC, owns a mixed-use property in Manhattan with a commercial space. Bochner Decl. ¶3. Bochner and his family rely on the rental payments for income. *Id.* ¶6. Bochner's commercial tenants have a "good guy" personal guaranty clause in their lease, which requires the guarantor—that is, the principal of the business-tenant—to pay the tenant's rent from the date the tenant's business fails through an agreed upon date. *Id.* ¶¶ 14–15; *see also id.* at ¶ 14 ("In a good guy guaranty, the principal of the business promises us that if the business does not succeed, the business will vacate the premises and the principal will pay rent through that date (or another agreed-upon date)."). In Bochner's commercial lease, operative during the first half of 2020, the tenant was a corporate entity, but the personal guarantor for the tenant's lease was Mitch Cantor, a natural person. Dkt. 64 Ex. 5 at 81. Bochner states that he requires guaranties for all commercial tenants, and that he would not have entered into the lease without one. Bochner Decl. ¶ 14. Bochner's tenant stopped paying full rent in January, and on March 20, 2020, gave six month notice of intent to surrender, turning over the keys on June 30, 2020. *Id.* ¶ 16. Bochner alleges that because he

---

[7] The Court notes that in one of the two commercial leases Plaintiff Yang proffered, the guaranty clause is unexecuted, *id.* Ex. UUU at 6, and in the other, the guarantor is the tenant, *id.* Ex. VVV at 15, 20.

cannot enforce the guaranty against the guarantor, he cannot recover $110,000 in rental income owed to him between March 7, 2020 and September 30, 2020.  *Id.* ¶ 18.

Plaintiffs have brought this suit seeking injunctive and declaratory relief, invalidating the Harassment Laws and the Guaranty Law under both the New York Constitution and the Federal Constitution, or in the alternate, declaring the laws preempted by state law.  On July 22, 2020, Plaintiffs filed a motion for preliminary injunctive and declaratory relief.  Dkt. 28.  On August 12, 2020, Defendants filed a motion to dismiss all claims.  Dkt. 37.

## DISCUSSION

The Court finds that each of Plaintiffs' claims fail as a matter of law and thus denies their motion for preliminary relief and grants Defendants' motion to dismiss**.**

## I. The Harassment Laws Are Not Unconstitutional

Plaintiffs challenge the Harassment Laws on two grounds: First, they argue that the Harassment Laws violate free speech by prohibiting them from sending to their tenants "routine rent demand notices and discussions about the consequences flowing from unpaid rent and efforts to collect rent."  Amended Compl. ¶ 172.  Second, Plaintiffs claim that—to the extent the Harassment Laws are unclear about what conduct they prohibit and allow—the laws are void for vagueness and thus violate due process.  While the Court appreciates Plaintiffs' concerns, their interpretation is unsupported by the text of the laws and the relevant case law.  As the City avows, the Harassment Laws do not prevent landlords from asking their tenants for rent due and owing.  For this reason, the laws neither violate the free speech provision of the First Amendment nor the Due Process Clause of the Fourteenth Amendment.[8]

---

[8] Although Plaintiffs challenge the Harassment Laws under both the Federal Constitution and the New York State Constitution, the Court only adjudicates Plaintiffs' federal claims.  As the Supreme Court noted in *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), "[a]

## A.  The Harassment Laws Do Not Implicate Plaintiffs' Free Speech Rights

Plaintiffs seek to—but argue that they are chilled from—communicating with delinquent tenants about past-due rent and pursuing available remedies to either collect that rent or to repossess their property.  Amended Compl. ¶¶ 149–66, 232.  The Harassment Laws do not prevent them from doing so.

As an initial matter, the City's attorneys unequivocally say so.  At oral argument before this Court, counsel for the City repeatedly insisted that "lawful demands for rent are not pr[o]scribed" by the harassment laws.  Dkt. 66 at Tr. 35:23; *id*. at Tr. 38:15–25; *see also* Defendants' Memorandum of Law in Support of Their Motion to Dismiss and in Opposition to Plaintiffs' Motion for Preliminary Injunctive and Declaratory Relief ("Def. Mem.") (dated Aug. 12, 2020) (Dkt. 39) at 10 ("[T]he plain meaning of the Harassment Laws does not preclude landlords from making lawful demands for unpaid rent.").  Even without these assurances of the City's counsel, the text and context of the laws support such a reading.

The Commercial Harassment Law addresses the tenant's obligation to pay rent directly.  It contains a provision that reads: "[a] landlord's lawful termination of a tenancy, lawful refusal to renew or extend a lease or other rental agreement, or lawful reentry and repossession of the covered property shall not constitute commercial tenant harassment."  Admin. Code § 22-902(b).  The law further states that none of the ordinance's provisions relieve a commercial tenant "of the obligation to pay any rent for which the commercial tenant is otherwise liable."  *Id*. § 22-903(b).

