UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC,  :  Civ. No. 20-cv-5301(RA)
Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias  :
Bochner, and 287 7th Avenue Realty LLC,                  :
                                                         :
                                       *Plaintiffs*,     :
                                                         :  **Oral Argument Requested**
                  v.                                     :
                                                         :
The City of New York, *a municipal entity*,              :
Bill de Blasio, *as Mayor of the City of New York*,      :
Louise Carroll, *Commissioner of New York City*          :
*Department of Housing Preservation &*                   :
*Development*, and Jonnel Doris, *Commissioner of*       :
*New York City Department of Small Business*             :
*Services*,                                              :
                                                         :
                                      *Defendants*.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR DECLARATORY RELIEF**

STROOCK & STROOCK & LAVAN LLP

Claude G. Szyfer
David J. Kahne
Darya D. Anichkova
180 Maiden Lane
New York, NY 10038
(212) 806-5400

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .........................................................................................4

    I.      COVID-19 AND ITS IMPACT ON NEW YORK CITY ....................................4

    II.     LEGISLATIVE RESPONSES TO THE PANDEMIC...........................................4

    III.    THE GUARANTY LAW .....................................................................................5

          A.     The Provisions of the Guaranty Law .......................................................... 7

                 1.     The Personal Guaranty in Commercial Leases ............................... 8

                 2.     The Guaranty Law's Impact on Plaintiff Bochner ........................ 10

ARGUMENT ...........................................................................................................11

    I.      THE GUARANTY LAW IS UNCONSTITUTIONAL ......................................12

          A.     The Guaranty Law Substantially Impairs Plaintiffs' Contractual Rights ....................................................................................................... 13

          B.     Significant and Legitimate Public Purpose................................................ 14

          C.     The Guaranty Law Is Neither a Reasonable Nor Appropriate Measure to Achieve the Public Purpose it was Designed to Serve........... 14

                 1.     The Guaranty Law Operates as a Permanent Extinguishment of  Guaranty Obligations............................................................... 15

                 2.     The Guaranty Law Does Not Reasonably Target Small Businesses or  Reopening Shuttered Businesses ......................... 17

                 3.     The Guaranty Law Reallocates Economic Burdens Solely and Squarely  on the Shoulders of Commercial Landlords .......... 18

                 4.     Guaranty Law Relief is Not Conditioned on Need ...................... 20

                 5.     The Guaranty Law Does Not Compensate Landlords for Damages  Suffered as a Result of the Impairment ...................... 22

          D.     The Process to Pass the Guaranty Law Was Unreasonable ..................... 23

CONCLUSION.........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>Ass'n of Surrogates and Supreme Court Reporters Within the City of New York</u>
<u>v. New York</u>,
940 F.2d 766 (2d Cir. 1991)............................................................................18, 19

<u>W. B. Worthen Co. ex rel. Bd. of Comm'rs of St. Improvement Dist. No. 513 of</u>
<u>Little Rock, Ark. v. Kavanaugh</u>,
295 U.S. 56 (1935)...................................................................................14, 21, 22

<u>Buffalo Teachers Fed'n v. Tobe</u>,
464 F.3d 362 (2d Cir. 2006).................................................................................16

<u>Caldarola v. Calabrese</u>,
298 F.3d 156 (2d Cir. 2002).................................................................................11

<u>East New York Sav. Bank v. Hahn</u>,
326 U.S. 230 (1945).....................................................................................2, 23, 24

<u>Home Bldg. & Loan Ass'n v. Blaisdell</u>,
290 U.S. 398 (1934)..........................................................................14, 15, 16, 22

<u>ITC Ltd. v. Punchgini, Inc.</u>,
482 F.3d 135 (2d Cir. 2007).................................................................................11

<u>Keystone Bituminous Coal Ass'n v. DeBenedictis</u>,
480 U.S. 470 (1987).............................................................................................19

<u>LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC</u>,
No. 12-cv-7311 (JPO), 2017 WL 1194681 (S.D.N.Y. Mar. 30, 2017),
<u>aff'd</u>, 744 F. App'x 710 (2d Cir. 2018)...............................................................11

<u>MedImmune, Inc. v. Genentech, Inc.</u>,
549 U.S. 118 (2007).............................................................................................11

<u>Melendez v. City of New York</u>,
16 F.4th 992 (2d Cir. 2021) .......................................................................... *passim*

<u>Nahabedian v. Intercloud Sys., Inc.</u>,
No. 15-CV-00669 (RA), 2016 WL 155084 (S.D.N.Y. Jan. 12, 2016)
(Abrams, J.)....................................................................................................11, 12

<u>Sanitation & Recycling Indus., Inc. v. City of New York</u>,
107 F.3d 985 (2d Cir. 1997)............................................................................19, 20

Sullivan v. Nassau Cnty. Interim Fin. Auth.,
    959 F.3d 54 (2d Cir. 2020), *cert. denied*, No. 20-560, 2021 WL 78148 (U.S.
    Sup. Ct. Jan. 11, 2021) ...................................................................................................12, 16

Sveen v. Melin,
    138 S. Ct. 1815 (2018) (Gorsuch, J., dissenting) ........................................................13, 14, 21

**Statutes**

11 U.S.C. § 502(b)(6) ..........................................................................................................24

28 U.S.C. § 2201 ...........................................................................................................1, 11

42 U.S.C. § 1983 ...................................................................................................................1

N.Y.C. Admin. Code § 22-1005 .........................................................................................1, 8

N.Y.C. Local L. 2020/55 ........................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 56 ............................................................................................................1, 11

Fed. R. Civ. P. 57 ............................................................................................................1, 11

Plaintiffs Elias Bochner and 287 7th Avenue Realty LLC (hereinafter "Plaintiffs") respectfully submit this memorandum of law in support of their motion for summary judgment on their second claim for relief, pursuant to Federal Rules of Civil Procedure 56 and 57, 28 U.S.C. § 2201, and 42 U.S.C. § 1983, which seeks to declare unconstitutional, New York City Admin. Code § 22-1005 (the "Guaranty Law").[1]

