UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias Bochner, and 287 7th Avenue Realty LLC, | Civ. No. 20-cv-5301(RA) |
| *Plaintiffs*, | **Oral Argument Requested** |
| v. | |
| The City of New York, *a municipal entity*, Bill de Blasio, *as Mayor of the City of New York*, Louise Carroll, *Commissioner of New York City Department of Housing Preservation & Development*, and Jonnel Doris, *Commissioner of New York City Department of Small Business Services*, | |
| *Defendants*. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR DECLARATORY RELIEF**

 

STROOCK & STROOCK & LAVAN LLP

Claude G. Szyfer
David J. Kahne
Darya D. Anichkova
180 Maiden Lane
New York, NY 10038
(212) 806-5400

*Attorneys for Plaintiffs*

Pursuant to Local Civil Rule 56.1, in support of their accompanying motion for declaratory relief (the "Motion"), Plaintiffs Elias Bochner and 287 7th Avenue Realty LLC (hereinafter "Plaintiffs") respectfully submit the following statement of material facts as to which Plaintiffs contend there is no genuine issue to be tried.

## UNDISPUTED MATERIAL FACTS

**I.       COVID-19 and its Impact on New York City**

1.       As a result of the ongoing COVID-19 pandemic, property owners, including Plaintiffs, saw a precipitous decline in their rental income, threatening their ability to pay their own bills, such as property taxes, mortgages, maintenance expenses and employee salaries. (ECF No. 32 ¶ 30; ECF No. 31 ¶ 37; ECF No. 52 ¶¶ 10-11).  In New York City, landlords reported having been unable to receive as much as 80% in rent from their commercial tenants during the pandemic.  (ECF No. 29-3 at 2[1]).

**II.      Legislative Responses to the Pandemic**

2.       In response to COVID-19, the State Legislature conferred broad emergency powers on the Governor to address the pandemic by amending Section 29-a of the Executive Law.  (ECF No. 29 ¶ 22).  Pursuant to that amendment, the Governor, by executive order, was empowered to issue any directive during a state disaster emergency—including an epidemic—that can only be overridden by a joint resolution of the Legislature.  (Id. at ¶¶ 23-24; ECF No. 29-15 at 2-3).  The Governor passed several executive orders impacting small businesses in New York City.  (ECF No. 29 ¶¶ 27-43).

3.       The New York State Legislature also passed two statutes to provide relief to both landlords and residential tenants:  The Emergency Rent Relief Act of 2020 ("ERRA") and the

---

[1] Page numbers refer to the pagination in the ECF filing stamps on documents filed in this action.

1

Tenant Safe Harbor Act ("TSHA").  (ECF No. 29 ¶¶ 45-46).  The ERRA makes rental assistance vouchers available to landlords on behalf of those tenants who have experienced an increase in their rent burdens between April 1 through July 31, 2020 because of a loss in income due to COVID-19.  (Id.; ECF No. 29-26 at 2-3).  The TSHA prevents courts from issuing warrants of eviction for nonpayment of rent that accrues from March 7, 2020 until the executive orders on non-essential gatherings expire.  (ECF No. 29 ¶¶ 45-46; ECF No. 29-27 at 2-3).

### III.     The Guaranty Law

4.      On April 21, 2020, the Council announced its intention to add three bills—including the Guaranty Law—to the Federal government's, Governor's and Legislature's directives.  (ECF No. 29 ¶ 54; ECF No. 29-32 at 2).  In describing the bills, the Speaker of the Council explained: "[i]t's essential that New Yorkers get the rent cancellation they need."  (ECF No. 29-32 at 2).

5.      The Council's Committee on Housing and Buildings and its Committee on Consumer Affairs and Business Licensing held a hearing on April 28, 2020.  (ECF No. 29 ¶ 55). On April 29, 2020, the Committee on Small Business and the Committee on Consumer Affairs and Business Licensing held a hearing.  (Id.).  The Committee Report summarized the bill's terms, providing no factual justification, no analysis of the bill's scope, and no consideration of any alternatives that might have been less burdensome or more narrowly tailored to those truly in need.  (Id. ¶¶ 62-64; ECF No. 29-36 at 41).  When Council Member Carlina Rivera asked Gregg Bishop, Commissioner of the City Department of Small Business Services, whether the department had heard from small business owners "regarding personal liability concerns," Bishop responded, "we have not."  (ECF No. 29-34 at 73).  When the Vice Chair of Community Board 7, a supporter of the Guaranty Law, was asked by the Council "how many" of his

2

members had been affected by personal guaranties during the pandemic, he stated that he did not have "the data." (Id. at 141).

