UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC,
Ling Yang, Top East Realty LLC, and Haight Trade
LLC, Elias Bochner, and 287 7th Avenue Realty LLC

                         *Plaintiffs,*

           *v.*

The City of New York, a municipal entity,
Bill de Blasio, as Mayor of the City of New York,
Louise Carroll, Commissioner of New York City
Department of Housing Preservation &
Development, and Jonnel Doris, Commissioner of
New York City Department of Small Business
Services,

                       *Defendants.*

------------------------------------------------------------------------x

**DEFENDANTS'
RULE 56.1 STATEMENT
OF MATERIAL
UNDISPUTED FACTS**

20 CV 05301 (RA)

       Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York and in support of their cross-motion for summary judgment, Defendants, by their attorney, HON. SYLVIA O. HINDS-RADIX, Corporation Counsel of the City of New York, hereby submit the following statement of material facts as to which Defendants contend there is no genuine issue to be tried:

**I.**      **Background**

      1.      COVID-19 is an acute respiratory illness caused by a novel coronavirus that first appeared in the United States in January 2020.

      2.      As of September 9, 2022, there have been over 600 million reported cases of COVID-19 worldwide,[1]  including over 2 million confirmed cases in New York City.[2]

---

[1] New York City Department of Health, Covid-19 data, available at:
https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page, (last visited, September 12, 2022).
[2]    New   York   City   Department   of   Health,   Covid-19   data,   available   at:
https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page, (last visited, September 12, 2022).

3.      On January 31, 2020, the United States Department of Health and Human Services declared the COVID-19 virus a public safety emergency.[3]

4.      On March 11, 2020, the World Health Organization declared it to be a global pandemic.[4]

5.      All levels of government took drastic measures to limit the spread of the disease, including implementing stay-at-home orders, mandating closure of businesses and restaurants, and restricting public and private gatherings.

6.      Chapter 23 of the New York State Laws of 2020 ("Chapter 23") amended sections 20(2)(a) and 29-a of the New York Executive Law.  The amendment to N.Y. Executive Law § 29-a enabled the Governor to "issue any directive during a state disaster emergency" involving, among other things, a epidemic or disease outbreak so long as such directive is "necessary to cope with the disaster," and expanded the Governor's existing authority to temporarily suspend laws, rules or orders.  The amendment to N.Y. Executive Law § 29-a took effect on March 3, 2020. *See* Exhibit "A" to the Declaration of Carlos F. Ugalde Alvarez ("Ugalde Decl."), [Dkt. 38-1].

7.      By New York State Gubernatorial Executive Order ("EO") No. 202 dated March 7, 2020, the Governor, *inter alia*, declared, pursuant to N.Y. Executive Law § 28, a state disaster emergency, effective March 7, 2020. Ugalde Decl., Ex. "B" [Dkt. 38-2].

---

[3]      United States Department of Health & Human Services, available at: https://aspr.hhs.gov/legal/PHE/Pages/2019-nCoV.aspx, (last accessed, September 12, 2022).

[4]Domenico Cucinotta and Maurizio Vanelli, WHO Declares COVID-19 a Pandemic, National Library of Medicine, available at:  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7569573/, (last accessed, September 12, 2022).

8.     By New York State Gubernatorial Executive Order No. 202.3, dated March 16, 2020, the Governor, *inter alia*, directed that, no later than March 16, 2020 at 8:00 p.m., (i) "[a]ny restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises," and (ii) "[a]ny gym, fitness centers or classes, and movie theaters shall also cease operation."  Ugalde Decl., Ex. "C" [Dkt. 38-3].

9.     By New York State Gubernatorial Executive Order No. 202.6, dated March 18, 2020, the Governor, *inter alia*, directed that, no later than March 20, 2020 at 8:00 p.m., "[a]ll businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize," and that "[e]ach employer shall reduce the in-person workforce at any work locations by 50%," except that these directives do not apply to "[a]ny essential business or entity providing essential services or functions," which include "essential retail including grocery stores and pharmacies." Ugalde Decl., Ex. "E" [Dkt. 38-6].

10.     By New York State Gubernatorial Executive Order No. 202.7, dated March 19, 2020, the Governor, *inter alia*, (i) ordered the closure of all barbershops, hair salons, tattoo or piercing parlors and related personal care services, including nail technicians, cosmetologists and estheticians, and the provision of electrolysis, laser hair removal services, by March 21, 2020 at 8:00 p.m., and (ii) modified "[t]he provisions of [EO No.] 202.6 requiring in-person work environment restrictions" so that, no later than March 21, 2020 at 8:00 p.m., non-essential businesses or entities "reduce the in-person workforce at any work locations by 75%." Ugalde Decl., Ex. "F" [Dkt. 38-6].

11.     On June 14, 2021, Governor Cuomo announced the end of the State's disaster emergency.[5]

## II.     The City's Enactment of Local Law 55 of 2020

12.     On April 22, 2020, at its stated meeting, the New York City Council ("City Council") introduced a piece of legislation—*i.e*, Introduction ("Intro") No. 1932—that, as amended, became Local Law No. 55 of 2020 (the "Guaranty Law"). *See* Declaration of Pamela A. Koplik September 23, 2022 ("Koplik Decl."), Exs. A-B.

13.     Fifteen City Council Members sponsored Intro 1932. *See* Koplik Decl., Ex. A.

14.     On April 29, 2020, the City Council's Committee on Small Business and Committee on Consumer Affairs and Business Licensing jointly held a hearing on Intro 1932 (the "April 29, 2020 Committee Hearing"). *See* Koplik Decl., Ex. D.

15.     During the April 29, 2020 Committee Hearing, Council Member and bill sponsor Carolina Rivera, stated:

> My bill will ensure that business owners, should they be forced to walk away or temporarily shutter their stores, through no fault of their own can do so without facing personal liability, ensuring that one day they may be able to return and relaunch or create a new thriving business in our neighborhoods. Sadly, I am already hearing from small businesses in my district that some landlords who I understand maybe suffering as well are going after small business owners life savings and personal assets during this national pandemic. These are folks like my constituents Mario, the owner of Follia, an amazing Italian restaurant on 3rd Avenue. Mario is already getting rent due notices and threats from his landlord that the personal liability clause in his lease will soon be acted upon. He has no where to turn right now. No matter the need, it is a moral and unethical failure for landlords to seek such restitution for people who have already lost their life's work. Any small business owners that's taken the right steps in incorporating their business should be protected by this bill and I encourage all members of these committees to please support Intro. 1932.

---

[5] *See* https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24

- 4 -

*See* Koplik Decl., Ex. D at 30:03 -31:03.

16.     During the April 29, 2020 Committee Hearing, City Council heard testimony about the accessibility of City, State, and Federal COVID-19 economic relief programs. *See generally id.*

17.     At the April 29, 2020 Committee Hearing, Yin Kong, the Director of Think Chinatown testified, in part, as follows:

> [B]oth SBS and SBA grants and loan programs were not inclusive in the grant owned businesses. Language support on the application and on the outreach of the program is sorely lacking. By the time grassroot efforts pulled together to fill in the gaps for translations, the funding was already run out. The cash basis business practice common in Chinatown also results in a paper trail that may not be able to fully reflect loses and informal payroll prevalent in small family owned businesses excluded many businesses from benefiting in meaningful amounts from the PPP.

*See* Koplik Decl., Ex. D at 252:04-252:16.

