UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Marcia Melendez, Jarican Realty Inc.,
1025 Pacific LLC, Ling Yang, Top East
Realty LLC, and Haight Trade LLC, Elias Bochner,
and 287 7th Avenue Realty LLC

                    *Plaintiffs,*

            *v.*

The City of New York, a municipal entity,
Bill de Blasio, as Mayor of the City of New York,
Louise Carroll, Commissioner of New York City
Department of Housing Preservation &
Development, and Jonnel Doris, Commissioner of
New York City Department of Small Business
Services,

                    *Defendants.*

20 CV 05301 (RA)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT DISMISSING THE COMPLAINT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY DECLARATORY RELIEF**

**HON. SYLVIA O. HINDS-RADIX**
Corporation Counsel of the
  City of New York
Attorney for Defendants
100 Church Street, 4th Floor
New York, NY 10007
Tel: (212) 356-2187
Fax: (212) 356-1148

September 23, 2022

Michelle Goldberg-Cahn,
Mark Muschenheim,
Pamela A. Koplik,
Scali Riggs,
    *of Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................................... i

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS.....................................................................................4

      A.     New York State's Response to COVID-19 ...............................4

      B.     The Impact of COVID-19 Closures on Small Businesses..................................................................................5

      C.     The City's Enactment of the Guaranty Law ...........................5

      D.     Plaintiffs and the Instant Action ...................................……..7

ARGUMENT..........................................................................................................8

**POINT I**...............................................................................................................8

    THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY AS A MATTER OF LAW. .........................................................8

      A.     Jurisdictional Defects Require Dismissal of the Complaint................................................................................9

      B.     The Guaranty Law Does Not Violate the Contracts Clause. ..................................................................................9

              1.     The Record Suggests That The Guaranty Law Does Not Substantially Impair Plaintiffs' Contract......................................10

              2.     The Guaranty Law Serves a Significant and Legitimate Public Interest........................................................................................12

              3.     The Guaranty Law is a Reasonable and Necessary Means to Achieve its Purpose....................................................................13

CONCLUSION.....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                    **<u>Pages</u>**

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ................................................... 15

*Buffalo Teachers Fed'n v. Tobe*,
    464 F.3d 362 (2d Cir. 2006) ......................................................... 9-10, 13, 14, 15

*Bush v. Vera*,
    517 U.S. 952 (1996) ..................................................................................... 8

*California v. Texas*,
    141 S. Ct. 2104 (2021) ................................................................................. 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................... 8

*CFCU Cmty. Credit Union v. Hayward*,
    552 F.3d 253 (2009 2d. Cir.) ...................................................................... 17

*East New York Savings Bank v. Hahn*,
    326 U.S. 230 (1945) ................................................................................... 22

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983) ................................................... 2, 9-10, 12, 15

*Goldberg v. Danaher*,
    599 F.3d 181 (2d Cir. 2010) ........................................................................ 8

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934) ......................................................... 1, 15, 22, 24

*Keystone Bituminous Coal Ass'n v DeBenedictis*,
    480 U.S. 470 (1987) ......................................................... 13, 17, 24

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
    571 U. S. 191 (2014) ................................................................................... 9

*Melendez v City of NY*,
    16 F.4th 992 (2d Cir. 2021) ............................................................. *passim*

*Nashville, C. & St. L. R. Co. v. Wallace*,
    288 U. S. 249 (1933) ................................................................................... 9

*New York v. Ferber*,
    458 U.S. 747 (1982) ..................................................................................... 9

*Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 985 (1997) ............................ 17, 24

**Page**

*Sveen v. Melin,*
   \_\_\_U.S.\_\_\_, 138 S Ct 1815 (2018) ................................................................. 10

*Twentieth Century Assocs., Inc. v. Waldman,*
   294 N.Y. 571 (1945) .......................................................................................... 15

*U.S. Trust Co. v. New Jersey,*
   431 U.S. 1 (1977) .......................................................................................... 1, 13

*W. B. Worthen Co. v. Kavanaugh,*
   295 U.S. 56 (1935) ............................................................................................ 24

**Statutes**

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 11, 15

Fed. R. Civ. P. 56(c) .................................................................................................. 8

N.Y.C. Admin. Code § 22-1005 ................................................................................ 6

N.Y.C. Admin. Code § 22-1005(1) .......................................................................... 14

N.Y.C. Admin. Code § 22-1005(2) .......................................................................... 15

N.Y. Executive Law § 29-a ....................................................................................... 4

**Other Authorities**

U.S. Const. Art. I, § 10 cl. 1 ..................................................................................... 9

*Business Loan Program Temporary Changes; Paycheck Protection Program,* 85
   Fed. Reg. 20811, 20814 (Apr. 15, 2020) ............................................................ 7

Gubernatorial Executive Order No. 202 ................................................................... 4

Gubernatorial Executive Order No. 202.3 ............................................................... 15

Gubernatorial Executive Order No. 202.6 ............................................................... 15

Gubernatorial Executive Order No. 202.7 ............................................................... 15

## PRELIMINARY STATEMENT

In this action, Plaintiffs challenge a law adopted by the City of New York to confront the social and economic fallout from the COVID-19 public health emergency. As part of its effort to respond to the economic devastation brought on by the COVID-19 pandemic, the New York City Council ("Council") passed Local Law No. 55-2020 ("Guaranty Law") to protect guarantors, who are typically small business owners, and who were subject to certain pandemic-related operational restrictions. The Guaranty Law operates as a defense to enforcement of personal guaranties in commercial leases when certain criteria are met. To invoke this defense, the guarantor must be a natural person or persons, the tenant must have been forced to cease operating its business due to certain pandemic era shutdown orders, and the tenant's default in payment of rent (or other event which would cause the guarantor to become liable under the contract) must have occurred between March 7, 2020 and June 30, 2021. The Guaranty Law aims to mitigate the adverse economic effects of the COVID-19 crisis, but does not alter any other remedy available to landlords to seek payment of rent under a commercial lease or to retake possession of the premises. Plaintiffs, a Limited Liability Company which owns commercial space in Manhattan, and its Managing Member, challenge the Guaranty Law under the Constitution's Contracts Clause.

While the Contracts Clause restricts the power of the States to impair contractual arrangements, the prohibition is "not an absolute one and is not to be read with literal exactness like a mathematical formula." *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977) (quotation marks omitted). Legislatures retain "broad power" to adopt generally applicable laws "without being concerned that private contracts will be impaired, or even destroyed, as a result." *Id.* at 22. This is especially true where the government acts to "safeguard the vital interests of its people," and to "protect the public health." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 436 (1934).

