UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias Bochner, and 287 7th Avenue Realty LLC, | :   Civ. No. 20-cv-5301(RA) |

Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC,   :   Civ. No. 20-cv-5301(RA)
Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias   :
Bochner, and 287 7th Avenue Realty LLC,                   :
                                                          :
                                    *Plaintiffs*,         :
                                                          :   **Oral Argument Requested**
        v.                                                :
                                                          :
The City of New York, *a municipal entity*,               :
Bill de Blasio, *as Mayor of the City of New York*,       :
Louise Carroll, *Commissioner of New York City*           :
*Department of Housing Preservation &*                    :
*Development*, and Jonnel Doris, *Commissioner of*         :
*New York City Department of Small Business*              :
*Services*,                                               :
                                                          :
                                    *Defendants*.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-
<u>MOTION FOR SUMMARY JUDGMENT</u>**

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
(212) 806-5400

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ........................................................................................................6

   A.  The Court Has Jurisdiction To Reach the Merits Of This Action ......................6

   B.  The Guaranty Law Violates The Contracts Clause............................................7

      1.  The Guaranty Law Substantially Impairs Contracts ....................................8

      2.  The Guaranty Law Is An Unreasonable and Inappropriate Means to Achieve
         The City's Professed Purpose ....................................................................11

         i.   The Guaranty Law Is Neither Temporary Nor Limited.........................16

         ii.  The Guaranty Law Did Not Condition Relief On Reopening ..............18

         iii. The Economic Burden Of The Guaranty Law Was Borne Solely By
            Commercial Landlords.........................................................................19

         iv. The Guaranty Law Is Not Conditioned On The Guarantor's Ability To Pay........21

         v.  The Guaranty Law Fails to Compensate Landlords For Damages Or Losses
           Resulting From the Impairment..........................................................23

   CONCLUSION...................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Babbitt v. Farm Workers Nat'l Union*,
    442 U.S. 289 (1979)...................................................................................................6

*W.B. Worthen Co. ex. rel. Bd. of Comm'rs of St. Improvement Dist. No. 513 of*
    *Little Rock Ark. v. Kavanaugh*,
    295 U.S. 56 (1935)...................................................................................................5

*California v. Texas*,
    141 S. Ct. 2104 (2021)...........................................................................................6

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398, 445 (1934).......................................................................................17

*Melendez v. City of New York*,
    16 F.4th 992 (2021)........................................................................................ *passim*

*New York v. Ferber*,
    458 U.S. 747 (1982)...............................................................................................6

*Ryan v. CFTC*,
    125 F.3d 1062 (7th Cir. 1997) ..............................................................................17

*Sanitation & Recycling Indus., Inc. v. City of New York*,
    107 F.3d 985 (2d Cir. 1997)............................................................................10, 11

*Sveen v. Melin*,
    138 S. Ct. 1815 (2018).........................................................................................10

*U.S. Trust Co. of New York v. New Jersey*,
    431 U.S. 1 (1977)..................................................................................................22

*W.B. Worthen Co. v. Thomas*,
    292 U.S. 426 (1934)...............................................................................................5

**Statutes**

New York City Admin. Code § 22-1005 ......................................................................1

Plaintiffs Elias Bochner and 287 7th Avenue Realty LLC (hereinafter "Plaintiffs") respectfully submit this reply memorandum of law in further support of their motion for summary judgment, which seeks to declare unconstitutional, New York City Admin. Code § 22-1005 (the "Guaranty Law" or the "Law"), and in opposition to the City Defendants' cross-motion for summary judgment.

## PRELIMINARY STATEMENT

In support of their motion for summary judgment, Plaintiffs demonstrated that the features of the Guaranty Law identified by the Second Circuit as "weighing heavily" against a finding of constitutionality were immutable and unchangeable by discovery.  No documents, depositions, or other discovery could alter the deficiencies.  Specifically, the Second Circuit identified the following ill-tailored elements of the Guaranty Law, which it described as a "permanently destructive contract impairment:"

> *First,* the Guaranty Law was not a "temporary" or "limited" impairment of contract, but instead permanently prevented landlords from recouping rent arrears arising from March 7, 2020 to June 30, 2021;

> *Second,* the Guaranty Law did not condition the relief it afforded tenants on their reopening business operations;

> *Third,* the Guaranty Law allocated unfairly the economic burden of the pandemic on the shoulders of a discrete group of private persons – commercial landlords;

> *Fourth,* the Guaranty Law was in no way conditioned on financial need, absolving all lease guarantors of any responsibility for up to sixteen months of rent arrears regardless of their ability to pay; and

> *Fifth,* the Guaranty Law failed to provide commercial landlords any compensation for damages or losses sustained as a result of their guaranties' impairment.

Since the filing of Plaintiffs' summary judgment motion, not a single fact adduced during discovery changed these unassailable features of the Guaranty Law.  Nor do the arguments presented by the City in opposition save the constitutionally infirm Law from invalidation.  As just one example, the City now argues that the Law is "temporary" or "limited" because it covers

a period of 16 months and the City Council heard from certain business owners whose lease terms were as long as 10 years.  (Opp. Br. 16).  This argument defies logic, well-settled Supreme Court case law, and the holdings of both this Court and the Second Circuit.  The severe impairment of the Guaranty Law is not determined by the length of any one particular lease.  As the Second Circuit held, and as contrasted with the rent moratorium in the Supreme Court's seminal decision in *Blaisdell*, the "Guaranty Law . . . does not simply defer guaranty obligations . . . it permanently and entirely extinguishes them" and "forever denies the landlord the full guarantied amount for that sixteen-month period."  *Melendez v. City of New York*, 16 F.4th 992, 1039-40 (2021).  None of the other attempts to address the five features fare any better, and none survive the "more exacting review" Defendants concede the Second Circuit's decision requires. (Opp. Br. 2).

Rather than seriously engage with the five constitutionally violative elements of the Law, Defendants largely rehash record evidence already reviewed by the Second Circuit.  They point to letters from small business owners, cherry-pick statements from the bill's sponsors about the perceived necessity of the Guaranty Law, and argue, based on this self-interested and anecdotal testimony, that the City Council acted reasonably when it enacted a law eviscerating the contract rights of commercial landlords.  The Second Circuit considered and rejected this argument.

