UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 03/31/2023

MELENDEZ, *et al*.,

                    Plaintiffs,

        v.

THE CITY OF NEW YORK, *et al*.,

                  Defendants.

No. 20-CV-5301 (RA)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

The COVID-19 pandemic presented an extraordinary set of challenges, impacting nearly every aspect of life across the globe, in some ways that we are only now beginning to understand. Managing the devastation wrought by the pandemic required a response from government at all levels, and federal, state, and local actors moved swiftly to enact legislation aimed at addressing widespread health and economic concerns. New York City found itself in a particularly vulnerable position in the early days of the pandemic, as cases of the virus soared and local businesses faced ruin seemingly overnight. As part of its pandemic response, the New York City Council considered and adopted a package of legislation aimed at alleviating the financial burdens facing small businesses. At issue in the present action is one law, N.Y.C. Local L. No. 55 of 2020 (the "Guaranty Law" or "Law"), rapidly adopted in that well-intentioned effort.

Plaintiffs Elias Bochner and his business, 287 7th Avenue Realty LLC, commercial landlords, brought this action alleging, as relevant here, that the Guaranty Law violates the Contracts Clause of the United States Constitution, as it renders so-called "guaranty clauses" in commercial leases in the City unenforceable for any unpaid rent between March 7, 2020 and June 30, 2021. In so doing, Plaintiffs argue, the Law permanently reallocated substantial financial

burdens exclusively upon commercial landlords, leaving them without legal recourse or compensation, even as the pandemic's effects subside, and even without requiring that guarantors demonstrate any financial hardship or need justifying nonpayment.

While recognizing the "burden [the] law puts on landlords" and expressly declining to "minimize the Guaranty Law's harm to Plaintiff[s]," this Court previously granted the City's motion to dismiss the Complaint, reasoning that Contracts Clause caselaw required "substantial deference" to "policymakers making good-faith efforts to act in the public interest." *Melendez v. City of New York*, 503 F. Supp. 3d 13, 32, 36 (S.D.N.Y. 2020). The Second Circuit reversed in part, identifying "five serious concerns" about the Law being a "reasonable and appropriate means" for the City to achieve its professed public purpose, as the Contracts Clause requires. *Melendez v. City of New York*, 16 F.4th 992, 1038–47 (2d Cir. 2021). The Circuit thus directed the City to develop the record to "identify . . . circumstances relevant to determining whether the Guaranty Law is [] reasonable and appropriate." *Id*. at 1046.

Now before the Court are cross-motions for summary judgment filed by Plaintiffs and the City. Guided by the Second Circuit's specific and thorough instruction, the Court finds that the City has been unable to adduce record evidence demonstrating that the Guaranty Law is reasonably tailored to accomplish its legitimate policy goals. Accordingly, for the reasons that follow, the Court concludes that the Guaranty Law violates the Contracts Clause; Plaintiffs' motion for summary judgment is therefore granted, and the City's motion denied.

## BACKGROUND

The Court described the facts giving rise to this action at length in its prior opinion dismissing the Complaint. *See Melendez*, 503 F. Supp. 3d at 19–27. For the sake of completeness, however, factual background related to the COVID-19 pandemic response at the time of the

Guaranty Law's passage is reiterated again below, together with the evidence presented following remand.

## I.   The State's Response to the Pandemic

The New York State Legislature, together with the Chief Judge of the New York Administrative Courts and the Governor, responded to the COVID-19 crisis with numerous regulations aimed at protecting the health, safety, and economic wellbeing of the people of New York.  On March 3, 2020, the New York State Legislature amended section 29-a of the New York Executive Law, granting the Governor the power to "issue any directive during a state disaster emergency" that the Governor deemed "necessary to cope with the disaster."  *See* SB S7919; N.Y. Exec. Law Art. 2-B § 29-a.  The amendment also expanded the Governor's existing authority to temporarily suspend "any statute, local law, ordinance, or orders, rules or regulations," as necessary to aid with coping with the disaster.  *Id.*

Following this expansion in authority, the Governor passed a series of executive orders. On March 7, 2020, the Governor issued EO 202, which declared a state of emergency in New York until September 7, 2020.  N.Y. Exec. Order No. 202 (Mar. 7, 2020), Dkt. 38, Ex. B.  The order "authorize[d] all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency."  The Governor subsequently filed a series of executive orders mandating the closure of the vast majority of businesses in the state.  *See, e.g.*, N.Y. Exec. Order No. 202.3 (Mar. 16, 2020), Dkt. 29, Ex. 18 (prohibiting bars and restaurants from serving food or beverages on premises and closing gyms and movie theatres); N.Y. Exec. Order No. 202.5 (Mar. 18, 2020), Dkt. 38, Ex. D (closing indoor malls, amusement parks, aquariums, zoos, and arcades); N.Y. Exec. Order No. 202.6 (Mar. 18, 2020), Dkt. 38, Ex. E (closing all non-essential businesses); N.Y. Exec.

3

Order No. 202.7 (Mar. 19, 2020), Dkt. 29, Ex. 20 (ordering barbershops, salons, and tattoo parlors to close).

The Governor also issued a series of executive orders regulating matters of housing.  For example, Executive Order 202.8 announced a ninety-day moratorium on commercial and residential evictions and foreclosures.  N.Y. Exec. Order No. 202.8 (Mar. 20, 2020), Dkt. 29, Ex. 21.  Executive Order 202.9 instructed the Superintendent of the Department of Financial Services to ensure that "any person or entity facing a financial hardship due to the COVID-19 pandemic" be given the opportunity for a forbearance of mortgage payments.  N.Y. Exec. Order No. 202.9 (Mar. 21, 2020), Dkt. 38, Ex. H.  Executive Order 202.28 mandated that residential landlords allow tenants facing financial hardships due to the pandemic to use their security deposits to pay past-due rent, and prohibited landlords from demanding late payment fees for rent due and owing from March to August.  N.Y. Exec. Order No. 202.28 (May 7, 2020), Dkt. 29, Ex. 23.

In June 2020, the state legislature passed a series of laws further regulating matters of housing.  On June 17, it passed the Emergency Rent Relief Act ("ERRA"), which was initially to remain in effect until July 2021.  2020 Sess. Law News of N.Y. Ch. 125 (S. 8419) § 3, Dkt. 29, Ex. 26.  Section 2.2 of the act authorized the state housing commissioner to establish a residential rent relief program for those affected by COVID-19.  *Id*. § 2.2.  Section 2.4 provided for rental subsidies, capped at 125 percent fair market rent, to be paid directly to landlords in the form of a rent-voucher.  *Id*. § 2.4.  Priority for these vouchers was to be given to those with greatest social and economic need.  *Id*. § 2.7.  That same date, the legislature amended the State Banking Law, adding § 9-x, which required all entities regulated by the New York Department of Financial Services to grant forbearance on all monthly mortgage payments for up to 180 days, subject to certain restrictions.  N.Y. C.L.S. Bank § 9-x (2020), Dkt. 39. Ex. EE.  And on June 30, the

4

legislature passed the Tenant Safe Harbor Act ("TSHA").  2020 Sess. Law News of N.Y. Ch. 125 (S. 8192-B), Dkt. 29, Ex. 27.  The TSHA prohibits courts from issuing warrants of eviction against those residential tenants who have suffered financial hardship during the COVID-19 period for rent due and owing during that period.  *Id*. § 2.1.  The TSHA instructed courts to consider factors such as change in income and liquid assets in determining whether a tenant suffered "financial hardship."  *Id*. § 2.2(b).  Section 3 of the law provided that—notwithstanding the other restrictions it imposed—courts may still award a judgment for rent due and owing in a summary proceeding. *Id* § 3.