---

federal court's grant of relief against state officials on the basis of state law . . . does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism." *Id*. at 106.  This Court heeds *Pennhurst*'s stricture and declines to exercise supplemental jurisdiction over Plaintiffs' state constitutional claims.

Although Plaintiffs rightly argue that the law does not explicitly address rent demands, *see* Amended Compl. ¶ 121, these provisions plainly permit the collection of rent from commercial tenants, and the Court interprets them, by extension, to allow landlords to make routine rent demands from their tenants.

The Residential Harassment Law, by contrast, lacks a comparable savings clause, which raises the question as to whether the legislature intended to distinguish between communications about past-due rent by residential landlords and commercial ones. The law's text, however, leads the Court to the conclusion that—like the Commercial Harassment Law—the Residential Harassment Law does allow for "routine rent demand notices and discussions about the consequences flowing from unpaid rent and efforts to collect rent." Amended Compl. ¶ 172.

Three things must be shown to establish a violation of the Residential Harassment Law: (1) the landlord threatened the tenant, (2) the threat was made "based on" the tenant's status or perceived status as a person affected by COVID-19, and (3) the threat causes or was intended to cause someone lawfully entitled to occupy the premises to relinquish their rights to the property. Admin. Code § 27-2004(a)(48). The Court assesses each of these elements in turn.

First, the Court examines what constitutes a "threat." Because the statute does not define it, the Court looks to the "ordinary, contemporary, common meaning" of the term for guidance. *United States v. Davila*, 461 F.3d 298, 302 (2d Cir. 2006) ("Because neither statute defines the words 'threat' or 'threaten,' we give them 'their ordinary, contemporary, common meaning.'"). The Second Circuit has identified the plain meaning of the word "threat" as follows:

> According to the Oxford English Dictionary, a threat is a "denunciation to a person of ill to befall him; esp. a declaration of hostile determination or of loss, pain, punishment, or damage to be inflicted in retribution for or conditionally upon some course; a menace." The American Heritage Dictionary, Fourth Edition, defines the word as "[a]n expression of an intention to inflict pain, injury, evil, or punishment," or "[a]n

indication of impending danger or harm." The same dictionary defines the word "threaten," in turn, as "[t]o express a threat against."

*Id.* at 302 (alterations in original). The Court recognizes that to most, being told that failure to pay rent may result in the loss of their home would constitute "[a]n indication of impending danger or harm." *Id*. It is hard to imagine many things as traumatic as being forced from one's home. Yet as courts have done in other contexts, it important to "distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences." *Walia v. Veritas Healthcare Sol., L.L.C.*, no 13-CV-6935 (KPF), 2015 U.S. Dist. LEXIS 105429, 2015 WL 4743542, *14–15 (S.D.N.Y. Aug. 11, 2015) (citing *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012)); *see also United States v. Raniere*, 384 F. Supp. 3d 282, 312–13 (E.D.N.Y. 2019) (citing *United States v. Bradley*, 390 F.3d 145, 155 (1st Cir. 2004), *judgment vacated on other grounds*, 545 U.S. 1101 (2005)). Informing a tenant that she will be obligated to vacate her home if she fails to make the payments for which she contracted is not the same thing as—for example—commencing repeated frivolous court proceedings against her. *See*, *e.g.*, *Aguaiza v. Vantage Props, LLC*, 69 A.D.3d 422, 423 (N.Y. Sup. Ct. 2010).

This is not to say that a rent demand could *never* be adjudged a threat. As the City acknowledged at oral argument, a "repeated onslaught [of] demands for rent . . . could rise to the level of harassment," Dkt. 66 at Tr. 37: 13–14, as could rent demands made in a particularly threatening manner. But this Court trusts the New York courts to faithfully make these judgments, and determine when a routine rent demand has transformed into a threat—due to repetition, tone, timing, or form.

Second, the Court assesses the meaning of the term "based on." Courts interpret this term to require but-for causation. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64

& n.14 (2007) (observing that "[i]n common talk, the phrase 'based on' indicates a but-for causal relationship and thus a necessary logical condition" and that the statutory phrase, "based on," has the same meaning as the phrase, "because of" (internal quotation marks omitted)); *Gross v FBL Fin. Servs.*, 557 U.S. 167, 176–77 (2009) (the phrase "based on" is commonly understood to mean that something is created in reliance on identified factors). Hence, for a rent demand to violate the Residential Harassment Law—assuming, *arguendo*, it is adjudged to be "a threat"—the demand must be made for the but-for reason that the tenant has been impacted by COVID-19 in one of the ways recognized by the statute. Put differently, a tenant would need to show that but-for the impact of COVID on them, the landlord would not be making the rent demand or "communicating with them about the consequences flowing from unpaid rent and efforts to collect rent." Amended Compl. ¶ 172.