## PRELIMINARY STATEMENT

The sole issue that remains in this litigation is whether the Guaranty Law is unconstitutional under the Contracts Clause.  In its carefully considered, 55-page decision analyzing the jurisprudential evolution of the Contracts Clause and then applying that analysis (and nearly all of the seminal Supreme Court Contracts Clause caselaw) to the legislative record and the Guaranty Law itself, the Second Circuit found that the Guaranty Law is constitutionally infirm.  Melendez v. City of New York, 16 F.4th 992 (2d Cir. 2021).  Because of at least five separate features of the law, the Second Circuit concluded that the Guaranty Law was neither a reasonable nor appropriate means to achieve the City's professed public purpose.  While leaving it to this Court to decide the issue in the first instance, the Second Circuit identified its "serious concerns" that the Guaranty Law does not pass constitutional muster.  (Id. at 1048).  Specifically, the Second Circuit concluded:

> *First*, the Guaranty Law was neither a "temporary" nor "limited" impairment of contract, but a *permanent* impairment of contractual leases that extinguishes the personal guaranty for a 16-month period;
>
> *Second*, the law failed to reasonably target small businesses or the reopening of shuttered businesses;

---

[1] While Plaintiffs originally sought preliminary injunctive and declaratory relief (ECF No. 27) when the matter was previously before this Court, given that (1) the Guaranty Law has since expired, and (2) there exists no genuine dispute of material fact on the legal question of the law's constitutionality, Plaintiffs respectfully submit that this matter is more appropriately decided on a motion for summary judgment for declaratory relief.

*Third*, the law reallocated economic burdens solely and squarely on the shoulders of commercial landlords;

*Fourth*, the relief provided in the Guaranty Law was not conditioned on need; and

*Fifth,* the Guaranty Law failed to compensate landlords for damages suffered as a result of the contractual impairment.

These five defects, which the Second Circuit found "weigh[] heavily" against a finding of reasonableness or appropriateness, are immutable.  (Id. at 1040).  No new facts or arguments can change these fundamental characteristics of the law, and there is no genuine dispute as to any material fact in this litigation.  While the Second Circuit left room for the parties, on remand, to "identify . . . other circumstances relevant to determining whether the Guaranty Law is [] reasonable and appropriate," there are no "other circumstances" to identify.  (Id. at 1046).  The record in this case is complete and is entirely comprised of the defective Guaranty Law itself and its flimsy legislative history.

Beyond the five elemental flaws in the design of the law itself, the process to enact the Guaranty Law, as reflected in its legislative history, fails to pass constitutional muster.  The Contracts Clause requires a legislative body to actually analyze whether a draconian measure like the Guaranty Law is appropriate under the circumstances.  Among other things, a legislature should hear evidence of the societal ill to be remedied and the likely impact of the legislation.  There should be "intensive study of the consequences of what has been done, readjustment to changing conditions, and safeguarding the future on the basis of reasonable forecasts."  East New York Sav. Bank v. Hahn, 326 U.S. 230, 234-35 (1945).  With respect to the Guaranty Law, the Second Circuit found that "nothing in the record indicates [the] City Council review[ed] . . . any empirical evidence" or conducted any "intensive study."  Melendez, 16 F.4th at 1044-45.  The hurried law was passed with "studied indifference" to the rights of landlords and without any

reasonable conditions or considerations.  With only "anecdotal or conclusory statements by

Council members" (Id. at 1045) and letters from small business owners and community groups,

the City Council rendered the personal guaranty completely unenforceable for a 16-month period

and effectively invalidated hundreds of thousands of commercial leases.  The record shows that

the sum total of the analysis before passage was little more than a statistic that small businesses

employ nearly half of the City's workforce and anecdotal testimony from a handful of small

business owners about their individual fears of personal bankruptcy.  With that, the Council

permanently gutted hundreds of thousands of commercial real estate leases throughout the City,

repudiating millions in contractually-owed rent by defaulting tenants and leaving landlords

Citywide without any remedy.

Perhaps most damning, the City Council _twice_ renewed the Guaranty Law after its

enactment, first in September 2020 and then again in April 2021, without any analysis of the

City's economic progress or the pandemic's continuing impact on small businesses.  Not a single

hearing was held, no testimony was heard, and no further study was conducted.  As the Second

Circuit recognized, "[e]ven if the first omission might be excused by the evolving pandemic

emergency, that conclusion does not easily obtain for the latter omissions given that between the

summer of 2020 and the summer of 2021, businesses were slowly allowed to reopen, and

between March 2020 and March 2021, trillions of dollars in pandemic financial assistance were

appropriated, including hundreds of billions to assist small businesses."  (Id. at 1044).  The

Guaranty Law's legislative history is undisputed.  No further development of the record can

change the scant legislative analysis performed prior to the Guaranty Law's passage (and

subsequent renewals) and nothing can change the Second Circuit's conclusion that the record

does not reflect sufficient deliberation.  (Id. at 1046).  The Second Circuit's analysis of the

unreasonable and inappropriate features of the Guaranty Law, as well as the infirmities concerning the law's passage, compels the ineluctable conclusion that it violates the Contracts Clause.  For all the same reasons, no further proceedings are necessary, this Court should enter judgment for Plaintiffs as a matter of law, and declare the Guaranty Law unconstitutional.

## STATEMENT OF FACTS

The facts of this case have previously been presented to this Court, and are set forth in the Second Circuit's decision.  The facts presented here focus on Plaintiffs' Contracts Clause challenge to the Guaranty Law.

## I.  COVID-19 AND ITS IMPACT ON NEW YORK CITY

The pandemic caused by COVID-19 indisputably impacted and continues to impact New York State's and City's economies—and the real estate industry in particular.  Property owners, including Plaintiffs, saw a precipitous decline in their rental income, threatening their ability to pay their own bills, such as property taxes, mortgages, maintenance expenses and employee salaries.  (SMF ¶ 1).[2]  In New York City, landlords reported having been unable to receive as much as 80% in rent from their commercial tenants during the pandemic.  (Id.).