6. Council Member Justin Brannan spotlighted his "concerns that [the Guaranty Bill] may end up helping Louis Vuitton as much as it helps Louise['s] [P]izza." (ECF No. 29-31 at 38). Council Member Peter Koo warned the City "need[ed] to address th[e] ecosystem as a whole and find a comprehensive solution for all," including "small landlords who are struggling to make payments and meet their obligations." (Id. at 63). At the hearings, a tenants' rights group identified a prescient issue presented by the Guaranty Law—"tenants who can pay but who are going to withhold rent out of solidarity." (ECF No. 29-33 at 41, 45).

7. Council members also recognized the Guaranty Law simply shifted contractual burdens from the tenant to the landlord: as Council Member Kalman Yeger put it: "we are in tough times and everybody is hurting" and "it can't just be that the tenant is not going to pay rent because the tenant doesn't have income. We have to find a way . . . to reduce the burden on all New Yorkers that are trying to come out of this." (ECF No. 29-34 at 91-92).

8. Council Member Fernando Cabrera questioned if it made "more sense to have the state and the city come up with a fund to pay for [] rent, just like Delaware," but discussions went no further. (ECF No. 29 ¶ 60; ECF No. 29-33 at 52). Towards the end of the hearing, several Council Members openly expressed doubts about the constitutionality of the Guaranty Law, including one member who argued "[t]he city cannot retroactively adjust, amend a contract that was entered into by two parties at arm's length . . . . [e]mergency or not . . . . *This feels unconstitutional.* We don't have a legal authority to go backwards into a contract that was entered into five, six, seven . . . years ago . . . and amend [it] retroactively to remove a provision." (ECF No. 29 ¶ 61; ECF No. 29-34 at 90) (emphasis added).

9. The "fiscal impact statement" in the legislative record is a two-page, pro forma document summarizing the legislation with no analysis.[2] The hearing record consists largely of one-page letters, including form letters, from self-interested individuals and advocacy groups. (See, e.g., ECF No. 38-52 at 148-69; ECF No. 38-53 at 2-195; ECF No. 38-54 at 2-180).

10. Despite these reservations, at a signing ceremony purporting to be a public hearing, on May 26, 2020, Mayor de Blasio signed the bill into law without further debate. (ECF No. 58 ¶ 129; ECF No. 29 ¶ 65). In total, the public and any interested parties had just 21 days to comment on the bill. (ECF No. 58 ¶ 130).

11. The City Council extended the Guaranty Law twice, first in September 2020 and again in March 2021. (Melendez v. City of New York, 16 F.4th 992, 1005 n. 27 (2d Cir. 2021); N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50). No additional hearings were held, no additional analysis performed and no changes made to the Guaranty Law. (N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50). By the summer of 2020, businesses started to reopen and by March 2021, trillions of dollars in pandemic assistance funds had been appropriated, and hundreds of billions of dollars were expended to assist small businesses. (Melendez, 16 F.4th at 1044). None of the changing economic conditions were factored into the decision to extend the Guaranty Law. (N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50). Instead, the City Council summarily and imprecisely declared that the extension was designed to provide businesses with "an opportunity to not only survive but also to generate sufficient revenues to defray owed financial obligations." (N.Y.C. Local L. 2020/98(9); N.Y.C. Local L. 2021/50(9)).

---

[2] Council of the City of New York Finance Division, Fiscal Impact Statement, Proposed Int. No. 1932-A, Small Business Committee, May 7, 2020, *available at* https://legistar.council.nyc.gov/View.ashx?M=F&ID=8405256&GUID=B6EE6978-34B0-4ADF-987E-4A4C0E811C78.

### A. The Provisions of the Guaranty Law

12. N.Y.C. Local L. 2020/55 amended the N.Y.C. Administrative Code adding §22-1005. (N.Y.C. Admin. Code §22-1005). The Guaranty Law forever prohibits landlords from enforcing personal guaranties executed as security for commercial leases for defaults occurring between March 7, 2020 and June 30, 2021. (Id.). Specifically, the Guaranty Law, entitled "Personal Liability Provisions in Commercial Leases" provides that:

> A provision in a commercial lease or other rental agreement involving real property located within the city . . . that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, **shall not be enforceable** against such natural persons if the conditions of paragraph 1 and 2 are satisfied.

(Id. at § 22-1005 (emphasis added)). The law's first condition for application involves tenants required to cease serving members of the public under executive orders 202.3, 202.6 and 202.7, mostly impacting restaurants, bars, or non-essential retail establishments. (Id. at § 22-1005(1)). The second requirement is that the default or other event causing the personal guarantor to become personally liable must have occurred between March 7, 2020 and June 30, 2021, inclusive. (Id.).