18.     At the April 29, 2020 Committee Hearing, small business owner, Alice Lu, testified, in part, as follows:

> I want to talk to a little bit about my families experience as well as many other small businesses experience in applying for these existing grants and loan opportunities that were given to us by the state, the city, and the federal government. So, my family actually applied for the Employee Retention Grant that was administered by the SBS. After having spent one entire day gathering all the necessary documents including bank statements, POS system statements, revenue, annual revenue, etc., we only found out that we were eligible for $960.00, a mere $960 and then on top of that when we were called and contacted by the administrator of the grant, we found out that we were not eligible for it because we had no proof of payroll that was acceptable to SBS. So, they insisted to us that the only acceptable document for payroll was check stubs but that's not something that exists for Chinatowns small mom and pop businesses and for microbusinesses. And so, therefore, it excludes all of these small businesses, immigrant businesses and microbusinesses"

*See Id.* at 254:22-255:19.

19.     At the April 29, 2020 Committee Hearing, small business owner, Ryan

Roy, testified, in part, as follows:

> My business is located in a building with over 100 smaller you know, studio
> spaces and I'm with a group of tenants who are approximately 80 or so of us that
> are trying to negotiate with a landlord and you know there's some talk about
> helping businesses who are being harassed by their landlord. We are experiencing
> the total opposite where no one is communicating with us except through you
> know, an intermediary who basically stonewalls us. So, we feel pretty powerless
> to voice our needs. We are unable to provide income to pay for our retail spaces
> and then you know, paying for our residential rents on top of that has just become
> incredibly challenging and I waited five hours because you know, to speak here
> because there is no other opportunities. There is no where our voice can be heard.
> So, I'm very grateful for this opportunity to speak and you know, I own a tattoo
> studio, I do not have employees but my space provides a space for other artists to
> work, so they rent room from my studio. I applied for a lot of loans. I'm not sure
> how I qualified or didn't, I haven't received anything yet and I was told by my
> account that the EDL or EIDL loan that I applied in March and there was a glitch
> or something and now I need to reapply but they are not taking new applications.
> So, it's a lot here and I want to keep it concise and just I guess I just want to get
> across that we're just feeling very powerless and like we have no voice and we're
> really hoping that you know, the people can provide support and you know, we're
> thinking of our families and our livelihoods are on the line here and we're
> desperate. So, I just wanted to speak for myself and other small businesses that
> are in my situations. That's all. Thank you for your time.

*See Id.* at 263:22-265:09.

20.     At the April 29, 2020 Committee Hearing, several individuals testified

about the broader role of Intro No. 1932 in the City's economic recovery. *See generally id.*

21.     Council Member Corey Johnson, a co-sponsor of Intro No. 1932 and City

Council Speaker at that time, stated:

> Small businesses employ 26 percent of New Yorkers and if they close down,
> hundreds of thousands of workers will permanently lose their jobs and the city
> loses out on billions of dollars in sales tax, property tax and income tax revenue.
> Our economy runs on small businesses and now they are facing unprecedented
> losses. This could be the worst economic disaster that New York City has seen
> since the great depression. Many businesses will be forced to shut down for good
> if they don't get more help. That won't just devastate business owners and their
> workers, it will further destabilize our economy, our neighborhoods, and the lives
> of so many New Yorkers. Congress made some improvements to the Paycheck

Protection program but those loans are still too hard to access in their ensured supply and I'm not confident that they will end up helping the vast majority of New York City small businesses. This is particularly true for the city's immigrant owned small businesses. They face significant obstacles in accessing loans because of language barriers, documentation requirements and eligibility criteria. We absolutely need more federal support here but there are some things that the city can do.

*See* Koplik Decl., Ex. D at 10:11-11:13.

22.     During the April 29, 2020 Committee Hearing, the following exchange occurred between City Council Member Carolina Rivera and Andrew Rigie, Vice Chair of Community Board 7 and Executive Director of the New York City Hospitality Alliance:

COUNCIL MEMBER RIVERA: So, thank you for what you said about the bill. You know, this is not an amendment to a contract, it's a temporary suspension and contract law does allow for broad changes based on emergency situations and I think this is certainly an emergency. We are in crisis. So, Andrew, I wanted to ask you and thank you for your testimony. How many of your members have been impacted by personal liability clauses during COVID19, more or less? And how many do you expect to face this?

ANDREW RIGIE: You know, that's a good question. I don't have the data. I can tell you thousands of restaurant, bars and clubs throughout the city are being impacted. The challenge is, we don't know when we're going to be able to reopen lawfully. But then once we can start reopening, if there will be a reduced occupancy and then what consumer purchasing behavior is going to be. Will we have enough sales to sustain those businesses. So, immediately, we've heard some stories where there's been great relationships between the small businesses and the landlords. But we've heard some as I think you mentioned earlier, where there is you know, been some threats or there hasn't been as good of communication. So, the longer that these closures go on and the uncertainty of what the business environment will be moving forward, leads me to believe that there will be more and more businesses or businesspeople whose personal livelihood and assets are at risk. So, I don't have an exact number but I have to imagine with 25,000 eating and drinking establishments in the five boroughs, we're talking about numbers in the thousands since the vast majority of them are not generating any revenue and their unable to pay the rent.

*See Id*. at 139:22-141:10.

23.     At the April 29, 2020 Committee Hearing, several individuals testified in support of Intro 1932. *See generally id.*

24.     Robert Bookman, General Counsel to the New York City Hospitality

Alliance, testified, in part, as follows:

> Nothing is keeping small business owners awake at night more than this, what we are calling the industry good guy guarantees. Typically, leases require that the business owner personally guaranteed the rent as long as the business is in possession of the premises. It is designed properly to prevent someone from operating while not paying the rent. But no one ever contemplated this situation where we are technically in possession but the government says we cannot operate or only minimally operate. For a landlord under these circumstances to file civil action against the small business owners personal assets, their life savings, their house is simply unconscionable and cannot be allowed to happen… May rent is coming due and business owners are deciding, should they give the keys back and permanently go out of business or risk another month of personal liability. You must act now… small businesses are not just the live blood of our neighborhoods, they are not just employers, their [sic] not just the reason why companies come to New York to do business, they are also why artists of all types can make a living here while pursuing their art, their music, their acting and their writing. There is no recovery for New York City without our restaurants and our small businesses.

*See* Koplik Decl., Ex. D at 153:14-155:08

25.     Greg Bishop, Commissioner of the New York City Department of Small

Business Services, testified, in part, as follows:

> I know the Brooklyn Chamber did a quick survey of their members of businesses in Brooklyn and there seems to be about I think 30 percent were not able to pay the rent and only about half of them have been able to work with their landlords.

*See Id*. at 83:5-83:09

26.     Small business owner, Mojito Iaba, testified, in part, as follows:

> I have two stores in Brooklyn. One is in Williams Park and one is in Greenpoint and due to COVID-19 we lost store. They are closed since March 18th and since most of our stores have no business, we have no income since March 18th. So, we tied [sic] to file PPP as emergency loans but so far, no luck…Then my landlord asked for rent for April. We told my landlord we are not making any money since March; he told me rain or shine or whatever is happening now, I have to pay the rent. She told me I have to use my savings money. I told her, we are having a crisis, so we ask for a better deal. Cheaper rent. Her answer was no. If we can't pay April or end of May rent, we have to leave by May 31st. We have to leave on

May 31st and she is going to keep the $9,000 deposit. So, we called 311 New York City for help and … the City Commercial Lease Assistance program. They have been helping us to get through this situation but since most of the commercial lease are unfair to the tenants, we decided to give up and move out by April 31st. . . .Small business needs help from New York City because New York City's economy made from small businesses that attribute from all over the world. In order to survive as a small business owner, New York City has to pass a bill to protect tenants from the landlord ASAP.

*See Id*. at 277:02:-278:15

27.    Many participants in the April 29, 2020 Committee Hearing did not believe that Intro No. 1932 went far enough to protect small businesses.