Analysis of a claim under the Contracts Clause proceeds in three parts. First, the

challenged law must substantially impair an existing contract. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983). Second, if there is a substantial impairment, courts consider whether the challenged law serves a legitimate public purpose. *Id.* Third, if the law serves a legitimate public purpose, courts then consider whether the law is appropriate and reasonable to achieve that purpose. *Id.* at 412. Here, any contractual impairment caused by the Guaranty Law is not substantial because the Guaranty Law is limited in time and scope, and because the Guaranty Law leaves Plaintiffs' contractual rights and remedies intact. Importantly, even if the Guaranty Law impaired Plaintiffs' contract, it served a legitimate public purpose and is reasonable and necessary to fulfill its intended purpose – protecting struggling businesses, the individuals that those businesses employ, and the City's economy as a whole. Supreme Court precedent is clear: legislatures are afforded wide discretion to enact laws in the public interest, even if they significantly diminish—or even eliminate—private contractual rights. That discretion is at an apex where, as here, a legislature confronts an emergency.

The Guaranty Law also survives a more exacting review recently set forth by the Second Circuit in *Melendez v City of NY*, 16 F.4th 992 (2d Cir. 2021). In connection with the third prong, the *Melendez* majority held that five aspects of the Guaranty Law precluded the conclusion that it was a reasonable and appropriate means to achieve its purpose "as a matter of law," but remanded for a decision on the law's constitutionality on a fuller record. *Id.* at 1038, 1047.

First, the majority viewed the Guaranty Law as neither "temporary" nor "limited." But the majority viewed the time period covered by the Guaranty Law out of context. When viewed in light of the multi-year terms of commercial leases, the relief period provided by the Guaranty Law *is* limited. Moreover, the record shows that the law's structure simply tracked its important public purposes: the legislature reasonably concluded that, absent relief from personal guaranties

- 2 -

covering the period of forced business closures, the prospect of crippling personal liability would remain, creating pressure for owners to shutter businesses early.

Second, the majority was concerned that the Guaranty Law had no requirement that businesses commit to reopening, noting "three assumptions informing the City's enactment of the Guaranty Law." However, these "assumptions" were supported by testimony from small business owner-guarantors. The testimony demonstrated that owner-guarantors were facing financial ruin, and that a specific condition of reopening in the Guaranty Law was not necessary because business owners wanted to remain open or to reopen and felt that the Guaranty Law would give them that ability.

Third, the majority underscored that the economic burden of the personal guaranty law would be borne solely by commercial landlords. But, the Guaranty Law left intact other tools available to commercial landlords to mitigate their losses, including the right to recover rent from a tenant, the right to enforce the tenant's obligation in a court proceeding, and the ability to apply security deposit funds toward unpaid rent. The law was designed to encourage landlords to renegotiate with their tenants to share the economic burden, and it was reasonable for the Council to conclude that commercial landlords are in a far better position to bear the economic burden than guarantors who were risking their personal assets. Moreover, the Guaranty Law cannot be looked at in isolation and must be viewed along with other legislative and City agency initiatives designed to assist small businesses weather the pandemic.

Fourth, the Second Circuit questioned the reasonableness of the Guaranty Law as not conditioned on the guarantor's need or ability to pay. However, the law is an attempt to head off a raft of business closures. The Council could reasonably predict that business owners would choose to close and limit their personal liability, even in circumstances where losing substantial

personal assets would not necessarily lead to an owner's impoverishment. And the Council could judge that its tailoring of the law solely to natural persons guaranteeing businesses that were forced to close was sufficient, without requiring an additional layer of bureaucracy to try to define and adjudicate "need" when time was short and the requirement for action pressing.

Finally, the Second Circuit pointed to the lack of compensation to landlords for the loss of the ability to enforce the personal guaranty, focusing on the allegations in the amended complaint regarding alleged inability to collect rent, recover from the Guarantor, and Plaintiff Bochner's alleged use of his own personal assets. However, the majority also acknowledged that other pandemic-related financial assistance to contracting parties may bear on the reasonableness of impairment without compensation. Here, Plaintiffs were able to borrow from their other successful business ventures to sustain themselves during times of economic uncertainty and obtain an SBA disaster loan in the amount of $150,000 in order to weather the pandemic.

## **STATEMENT OF FACTS**[1]

**A.    New York State's Response to COVID-19**

COVID-19, a highly contagious acute respiratory illness, first appeared in the United States in January 2020. As of September 9, 2022, there have been over 600 million reported cases of COVID-19 worldwide, including over 2 million confirmed cases in New York City. D56.1 ¶ 2.

Following the amendment of N.Y. Executive Law § 29-a, the Governor, by Executive Order ("EO") No. 202 dated March 7, 2020, declared a state disaster emergency and directed the total closure of non-essential businesses and the complete or partial suspensions of others. D56.1 ¶¶ 7-11; Declaration of Carlos Fernando Ugalde Alvarez ("Ugalde Decl.") dated

---

[1] For a complete statement of the material and undisputed facts, Defendants respectfully refer the Court to Defendant's Statement of Material Undisputed Facts dated September 23, 2022 ("D56.1").

August 12, 2020, Exs. B-F [Dkt. 38-2 to 38-7].

**B.      The Impact of COVID-19 Closures on Small Businesses**

These crucial measures limited the spread of COVID-19, averting an even more severe public health catastrophe, but they had profound costs. As the pandemic was just beginning to take hold, the City's Comptroller warned of "significant projected losses in the entertainment, hotel, restaurant, travel, and tourism sectors," the industries most affected by stay-at-home orders.[2] D56.1 ¶ 39; *See also* Declaration of Pamela A. Koplik dated September 23, 2022 ("Koplik Decl.") Ex. H at pp. 9-28. Business downturns had the potential to cost the City $3.2 billion in lost tax revenues. *Id*. Those predictions soon became a stark reality. Approximately 80% of restaurant employees lost their jobs. *Id*. A month into the pandemic, unemployment claims in the City had increased a staggering 2,637%.[3]

**C.      The City's Enactment of the Guaranty Law**

In an effort to address the dual public health and economic crises, the City took substantial measures to alleviate the impact of the pandemic on New Yorkers. On April 22, 2020, the Council, in its first ever virtual stated meeting, introduced a package of bills to promote public health, protect essential workers, and assist small businesses. D56.1 ¶ 11; Koplik Decl., Exs. A-B. One bill in particular, Introduction No. 1932 ("Intro No. 1932"), was aimed at alleviating the financial pressures specifically impacting the City's small business economy. *Id*. In reviewing this proposal, Council collected thousands of pages of written testimony; reviewed surveys, articles, and reports; held six public hearings; and heard hours of oral testimony from small business regulators and advocates, real estate interest groups, chambers of commerce, community organizations, and others. *See generally*, D56.1. In response to this compelling evidence and

---

[2] *See* Ugalde Decl. Ex. RR [Dkt. 38-45].
[3] *See* Ugalde Decl. Ex. NN [Dkt. 38-40].

testimony, the Council passed Intro No. 1932, as amended, by an overwhelming majority. D56.1 ¶ 43; Koplik Decl., Ex. J. The Guaranty Law was enacted on May 26, 2020 as Local Law No. 55 of 2020.  D56.1 ¶¶ 46-47; Koplik Decl., Exs. K-L.