Equally unsuccessful is Defendants' attempt to sidestep the deficiencies in the Guaranty Law by shifting the focus to Mr. Bochner, the Managing Member of 287 7th Avenue Realty LLC.  Specifically, Defendants suggest Mr. Bochner's decision not to pursue an action against the guarantor somehow demonstrates that the personal guaranty is not a primary inducement to entering a commercial lease.  (Opp. Br. 10-11).  However, conspicuously missing from their factual recitation are the email exchanges between Mr. Bochner's property manager, Guardian

Realty LLC ("Guardian"), and Mr. Bochner's tenant, Sunburger 1 LLC ("Sunburger").  In

particular, the City omits a dispositive email, sent on June 18, 2020, by Sunburger's President, in

which the tenant expressly claimed that its guarantor was not liable for rent from March 7, 2020

to September 30, 2020, specifically invoking the protection of the Guaranty Law:

> As you may be aware, on May 26, 2020 legislation was enacted in NYC
> that affects the guarantor's liability under the lease for the BRGR restaurant
> at 287 7th Avenue (N.Y.C. Council Int. No. 1932-A (2020)) and N.Y.C.
> Council Int. No. 1914-A (2020)).  <u>Under the protections afforded under this
> law, the guarantor is not liable for rent, utility expenses or taxes owed by
> the tenant or for fees or charges relating to routine maintenance owed by the
> tenant and occurring between March 7, 2020 and September 30, 2020.</u>

(Szyfer Decl. Ex. 1[1] at Bochner0000119 (emphasis added)).  As they testified, Mr. Bochner and

Guardian elected to not pursue an action against the guarantor because the Guaranty Law

prevented such actions—not because they believed the guaranty was unimportant.  (Dkt. 104-44

(Defendants' Ex. NN) at 33:8-14; Dkt. 104-53 (Ex. VV) at 30:10-21).  To the contrary, Mr.

Bochner testified that he requires guaranties as a critical component of all of his commercial

leases.  (Dkt. 52 (Declaration of Elias Bochner in Support of Plaintiffs' Motion for Preliminary

Injunctive and Declaratory Relief ("Bochner Decl."), dated Aug. 25, 2020) ¶ 14).

    The circumstances of Mr. Bochner's lease with Sunburger represent the only new facts

elicited during discovery not reviewed by the Second Circuit and demonstrate unequivocally

how the ill-tailored Guaranty Law harmed small landlords in New York City.  While Defendants

claim the City Council sought to protect individual guarantors of their own businesses from

personal liability, the guarantor of Sunburger's lease was not the owner of the business, but a

---

[1] References to "Szyfer Decl. Ex." are to exhibits to the Declaration of Claude G. Szyfer, dated October 14, 2022, filed concurrently herewith.

separate, wealthy individual.[2]  Defendants also argue that the Guaranty Law was intended to

encourage Landlords to negotiate and renegotiate leases for the "benefit [of] the economy as a

whole."  (Opp. Br. at 20).  Here, however, the Guaranty Law allowed the tenant and guarantor to

walk away from their obligations without negotiation and any "benefit [of] the economy as a

whole."  Defendants further argue that the Guaranty Law left other remedies available to

commercial landlords, yet Mr. Bochner had no way to collect rent.  And finally, Defendants

contend that commercial landlords were in a far better position to bear the economic burden and

"weather" the pandemic, yet because of his inability to collect rent, Mr. Bochner was forced to

take out a $150,000 Small Business Administration ("SBA") loan to cover his company's

operating expenses and had to borrow from his other businesses in order to cover taxes on the

property—not Sunburger or Mr. Cantor.  (Dkt. 104-53 (Defendants' Ex. VV) at 46:9-47:16).  In

its opinion, the Second Circuit recognized that the Guaranty Law simply shifted the burden of

the pandemic onto the shoulders of one private group – commercial landlords.  Plaintiff Bochner

is a paradigm of that shifted burden.

       Two other points merit emphasis at the outset.  First, as they did before the Second

Circuit, Defendants posit a disingenuous, accordion-like description of the Guaranty Law,

expanding and contracting to fit their particular argument.  When claiming the Law was

reasonably passed to address a significant and legitimate purpose, Defendants emphasize its

breadth, stressing that the Law benefits not only commercial tenants, but the "hundreds of

thousands" of New Yorkers employed by commercial tenants.  (*E.g.*, Opp. Br. 16)  Yet, when

---

[2] While Defendants suggest that Plaintiffs have "little information" about him, a cursory internet search reveals that the guarantor here, Mitch Cantor, was previously a Co-Chief Investment Officer at Goldman Sachs Asset Management, the Chief Executive Officer of a $13 billion money management firm and, most recently, the founder and portfolio manager of a California-based hedge fund, Mountain Lake Investment, which has close to $117 million in assets under management.  *See, e.g.,* http://www.mountainlakeinvest.com/team.html.

Defendants argue the Law was appropriately tailored, its impact suddenly shrinks and the Law has many "built in limitations." Defendants cannot have it both ways.

Second, Defendants' attempted mitigation of the Second Circuit's concern that the Law lacked a reopening requirement demonstrates the contradictory and illogical construction of the Guaranty Law itself. On one hand, Defendants' argue that a reopening condition was "not necessary" because business owners "wanted to remain open or to reopen." (Opp. Br. 3). Yet, in the same breath (and just two paragraphs later), Defendants contend the Council could reasonably predict that business owners "would choose to close and limit their personal liability" thus demonstrating the reasonableness of the Guaranty Law. (*Id.*) This manifest incongruity is in keeping with the slipshod way the Council passed the Guaranty Law. Without any data about "good guy" guarantees or any nuanced analysis of how the Law would operate, the Council, and now Defendants, believe that as long as they pay some vague lip-service to the general welfare of the City, and cite to anecdotal evidence of economic suffering of small businesses, personal guarantees could be rendered completely unenforceable Citywide. As the Second Circuit made clear, the constitutional protection of the Contracts Clause requires precision, not a sledgehammer. Even legislation passed during a pandemic must be meaningfully tailored and "limited by reasonable conditions appropriate to the emergency." *W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 433 (1934). As Justice Cardozo pointed out, "[e]ven when the public welfare is invoked as an excuse," legislation cannot be passed "without moderation or reason." *W.B. Worthen Co. ex. rel. Bd. of Comm'rs of St. Improvement Dist. No. 513 of Little Rock Ark. v. Kavanaugh,* 295 U.S. 56, 60 (1935).

Notably, Defendants concede that this motion "presents a pure legal question" on the merits.  (Opp. Br. 8).  Accordingly, this Court should grant Plaintiffs' summary judgment motion and deny the motion for summary judgment filed by Defendants.