The Chief Administrative Judge of the NY Courts also issued a series of administrative orders, some of which prohibited the initiation of foreclosures on commercial properties and suspended commercial and residential evictions.  *See*, *e.g.*, N.Y. Admin. Order No. 68/20 (Mar. 16, 2020), Dkt. 38, Ex. AA (suspending all eviction proceedings until further notice); N.Y. Admin. Order No. 157/20 (July 23, 2020), Dkt. 56, Ex. C (prohibiting the initiation of foreclosures on commercial mortgages for non-payment if the property owner is facing financial hardships due to COVID-19); N.Y. Admin. Order No. 160A/20 (Aug. 13, 2020), Dkt. 56, Ex. D (continuing to prohibit the initiation of eviction proceedings for commercial tenants if the tenant is facing financial hardships due to COVID-19 and suspending all residential eviction proceedings commenced after March 1).

II.    *The City's Guaranty Law*

New York City's City Council also passed a slate of local ordinances to combat the pandemic's economic impact.  Of relevance on remand is one of those laws, first passed on May 26, 2020, Local Law No. 55-2020, known as the "Guaranty Law."  It provides:

> A provision in a commercial lease or other rental agreement involving real property located within the city that provides for one or more natural persons who are not

the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, shall not be enforceable against such natural persons if the conditions of paragraph 1 and 2 are satisfied.

*Id*. § 22-1005.  The first requirement for the Guaranty Law to apply is that either

> (a) The tenant was required to cease serving patrons food or beverage for on-premises consumption or to cease operation under executive order number 202.3 issued by the governor on March 16, 2020;
> (b) The tenant was a non-essential retail establishment subject to in-person limitations under guidance issued by the New York state department of economic development pursuant to executive order number 202.6 issued by the governor on March 18, 2020; or
> (c) The tenant was required to close to members of the public under executive order number 202.7 issued by the governor on March 19, 2020.

*Id*. § 22-1005(1)(1).  The second requirement is that "[t]he default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and September 30, 2020, inclusive."  *Id*. § 22-1005(1)(2).

On September 28, 2020, the Guaranty Law was extended to encompass all liabilities that accrued between September 30, 2020 and March 31, 2021.  N.Y.C. Local L. No. 98 of 2020; *see also* Dkt. 69 (Plaintiffs' letter describing the extension).  The Law was extended for a final time on March 25, 2021 to encompass liability for unpaid rent on commercial leases through June 30, 2021.  N.Y.C. Local L. No. 50 of 2021.

The Guaranty Law was passed in its first iteration relatively quickly.  It was introduced during a New York City Council meeting on April 22, 2020, and passed just over a month later.  Koplik Decl. ¶ 4, Dkt. 104; *see also id.*, Ex. B.  On April 29, 2020, the Council's Committee on Housing and Building and the Committee on Consumer Affairs and Business Licensing released a report discussing the pandemic's effect on small businesses and the need for laws like the Guaranty Law.  *See* Dkt. 104, Ex. C.  The report noted that, while the State's efforts "to support

small businesses during this crisis have provided some measure of relief for small business owners and their employees," there were a "range of outstanding issues that continue to make operating a business during the pandemic particularly difficult." *Id*. at 28. Specifically, the report expressed concern with "[b]usinesses who experience a drop in revenue due to COVID-19 . . . fac[ing] added legal pressure to meet financial obligations," including "imposing personal liability." *Id*. at 28–29. The report further noted that "[w]ithout recourse, landlords and debt servicers may resort to threats, which continues to make protecting businesses from harassment an important issue as the City grapples with the effects of COVID-19." *Id* at 29.

The Committees also held a series of open hearings on the Law, inviting feedback from "a broad spectrum of stakeholders including tenants, property owners, the Marshals, Sheriff's, the advocates, and the public, so that the council can get a better perspective on both sides of the issue." Dkt. 29, Ex. 33 at 8. During the April 29 hearing on the proposed Guaranty Law, the Committee heard from individuals and groups like the Deputy Commissioner of Policy and Intergovernmental Affairs of the New York City Commission on Human Rights, REBNY, the New York City Community Housing Improvement Program ("CHIP"), and the Legal Aid Society, Dkt. 104, Ex. D, and received almost 1,000 pages of written testimony from representatives from the New York City Department of Small Business Services ("SBS"), REBNY, United for Small Businesses NYC, Volunteers of Legal Service ("VOLS"), CHIP, and the Legal Aid Society. Dkt. 104, Exs., E-1, E-2, E-3, E-4, E-5.

During the hearing, the majority of testimony received—both from council members and community stakeholders—expressed support for the Law, and spoke compellingly about the harms the Law would help to ameliorate. Gabriel Stulman, CEO and Founder of Happy Cooking Hospitality, for example, explained to the Council, "[e]motionally and financially I am preparing

for this possibility of going bankrupt and belly up," further stating, "I am concerned that my landlords in *addition* to them keeping my security deposits (most of them 3 months and in excess of $60,000) are entitled to—and likely will—sue me personally for my obligations under my various leases." Def. 56.1 ¶ 32; Dkt. 104, Ex. E1 at 106–07 (emphasis in original). Stulman noted that he believed the Guaranty Law would be "instrumental" to his "existence" and that of "most small businesses in this city." *Id*. Then-Speaker Corey Johnson agreed, arguing that "[m]any businesses will be forced to shut down for good if they don't get more help." Def. 56.1 ¶ 21; Dkt. 104, Ex. D at 10:11–11:13.

Several speakers, however, expressed specific reservations about the Guaranty Law's efficiency and even its legality. Council Member Yerger explained at the April 28 hearing that he was "worried about the small landlords" and urged that any effort to provide relief for commercial tenants should "go hand [in] hand with relief for landlords." Dkt. 29, Ex. 33 at 46. Perhaps most notably, at the hearing the next day, he again raised concerns, and explicitly argued that the Guaranty Law was a "violation of Article I Section 10," the Contracts Clause, and that:

> [t]he city cannot retroactively adjust, amend a contract that was entered into by two parties at arm's length. You can't do it, [it's] illegal . . . . Emergency or not, and this is the real epitome of an emergency . . . . but we have an obligation to actually be honest with New Yorkers.

Dkt. 104, Ex. D at 89. He went on to say that that the Law "feels unconstitutional," and that the City did not "have the legal authority to go backward into a contract that was entered into five, six, seven . . . years ago," in order to "amend [it] retroactively to remove a provision." *Id*.