In other words, while a landlord may not harass someone because she has been impacted by COVID-19, the landlord may demand rent because the rent is due. In cases in which the tenant is protected by the Residential Harassment Law because she is a front-line worker, a caretaker of a person with COVID-19, or she herself has been diagnosed with COVID, a typical rent demand would be unrelated to that tenant's status as a "person impacted by COVID-19." Admin. Code § 27-2004(a)(48)(f-7). In cases in which the impact of COVID-19 on a tenant has been exclusively economic in nature (because she "became unemployed, partially unemployed, or could not commence employment as a direct result of COVID-19," or received "a rent concession or forbearance for any rent owed during the COVID-19 period") it may be more difficult to distinguish that tenant's failure to pay rent from her "status as a person impacted by COVID-19." *Id*. Nonetheless,

21

the Court remains confident in the state courts' ability to differentiate those cases in which the but-for impetus for a rent demand is, for example, the tenant's loss of employment due to COVID, and those in which it is simply because the tenant has not paid her rent. The former may violate the Residential Harassment Law; the latter does not.

Lastly, the law's requirement that the threat causes or was intended to cause someone lawfully entitled to occupy the premises to relinquish her rights to the property, *id.* § 27-2004(a)(48), provides yet another basis for a court to separate a routine effort to collect rent from harassment.

In sum, routine demands for rent are beyond the purview of either the Residential or the Commercial Harassment Laws. Plaintiffs have thus failed to plausibly allege that the Harassment Laws violate their right to free speech under the First Amendment.

### B. The Harassment Laws Are Not Void for Vagueness

"As one of the most fundamental protections of the Due Process Clause, the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (internal citations and quotation marks omitted). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

Plaintiffs assert that the Harassment Laws are void for vagueness because they fail to "give[] any notice as to whether routine requests for rent and the consequences for nonpayment

constitute unlawful threats." Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion for Preliminary Injunctive and Declaratory Relief and in Opposition to Defendants' Motion to Dismiss ("Pl. Reply") (dated Aug. 26, 2020) (Dkt. 48) at 11.[9] For the reasons articulated above, however, the Court cannot conclude that a "pe[rson] of ordinary intelligence" would understand the Harassment Laws in this way. *Hill*, 530 U.S. at 732.

To support their vagueness argument, Plaintiffs set out what they assert are two instances of the laws being misinterpreted. First, Plaintiffs point to the complaint in *Gap, Inc. v. 44-45 Broadway Leasing Co., LLC*, No. 652549/2020, in which a commercial tenant of a landlord not affiliated with this lawsuit claimed that an attempt to terminate a lease due to non-payment of rent violated the Commercial Harassment Law. Dkt. 29 Ex. 5. Second, Plaintiff Melendez also notes that a residential tenant of hers previously accused her of harassment when she sent a late-rent notice. *See* Melendez Decl. ¶ 21. Yet upon closer inspection, neither of these examples advance Plaintiffs' arguments. With respect to Melendez's tenant, that individual accused Melendez of harassment *before* the laws at issue were passed, and so this anecdote is not illustrative of anyone's understanding of these new laws. In the *Gap* case, though the tenant sought a declaratory judgment that it had been harassed, Dkt. 29 Ex. 5 ¶ n, its Commercial

---

[9] It is unclear whether Plaintiffs' challenge is facial or as-applied. Plaintiffs' challenge is styled as a facial challenge, yet Plaintiffs allege only that a single application of the laws is unconstitutional: when applied against landlords making a routine rent demand from their tenants. Pl. Mem. at 28. To show that a law is facially invalid, a plaintiff must demonstrate either "(1) 'that the law is unconstitutional in all of its applications,' or (2) that 'a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep.'" *Expressions Hair Design v. Schneiderman*, 803 F.3d 94, 105 (2d Cir. 2015) (*quoting Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 & n.6 (2008)). Plaintiffs have not attempted to make this showing, and do not dispute that the harassment laws would be lawful in certain applications—for example, if applied against a landlord seeking to evict a sick tenant because of the tenant's illness. Because Plaintiffs only address the law's application to routine rent demands, Pl. Mem. at 18 n.7, the Court will consider this an as-applied due process challenge.

Harassment Law argument consisted solely of one paragraph in a 25-page complaint, *Id*. ¶ 42. Tellingly, the court in that case ultimately ordered the plaintiffs to pay the defendants the rent it owed, and did so without mention of the Commercial Harassment Law. *See Gap, Inc. v 44-45 Broadway Leasing Co. LLC*, No. 652549/2020, 2020 N.Y. Misc. LEXIS 3505, at *1 (N.Y. Sup. Ct. July 21, 2020). Hence, if anything, the *Gap* litigation stands for the proposition that landlords are indeed permitted to ask for rent, which tenants are required to pay.