## II.  LEGISLATIVE RESPONSES TO THE PANDEMIC

On top of the panoply of measures undertaken by the Federal government in response to COVID-19, detailed by the Second Circuit, Melendez, 16 F.4th at 998-1001, the State Legislature conferred broad emergency powers on the Governor to address the pandemic by amending Section 29-a of the Executive Law.  (SMF ¶ 2).  Pursuant to that amendment, the Governor, by executive order, was empowered to issue any directive during a state disaster emergency—including an epidemic—that can only be overridden by a joint resolution of the

---

[2] "SMF" refers to Plaintiffs' Local Civil Rule 56.1 Statement of Material Facts, filed concurrently herewith.

Legislature.  (Id.).  The Governor passed several executive orders impacting small businesses in New York City.  (Id.).

The Legislature also passed two statutes to provide relief to both landlords and residential tenants:  The Emergency Rent Relief Act of 2020 ("ERRA") and the Tenant Safe Harbor Act ("TSHA").  (Id. ¶ 3).  The ERRA makes rental assistance vouchers available to landlords on behalf of those tenants who have experienced an increase in their rent burdens between April 1 through July 31, 2020 because of a loss in income due to COVID-19.  (Id.).  The TSHA prevents courts from issuing warrants of eviction for nonpayment of rent that accrues from March 7, 2020 until the executive orders on non-essential gatherings expire.  (Id.).

## III.    THE GUARANTY LAW

Despite the extensive panoply of existing protections, on April 21, 2020, the Council announced its intention to add three bills—including the Guaranty Law—to the Federal government's, Governor's and Legislature's directives.  In describing the bills, the Speaker of the Council explained: "[i]t's essential that New Yorkers get the rent cancellation they need." (Id. ¶ 4).  Yet, the laws were not targeted at New Yorkers who actually needed rent relief. Instead, in blunderbuss fashion, the Council laws covered broad swaths of the City, including those managing the pandemic and even faring well during the economic crisis.

The Guaranty Law was passed with little analysis or close consideration.  The Council's Committee on Housing and Buildings and its Committee on Consumer Affairs and Business Licensing held a hearing on April 28, 2020.  (Id. ¶ 5).  On April 29, 2020, the Committee on Small Business and the Committee on Consumer Affairs and Business Licensing held a hearing. (Id.).  No empirical evidence was presented at either hearing to support the necessity of the Guaranty Law.  The Council's hearings largely consisted of a patchwork of vague and anecdotal evidence.  The legislative analysis, too, reflects the roughshod nature of the process.  The

Committee Report merely summarized the bill's terms, providing no factual justification, no analysis of the bill's scope, and no consideration of any alternatives that might have been less burdensome or more narrowly tailored to those truly in need.  (Id.).  When Council Member Carlina Rivera asked Gregg Bishop, Commissioner of the City Department of Small Business Services, whether the department had heard from small business owners "regarding personal liability concerns," Bishop responded, "we have not."  (Id.). When the Vice Chair of Community Board 7, a supporter of the Guaranty Law, was asked by the Council "how many" of his members had been affected by personal guaranties during the pandemic, he stated that he did not have "the data."  (Id.).

In fact, the Council received just as much evidence directly in opposition to the Guaranty Law.  Council Member Justin Brannan, for example, spotlighted his "concerns that [the Guaranty Bill] may end up helping Louis Vuitton as much as it helps Louise['s] [P]izza."  (Id. ¶ 6).  Council Member Peter Koo warned the City "need[ed] to address th[e] ecosystem as a whole and find a comprehensive solution for all," including "small landlords who are struggling to make payments and meet their obligations."  (Id.).  At the hearings, a tenants' rights group identified a prescient issue presented by the Guaranty Law—"tenants who can pay but who are going to withhold rent out of solidarity."  (Id.).

Council members also recognized the Guaranty Law simply shifted contractual burdens from the tenant to the landlord.  As Council Member Kalman Yeger put it: "we are in tough times and everybody is hurting" and "it can't just be that the tenant is not going to pay rent because the tenant doesn't have income.  We have to find a way . . . to reduce the burden on all New Yorkers that are trying to come out of this."  (Id. ¶ 7).

No serious alternatives to the Guaranty Laws were discussed by the Council.  Council Member Fernando Cabrera questioned if it made "more sense to have the state and the city come up with a fund to pay for [] rent, just like Delaware."  (Id. ¶ 8).  But discussions went no further. Towards the end of the hearing, several Council Members openly expressed doubts about the constitutionality of the Guaranty Law, including one member who argued "[t]he city cannot retroactively adjust, amend a contract that was entered into by two parties at arm's length . . . . [e]mergency or not."  (Id.).

Despite these reservations, at a signing ceremony purporting to be a public hearing, on May 26, 2020, Mayor de Blasio signed the bill into law without further debate.  (Id. ¶ 10).  In total, the public and any interested parties had just 21 days to comment on the bill.  (Id.).

The City Council extended the Guaranty Law twice, first in September 2020 and again in March 2021.  (Id. ¶ 11).  No additional hearings were held, no additional analysis performed and no changes made to the Guaranty Law.  (Id.).  By the summer of 2020, businesses started to reopen and by March 2021, trillions of dollars in pandemic assistance funds had been appropriated, and hundreds of billions of dollars were expended to assist small businesses.  (Id.). None of the changing economic conditions were factored into the decision to extend the Guaranty Law.  (Id.)  Instead, the City Council summarily and imprecisely declared that the extension was designed to provide businesses with "an opportunity to not only survive but also to generate sufficient revenues to defray owed financial obligations."  (Id.).

## A.      The Provisions of the Guaranty Law

The Guaranty Law forever prohibits landlords from enforcing personal guaranties executed as security for commercial leases for defaults occurring between March 7, 2020 and

June 30, 2021.[3]  Specifically, the Guaranty Law, entitled "Personal Liability Provisions in Commercial Leases" provides that:

> A provision in a commercial lease or other rental agreement involving real property located within the city … that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, **shall not be enforceable** against such natural persons if the conditions of paragraph 1 and 2 are satisfied.