### B. The Personal Guaranty in Commercial Leases

13. The personal guaranty is an essential part of commercial leasing in the City. (ECF No. 30 ¶ 27). Depending on their credit-worthiness, personal guaranties enable tenants to lease space they would otherwise be precluded from leasing because of an owner's need or desire to place a more creditworthy tenant on the lease. (Id.). Guaranty agreements provide additional security where the tenant named on the lease is a corporation, LLC, or other entity, such that the entity's officers or members would be protected from personal liability for the

5

entity's debts. (Id. at ¶ 28). Often, the guarantor is an owner or other principal of the business entity who agrees to be personally liable for the obligations of the tenant. (Id.).

14. Guaranties take various forms. (Id. ¶ 29). A guaranty agreement may constitute a "full" guaranty, where the guarantor guarantees payment of the tenant's obligations through the end of the lease, whether or not the lease is terminated early or not. (Id.). Alternatively, it may be a limited guaranty—or a "good guy" guaranty—where a guarantor's obligations run through the date when the tenant surrenders possession of the premises to the landlord, which he can do prior to the end of a lease to avoid the balance of rent payments. (Id.). Guaranty agreements—and "good guy" guaranties, in particular—benefit both owners and tenants. (Id. ¶ 30). They encourage property owners to lease property to commercial tenants who may not be as creditworthy and they incentivize tenants to voluntarily surrender a leased property without the landlord having to resort to an eviction proceeding giving the landlord the ability to re-let a commercial space. (Id.). Good guy guaranties help prevent the worst-case scenario for small landlords—and for the overall health of the real estate market—when a tenant continues to occupy the premises during and beyond the lease term without paying rent. (Id. at ¶ 31).

15. The Guaranty Law forever cancels "good guy" and any other personal guaranties contained in New York City commercial leases for the period between March 1, 2020 and June 30, 2021. (Id. at ¶¶ 96-99). The Guaranty Law's triggers do not contain any substantial injury requirement and therefore could be—and, indeed, have been—invoked by businesses that are well-capitalized or surviving the pandemic well. (Id.). Tens of thousands of small business landlords in New York City have been impacted by the Guaranty Law. (ECF No. 29 ¶ 86).

**IV.   The Guaranty Law's Impact on Plaintiff Bochner**

16. Plaintiff Elias Bochner ("Mr. Bochner") is a shareholder of 287 7th Avenue

Realty LLC, a limited liability company, which owns the property located at 287 7th Avenue, a mixed-use building with one commercial space. (ECF No. 52 ¶¶ 2-3). Mr. Bochner and his family rely on the rental payments for their income and he requires "good guy" guaranties for all of his commercial tenants in the regular course of business. (Id. ¶¶ 6, 14). Like thousands of commercial landlords throughout New York City, Mr. Bochner would not have entered into any lease agreements with a small business if not for the "good guy" guarantee given by the principals of the business. (Id.).

17.     The principal of the commercial tenant at 287 7th Avenue—Sunburger 1 LLC ("Sunburger")—agreed to a "good guy" guaranty with a six-month notice provision. (Id. ¶ 15). Starting in December 2019, even before the pandemic, Sunburger defaulted in paying full rent. (Id. ¶ 16). On March 20, 2020, Sunburger provided notice of its intent to surrender the property on September 20, 2020, agreeing to be liable for six months of rent, but avoiding rent beyond that point by handing the premises back over to Mr. Bochner. (Id.). Both parties agreed that pursuant to the "good guy" guaranty, Sunburger's principal pay rent until September 20, 2020. (Id. ¶ 17). However, Sunburger's principal defaulted, and because of the Guaranty Law, the personal guaranty could no longer be enforced and Mr. Bochner has no practical means under the commercial lease agreement to collect unpaid rent pursuant to the parties' agreement. (Id. ¶ 18). The Guaranty Law canceled the six months' rent payments the parties agreed upon and rendered the commercial lease virtually valueless for the period March 20, 2020 to September 20, 2020. (Id.).

18.     The Guaranty Law threatens to financially harm Mr. Bochner's small business. (Id. ¶¶ 18-22). Because it has been unable to recover unpaid rent amounts (approximately $110,000), 287 7th Realty LLC may not have sufficient assets to continue to operate as a going

concern and may not be able to meet the tax obligations and operational expenses of the property.  (Id. ¶¶ 19-20).  Indeed, Mr. Bochner had to pay the $35,000 in taxes for the property due July 1, 2020 using his own personal funds.  (Id. ¶ 20).

Dated:   New York, New York
         March 28, 2022

                                          **STROOCK & STROOCK & LAVAN LLP**

By:   */s/ Claude G. Szyfer*
      Claude G. Szyfer
      David J. Kahne
      Darya D. Anichkova
      180 Maiden Lane
      New York, New York 10038
      (212) 806-5400
      cszyfer@stroock.com
      dkahne@stroock.com
      danichkova@stroock.com

*Attorneys for Plaintiffs*