28.    Karen Narefski, Senior Organizer for Equitable Economic Development at the Association for Neighborhood and Housing Development, testified, in part, as follows:

We also support Intro. 1932, we think it's an important effort to protect small business owners from personal financial risk, but we ask the city to strengthen it by expanding it beyond the COVID-19 period and by clarifying that personal guarantee agreement, even that are not included in the lease itself, are also covered by the Intro.

*See Id*. at 208:16.

29.    Julian Hill, Supervising Attorney at TakeRoot Justice, testified, in part, as follows:

Two quick suggestions, extend the COVID-19 period by several months to contemplate what would inevitably a need for time to recover and two, expand the definition of personal liability provision to include guarantee agreements which often accompany leases and give effect to personal liability in the first place. Look, before TakeRoot, I've advised domestic and Latin American companies at a very large law firm, so I understand there are multiple perspectives here, but let's not ignore what's obvious. Small businesses need rent relief. Most landlords are not providing that relief despite our efforts. The largest corporations in the world got bailed out. People need to know that City government which has the authority to abate rent will put all of its tools on the table to help them. Failure means power in property in the hands of fewer large corporations and monopolies which has been brought up several times today, and the exploitation of community, labor, culture, and investments.

*See Id*. at 258:16-259:12.s

30.     In connection with the April 29, 2020 Committee Hearing, the Committee received written testimony from several individuals, organizations and entities.   *See* Koplik Decl., Exs. E1-E5.

31.     This testimony touched on several topics, including how other COVID-19 relief measures were inadequate, how landlords were eager to seize personal assets of guarantors, and how Intro No. 1932 was integral to the reopening of small businesses throughout the City. *See generally id.*

32.     Gabriel Stulman, CEO and Founder of Happy Cooking Hospitality, testified, in part, as follows:

> We have applied for every loan and grant that we've deemed worthwhile: NYC Business Continuity Fund, Federal EIDL Loans, James Beard Foundation Grants, and the Federal PPP Loans. In most cases, we've had to submit 8 independent applications - one for each individual LLC. *To date, we have not been approved for a single application. ...* Emotionally and financially I am preparing for this possibility of going bankrupt and belly up.. I am concerned that my landlords in *addition* to them keeping my security deposits (most of them 3 months and in excess of $60,000), are entitled to — and likely will — sue me personally for my obligations under my various leases. The Bill 1932-2020 that you have proposed is instrumental to my existence and that of most small businesses in this city. I am currently living in fear and anxiety of my personal exposure to my landlords, most of whom are demonstrably unsympathetic to my standing during this crisis, and extremely unlikely to release me from any potential liability. If this legislation is not made into law, I do not have enough assets or savings to cover the personal liability and guarantees of all of my commercial leases. If this bill does not pass, I am at risk of not only losing my restaurants and my income, but beyond that, I am at risk of losing the entirety of my life savings and any and all assets I have until I am personally bankrupt. I understand and accept the terms of the Good Guy Clause under normal circumstances. I accept the responsibility that if my business is failing, that I need to provide adequate notice to my landlord before exiting the lease. The "Notice Period" for most of my leases ranges from 3-6 months. Under my current obligations, I must cover all arrears in rent (April and May) plus an additional 3-6 months of rent after I give notice. Failure to pay all of that rent in addition to sacrificing my security deposits, leaves me personally liable. That's a *bullish* set of circumstances to be forced to agree to under normal circumstances — but we all agree anyway, because that is the rules of the game of commercial leases. These are NOT normal circumstances. To hold me - and others like me - accountable to these clauses when the reason for our failures and closures can be

precisely attributed to the COVID-19 pandemic and subsequent government mandated closures is fatal. I have done everything in my power to mitigate these circumstances directly with my landlords. Despite the siren blaring in the background, most of my landlords remain unmoved and my attorneys have advised me in stark terms about my risks. I appeal to you as a last resort before me, and the many other well meaning business people, residents, and families like mine, that are at risk of being decimated.

*See* Koplik Decl., Ex. E1 pp. 106-108.

33.     Bryan Cowan, Founder of Wisefish, testified, in part, as follows:

When we signed our leases we had every intention of living up to the terms and guarantees we made to our landlords. If we failed because our business didn't work, that was on us - and we understood the costs. However, the situation we face today is failure due to an unprecedented circumstance that was completely out of our control. Because of personal guarantees in our leases I not only have to deal with a potentially failing business, I too have to think about personal financial ruin and bankruptcy. As a newlywed I look to the future and was hoping to begin a family and potentially buy a home. These are all things that would need to be put on hold with a bankruptcy on my record.

*See Id.* at  p. 111.

34.     Joseph Conti, Owner of Shuraku, testified, in part,  as follows:

Your proposed law that would release commercial tenants from personal guarantee would be life changing for me and many other small business owners. 3 years ago, when I took my life savings to open up a 20 seat, 6 employee restaurant in the West Village, the only way I could secure a lease was to provide a personal guarantee. That guarantee entitles my landlord to 6 months rent (at $18,000 per month),other fees and my security deposit (3 months rent) should I request to vacate the premises prior to the end of the 10 year lease. In the current situation I cannot afford to pay rent and I cannot afford to give notice. I will quickly run out of money either way. I applied early on for the PPP and 2 other SBA loans, but I was not approved before the funds dried up. I have filed loss of income claims with my insurance company to no avail. I am out of options. … We will then be forced into bankruptcy to liquidate whatever little else we might have, to pay commercial rent on a location that has been forced to close.

*See Id.* at p. 13.

35.     Doris Huang, owner of The Deco Food + Drink testified, in part, as

follows:

- 11 -

> I can guarantee that my business, along with so many other independently-owned
> hospitality and retail businesses in NYC, will NOT survive if we cannot
> completely renegotiate our leases post-COVID. . . . The vast majority of us
> WANT to revive our businesses, but it will be impossible without some bold
> support from our landlords and from the government.

*See Id*. at p. 146.

36.     Over 700 business operators submitted virtually identical written

testimony, which states, in part, as follows:

> As the operator of a business in your district, I URGE you to SPONSOR and
> PASS the following critical legislation that will support small businesses in your
> district, giving us a fighting chance to survive

*See* Koplik Decl., Exs. E1-E5.

37.     On April 29, 2020, the Committees also issued a Briefing Paper and

Committee Report of the Governmental Affairs Division ("April 29, 2020 Committee Report"),

which states, in part, as follows:

> Restrictions similar to PAUSE have been implemented across the country, which
> has caused a massive reduction in the number of small businesses operating. In
> their survey of small businesses (under 500 employees), the National Bureau of
> Economic Research found that 43 percent of businesses had closed due to
> COVID-19 and that they had reduced their staff by about 40 percent since January
> 2020. The results were more severe in the Mid-Atlantic region, which includes
> New York, where 57 percent of businesses were closed, and staff employment
> decreased by 47 percent. . . .The nation's economy is dependent on its small
> businesses. There are approximately 27 million of these businesses across the
> country and they are responsible for employing 57 million workers. When
> including the owners of these businesses, in addition to employees, that total
> comes to an estimated 85 million people. According to the Small Business
> Administration, small businesses are responsible for creating two-thirds of the
> Country's new jobs. Given their vital role, it is crucial that they are either given
> alternative means to operate, in as lucrative a manner as possible, throughout the
> COVID-19 crisis, and/or are provided the necessary support to restart their
> operations once social distancing measures have been lifted.… A Reuters article
> claimed that 25 percent of the initial $350 billion allocated to SBA loan programs
> went to fewer than two percent of the firms that got relief, with some of these
> being large, publicly-traded companies with thousands of employees and

hundreds of millions of dollars in annual sales. . . .Immigrant communities in NYC may have had even more difficulty applying to and obtaining federal funds, which would considerably impact the City's economy. Immigrant workers make up 45 percent of the city's workforce and own one-half of New York City's businesses. In some neighborhoods, immigrant-owned businesses employ up to 42 percent of the neighborhood population. . . .For those with access to COVID-19 funding programs, there are drawbacks to consider. Although the federal government's PPP program offers loan forgiveness, there are significant conditions to satisfy. Seventy-five percent of the PPP loan's forgiven amount must be spent on payroll costs, a condition that appears to have taken shape late in the process. If 75 percent of the forgiven amount must be spent on payroll costs, that may leave less for businesses to spend on obligations such as rent and utilities, which may be disproportionately higher in our City. . . .There are concerns about whether the City's economy will strengthen quickly enough to satisfy the terms of these loans, and businesses might struggle to pay off additional debt (even at low or no interest rates) after this sustained period of closure and reduced income. . .The vast array of departments and agencies have made it difficult for businesses to navigate and, as discussed, there have been numerous limitations to the government programs that are further compounded by the technological and language barriers that some small business owners also face. This comes on top of the other issues that small businesses have to navigate during this crisis range from trying to make rent and payroll, finding suppliers and moving retail online, to negotiating insurance claims, delivery commissions, and bank loans.