        The Guaranty Law added Admin. Code § 22-1005, entitled "Personal liability provisions in commercial leases." When the Council considered the law, business owners-guarantors were facing a stark choice: close their doors or risk another month of personal liability.[4] With more and more choosing the first option, commercial corridors would become "blighted" and turn into "ghost towns." D56.1 ¶ 58; Koplik Decl., Ex. O at 60:8-61:17. Many small business owners submitted letters explaining their well-founded fears that enforcement of personal guaranties could cause them to "not only lose our business, our livelihoods and our investments in the business, but also spend every other dollar we have on commercial rent on a space that is unusable." Koplik Decl., Ex. E1 p.13. One owner described the risk of "not only losing my restaurants and my income," but also the "risk of losing the entirety of my life savings and any and all assets I have until I am personally bankrupt." D56.1 ¶ 32; Koplik Decl., Ex. E1 pp. 106-108. Business groups and community organizations also supported the law. See, e.g. D56.1 ¶¶ 24-25, 28-29.

        The Guaranty Law dovetailed with other efforts to address the COVID-19 crisis. For example, federal Paycheck Protection Program loans available to small businesses, whose "overarching focus" was on "keeping workers paid and employed" required that at least 75% of loans be used for payroll. *Business Loan Program Temporary Changes; Paycheck Protection*

---

[4] The legislative record reflects specific concerns with so-called "good guy" guaranties, such as the one at issue in this case. *See*, *e.g.*, D56.1 ¶¶ 24, 32, 59. Good guy guaranties allow the tenant to give up possession of the leased premises in return for extinguishing ongoing personal liabilities of the guarantor. Koplik Decl., Ex. OO at p. 76. But, it is not as simple as giving up the keys and walking away. To avoid future liability, the guarantor must ordinarily provide notice—and sometimes, such as here, as much as six-months' notice—racking up personal liability during that entire period. *Id.*

*Program*, 85 Fed. Reg. 20811, 20814 (Apr. 15, 2020). In addition, the COVID-19 Pandemic Small Business Recovery Grant Program, offered by New York State, initially required that a business show profit in 2019 as a requirement for eligibility. Many of the City's small businesses could not access these state funds because of this requirement. Declaration of Coby Kalter ("Kalter Decl.") at ¶ 7. Council heard testimony in support of the Guaranty Law from numerous business owners who indicated that PPP and other available loan and grant programs were difficult to access, underfunded, and otherwise not benefiting owners in a meaningful way. D56.1 ¶¶ 17-34.

        The final law received broad support. A representative of the local hospitality sector testified that nothing "is keeping small business owners awake at night more than … personal guaranties on commercial leases." D56.1 ¶ 24; Koplik Decl., Ex. D at 153:14-155:08. The extensions of the Guaranty Law (Local Law Nos. 98-2020 and 50-2021) likewise received broad support, were the result of multiple hearings where the Council received oral and written testimony from small business owners, and large institutional organizations that support them, about the urgent need for personal liability protections.[5] D56.1 ¶¶ 51- 79.

## D.    Plaintiffs and the Instant Action

        Plaintiff Elias Bochner ("Plaintiff Bochner") is the Managing Member of Plaintiff 287 7th Avenue Realty LLC ("Plaintiff 7th Avenue"), a limited liability company, which owns the property located at 287 7th Avenue, a mixed-use building with one commercial space ("subject premises"). D56.1 at 87; Plaintiffs' Rule 56.1 Statement ("P56.1") at ¶ 16; Koplik Decl., Ex. UU.

        Plaintiffs allege, and defendants do not dispute, that pursuant to a June 9, 2006 Lease ("Lease"), Plaintiff 7th Avenue leased the one commercial space at the subject premises to Tenant Sunburger 1 LLC ("Sunburger"). D56.1 at ¶ 88; P56.1 at ¶ 17; Koplik Decl., Ex. OO1-002.

---

[5] The extensive legislative record for the extensions of the Guaranty Law were not part of the prior record of this case and were not in the record before the Second Circuit. Koplik Dec. ¶¶ 15-37, Exs. N – MM.

Plaintiff 7th Avenue obtained a security deposit in the amount of $57,000. D56.1 at ¶ 101; Koplik Decl., Ex. SS at 2. Mitch Cantor ("Guarantor") personally guaranteed the Lease by signing a "good guy" guaranty. D56.1 at ¶ 89; Koplik Decl., Ex. OO2 at p. 29. On March 20, 2020, Sunburger served a Six Month Notice of Tenant's Intention to Vacate and Surrender the Premises for the subject premises (D56.1 at ¶ 91; Koplik Decl., Ex. QQ), and subsequently surrendered the subject premises (and all fixtures, furniture and equipment therein) effective June 30, 2020. D56.1 at ¶ 92; Koplik Decl., Ex. RR. Eleven months later, in February 2021, Plaintiff 7th Avenue received a disaster assistance loan in the amount of $150,000 from the U.S. Small Business Administration. D56.1 at ¶ 100; Koplik Decl., Exs. TT, UU.

## ARGUMENT[6]

### POINT I

### THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY AS A MATTER OF LAW.

Plaintiffs seek relief declaring as unconstitutional and enjoining the Guaranty Law.[7] *See generally* Amended Complaint ("Am. Compl."). Yet, government enactments are presumed to be constitutional. *Bush v. Vera*, 517 U.S. 952, 992 (1996). A movant is entitled to a grant of summary judgment as a matter of law when "there is no genuine issue as to any material fact." FRCP 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Because [this] motion . . . presents a pure legal question, . . . the district court is equipped to make a determination on the merits." *Goldberg v. Danaher*, 599 F.3d 181, 183 (2d Cir. 2010).

---

[6] Plaintiffs' challenges to the Commercial and Residential Harassment Laws (Local Law Nos. 53-2020 and 56-2020) were dismissed by this Court and affirmed by the Second Circuit. *Melendez v. City of NY*, 16 F.4th 992 (2d Cir. 2021).