## ARGUMENT

### A.    The Court Has Jurisdiction To Reach the Merits Of This Action

Defendants now submit the Complaint should be dismissed because of two jurisdictional arguments—both equally meritless.  First, Defendants claim the City "does not enforce the Guaranty Law;" accordingly, any decision by this Court would somehow amount to an advisory declaration.  (Opp. Br. 9).  The Supreme Court's decision in *California v. Texas*—on which Defendants rely—held that plaintiffs lacked standing because the statutory provision in question failed to include a penalty for noncompliance rendering the provision unenforceable.  *California v. Texas*, 141 S. Ct. 2104, 2108 (2021) ("To find standing to attack an unenforceable statutory provision would allow a federal court to issue what would amount to an advisory opinion without the possibility of an Article III remedy").[3]  That is plainly not the case here.

Next, without citation to any caselaw, Defendants' claim this action is not ripe because Plaintiffs failed to commence a likely futile litigation seeking recovery of the unpaid rent from Sunburger (who claimed no assets) or Mr. Cantor (who Sunburger claimed was immune because of the Guaranty Law).  Defendants' argument misses the mark.  Plaintiffs do not seek monetary damages in this action, but redress for the deprivation of their constitutional rights.  Because of the Guaranty Law's operation, Plaintiffs have been "permanently" deprived of their bargained-for contractual right to enforce the personal guaranty in the lease with Sunburger.  *Melendez*, 16

---

[3] Plaintiffs hardly seek an advisory opinion.  Their injury is precisely the type of "'flesh-and-blood' legal problem[]" over which this Court has jurisdiction.  *New York v. Ferber*, 458 U.S. 747, 768 (1982) (Courts "[have] no jurisdiction to pronounce any statute . . . void, because [it is] irreconcilable with the Constitution, *except as [they are] called upon to adjudge the legal rights of litigants in actual controversies*").  *Id.* at 767 n.20 (quotation marks and citations omitted) (emphasis added).

F.4th at 1034; *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation").  A favorable decision, declaring the Guaranty Law unconstitutional under the Contracts Clause, would reinstate Plaintiffs' bargained for contractual rights.  Thus, this Court has jurisdiction to reach the merits of this action.

      **B.**     **The Guaranty Law Violates The Contracts Clause**

Turning to the merits of the Contracts Clause claim, Defendants ignore the Second Circuit's ruling in *Melendez* and attempt to invoke a self-defined "traditional application of Supreme Court precedent" where legislatures retain "broad power" to impair private contracts and courts should simply "defer to legislative judgment as to the necessity and reasonableness of a particular measure."  (Opp. Br. 13) (citation omitted).

However, after its own lengthy discussion of the evolution of the Contracts Clause, the Second Circuit rejected affording such broad deference to the Council.  As the Panel stated, "the Clause continues to afford individuals the right to use contracts to order their affairs and to rely thereon except as warranted by a significant and legitimate public purpose pursued through reasonable and appropriate means."  *Melendez*, 16 F.4th at 1032.  Thus, the standard, as articulated in *Melendez*, is "more demanding than the rational basis review."  *Id.*  Contrary to Defendants' assertions, the Council is decidedly not free to adopt laws without any concern that private contracts will be destroyed.

The Second Circuit also held, despite Defendants' argument to the contrary, that the Contracts Clause standard of review varies with the degree of contract impairment.  *Id.* at 1035.  Where, as here, there is a severe impairment, or a complete evisceration of contractual rights, the Circuit ruled that the inquiry is pushed beyond a cursory review towards a "careful examination" of the challenged legislation.  *Id.* (*citing Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234,

245 (1978)). Defendants' self-serving attempt to shield the Guaranty Law from this appropriate level of scrutiny should be rejected. Under the "careful examination" mandated by the Second Circuit, the Guaranty Law fails to pass constitutional muster.

1.    The Guaranty Law Substantially Impairs Contracts

Both this Court and the Second Circuit concluded the Guaranty Law operates as a "substantial impairment" of contract. In its prior decision, this Court ruled that the imposition of the Guaranty Law, "like the pandemic itself, was entirely unforeseeable," and that the personal guaranty was "an essential provision" and a "primary inducement" for parties to enter a commercial lease. (Dkt. 71 (Opinion & Order, dated Nov. 25, 2020) at 26). In reaching that conclusion, the Court relied on Mr. Bochner's Declaration in which he explained that he "require[s] good guy guaranties for all of our commercial tenants in the regular course of our business" and "would not have entered into any lease agreements with small businesses if not for the good guy guaranties…" (Dkt. 52 (Bochner Decl. ¶ 14)). The "good guy" guaranty, as Mr. Bochner put it, is "critical" to all of his commercial leases. *Id.*

The Second Circuit, like this Court, credited Mr. Bochner's sworn testimony and found that the Guaranty Law operates as a substantial impairment because the "permanent and irrevocable repudiation of guaranty obligations seriously upsets landlords' reasonable expectations and undermines the contractual bargain." *Melendez*, 16 F.4th at 1034 (internal quotation marks and citations omitted). The Law not only disrupts or upsets contractual arrangements, it completely *obliterates* reasonable expectations in commercial leases.

During discovery, Defendants did not challenge Mr. Bochner's sworn statements about the centrality of the "good guy" guaranty provision to his commercial leases. Defendants failed to ask Mr. Bochner to explain the critical importance of a "good guy" guaranty, its role as a primary inducement to entering a commercial lease, or the foreseeability of the Guaranty Law.

Accordingly, Defendants fail to identify any material issue of fact as to whether Mr. Bochner requires "good guy" guarantees for all of his commercial tenants or whether a "good guy" guaranty is a necessary provision for him to enter commercial leases with small businesses.

Instead, at his deposition, Defendants' gerrymandered questions focused on whether Mr. Bochner or his company attempted to enforce the "good guy" guaranty through litigation despite the Guaranty Law's express prohibitions. Defendants now argue that because Plaintiffs' "rarely communicated with the guarantor" and did not attempt to collect from the tenant or guarantor through litigation, the personal guaranty was not a "critical inducement" to the commercial lease. (Opp. Br. at 10-11). Defendants' argument is specious.