As applicable for the purposes of the present motion, a local landlord, Elias Bochner, claims to have been harmed by the Guaranty Law. Plaintiff Bochner, through his company, Plaintiff 287 7th Avenue Realty LLC, owns a mixed-use property in Manhattan with a commercial space. Pl. 56.1 ¶ 16. Bochner and his family rely on the rental payments for income. *Id*. Bochner's

commercial tenants have a so-called "good guy" personal guaranty clause in their lease, which requires the guarantor to pay the tenant's rent from the date the tenant's business fails through an agreed upon date. *Id.* ¶¶ 14–17. In Bochner's commercial lease, operative during the first half of 2020, the personal guarantor for the lease was Mitch Cantor, a person other than the tenant. Dkt. 64, Ex. 5 at 81. Bochner states that he requires guaranties for all commercial tenants, and states that he "would not have entered into" the lease without one. Pl. 56.1 ¶ 16. Bochner's tenant stopped paying full rent in January 2020—before the onset of the COVID-19 pandemic in New York—and, on March 20, 2020, gave six-month notice of intent to surrender. *Id.* ¶ 17. Because Bochner could not enforce the guaranty clause in the commercial lease against the guarantor, he was unable to recover some $110,000 in rental income owed to him between March 20, 2020 and September 20, 2020. *Id.* ¶¶ 17–18.

## PROCEDURAL HISTORY

Plaintiffs brought this action seeking injunctive and declaratory relief, alleging, as relevant here, that the City's Guaranty Law violated the Contracts Clause of the United States Constitution, which prohibits "State . . . Law[s] impairing the Obligation of Contracts." U.S. CONST. art. 1, § 10, cl.1.[1] The City moved to dismiss all claims.

---

[1]     Plaintiffs also challenged amendments to the City's existing Residential and Non-Residential Harassment Laws, *see* N.Y.C. Admin. Code §§ 22-901, *et seq.*, 27-2004, *et seq.* (together the "Harassment Amendments"), which prohibited "threatening" residential or commercial tenants based on their COVID-19 status, under the Due Process and Free Speech Clauses of the New York and Federal Constitutions. This Court dismissed the challenges to the Harassment Amendments, *see Melendez*, 503 F. Supp. 3d at 27–31, and the Second Circuit affirmed the dismissal of those claims, *see Melendez*, 16 F.4th at 996.

Plaintiffs Yang and Melendez did not sue on the Contracts Clause issue, and only pressed the now-dismissed challenges to the City's Harassment Amendments. Because the Guaranty Law challenge was brought only by Plaintiff Bochner and his business, 287 7th Avenue Realty LLC, they are the only remaining Plaintiffs to this action.

This Court granted the motion to dismiss, concluding that the Contracts Clause challenge to the Guaranty Law failed to state a claim. *Melendez*, 503 F. Supp. 3d at 32–34. It reasoned that, although Plaintiffs had plausibly alleged a substantial impairment of their commercial leases, dismissal was warranted because the Guaranty Law advanced a legitimate public purpose and was a reasonable and appropriate means of achieving that purpose. *Id*. Although determining it was bound by caselaw requiring "substantial deference" to "policymakers making good-faith efforts to act in the public interest," *id*. at 32, the Court observed that it was "cognizant of the burden th[e] law puts on landlords," *id*. at 32, and expressly declined to "minimize the Guaranty Law's harm to Plaintiff[s]," which it "recognize[d] [wa]s substantial," *id*. at 36.

The Second Circuit affirmed in part and reversed in part. *See Melendez*, 16 F.4th at 996. Although agreeing with this Court's dismissal of the claims related to the Harassment Amendments, *id*. 1010–16, the Second Circuit concluded that the Contracts Clause claims could not have been dismissed on the pleadings "as a matter of law," as certain characteristics of the Law "weighed heavily" against the reasonableness of the legislation. *Id*. at 1016–47. Specifically, as set forth more fully below, the Circuit identified "five features of the Guaranty Law"—which it elsewhere termed "serious concerns" with the Law—which, in their "totality," "informed [its] conclusion" precluding dismissal of the Contracts Clause Claim. *Id*. at 1038–46. It remanded with instructions that the City "identify . . . circumstances relevant to determining whether the Guaranty Law is [] reasonable and appropriate" on a more developed record. *Id*. at 1046.

Plaintiffs and the City have now filed cross-motions for summary judgment, and the Court heard oral argument on the motions on December 19, 2022.

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009). In determining whether there is a genuine issue of material fact, the Court must view all facts "in the light most favorable to the non-moving party." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001). Where both parties move for summary judgment, "each party's motion must be examined on its own merits, and . . . all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

**DISCUSSION**

**I.   Plaintiffs Have Established Article III Standing**

Article III, Section Two of the Constitution "restricts federal courts to deciding 'Cases' and 'Controversies' and thus imposes what the Supreme Court has described as the 'irreducible constitutional minimum of standing,'—injury-in-fact, causation, and redressability." *Baur v. Veneman*, 352 F.3d 625, 631–32 (2d Cir. 2003) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Thus, to establish constitutional standing, a plaintiff must "allege, and ultimately prove, that he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief." *Id*. at 632; *see also Bennett v. Spear*, 520 U.S. 154, 162 (1997). The City now asserts, based in part on evidence obtained during discovery, that Plaintiffs have failed to establish standing because they have not

demonstrated an injury-in-fact, let alone one that is traceable to the City's Guaranty Law.  *See* Def. Mem. at 9; Def. Reply at 1–2; Def. Letter, Dec. 7, 2022.  The Court disagrees.

### A.  Plaintiffs Have Demonstrated an Injury-In-Fact

The Supreme Court has instructed that an injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (cleaned up).  "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way," *Spokeo v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up), and for it to be 'concrete,' it must be "real and not abstract," though it need not be "tangible," *id.* at 340 (cleaned up).  For it to be actual or imminent, a "plaintiff must show that he has sustained or is immediately in danger of sustaining" a direct harm as a result of the challenged conduct.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (cleaned up).

On its face, the Guaranty Law invalidated Plaintiffs' bargained-for contract rights because it provides that any personal guaranty clauses in commercial leases "shall not be enforceable" to cover defaults occurring during the March 2020 to June 2021 period.  N.Y.C. Local L. 55 of 2020 (as extended by N.Y.C. Local L. No. 50 of 2021).  As the Second Circuit noted, the Law thus "does not simply defer a landlord's ability to enforce a personal guaranty; it forever extinguishes it."  *Melendez*, 16 F.4th at 1005.  This kind of "monetary injury" to the Plaintiffs—permanently barring them from collecting more than a hundred thousand dollars in unpaid rent for a prime commercial tenancy in the heart of Manhattan—plainly establishes that they "ha[ve] suffered a concrete injury in fact under Article III."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).  It matters not, as the City insists, that Plaintiffs took out an SBA loan in order to cover unpaid rent and taxes.  As an initial matter, on this record, the SBA loan remains unforgiven.  And, in any event, by being forced to recoup expected rent payment by alternative means, Plaintiffs

12

demonstrate precisely the kind of "direct and personal stake in the controversy" that the injury-in-fact inquiry seeks to answer.  *Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1107 (2d Cir. 1992).

### B.  Plaintiffs' Injury is Fairly Traceable to the Guaranty Law

So too, the plain text of the Guaranty Law establishes causation, as "alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004).

Where, as here, a plaintiff is "threatened by the enforcement of a statute that specifically targets the plaintiffs, the [fairly traceable] requirement is met."  *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019); *see also id.* (finding plaintiff's injury was "'fairly traceable' to the Statute" when the statute "is a solid barrier to the extension of the Airport's runway" and "[n]othing can happen while the Statute is in place").  The recent case *General Motors LLC v. KAR Auto Group of Decorah, Inc.*, is particularly instructive.  *See* 2022 WL 1715216 (N.D. Iowa Mar. 11, 2022).  There, the court found that a plaintiff had established standing to sue for Contracts Clause violations where the "plaintiff's inability to terminate or sue on its breached term [was] fairly traceable to [the challenged statute]," because "[b]ut for [the challenged] law, plaintiff could enforce its [contractual] provisions."  *Id.* at *5.