The Court does not go so far as to say that the Harassment Laws will never be misinterpreted. The City surely could have written the laws more clearly to explicitly state what its lawyers now acknowledge: that the Harassment Laws do not bar routine rent demands. Dkt. 66 at Tr. 35:23; *id*. at Tr. 38:15–25; Def. Mem. at 10.[10] But because the Court cannot conclude that a "pe[rson] of ordinary intelligence" would understand the Harassment Laws to prohibit routine rent demands the law is not void for vagueness. *Hill*, 530 U.S. at 732. Plaintiffs have thus failed to plausibly allege that the Harassment Laws violate the Due Process Clause of the Federal Constitution.

## II. The Guaranty Law Is Not Unconstitutional

Plaintiff Bochner[11] challenges the constitutionality of the Guaranty Law under the Contract Clause of the Federal Constitution, which provides that "no State shall . . . pass any . . . Law impairing the Obligations of Contracts." U.S. CONST. art. 1, § 10. Though written in absolute

---

[10] The Court notes that the City's Department of Housing Preservation & Development has provided guidance as to what constitutes harassment in its 2019 publication "ABCs of Housing," which can be accessed through the department's website. *See* NYC Dep't of Housing Preservation & Dev., ABCs of Housing at 15–16, https://www1.nyc.gov/assets/hpd/downloads/pdfs/services/abcs-of-housing.pdf (last visited November 25, 2020).

[11] Plaintiff Yang is no longer prosecuting the Contract Clause issue, Dkt. 59 at 1, and there is no evidence that Plaintiff Melendez has any commercial leases including a personal guaranty by a non-tenant. The Guaranty Law challenge is thus brought by Plaintiff Bochner alone.

terms, the Contract Clause does not give private parties the unconditional right to contract without government interference. Rather, the Supreme Court has plainly stated that "the police power . . . is paramount to any rights under contracts between individuals." *Manigault v. Springs*, 199 U.S. 473, 480 (1905) ("It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected."); *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (permitting contract interference so long as it is in furtherance of the "inherent police power of the State 'to safeguard the vital interests of its people.'"). Indeed, "[t]he principle is firmly established today that all contracts are subject to the police power of the State." *Twentieth Century Assocs., Inc. v. Waldman*, 63 N.E.2d 177, 179 (N.Y. 1945).

When deciding whether a law violates the Contract Clause, courts in this Circuit ask: "(1) [whether] the contractual impairment [is] substantial and, if so, (2) [whether] the law serve[s] a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) [whether] the means chosen to accomplish this purpose [are] reasonable and necessary." *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020) (quoting *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006)); see also *Energy Reserves*, 459 U.S. at 411–18 (applying the same test). Although the Court finds that Plaintiff has plausibly alleged substantial impairment to his contract, it recognizes that the case law in this Circuit affords "substantial deference" to those policymakers making good-faith efforts to act in the public interest. *See Elmsford Apt. Assocs.*, 2020 U.S. Dist. LEXIS 115354 at *36. For this reason, while the Court is cognizant of the burden this law puts on landlords, it

concludes that Plaintiff has not plausibly pled that the Guaranty Law violates the Contract Clause..

### A. The Guaranty Law Substantially Impairs Plaintiff's Contracts

The substantiality of a contract's impairment depends upon "the extent to which reasonable expectations under the contract have been disrupted." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). "[T]he reasonableness of expectations depends, in part, on whether legislative action was foreseeable." *Sullivan*, 959 F.3d at 64; *see also Sanitation*, 107 F.3d at 993 ("Impairment is greatest where the challenged government legislation was wholly unexpected."). Here, the Court finds that the imposition of the Guaranty Law, like the pandemic itself, was entirely unforeseeable.

Further, courts are apt to find substantial impairment in instances where the hindered contract provision was a "primary inducement" for the parties to enter the contract or a "central provision [of the contract] upon which it can be said [the parties] reasonably rely." *Buffalo Teachers*, 464 F.3d at 368. Plaintiff asserts—and the Court accepts as true—that the guaranty clause was an essential provision of his commercial lease, averring that he would not have signed the lease without a guaranty clause in it. *See* Bochner Decl. ¶ 14. This renders the clause a "primary inducement."