(N.Y.C. Admin. Code § 22-1005 (emphasis added)).  The law's first condition for application involves tenants required to cease serving members of the public under executive orders 202.3, 202.6 and 202.7, mostly impacting restaurants, bars, or non-essential retail establishments.  (Id. at § 22-1005(1)).  The second requirement is that the default or other event causing the personal guarantor to become personally liable must have occurred between March 7, 2020 and June 30, 2021, inclusive.  (Id.).  The Guaranty Law makes all personal guaranties non-enforceable regardless of the type of personal guaranty or the financial circumstances of the guarantor.  It permanently eliminates the landlord's ability to recoup uncollected rent payments owed by defaulting tenants, or to re-let commercial premises.

    1.    <u>The Personal Guaranty in Commercial Leases</u>

To put the prohibition in context, the personal guaranty is an essential part of commercial leasing in the City.  (SMF ¶ 13).  Depending on their credit-worthiness, personal guaranties enable tenants to lease space they would otherwise be precluded from leasing because of an owner's need or desire to place a more creditworthy tenant on the lease.  (Id.).  Guaranty agreements provide additional security where the tenant named on the lease is a corporation,

---

[3] N.Y.C. Local L. 2020/55 amended the N.Y.C. Administrative Code, adding §22-1005.

LLC, or other entity, such that the entity's officers or members would be protected from personal liability for the entity's debts.  (Id.).  Often, the guarantor is an owner or other principal of the business entity who agrees to be personally liable for the obligations of the tenant.  (Id.).

Guaranties take various forms.  (Id. ¶ 14).  A guaranty agreement may constitute a "full" guaranty, where the guarantor guarantees payment of the tenant's obligations through the end of the lease, whether or not the lease is terminated early or not.  (Id.).  Alternatively, it may be a limited guaranty—or a "good guy" guaranty—where a guarantor's obligations run through the date when the tenant surrenders possession of the premises to the landlord, which he can do prior to the end of a lease to avoid the balance of rent payments.  (Id.).  Guaranty agreements—and "good guy" guaranties, in particular—benefit both owners and tenants.  (Id.).  They encourage property owners to lease property to commercial tenants who may not be as creditworthy and they incentivize tenants to voluntarily surrender a leased property without the landlord having to resort to an eviction proceeding giving the landlord the ability to re-let a commercial space.  (Id.).  "Good guy" guaranties help prevent the worst-case scenario for small landlords—and for the overall health of the real estate market—when a tenant continues to occupy the premises during and beyond the lease term without paying rent.  (Id.).

The Guaranty Law forever cancels "good guy" and any other personal guaranties contained in New York City commercial leases for the period between March 1, 2020 and June 30, 2021.  (Id. ¶ 15).  The Guaranty Law's triggers do not contain any substantial injury requirement and therefore could be—and, indeed, have been—invoked by businesses that are well-capitalized or surviving the pandemic well.  (Id.).  Tens of thousands of small business landlords in New York City have been impacted by the Guaranty Law.  (Id.).

2.      The Guaranty Law's Impact on Plaintiff Bochner

Plaintiff Elias Bochner ("Mr. Bochner") is one of those landlords. Mr. Bochner is a shareholder of 287 7th Avenue Realty LLC, a limited liability company, which owns the property located at 287 7th Avenue, a mixed-use building with one commercial space. (Id. ¶ 16). Mr. Bochner and his family rely on the rental payments for their income and he requires "good guy" guaranties for all of his commercial tenants in the regular course of business. (Id.). Like thousands of commercial landlords throughout New York City, Mr. Bochner would not have entered into any lease agreements with a small business if not for the "good guy" guarantee given by the principals of the business. (Id.).

The principal of the commercial tenant at 287 7th Avenue—Sunburger 1 LLC ("Sunburger")—agreed to a "good guy" guaranty with a six-month notice provision. (Id. at ¶ 17). Starting in December 2019, even before the pandemic, Sunburger defaulted in paying full rent. (Id.). On March 20, 2020, Sunburger provided notice of its intent to surrender the property on September 20, 2020, agreeing to be liable for six months of rent, but avoiding rent beyond that point by handing the premises back over to Mr. Bochner. (Id.). Both parties agreed that pursuant to the "good guy" guaranty, Sunburger's principal pay rent until September 20, 2020. (Id.). However, Sunburger's principal defaulted, and because of the Guaranty Law, the personal guaranty could not be enforced and Mr. Bochner has no practical means under the commercial lease agreement to collect unpaid rent pursuant to the parties' agreement. (Id.). The Guaranty Law canceled the six months' rent payments the parties agreed upon and rendered the commercial lease virtually valueless for the period March 20, 2020 to September 20, 2020. (Id.).

The Guaranty Law threatens to financially harm Mr. Bochner's small business. (Id. ¶ 18). Because it has been unable to recover unpaid rent amounts (approximately $110,000), 287 7th Realty LLC may not have sufficient assets to continue to operate as a going concern and may

not be able to meet the tax obligations and operational expenses of the property.  (Id.).  Indeed, Mr. Bochner had to pay the $35,000 in taxes for the property due July 1, 2020 using his own personal funds.  (Id.).

## ARGUMENT

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law.'"  LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC, No. 12-cv-7311 (JPO), 2017 WL 1194681, at *6 (S.D.N.Y. Mar. 30, 2017), aff'd, 744 F. App'x 710 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).   Once the movant has demonstrated there is no genuine issue as to a material fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation and quotation marks omitted).   "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment."  ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir. 2007).

It is well-established that declaratory relief is appropriate in a "case of actual controversy" within the Court's jurisdiction—such as this one—and that such declaratory relief is dispositive.  See, e.g., MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126 (2007); 28 U.S.C. § 2201; Fed. R. Civ. P. 57.  "Under the Declaratory Judgment Act, a court must grant declaratory relief if the judgment will (1) 'serve a useful purpose in clarifying and settling the legal relations in issue'; or (2) 'afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'"  Nahabedian v. Intercloud Sys., Inc., No. 15-CV-00669 (RA), 2016 WL 155084, at *5 (S.D.N.Y. Jan. 12, 2016) (Abrams, J.) (quoting Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir. 1992)).