Koplik Decl., Ex. C at pp. 10-28 (footnotes omitted).

38.    On May 13, 2020, the City Council amended Intro. No. 1932 as Intro. No. 1932-A.  *See* Koplik Decl., Ex. F.

39.    On May 13, 2020, the Committee issued a Committee Report of the Governmental Affairs Division ("May 13, 2020 Committee Report") on Intro. No. 1932-A. Koplik Decl., Ex. H.

40.    On May 13, 2020, the City Council's Committee on Small Business held a hearing on Intro. No. 1932-A (the "May 13, 2020 Committee Hearing").  *See* Koplik Decl., Ex. I.

41.     During the May 13, 2020 Committee Hearing, City Council Member and Chairperson of the Committee on Small Business, Mark Gjonaj ("Chairperson Gjonaj"), stated, in part, as follows:

> Intro 1932 will prohibit enforcement of commercial lease provisions that hold business owners personally responsible when their business cannot pay rent due to COVID-19. Intro 1914 protects tenants from landlord harassment during this crisis. While many landlords in the state are renegotiating leases to help their tenants, this bill will provide additional protection to small businesses that may be experiencing harassment. The bills we're voting on today are strong starts to protecting our small businesses during this pandemic and as Chair of the Small Business Committee it is my priority to ensure that our small business sector will re-emerge strong after stay at home orders are lifted and the city begins to reopen.

*Id.* at 5:3 – 5:17.

42.     On May 13, 2020, the Committee passed Into 1932-A by a vote of five (5) in the affirmative and zero (0) in the negative and no abstentions.  *See Id.*

43.     On May 13, 2020, the City Council held a stated meeting during which it passed Intro. No. 1932-A by a vote of forty-four (44) in the affirmative and six (6) in the negative. *See* Koplik Decl., Ex. J.

44.     During the May 13, 2020 stated meeting, City Council Member Carolina Rivera, stated, in part, as follows:

> . . . I have heard from countless small business owners these past few weeks … now worrying about going belly up about the very real possibility that their stores may have to change or even never return after this pandemic ends … So, while my bill will not be able to bring back . . . any business that we lose, and [sic] can ensure that the owners who poured years then dreams into a store friends to not have to face our landlord going after their personal life savings and asset because of a disaster no one saw coming.

*See Id.* at pp. 29-30.

45.     During the May 13, 2020 stated meeting, City Council Member and then Speaker Corey Johnson stated, in part, as follows:

> When I met with some restaurant owners last virtually, we learned that this is one of the top issues keeping them up that night. It is awful. Losing your business is hard enough. But imagine someone coming after your home, as well, while your business is closed.

*See Id.* at p. 17.

46.     On May 26, 2020, the Mayor approved Intro. No. 1932-A and signed it into Law.  *See* Koplik Decl., Ex. K.

47.     Local Laws 55 took effect on May 26, 2020.  *See* Koplik Decl., Ex. L.

## III.     <u>The Guaranty Law</u>

48.     Local Law 55 amended Section 1. Chapter 10 of title 22 of the administrative code of the city of New York is amended by adding a new section 22-1005 to read, in pertinent part, as follows:

> § 22-1005. Personal liability provisions in commercial leases. A provision in a commercial lease or other rental agreement involving real property located within the city that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, shall not be enforceable against such natural persons if the conditions of paragraph 1 and 2 are satisfied:
>
> 1. The tenant satisfies the conditions of subparagraph (a), (b) or (c):
>
> (a) The tenant was required to cease serving patrons food or beverage for on-premises consumption or to cease operation under executive order number 202.3 issued by the governor on March 16, 2020;
>
> (b) The tenant was a non-essential retail establishment subject to in-person limitations under guidance issued by the New York state department of economic development pursuant to executive order number 202.6 issued by the governor on March 18, 2020; or
>
> (c) The tenant was required to close to members of the public under executive order number 202.7 issued by the governor on March 19, 2020.

2. The default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and September 30, 2020, inclusive.

## IV.   **The City's Enactment of Local Law 98 of 2020**

49.   On September 14, 2020, the City Council's Committee on Small Business held a hearing to discuss the first extension of the Guaranty Law (Intro 2083) (the "September 14, 2020 Committee Hearing"). *See* Koplik Decl., Ex. O.

50.   During the September 14, 2020 Committee Hearing, Chairperson Gjonaj stated, in part:

> This past spring the council boldly acted to prevent this through the passage of Local Law 55, which temporarily prohibited the enforcement of personal liability provisions and some commercial leases. The preconsidered introduction will extend this necessary bill. The mass closure of city small businesses will leave commercial corridors decimated and unemployment rates high. Households will struggle to feed their families.

*See* Koplik Decl., Ex. O, 7:3-11.

51.   Council Member Rivera, the sponsor of the extension bill, stated in part:

> So I appreciate the opportunity to speak briefly on my preconsidered bill that we are hearing today to extend the prohibition of enforcement of personal liability provisions in commercial leases or rental agreement involving a COVID-19-impacted tenant. Since we passed my legislation to create this emergency prohibition in May, I have heard from countless small business owners of their gratitude and thanks for the city giving them a lifeline when our state and federal government had failed to do so. Just last week New York Magazine's Chris Crowley interviewed one restaurant owner, Roni Mazumdar, who said that the protections in this bill, and I quote, "Absolutely and desperately needs to continue. It would be a fatal blow to the restaurant industry if they don't extend it." While more than 2800 businesses in New York City have permanently closed since March 1, according to data from Yelp, those small business owners can take solace in the fact that their landlords cannot go after their personal life savings and assets thanks to this prohibition. And countless other businesses teetering on the edge can continue to focus on paying workers and supporting their communities without this threat looming over them. While I hoped in May that our federal government would have been able to bring us back to a point where most businesses could fully reopen safely, today that just isn't the case. That is why we are forced to return here today to vote on a six-month extension to the

prohibition, and I'm hoping I'll have your support when this bill is up for a vote. I look forward to hearing today the stories of small businesses, workers, landlords, and others suffering in the midst of this crisis, and while I certainly understand that this law and the proposed extension we're hearing today may not, may not be supported by everyone at this hearing, rest assured that I will continue to push for any and all measures that our city can take to help our communities and those most at risk.

*See* Koplik Decl., Ex. O at 8:7-9:23.

52.     Commissioner Jonnel Doris of the New York City Department of Small Business Services testified at the September 14, 2020 Committee Hearing and stated, in relevant part:

It is my pleasure to testify before the City Council today on the preconsidered of Intro 1932 that seeks to extend the temporary personal guarantee protection provisions for commercial tenants impacted by COVID-19 until March 2021. I am grateful for the council's ongoing support and friendship as we work together to advocate for small businesses throughout the city. The economic crisis brought forth by the COVID-19 has been tremendous. Rent challenges for commercial tenants continue to place enormous pressure on our businesses and business owners, now more than ever, disproportionately affecting our communities of color.