[7] Plaintiffs appear to assert an as-applied challenge on the basis of their Contracts Clause claim. *See* Compl. ¶¶ 194-199 and 204-205; *see also* Plaintiffs' Br. at 10-11.

## A.     Jurisdictional Defects Require Dismissal of the Complaint

At the outset, plaintiffs suffer from two jurisdictional problems. To start, the court has no free-floating "jurisdiction to pronounce any statute … void because irreconcilable with the Constitution." *New York v. Ferber*, 458 U.S. 747, 767 n.20 (1982) (quotation marks omitted)*; see also Nashville, C. & St. L. R. Co. v. Wallace*, 288 U. S. 249, 262 (1933) (inquiring whether a suit for declaratory relief "would be justiciable in this Court if presented in a suit for injunction"); *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U. S. 191, 197 (2014) (noting that a court looks to "the nature of the threatened action in the absence of the declaratory judgment suit" to determine whether jurisdiction exists). The City does not enforce the Guaranty Law, it is a defense that would by a guarantor. Because the City does not "enforce [the Guaranty law]" against plaintiffs, any injunction would "amount to no more than a declaration that the statutory provision they attack is unconstitutional," which is "that is the very kind of relief that cannot alone supply jurisdiction otherwise absent." *California v. Texas*, 141 S. Ct. 2104, 2116 (2021). Moreover, the action is not ripe. Discovery revealed that Plaintiffs never attempted to recover any amounts in litigation from Sunburger or the Guarantor, the Guarantor never invoked the defense of the Guaranty Law. *See* D56.1 ¶ 96. Moreover, at least a portion of the alleged amounts due pursuant to the Lease accrued prior to March 7, 2020 and are still conceivably recoverable from the Guarantor despite the Guaranty Law. *See* D56.1 ¶ 99; Koplik Decl., Ex.SS.

## B.     The Guaranty Law Does Not Violate the Contracts Clause.

The Contracts Clause provides that "[n]o State shall pass any . . . Law . . . impairing the Obligation of Contracts." U.S. Const. Art. I, § 10 cl. 1. The extent to which States may exercise their police powers to the detriment of private contracts is determined by applying the three-part test articulated in *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1982) [hereinafter, "*Energy Reserves*"]; *See Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir.

2006) [hereinafter, "*Buffalo Teachers*"].

1.   The Record Suggests That The Guaranty Law Does Not Substantially Impair
     Plaintiffs' Contract.

The threshold inquiry in a Contracts Clause analysis is whether the law "has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Reserves*, 459 U.S. at 411. The substantial impairment inquiry asks "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Melendez,* 16 F.4th at 1033 (quoting *Sveen v. Melin*, ___U.S.___, 138 S Ct 1815, 1822 (2018)).

Crediting Plaintiffs' allegations as true, the Second Circuit held that Plaintiffs had plausibly pled a substantial impairment of their contract. *See Melendez*, 16 F.4th at 1033. In so holding, the Second Circuit specifically credited Plaintiffs' allegations that personal guaranties are "critical inducements," for Plaintiffs when entering into a commercial lease. *Melendez*, 16 F.4th at 1034. ("[W]e must accept as true plaintiffs' assertion that personal guaranties play this indispensable role in commercial leases and infer therefrom that landlords reasonably rely on the protection of such guaranties when leasing to small businesses."). Plaintiffs reiterate in their Supplemental Memorandum of Law in Support of Their Motion for Declaratory Relief [Dkt. 92] ("Pls. Supp. Br.") that the personal guaranty was a "primary inducement" without which Plaintiff 7th Avenue would not have entered into the lease. Pls. Supp. Br. at p. 14. However, the post-discovery record contradicts this claim.

Deposition testimony makes clear that, far from being an integral part of Plaintiffs' contract, Plaintiffs rarely communicated with the guarantor. *See generally*, D56.1 ¶¶ 95-98; Koplik Decl., Exs. NN, VV. Plaintiffs noted that "personal guaranties enable tenants to lease spaces they would otherwise be precluded from leasing because of an owner's need or desire to place a more

creditworthy tenant on the lease." Pls. Supp. Br. at pp. 8-9. Yet, Plaintiffs appear to know little more than the guarantor's name. D56.1 ¶¶ 95-98; Koplik Decl., Exs. NN, VV. Plaintiffs do not have contact information for the guarantor. *Id*. Plaintiffs do not know the relationship between the guarantor and their tenant. *Id*. Critically, even after the tenant defaulted, Plaintiffs did not attempt to collect from the tenant or guarantor through litigation. *Id*. These facts weigh heavily against a finding that the guaranty was a "critical inducement" as Plaintiffs claim.

Although the Guaranty Law leaves intact a landlord's ability to enforce debts arising in the covered statutory period against tenants, the Second Circuit expressed skepticism about the practical realities of doing so. The majority stated that "the practical likelihood of landlords . . . recovering rent arrears from delinquent small business tenants is speculative at best" because "a landlord invokes his guaranty rights only when a tenant is not paying rent" and "state laws and regulations have limited landlords' ability to use eviction to minimize their rent losses." *Melendez*, 16 F.4th at 1033. The majority further posited that collecting rent from tenants might prove difficult because "commercial tenants . . . can dissolve and/or use bankruptcy to avoid accumulated rent indebtedness." *Id.* The Court concluded, "viewing the pleadings record in the light most favorable to plaintiffs as we are required to do on review of a judgment of dismissal under Rule 12(b)(6), we are not now persuaded that, as a matter of law, tenants' continued obligations for unpaid rent compels a conclusion that the Guaranty Law's permanent impairment of guaranty obligations is not substantial." *Id*. at 1033-34.

However, the legislative record reflects that the practical likelihood of recovering from a guarantor is equally dubious. The record includes testimony from several owner-guarantors indicating that they have few assets beyond the assets of the businesses whose leases they guaranteed. *See*, *e.g*., D56.1 ¶ 34; Koplik Decl. Ex. E1 p.13. Testimony in the legislative record

further reflects that individual guarantors were facing personal bankruptcy.[8] Importantly, Plaintiffs asserted no facts that speak to the assets or solvency of their guarantor. Indeed, Plaintiffs have little information concerning their guarantor. *See* D56.1 ¶¶ 95-98; Koplik Decl., Exs. NN, VV.

Because this Court is no longer bound to accept Plaintiffs' claims as true, and because the record contradicts Plaintiffs' claim that a personal guaranty is a critical inducement upon which they have reasonably relied, this Court should find that the Guaranty Law does not substantially impair Plaintiffs' contract.