First, Defendants' insinuation that Mr. Bochner and 287 7th Realty LLC did not attempt to collect rent from the guarantor or tenant is directly contradicted by the facts. Mr. Bochner testified that his company repeatedly "[sought] to recover the amounts that are due under the lease from Sunburger 1 LLC" and "confronted" the tenant in an attempt to collect rent. (Dkt. 104-53 (Defendants' Ex. VV) at 30:2-31:24). Contemporaneous documentation confirms that for weeks, Guardian, 287 7th Avenue's property manager, attempted to collect rent and complained about "mistreatment" by the tenant, who was "putting us the managing company in a very bad position" since Mr. Bochner needed rent to "[pay bills], taxes[,] and water[,] sewer[,] insurance[,] mortgage." (Szyfer Decl. Ex. 2 at Bochner0000112-13).

That the property manager did not reach out directly to the guarantor, Mitch Cantor, fails to raise any material issue of fact. Once the Guaranty Law was passed by the City Council, Mr. Bochner and Guardian ran into a "dead end" trying to collect rent. (Dkt. 104-44 (Defendants' Ex. NN) at 25:18-25). Sunburger's President sent Guardian an email asseverating that the Guaranty Law had been passed, that the tenant and guarantor invoked the Guaranty Law, and

that therefore, "the guarantor is not liable for rent… .and occurring between March 7, 2020 and September 30, 2020."  (Szyfer Decl. Ex. 1 at Bochner0000119).  Defendants have cited no authority supporting the illogical notion that for a contractual impairment to be substantial, Plaintiffs must commence a costly and likely futile lawsuit.  Rather than attempt to enforce the "good guy" guaranty (invalidated by the Council), Plaintiffs promptly commenced this action, challenging the constitutionality of the Law.

Even if Mr. Bochner had not pursued the rent payments, the "substantial impairment" analysis under the Contracts Clause is aimed at the foreseeability of the impairment at the time of contracting and whether the reasonable expectations under the contract have been disrupted. *Sanitation & Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 993 (2d Cir. 1997).  Of necessity, the inquiry focuses on the parties' *expectations* upon entering the contract, not the parties' conduct after the impairment.  Indeed, a key component in the determination as to whether legislation operates as a substantial impairment is whether the impairment "prevents the party from safeguarding or reinstating his rights."  *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).  Here, as evidenced by the emails from his tenant, there can be no serious dispute that the Guaranty Law prevented Mr. Bochner from "safeguarding or reinstating his rights."

Moreover, Defendants acknowledge, as they must, that the Second Circuit was skeptical of the argument that the Guaranty Law does not operate as a substantial impairment because it "leaves intact a landlord's ability to enforce debts . . . against tenants" given the "practical realities of doing so."  (Opp. Br. 11).  Instead, Defendants insist the Guaranty Law is not a substantial impairment because it is "equally dubious" that a commercial landlord could recover from a guarantor.  *Id.*  The gravamen of Defendants' argument appears to be that all "good guy" guarantees lack value and that the wholesale elimination of such provisions cannot be considered

10

substantial.  The argument is patently meritless.  For many landlords in New York City,
including Mr. Bochner, a personal guaranty constitutes a property owner's financial backstop
and the only remedy to regain possession of the leased premises, to re-let fallow properties, and
to recover unpaid rent absent protracted court proceedings.  (Dkt. 30 (Declaration of Santo
Golino in Support of Plaintiff's Motion for a Preliminary Injunction, dated Jul. 22, 2020) at 9,
29-20).  Indeed, the City itself, as well as the federal government and New York State have all
insisted on personal guaranties in connection with their own extension of pandemic-related
loans.[4]  The City's requirement of a personal guaranty in connection with the NYC Storefront
Loan Program demonstrates it hardly believes collection is "dubious."  In sum, the Guaranty
Law extinguishes an "essential provision" of the commercial lease, and there is no material fact
in dispute contradicting the Law's substantial impairment of contract rights.

> 2.   The Guaranty Law Is An Unreasonable and Inappropriate Means to
>      Achieve The City's Professed Purpose

Having concluded that the Guaranty Law operates as a substantial impairment and that it
served a legitimate public interest, the Second Circuit's decision predominantly turned on the
third prong of the Contracts Clause, whether the means chosen to achieve the Council's goal was
drawn in a "reasonable and appropriate" way.  *Melendez*, 16 F.4th at 1038.  A law that works a
substantial impairment of contractual relations must be "specifically tailored to meet the societal
ill it is supposedly designed to ameliorate."  *Sanitation & Recycling Indus., Inc.,* 107 F.3d at 993.

If the purpose of the Guaranty Law, as the Defendants assert, was to prevent a
guarantor's personal bankruptcy (Opp. Br. at 12), then the legislation was not drawn reasonably

---

[4] Personal guaranties are required for the COVID Chai + 1, NYC Storefront Loan Program (*see* NYC Storefront
Loan Program - COVID Chai+1 (chaiplus1.com)), U.S. Small Bus. Ass'n, SBA loans in excess of $200,000 (*see*
https://www.sba.gov/funding-programs/loans/covid-19-relief-options/covid-19-economic-injury-disaster-loan/about-
covid-19-eidl), and for the New York State, New York Forward Loan Fund program (*see*
https://esd.ny.gov/nyforwardloans-info).

or appropriately.  The Guaranty Law impacts *all* personal guarantees, not just those involving guarantors facing bankruptcy.  On the record here, the Guaranty Law protected a wealthy financier, non-owner guarantor, at the expense of Mr. Bochner, a small commercial landlord.  The Second Circuit left it to Defendants on remand to identify any other evidence or circumstances relevant to whether the Guaranty Law was reasonable.  Defendants have only recycled anecdotal hearing testimony that the Second Circuit has already reviewed.

Before examining the reasonableness and appropriateness of the Law, the Second Circuit analyzed the "purpose" of the Guaranty Law using precisely the same legislative record – scarce as it is – that Defendants now point to.  The Circuit observed that "hundreds of persons identifying themselves as 'operators' of 'restaurant and nightlife' businesses submitted brief, identically worded, letters supporting the Guaranty Law as 'critical' to giving them 'a fighting chance to survive' the pandemic."  *Melendez*, 16 F.4th at 1007.  Yet, the Circuit recognized that the record was comprised of "only anecdotal or conclusory statements," none of which evinced the empiric or "intensive study" required of a legislature before passing a draconian measure like the Law.  *Id.* at 1045.  The testimony did not factor into whether the *means* employed by the City was reasonable and appropriate to its professed public purpose.  After all, while the Second Circuit reviewed the written letters from the small business owners that the City now relies upon, the Panel also gave weight to significant record testimony from individuals and groups who *opposed* the legislation.  For example, one landlord urged the Council to:

> take into account the health and financial well-being of *both landlords and tenants* in crafting legislation and, at the least, to make it incumbent on tenants to show that they are unable to pay their rent due to COVID-19 and to make arrangements for them to catch up when the economic situation improves.