### C.  Finding the Guaranty Law Unconstitutional Would Redress Plaintiffs' Injury

Finally, redressability is established where it is likely that the injury complained of will be remedied by a favorable decision in the action at hand.  *See Lujan*, 504 U.S. at 561; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) (holding that the redressability requirement is met where a favorable decision will remove the "absolute barrier"

13

imposed by the statute at issue).

Plaintiffs have demonstrated here that the Guaranty Law poses such an absolute barrier to recovering unpaid rent from the guarantor. New York courts have repeatedly dismissed claims by landlords against guarantors, citing the Guaranty Law as the basis for doing so. *See, e.g.*, *Spectra Photo Art, Inc. v. Mendared, LLC*, 2022 WL 16924078, at *2 (N.Y. Sup. Ct. Nov. 10, 2022) ("Since Administrative Code § 22-1005 prohibits enforcement of the rent and real estate tax obligations that [the guarantor's] guaranty covers, the complaint's first and second causes of action fail to state a claim for an enforceable liability against [the guarantor]."); *274 Madison Co. LLC v. Vieira*, 2021 WL 4441911 (N.Y. Sup. Ct. Sept. 28, 2021), *aff'd*, 205 A.D.3d 403 (N.Y. App. Div. 2022) (holding same for period covered by the Guaranty Law); *27 Morton, L.P. v. MDS Fashions, Ltd*, 2020 WL 6867927, at *2 (N.Y. Sup. Ct. Nov. 20, 2020) (reasoning "[t]he New York City Council was well aware of the potential unfairness to landlords and it enacted this law anyway in order to protect individual guarantors whose business were shut down because of Covid").

A finding by this Court that the Guaranty Law violates the Contracts Clause would enable Plaintiffs to enforce the guaranty clause of their commercial lease. *See In re Old Carco LLC*, 470 B.R. 688 (S.D.N.Y. 2012) (holding, in an action for declaratory judgment, that plaintiff's injury could be redressed by a favorable decision that the challenged statute violated the Contracts Clause); *Gen. Motors*, 2022 WL 1715216, at *5 (reasoning a finding that the challenged statute "is unconstitutional would redress [plaintiff's] injury," as, "[w]ith such a declaration, courts would not enforce [the statute] and void [the parties' contractual provisions], so plaintiff could enforce those contractual provisions in court").[2]

---

[2]     The City's arguments regarding the related doctrine of "ripeness" are similarly unavailing. "Often, the best way to think of constitutional ripeness is a specific application of the actual injury

Because the Court concludes that Plaintiffs have established Article III standing, it turns to the merits of their Contracts Clause challenge.

## II.   The Guaranty Law Violates the Contracts Clause

As they did on the motion to dismiss, Plaintiffs Bochner and his business, 287 7th Avenue Realty LLC, challenge the constitutionality of the Guaranty Law under the Contracts Clause, which provides that "no State shall . . . pass any . . . law impairing the Obligations of Contracts." U.S. CONST. art. 1, § 10, cl. 1.  Though written in absolute terms, the Contracts Clause does not give private parties the absolute right to contract without government interference; instead, courts have interpreted it to allow limited interference in contracts, so long as that interference is in furtherance of the "inherent police power of the State to safeguard the vital interests of its people." *Energy Reserves Group v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (cleaned up); *see also Twentieth Cent. Assoc. v. Waldman*, 294 N.Y. 571, 580 (1945) ("The principle is firmly established today that all contracts are subject to the police power of the State, and, when emergency arises and the public welfare requires modification of private contractual obligations

---

aspect of Article III standing . . . . Constitutional ripeness, in other words, is really just about the first *Lujan* factor."  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). Having established that a dispute related to the Guaranty Law has generated injury significant enough to satisfy the "case or controversy" requirement of Article III—that is, that Plaintiffs are unable to collect unpaid rent from the guarantor given the Law—Plaintiffs have similarly established that this action is ripe for judicial review.  *See New York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 132–34 (2d Cir. 2008).

Moreover, contrary to the suggestion that Plaintiffs were required to first file suit against the guarantor to enforce the guaranty clause, "the ripeness doctrine does not require litigants to engage in futile gestures such as to jump through a series of hoops" before bringing and action to avail themselves of legal rights.  *Sherman v. Town of Chester*, 2013 WL 1148922, at *9 (S.D.N.Y. Mar. 20, 2013), *aff'd in part*, 752 F.3d 554 (2d Cir. 2014).  The uniform reading by New York's courts of the Guaranty Law has resulted in the dismissal of suits precisely of the sort that the City demands.  *See supra* at 14.  It thus would have been futile for Plaintiffs to bring such a claim against the guarantor before filing this action.

in the public interest.").

When deciding whether a law violates the Contracts Clause, courts in this Circuit ask the following: "(1) whether the contractual impairment is substantial and, if so, (2) whether the law serves a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and necessary." *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020) (citing *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006)) (cleaned up); *see also Energy Reserves Grp.*, 459 U.S. at 411–18 (applying the same test).

For the reasons that follow, the Court once again finds that the contractual impairment imposed by the Guaranty Law on Plaintiffs was substantial, and that the City's effort to mitigate the devastating economic impact of the COVID-19 pandemic constituted a legitimate public purpose. However, guided by the Second Circuit's specific and detailed instruction that the City must justify the reasonableness of the Guaranty Law given "at least five serious concerns" articulated by the panel majority's opinion, *Melendez*, 16 F.4th at 1047, the Court finds that the Law fails to withstand means-ends scrutiny under the final prong of the *Sullivan* test.

### A.  The Guaranty Law Substantially Impairs Contracts

The substantiality of a contract's impairment depends upon "the extent to which reasonable expectations under the contract have been disrupted." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). "[T]he reasonableness of expectations depends, in part, on whether legislative action was foreseeable." *Sullivan*, 959 F.3d at 64; *see also Sanitation*, 107 F.3d at 993 ("Impairment is greatest where the challenged government legislation was wholly unexpected."). Courts are apt to find substantial impairment in instances where the hindered contract provision was a "primary inducement" for the parties to enter the contract or a

"central provision [of the contract] upon which it can be said [the parties] reasonably rely." *Buffalo Tchrs.*, 464 F.3d at 368.  Finally, in making an assessment of substantiality, courts consider whether the contractual impairment is temporary or permanent.  *See WB WorthenCo. V. Thomas*, 292 U.S. 426, 433–34 (1934); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978).

Taken together, these considerations previously led this Court to conclude that the Guaranty Law imposes a substantial impairment on Plaintiffs' contracts.  And, in its opinion, the Second Circuit agreed with that determination, finding that the Guaranty Law substantially impairs the contract rights of landlords, such as Plaintiff Bochner, whose commercial lease agreements are secured by personal guarantees.  *See Melendez*, 16 F.4th at 1032–35.  In so doing, the Circuit observed that the "law renders unenforceable any personal guaranties of rent obligations arising under such leases" for the proscribed period.  *Id*. at 1033.  It also specifically listed two reasons that the City's argument—"that the rent obligation of commercial leases is not severely diminished by the Guaranty Law because the landlord may continue to seek unpaid rent from the tenant," *id*. at 1033—fails in the present action.  "First," the panel majority reasoned, "the practical likelihood of landlords such as plaintiff Bochner recovering rent arrears from delinquent small business tenants appears speculative at best."  *Id*. at 1033.  "Second, the law recognized a secured obligation to establish effectively two contractual bargains, one between the principals and the other between a principal and the guarantor;" and the "fact that the Guaranty Law does not invalidate the first bargain cannot gainsay its destruction of the second for guarantor obligations."  *Id*. at 1034.