Lastly, in making an assessment of substantiality, courts consider whether the contractual impairment is temporary or permanent. *See W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 434 (1934); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978). Defendants stress that the contractual impairment is limited, given that it only applies to certain guarantors and only for money owed during a certain period of time. Def. Mem. at 19. This may be true, but the fact remains that for those debts covered by the Guaranty Law, the contractual impairment is

permanent. Bochner will never be able to collect from the personal guarantor money due and owing between March 2020 and March 2021, even after the pandemic ends. *See* Admin. Code § 22-1005.

Taken together, these considerations lead to the conclusion that the Guaranty Law does in fact impose a substantial impairment on Plaintiff's contract. To survive, then, the law must advance a legitimate public interest and be reasonable and necessary to do so. *See Buffalo Teachers*, 464 F.3d at 368, 376; *see also Sullivan* 959 F.3d at 64, 69.

### B. The Guaranty Law Advances a Legitimate Public Interest

"[T]he law affords States a wide berth to infringe upon private contractual rights when they do so in the public interest." *Elmsford Apt. Assocs.*, 2020 U.S. Dist. LEXIS 115354 at *36 (citing *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 16 (1977)). A legitimate public purpose is one "aimed at remedying an important 'general social or economic problem' rather than 'providing a benefit to special interests.'" *Sanitation,* 107 F.3d at 993.

Here, the Court finds that the City passed the Guaranty Law to benefit the public interest, not itself or any special interest. While on its face the law directly benefits only commercial tenants, according to a recent report of the New York City Municipal Government, small businesses employ nearly half of New York City's workforce. *See* Dkt. 29 Ex. 44 at 3, SMALL BUSINESS FIRST, Report of the New York City Municipal Government, https://www1.nyc.gov/assets/smallbizfirst/downloads/pdf/small-business-first-report.pdf (last visited November 25, 2020); *see also* Brief of Amicus Curiae Volunteers of Legal Service ("VOLS Br.") (dated Aug. 13, 2020) (Dkt. 41 Ex. 1) at 20 ("Small businesses represent 98% of New York City's employers and provide employment for over 3 million people—about half of the City's workforce."). The Guaranty Law seeks to prevent New York's small business owners

27

from being "pushed into both business and personal bankruptcy," which would eliminate their ability to "remain[] in or return[] to microentrepreneurship," and would "further exacerbat[e] the ongoing economic crisis" for the entire City. VOLS Br. at 24; *see also* Dkt. 29 Ex. 31 at 29 (testimony of the Guaranty Law's author, Councilmember Rivera, expressing similar concerns).

And critically, there is no allegation that the City passed the Guaranty Law to benefit itself. In *Sullivan*, the court asked whether "the [City] in breaching a contract is acting like a private party who reneges to get out of a bad deal, or is governing, which justifies its impairing the plaintiffs' contracts in the public interest." 959 F.3d at 65. Here, the facts reflect the latter. The law thus advances a legitimate public interest.

### C. The Guaranty Law Is Reasonable and Necessary to Advance the Public Interest

The third prong—whether the Guaranty Law is reasonable and necessary to advance the public interest—presents the closest question. What is clear, however, is that the Second Circuit is extremely deferential to the decisions of policymakers seeking to advance a legitimate public interest. "Where social or economic measures are involved, courts will defer to legislative judgment in determining whether particular actions are 'reasonable and necessary.'" *Condell v. Bress*, 983 F.2d 415, 418 (2d Cir. 1993); *see also United States Trust Co.*, 431 U.S. at 22–23 ("As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."); *Sanitation*, 107 F.3d at 994 ("When reviewing a law that purports to remedy a pervasive economic or social problem," a court's analysis must be "carried out with a healthy degree of deference to the legislative body that enacted the measure."). Given that mandated deference, the Court concludes that the Guaranty Law is reasonable and necessary.

In considering a law's necessity, courts have looked to whether the law in question seeks to address a real emergency. *See Allied Structural Steel Co.*, 438 U.S. at 250 (striking down a "law [that] was not even purportedly enacted to deal with a broad, generalized economic or social problem."). For example, in rejecting the Contract Clause challenge raised in *Buffalo Teachers*, the Second Circuit distinguished the facts of that case from those presented in earlier cases like *Association of Surrogates & Supreme Court Reporters v. New York*, 940 F.2d 766 (2d Cir. 1991), and *Condell*, 983 F.2d 415, in which "the legislature's justifications of reasonableness and necessity [were] dubious at best" given that whether "there was an emergency or dire need justifying the impairment was in doubt." *Buffalo Teachers*, 464 F.3d at 373. In *Association of Surrogates*, the State of New York cut its judicial employees' salaries by 10% in order "to finance an expansion of its court system." *See* 940 F.2d at 773. In *Condell*, the State enacted a similar payroll lag for executive branch employees in response to a budget deficit. *See* 983 F.2d at 417. In neither case did the government classify the problem as an "emergency."[12] In *Buffalo Teachers*, "no one question[ed] the existence of a very real fiscal emergency." 464 F.3d at 373. Here, Plaintiff does not dispute that a real emergency exists; indeed, there can be no doubt that the City is in crisis—economic and otherwise. *See*, *e.g.*, Dkt. 29 Ex. 37 at 6 (analysis of the NYC Comptroller indicating that hotel occupancy and restaurant sales were expected to drop 80%); *id.* (National Bureau of Economic Research indicating that 57% of businesses in New York have closed). The Court is thus satisfied that the law is "necessary" for the purposes of this analysis.