As this Court has previously ruled, declaratory relief is a remedy, and not an independent cause of action.  Id.  Here, in light of the expiration of the Guaranty Law, declaratory judgment, as sought in the Amended Complaint—rather than permanent injunctive relief—is the appropriate remedy.  Here, the parties clearly dispute the constitutionality of the Guaranty Law, thus satisfying the "case or controversy" requirement.  Moreover, declaratory relief is likewise proper in order to clarify the constitutionality of the Guaranty Law in light of the Second Circuit's decision, will provide full relief to Plaintiffs, and afford Plaintiffs (and all commercial landlords) relief from the ongoing uncertainty around the enforcement of personal guaranties in their leases for defaults occurring during the pendency of the Guaranty Law.

## I.    THE GUARANTY LAW IS UNCONSTITUTIONAL

The Second Circuit's decision dictates that Plaintiffs should succeed on their Contracts Clause claim as a matter of law, and Defendants can raise no triable issue of fact as to the Guaranty Law's constitutionality.  The test to determine whether a law treads unconstitutionally on contract rights is well-settled and previously applied by this Court.  The analysis proceeds in three steps and asks: (1) whether the contractual impairment is substantial; (2) whether the state action serves a legitimate purpose; and (3) whether the means chosen to accomplish the purpose are reasonable and necessary.  Sullivan v. Nassau Cnty. Interim Fin. Auth., 959 F.3d 54, 64 (2d Cir. 2020), cert. denied, No. 20-560, 2021 WL 78148 (U.S. Sup. Ct. Jan. 11, 2021).  The Circuit held that the Guaranty Law likely fails the third prong.  Melendez, 16 F.4th at 1038-47.  That conclusion should govern here.  The Guaranty Law is neither reasonable nor appropriately drawn to accomplish its purported public purpose.

Before engaging in this three-pronged balancing analysis of the constitutionality of the Guaranty Law, in an effort to resolve the parties' disputed level of deference to afford the legislature in these statutory challenges, the Second Circuit reviewed the "jurisprudential route"

of the Contracts Clause in a careful and detailed discussion.  The majority opinion traced the constitutional provision's development to emphasize that the Contracts Clause maintains vitality and relevance and that its "limitation on state power" is not "illusory."  Id. at 1027.[4]  While the three-pronged "balancing test" remains, the Circuit recognized that if the "Contracts Clause is to retain any meaning at all, . . . it must be understood to impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power."  Melendez, 16 F.4th at 1028 (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 242 (1978)).  The Circuit concluded that courts should not simply defer or acquiesce to legislative judgment.  Instead, as Plaintiffs argued, the standard is "more demanding" than a rational basis review, although not as exacting as strict scrutiny.

Importantly, informing the more demanding review within the Contracts Clause balancing test is the severity of the impairment at issue.  Plaintiffs argued and the Circuit agreed that where, as here, a law operates as a "severe impairment," the Contracts Clause analysis is pushed into a more "careful examination of the nature and purpose of the state legislation."  Id. at 1029 (quoting Allied Structural Steel, 438 U.S. at 245).  The same standard of review and analysis applies here.

### A.      The Guaranty Law Substantially Impairs Plaintiffs' Contractual Rights

This Court has previously held, and the Second Circuit agreed, that the Guaranty Law significantly impairs personal guaranty agreements.  Melendez, 16 F.4th at 1033.  The imposition of the legislation, like the pandemic itself, was entirely unforeseeable and the

---

[4] Recent Supreme Court case law, too, has amplified the unqualified language of the constitutional text of the Contracts Clause and cautioned against a malleable and uncertain standard upon which to review legislative enactments.  See Sveen v. Melin, 138 S. Ct. 1815, 1827 (2018) (modern case law permitting a state to substantially impair contractual obligations so long as it is "reasonable," seems "hard to square with the Constitution's original meaning") (Gorsuch, J., dissenting).

personal guaranty is a "primary inducement" for a commercial landlord to enter into a lease with a tenant.  The Guaranty Law obliterates the personal guaranty and reasonable expectations in existing commercial leases.  It therefore operates as a severe impairment requiring more careful examination and scrutiny.

### B.       Significant and Legitimate Public Purpose

On the second prong, the Second Circuit held that "the record . . . plausibly suggests a significant and legitimate purpose for the Guaranty Law."  (Id. at 1038).  Plaintiffs disagree with that finding, particularly since the Circuit recognized that the record demonstrates the Guaranty Law benefits only "a favored group: commercial-lease guarantors."  (Id. at 1037) (citation and quotation marks omitted).  Narrowly meddling in individual commercial leases to reallocate contractual burdens to landlords does not benefit all New Yorkers or further a legitimate public purpose.  Nevertheless, even if the Guaranty Law was aimed at serving a significant and public purpose, the legislation must still be drawn in a reasonable and appropriate way—which did not occur here.

### C.       The Guaranty Law Is Neither a Reasonable Nor Appropriate Measure to Achieve the Public Purpose it was Designed to Serve

Applying the principles identified in Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398 (1934) and its progeny, the Second Circuit identified "at least five serious concerns about" Guaranty Law.  (Melendez, 16 F.4th at 1047).  Each of these defective features demonstrates that the ill-fitting Law was passed "without moderation or reason," and when evident and far more reasonable courses of action would have served the Council's purpose equally well.  W. B. Worthen Co. ex rel. Bd. of Comm'rs of St. Improvement Dist. No. 513 of Little Rock, Ark. v. Kavanaugh, 295 U.S. 56, 60-61 (1935); Sveen, 138 S. Ct. at 1829 (Gorsuch, J. dissenting).

1.      The Guaranty Law Operates as a Permanent Extinguishment of
        Guaranty Obligations

The first aspect of the Guaranty Law raising "serious concerns" for the Second Circuit is

that it was not a "temporary" or "limited" impairment of contract.  Melendez, 16 F.4th at 1038-

39.  The Guaranty Law *permanently* cancels the enforceability of personal guaranties for a 16-

month period.  As the Circuit recognized, "although the Guaranty Law pertains only to rent

arrears arising between March 7, 2020, and June 30, 2021, it does not simply defer guaranty

obligations until the conclusion of that period," but instead "permanently and entirely

extinguishes them."  (Id. at 1039).  For any lease entered into, even leases commencing before

the law's enactment, despite signing leases entitling them to rent payments, landlords were not

paid while a tenant continued to occupy the premises, nor could they re-let the premises to

attempt to recoup the losses during that period.  The City Council could have easily declared the

moratorium on guaranties "temporary" or extended the time within which the guarantor could

pay without canceling the underlying debt.  It unreasonably chose not to do so.