*           *           *

Though rent affordability has been an issue that this administration as tackled, ah, since its inception, the financial crisis brought forth by COVID-19 has only heightened these challenges and forced us to think creatively, which is why we are here to speak on the administration's support for the extender bill relating to Local Law 55 of 2020, which aims to extend the guaranteed protection provisions of Local Law 55 for commercial tenants impacted by COVID-19 until March 2021. We have heard from our constituents how the bill has allowed them to plan accordingly, allow business owners to make determinations without having to endure additional losses. Many businesses are planning to make a decision before the end of the [month] on whether to remain open. This extension allows for further planning and allows them to generate additional income in the absence of federal and state aid.

*See* Koplik Decl., Ex. O at 11:21-13:17.

53.     Commissioner Doris further testified that SBS has heard that "there has been an increase in landlords who are looking to negotiate and renegotiate…with their tenants based upon…the [enactment of the Guaranty Law.]" *See* Koplik Decl., Ex. [X] 31:5-9.

54.     In response, Council Member Rivera explained at the September 14, 2020

Committee Hearing:

> That's great, and that was absolutely one of the intentions of, of putting forward
> this bill, was to not just protect our small business owners who are really just such
> important New Yorkers to us, they keep the city moving, that are the lifeblood,
> but also to show to some of these landlords that, um, we really are trying to do
> everything we can to support a fair and effective negotiation. We realize
> everybody's in hard times, ah, but that increase in landlords looking to negotiate
> new lease terms was absolutely a positive side effect of the bill that I put forward
> that we're hoping to extend today,…

*See* Koplik Decl., Ex. O at 32: 4-16.

55.     At the September 14, 2020 Committee Hearing, Andre Rigie testified on

behalf of the New York City Hospitality Alliance, stating in relevant part:

> Ah, you know, when this legislation passed, ah, earlier this year to suspend the
> enforcement of personal liability guarantees, ah, in leases, this is one action the
> council took that has helped saved countless small business owners, you know,
> people who put their livelihoods into these small businesses and the fact that they
> cannot only lose their business, but then their landlords can go after their personal
> assets, their savings, their homes, just created so much fear and uncertainty. So
> we at the New York City Hospitality Alliance, which is a nonprofit organization
> representing restaurants and nightlife venues throughout the five boroughs
> strongly support, ah, the extension of this, ah, law. We conducted a survey and
> we've been doing it monthly, but to the most recent one, ah, about 500 restaurants
> in the five boroughs responded, and 83% of them had paid no rent or partial rent,
> ah, and only one in 10 had been able to renegotiate their leases. So we are still in a
> dire situation. It was just announced, thankfully, ah, that September 30 we will
> begin indoor dining at a 25% reduced occupancy. But let's keep in mind prep that
> when restaurants a 100% occupancy, ah, they could barely even survive in many
> cases. So I can't explain how important extending this law is, ah, to the future of
> our small businesses and I also think it's important to note that, you know, many
> small restaurant owners I've spoken with, if this law wasn't in effect and they
> know they did not have this protection, they may just toss their keys in right now,
> even though otherwise they had a successful restaurant that they hoped one day
> they could, ah, bring back. So, again, this law is just so important.

*See* Koplik Decl., Ex. O at 47: 11-48:20.

56.     Upon being asked by Council Member Rivera regarding how many of the

New York City Hospitality Alliance members have been impacted by personal liability

- 18 -

provisions and how may his organization has heard from concerning the bill (*see* Koplik Decl.

Ex. O at 50:14-18), Mr. Rigie responded, in part:

> Well, so I don't have a, a hard number for you. But what I can tell you is I am bombarded with phone calls, text messages, everything you can imagine, same way, you know, direct messages, you know, by hundreds, I'm sure it's thousands. I mean, you, you look at the 25,000-plus eating and drinking establishments pre-pandemic, the vast majority of them are small business owners, meaning that there is a likelihood that they do have one of these personal liability guarantees in their leases. So, I mean, I expect the number is in the thousands. I can just tell you from my experience, it's almost everyone I've spoken to tells us how important this law is. And without it they would probably just have to toss back their keys now, um, which would be horrible for the city because then we know no matter what we do we're not gonna get these restaurants back. Um, but we also know the underlying issue is that people's personal assets are on the line and when we talk about people, particularly living here in the city, we need to keep our New Yorkers here and to do that they're gonna have their, need their resources and resources. So, um, again, I expect the number is in the thousands. Um, I've heard around the clock, and I've been continually asked, you know, this is getting extended, right, this is getting extended? So, um, you know, that's the best answer I can give you. I hope it's somewhat sufficient.

*See* Koplik Decl., Ex. O at 50:19-51:22.

57.     During the September 14, 2020 Committee Hearing, Karen Duresky,

Senior Organizer for Equitable Economic Development at the Association for Neighborhood and

Housing Development testified in support of the extension bill. She stated, in part:

> We supported, um, Local Law 55 when it was first introduced, um, and we certainly believe that it should be extended through March 2020, as proposed. Um, of course, some of the businesses that have closed in April have been able to reopen in a limited capacity but, um, the public health requirements of operating during a pandemic have increased financial strain, um, and many of the businesses that we work with and, and nonprofit cultural and other spaces, um, rely on public assembly and on people coming together, and they may not be able to be fully operational for long after, um, the period ends. Ah, so the challenges to small businesses are really numerous and they have been touched on very eloquently in this hearing, um, so this is an important way to, ah, to ensure some protection, um, for the individuals who are running those businesses and ensure that their livelihoods are not ruined along with the potential risk to their business.

*See* Koplik Decl., Ex. O at 56:19-57:14

58.     Mr. Bookman also testified at the September 14, 2020 Committee Hearing

in support of the extension bill stating in part:

> So, yes, in such an unprecedented emergency it is not only appropriate for
> government to intervene, ah, but it is, it is a moral imperative for government to
> protect the thousands of small business owners, the ones most likely to have to
> have personal guarantees, 'cause large corporations when they sign these leases
> don't need the personal guarantees. Um, to protect, ah, to protect these businesses
> that protect our city and our commercial corridors from becoming blighted and
> ghost towns, ah, which would negatively impact our quality of life, public safety,
> sanitation, you know, etcetera. Um, and this law has been very effective. Um, as
> an attorney, you know, with a very small little country practice, I could tell you, I
> know of dozens of clients just, you know, in, in my practice that but for this law
> would have already been forced to turn in their keys, ah, and close their
> restaurants permanently 'cause they could not take the additional risk of the
> personal liability. And yes, ah, we were all shocked that indoor dining has, ah, did
> not start on July 6 when we originally passed Local Law 55, as we thought it
> would, and it's taken three full months for it to happen, and then at only 25%
> capacity. But it has gotten the attention of landlords, who have been waiting for us
> to open and open at full capacity, um, but given that that didn't happen this law is
> necessary to bring more and more landlords to the table and say, listen, you know,
> let's work out something 'cause it's better to have that tenant who's always there
> for years, who didn't miss rent at a reduced rent, um, than an empty space, ah, and
> you do not have the opportunity to go after us personally now.

*See* Koplik Decl., Ex. O at 60:8-61:17

59.     Iyong Kim, Assistant Director of Small Business Programs at the Asian

American Federation also testified in support of the extension bill, stating in relevant part:

> Um, I'd like to thank, um, Council Member Rivera for the preconsidered bill, the
> good guy clauses, an especially pressing issue for immigrant small business
> owners, as well, and as we welcome this effort to extend this protection I would
> also request for an ample outreach to the immigrant communities to make sure
> that all small business owners are aware of their rights.