    2.    <u>The Guaranty Law Serves a Significant and Legitimate Public Interest.</u>

Assuming *arguendo* that this Court finds a substantial impairment, the Court must next determine if the law has a legitimate public purpose. *Energy Reserves*, 459 U.S. at 411. The "remedying of a broad and general social or economic problem" constitutes such a purpose. *Id*. at 412. The Guaranty Law easily meets the public-purpose test because it is designed to prevent the bankruptcies of small business owners, the firing of their employees, and the broader economic devastation brought on by a raft of business closures.[9] As the Second Circuit stated, "the COVID-19 pandemic has prompted a serious economic as well as health emergency in New York City. Nor do plaintiffs deny that – the Contracts Clause's origins in economic crises notwithstanding – controlling precedent recognizes the mitigation of economic emergencies as a public purpose that can support

---

[8] *See, e.g.*, D56.1 ¶ 33; Koplik Decl., Ex. E1, p. 111("Because of personal guarantees in our leases I not only have to deal with a potentially failing business, I too have to think about personal financial ruin and bankruptcy."); D56.1 ¶ 34; Koplik Decl., Ex. E1, p. 13 ("In the current situation I cannot afford to pay rent and I cannot afford to give notice. I will quickly run out of money either way . . . I am out of options. … We will then be forced into bankruptcy to liquidate whatever little else we might have, to pay commercial rent on a location that has been forced to close.").

[9] As the Council Member Rivera explained, "countless small business owners" had very real concerns about "going belly up" and the potential to lose "their personal life savings and asset[s] because of a disaster no one saw coming." D56.1 ¶ 44; Koplik Decl., Ex. J at pp. 29-30. And, as the Council elaborated in extending the law, individuals "risk losing their personal assets, including their possessions and even their own homes, transforming a business loss into a devastating personal loss." D56.1 ¶ 73; Koplik Decl., Koplik Decl., Ex. Z at p.3. Alternatively, if business owners opted to close their doors to avoid personal liability, "the economic and social damage caused to the city will be greatly exacerbated." *Id.*

contract impairment." *Melendez*, 16 F. 4th at 1036. Though Plaintiffs "disagree" with the Second Circuit's findings (Pls. Supp. Br. at p.14), Plaintiffs have not seriously attempted to refute this point either by legal argument or developing the record.

      3.    <u>The Guaranty Law is a Reasonable and Necessary Means to Achieve its Purpose.</u>

      **a. The Council Reasonably Concluded that the Guaranty Law Would Mitigate the Economic Crisis**

When reviewed under the traditional application of Supreme Court precedent, the Guaranty Law is a reasonable and necessary means to achieve its intended purpose. The touchstone of the Supreme Court's modern Contracts Clause jurisprudence is that legislatures retain "broad power" to adopt generally applicable laws "without being concerned that private contracts will be impaired, or even destroyed, as a result." *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977); *see also Buffalo Teachers,* 464 F.3d at 367 (explaining that the legislature's police power "is paramount to any rights under contracts between individuals" (quotation marks omitted)). As the Supreme Court has "repeatedly held," so long as the government is not a contracting party, courts should "defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Keystone Bituminous Coal Ass'n v DeBenedictis*, 480 U.S. 470, 505 (1987) (quotation marks omitted).

      Here, the Council properly judged that the Guaranty Law was a reasonable and appropriate means to address the potential for the mass, permanent closure of small businesses, taking with them the livelihoods of all the employees who depend on those businesses reopening in some capacity. The Guaranty Law is not simply a poverty-prevention measure, but rather an attempt to head off a raft of business closures for the broader public good. Many business owners testified at the hearings and through the written testimony that enforcement of personal guaranties could cause them not only to lose their businesses, but to lose their life savings. *See generally*,

D56.1; Koplik Decl. The Council heard testimony from numerous sources that other efforts to address the COVID-19 crisis, such as loan and grant programs, were difficult to navigate, inaccessible to many because of language barriers, and quickly ran out of funding. *Id*. The Council made a considered judgment, based on its own experience and a substantial legislative record, that the personal guaranty law would accomplish its goals.

      The Guaranty Law's built-in limitations further demonstrate that it is a reasonable and appropriate means to serve the public interest. The law is tailored in four material respects. First, the law affects only guaranties signed by a "natural person," excluding corporate guarantors, and has no effect on the terms of the actual lease. Indeed, the law did not apply to any of the original plaintiffs, and the complaint had to be amended to find plaintiffs who were purportedly affected by the law. Second, the law applies only to commercial tenants who were forced to close or reduce capacity under a subset of executive orders. N.Y.C. Admin. Code § 22-1005(1). Third, the law only renders a qualifying personal guaranty unenforceable when a default or other event causing the individual-guarantor's personal liability occurs between March 7, 2020 and June 30, 2021. Finally, the law does not deprive landlords of any other remedies under their leases, including recovering unpaid rent and interest from tenants, charging late payment fees, applying security deposit funds, terminating a tenant's right to possession, recovering damages, and selling property in the premises and applying proceeds to unpaid rent.

      The Council also considered other alternatives and opted to narrow the scope of the law. *See Buffalo Teachers*, 464 F.3d at 371. For instance, the draft bill that was originally introduced, Intro. No. 1932, was vastly reduced in scope by Intro. No. 1932-A, which was enacted

as the Guaranty Law.[10] S*ee Koplik Decl. Exs. A, L*. As enacted, the law only covers commercial tenants subject to the in-person business and workplace restrictions set forth in EO Nos. 202.3, 202.6, and 202.7 and is limited in duration. *Id.* § 22-1005(2). *See Buffalo Teachers*, 464 F.3d at 371; *see also Blaisdell*, 290 U.S. at 447; *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242-43 (1978).

In view of the unprecedented emergency to which it responds, there can be no doubt that the Guaranty Law, in the words of *Energy Reserves*, "is of a character appropriate to the public purpose justifying the legislation's adoption."[11] *Energy Reserves,* 459 U.S. at 412.

### b. The Five Factors Identified by the Second Circuit do not render the Guaranty Law Unconstitutional

The Guaranty Law also survives when reviewed under the Second Circuit's recently articulated standard for Contracts Clause analysis. *See generally Melendez v City of NY*, 16 F.4th 992 (2d Cir. 2021). In *Melendez*, the majority identified five aspects of the Guaranty Law that, in its view, weighed against Rule 12(b)(6) dismissal as a matter of law. Notably, the extensive legislative record for the extensions of the Guaranty Law was not before the Second Circuit. And the Second Circuit provided that this court should consider the effect of these factors on remand and with a fuller view of the record. The full record and a careful reading of the law's true purposes establish that the Guaranty Law was a reasonable and appropriate means to achieve those purposes.