*Id.* at 1007 (internal quotation marks and citations omitted) (emphasis added).  Council members, too, questioned whether the City could "retroactively adjust or amend a contract that was entered

12

into by two parties at arms-length" (*id.* at 1008 (citations omitted)) and whether the Guaranty

Law, without any conditions, "may end up helping Louis Vuitton as much as it helps Louise

Pizza." (Dkt. 29-31 (Exhibit 31 to Declaration of Stephen P. Younger in Support of Plaintiffs'

Motion for Preliminary Injunctive and Declaratory Relief, dated Jul. 22, 2020 ("Younger Decl.")

at 37). Moreover, the Second Circuit acknowledged the slipshod nature of the legislation

process, recognizing that at the only hearing before passage of the Law, Council members did

not have "the data" on the impact of personal guaranties on small businesses. *Melendez*, 16

F.4th at 1008. The legislative history submitted by Defendants in support of this summary

judgment motion confirms the slapdash nature of the proceedings. Six months after its passage,

at the hearing on Local Law 98 extending the Guaranty Law in September 2020, the City still did

not have the "exact number" of businesses impacted by personal liability clauses, instead relying

on the "general consensus" that the Law assisted small businesses. (Dkt. 104-19 (Defendants'

Ex. O) at 33). Six months later, the findings and declarations of the City Council for Local Law

50, extending the Guaranty Law again until June 30, 2021, was *nearly identical to* the prior

findings and declaration from Local Law 98, using the same stale statistics. (*Compare* Dkt. 104-

30 (Defendants' Ex. Z) *with* Dkt. 104-43 (Defendants' Ex. MM)).[5] Here, Defendants summarily

conclude that the Guaranty Law was a "carefully calibrated piece of legislation," (Opp. Br. 25)

yet cite little more than the same anecdotes; unspecific, aggregate data about how all small

businesses are faring in New York City; and a New York Times article about overall pandemic

---

[5] Notwithstanding Defendants' cherry-picked testimony, it merits noting that at the time of both extensions of the
Law, small business owners and trade groups alike reiterated the ineffectual and inequitable nature of the legislation
to the Council and emphasized how it severely hurt small commercial landlords. *See, e.g.*, Dkt. 104-19 (Defendants'
Ex. O) at 66-70, Dkt. 104-20 (Defendants' Ex. P) at 13-14, Dkt. 104-34 (Defendants' Ex. DD) at 14-15.

job loss in the City as sufficient justification for extending the Guaranty Law (Opp. Br. 23).  This is not the type of evidence on remand that the Second Circuit had in mind.[6]

Defendants offer two additional reasons why the Guaranty Law was "reasonable."  First, they suggest that other efforts to address the COVID-19 crisis, such as loan and grant forgiveness programs, were "difficult to navigate, inaccessible to many because of language barriers, and quickly ran out of funding." (Opp. Br. at 14). Even if true, such programs were difficult to navigate for *all* small businesses, tenants and small commercial landlords alike.

The bare assertion that "government pandemic assistance was not accessible to small business tenants" (Opp. Br. at 24), however, is not only unsupported, it is flatly refuted by Defendants own documents submitted in support of summary judgment.  The legislative record annexed to Defendants' motion demonstrates that when considering the extension of the Guaranty Law, the Commissioner of Small Business Services—and a named defendant in this action—Jonnel Doris, testified before the City Council's Committee on Small Business and enumerated, in detail, the panoply of ways small business owners *were able to access pandemic assistance in New York City.*

Commissioner Doris' testimony identified  an "Open Restaurants" program in the City which was "an early lifeline for businesses and [] enrolled more than 11,000 establishments since its inception in June 2020 and [] saved an estimated 90,000 jobs citywide."  Dkt. 104-34

---

[6] In its opinion, the Second Circuit noted that "thousands of pages of written materials were submitted to this court wholesale, with no attempt to distinguish those pertaining primarily to the Guaranty Law and those pertaining to any of the other laws that were part of the City's relief package, many of which generated considerable public comment." *Melendez*, 16 F.4th at 1006 n.31.  The submission left the Panel looking through a "haystack" to identify comments relevant to the Law.  It emphasized that "defendants might well be advised to highlight portions of the record they deem favorable to their arguments." *Id.*  Yet, in their voluminous submission, Defendants repeat precisely the same mistake, burdening this Court to unpack wholesale legislative history without any attempt isolate the Guaranty Law from other laws being considered.  Defendants' exhibits total well over 2,600 pages and Defendants have not cited specifically to any analysis or data supporting the passage or extension of the Law.

(Defendants' Ex. DD) at 4.  Commissioner Doris further noted the City was the first in the country to provide financial assistance to small businesses and launched the Employee Retention Grant and the Small Business Continuity Loan Fund, "giving relief when federal and state programs were not yet available." *Id.*  According to Commissioner Doris' submission, Commercial Revitalization Grants, NYC LMI Storefront Loans and the Strategic Impact COVID-19 Commercial District Support Grants "put $61 million into the pockets of 4,500 small businesses and allocated $4.4 million to 50 small business supporting organizations in 66 communities." *Id.* at 5.  For those who had trouble "navigating" loan assistance, Fair Share NYC "provides direct assistance to businesses and offers free resources, one-on-one technical application assistance, and help connecting to PPP lenders." *Id.*  The program helped "over 300 businesses access $17.5 million in PPP funds…" *Id.*

Thus, contrary to Defendants' unsubstantiated conclusory statements, the record flatly demonstrates that funds and assistance to access such funds were available.[7]  Moreover, these relief programs were created and financed in an environment already filled with a plethora of legislative protections designed to mitigate the pandemic's economic impact on tenants, including the Harassment Amendments affirmed by the Second Circuit.  Among other measures, gubernatorial orders predating the Guaranty Law provided for: 1) a moratorium on tenant evictions, 2) a requirement that landlords provide certain rent relief to tenants if they face

---

[7] Defendants rely on the Declaration of Coby Kalter for the proposition that small businesses could not access state funds during the pandemic and that the invalidation of the Guaranty Law would threaten the financial security of small business owners and their families.  First, the ex-post analysis of the Law has no bearing on the reasonableness and appropriateness of the Law when passed by the Council.  Second, the Declaration, couched in generalities, constitutes inadmissible hearsay and is contradicted by the testimony of Commissioner of SBS, the agency where Mr. Kalter works.  Third, Mr. Kalter was not offered for deposition during the discovery period in this action. Although we believe his Declaration should have no impact on this Court's determination, to the extent the Court intends to rely on its statements, Plaintiffs respectfully reserve the right to test Mr. Kalter's assertions.

financial hardships due to COVID-19, and 3) a prohibition against demands for payment of fees or charges for late payment of rent.  (Dkt. 29 (Younger Decl.) ¶¶ 37, 39, 41-43).[8]

As they did at the Second Circuit, in support of "reasonableness," Defendants also rehash the purported "built-in limitations" to the Guaranty Law.  Each of the limitations—all rejected by the Second Circuit—are either insufficiently tailored or illusory:

- First, while the Law only applies to guaranties signed by a "natural person," it completely wipes out such guaranties, leaving nothing for the landlord to enforce.  There is no limitation whatsoever to the Law's impact within the personal guaranty contracts to which it applies, nor is there any limitation that the legislation apply only to those guarantors in need.