The Court finds that nothing in the record demands a conclusion different than the one previously reached, and adopted by the Second Circuit, on the substantial impairment prong of the Contracts Clause analysis.  To survive, then, the law must advance a legitimate public interest and be reasonable and necessary to do so.  *See Buffalo Tchrs.*, 464 F.3d at 368, 376; *see also Sullivan*

959 F.3d at 64, 69.

### B. The City Adopted the Guaranty Law to Advance a Legitimate Public Purpose

A legitimate public purpose for Contracts Clause purposes is one "aimed at remedying an important general social or economic problem rather than providing a benefit to special interests." *Sanitation,* 107 F.3d at 993 (cleaned up).  The Court previously determined that the Guaranty Law served such a significant and a legitimate purpose—namely, mitigating the economic emergency experienced in New York City as a result of the COVID-19 pandemic.  Specifically, it reasoned that the Law was enacted in an effort to prevent New York's small business owners from being "pushed into both business and personal bankruptcy," which would have eliminated their ability to remain in or return to business, thereby exacerbating the economic crisis within the City. *Melendez*, 503 F. Supp. 3d at 33.  The Court further found that there had been no allegation that the City passed the Guaranty Law to benefit to benefit a special interest, nor that it had done so to benefit itself.  *Id.   Contra Sullivan*, 959 F.3d at 65 (reasoning that the City, "in breaching a contract[,] [wa]s acting like a private party who reneges to get out of a bad deal").

In its analysis of the legitimate purpose prong, the Second Circuit acknowledged that the City's articulation of its purpose for enacting the Law "finds some record support." *Melendez*, 16 F.4th at 1036.  It cited Council Member Rivera's April 29, 2020 statement explaining, among other things, that she was sponsoring the Guaranty Law

> [to] ensure that business owners, should they be forced to walk away or temporarily shutter their stores, through no fault of their own[,] can do so without facing personal liability, ensuring that one day they may be able to return and relaunch or create a new thriving business in our neighborhoods.

*Id*.  The Court of Appeals went on, however, to find that Plaintiffs' contrary argument—that the Guaranty Law was enacted to "benefit[] only a favored group: commercial-lease guarantors"—was, itself, "not wholly devoid of support in the pleadings record."  *Id*. at 1037 (cleaned up).

Ultimately, the Circuit determined that the question of legitimate public purpose could not, on the pleadings alone, "be decided as a matter of law for either party," and "would benefit from further record support." *Id*.

On remand, the City emphasizes that that the Guaranty Law "easily meets the public-purpose test because it is designed to prevent the bankruptcies of small business owners, the firing of their employees, and the broader economic devastation brought on by a raft of business closures." Def. Mem. at 12. It cites Council Member Rivera's statement that "countless business owners" had serious concerns about "going belly up" at the time that the Law was adopted, and that they specifically feared losing "their personal life savings and asset[s] because of a disaster no one saw coming." Def. 56.1 ¶ 44; Dkt. 104, Ex. J. at 29–30. The City also points to the fact that the extensions of the Guaranty Law stated that it was enacted because individuals "risk[ed] losing their personal assets, including their possessions and even their own homes, transforming a business loss into a devastating personal loss." Def. 56.1 ¶ 73; Dkt. 104, Ex. Z at 3.

Accordingly, the Court concludes that the Guaranty Law was enacted with a legitimate public purpose, as the City was aiming to "remedy[] an important general social or economic problem," *Sanitation*, 107 F.3d at 993 (cleaned up), at the height of the COVID-19 pandemic. To be clear, as described at length below, analyzing the evidence before it through the lens provided by the Second Circuit, the Court holds that the means that the City employed to advance that purpose were not reasonable in their design, such that the Law fails to survive constitutional scrutiny. But—flawed or not—the City's policy goals in passing the Guaranty Law advanced a legitimate general interest of mitigating a staggering economic crisis brought about by a once-in-a-lifetime pandemic.

C.  **The Guaranty Law was Not a Reasonable Means to Advance the City's Interest**

Applying *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934), and its progeny, the Second Circuit identified what it termed "five serious concerns about" the City's passage of the Guaranty Law.  *Melendez*, 16 F.4th at 1047.  In light of the Circuit's instruction, each of these five concerns is addressed below.  Ultimately, the Court concludes that, given the City's failure to present record evidence to address the Circuit's specific concerns, it has failed to demonstrate that the Guaranty Law is a "reasonable and appropriate" means of advancing the City's legitimate public purpose.

1.  **The Guaranty Law is Not a "Temporary" Impairment of Contract**

The Second Circuit first highlighted its concern that "the Guaranty Law is not a 'temporary' or 'limited' impairment of contract, a factor critical to the Supreme Court's conclusion in *Blasdell* that a state moratorium law was a reasonable means to afford economic relief during the Great Depression."  *Melendez*, 16 F.4th at 1038 (citing *Blaisdell*, 290 U.S. at 439).  The moratorium law upheld by the Supreme Court in *Blaisdell*, the Circuit underscored, was not permanent or unlimited—while it deferred a mortgagor's obligations, it did not extinguish them forever.  *See id.* at 1038–39 (citing 290 U.S. at 445).  Rather, the law assumed that, when the moratorium period expired—that is, once the legislature determined the economic burdens of the Great Depression had eased—the underlying "integrity of the mortgage indebtedness [was] not impaired" and that the parties' remedies would therefore be "maintained."  *See id*.

Here, "although the Guaranty Law pertains only to rent arrears arising between March 7, 2020, and June 30, 2021, it does not simply defer guaranty obligations until the conclusion of that period," but instead "permanently and entirely extinguishes them."  *Id*. at 1039.  As counsel for the City agreed at oral argument on the present motion, for any commercial lease entered into

containing a guaranty clause, landlords are *forever* barred from recovering rent to which they are entitled from a guarantor during that 16-month period if a tenant is left unable to pay. *See* Oral Arg. Tr., Dkt. 121 at 13:24–14:3 ("THE COURT:  But it is permanent; you would agree it is permanent?  MS. KOPLIK: For that 16 –  THE COURT: For the 16 months.  MS. KOPLIK: Yes."); *see also id.* at 14:5–6 ("But that permanence for the 16 months tracks the law's important public purposes . . . .").  The City Council could have easily declared that the Guaranty Law's impact on guaranty clauses was "temporary," as in *Blaisdell*, such that it would cease to extinguish contractual obligations when the City determined that the COVID-19 pandemic had eased, but it chose not to do so.

As it did before the Court of Appeals, the City points to *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362 (2d Cir. 2006) and *Sullivan v. Nassau County Interim Finance Authority*, 959 F.3d 54 (2d Cir. 2020), arguing that permanent impairments of private contracts have occasionally been upheld as against Contracts Clause challenges.  But the Second Circuit found that this argument "misses the point," 16 F.4th at 1040—a conclusion that this Court will not second guess. In both *Buffalo Teachers* and *Sullivan*, public employees were denied scheduled wage *increases*, not their regular wages themselves.  Here, by contrast, landlords like Plaintiffs are permanently barred from recovering any rent owed during the period covered by the Guaranty Law, not merely from, for instance, implementing rent increases during the timeframe.  *See Melendez*, 16 F.4th at 1039–40.