_____

[12] The Court also notes that in both *Condell* and *Association of Surrogates*, the state was a party to the contract at issue. For this reason, the court in those cases afforded the government less deference than is appropriate here. *See Condell*, 983 F.2d at 418; *Association of Surrogates*, 940 F.2d at 771.

The reasonableness of the Guaranty Law is more difficult to discern. The City's aim seems to be to protect small business owners from personal financial ruin on the heels of the pandemic-related closure of their businesses. *See* Dkt. 29 Ex. 31 (the Guaranty Law's sponsor explaining that the law was passed to "pre[v]ent commercial landlords from going after business owners['] personal assets"); Dkt. 29 Ex. 37 (small business owner explaining that enforcement of a personal liability provision "may leave him 'personally bankrupt' and 'at risk of losing the entirety of [his] life savings'"). Given that the City has publicly reported that small businesses employ nearly half of its workforce, *see* Dkt. 29 Ex. 44 at 3, SMALL BUSINESS FIRST, Report of the New York City Municipal Government, https://www1.nyc.gov/assets/smallbizfirst/downloads/pdf/small-business-first-report.pdf (last visited November 25, 2020), ensuring the financial survival of their owners seems criticial to City's economic recovery from this pandemic, *see* Dkt. 29 Ex. 31 at 29. Nonetheless, the Court recognizes why Plaintiff views it inequitable for the City to shift the pandemic's financial burden from small business owners to their landlords, many of whom are also struggling financially during this difficult time. *See* Bochner Decl. ¶ 18 (Plaintiff Bochner alleging that the Guaranty Law leaves him unable to recover $110,000 in rental income).

It is not the role of this Court, however, to opine on the wisdom of the policy decision at issue here—that is, the decision to shift the economic impact of the pandemic from commercial tenants and their guarantors to landlords. *See Home Bldg. & Loan Ass'n. v. Blaisdell*, 290 U.S. 398, 447–48 (1934) ("Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned."); *see also Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998) ("[I]t is not the province of this Court to substitute its judgement for that of . . . a legislative body."). Well established law in this Circuit mandates that

such policy decisions be left to the policymakers.  *See Buffalo Teachers*, 464 F.3d at 369; *Sanitation*, 107 F.3d at 994.  This deference is especially strong in cases like this where the state is not a party to the contract.  *See Buffalo Teachers*, 464 F.3d at 369 (noting that "when a law impairs a private contract, substantial deference is accorded," although "[p]ublic contracts are examined through a more discerning lens") .

Instead, in assessing the law's reasonableness, the Court looks to the law's tailoring.  In *WB Worthen Co.*, for example, the Supreme Court addressed an Arkansas state law that permanently exempted insurance payments to any Arkansas resident from seizure by the courts.  *See* 292 U.S. at 431.  Because the law "contain[ed] no limitations as to time, amount, circumstances, or need," the Court found it violated the Contract Clause.  *Id*. at 434.  In contrast, the law here is tailored in several ways.

First, the Guaranty Law applies to a subset of commercial leases.  It is limited to those commercial tenants whose businesses (1) were "required to cease serving patrons food or beverage for on-premises consumption . . . under executive order number 202.3," (2) were "required to close to members of the public under executive order number 202.7," or (3) were deemed "non-essential retail establishment subject to in-person limitations under . . . executive order number 202.6."  Admin. Code. § 22-1005(1).  Further, the law only prohibits the enforcement of a personal guaranty made by a natural person who is not the tenant—personal guaranties made by tenants or corporate entities are not affected.  *Id*. § 22-1005.