As the Second Circuit held, the seminal Supreme Court case of Home Bldg. & Loan

Ass'n v. Blaisdell, is directly on point and compels the conclusion that the permanence of the

law renders it unreasonable.  290 U.S. 398.  In Blaisdell, in order to forestall a massive

foreclosure crisis during the Great Depression, Minnesota passed the Minnesota Mortgage

Moratorium Act, giving mortgagors an extended redemption period in which they could remain

in possession of the property.  (Id. at 441).  The law was upheld by the Supreme Court because

by deferring rather than destroying the mortgage obligation, the underlying "integrity of the

mortgage indebtedness is not impaired."  (Id. at 445).  The mortgagor was still required to pay

the fair rental value of the premises and interest on the mortgage, albeit at a later point in time.

(Id.).  Thus, even in the midst of the Great Depression, owners of property could still collect

income because the Supreme Court recognized that legislation must be "appropriate to the emergency" and only upon "reasonable conditions." (Id. at 479). The legislature protected both mortgagor and mortgagee by passing legislation that had the interests of both parties in mind. (Id.).

There is no reason why "similar conditions" could not have been enacted here. Just as in Blaisdell, the City Council could have provided relief "appropriate to the emergency" by giving commercial tenants a temporary reprieve or moratorium without forever eviscerating the "integrity" of the security to which the landlord was entitled. Instead, the Council canceled the contractual protection, adopting a means "so destructive of contract rights" as to render the Guaranty Law unconstitutional. Melendez, 16 F.4th at 1039. It was wholly unreasonable to permanently and entirely extinguish the guaranty rights, completely ignoring the interests of commercial landlords.

Before this Court and again before the Second Circuit, the City pointed to Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362 (2d Cir. 2006) and Sullivan v. Nassau Cnty. Interim Fin. Auth., 959 F.3d 54 (2d Cir. 2020), to suggest that permanent impairments may be constitutional. But as the Second Circuit found, that argument "misses the point." Melendez, 16 F.4th at 1040. In both Buffalo Teachers and Sullivan, public employees were deprived of scheduled wage *increases* on a prospective basis, *not of the wages themselves.* Teachers and public employees still received their regular salaries. Landlords impacted by the Guaranty Law, in contrast, receive *nothing.* Even if plaintiffs in Buffalo Teachers and Sullivan lost scheduled wage increases permanently, it is far more reasonable and appropriate to eliminate a planned increase in salary in the midst of an economic emergency than it is to "forever den[y] the landlord the full

16

guaranteed amount for that sixteen-month period" and "entirely extinguish[]" all personal

guaranties in commercial leases in the City.  Melendez, 16 F.4th at 1039, 1040.

The Guaranty Law's permanence and the absence of any mitigating conditions render it

unconstitutional.  No discovery or further development of the record can change these

unassailable facts.

2.      The Guaranty Law Does Not Reasonably Target Small Businesses or
        Reopening Shuttered Businesses

*Second*, if the purpose of the Guaranty Law was to prevent a guarantor's personal

bankruptcy, as the City asserts, then the legislation was not drawn reasonably or appropriately to

achieve that public purpose.  The Guaranty Law was not tailored to help "shuttered small

businesses survive the pandemic so that they can reopen after the emergency, ensuring

functioning neighborhoods throughout the City."  Melendez, 16 F.4th at 1040.  The law is based

on the fundamental assumptions that (1) shuttered businesses are owned by their individual

guarantors, (2) "that these owner-guarantors would be financially ruined if required to pay their

businesses' rent arrears," and (3) "that financially ruined owners would be unlikely to reopen

shuttered businesses."  Id.  However, as the Second Circuit observed, the Guaranty Law "does

not condition the relief it affords on guarantors owning shuttered businesses or, even if they do,

on their ever reopening those businesses.  Rather, guarantors receive the full relief afforded by

the Guaranty Law even if they never reopen (or intend to reopen) their businesses."  (Id. at

1041).  In other words, there is a glaring "missing link" between the Guaranty Law's stated

purpose and the means by which it seeks to accomplish that purpose.  (Id.).

It merits emphasizing all the ways in which the legislature *could have* fashioned a more

targeted law.  In its analysis, the Second Circuit repeatedly observed the many ways in which

similar laws, serving similar public purposes during this pandemic, were appropriately, and

therefore, constitutionally tailored.  The Restaurant Revitalization Fund, for example, which provided aid to restaurants struggling during COVID-19, conditioned the aid and did not provide benefits to restaurants that were permanently closed or that could not certify that the funds were not necessary to support continuing operations.  (Id. at 1041).  The CARES Act and even New York's statutory eviction moratoria applied only to those tenants in need, who claimed pandemic-related hardship.  None of these protections were contained in the overbroad and ill-suited Guaranty Law or even considered during legislative deliberations.  The law simply eviscerates a crucial provision from commercial leases throughout the City.  As one Council Member presciently observed at the time of the Guaranty Law's passage, "*[t]his feels unconstitutional*.  We don't have a legal authority to go backwards into a contract that was entered into five, six, seven . . . years ago . . . and amend [it] retroactively to remove a provision."  (SMF ¶ 8).  The failure of the Guaranty Law to condition relief on reopening shuttered businesses is fundamentally unreasonable and cannot be changed by discovery or any additional record evidence.  Indeed, the "missing link" that the Second Circuit identified, Melendez, 16 F.4th at 1041, cannot be found anywhere in the record.