*See* Koplik Decl., Ex. O at 72:13-20.

60.     Kathleen Riley, from the New York State Restaurant Association also

testified in support of the extension bill at the September 14, 2020 hearing, stating in part:

> NYSRA is wholeheartedly in support of extending the provisions of Local Law
> 55 until March 31, 2021. This law, which prevents personal liability provisions in

commercial leases from being enforced against COVID-related defaults has provided both protection and peace of mind to our New York City restaurants in the last few months. Without intervention, the protection would expire on September 30, and while that date seemed reasonable back in April, we have unfortunately had a much worse summer than everyone had hoped. Between the outbreaks of COVID-19 around the country and the dire local economic situation, the summer served as a reality check that the impacts of the COVID-19 pandemic will be much more extreme and long-lasting than previously [inaudible]. The support to extend the protections of Local Law 55 is strong and as early as June or July our members realized they would need such an extension to continue planning their recoveries.

*See* Koplik Decl., Ex. O at 86:20-87:15.

61.     Ms. Riley further testified regarding employment in the restaurant industry

stating, in relevant part as follows:

Nearly every restaurant that is open right now is operating at net mutual or a loss, but still striving to provide what jobs they can and taking every necessary precaution to ensure the health and safety of their employees and customers.

*See* Koplik Decl., Ex. O at 89:2-6.

62.     Michael Brady, the Chief Executive Officer of the Third Avenue Business

Improvement District and the Bruckner Boulevard Improvement District, collectively

representing a thousand South Bronx largely immigrant-owned mom and pop businesses, also

testified at the September 14, 2020 hearing in support of the extension. *See* Koplik Decl., Ex. O

at 100–106.

63.     In connection with the September 14, 2020 Committee Hearing, the

Committee received written testimony the Public Advocate Jumaane Williams, and several

individuals, organizations and entities.  *See* Koplik Decl., Ex. P.

64.     This testimony touched upon the necessity for the extension of the

Guaranty Law. *See generally id.*

65.     Camilla Marcus on behalf of an organization named Relief Opportunities

for All Restaurants ("ROAR") wrote

> As restrictions remain in place and business operations cannot safely return to
> normal, many restaurant owners fear losing their personal savings and risking
> stability for their own families in the coming weeks. In fact, I closed my
> restaurant west~bourne, at 137 Sullivan Street in Soho, last week for just this very
> reason. With a landlord who refused to negotiate reasonably given the new reality
> we were dealt, I simply could not gamble my personal financial stability with a
> one-year old son at home at the risk of this legislation not being extended, and the
> end of month deadline just loomed too powerfully. I now hope that our closing
> was not in vain. The legislation being discussed today will provide medium term
> assurance and relief to many of us in the restaurant business who are faced with
> an impossible choice and enormous uncertainty in the coming months.

*See* Koplik Decl., Ex. P, p. 11.

66.     On September 14, 2020 the Committee on Small Business issued a report

detailing the impact of the COVID -19 crisis on small businesses in New York City, which states

in relevant part.

> Because of the high cost of rent and the inability to make adequate revenue,
> restaurant and other small business owners affected by COVID-19-related
> restrictions on their operations have urged the Council to extend Local Law 55 of
> 2020 (Int. No. 1932-A), which protects certain COVID-19-impacted commercial
> tenants from personal liability when a default of other such event occurs between
> March 7, 2020 and September 30, 2020. Personal liability provisions in
> commercial leases may hold a business owner personally responsible if they are
> unable to pay rent by threatening the seizure of their personal assets or property.
> In order to prevent this, an owner must turn in the keys to the property, effectively
> ending their lease. According to one restaurant owner, "Come September 30… if
> [Local Law 55] doesn't get extended – [you] might see a massive number of
> evictions. Evictions will continue to happen at an exponential rate, and I think this
> will be the specific last straw many restaurateurs are holding onto." The owner
> predicted that if Local Law 55 is not extended, it would be "a fatal blow to the
> restaurant industry." Another owner predicted that many restaurants that have not
> already closed would "giv[e] up, thinking there's no real help at all."

*See* Koplik Decl., Ex. Q, p. 6-7.

67.     On September 16, 2020, the Council held a stated meeting at which

Council Member Rivera stated in part:

My original bill suspending personal liability provisions is set to expire on September 30, and it is critical that we pass an extension as quickly as possible. It's clear that we all underestimated how long this crisis would last and its impact on small business owners, but I hope you will recognize the continued urgency of this moment. Extending this law is one of the few tangible actions this body can take to save small businesses from permanently shuttering and their owners from financial ruin. It is simply unethical to let this expire and allow landlords to go after people who have already lost their income and livelihoods in the midst of an ongoing economic and public health crisis. I'm kept up at night thinking about the countless small business owners who have reached out to my office, terrified that they'll now lose any semblance of financial independence after they've already lost their income and livelihoods due to COVID. Earlier this week at the hearing for this preconsidered bill we heard from Louise Fabier, the owner of two Brooklyn bars, the Pencil Factory and [inaudible] and Sons. She currently owes her landlords $100,000 in back rent from the start of the pandemic and without these protections her only option will be to operate her bars at a loss and be saddled with debts for the next 30 years to pay back her rent. That means she will be paying until she is 86 years old. Even with outdoor dining and limited indoor dining on the horizon, the reality is that very few of them will be able to break even for the foreseeable future.

*See* Koplik Decl., Ex. R, 62:7-63:14.

68.     On or about September 22, 2020, the City Council amended Intro. No. 2083 as Intro. No. 2083-A.  *See* Koplik Decl., Ex. S.

69.     On September 23, 2020, the Committee on Small Business held a hearing to discuss Intro 2083-A. *See* Koplik Decl., Ex. U. At that hearing, Chairperson Gjonaj, stated in relevant part:

The COVID-19 crisis presents the greatest threat to small business economy in modern history. According to a recent report by the city comptroller, small business revenues should drop 25 percent since January ranking New York City 40th amongst the 52 largest American cities during this period. In early April, small businesses had experienced a drop in revenue of over 60 percent. As small businesses are experiencing massive declines in revenue, thousands of small businesses have closed in New York. According to the city comptroller report, at least 2800 small businesses closed permanently between March 1st and July 10th. Partnership that New York City predicts that as many as 1/3 of the 230,000 small businesses in New York City may never reopen, forever changing the commercial corridors that make up our neighborhoods. As small businesses are experiencing declines in revenue, many small businesses have been unable to pay rent. The hospitality Alliance surveyed restaurants, bars, nightclubs, and 11 venues in late

> August and in early September and found that 87 percent of respondents did not
> pay their full August rent. I want to emphasize that many landlords in this city are
> hopefully renegotiating their leases with their tenants in good faith. Some small
> business owners may fear, however, that their inability to pay rent may lead to
> their landlords to go after their assets or personal property. This past spring, the
> Council boldly acted to prevent this through the passage of local law 55 which
> temporarily prohibited the enforcement of personal liability provisions in some
> commercial leases. The proposed introduction we'll be voting on today will
> extend this necessary bill until March 31st, 2020. Proposed Introduction 2083 will
> also mandate Department of Small Business Services or another agency
> designated by the Mayor to conduct an information and outreach campaign to
> educate commercial tenants affected by this law about its protections which I
> hope will also take into considerations the language barrier and various businesses
> throughout the city. The mass closure of the city's small business will leave
> commercial corridors decimated and unemployment rates high. As the Chair of
> the Committee on Small Business, it is my priority to ensure our small business
> sector will reemerge strong after the COVID-19 crisis is over.

See Koplik Decl., Ex. U, 3:13-5:11.