---

[10] The initial proposal would have suspended the enforcement of guaranties for commercial tenants who (1) were subject to any seating, occupancy, or on-premises limitations pursuant to any order issued by the Governor or the Mayor; or (2) suffered a 50% or more decline in revenues compared to its pre-COVID revenues. D56.1 ¶ 38; Koplik Decl., Ex. F.

[11] In *Twentieth Century Assocs., Inc. v. Waldman*, 294 N.Y. 571, 580 (1945), the New York Court of Appeals upheld a law establishing a rent ceiling for commercial spaces that was enacted during a public emergency because "[i]n the light of the emergency which called into play the police powers of the State in this case, we are unable to say that the measures taken in the public interest were unreasonable or inappropriate to curb the evils arising from the emergency and to accomplish the public purposes declared in the statute."

First, the majority noted that the fact that the Guaranty Law is not a "temporary" or "limited" impairment "weigh[s] heavily against a finding of reasonableness" *Melendez*, 16 F.4th at 1049. While the law applies only where the tenant defaulted between March 2020 and June 2021, the majority reasoned that it "destroys the guaranties by rendering them forever unenforceable" for that period. *Id*. at 1039.

But the majority viewed this time period out of context. When viewed in light of the multi-year terms of commercial leases, the relief period provided by the Guaranty Law *is* limited. The Guaranty Law covers the period of March 7, 2020 to June 30, 2021 – just under 16 months, which is a fraction of Plaintiff 7th Avenue's lease term. Indeed, Council heard testimony from business owners whose lease terms were as long as 10 years. *See* D56.1 ¶34; Koplik Decl. Ex. E1, p. 13. Plaintiff 7th Avenue's lease was initially for a seven-year term, and was subsequently extended for multi-year terms, with the most recent extension for a five (5) year term. Koplik Decl. Ex. OO. The Guaranty Law only protects a personal guarantor from liability for debts accruing during an extremely limited sixteen month window – not the entirety of the lease term.

And the law's structure simply tracked its important public purposes: the legislature reasonably concluded that, absent relief from personal guaranties covering the period of forced business closures, the prospect of crippling personal liability would remain, creating pressure for owners to shutter businesses early. The Council was deeply concern with the impact, not only on individual guarantors, but on the effect that these closures would have on the City's economy generally. As then-Speaker Corey Johnson, observed:

> Small businesses employ 26 percent of New Yorkers and if they close down, hundreds of thousands of workers will permanently lose their jobs and the city loses out on billions of dollars in sales tax, property tax and income tax revenue. Our economy runs on small businesses and now they are facing unprecedented losses. This could be the worst economic disaster that New York City has seen since the great depression. Many businesses will be forced to shut down for good if they

don't get more help. That won't just devastate business owners and their workers, it will further destabilize our economy, our neighborhoods, and the lives of so many New Yorkers. Congress made some improvements to the Paycheck Protection program but those loans are still too hard to access in their ensured supply and I'm not confident that they will end up helping the vast majority of New York City small businesses. This is particularly true for the city's immigrant owned small businesses. They face significant obstacles in accessing loans because of language barriers, documentation requirements and eligibility criteria. We absolutely need more federal support here but there are some things that the city can do.

D56.1 ¶ 21; Koplik Decl., Ex. D at 10:11-11:13.

Even if "permanent," Supreme Court (and prior Second Circuit) precedent upheld permanent deprivations in *DeBenedictis* and *Sanitation & Recycling*. *DeBenedictis*, 480 U.S. at 505; *Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 985, 994 (1997); *see also CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 268 (2d. Cir. 2009) (upholding law that, as here, "reduces the assets available for satisfaction of" debt obligation). In neither case did the decision give any indication that the permanency of the deprivation "weigh[s] heavily" against the law's constitutionality.

Second, the majority held that the Guaranty Law's lack of a requirement that businesses commit to reopen after the forced closures ended weighed against its reasonableness in light of what the majority viewed as the Guaranty Law's purpose, *i.e.* to "help shuttered businesses survive the pandemic." *Melendez*, 16 F.4th at 1040. The majority noted "three assumptions informing the City's enactment of the Guaranty Law: (a) that shuttered small businesses are usually owned by the individuals guaranteeing their leases (b) that these owner-guarantors would be financially ruined if required to pay their businesses' rent arrears, and (c) that financially ruined owners would be unlikely to reopen shuttered businesses." *Id.* at 1040-41. The majority concluded "[t]he problem with concluding that the Guaranty Law is an appropriate means to serve this public purpose is that the law does not condition the relief it affords on guarantors owning shuttered

businesses or, even if they do, on their ever reopening those businesses." *Id*.

These "assumptions" identified by the majority were based on the legislative record, specifically, testimony from small business owners and guarantors. *See e.g.*, D56.1 ¶¶ 32-34; Koplik Decl. Ex. E1 at pp. 13, 106-08, 111. This testimony from owner-guarantors showed how dire their financial circumstances were. For example, Gabriel Stulman, CEO and Founder of Happy Cooking Hospitality testified:

> Emotionally and financially I am preparing for this possibility of going bankrupt and belly up… I am concerned that my landlords in *addition* to them keeping my security deposits (most of them 3 months and in excess of $60,000), are entitled to — and likely will — sue me personally for my obligations under my various leases. The Bill 1932-2020 that you have proposed is instrumental to my existence and that of most small businesses in this city.

D56.1 ¶ 32; Koplik Decl., Ex. E1 pp. 106-108.

Based on the extensive testimony in the record from small business owner-guarantors on this point, it was reasonable for the Council to conclude that small business owners would be "financially ruined if required to pay their businesses' rent arrears." Indeed, many small business owners had "no clear path forward to continue to earn a living." Kalter Decl. ¶ 6.

For similar reasons, it was also reasonable for Council to conclude that a specific condition of reopening in the Guaranty Law was not necessary. Business owners were clear – they wanted to remain open or to reopen and felt that the Guaranty Law would give them that ability. For example, one business owner testified that "[t]he vast majority of [small business owners] WANT to revive our businesses, but it will be impossible without some bold support from our landlords and from the government." D56.1 ¶ 35; Koplik Decl., Ex. E1 at p. 146 (emphasis in original). In addition, over 700 business operators submitted virtually identical written testimony, which stated:

> As the operator of a business in your district, I URGE you to SPONSOR and PASS the following critical legislation that will support small businesses in your district,

        giving us a fighting chance to survive.

*See* D56.1 ¶ 36; Koplik Decl., Exs. E1-E5. (underline emphasis added).