- Second, the so-called "subset" of commercial landlords impacted by the Law includes at least *2,100 bars and 27,000 restaurants*, among other retail establishments—hardly a moderating factor.  (Dkt. 29 (Younger Decl.) ¶ 86).

- Third, the Law is not meaningfully "limited in duration."  The Law forever prohibits enforcement of the guaranty and cancels rent for any default occurring during a 16-month period of time.

- The "other remedies" Defendants identify (Opp. Br. 14) as still available to landlords are pyrrhic.  For a defaulting or uncreditworthy tenant, landlords cannot recover unpaid rent, charge late payment fees, terminate a tenant's right to possession, or evict a tenant.  Defendants amazingly suggest that a landlord can also simply sell "*the premises and apply[] the proceeds to unpaid rent*."  (Opp. Br. 14) (emphasis added).  The whole point of the "good guy" guaranty, is to take repossession of a commercial space to allow a landlord to re-let the premises—not sell the property.

When Defendants finally reach the five factors identified by the Second Circuit, they insist that a "full record" and a "careful reading" of the Law cures its constitutional deficiencies. (Opp. Br. 15).  Yet, in reality, a "careful reading" of Defendants' submission reveals the absence of any new record evidence that can fix the Law's fatal characteristics.

         *i.*       *The Guaranty Law Is Neither Temporary Nor Limited*

---

[8] The facts uncovered regarding Plaintiffs in discovery also support the availability of funds.  While Defendants insist that "PPP and other available loan and grant programs were difficult to access," Mr. Bochner's tenant, Sunburger, obtained a PPP loan in the amount of $60,000, which he used in part to pay rent.  (Opp. Br. at 7; Dkt. No. 104-44 (Defendants' Ex. NN) at 30; Szyfer Decl. Ex. 2 at Bochner0000112).

In a half-hearted attempt to save the Guaranty Law, Defendants claim that the Second

Circuit's conclusion that the Law "destroys the guaranties by rendering them forever

unenforceable" is inapt because it "viewed this time period out of context."  (Opp. Br. 16).

There was nothing "out of context" about this Court and the Second Circuit's analysis of the

impact of the Guaranty Law.  No matter the length of the lease term – whether it is a 10-year

lease or the five-year extension that Mr. Bochner's signed with his tenant – the Guaranty Law

"forever denies the landlord the full guaranteed amount for that sixteen-month period."

*Melendez*, 16 F.4th at 1040.  As the Second Circuit held, "[t]hat law does not simply freeze, or

even reduce, the amount a landlord can recoup from a guarantor for rent arrears arising from

March 7, 2020," it permanently extinguishes it.  *Id.*[9]

Conspicuously absent from Defendants' submission is any explanation for why

"reasonable conditions" could not have been enacted here.  In support of their motion for

summary judgment Plaintiffs explained that in the seminal case of *Home Bldg. & Loan Ass'n v.*

*Blaisdell*, in the midst of a foreclosure crisis during the Great Depression, Minnesota passed a

Mortgage Moratorium Act that was upheld by the Supreme Court because mortgagors were still

required to be pay fair rental value of the premises, albeit at a later time.  290 U.S. 398, 445, 479

(1934). The "integrity of the mortgage indebtedness" was not impaired and the legislature

---

[9] Equally unavailing is the distorted argument advanced by the Volunteers of Legal Service ("VOLS") in its "amicus" submission that the permanency of the Law warrants little weight given the totality of the circumstances. ("VOLS" Br. at 4-5).  While the Second Circuit used the word "totality" to describe the "totality" of features of the Law warranting remand, it never suggested that its permanency depends on the totality of the economic circumstances.  To the contrary, the permanency of the Law elevated the review to a "careful examination." *Melendez*, 16 F.4th at 1035.

While the Court has yet to rule on VOLS' leave to file, the submission calls to mind Judge Posner's observation that "[t]he vast majority of amicus curiae briefs are filed by allies of litigants and duplicate the arguments made in the litigants' briefs, in effect merely extending the length of the litigant's brief . . . . The term 'amicus curiae' means friend of the court, not friend of a party."  *Ryan v. CFTC*, 125 F.3d 1062, 1063 (7th Cir. 1997).  Other than reiterate Defendants' legal arguments, the VOLS brief contains the same generalized, hearsay-ridden information about small businesses already presented in hearing testimony by VOLS to the Council, and rejected by the Circuit.

protected both the mortgagor and mortgagee by passing legislation that had the interests of both parties in mind. *Id.* Defendants fail to explain why a similar moratorium, delay or any other more moderately fashioned law short of complete and permanent rent cancellation could not have been passed (or even explored by the Council). The Guaranty Law's permanent extinguishment of rights without any mitigating conditions renders it unconstitutional.

ii.  *The Guaranty Law Did Not Condition Relief On Reopening*

Nor have Defendants answered why it was "reasonable or appropriate" for the Council to leave out a reopening condition in the Guaranty Law. The Second Circuit found the omission "curious" particularly since other, prominent pandemic-related relief measures were conditioned on continued operation of businesses. *Melendez*, 16 F.4th at 1041. Forgiveness of PPP loans, for example, was "conditioned on maintenance of workforce and compensation levels." *Id.* Similarly, the Restaurant Revitalization Fund did not provide benefits to restaurants that were permanently closed. Yet, the Guaranty Law, with a professed public purpose of "help[ing] shuttered small businesses survive the pandemic so that they can reopen after the emergency," excused guarantors entirely from rent liability "even in circumstances where they do nothing to serve the public interest." *Id.* at 1040-41. The Second Circuit understood that small businesses experienced extreme personal and economic hardships during the pandemic, but still found no "record basis" to fill the "missing link" between the purpose of the Guaranty Law and the means adopted to achieve that purpose. It therefore left it to Defendants "to offer evidence on remand" demonstrating the missing link. *Id.* at 1041.