Given the City's admission that the Guaranty Law does not only impair guaranty clauses in a "temporary" fashion, the Court finds that the first concern addressed by the Second Circuit weighs in favor of Plaintiffs and a finding that the Law violates the Contracts Clause.

## 2. The Record Does Not Support an Assumption Upon Which the Guaranty Law was Based

The Second Circuit next noted skepticism—"on the pleadings record"—that the Guaranty Law was "an appropriate means for achieving its professed public purpose: to help shuttered small businesses survive the pandemic so that they can reopen after the emergency, ensuring functioning neighborhoods." 16 F.4th at 1040. It reasoned that the City had made three "assumptions informing [its] enactment of the Guaranty Law," namely:

(a) that shuttered small businesses are usually owned by the individuals guaranteeing their leases,
(b) that these owner-guarantors would be financially ruined if required to pay their businesses' renter arrears, and
(c) that financially ruined owners would be unlikely to reopen shuttered businesses.

*Id*. In an effort to "mitigate the last concern," the panel majority found that the City had chosen to "absolve[] commercial-lease guarantors of their obligations for rent arrears" during the covered period. *Id*. at 1040–41. The issue with such a rationale, the Circuit stated, was that "the law does not condition the relief it affords on guarantors owning shuttered businesses or, even if they do, on their ever reopening their businesses." *Id*. at 1041. "Rather, guarantors receive the full relief . . . even if they never reopen (or intend to reopen) their businesses." *Id*. While the Circuit noted its general "defer[ence] to legislative judgments about the means reasonable and appropriate to address a public emergency," it expressly cautioned that "such deference is not warranted in the absence of some record basis to link purpose and means that, otherwise, appear[ed] missing" at the pleadings stage. *Id*.

Now with the benefit of significant time to address this discrete concern raised by the Circuit, the City has relied upon the same record evidence it cited at the motion to dismiss stage to demonstrate that the Council's legislative determination about the means-ends fit of the Guaranty Law was appropriate. To be sure, that record indicates the City Council was presented with a

wealth of testimony from small business owners which made starkly clear just how dire their financial circumstances were, particularly at the outset of the pandemic in the spring of 2020. That testimony underscored that rent obligations under commercial leases were taking a significant financial toll. To take one example: Joseph Conti, the owner of Shuraku in the West Village, explained, "the only way I could secure a lease was to provide a personal guarantee. That guarantee entitles my landlord to 6 months rent (at $18,000 per month), other fees and my security deposit (3 months rent) . . . In the current situation I cannot afford to pay rent and I cannot afford to give notice. I will quickly run out of money either way." Def. 56.1 ¶ 34 (citing Dkt. 104, Ex. E-1 at 13). Similarly, small business owner Mojito Iaba, who was the owner of stores in Williams Park and Greenpoint in Brooklyn, said "we have no income since March 18th. So we [attempted] to file PPP as emergency loans but so far, no luck . . . Then my landlord asked for rent for April . . . In order to survive as a small business owner, New York City has to pass [this] bill." *Id.* ¶ 26 (citing Dkt. 104, Ex. D. at 277:02–278:15).

The record further lends support to the notion that the City heard testimony from owner-guarantors supporting assumption (b) identified by the Circuit—that these owner-guarantors would be personally financially devastated if required to pay their businesses' rent arrears. *See e.g., Id.* ¶¶ 31–34; Dkt. 104, Ex. E-1. Bryan Cowan, the owner of Wisefish, testified in part: "Because of personal guarantees in our leases I not only have to deal with a potentially failing business, I too have to think about personal financial ruin and bankruptcy. As a newlywed I look to the future and was hoping to begin a family and potentially buy a home. These are all things that would need to be put on hold with a bankruptcy on my record." *Id.* (citing Dkt. 104, Ex. E-1 at 111). As noted before, Gabriel Stuhlman, the founder of Happy Cooking Hospitality, testified:

> Emotionally and financially I am preparing for this possibility of going bankrupt and belly up . . . I am concerned that my landlords in addition to them keeping my

security deposits (most of them 3 months and in excess of $60,000), are entitled to—and likely will—sue me personally for my obligations under my various leases. The Bill [] that you have proposed is instrumental to my existence and that of most small businesses in this city.

Def. 56.1 ¶ 32; Dkt. 104, Ex. E-1 at 106–08.

The record also reveals that the City Council heard at least some testimony from business owners indicating that, without legislation targeting guaranty clauses in commercial leases, they were uncertain if they would ever be able to reopen shuttered businesses, thereby addressing assumption (c) outlined by the Court of Appeals.  One business owner said that, without security against enforcement of personal guaranty clauses, he would be unable to reopen after the Pandemic had subsided.  *See* Def. 56.1 ¶ 35; Dkt. 104, Ex. E-1 at 146 ("The vast majority of [small business owners] WANT to revive our businesses, but it will be impossible without some bold support from our landlords and from the government.") (capitalization in original).  Indeed, some 700 business operators submitted written testimony which stated: "As the operator of a business in your district, I URGE you to SPONSOR and PASS the following critical legislation that will support small businesses in your district, giving us a fighting chance to survive."  Def. 56.1 ¶ 36; Dkt. 104, Exs. E1–E5.  Amicus VOLS has additionally asserted that, in April of 2020, when the legislation was initially proposed, "40% of [its] clients with commercial leases indicated that they had already missed commercial rent payments, and 89% indicated that they anticipated missing commercial rent payments."  Dkt. 41, Kats Decl. ¶ 22.

That testimony aside, the "missing link," *Melendez*, 16 F.4th at 1041, remains, however, that the City cannot demonstrate that it had before it evidence supporting assumption (a) identified by the Circuit—that "shuttered small businesses are usually owned by the individuals guaranteeing their leases," *id*. at 1040—nor that it considered evidence justifying why it need not "condition the relief [of the Guaranty Law] on guarantors owning shuttered businesses, or, even if they do, on

24

their ever reopening those businesses," *id*. at 1041.

This failing on the City's part is critical to this Court's analysis of the Contracts Clause challenge, because the Second Circuit's opinion observed the myriad ways in which the City could have fashioned a more targeted law to address its stated purpose.  It noted that "other pandemic relief serving a similar public purpose [wa]s specifically conditioned on a business's continued operation."  *Id*. at 1041.  "[F]orgiveness of low-interest PPP loans to small businesses," for instance, was "conditioned on maintenance of workforce and compensation levels;" and "the Restaurant Revitalization Fund [did] not provide benefits to restaurants that [we]re 'permanently closed' or that [could not] certify in good faith that the relief funds [we]re 'necessary to support . . . ongoing or anticipated operations.'"  *Id*. at 1041.  Moreover, the CARES Act and even New York's statutory eviction moratoria applied only to those able to demonstrate need after claiming a pandemic-related hardship.  *Id*. at 1043.  The Guaranty Law, by contrast, permanently eviscerated a crucial provision negotiated into commercial lease contracts throughout the City.  And it did so irrespective of (1) a showing that the affected guarantor owned the small business, (2) that such owner-guarantor had financial need, and (3) that such owner-guarantor would reopen the closed business following the pandemic emergency if provided the aid.