Second, although the Guaranty Law permanently extinguishes some personal liability for those to whom it applies, the law is still temporally limited in that it only applies to those debts that arose between March 2020 and March 2021.  *See* Admin. Code § 20-1005.  In this respect, the law is similar to those upheld in *Buffalo Teachers*, 464 F.3d at 373, and *Sullivan*, 959 F.3d at

69.  In those cases, although the challenged wage freezes were only in effect for a short period of time, they permanently deprived plaintiffs of benefits for which they had contracted, because neither law provided for retroactive back pay once the wage freeze was lifted.  *See Sullivan*, 959 F.3d at 58–60  (noting that the relevant statute allowed wage freezes "for one year"); *Buffalo Teachers*, 464 F.3d at 366—67, 371 (noting that the wage freeze was "temporary").  The fact that they were only in effect for a relatively short period contributed to the courts' determination in those cases that the law was reasonable.  *See Sullivan*, 959 F.3d at 68; *Buffalo Teachers*, 464 F.3d at 371–72.  Because the Guaranty Law will expire in March 2021, *see* Admin. Code § 20-1005, it is distinguishable from those wholly unlimited laws that courts have previously struck down, *see*, *e.g.*, *Allied Structural Steel Co.*, 438 U.S. at 250 (noting that the law at issue in that case "did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships—irrevocably and retroactively").

Third, the Guaranty Law leaves commercial landlords with other means through which they can recoup the rental income they have lost.  Here, for instance, Plaintiff remains free to attempt to recover unpaid rent and interest from tenants, charge late payment fees, terminate the tenant's right to possession, evict the tenant, and recover damages.  Dkt. 64, Ex. 5, §§ (1)(G).  The Court recognizes that, given the reality posed by the pandemic, these alternatives may be more difficult to enforce than a personal liability provision might be.  Indeed, for commercial tenants with few to no assets, the money may prove impossible to collect.  Nonetheless, landlords are not without the possibility of other recovery, providing another basis for a finding of reasonableness.  *See Richmond Mortg. & Loan Corp. v. Wachovia Bank & Tr. Co.*, 300 U.S. 124, 130 (1937) (noting that a law that "alters and modifies one of the existing remedies for

realization of the value of the" contract, but leaves the parties with other remedies allowing him to obtain the full value of the contract, does not violate the Contract Clause); *see also Elmsford*, 2020 WL 3498456 at *45 (refusing to find a Contract Clause violation where a challenged law left plaintiffs with a "suite of contractual remedies" with which they could recoup the funds for which they contracted).

None of this is said to minimize the Guaranty Law's harm to Plaintiff or others he seeks to represent, which the Court recognizes is substantial. Rather, these facts demonstrate that—under existing case law—the law is reasonable because is not without "limitations as to time, amount, circumstances, or need." *WB Worthen Co.*, 292 U.S. at 434. The Court thus concludes that the Guaranty law is reasonable, necessary, and passed to advance a legitimate public interest. For this reason, despite his showing of substantial impairment, Plaintiff has failed to plausibly plead a Contract Clause violation here.

## III. The Challenges Ordinances are Not Preempted by State Law

Plaintiffs next contend that the Harassment Laws and the Guaranty Law are preempted by New York state law under the doctrines of both conflict preemption and field preemption. Pl. Mem. at 28. Under New York law, "[a] local law will be preempted either where there is a direct conflict with a state statute (conflict preemption) or where the legislature has indicated its intent to occupy the particular field (field preemption)." *Eric M. Berman, P.C. v City of New York*, 37 N.E.3d 82, 86 (N.Y. 2015). Plaintiffs assert that the challenged laws are both field and conflict preempted. *See* Amended Compl. at 52. The Court concludes otherwise.

### A. Plaintiffs Cannot Establish Field Preemption

In New York, field preemption occurs when: (1) "a declaration of State policy evinces the intent of the Legislature to preempt local laws on the same subject matter" or (2) "the

Legislature's enactment of a comprehensive and detailed regulatory scheme in an area in controversy is deemed to demonstrate an intent to preempt local laws." *Matter of Chwick v. Mulvey*, 81 A.D.3d 161, 169–70 (N.Y. App. Div. 2010). "[W]hen the Legislature has demonstrated its intent to preempt the field, all local ordinances are preempted, regardless of whether they actually conflict with the state law." *Id.* at 172. Plaintiffs assert that the state government has occupied the field of pandemic response. They cite the state legislature's amendment of Executive Law § 29-a, which gave the Governor the power to "issue any directive during a state disaster emergency" that the Governor deemed "necessary to cope with the disaster." Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Injunctive and Declaratory Relief ("Pl. Mem.") (dated Jul. 22, 2020) (Dkt. 28) at 30 (citing N.Y. Exec. Law Art. 2-B § 29-a). Plaintiffs assert that "the Governor ha[s] used this authority to issue comprehensive Executive Orders to regulate landlord-tenant relationships during the Pandemic" shows an intent to occupy the field of COVID-19 response. *Id*. at 31.