    3.    <u>The Guaranty Law Reallocates Economic Burdens Solely and Squarely on the Shoulders of Commercial Landlords</u>

*Third*, the Guaranty Law directly foists the entire economic responsibility for the pandemic's impact on commercial landlords.  Permanently excusing the personal guarantors comes at the direct expense of landlords, rather than balancing the burden with commercial tenants or with the City's citizenry, more generally.  In <u>Ass'n of Surrogates and Supreme Court Reporters Within the City of New York v. New York</u>, the Second Circuit held that when legislation places costs "on the few shoulders" of one particular class of people, rather than the "many shoulders of the citizens of the state," it violates the Contracts Clause.  <u>Melendez</u>, 16

18

F.4th at 1042 (*citing* Ass'n of Surrogates and Supreme Court Reporters Within the City of New York v. New York, 940 F.2d 766, 773 (2d Cir. 1991)).

Just as in Ass'n of Surrogates, the Guaranty Law places the cost of achieving its stated purpose—helping small businesses survive the pandemic—squarely on the "few shoulders" of one party, commercial landlords, rather than allocating the burden on the "citizenry that would benefit therefrom." (Id.). Moreover, in the process, the City "upset[] lawfully contracted-for expectations between landlords and guarantors," permanently eliminating the landlords' rights and the guarantors' responsibilities with respect to rent defaults during the prescribed period. (Id.). The private nature of the contracts at issue here does not mitigate this concern: as the Second Circuit observed, while Ass'n of Surrogates is a public contract case, "reasonableness and appropriateness concerns are raised by a legislative decision to provide financial relief to certain persons not through public funds but by destroying the contract expectations of other persons, particularly persons not responsible for the circumstances warranting relief." (Id.).

Moreover, in direct contrast to other cases in which permanent impairments have been upheld by the courts, where the "burden of contractual impairment was tailored to the party causing the public harm that the state sought to mitigate," landlords here are not alleged to be "in any way responsible for the economic problem that the Guaranty Law seeks to address." (Id. (*distinguishing* Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 504-06 (1987); Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 990, 994 (2d Cir. 1997)).

At the time of its passage, the City Council understood that the burden of the Guaranty Law falls entirely on landlords. Council Member Rivera remarked that: "[l]andlords are also facing struggles and the small and nonprofit landlords need further financial support" and Council Member Yeger noted that, "it's not that the landlord's wrong . . . . [W]e are in tough

times and everybody is hurting and it can't just be that the tenant is not going to pay rent because the tenant doesn't have income.  We have to find a way . . . to reduce the burden on all New Yorkers that are trying to come out of this."  (Id. at 1045 n.79).  The inappropriate foisting of the burden of the pandemic's impact on commercial leasing solely on landlords is an immutable feature of the Guaranty Law that cannot be supplemented or recast by additional discovery or record evidence.

        4.    <u>Guaranty Law Relief is Not Conditioned on Need</u>

     *Fourth*, and perhaps most glaringly, the Guaranty Law permanently absolves all lease guarantors of any responsibility for up to sixteen months of rent arrears regardless of their ability to pay.  There is no "substantial injury" or "substantial need" requirement for commercial tenants to avail themselves of the Guaranty Law.  The City Council could have easily included such a requirement to prevent well-capitalized commercial tenants from taking advantage of the Guaranty Law despite not needing its protections.  As the Second Circuit recognized, "[m]any forms of pandemic relief are conditioned on individual applicants demonstrating need or hardship."  <u>Melendez</u>, 16 F.4th at 1043.  In support, the Circuit pointed to the CARES Act stimulus payments, which were conditioned on gross income, and the American Rescue Plan's Restaurant Revitalization Fund, which provided financial assistance based on eligible businesses' pandemic-related revenue losses.  <u>Id.</u>  Even New York's pandemic eviction moratorium only applied to those claiming COVID-19 related hardship.  <u>Id.</u>  The concept of a hardship requirement was clearly known to the City Council.  At the time of the Guaranty Law's passage, one landlord strongly urged the Council to "take into account the health and financial well-being of both landlords and tenants in crafting legislation," and, "make it incumbent on tenants to show that they are unable to pay their rent due to COVID-19."  <u>Id.</u> at 1007 (citation omitted).

A substantial injury or need requirement would have achieved the stated goal of business owners not "fac[ing] the loss of their business and personal financial ruin or bankruptcy" without a wholesale repudiation of virtually all personal guaranties in certain commercial leases.  Id. at 1005.  It was a far more precise, far more moderate and available course to target the same public purpose that the City Council failed to enact.

The lack of a need condition undermines the Guaranty Law under well-settled precedent.  For example, the Second Circuit noted that in Kavanaugh, "[t]he omission of any need condition weighed against the reasonableness of mortgage moratorium relief."  Melendez, 16 F.4th at 1043 (citing Kavanaugh, 295 U.S. at 61).  In Kavanaugh, the Supreme Court found the impairment of contract to be unreasonable where the law did "not even [] require[] that the debtor shall satisfy the court of his inability to pay."  Kavanaugh, 295 U.S. at 61.

As the Second Circuit noted, the fact that Guaranty Law relief is limited to guarantors of businesses that were forced to shutter or reduce operations during the pandemic does not, on its own, "mean that a particular guarantor cannot pay rent arrears, particularly when temporally cabined by a good-guy provision.  Nor does it necessarily mean that a particular landlord is better able than a particular guarantor to bear the financial burden of a tenant's inability to pay rent."  (Id.).  If the purpose of the Guaranty Law was to prevent a guarantor's personal bankruptcy, then the legislation was not drawn reasonably or appropriately because it impacts *all* personal guaranties, not just those involving guarantors facing bankruptcy.  A hardship or substantial injury requirement would have "serve[d] the state's purposes equally well."  Sveen, 138 S. Ct. at 1829 (Gorsuch, J. dissenting) (citation omitted).  The failure to include a need or substantial injury requirement is a fatal defect of the law and it cannot be changed by discovery

or supplemented by additional record evidence.  The Second Circuit itself noted that "[t]he record here provides no similar showing."  <u>Melendez</u>, 16 F.4th at 1045.

     5.    <u>The Guaranty Law Does Not Compensate Landlords for Damages Suffered as a Result of the Impairment</u>

*Fifth*, the law is unreasonable because it fails to provide landlords any compensation for damages or losses sustained as a result of their guaranties' impairment.  The law permanently deprives landlords of the protection of a guaranty for up to sixteen months of rent arrears and "the failure to condition such relief on some compensation for, or mitigation of, tax and other obligations that the landlord (or his principal) is required to satisfy, is a further reason to question the reasonableness and appropriateness of the Guaranty Law."  <u>Id.</u> at 1046.