70.     On September 13, 2020 the Committee passed Intro 2803-A by a vote of four (4) to zero (0) and no abstentions.  See Koplik Decl., Ex. U.

71.     The Committee also issued a report on September 23, 2020, detailing the impact of the COVID -19 crisis on small businesses in New York City which was substantially similar to its September 14, 2020 Report. See Koplik Decl., Ex. V.

72.     On September 28, 2020, the City Council held a stated meeting during which it passed Intro. No. 2803-A by a vote of forty-five (45) in the affirmative and five (5) in the negative. See Koplik Decl., Ex. X.

73.     Local Law 98 of 2020 contained a "Declaration of legislative intent and findings," which detailed, among other matters, the numbers of jobs lost in the food services and drinking places subsector, the retail trade sector, and the personal and laundry services subsector, and declared, in pertinent part:

> 5. While businesses may be willing to weather the economic hardships imposed
> upon them by governmental measures to combat COVID-19 by either staying

open or temporarily closing and later reopening, individual owners and other natural persons who personally guarantee the financial obligations of these businesses face a different and more substantial risk than losing revenue and profit. They risk losing their personal assets, including their possessions and even their own homes, transforming a business loss into a devastating personal loss. This is particularly a risk for small businesses, as the scale of the financial obligations of larger businesses generally renders having a natural person guarantee those obligations impracticable.

6. If these individual owners and natural persons are forced to close their businesses permanently now or to suffer grave personal economic losses like the loss of a home, the economic and social damage caused to the city will be greatly exacerbated and will be significantly worse than if these businesses are able to temporarily close and return or, failing that, to close later, gradually, and not all at once.

*See* Koplik Decl., Ex. Z at 3.

74.     Local Law 98 of 2020 amended Section 1. Chapter 10 of title 22 of the administrative code of the City of New York by amending section 22-1005 to read, in pertinent part, as follows:

§ 22-1005. Personal liability provisions in commercial leases. A provision in a commercial lease or other rental agreement involving real property located within the city, *or relating to such a lease or other rental agreement,* that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, shall not be enforceable against such natural persons if the conditions of paragraph 1 and 2 are satisfied:

*             *             *

2. The default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and *March 31, 2021*, inclusive.

*Id.* at 5.

## V.     The City's Enactment of Local Law 50 of 2021

75.     On March 17, 2021, the City Council's Committee on Small Business held a hearing to discuss the second extension of the Guaranty Law (Intro 2243) (the "March 17, 2021 Committee Hearing"). *See* Koplik Decl., Ex. CC.

76.     At the March 17, 2021 Committee Hearing, Council Member Rivera stated, in part:

> It's been 10 months since we first passed this emergency legislation. I don't think any of us could have foreseen last year that we'd still be in this situation in March 2021. This disaster has profoundly changed our cityscape with a nearly 40% decrease in the number of small businesses operating citywide in the last year, according to Harvard Universe, and 12% of all businesses in lower Manhattan, which includes my district, have closed, according to the Downtown Alliance.
>
> *                    *                    *
>
> But of all of our work in the council this personal liability legislation is the effort I continue to hear the most about from small business owners, many who reached out over the past [month] worried they would have to shut down their business without the extension. The continued suspension of personal liability clauses and commercial leases will ensure that countless businesses teetering on the edge can continue to focus on paying workers and supporting their communities without the threat of landlords going after their personal life savings and assets if they do have to shut down.

*See* Koplik Decl., Ex. CC, 15:24-17:7.

77.     Many others testified in support of the second extension bill at the March 17, 2021 hearing including Commissioner Doris, Take Root Justice, New York City Hospitality Alliance, Volunteers of Legal Service ("VOLS"), New York State Restaurant Association, Cooper Square Committee, New York City Artist Coalition and Music Workers Alliance, among others. *Id.*, generally.

78.     In connection with the March 17, 2021 Committee Hearing, the Committee received written testimony from several individuals, organizations and entities. *See* Koplik Decl., Ex. DD.

79.     Kathleen Reilly of the New York State Restaurant Association wrote in support of the second extension of the Guaranty Law in pertinent part as follows:

> NYSRA is wholeheartedly in support of extending the provisions of local law 98 of 2020 until March 31, 2021. This law, which prevents personal liability provisions in commercial leases from being enforced against Covid-related defaults, has provided both protection and peace of mind to NYC restaurants over the last year. Without intervention, the protection would expire at the end of the month, on March 31. We recognize that these protections have already been extended once, and while the new end date seemed reasonable back in September, the holiday surge of Covid-19, the second shutdown of indoor dining, and the timelines for vaccinations and the federal Restaurant Revitalization Fund all contribute to our current need for a second extension. The support to extend the protections of local law 98 of 2020 is very strong with New York City operators, and they have been inquiring with us for months about the possibility of an extension.

*See* Koplik Decl., Ex. DD, p. 16.

80.     The Committee also issued a report on March 17, 2021, detailing the impact of the COVID -19 crisis on small businesses in New York City. *See* Koplik Decl., Ex. EE.

81.     On or about March 24, 2021, the City Council amended Intro. No. 2243 as Intro. No. 2243-A.  *See* Koplik Decl., Ex. GG.

82.     On September 13, 2020 the Committee on Small Busines passed Intro 2803-A by a vote of five (5) to zero (0) and no abstentions.  *See* Koplik Decl., Ex. II.

83.     The Committee also issued a report on March 25, 2021, detailing the impact of the COVID -19 crisis on small businesses in New York City which is substantially similar to its March 17, 2021 report. *See* Koplik Decl., Ex.JJ.

84.     On March 25, 2021, the City Council held a stated meeting during which it passed Intro. No. 2243-A by a vote of forty-three (43) in the affirmative and six (6) in the negative. *See* Koplik Decl., Ex. LL.

85.     Local Law 50 of 2021 contained a "Declaration of legislative intent and findings," which detailed, among other matters, the numbers of jobs lost in the food services and drinking places subsector, the retail trade sector, and the personal and laundry services subsector, and declared similar to Local Law 98 of 2020, in pertinent part, as follows:

> 5. While businesses may be willing to weather the economic hardships imposed upon them by governmental measures to combat COVID-19 by either staying open or temporarily closing and later reopening, individual owners and other natural persons who personally guarantee the financial obligations of these businesses face a different and more substantial risk than losing revenue and profit. They risk losing their personal assets, including their possessions and even their own homes, transforming a business loss into a devastating personal loss. This is particularly a risk for small businesses, as the scale of the financial obligations of larger businesses generally renders having a natural person guarantee those obligations impracticable.

> 6. If these individual owners and natural persons are forced to close their businesses permanently now or to suffer grave personal economic losses like the loss of a home, the economic and social damage caused to the city will be greatly exacerbated and will be significantly worse than if these businesses are able to temporarily close and return or, failing that, to close later, gradually, and not all at once.

*See* Koplik Decl., Ex. MM at 3.

86.     Local Law 50 of 2021 amended Section 1. Chapter 10 of title 22 of the administrative code of the City of New York by amending section 22-1005 to read, in pertinent part, as follows:

> § 22-1005.

> 2. The default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and *June 30, 2021*, inclusive.

*Id.* at 4-5.

## VI.     Plaintiffs' 287 7th Avenue Realty LLC and Elias Bochner

87.     Plaintiff Elias Bochner ("Plaintiff Bochner") is the Managing Member of Plaintiff 287 7th Avenue Realty LLC ("Plaintiff 7th Avenue"), a limited liability company, which owns the property located at 287 7th Avenue, a mixed-use building with one commercial space (the "subject premises"). *See* Plaintiffs' Rule 56.1 Statement ("P56.1") at ¶ 16; Koplik Decl., Ex. UU.