Based on this testimony and the many other impassioned pleas of small business owners impacted by the shutdown, Council could reasonably conclude that requiring a commitment to reopen was simply unnecessary. No one wanted to close. No one wanted to be out of business be it temporarily or permanently.

The law serves a broader public purpose as well. The purpose of the Guaranty Law was not only to help small business survive and to protect their employees, but also to prevent the broader devastation caused by business closures and mass layoffs combined with personal bankruptcies. As set forth in the law's declaration of legislative intent and findings, if "individual owners and natural persons are forced to close their businesses permanently now or to suffer grave personal economic losses like the loss of a home, the economic and social damage caused to the city will be greatly exacerbated and will be significantly worse than if these businesses are able to temporarily close and return or, failing that, to close later, gradually, and not all at once." D56.1 ¶¶ 73, 85; Koplik Decl., Exs. MM, Z at 3.

As Council Member and bill sponsor Carolina Rivera, stated:

> My bill will ensure that business owners, should they be forced to walk away or temporarily shutter their stores, through no fault of their own can do so without facing personal liability[.] Sadly, I am already hearing from small businesses in my district that some landlords who I understand maybe suffering as well are going after small business owners life savings and personal assets during this national pandemic.

*See* D56.1 ¶ 15; Koplik Decl., Ex. D at 30:03 -31:03. As set forth *supra*, Speaker Johnson identified the greater threat to New York City's economy, and the "significant obstacles" small business owners faced in securing pandemic relief from other sources. *See* D56.1 ¶ 21; Koplik Decl., Ex. D 10:11-11:13.

Third, the majority underscored that the economic burden of the personal guaranty law would be borne solely by commercial landlords. *Melendez*, 16 F.4th at 1042. But as stated, *supra*, this economic burden can be mitigated – the Guaranty Law does not render unenforceable or diminish Plaintiffs' (i) right to recover the tenant's rental payments during the applicable time period; (ii) right to enforce the tenant's rental obligation in a court proceeding; or (iii) ability to apply often substantial security deposit funds towards unpaid rent.

Additionally, the Guaranty Law was intended to encourage Landlords to negotiate and renegotiate leases with their tenants for the benefit the economy as a whole. As Council Member Rivera stated at the September 14, 2020 hearing on the first extension bill for the Guaranty Law (Local Law 98 of 2020):

> That's great, and that was absolutely one of the intentions of, of putting forward this bill, was to not just protect our small business owners who are really just such important New Yorkers to us, they keep the city moving, that are the lifeblood, but also to show to some of these landlords that, um, we really are trying to do everything we can to support a fair and effective negotiation. We realize everybody's in hard times, ah, but that increase in landlords looking to negotiate new lease terms was absolutely a positive side effect of the bill that I put forward that we're hoping to extend today,…

*See* Koplik Decl., Ex. O at 32: 4-16; Kalter Decl. at ¶¶ 9-14.

Moreover, in cases asserting a Contracts Clause claim, an unequal burden is placed on the party whose contract rights are affected. It was reasonable for the Council to conclude that, unlike personal guarantors, commercial landlords were in far better position to bear the economic burden.[12]  As the Council specifically found in the "declaration of legislative intent and findings,"

---

[12] Plaintiff Bochner, the only remaining individual Plaintiff in this action, specifically benefitted from this shield. Contrary to Bochner's claims, he did not spend personal funds to cover any debts resulting from a tenant's failure to pay rent. Plaintiff Bochner testified at his deposition that $200,000 of funds to pay real estate taxes were contributed "from other investments that we have" and explained that there is a "common practice" that "when one building is short, that one entity will borrow [from] the other entity and when the funds are available, pay it back." Koplik Decl., Ex. VV, 42:13 – 43:25.

of both Local Law Local Law 98 of 2020 and Local Law 50 of 2021:

> While businesses may be willing to weather the economic hardships imposed upon them by governmental measures to combat COVID-19 by either staying open or temporarily closing and later reopening, individual owners and other natural persons who personally guarantee the financial obligations of these businesses face a different and more substantial risk than losing revenue and profit. They risk losing their personal assets, including their possessions and even their own homes, transforming a business loss into a devastating personal loss. This is particularly a risk for small businesses, as the scale of the financial obligations of larger businesses generally renders having a natural person guarantee those obligations impracticable.

*See* Koplik Decl., Exs. Z and MM at 3.

The Guaranty Law's placement of any economic burden cannot be viewed in isolation:

> The City Council treated the Guaranty Law as part of an overall package to support small businesses impacted by the pandemic. In addition to the policies it eventually enacted, including the Guaranty Law, the City Council considered alternative policies and policy designs… the City Council ultimately did not adopt the position of the landlords and others who opposed the Guaranty Law, it did not limit landlords' other remedies to enforce commercial tenants' obligations through the Guaranty Law, and it later passed legislation to provide tax relief to certain property owners adversely impacted by COVID-19.  See App'x at 3534-35 (reproducing NYC Local L. 2020/62).

*Melendez*, 16 F.4th at 1066-1067 (Carney, J., dissenting in part); Local Law 62 of 2020.

Additionally, separate from legislative initiatives, City agencies in general, and SBS in particular, helped businesses weather the pandemic in other ways:

> [SBS] helped small businesses weather this critical period by: assisting more than 10,000 small businesses connect to more than half a billion in city, state, federal, and philanthropic funding opportunities; helping hundreds of business owners negotiate leases to keep their doors open; launching a small business hotline that fielded more than 75,000 calls about reopening, financing, business operations, and legal assistance; and supporting more than 12,000 restaurants and saving more than 100,000 jobs. [SBS] supported innovative programs that helped employers to: train employees in tech and healthcare to meet the growing demand for remote workers; adopt and expand e-commerce models; and leverage opportunities to provide new

goods and services.

*See* SBS Report entitled *Supporting NYC Small Business Recovery & Growth.*[13] The analysis of the placement of economic burden must not be looked at separate from the full panoply of services available to all businesses (including landlords) to weather the pandemic.