Defendants fail to identify any such evidence. Instead, Defendants simply reuse the same anecdotal testimony, stressing the dire economic situation that some small businesses faced. (Opp. Br. 18). To be clear, the pandemic significantly impacted the City's economy and that small businesses (tenants and landlords alike) suffered. But that is not the relevant question.

18

The purported purpose of the Guaranty Law was not to provide free financial assistance to private tenants, but to ensure the reopening of New York City and to benefit the City's economy as whole by allowing businesses to survive past the emergency.  Even Defendants concede the Guaranty Law was "not simply a poverty-prevention measure, but rather an attempt to head off a raft of business closures for the broader public good."  (*Id.* at 22).  With that purpose, the Law should have been conditioned on reopening.  If, as Defendants postulate, small business owners "want[ed]" (*Id.* at 18) to revive their businesses and wanted the Guaranty Law because it gave them a "fighting chance to survive" (*Id. at* 19), the Council could have used that desire and conditioned the Law on a promise from these businesses to reopen.

The evidence elucidated in discovery demonstrates the real world impact of the Law's "missing link."  Without a reopening condition, Mr. Bochner's tenant, Sunburger, simply vacated the 287 7th Avenue premises, availing itself of the Guaranty Law and ending its tenancy, never reopening its doors.  If the Law was meant to ensure the continued operation of neighborhood businesses throughout the City, it failed that purpose in the case of Plaintiffs.  The Second Circuit expressed concern that businesses would simply "move on" without a commitment to reopen a shuttered business if afforded Guaranty Law relief.  *Melendez*, 16 F.4th at 1041.  That is precisely what occurred here.

     iii.  *The Economic Burden Of The Guaranty Law Was Borne Solely By Commercial Landlords*

Defendants have similarly done nothing to assuage the Second Circuit's concern regarding the Guaranty Law's one-sided allocation of economic burden.  The Panel correctly recognized that "permanently excusing guarantors from pandemic-accrued rent liabilities comes not at City expense (or, more precisely, that of the public that benefits from functioning neighborhoods) but, rather, at the expense of a discrete group of private persons: commercial

19

landlords." *Melendez*, 16 F.4th 1042.  The Guaranty Law transferred the economic burden of the pandemic onto the "few shoulders" of commercial landlords, a subset of individuals not responsible for the circumstances warranting relief by destroying landlords'—and only landlords'—lawfully contracted-for expectations under contract.

Throughout their submission, Defendants suggest that it was reasonable to assume that landlords were better positioned to absorb or "weather" the pandemic.  (Opp. Br. 22).  Not so. As the Second Circuit held, "defendants point to nothing in the record to compel a conclusion that commercial landlords are better positioned financially than guarantors to absorb the economic blows of the pandemic on commercial real estate."  *Melendez*, 16 F.4th at 1044.

Defendants still point to nothing in the record to compel such a conclusion.  Instead, they argue first that that the economic burden "can be mitigated" by the "right to recover the tenant's rental payments," the "right to enforce the tenant's rental obligation in a court proceeding" or the ability to apply securities deposits.  (Opp. Br. 20).  As noted, this argument is divorced from the real world implications of the Guaranty Law and the record in this action.  Precisely as this Court recognized, "for commercial tenants with few to no assets, the money may prove impossible to collect."  (Dkt. 71 (Opinion & Order, dated Nov. 25, 2020)).  Although Mr. Bochner was able to apply a small security deposit from his tenant to the amount of unpaid rent, he relied on rent collection to meet tax and other operating expenses for his properties *that were not excused during the pandemic.*

Defendants next argue that the Guaranty Law was intended to "encourage Landlords to negotiate and renegotiate leases with their tenants for the benefit of the economy as a whole." (Opp. Br. 20).  It is hard to fathom how eliminating the "good guy" guaranty actually encourages good faith negotiation.  The record demonstrates the illogical nature of the argument.  Once Mr.

Bochner's tenant and guarantor were relieved of their obligation to pay rent, they did not come to the table to negotiate an extension of their lease.  Instead, with over $116,000.00 due in outstanding rent, they gave the requisite notice and vacated the premises without paying.  (Dkt. 104-53 (Defendants' Ex. VV) at 34).

Even if, as Defendants suggest, the Law encouraged negotiation or renegotiation – and there is no empirical data to suggest that occurred – such negotiation would again come at the economic expense of the "few shoulders" of commercial landlords, who would be forced to make rent concessions in the face of potential vacatur of their premises.  The inequity of this shifted burden is particularly egregious since a commercial tenant typically receives the benefit of favorable lease and security deposit terms precisely because of a well-financed personal guarantor.  Here, such security was just two-month's rent.  The Second Circuit was acutely concerned with the legislative decision to "provide financial relief to certain persons not through public funds but by destroying the contractual expectation of other persons . . . ."  *Melendez*, 16 F.4th at 1042.  Defendants have shown nothing to allay that concern.

Lastly, Defendants also attempt to mitigate the disproportionate economic burden placed on commercial landlords by insisting that "City agencies in general, and SBS in particular, helped businesses weather the pandemic in other ways" and that there were a "panoply of services available to all businesses (including landlords)."  (Opp. Br. 21-22).  The argument is easily disposed of.  These City agencies and the panoply of services were available to and assisted *commercial tenants and landlords alike*.  If anything, federal and state assistance focused on assisting small business tenants even more than the commercial landlord.