In light of the City's failure to point to record evidence providing for this "missing link," the Court finds that the second concern addressed by the Second Circuit weighs in favor of a finding that the Guaranty Law violates the Contracts Clause.

### 3.  The Burden of the Guaranty Law was Placed Exclusively Upon Landlords

The Circuit's third stated concern with the Guaranty Law is that the City exclusively allocated its economic burden on landlords.  *See Melendez*, 16 F.4th at 1042.

The court pointed to the circumstances identified in *Association of Surrogates and Supreme*

*Court Reporters v. New York*, 940 F.2d 766 (2d Cir. 1991), to explain its skepticism regarding the appropriateness of such burden allocation. In that case, a state payroll lag had deprived judicial employees of ten days' pay over a twenty-week period, purportedly to one day be paid back upon the termination of their employment. *See id.* at 772. In finding that such an arrangement violated the Contracts Clause, the Second Circuit faulted the state for funding the expansion of the court system—which was the stated purpose of the scheme—by placing costs "on the few shoulders of judiciary employees instead of the many shoulders of the citizens of the state." *Id.* at 773; *see also id.* (noting that the state could have covered costs by, among other things, "rais[ing] taxes"). As in *Association of Surrogates*, the Circuit reasoned that "[h]ere too, the City did not afford Guaranty Law relief by appropriating existing funds or raising taxes so as to place the burden of preserving neighborhoods on the citizenry that would benefit therefrom," but instead "transferred the burden to the 'few shoulders' of commercial landlords." *Melendez*, 16 F.4th at 1042. Doing so "upset[] lawfully contracted-for expectations between landlords and guarantors." *Id.*

The City's allocation of the burden here is also unlike cases where the "burden of contractual impairment was tailored to the party causing the public harm that the state sought to mitigate." *Id.* In *Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, 504–06 (1987), for example, the Supreme Court upheld a regulation which invalidated contractual liability waivers for mine operators because the regulation was designed to prevent and remedy the operators' damage to protected lands. So too, in *Sanitation*, the Second Circuit rejected a Contracts Clause challenge to a license provision for early contract terminations because it had been enacted to address industry infiltration by organized crime. *See* 107 F.3d at 990, 994. Here, there is no record support for the proposition that commercial landlords were in any way responsible for the economic crisis that the Guaranty Law sought to mitigate. To the contrary, the record is replete

with testimony before the Council about the unique economic disaster caused by the onset of the COVID-19 pandemic, and the havoc that the virus wreaked upon New York City residents—something with which landlords had nothing to do.

The City urges the Court not to consider the economic burden placed upon landlords by the Guaranty Law "in isolation." Def. Mem. at 21. The Law, of course, was enacted by the City Council against a backdrop of state and federal regulations designed to address the harms caused by COVID-19, and viewed alongside that concurrent regulation, the burden of the Law is not quite so easily ascertained. The City recognized, for instance, that early COVID-19 orders had a "catastrophic impact on the city's economic and social livelihood," and that they had required the closure of—or severely limited access to—local businesses. *See, e.g.*, N.Y.C. Local L. 98 of 2020; N.Y.C. Local L. 50 of 2021. Put differently, the City recognized that *tenants'* contracted-for rights in commercial leases had already been eliminated by then-existing law, which prevented, or seriously curtailed, enjoyment of leased premises. Moreover, the City adopted the Guaranty Law with full awareness that the City's agencies—and SBS in particular—were actively helping businesses weather the pandemic in other ways. This assistance included benefits, the City now argues, of which landlords like Plaintiffs were free to avail themselves. *See* Def. Mem. at 22 (citing NYC Small Business Services Report, *Supporting NYC Small Business Recovery & Growth*, https://www1.nyc.gov/assets/sbs/downloads/pdf/about/reports/supporting-nyc-recovery-growth.pdf). So understood, the decision to adopt the Guaranty Law, the City argues, in reality only balanced the burden felt by tenants, guarantors, and landlords.

Appealing as that argument may be on first blush, however, the City's insistence that similar "government pandemic assistance was not accessible to small business tenants," Def. Mem. at 24, is not supported by the record. Indeed, the legislative record the City attaches to its motion

underscores that, when considering extensions to the Guaranty Law, it directly acknowledged that small business owners—including owner-guarantors—were equally able to access this assistance. Before the Law's passage, Jonnel Doris, the Commissioner of Small Business Services, for example, testified before the City Council's Committee on Small Business and enumerated the panoply of ways that small business owners were also able to access pandemic relief funds in New York City. *See* Dkt. 104, Ex. DD at 4; *see also* Pl. Reply at 14–15.

The City also argues that the Guaranty Law's economic burden was justified given that it was intended to "encourage [l]andlords to negotiate and renegotiate leases with their tenants for the benefit of the economy as a whole." Def. Mem. at 20. But it does not explain how the City concluded, with a change to the commercial leases rendering guaranty clauses permanently unenforceable, that guarantors would have any incentive based on the Law to enter negotiations with landlords regarding unpaid rent. As Plaintiff Bochner here experienced, once his tenant and guarantor were relieved of their obligation to pay rent on their commercial lease, they did not seek to come to the table to negotiate. Rather, with some $110,000 in outstanding rent remaining due, they gave notice and vacated the premises without payment. *See* Dkt. 104, Ex. VV at 34. And even if, as the City suggests, the Law was meant to encourage renegotiation, the changed nature of any such negotiations would nevertheless have come at the exclusive expense of the "few shoulders," *Ass'n of Surrogates*, 940 F.2d at 773, of commercial landlords, who would have been forced to make unilateral concessions without bargained-for guaranty clauses as leverage.

At bottom, the City is unable to justify its decision to exclusively allocate the burden on landlords with its additional record evidence. The third area of concern identified by the Circuit thus weighs in favor of Plaintiffs and a finding that the Guaranty Law violates the Contracts Clause.

### 4.   The City Did Not Condition the Application of the Guaranty Law on Need

Fourth, the Second Circuit noted that the Guaranty Law was "not conditioned on need," in that it "permanently absolves all small-business lease guarantors of any responsibility for up to sixteen months of rent arrears regardless of their ability to pay." *Melendez*, 16 F.4th at 1043.

The Circuit found the lack of any hardship requirement in the Law particularly significant, and pointed to the various forms of state and federal pandemic relief which, by contrast, did condition a benefit on need, such as stimulus payments tied to individuals' adjusted gross incomes, *see* CARES ACT § 2201(a), and even New York's pandemic eviction moratorium, which only applied to those claiming COVID-19 related hardship, *Melendez*, 16 F.4th at 1043. Paradoxically, then, while individual tenants *were* required to demonstrate financial hardship in order to be shielded from eviction and remain in their homes, commercial lease guarantors *were not* required to demonstrate any need whatsoever before the Guaranty Law absolved them of the need to pay rent for business tenants owed under commercial leases. And, more to the point, at the time of the Guaranty Law's passage, the City Council was specifically confronted with evidence and arguments about the need to apply a hardship requirement to the legislation. One landlord's testimony, for instance, strongly urged the City to "take into account the health and financial well-being of both landlords and tenants in crafting legislation," and to "make it incumbent on tenants to show that they are unable to pay their rent due to COVID-19" before guarantors were given the benefit of not doing so. *Id*. at 1047.