To be sure, "[t]he more comprehensive a statutory scheme, the less 'room [there is] for local ordinances to operate.'" *Chwick*, 81 A.D.3d at 172 (quoting *Dougal v. County of Suffolk*, 102 A.D.2d 531, 533 (N.Y. App. Div. 1984)). The comprehensiveness of a statutory scheme, however, is not necessarily dispositive. In *Garcia v. N.Y.C. Department of Health & Mental Hygiene*, Plaintiffs challenged a local ordinance mandating influenza vaccines under a theory of field preemption. *See* 106 N.E.3d 1187, 1199–1200 (N.Y. 2018). Plaintiffs there pointed to a provision in the state's health code granting the Commissioner of the New York State Department of Health the power to "establish and operate such adult and child immunization programs as are necessary to prevent or minimize the spread of disease and to protect the public health," *id*. at 1200 (citing Public Health Law §206(1)), as well as the State's comprehensive

statutory scheme for school vaccinations, *id*. at 1201–02.  Despite this evidence, the New York Court of Appeals held that there was no field preemption because the statutory scheme demonstrated "the state legislature's recognition that municipalities play a significant role in vaccination programs."  *Id*. at 1202.  By contrast, in considering the state's regulatory scheme for handgun possession in *Chwick*, the court found that the state regulations left "'no room for local ordinances to operate.'"  81 A.D.3d at 172.

Here, the Governor's EOs look more like the statutory scheme in *Garcia* than that in *Chwick*.  Plaintiffs repeatedly cite the provisions of the EOs that prohibit local governments from "issu[ing] any local emergency order . . . inconsistent with, conflicting with or superseding the foregoing directives."  N.Y. Exec. Order No. 202.3 (Mar. 16, 2020), Dkt. 29 Ex. 18; *see* Amended Compl. ¶ 212, 213; *see also* Pl. Mem. at 18; *see also* Pl. Reply at 29.  But these provisions leave room for local regulations, such as those at issue here, that do not conflict.  Given that the state statutory scheme clearly leaves room for some local legislation, the Court finds that Plaintiffs have failed to plausibly plead field preemption.

### B.  The Laws Are Not Conflict Preempted

"Under the doctrine of conflict preemption, a local law is preempted by a state law when a right or benefit that is expressly given . . . by . . . State law. . . has then been curtailed or taken away by the local law." *Chwick*, 81 A.D.3d at 167–68 (internal citations omitted).  However, the "fact that both the State and local laws seek to regulate the same subject matter does not in and of itself give rise to an express conflict."  *Jancyn Mfg. Corp. v County of Suffolk*, 71 N.Y.2d 91, 97 (1987).

Plaintiffs argue that the Harassment Laws conflict with both the TSHA and the ERRA by (1) prohibiting rent collection expressly permitted by these laws and (2) expanding the pool of

persons entitled to relief.  *See* Pl. Mem. at 28–29.  But the Court has already concluded that the

Harassment Laws do not prevent the collection of rent.  *See* Section I.a, *supra*.  And to the extent

they cover more people than the THSA or ERRA do, this does not amount to a conflict because

the laws regulate different conduct: the Harassment Laws prohibit harassment by landlords,

while THSA and ERRA concern evictions and rental vouchers.  Dkt. 29 Exs. 26–27.

In *Garcia*, when the New York Court of Appeals was asked to determine whether a city

ordinance mandating influenza vaccines conflicted with a state law setting forth a list of

mandatory vaccinations that did not include influenza.  106 N.E.3d at 1200–01.  The court held

that there was no conflict preemption because "nothing in [the state law] suggests that the list of

vaccinations set forth therein is an exclusive one that may not be expanded by local

municipalities."  *Id*. at 1201 (citing Pubic Health Law § 2164); *see also Patrolmen's Benevolent

Ass'n of City of N.Y. v. City of N.Y.,* 142 A.D.3d 53, 61 (N.Y. App. Div. 2016) (finding no

conflict preemption when two laws "serve different objectives, and provide for different

remedies").

The same is true here.  The State's granting of certain protections to persons experiencing

financial distress due to the pandemic does not preclude the City from granting additional

protections to a wider group of New Yorkers, including those negatively impacted by the

pandemic in other ways.  Thus, no plausible allegation of conflict preemption has been raised as

to the Harassment Laws.

Finally, Plaintiff Bochner also alleges that the Guaranty Law is conflict preempted, but

fails to identify with which state law it conflicts.  The Court can find no state law prohibiting the

temporary limitation of personal guaranties, nor does any of the Governor's pandemic-related

EOs address this issue.  Accordingly, Plaintiffs have failed to plausibly plead conflict preemption as to any of the challenged laws.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted and Plaintiffs' claims are dismissed.  Plaintiffs' motion for a preliminary injunction and preliminary declaratory judgment is also denied.

The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 27 and 37 and to terminate this case.

Dated:     November 25, 2020
           New York, New York

_____
Ronnie Abrams
United States District Judge