The damages are not theoretical.  Plaintiff Bochner, for example, has been unable to recover unpaid rent amounts totaling approximately $110,000 and had to pay the $35,000 in taxes for the property due July 1, 2020 using his own personal funds.  (SMF ¶ 18).  The Guaranty Law does not compensate landlords like Mr. Bochner for damages suffered as a result of the personal guaranty impairment.

In contrast, the moratorium upheld in <u>Blaisdell</u> "allowed a delinquent mortgagor to remain in possession of premises on the condition that he pay the mortgagee reasonable rent throughout the moratorium period," thus ensuring that the mortgagee was "not left without compensation for the withholding of possession."  <u>Melendez</u>, 16 F.4th at 1046-47 (*quoting* <u>Home Bldg. & Loan Ass'n v. Blaisdell</u>, 290 U.S. at 445).  As the Second Circuit observed, the compensation condition "was an important factor in identifying the mortgage moratorium in <u>Blaisdell</u> as a reasonable means to provide temporary and limited economic relief to mortgagors."  <u>Id.</u> at 1045-46.  Likewise, "the absence of a compensation requirement informed the identification of a Contracts Clause violation in <u>Kavanaugh</u>."  <u>Id.</u> (*citing* <u>Kavanaugh</u>, 295

U.S. at 61).  The unreasonable failure of the Guaranty Law to compensate landlords at all for invalidating all personal guaranties is unchangeable.  Like the other four concerns discussed above, it cannot be altered through discovery or supplemented by additional record evidence.

### D.      The Process to Pass the Guaranty Law Was Unreasonable

The Council's failure to address any of the five features identified by the Second Circuit (or any other reasonable conditions) is not surprising.  The Guaranty Law was passed after a one-day hearing consisting mainly of testimony from advocacy groups and interested parties.  (SMF ¶¶ 4-10).  In the hurried lead-up to its passage, no basic analysis—expert or otherwise—was submitted.  (Id.).  Despite the City's professed public purpose, there is not a scintilla of factual support in the legislative record evidencing a "wave of personal bankruptcies" that would occur without the Guaranty Law, or any estimates of the number of such personal bankruptcies.  Nor is there any evidence or testimony suggesting that the enforcement of personal guaranties would lead small businesses to close or fire their employees, or that City residents were denied any services on account of the enforceability of the personal guaranty.  (Id.).

The "fiscal impact statement" in the legislative record, for example, is a two-page, pro forma document summarizing the legislation with no analysis.  (Id. ¶ 9).  The Committee Report similarly summarizes the bill's terms and the hearing record consists largely of one-page letters, including form letters, from self-interested individuals and advocacy groups.  (Id.).  And the law was extended *twice,* despite continuous opposition and without any adjustment, additional analysis, or expert opinion.  (Id. ¶ 11).

The Supreme Court's decision in Hahn underscores the unreasonableness of the legislative process and lack of deliberation here.  See East New York Sav. Bank v. Hahn, 326 U.S. 230 (1945).  In Hahn, before imposing a foreclosure moratorium, the legislature established two separate, joint legislative committees to review the mortgage situation in New York and

conduct an "exhaustive study" of the moratorium.  (Id. at 233).  The Supreme Court found the law to be constitutional because it was frequently adjusted over time and reanalyzed as circumstances changed, and because the legislature relied on the considered judgment of expert opinion, documentary evidence and economic arguments all outside the "pooled general knowledge of its members."  (Id. at 234).  Among other things, the Court held that the legislature should hear evidence of the societal ill to be remedied and the likely impact of the legislation. There should be "intensive study of the consequences of what has been done, readjustment to changing conditions, and safeguarding the future on the basis of reasonable forecast."  (Id. at 234-35).

        None of that was done here.  Having reviewed the entire legislative history of the Guaranty Law, the Second Circuit recognized that "nothing in the record indicates City Council review of any empirical evidence" or any "intensive study."  Melendez, 16 F.4th at 1044-45. Had the Council given the proposed legislation even a modicum of scrutiny or held a hearing with evidence and experts, it would have recognized that the Guaranty Law fails to serve any of its stated purposes.  The law will not stem a "wave of personal bankruptcies," since the purpose behind the "good guy" guaranty in particular, is to prevent personal bankruptcy and ensure that commercial premises are returned to the landlord without drawn out proceedings.  Moreover, protections already exist in the bankruptcy code to shield a commercial tenant or guarantor on account of any failure to pay rent.  See 11 U.S.C. § 502(b)(6) (capping a landlord's claim in bankruptcy for damages resulting from the termination of a lease).

        Nor will the law prevent unemployment or the closure of small business, no matter how many New Yorkers small businesses employ.  By the time a landlord invokes the personal guaranty, a commercial tenant has already defaulted and any hope of continuing to operate is

likely long gone.  If the Council had developed a substantive record, it would have realized that

the Law will not create "an opportunity" for small businesses to generate revenue.  Instead, once

the Guaranty Law expires, personal guarantors will inevitably assert its protection, leaving the

commercial tenant to pay all accrued unpaid rent at once or face eviction.  The resulting harm to

tenants demonstrates the Council's wholly illogical approach and fundamental misunderstanding

of the basic workings of the real estate market.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs'

motion for summary judgment and declare the Guaranty Law unconstitutional.  There are no

genuine issues of material fact, and as a matter of law, the Guaranty Law violates the Contracts

Clause of the U.S. Constitution.


Dated:   New York, New York
         March 28, 2022

STROOCK & STROOCK & LAVAN LLP


By: */s/ Claude G. Szyfer*
    Claude G. Szyfer
    David J. Kahne
    Darya D. Anichkova
    180 Maiden Lane
    New York, NY 10038
    (212) 806-5400
    cszyfer@stroock.com
    dkahne@stroock.com
    danichkova@stroock.com

    *Attorneys for Plaintiffs*