88.     Plaintiffs allege, and defendants do not dispute, that pursuant to a June 9, 2006 Lease between 177 West 76th Street Associates and Sunburger 1 LLC ("Lease"), and the options exercised thereafter, Plaintiff 7th Avenue leased the one commercial space at the subject premises to Tenant Sunburger 1 LLC ("Sunburger"). *See* P56.1 at ¶ 17; Koplik Decl., Ex. OO1-OO2.

89.     Mitch Cantor (the "Guarantor") signed the guaranty under the Lease. *See* Koplik Decl., Ex. OO2 at 29.[6]

90.     Steven Leicht was at all relevant times the Chief Executive Officer of Sunburger 1, LLC. *See* Koplik Decl., Exs. PP, QQ, RR.

91.     Sunburger served a March 20, 2020 Six Month Notice of Tenant's Intention to Vacate and Surrender the Premises for the subject premises. *See* Koplik Decl., Ex. QQ.

92.     Sunburger surrendered the subject premises (and all fixtures, furniture and equipment therein) effective June 30, 2020. *See* Koplik Decl., Ex. RR.

93.     Guardian Realty Management ("Guardian") manages the property on behalf of Plaintiff 7th Avenue. *See* Koplik Decl., Ex. NN, 6:5-20.

94.     Shlome Reifer works for Guardian and represented Plaintiff 7th Avenue at the Rule 30(b)(6) deposition on August 16, 2022. *See* Koplik Decl., Ex. NN, *generally*.

---

[6] Exhibit pages herein refer to the page of the "pdf" as filed on the docket.

95.     Plaintiffs 7th Avenue and Bochner admitted that they never attempted to recover alleged monies due pursuant to the Lease from Sunburger via litigation. *See* Koplik Decl., Ex. NN, 25:13-26:8; Ex. VV, 31:6-8.

96.     Plaintiffs 7th Avenue and Bochner admitted that they never attempted to recover alleged monies due pursuant to Guaranty from the Guarantor via litigation or otherwise. *See* Koplik Decl., Ex. NN, 36:13-37:8; Ex. VV, 32:12-33:7.

97.     Plaintiff 7th Avenue admitted never communicating with the Guarantor at all. *See* Koplik Decl., Ex. NN, 21:6-22:8.

98.     At the Rule 30(b)(6) deposition on August 16, 2022, Shlome Reifer testified as follows:

Q. Do you have contact information for Mitch Cantor?

A. No, we don't.

* * *

Q. Have you ever communicated with Mitch Cantor?

A. We don't communicate with guarantors if tenants are paying on a day-to-day basis, even if they do have some sort of a balance. It just gets between the landlord and the tenant's bad side if we do reach out to the guarantor and we cross out the tenant, so we do not usually communicate with the guarantor if the tenant is still occupying the space and plans on making some sort of payments.

Q. Have you ever communicated with Mitch Cantor?

A. No, we haven't.

*See* Koplik Decl., Ex. NN, 21:23-22:08.

99.     At least a portion of the alleged amounts due pursuant to the Lease accrued prior to March 7, 2020 and are still conceivably recoverable from the Guarantor despite the Guaranty Law. *See* Koplik Decl., Ex.SS.

100.    Plaintiff 7th Avenue received a disaster assistance loan in the amount of $150,000 from the U.S. Small Business Administration. *See* Koplik Decl., Exs. TT, UU.

101.    Plaintiff 7th Avenue used Sunburger's security deposit in the amount of $57,000. *See* Koplik Decl., Ex. SS at 2.

102.    When Sunburger vacated the subject premises, it left furniture, fixtures, and equipment, which were used by a subsequent tenant. *See* Koplik Decl., Exs. RR, NN, 34:20-35:4, 40:10-25, Ex. VV, 37:19-38:7.

103.    At the Rule 30(b)(6) deposition on August 16, 2022, Shlome Reifer testified as follow:

Q. What did you observe at that walkthrough?

A. If I remember correctly, I met with two young ladies. I believe it was a manager and an employee. They showed me the space and that was the end of it.

Q. What was the condition of the space?

A. It was in good condition. They had benches, they had walk-in refrigerators that they left there. They had some things left upstairs in the office, a camera system, a large safe, and they had a dining setting on the first floor.

* * *

Q. What happened to those things that you found, the safe and all the things you mentioned, the walk-in refrigerator, the benches, what happened to all that stuff?

MR. KAHNE: Object to form.

A. So whatever was left at 287 Seventh Avenue was used by the next tenant, which happened to be a restaurant as well.

*See* Koplik Decl., Ex. NN, 34:24-35:18.

104.    Both Plaintiffs 7th Avenue and Bochner provided deposition testimony establishing that the real estate taxes were paid from funds from another entity owned by Plaintiff Bochner. *See* Koplik Decl., Ex. NN, 45:18-46:8, Ex. VV, 42:13-43:25.

105.    With respect to payment of the property taxes and other expenses related

to the subject premises, Plaintiff Bochner testified as follows:

Q The question is, do you have any ownership interest in any other LLCs?

A The answer is, yes, but I'm not prepared to list them all. I don't have them in front of me.

Q Did you ever pay, personally pay, taxes, real estate taxes, for 287 7th Avenue Realty?

MR. KAHNE: Object to the form. You can answer.

THE WITNESS: Answer?

MR. KAHNE: Yes.

A I don't remember.

Q Did you contribute any money toward real estate taxes for 287 7th Avenue Realty in calendar year 2020?

A I don't remember.

Q Did you ever contribute any money toward real estate taxes for 287 7th Avenue Realty in calendar year 2021?

A I don't remember the exact dates but I believe from 2020 up through until 2022 we had put in $200,000 for real estate taxes and whatever expenses the building needed.

Q Who is we?

A That means us, the ownership, the partnership with other corporations or personal.

Q And where did that $200,000 come from?

A It came from other investments that we have.

Q Which other investments?

A I don't remember exactly where it came from but it came from 177 -- I don't remember which building but the total we put in was $200,000. That's besides the EIDL loan that we got for $150,000.

Q The what loan? I'm sorry. I didn't hear that.

A The loan, the SBA loan, that we got in June 2020 for $150,000 plus our $200,000 today is $350,000 that we have a liability to pay back.

Q The $200,000 that you put into 287 7th Avenue Realty LLC, was that a gift?
A No.

Q What was it?

A A loan. It has to be paid back.

Q Is there a loan agreement?

A No.

Q Is there an oral loan agreement?

A A simple understanding. I mean it's a common practice between the building. Sometimes when the building is short, that one entity will borrow the other entity and when the funds are available, pay it back.

Q Is there interest on the loan?

A No.

See Koplik Decl., Ex. VV, 42:13-44:02.

106.    With respect to payment of the property taxes and other expenses related to the subject premises, 30(b)(6) witness, Shlome Reifer, testified as follows:

Q. So who paid the amounts from 2020 to 2022?

MR. KAHNE: Object to form. You can answer.

A. So 287 7th Avenue Realty LLC paid for the taxes, which was, I believe, borrowed from a different entity of theirs.

Q. I'm sorry?

A. It was a loan from a different entity of theirs. So they loaned him the money to be able to pay the taxes.

*See* Koplik Decl., Ex. NN, 45:18-45:24.

Dated:         New York, New York
               September 23, 2022

                                        **HON. SYLVIA O. HINDS-RADIX**
                                        Corporation Counsel of the
                                            City of New York
                                        Attorney for Defendants
                                        100 Church Street, 4th Floor
                                        New York, New York 10007
                                        Tel: (212) 356-2187
                                         Email:     pkoplik@law.nyc.gov
                                                    sriggs@law.nyc.gov


                        By: _____/s/_____
                            PAMELA A. KOPLIK
                            SCALI RIGGS
                            Assistant Corporation Counsel