Fourth, the Second Circuit noted that the Guaranty Law is not conditioned on the guarantor's need or ability to pay. *Melendez,* 16 F. 4th at 1043. But the law is not simply a poverty-prevention measure, but rather an attempt to head off a raft of business closures for the broader public good. Council could reasonably predict that business owners would choose to close and limit their personal liability, with all the broader economic consequences that would entail, even in circumstances where losing substantial personal assets would not necessarily lead to an owner's impoverishment. And the Council could judge that its tailoring of the law solely to natural persons guaranteeing businesses that were forced to close was sufficient, without requiring an additional layer of bureaucracy to try to define and adjudicate "need" when time was short and the requirement for action pressing. Moreover, a showing of need has never been previously required by the Supreme Court. *See*, *e.g.*, *East New York Savings Bank v. Hahn*, 326 U.S. 230, 231 (1945) (no showing of need required)*; Blaisdell,* 290 U.S. 398 (same)*.*

Nevertheless, the record is replete with testimony from small business owners, and large institutional organizations that advocate for them[14] demonstrating the ongoing and urgent need for personal liability relief. *See* D56.1 at ¶¶ 17-36, 55-65, 77-79; *See also*, Kalter Decl at ¶¶

---

[13]Available at https://www1.nyc.gov/assets/sbs/downloads/pdf/about/reports/supporting-nyc-recovery-growth.pdf (last visited Sept. 23, 2022)

[14] These organizations include, Think Chinatown, New York City Hospitality Alliance, Association for Neighborhood and Housing Development, Asian American Federation, The New York State Restaurant Association, the Third Avenue Business Improvement District and the Bruckner Boulevard Improvement District, Relief Opportunities for All Restaurants ("ROAR"), Take Root Justice, Volunteers of Legal Service ("VOLS"), Cooper Square Committee, and New York City Artist Coalition and Music Workers Alliance.

9-14. Moreover, while Plaintiffs erroneously imply that the "changing economic conditions" made the extensions of the Guaranty Law unnecessary (Pls. Supp. Br. at p. 7) that cannot be further from the truth. New York City is still struggling to recover from the pandemic, especially in the hospitality industry where many personal guaranties tend to occur:

> While the country as a whole has recently regained all of the jobs it lost early in the health crisis, New York City is still missing 176,000 [jobs] representing the slowest recovery of any major metropolitan area, according to the latest employment data….A majority of the lost private sector jobs have been concentrated in the hospitality and retail industries, traditional pipelines into the work force for younger adults, immigrants and residents without a college degree.

Nicole Hong and Matthew Haag, *In New York City, Pandemic Job Losses Linger*, N.Y. Times, September 14, 2022.

Finally, the Second Circuit pointed to the lack compensation to landlords for the loss of the ability to enforce the personal guaranty. *Melendez*, 16 F. 4th at 1045-46. But in questioning the lack of a compensation requirement, the majority focused on the allegations of the Plaintiff Bochner in the Am. Compl. stating, in relevant part:

> On the present record we must assume that such damages can be extensive. The amended complaint alleges that when an inability to collect rent or to enforce rent guaranties left landlord 287 7th Avenue Realty LLC unable to pay tax obligations, the LLC's principal, Mr. Bochner, drew on $35,000 of his own fund to make the payments.

*Id.* at 1045. In fact, the fully-developed record now reveals that, despite allegations to the contrary, Plaintiff Bochner *did not* personally pay property taxes owed by Plaintiff 7th Avenue. *See supra* fn. 12. Moreover, the record here reveals other ways that Plaintiffs were able to weather the pandemic, including the fact that the tenant left behind assets including restaurant fixtures and other equipment, which were then leased along with the commercial space to a different restaurant in October 2020. *See* D56.1  at ¶¶ 102-103; Koplik Decl., Ex. NN, 34:24-35:18, 55:17-18. Far from having insufficient "assets to continue to operate as a going concern" (Pl. 56.1 ¶18), Plaintiffs

were able to use assets left behind by the tenant, and borrow from their other successful business ventures to sustain themselves during times of economic uncertainty.

Moreover, no case has ever suggested that the government is obligated to compensate a party whose contract is impaired—such a requirement is found in the Takings Clause, but not the Contracts Clause. At most, two New Deal-era mortgage moratoria cases mention a mortgagor's ongoing obligation to pay some amount. *See Blaisdell*, 290 U.S. at 445; *W. B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 61 (1935). But here, as in those cases, tenants are obligated to pay the rent as it is due under the lease—only guarantors are exempt. Moreover, none of the modern cases suggest that any compensation is owed, or that compensation is even a relevant consideration, when the legislature extinguishes valuable contract rights. See, e.g., *DeBenedictis*, 480 U.S. at 505; *Sanitation & Recycling*, 107 F.3d at 994. Indeed, the Second Circuit itself acknowledged that it was not "suggest[ing] that compensation is always necessary to defeat a Contracts Clause challenge." *Melendez*, 16 F. 4th at 1046.

Here too the Guaranty Law cannot be viewed in isolation. Critically, the Second Circuit acknowledged that "other pandemic-related financial assistance to contracting parties may bear on the reasonableness of impairment without compensation." *Melendez*, 16 F 4th at fn. 82. And the Second Circuit left open the possibility that their analysis could be altered with additional record evidence on this point. *Id.* As discussed above, government pandemic assistance was not accessible to small business tenants. D56.1 at ¶¶ 17-34; Kalter Decl. at ¶ 7. Notably, here it is undisputed that Plaintiff 7th Avenue was able to obtain an SBA disaster loan in the amount of $150,000 in order to weather the pandemic.[15] D56.1 at ¶ 100; Koplik Decl., Exs. TT, UU.

---

[15] Defendants requested in discovery, but Plaintiffs failed to provide the following regarding the SBA disaster loan: i) the application documents; ii) an itemization of what the SBA disaster loan was used for; and iii) the amount still due and owing on the SBA disaster loan. Koplik Decl. ¶ 47.

Applying the factors identified by the Second Circuit, a review of the full legislative record and a careful reading of the law's true purposes establish that the Guaranty Law was a reasonable and appropriate means to achieve those purposes. When small business owners decided to back their businesses with their personal assets, potentially placing their life savings and homes on the line, they were betting on their business plans, not on a once-in-a-century pandemic. Before the Council acted, the expectation under most commercial leases was that small business commercial tenants (and their guarantors) alone should bear the risk and the financial fallout from the pandemic. The Council sought to support the City's small businesses, and those who rely on them, with a carefully-calibrated piece of legislation that was mindful of the needs and resources available to owner-guarantors and their landlord partners. While the pandemic is receding, the economic harm brought to these small businesses is still palpable. Invalidating the Guaranty Law would threaten the financial security of thousands of small business owners and their families, employees, and communities. *See generally*, Kalter Decl.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' cross-motion for summary judgment dismissing the Am. Compl. in its entirety. There are no genuine issues of material fact and the Guaranty Law is Constitutional.

Dated:        New York, New York
              September 23, 2022

                              **HON. SYLVIA O. HINDS-RADIX**
                              Corporation Counsel of the City of New York
                              Attorney for Defendants


                              By:_____/s/_____
                                  Pamela A. Koplik
                                  Scali Riggs
                                  E-mails: pkoplik@law.nyc.gov
                                           sriggs@law.nyc.gov

- 25 -