    *iv.* *The Guaranty Law Is Not Conditioned On The Guarantor's Ability To Pay*

21

Perhaps most obviously, the Law was unreasonably designed because the City could have easily included a need or injury requirement.  Any type of requirement would have achieved the stated goal of business owners not facing the loss of their business and also personal bankruptcy without a wholesale repudiation of all personal guarantees.  The Law permanently absolves all small-business lease guarantors regardless of their ability to pay.  It should be emphasized that the City Council not only had PPP and the Restaurant Revitalization Fund as models for the creation of an injury or need requirement, but prior State gubernatorial action which predated the Law likewise contained these requirements.  (Dkt. 29, (Younger Decl.) ¶¶ 37, 39, 41-43).  Well-capitalized guarantors did not need the protection of the Guaranty Law, and there were readily available guardrails to temper the categorial legislation passed.[10]

Contracts Clause caselaw is clear that a governmental entity cannot "impose a drastic impairment when an evident and more moderate course would serve its purpose equally well." *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 31 (1977).  A need or injury requirement was a clear "evident and more moderate course." *Id.*[11]

As they argued before the Second Circuit, without any newly adduced evidence, Defendants attempt to address this fourth factor, arguing the Council could "judge that its tailoring of the law solely to natural persons" was sufficient to make the Law reasonable.  (Opp. Br. at 22).  This argument was already raised and was rejected by the Circuit.  As the Panel held:

> [t]o be sure, the Guaranty Law only affords relief to natural-person
> guarantors of businesses forced to shutter or reduce operations

---

[10] The VOLS "amicus" brief suggests the well-capitalized guarantor is a "red herring" because the Law "does not impair a commercial landlord's right to recover as against that well-capitalized commercial *tenant*," like Louis Vuitton.  (VOLS Br. at 16) (emphasis added).  The assertion clearly misses the point and conveniently ignores the facts of this case, where a well-capitalized *guarantor*, not tenant, was beyond the reach for payment despite the tenant's inability to pay.

[11] In fact, as Defendants concede, an injury requirement was so "evident" to the Council that it actually considered suspending personal guaranties for businesses suffering a 50% or more decline in revenues, but inexplicably declined to impose the condition (or any similar requirement).  (Opp. Br. at 15 n.10).

> during the pandemic. But that, by itself, does not mean that a
> particular guarantor cannot pay rent arrears, particularly when
> temporally cabined by a good-guy provision. Nor does it
> necessarily mean that a particular landlord is better able than a
> particular guarantor to bear the financial burden of a tenant's ability
> to pay rent.

*Melendez*, 16 F.4th at 1043. The Second Circuit also identified that many forms of pandemic

financial relief were conditioned on applicants demonstrating need or hardship in order to make

sure that public benefits were responsibly distributed to serve their public purpose. Yet, in this

case, "[t]he record indicates little Council discussion on the subject of guarantor need, much less

a stated reason for not including such a condition in the challenged law." *Id.* at 1044 Even if the

first omission of a considered Council discussion on guarantor ability to pay might be excused

by the quick onset of the emergency, the Law was renewed in September 2020 and again in April

2021, all while "trillions of dollars in pandemic financial assistance were appropriated, including

hundreds of billions to assist small businesses." *Id.* The Second Circuit gave the Defendants the

opportunity to adduce evidence of a need analysis, or any investigative, or empirical process,

outside merely relying "upon the pooled general knowledge of its members" before the drastic

impairment of all commercial leases. *Id.* at 1045 (citations omitted). Defendants have failed to

identify any such evidence.

        *v.*    *The Guaranty Law Fails to Compensate Landlords For Damages
            Or Losses Resulting From the Impairment*

       Finally, the Second Circuit questioned the reasonableness of the Law because it fails to

provide any compensation for damages or losses sustained as a result of the impairment.

Supreme Court precedent teaches that the inclusion of compensation for the impaired party

counsels in favor of constitutionality, while the absence of a compensation requirement points

towards unconstitutionality. *Melendez*, 16 F.4th at 1062. The Panel assumed that damages from

the Guaranty Law could be extensive and gave an example from the Amended Complaint, which alleges that Mr. Bochner drew on $35,000 of his own funds to pay for taxes. *Id.* at 1045.

Defendants harp on this $35,000 figure and suggest that Mr. Bochner did not personally pay taxes. The suggestion is both wrong and beside the point. First, Mr. Bochner *did* pay property taxes on 287 7th Avenue, usually borne by the tenant, that he was forced to pay because his tenant and guarantor refused. Mr. Reifer, property manager at Guardian who paid the property taxes, testified that Mr. Bochner had to borrow from a separate entity that he owned to be able to pay the taxes, because it was his responsibility to pay. (Dkt. No. 104-44 (Defendants' Ex. NN) at 46). That the payment for taxes came from a corporate account of Mr. Bochner's rather than a personal account is of no consequence. It is Mr. Bochner who was personally damaged and never compensated from the contractual impairment.

Tellingly, apart from the $35,000 in taxes, Defendants make no mention of the undisputed $116,000 in rent that Mr. Bochner was damaged on account of his inability to collect rent after the Guaranty Law's passage. He received no compensation for this large loss.

Defendants appear to suggest that the SBA disaster loan Mr. Bochner obtained in the amount of $150,000 makes the Law reasonably tailored to achieve its purpose. But Mr. Bochner explained that the loan has not been forgiven; he must pay "four [or] five" percent interest on the loan, and none of the money borrowed remains because it was used to pay outstanding liabilities on 287 7th Avenue. (Dkt. No. 104-53 (Defendants' Ex. VV) at 46-47). While Defendants give the impression that Mr. Bochner benefited from the Law, the opposite is true. While Mr. Bochner's tenant, Sunburger and its wealthy guarantor simply walked away from their contractual obligations, Mr. Bochner remains saddled with repaying, with interest, a $150,000 loan.

As the Circuit noted, compensation is not always necessary for contract-impairing legislation.  But where "as here, a law permanently deprives a landlord of protection of a lease guaranty for up to sixteen months of rent arrears and without regard to guarantor need, the failure to condition such relief on some compensation for, or mitigation of, tax and other obligations that the landlord (or his principal) is required to satisfy, is a further reason to question the reasonableness and appropriateness of the Guaranty Law."  *Melendez*, 16 F.4th at 1046.

The Law completely wiped out the validly bargained for contractual rights of tens of thousands of commercial landlords Citywide, without any compensation, without any qualifying or modifying conditions, and without any study of the consequences of the draconian legislation or readjustment upon renewal to changing economic conditions.  If the Contracts Clause is to retain any meaning, legislation such as the Law should be invalidated.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment and declare the Guaranty Law unconstitutional and deny Defendants' motion for summary judgment.  There are no genuine issues of material fact, and as a matter of law, the Guaranty Law violates the Contracts Clause of the U.S. Constitution.

Dated:   New York, New York
         October 14, 2022

                                    STROOCK & STROOCK & LAVAN LLP

                                    By: */s/ Claude G. Szyfer*
                                        Claude G. Szyfer
                                        David J. Kahne
                                        Darya D. Anichkova
                                        180 Maiden Lane
                                        New York, NY 10038
                                        (212) 806-5400
                                        cszyfer@stroock.com

                                        *Attorneys for Plaintiffs Elias Bochner and 28*
                                        *7th Avenue Realty LLC*

25