Highlighting its concern regarding the Law's lack of a hardship requirement, the Second Circuit cited *W.B. Worthen Co. ex rel. Board of Commissioners of Street Improvement District No. 513 of Little Rock, Ark, et al. v. Kavanaugh*, wherein the Supreme Court found impairment of a contract unreasonable where the law did "not even" require a debtor to satisfy the court of his

"inability to pay" rent.  295 U.S. 56, 61 (1935).  And, indeed, later Contracts Clause cases make clear more generally that a governmental entity may not "impose a drastic impairment when an evident and more moderate course would serve its purpose equally well."  *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 31 (1977).  Given the testimony before the City Council at the time, a hardship requirement (or means-testing) was plainly an "evident and more moderate course."  Nevertheless, the City enacted (and then twice extended) the legislation without so tailoring the legislation.  *See* N.Y.C. Local L. 98 of 2020; N.Y.C. Local. L. 50 of 2021.

On remand, the City has largely responded to this concern by again emphasizing that there was testimony before the Council from small business owners demonstrating the ongoing and urgent need for relief.  *See* Def. 56.1 ¶¶ 17–36, 55–65, 77–79.  This generalized evidence, however, only lends support to the notion that small business owners who *could* demonstrate such need were the proper subjects of legislative intervention—not that those less impacted should be as well.

Alternately, the City argues that the fact that the Guaranty Law was cabined in *some* way—namely, to benefit only natural-person guarantors—is evidence of reasonable tailoring.  Def. Mem. at 22.  Such a limitation, it asserts, eliminated the slippery-slope concern, in Council Member Justin Brannan's words, that the Guaranty Law "may end up helping Louis Vuitton as much as it helps Louise['s] [P]izza."  Pl. 56.1 ¶ 6; Dkt. 29, Ex. 31 at 38.  That is, the City specifically recognized that "the scale of the financial obligations of larger businesses generally renders having a natural person guarantee those obligations impracticable."  N.Y.C. Local L. 98 of 2020.  Moreover, the City contends, as Plaintiffs admit, the need for personal guarantees in commercial leases in the first place "depend[ed] on [] credit-worthiness," Pl. Mem. at 8–9, as the only individuals who would be impacted by the Guaranty Law were those supporting businesses that were already not financially secure.

30

But argument regarding the tailoring evinced by the natural-person requirement was raised and squarely rejected by the Circuit on appeal.  As the panel majority held:

> To be sure, the Guaranty Law only affords relief to natural-person guarantors of businesses forced to shutter or reduce operations during the pandemic.  But that, by itself, does not mean that a particular guarantor cannot pay rent arrears, particularly when temporally cabined by a good-guy provision.  Nor does it necessarily mean that a particular landlord is better able than a particular guarantor to bear the financial burden of a tenant's ability to pay rent.

*Melendez*, 16 F.4th at 1043.

While the Circuit gave the City the opportunity to bring forward evidence of a need analysis, or any investigative or empirical process whatsoever, outside merely relying "upon the pooled general knowledge of its members," *id*. at 1045, it has proven unable to do so on this record.  Thus, as in *Kavanaugh*, "[t]he omission of any need condition weigh[s] against the reasonableness of" the legislation substantially impairing contracts here.  295 U.S. at 61.

### 5.  The Guaranty Law Does Not Compensate Landlords for Unpaid Rent

Finally, the Second Circuit considered "the law's failure to provide for landlords or their principals to be compensated for damages or losses sustained as a result of their guaranties' impairment."  *Melendez*, 16 F.4th at 1045.  It emphasized that the moratorium upheld in *Blaisdell* "allowed a delinquent mortgagor to remain in possession of premises on the condition that he pay the mortgagee reasonable rent throughout the moratorium period," thus ensuring the mortgagee was "not left without compensation for the withholding of possession."  *Id*. at 1046–47 (quoting *Blaisdell*, 290 U.S. at 445).  The panel majority expressed that, such a compensation condition "was an important factor in identifying the mortgage moratorium in *Blaisdell* as a reasonable means to provide temporary and limited economic relief to mortgagors."  *Id*. at 1045–46.  So too, the "absence of a compensation requirement informed the identification of a Contracts Clause violation in *Kavanaugh*."  *Id*. (citing 295 U.S. at 61).

That said, the Circuit expressly cautioned that it was "not [] suggest[ing] that compensation is always necessary to defeat a Contracts Clause challenge," nor that such concern could not be "altered through discovery or supplemented by additional record evidence." *Id.* at 1046.  Rather, the court noted that "[t]he availability of other pandemic-related financial assistance to contracting parties may bear on the reasonableness of impairment without compensation, and [that] the parties may [] develop the record on this point further on remand." *Id.* at 1046 n.82.

The record now confirms that Plaintiff Bochner has been unable to recover unpaid rent amounts totaling approximately $110,000, and that, via another business account, he paid $35,000 in taxes for the property due July 1, 2020.  Dkt. 104, Ex. NN at 46.  As neither party disputes, the Guaranty Law itself provides no assistance to landlords like Bochner.  The City, however, argues that the Court should concentrate on the fact that Bochner did not pay property takes on 287 7th Avenue from a personal account, *see* Def. Mem. at 20 n.12, and that Plaintiff 7th Avenue was able to obtain a pandemic relief loan from the SBA, *see id.* at 24.  The City also emphasizes Plaintiffs were able to borrow from other successful business ventures, and that they "weather[ed] the pandemic" in other ways, including because the tenant left behind restaurant fixtures which were then leased along with the commercial space to a different restaurant in October 2020.  Def. 56.1 ¶¶ 102–03; Dkt. 104, Ex. NN 34:24–35:18, 55:17–18.

Such obfuscation is unavailing.  The fact remains that Plaintiffs here were damaged, to the tune of approximately $150,000, and have not been compensated—precisely the concern that the Second Circuit wanted the City to address on remand.  As to the SBA disaster loan, Bochner explained that it has not been forgiven, and that he must pay "four [or] five" percent interest until it is fully paid off.  Dkt. 104, Def. Ex. VV, at 46–47.

As with the City's failure to adduce record evidence addressing the Second Circuit's other

"serious concerns" regarding the Guaranty Law, the Court finds that the City has not meaningfully articulated a record-based position to conclude that the Law's lack of compensation to landlords like Plaintiff Bochner was a reasonable and appropriate means of advancing the legislation's purpose.  This factor therefore weighs in favor of a finding that the Guaranty Law violates the Contracts Clause.

*     *     *

In sum: the City has proven unable to provide record evidence to answer the "five serious concerns about [the Guaranty Law] being a reasonable and appropriate means to pursue the professed public purpose," as the Second Circuit instructed.  *Melendez*, 16 F.4th at 1047.  The Court thus concludes that the Law violates the Contracts Clause by rendering the guaranty clauses in Plaintiffs' commercial leases unenforceable for unpaid rent during the covered period, March 7, 2020 and June 30, 2021, and that Plaintiffs are entitled to summary judgment.

## CONCLUSION

Accordingly, Plaintiffs' motion for summary judgment is granted, and Defendants' motion for summary judgment denied.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 91, 101, and 109, and to close this case.

SO ORDERED.

Dated:    March 31, 2023
          New York, New York

_____
Hon. Ronnie Abrams
United States District Judge

33